UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

          **Plaintiff,**

v.

MICHELE LEONHART, in her
official capacity as Acting Administrator
of the Drug Enforcement Administration;      **Case No.** 1:08-CV-00635 (RMC)

DRUG ENFORCEMENT
ADMINISTRATION;

U.S. DEPARTMENT OF JUSTICE;

MICHAEL V. MUKASEY,
in his official capacity as the
Attorney General of the United States;
and

UNITED STATES OF AMERICA,

          **Defendants.**

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON COUNT THREE OF THE COMPLAINT

Plaintiff Novelty Distributors d/b/a Greenfield Labs ("Novelty"), by counsel and

pursuant to Fed. R. Civ. P. 56, hereby moves this Honorable Court for summary

judgment on the third cause of action in Novelty's complaint.  Novelty seeks a judgment

that during the course of executing a warrant at the Greenfield, Indiana headquarters of

Novelty, DEA agents—through the imposition of an unconstitutional prior restraint and

through an assault and battery on Novelty executive JR Merlau--violated Novelty's First

Amendment right to make a contemporaneous record of the warrant.

     As explained in the attached memorandum of points and authorities, there are no

genuine issues of material fact, and a declaratory judgment may be entered in Novelty's

favor forthwith as a matter of law.


                Respectfully submitted,

                NOVELTY, INC.


                By:_____/s/_____
                   Jonathan W. Emord (Bar No. 407414)
                   Andrea G. Ferrenz (Bar No. 460512)
                   Peter A. Arhangelsky

                Its Counsel

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Dated:  April 28, 2008

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,**<br><br><br>**Plaintiff,**<br><br>**v.**<br><br>**MICHELE LEONHART, Administrator,**<br>**UNITED STATES DRUG**<br>**ENFORCEMENT ADMINISTRATION;**<br>**et al.,**<br><br><br><br>**Defendants.** | **Case No.** 1:08-CV-00635 (RMC) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT ON COUNT THREE OF THE COMPLAINT**

JONATHAN W. EMORD
ANDREA G. FERRENZ
PETER A. ARHANGELSKY
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii

Table of Authorities ........................................................................................................... iii

Motion for Summary Judgment Standard ......................................................................... 1

Summary of Uncontested Material Facts ........................................................................... 1

The District Court Has Jurisdiction To Hear Novelty's Constitutional Challenge ............. 5

　　Standing ....................................................................................................................... 7

DEA Violated Novelty's First Amendment Right to Receive Information and Make a
Contemporaneous Record ................................................................................................. 8

Conclusion ...................................................................................................................... 20

## EXHIBITS & ATTACHMENTS

Attachment 1:  Plaintiff's Statement of Uncontested Material Facts

Exhibit 1 – Affidavit of Kenneth "JR" Merlau (Portions Marked Confidential)

Exhibit 2 – Testimony of JR Merlau

Exhibit 3 – Affidavit of Ryan Polk

Exhibit 4 – Testimony of Ryan Polk

Exhibit 5 – Warehouse Map of Novelty's Greenfield, Indiana Facilities (Confidential)

Exhibit 6 – Affidavit of Darrell Meador

Exhibit 7 – Administrative Warrant

Exhibit 8 – Affidavit of Mark Bledsoe (Novelty v. Tandy)

## TABLE OF AUTHORITIES

**Cases**

Alexander v. U.S., 509 U.S. 544, 550 (1993) ........................................................ 10, 16, 18

Allison v. State, 299 N.E.2d 618 (Ind. App. 1973)............................................................. 7

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)....................................................... 1

Anderson-Bay v. District of Columbia, 466 F.Supp. 2d 51 (D.D.C. 2006)........................ 7

Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221 (1987)..................................... 10

Bantam Books, Inc. v. Sullivan, 372 U.S. 58 (1963)..................................................... 9, 18

Belcher v. Mansi, 569 F.Supp. 379 (D.R.I. 1983) ...................................................... 12, 16

Bell v. Hood, 327 U.S. 678 (1946) ..................................................................................... 6

Bennett v. Spear, 520 U.S. 154 (1997) ............................................................................... 7

Board of Educ. v. Pico, 457 U.S. 853 (1982) ............................................................... 9, 16

Butler v. Michigan, 352 U.S. 380 (1957) .......................................................................... 16

Capital Cities Media, Inc. v. Chester, 797 F.2d 1164 (3d Cir. 1986) ............................... 11

Cirelli v. Town of Johnston School District, 897 F.Supp. 663 (D.R.I. 1995) .................. 12

City of Houston, Texas v. Hill, 482 U.S. 451 (1987) ....................................................... 16

City of Ladue v. Gilleo, 512 U.S. 43 (1994)..................................................................... 15

Elrod v. Burns, 427 U.S. 347 (1976) .................................................................................. 7

Fisher v. Carrousel Motor Hotel, Inc. 424 S.W. 2d 627 (Tex. 1967) ................................ 7

Fordyce v. City of Seattle, 55 F.3d 436 (9th Cir. 1995) ................................................... 12

Globe Newspaper Co. v. Superior Court for the County of Suffolk, 457 U.S. 596 (1982) 9

Greater New Orleans Broadcasting Assn., Inc. v. United States, 527 U.S. 173 (1999) ..... 8

Herbert v. Lando, 441 U.S. 153 (1979) ............................................................................. 11

Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952)......................................................... 9

King County v. Seattle School District No. 1, 263 U.S. 361 (1923) .................................. 6

Leathers v. Medlock, 499 U.S. 439 (1991) .......................................................... 9

Mills v. Alabama, 384 U.S. 214 (1966) .............................................................. 11

Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272
(D.C. Cir. 2005) ............................................................................................ 7

National Magazine v. U.S. Dept. of Defense, 762 F.Supp. 1558 (S.D.N.Y. 1991).......... 11

New York Times Co. v. U.S., 403 U.S. 713 (1971) ............................................... 9

Newson v. Norris 888 F.2d 371 (6th Cir. 1989) .................................................. 7

PDK Labs, Inc. v. Ashcroft, 338 F.Supp. 2d 1 (D.D.C. 2004) ................................. 1

Police Department of the City of Chicago v. Mosley, 408 U.S. 92 (1972) ..................... 16

Powell v. McCormick, 395 U.S. 486 (1969) ........................................................ 6

Procunier v. Martinez, 416 U.S. 396 (1974)........................................................ 16

Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980). .......................................... 9

Schenck v. United States, 249 U.S. 47 (1919)........................................................ 9

Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105
(1991)............................................................................................... 8, 10

Smith v. City of Cumming, 212 F.3d 1332 (11th Cir. 2000)..................................... 12, 15

Smith v. Daily Mail Pub. Co., 443 U.S. 97 (1979)................................................. 9

Stanley v. Georgia, 394 U.S. 557 (1969)........................................................ 13, 15

Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503 (1969) ......... 8

Trudeau v. FTC, 456 F.3d 178 (2006) ............................................................... 6

U.S. v. Playboy Entertainment Group, Inc., 529 U.S. 803 (2000)................................. 8

Vance v. Universal Amusement Co., Inc., 445 U.S. 308 (1980)................................. 9

Welsh v. Wisconsin, 466 U.S. 740 (1984)........................................................ 15

Whiteland Woods, LP v. Township of West Whitelan, 193 F.3d 177 (3d Cir. 1999)...... 12

Wilbur v. Harris, 53 F.3d 542 (2d Cir. 1995) ..................................................... 5

**Statutes**

21 U.S.C. § 2201 ............................................................................................................. 8

IND. CODE ANN. §10-403 (2008) ................................................................................... 7

U.S. CONST. amend I ...................................................................................................... 8

## Other Authorities

ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT
    (Harper & Brothers 1948) ...................................................................................... 16

ALEXANDER MEIKLEJOHN, POLITICAL FREEDOM:  THE CONSTITUTIONAL POWERS OF THE
    PEOPLE (Greenwood Press 1979) .......................................................................... 10

JAMES MADISON, 5 THE WRITINGS OF JAMES MADISON 370-80 (G. Hunt ed. 1904) ........ 11

Vincent Blasi, The Checking Value in First Amendment Theory, 1977 Am. Bar Found.
    Research J. 521 (1977) ......................................................................................... 10, 19

William J. Brennan, Jr. The Supreme Court and the Meiklejohn Interpretation of the First
    Amendment, 79 Harv. L. Rev. 1 (1965) .................................................................... 10

## Rules

Fed. R. Civ. P. 56 ............................................................................................................. 1

### I.  MOTION FOR SUMMARY JUDGMENT STANDARD

Fed. R. Civ. P. 56 states that summary judgment shall be granted if the pleadings,

depositions, answers to interrogatories, admissions on file, and affidavits show that there

is no genuine issue of material fact in dispute and that the moving party is entitled to

judgment as a matter of law.  See Fed. R. Civ. P. 56; see also PDK Labs, Inc. v. Ashcroft,

338 F.Supp. 2d 1, 5-6 (D.D.C. 2004).  Material facts are those "that might affect the

outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).

### II.  SUMMARY OF UNCONTESTED MATERIAL FACTS

On July 9, 2007, DEA investigators arrived at Novelty's Greenfield, Indiana

headquarters to execute an administrative search warrant.  See Novelty's Statement of

Uncontested Material Facts at ¶ 1 ("Novelty's Statement").  The search warrant issued

under a different case in the Federal District Court for the Eastern District of Indiana,

Novelty v. Keisler, 1:04CV-1502-DFH-TAB.  See Novelty Statement at ¶ 1.  At the time

the administrative warrant issued, Novelty had then pending in the United States District

Court for the District of Columbia, Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU),

a charge that DEA agent Darrell Meador had executed a false statement in an affidavit

filed by the DEA in that case.  See Novelty Statement Exhibit 4 at 1529-35, 2006-07,

2116-18 (Polk Testimony); Statement Exhibit 4 at 2221-22 (Merlau Testimony);

Statement Exhibits 1, 3 (Merlau and Polk Affidavits).[1]

---

[1] Meador's affidavit stated that he possessed evidence that Novelty intended to sell solid dosage form ephedrine containing over-the-counter drugs in two states, Kentucky and Tennessee, where only gelcap forms were legally saleable.  See Meador Affidavit at ¶ 17 (Exhibit 6).  The statement was false.  See Affidavit of Mark Bledsoe at 18-19 (Exhibit 8).  Novelty drew the false statement to the Court's attention.  Id.

While Darrell Meador was directly accused of submitting a false affidavit and before resolution of the charge, he nonetheless appeared at Novelty's headquarters on July 9, 2007, to participate in a search of Novelty's records.  Included within the broad scope of the warrant were documents that could, if they existed (which they did not), prove exculpatory of the charge against Meador.  Id. at ¶¶ 3-4.  Novelty became alarmed by the clear conflict of interest and apparent bias.  Id. at ¶ 2.  Meador possessed a personal interest in locating information that could vindicate him on the false affidavit charge yet was included as one of the DEA agents tasked to execute the warrant.  Id. at ¶ 5.  Moreover, Meador was not from the local DEA district office.  Rather, he was transported by DEA from the Washington headquarters for the task, another unusual development.  See Novelty Statement Exhibit 2 at 2222 (Merlau Testimony); Statement Exhibit 4 at 1529-30 (Polk Testimony).  Furthermore, DEA agents were accompanied by DEA counsel Brian Bayly, who was then representing DEA against Novelty in proceedings pending before the DEA and before the United States District Court for the District of Columbia, where before both he had represented that discovery was not allowed and, hence, the warrant appeared to be improperly used as a vehicle for discovery without leave of the ALJ at DEA or Judge Ricardo M. Urbina in the U.S. District Court for the District of Columbia.  Id. at ¶ 3-4.  At the outset of the warrant execution, DEA attorney Bayly gratuitously stated that the search warrant had nothing to do with the suits Novelty had recently filed against DEA in federal court, implying by raising the point with a gratuitous denial that, indeed, the execution of the warrant was retaliatory.  Id. at ¶ 4.

2

Novelty executives objected to the presence of both Meador and Bayly, voicing their concerns over both individuals' inherent conflicts of interest and personal biases. Id. at ¶ 3. Despite those objections, DEA did not remove the two individuals until three days thereafter into the five day inspection (and that only after Novelty's local counsel complained to DEA counsel Linden Barber in DEA's Washington office concerning the conflicts of interest and bias). Id.

Novelty executives permitted DEA full access to Novelty's facilities and assisted DEA in all of its requests. Id. at ¶ 2. To accommodate the inspection team, Novelty provided agents use of a 12 by 20 foot conference room as a workspace. Id. On Wednesday, July 11, 2007, DEA investigator Lisa Barnhill demanded that Novelty Chief Financial Officer Ryan Polk produce records totaling over 12,000 pages in volume within three hours, a physical impossibility, yet Novelty executive Polk began efforts to secure the required information in the format requested by Ms. Barnhill. Id. at ¶ 6. To meet DEA demands, Novelty's IT staff was required to construct new computer programming to produce the electronic records in an accommodating format. Id. While Novelty had the information within its databases, the requested data exceeded the file-size limitations for Novelty's Microsoft programs. Id.

While Polk scrambled to meet DEA's extraordinary production demand, DEA investigator Barnhill falsely accused him of "scrubbing documents," Id. at ¶ 7, and DEA agent Madeline Kuzma falsely accused Polk of "sanitizing documents." Id. Ms. Barnhill then sought compliance by threatening Novelty executives with arrest. Id. She falsely alleged that Polk was obstructing and impeding the investigation, then produced a code book and had him read the section that permits DEA to arrest those who obstruct and

impede the investigation.  She stated to him that it would not be Novelty's lawyers who would be arrested but, rather, Novelty's executives.  <u>See</u> Novelty Statement at ¶ 7. Barnhill also accused Polk of possessing a spent package of ephedrine from a methamphetamine user, upon finding a returned package in the secure caged facility that holds returns.  <u>See</u> Novelty Statement Exhibit 4 at 2010 (Polk Testimony).  From Barnhill's threat of arrest, Novelty executives believed they were at imminent risk of being arrested (despite the fact that no arrest was legally permissible under DEA's statutory and regulatory scheme based on the actual facts).  Indeed, Novelty executive Polk told Novelty executive Merlau shortly after being threatened with arrest that he anticipated DEA would in fact make an arrest.  <u>See</u> Novelt Statement Exhibit 4 at 1533 (Polk Testimony); Statement Exhibit 2 at 2223-24 (Merlau's testimony).

Given the unsettling nature of these encounters and the threat of arrest, Novelty executives conferred with outside counsel regarding the unusual and adversarial nature of the warrant execution.  <u>Id.</u> at ¶ 8.  Based on counsel's advice and their own perception of need, Novelty executives decided to make a contemporaneous record of the events transpiring.  <u>Id.</u> at ¶ 8.  Ryan Polk specifically testified that "we had an exchange about the threat of arrest (which I felt was completely without merit) . . . and I wanted to have some proof or documentation that what was happening was exactly what was ultimately going to come out about what happened that day . . .  I felt the best way to do that would be to document that through some form of media."  Novelty Statement Exhibit 4 at 2011 (Polk testimony).  At around noon on July 11, while agents vacated the conference room for lunch, Novelty executives installed a video-recorder on a tripod at the far end of the conference room.  <u>Id.</u>  Novelty executives placed the video-recorder in a location that did

not block ingress to or egress from the conference room and did not impede the working space of the room.  Id.  The video-recorder was set to record.  At around 1:15 PM July 11, Novelty executives discovered that DEA agents had unplugged the video-recorder and removed it to the outside hallway where it was left inoperable.  Id.

Novelty Vice President of Product Compliance Kenneth "JR" Merlau objected to DEA's removal of the video-recorder and reinstalled the camera in the presence of DEA investigators.  Id. at ¶ 9.  DEA agent Meador present in the conference room at the time rose from his chair at the conference room table, rapidly approached Merlau, and then forcibly removed the camera from Merlau's hands.  Id.  Meador then placed the video-recorder outside the conference room.  Although Merlau again raised objection to the violation of Novelty's right to record, Meador declared that DEA investigators would not permit Novelty to record.  Id.

Late afternoon on July 11, Merlau entered the conference room with a dictation audio-recording device.  Id. at ¶ 10.  Merlau depressed the record button and placed the audio-recorder on the conference table in plain view.  Id.  Novelty executives indicated they wished to have a recording of the events that included DEA's execution of the search and meetings held in the conference room between Novelty executives and DEA investigators.  Id.  Shortly thereafter Novelty executives discovered that DEA agents had dismantled the audio-recorder, removing the batteries and cassette tape, and placing the parts on the conference room table.  Id.

## III.  THE DISTRICT COURT HAS JURISDICTION TO HEAR NOVELTY'S CONSTITUTIONAL CHALLENGE

Novelty seeks declaratory relief in this Motion for Summary Judgment.  Novelty's constitutional challenge does not seek administrative remedies or review of an action

under the Administrative Procedure Act and, thus, no exhaustion of administrative remedies is required.  See Wilbur v. Harris, 53 F.3d 542, 544-45 (2d Cir. 1995) (exhaustion not required for First Amendment constitutional claim).  Novelty has no administrative procedure to pursue.  By denying Novelty the right to record the execution of the warrant, DEA deprived Novelty of its First Amendment rights through the imposition of an unconstitutional prior restraint.  Novelty seeks recognition by this Honorable Court that a United States agent acting under color of his authority violated Novelty's First Amendment rights.  The declaration is critical to ensure that the First Amendment violation by DEA agents does not recur.  As a registrant, Novelty must be secure in the knowledge that its rights are protected during any future DEA investigatory or enforcement action.

This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331; see also Trudeau v. FTC, 456 F.3d 178 (2006).  "It has long been held that a suit 'arises under' the Constitution if a petitioner's claim 'will be sustained if the Constitution . . . [is] given one construction and will be defeated if [it is] given another."  Powell v. McCormick, 395 U.S. 486, 512 (1969) (citing Bell v. Hood, 327 U.S. 678, 685 (1946)); see also King County v. Seattle School District No. 1, 263 U.S. 361, 363-364 (1923).  Novelty raises a Constitutional claim for the violation of its First Amendment right to receive information and make a public record of the unreasonable execution of a warrant.  Novelty's claim thus "arises under the Constitution" as required by 28 U.S.C. § 1331, and this Court has original jurisdiction over the claim.

### A.    Standing

A plaintiff bringing a constitutional challenge must demonstrate Article III standing before this court.  See Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1287 (D.C. Cir. 2005).  Article III standing requires (1) an injury in fact, (2) that the injury is fairly traceable to the actions of the defendant, and (3) that the injury will likely be redressed by a favorable decision."  Bennett v. Spear, 520 U.S. 154 (1997).  Novelty and its executives suffered a deprivation of their constitutional rights.  Those rights were deprived when DEA refused to allow videorecording on July 11, 2007, and when DEA agent Meador forcibly removed the videocamera from Novelty executive Merlau's hands that day through an assault and battery.[2]  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes

_____

[2] See IND. CODE ANN. §10-403 (2008) (assault and battery).  Merlau testified that agent Meador forcibly removed the videorecorder from his hands.  Novelty Statement Exhibit 2 at 2389-93 (Merlau Testimony).  The elements of an assault and battery are:  "(1) the unlawful touching, (2) of another human being, (3) in a rude, insolent, or angry manner."  See Allison v. State, 299 N.E.2d 618, 621 (Ind. App. 1973).  Under federal law, "battery 'is an intentional act that causes a harmful or offensive bodily contact.'" Anderson-Bay v. District of Columbia, 466 F.Supp. 2d 51, 68 (D.D.C. 2006) (internal citations omitted).  JR Merlau testified that agent Meador placed him in apprehension of imminent harmful or offensive physical contact when he forcibly removed the camera.  See Novelty Statement at ¶ 9; Statement Exhibit 2 at 2389-93 (Merlau Testimony): "[Meador] was moving quickly enough so that I did think that he might hit me. . . He came and forcibly took [the camera] out of my hands.  I would not say that it was a tug of war.  I wasn't going to duke it out with somebody.  But I mean it was something that he removed from my hands."  Id.; see Fisher v. Carrousel Motor Hotel, Inc. 424 S.W. 2d 627, 629 (Tex. 1967) (actual physical contact is not necessary to constitute a battery so long as there is contact with clothing or an object closely identified with the body; Fisher defendant battered plaintiff by smacking plate from plaintiff's hand); Impson v. State, 721 N.E.2d 1275, 1285 (Ind. App. 2000) (upholding a battery when defendant knocked person's glasses off by a light smack that did not touch the face).

irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Newson v. Norris 888 F.2d 371, 378 (6th Cir. 1989) ("The Supreme Court has unequivocally admonished that even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify [] relief"). Novelty has thus suffered a rights violation, an injury under Article III standing analysis. DEA agents acting under color of federal law brought this constitutional deprivation upon Novelty. But for DEA's actions Novelty would not have suffered a loss of rights.

Novelty's injury is redressible by a favorable decision from this Court. Under 21 U.S.C. § 2201, this Court may grant declaratory relief that has the "force and effect of a final judgment or decree." 21 U.S.C. § 2201 (a). This Court can vindicate Novelty's legal rights with the declaration Novelty now requests. As such, a final judgment from this court redresses Novelty's constitutional injury.

## IV. DEA VIOLATED NOVELTY'S FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION AND MAKE A CONTEMPORANEOUS RECORD

The First Amendment of the United States Constitution prohibits government action "abridging the freedom of speech, or of the press.." U.S. CONST. amend I. The freedoms protected by the First Amendment are fundamental rights, subject to government restriction only in the most extraordinary circumstances. See U.S. v. Playboy Entertainment Group, Inc., 529 U.S. 803, 816-17 (2000). "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." Id. at 816 (citing Greater New Orleans Broadcasting Assn., Inc. v. United States, 527 U.S. 173 (1999)); see also Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 509 (1969) ("[T]he state bears the burden of justifying its

restrictions . . .").  Thus, government can abridge the freedoms protected by the First

Amendment only upon compelling need and proof that there exists no less speech

restrictive alternative to accomplish the government objective.  Simon & Schuster, Inc. v.

Members of New York State Crime Victims Bd., 502 U.S. 105, 115-116 (1991).

Government restrictions based on the specific expression or content of speech are

presumptively inconsistent with the First Amendment.  Id. at 115 (applying strict scrutiny

to content-based regulation).  Actions that target specific speakers are content-based and

presumptively invalid.  Id.; see also Leathers v. Medlock, 499 U.S. 439 (1991) (specific

tax targeted small group of speakers).  Actions that prevent recordation of newsworthy

events are unconstitutional prior restraints on freedom of speech and press.  See, e.g.,

New York Times Co. v. U.S., 403 U.S. 713 (1971) (Pentagon papers case); Globe

Newspaper Co. v. Superior Court for the County of Suffolk, 457 U.S. 596 (1982); Board

of Education v. Pico, 457 U.S. 853 (1982); Richmond Newspapers, Inc. v. Virginia, 448

U.S. 555 (1980).

　　　The imposition of a prior restraint, as in this case, is anathema to the core principles

protected by the First Amendment.  See Bantam Books, Inc. v. Sullivan, 372 U.S. 58

(1963); see generally, Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952); Vance v.

Universal Amusement Co., Inc., 445 U.S. 308 (1980); Smith v. Daily Mail Pub. Co., 443

U.S. 97 (1979).  The Government may not prohibit the exercise of First Amendment

freedoms through prior restraint except in the most exceptional circumstances, such as

when the national security would be placed in imminent peril through release of the

information.  See Near v. State of Minnesota ex. Rel. Olson, 283 U.S. 697 (1931); New

York Times Co. v. United States, 403 U.S. 713 (1971); Schenck v. United States, 249

U.S. 47 (1919).  Those circumstances do not apply here wherein Novelty merely sought to record for itself, its counsel, and the public DEA agents actions during the course of the execution of a warrant.  Prior restraints are presumptively unconstitutional.  See Bantam Books, 372 U.S. at 70 (collecting cases).

DEA's agents limited Novelty's rights because of the content Novelty sought to record.  DEA did not want a videorecording made of their actions during warrant execution. For purposes of Novelty's First Amendment claim, therefore, the government must survive the strictest scrutiny for its incursion of Novelty's rights because its actions were obviously content-based.  See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd., 502 U.S. 105, 115-16 (1991) (government restrictions based on the specific expression or content of speech are presumptively invalid).  Its actions cannot survive because the Government has no compelling interest in preventing its officers from being recorded when they execute a search warrant in a private business establishment under these circumstances.  Moreover, although the recording devices were intentionally placed to avoid obstructing agent access to materials and to ingress and egress (Novelty Statement at ¶ 8), the non-speech restrictive alternative of causing the recorders to be located elsewhere in the room was available to the agents but they chose to remove the devices entirely from their presence, dismantling them while doing so.  See Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 231-32 (1987) (content based suppression of speech unconstitutional in the absence of a compelling state interest and in the presence of non-speech suppressive less restrictive alternatives).

The First Amendment's "checking value" is one of its core purposes.  See Vincent Blasi, The Checking Value in First Amendment Theory, 1977 Am. Bar Found. Research

J. 521 (1977); ALEXANDER MEIKLEJOHN, POLITICAL FREEDOM: THE CONSTITUTIONAL

POWERS OF THE PEOPLE (Greenwood Press 1979); William J. Brennan, Jr. The Supreme

Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv. L. Rev. 1

(1965); see also Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1184-86 (3d Cir.

1986) (discussing "checking value" of First Amendment); National Magazine v. U.S.

Dept. of Defense, 762 F.Supp. 1558, 1572 (S.D.N.Y. 1991) (same); Herbert v. Lando,

441 U.S. 153, 185 n.4 (1979) (discussing application of "checking value"); Mills v.

Alabama, 384 U.S. 214, 219 (1966) (stating "[T]he press serves and was designed to

serve as a powerful antidote to any abuses of power by governmental officials . . .

Suppression of the right of the press to praise or criticize governmental agents and to

clamor and contend for or against change . . . muzzles one of the very agencies the

Framers of our Constitution thoughtfully and deliberately selected to improve our society

and keep it free").   In advocating the First Amendment, the founding fathers aimed to

ensure that private citizens could check abuses of power by government men and

measures.  See JAMES MADISON, 5 THE WRITINGS OF JAMES MADISON 370-80 (G. Hunt

ed. 1904); see also Capital Cities Media, 797 F.2d at 1184 (discussing James Madison's

foundational contribution to checking value theory).  A central role of the First

Amendment is to permit recordation and publication of instances of abuse of power

because that has the salutary effect of keeping government agents honest.  See supra

Blasi.

Faced with threats of arrest, false charges of document scrubbing and sanitizing,

demands for production of 12,000 pages of documents in the span of three hours, and

false charges of harboring a spent ephedrine product received from a methamphetamine

11

user, Novelty's executives were reasonable in asserting their right to make a video record of the events occurring on Novelty premises.  The courts have upheld videotaping of investigations against private parties by government agents.  See, e.g., Robinson v. Fetterman, 378 F.Supp. 2d 534 (E.D.Pa. 2005) (First Amendment right to videotape police investigation from private land); Whiteland Woods, LP v. Township of West Whitelan, 193 F.3d 177, 184 (3d Cir. 1999) (First Amendment right to have some record of government hearing even though videotape ban was permissible); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) ("First Amendment protects the right to gather information about what public officials do on public property . . ."); Fordyce v. City of Seattle, 55 F.3d 436, 439 (9th Cir. 1995) (acknowledging First Amendment right to film matters of public interest); Cirelli v. Town of Johnston School District, 897 F.Supp. 663, 665 (D.R.I. 1995) (government employee had right to videotape school conditions); Belcher v. Mansi, 569 F.Supp. 379, 381-82 (D.R.I. 1983) (right to tape record school committee meeting).

Novelty's case is similar to the issue presented in the District Court for the Eastern District of Pennsylvania in Robinson v. Fetterman.  See Robinson, 378 F.Supp. 2d at 538-39.  Robinson believed police officers were conducting truck inspections in an unsafe manner alongside State Route 41.  Id.  To make a visual record of the events, Robinson obtained permission from an adjacent landowner and proceeded to videotape police officers from a distance of approximately 20 to 30 feet.  Id.  Police officers confronted Robinson and ultimately seized his video camera when he refused to stop taping.  Id.  Officers subsequently arrested Robinson under a state harassment law.  Id. at 540.  Robinson pursued his constitutional claim under Section 1983 and the Court held

that Robinson had an unconditional First Amendment right to make a visual record.  Id.

at 541.

Significantly, the court noted that Robinson's motives for videotaping were

immaterial.  Id.  "Although Robinson need not assert any particular reason for

videotaping the troopers, he was doing so in order to make a visual record of what he

believed was the unsafe manner in which they were performing their duties."  Id.  Citing

Supreme Court precedent, the Robinson court held, "[v]ideotaping is a legitimate means

of gathering information for public dissemination and can often provide cogent evidence,

as it did in this case.  In sum, there can be no doubt that the free speech clause of the

Constitution protected Robinson as he videotaped the defendants. . ."  Id. (citing Stanley

v. Georgia, 394 U.S. 557, 564 (1969)).[3]

Like the plaintiff in Robinson, Novelty believed government officials acted

improperly and Novelty executives sought video (and later audio) record the events

taking place.  They intended to use the recording in potential legal proceedings that in

fact materialized and they intended to make the recordings public.  Novelty Statement at

¶ 8.  A record of the unusual circumstances was necessary to help Novelty counsel

evaluate the legality of DEA agents' actions; it was essential to protect Novelty

executives during future inspections resulting from the unreasonable search; and it was

the only means to provide the public with knowledge of DEA's conduct.  Novelty

executives, like the plaintiff in Robinson, were deprived of their ability to produce a

---

[3] The Robinson court also acknowledged that "to the extent that the troopers were restraining Robinson from making any future videotapes and from publicizing or publishing what he had filmed, the defendants' conduct clearly amounted to an unlawful prior restraint upon his protected speech."  Robinson, 378 F.Supp. 2d at 541; see infra at 14.

contemporaneous video and audio record as guaranteed by the First Amendment of the United States Constitution. See Robinson, 378 F.Supp. 2d at 541.

On three occasions Novelty executives attempted to install recording devices and on all three were denied the right to do so by DEA agents. See Novelty Statement at ¶¶ 8-10. DEA ignored Novelty's objections, including an assertion by Novelty executive Merlau that he possessed a constitutional right to record the events. Id. DEA physically prevented Novelty from making its record. Id. On one occasion, DEA agent Meador went so far as to commit an assault and battery to enforce DEA's decision to disallow videotaping: "grabbing" the video-recorder straight from the hands of Merlau, removing it from the conference room. Id. at ¶ 9. Novelty's final attempt to audio-record was thwarted when DEA physically dismantled the audio recording device rendering it inoperable. Id. at ¶ 10.

DEA cannot rationally argue that the recording process would have impaired its agents' search. The uncontroverted testimonial record establishes that the video and audio recording equipment was located in a manner that did not obstruct access to documents or ingress to or egress from the conference room. Novelty Statement at ¶ 8. The video-recorder consumed only a small section of the conference room and Novelty purposefully stationed the recorder in a manner not to interfere with working use of the room. Id. at ¶ 8. The tripod did not block ingress to or egress from the room, nor did it obstruct access to documents. Id. Similarly, the small diction audio-recorder could not possibly have impaired the agents' ability to carry out their investigative functions. Agents raised no substantive objections to the precise location of the recording devices; they simply demanded that they not be recorded at all. Novelty Statement at ¶ 8.

14

In the matter *sub judice*, government agents abused their authority while behind closed doors on private property. In the presence of a warrant, Novelty executives were not at liberty to refuse the agents entry or access to documents. The law consistently affords greater protection to the activities of owners while on private property. See, e.g., Welsh v. Wisconsin, 466 U.S. 740, 750 n.11 (1984) (Fourth Amendment affords greater protection to home in context of warrantless searches). "A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to speak there." City of Ladue v. Gilleo, 512 U.S. 43, 58 (1994) (analyzing right to display political signs on private property) (internal citations omitted). "If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." Stanley, 394 U.S. at 565 (discussing increased protections of First Amendment in private space). Although Novelty's business headquarters is less private than one's home, it is more private than a public street corner and yet the law has protected recording of government actions from public and private properties. See Robinson, 378 F.Supp. 2d at 539 (videotape from private property); Smith v. City of Cumming, 212 F.3d at 1333 (public property). The public has an even greater need for government transparency when agents encroach on the boundaries of private property where their actions may occur without public scrutiny. Therefore, rights afforded citizens on a public highway must be no less than equally applicable to Novelty executives on their own privately owned property when it comes to the entry of government agents upon those grounds to execute a warrant.

15

DEA prevented videorecording because it did not want a record of the content of its investigation.  DEA has no statutory or regulatory grant of authority to its agents to prevent video-recording of the execution of a warrant nor could DEA constitutionally. The <u>Robinson</u> court instructed that the videotaping party's motives are immaterial, as the videographer has the right to tape without regard to purpose.  <u>See</u> <u>Robinson</u>, 378 F.Supp. 2d at 541 ("Robinson need not assert any particular reason for videotaping the troopers . . .").   DEA agents are not justified in censoring First Amendment freedoms on the grounds that the presence of a videorecorder or audiorecorder inconvenienced them, annoyed them, or caused them to feel unrest.  <u>See</u> <u>City of Houston, Texas v. Hill</u>, 482 U.S. 451, 462 (1987) (analyzing verbal criticism of police officers).  In <u>Hill</u>, the Court held that mere "inconvenience, annoyance, or unrest" were insufficient reasons to preclude protected speech.  <u>Id</u>   <u>See</u> also <u>Belcher v. Mansi</u>, 569 F.Supp. 379, 385 (D.R.I. 1983).  "If officials were to grant or deny indulgences on the basis of the content of the speech (or in this case, the content of the listening), they would undermine the nation's commitment to the 'equality of status in the field of ideas.'"  <u>Id.</u> (quoting <u>Police Department of the City of Chicago v. Mosley</u>, 408 U.S. 92, 96 (1972)).  The paramount First Amendment checking value cannot be overridden because government agents dislike being made to account for their actions.   Making government agents accountable for their actions is central to the First Amendment's checking value and has long been lauded as indispensable to its proper functioning.  <u>See</u> ALEXANDER MEIKLEJOHN, FREE SPEECH AND ITS RELATION TO SELF-GOVERNMENT (Harper & Brothers 1948); <u>Board of Educ. v. Pico</u>, 457 U.S. 853, 867 n.20 (1982); <u>see</u> <u>also</u> <u>Butler v. Michigan</u>, 352 U.S. 380, 383-384 (1957); <u>Procunier v. Martinez</u>, 416 U.S. 396, 408-409 (1974).

The exercise of power in this case allowed DEA "to chill [plaintiffs] in the exercise of their protected rights to freedom of speech, freedom of association and freedom of the press." Belcher, 569 F.Supp. at 381.  In Belcher, the District Court for the District of Rhode Island analyzed whether the plaintiff had a constitutionally protected right to tape record school committee meetings without express knowledge and consent of the committee.  Id. at 380.  Although the decision ultimately turned on state law, the court acknowledged that the state action was "plainly enmeshed with the federal constitutional claims" and proceeded to award attorneys' fees under the federal statute. Id. at 386 n.10.  The court believed the state law was imbued with federal constitutional underpinnings in that "two salient First Amendment values—the public's right to know and the accountability of public institutions—are the core of the [state] Act." Id. at 382. Defendants' prohibition of tape recording did not cause substantial injury, but the Rhode Island District Court nevertheless held:

> While the vice practiced by the defendants in the case at bar seems somewhat mild, vigilance in the assiduous protection of the rights of citizen is necessary in response to any unwarranted decurtation of those rights—mild or odious.  So here:  if the public's twin rights, to know and to expect that the institutions of government will be accountable, are to be safeguarded, they deserve to be protected against all impermissible incursions as devastation can result as effectively from the combined effect of multiple pinholes in the dike as from the blasting of a single major cavity.

Id. at 385-86.

DEA's behavior chilled Novelty executives' First Amendment rights not only because they demanded the videotaping and audiotaping cease entirely in the presence of the warrant but also because they had threatened Novelty executives with arrest despite an absence of lawful grounds, thus creating an environment in which Novelty executives

were intimidated and fearful of the further abusive use of power if they persisted with the exercise of their First Amendment rights.  <u>See</u> Novelty Statement at ¶ 7.

      Novelty executives desired to record, but believed future attempts were certain to result in DEA sanction.  <u>See</u> Novelty Statement at ¶ 11; Statement Exhibit 2 at 2375, 2379 (Merlau Testimony).  On July 12, DEA agents observed a Novelty employee with a video-recorder and refused to continue the search.  <u>See</u> <u>id.</u>  An agent swore at Novelty executive JR Merlau for again attempting to record and then rapidly departed the Novelty facility.  <u>Id.</u>  Fearing adverse consequences from DEA, Novelty did not thereafter try to record, particularly because its executives were on notice of the earlier threat of arrest. <u>Id.</u>  This decision resulted from DEA's virtual ultimatum which in effect forced Novelty to either stop recording or potentially face punishment for impeding the investigation. Ironically, the recording was a response to DEA's threat of arrest among other abuses and yet it was the threat of arrest that ultimately caused Novelty to fear continued videotaping.  <u>Id.</u> at ¶¶ 7-8.  One cannot discount the fact that Novelty is a regulatee of the DEA and can be inspected at any time; thus, so long as Novelty remained a regulatee, it would have to face DEA agents in future and, so, could not escape recurrence of the same rights violations or of potential agency retaliation for taking an action to which the DEA agents vehemently objected.

      The agents' declaration that they would not permit videorecording was a blanket restraint applicable to present and future attempts.  "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur."  <u>Alexander v. U.S.</u>, 509 U.S. 544 (1993) (RICO case discussing prior restraint in context of "expressive

activities"). Prior restraints appear before the Court "bearing a heavy presumption against constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).

Novelty's purpose in recording was to preserve a record of unreasonable, abusive government conduct in the execution of a warrant, which conduct occurred principally on Monday through Wednesday, July 9 to 11 while DEA agent Darrell Meador, who had a personal stake and conflict of interest in executing the warrant in light of a false statement charge then pending against him in this Court, remained present on site. See Novelty Statement at ¶¶ 3, 5. When Novelty's local counsel objected to the conflict of interest and bias of Meador and DEA counsel Bayly, DEA counsel Linden Barber caused Meador and Bayly to be removed. See Novelty Statement at ¶ 3.

DEA agents slipped underneath the public eye by precluding any record of their behavior. Novelty is greatly impaired in its ability to inform the public of the injustices suffered behind closed doors in its Greenfield, Indiana facility because of the prior restraint imposed on its contemporaneous recording.

Knowledge in the public of government affairs has long been a central underpinning of the First Amendment. James Madison wrote, "A popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And the people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Writings of James Madison 103 (G. Hunt ed. 1910); See Blasi, supra at 9 (and related citations First Amendment's "checking value").

19

**CONCLUSION**

For the foregoing reasons, Novelty respectfully requests that this Honorable Court grant Novelty's Motion for Summary Judgment with respect to Count Three in Novelty's complaint, issuing a declaration that during the course of DEA's investigation of Novelty on July 9 to July 11, DEA violated Novelty's First Amendment right to record the actions of the DEA's agents then executing a warrant.

Respectfully submitted,

NOVELTY, INC.,

By: _____/s/_____
      Jonathan W. Emord
      Andrea G. Ferrenz
      Peter A. Arhangelsky
      Attorneys for Plaintiff

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com
Dated: April 28, 2008

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,**<br><br><br><br>           **Plaintiff,**<br><br>**v.**<br><br>**MICHELE LEONHART, Administrator,<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION;<br>et al.,**<br><br><br><br>           **Defendants.** | **Case No.**<br><br>1:08-CV-00635 (RMC) |

<u>**PLAINTIFF'S STATEMENT OF UNCONTESTED MATERIAL FACTS**</u>

      Plaintiff, by counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), hereby submits its statement of material facts as to which there is no genuine issue.

      1.     On July 9, 2007, DEA investigators arrived unannounced at Novelty Inc.'s Greenfield, Indiana facilities to execute an administrative search warrant.  <u>See</u> Affidavit of Kenneth "JR" Merlau at 10, ¶ 34 ("Merlau Affidavit"), Attached as Exhibit 1; Affidavit of Ryan Polk at 2, ¶ 5 ("Polk Affidavit"), Attached as Exhibit 3; Transcript at 2215-26, 1511-15, 1529-36, 2022-33.  The warrant issued under a matter in the Federal District Court for the Eastern District of Indiana, <u>Novelty v. Keisler</u>, 1:04CV-1502-DFH-TAB.  DEA agents occupied Novelty's facilities for five consecutive days.  <u>See</u> Merlau Affidavit at 10, ¶ 34; Merlau Transcript at 2215-26.

2.      Novelty allowed DEA full access to its facilities, offered assistance with all DEA requests, and provided DEA use of a conference room during the warrant execution.  See Merlau Affidavit at 11, ¶ 35; Polk Transcript at 2088-89; see also Novelty Warehouse Map (Exhibit 5) (Conference room located in area designated "Main Office'); Merlau Transcript at 2270 (identifying location of office).

3.      On the first day of the inspection, Novelty executives became concerned of undue bias in the investigation.  See Merlau Affidavit at 11, ¶ 36.  DEA counsel Brian Bayly arrived from the DEA Washington, D.C. office.  Id.; Polk Affidavit at 2, ¶ 5. Bayly was then acting counsel for DEA against Novelty in a DEA administrative proceeding then pending before DEA and was involved with another matter brought by Novelty against DEA in the United States District Court for the District of Columbia. See Merlau Affidavit at 11, ¶ 36; Polk Affidavit at 2, ¶ 5.  Also present from the DEA Washington, D.C. office was Darrell Meador, an investigator accused of submitting a false affidavit against Novelty in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU), involving related factual issues then pending before the U.S. District Court for the District of Columbia.  See Merlau Affidavit at 11, ¶ 36; Polk Affidavit at 2, ¶ 5; Merlau Transcript at 2221-22; Polk Transcript at 1529-35, 2006-07, 2116-18.  At the outset of the investigation, Novelty objected vehemently to the presence of Bayly and Meador because of their involvement in proceedings against Novelty and Meador's pending false statement charge (both present from DEA's Washington, D.C. office rather than from DEA's Indianapolis district office) to involve a conflict of interest and to be evidence of bias.  See Merlau Affidavit at 11, ¶ 36; Polk Affidavit at 2, ¶ 5.  Despite Novelty's objection, both remained on site for three days to aid in the execution of the

warrant.  See Polk Affidavit at 2, ¶ 5; Polk Transcript at 1529-35, 2006-07, 2116-18.

Thereafter, when Novelty's local counsel objected to the conflict of interest and bias to

DEA counsel Linden Barber, Barber caused Bayly and Meador to be removed.  See

Merlau Transcript at 2216.

4.      The statutory provision governing execution of the warrant in question

requires that execution be performed reasonably.  See 21 U.S.C. § 880 (b) (3) (B) ("to

inspect, within reasonable limits and in a reasonable manner, controlled premises. . .").

The warrant itself also included this restriction.  See Administrative Search Warrnat at 1

(Exhibit 7).  While executing the warrant, DEA agents acted unreasonably.  See Merlau

Affidavit at 11, ¶ 37.  First, DEA counsel Brian Bayly then representing DEA in

litigation against Novelty gratuitously stated at the start of the investigation that the

execution of the warrant was not in response to Novelty's filing suit against DEA.  See

Merlau Affidavit at 11, ¶ 37; Merlau Transcript at 2216.

5.      DEA investigator Darrell Meador then accused by Novelty in the U.S.

District Court for the District of Columbia of submitting a false affidavit (see Meador

Affidavit, Exhibit 6) was permitted to execute the warrant which, based upon its breadth,

would allow him to perform personal discovery to identify any evidence that might prove

exculpatory of the charge against him, thereby revealing a bias and personal interest.  See

Merlau Affidavit at 11, ¶ 37; Merlau Transcript at 2217.   In his affidavit, Meador falsely

accused Novelty of having an intent to sell illegally tablet form ephedrine and

pseudoephedrine containing over-the-counter drugs in states that limit sales only to

gelcap forms.  See Exhibit 6 (Affidavit of Meador).  In fact, Novelty never sold and never

intended to sell tablet form ephedrine and pseudoephedrine in gelcap states and the

evidence upon which Meador relied for the charge did not establish a foundation for the accusation.  See Exhibit 1 (Affidavit of Merlau).

6.    On Wednesday, July 11, 2007, DEA investigator Lisa Barnhill demanded that Novelty produce over 12,000 pages of documents in a format she specified within three hours.  See Polk Affidavit  2-3, ¶ 6; Polk Transcript at 1513, 2095-99.  The task was physically impossible in the time allotted.  Id.  Barnhill's demand required Novelty construction of new computer programming to produce the electronic records in a format suitable to DEA's request.  Id.  While the data existed in Novelty's normal business records, the request was beyond the capabilities of Microsoft software.  Id.

7.    DEA investigator Lisa Barnhill falsely accused Novelty Chief Financial Officer Ryan Polk of "scrubbing documents," and DEA agent Madeline Kuzma falsely accused Mr. Polk of "sanitizing documents."  See Polk Affidavit at 3, ¶ 7; Polk Transcript at 1534-35; see also Merlau Affidavit at 12, ¶ 37; Merlau Transcript at 2222-25.  DEA agent Barnhill threatened to arrest a Novelty executive.  See Polk Affidavit at 3, ¶ 7; Polk Transcript at 1534-35.  Upon her baseless accusation that Polk sanitized documents, agent Barnhill handed Polk a codebook and accused him of obstructing the inspection.  See Polk Transcript at 1531.  Barnhill instructed Polk to read a codebook section that detailed DEA's authority to arrest under certain circumstances.  Id.  Barnhill then told Polk that "it won't be one of your attorneys that are arrested.  It will be a Novelty employee."  Id.  Polk was under the impression that he would be arrested if he did not produce the documentation within three hours from Barnhill's demand.  Id. at 1533.  Ryan Polk later discussed the threat of arrest with JR Merlau before Novelty determined to video-record the warrant execution.  See Merlau Transcript at 2223-24

4

(noting Polk was "very upset").  DEA agent Barnhill falsely stated that an empty product container inside Novelty's caged, secured scheduled listed chemical product warehouse was likely left over from a methamphetamine user.  Polk Transcript at 2010.

8.      Novelty executives conferred with outside counsel concerning the unusual events of and threats during the warrant execution.  See Merlau Affidavit at 12, ¶ 38. Based on counsel's advice, at around noon on Wednesday, July 11, Novelty Vice President of Product Compliance Kenneth "JR" Merlau installed a video-recorder on a tripod to record what transpired.  See Merlau Affidavit at 12, ¶ 38; Merlau Transcript at 2215-2222.  He did so to obtain a full record of the warrant execution for use by counsel and for the public.  See Merlau Transcript at 2221-26.  The video recorder occupied approximately 3 square feet at the end of a 12 by 20 foot room so as not to block ingress, egress, or DEA access to documents.  See Polk Transcript at 2011-12; Merlau Transcript at 2271.  DEA agents removed the video-recorder from the room.  See Merlau Affidavit at 12, ¶ 38; Merlau Transcript at 2215-22  Novelty executive Merlau objected to the removal of the video-recorder.  Id.  Over the objection, DEA agents stated that they would not allow themselves to be videotaped.  Id.; see also Polk Transcript a 2014.

9.      Later on Wednesday, July 11, Novelty executive Merlau entered the conference room in the presence of DEA agents and again assembled the video-recorder on the tripod and connected the power cord into the wall socket.  See Merlau Affidavit at 12, ¶ 39.  DEA agent Meador proceeded rapidly from a chair at the conference table to Merlau.  Id. at 13, ¶ 39; Merlau Transcript at 2388-2393.  Meador grabbed the video-recorder from Merlau's hands, pulled the electrical cord from the wall socket, and removed the video-recorder from the room.  Id.  Merlau protested that Meador had no

lawful authority to prevent the videotaping to no avail.  <u>Id.</u>; Merlau Transcript at 2219-20.

10.     Later Wednesday afternoon, near the close of business, Merlau entered the conference room again, this time with a dictation audio-recorder.  <u>See</u> Merlau Affidavit at 13, ¶ 40.  Merlau began recording and placed the audio-recorder on the conference table in plain view.  <u>Id.</u>; Merlau Transcript at  2220.  As Merlau departed from the conference room he observed DEA agents dismantle the audio-recorder.  <u>See</u> Merlau Transcript at 2378.  Novelty executives returned later that afternoon to meet with DEA agents and found the recorder dismantled on the table.  <u>See</u> Merlau Affidavit at 13, ¶ 40; Merlau Transcript at 2220-21; <u>see</u> <u>also</u> Polk Affidavit at 3-4, ¶ 8; Polk Transcript 2020-22.

11.     Novelty executives eventually stopped their attempts to video-record DEA because they feared DEA would consider them noncompliant and were aware of the earlier threats of arrest which had not been retracted.  <u>See</u> Merlau Transcript at 2375, 2223-24; Polk Transcript at 1531 (threat of arrest).  On Thursday, July 12, DEA agents swore at Novelty executives and departed the facility when Merlau again demonstrated that he intended to videotape the events of the search.  <u>See</u> Merlau Transcript at 2379.  Novelty executives still desired to video-record the warrant execution but DEA's prior three denials created an ongoing perception that Novelty could not videotape, would be prevented from videotaping.  <u>See</u> Merlau Transcript at 2379.  Moreover, they remained conscious of the threat of arrest and feared, based on DEA reactions, that an arrest would be made.  Merlau Transcript at 2375 (fear of noncompliance); Polk Transcript at 1531-35 (threat of arrest).

Respectfully submitted,

NOVELTY, INC.


By: _____/s/_____
           Jonathan W. Emord
           Andrea G. Ferrenz
           Peter A. Arhangelsky

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938f
jemord@emord.com

Dated:  April 28, 2008

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,<br><br>     **Plaintiff,**<br><br>**v.**<br><br>MICHELE LEONHART, Administrator,<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION;<br>et al.,<br><br>     **Defendants.** | **Case No.** 1:08-CV-00635 (RMC) |

ORDER

Following the Court's consideration of the Plaintiff's Motion for Summary

Judgment on Count III of the Complaint and all exhibits thereto and consideration of the

Defendant's Opposition thereto and Plaintiff's reply thereto, the Court **HEREBY**

**ENTERS THE FOLLOWING JUDGMENT ON THE MERITS.** The Court

**DECLARES** THAT:

1.  The Drug Enforcement Administration through its agents (collectively "DEA")

  violated the First Amendment to the United States Constitution when in July

  2007 DEA denied Novelty executives through a prior restraint and through the

  commission of an assault and battery the opportunity to video-record and audio-

  record in an unobtrusive manner the execution of an administrative warrant at

  Novelty's headquarters in Greenfield, Indiana.

IT IS SO ORDERED this _____ day of _____, 200__

_____
ROSEMARY M. COLLYER
UNITED STATES DISTRICT
COURT JUDGE

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

                    **Plaintiff,**

    **v.**                                                      **Case No. 08cv00635(RMC)**

**Michele Leonhart,**
**In her official capacity as**
**Acting Administrator of the**
**Drug Enforcement Administration, et al.,**

                    **Defendants.**

### NOTICE OF FILING OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT THREE OF PLAINTIFF'S COMPLAINT

Novelty Distributors Inc. (hereinafter "Novelty"), by counsel and pursuant to Local Rules 7 (h) and 5.4 hereby submits this notice that it is filing Plaintiff's Motion for Summary Judgment, Memorandum of Points and Authorities, Statement of Uncontested Facts, and 8 Exhibits electronically today, April 28, 2008.  Novelty hereby declares that two exhibits appended to its Motion for Summary Judgment, Exhibits 1 and 5, contain confidential information protected under the April 18, 2008 Protective Order.  See Local Rule 5.1 (j).  The documents have been redacted and are filed in full under seal.

Respectfully submitted,


_/s/_____
Jonathan W. Emord (407414)
Andrea G. Ferrenz (460512)
Peter A. Arhangelsky
*Counsel for Novelty*

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Date Submitted:  April 28, 2008

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC., D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION; et al.,** | Case No. |
| | 1:08-CV-00635 Hon. Rosemary M. Collyer |
| | *CONFIDENTIAL DOCUMENT UNDER SEAL* |
| **Defendants.** | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AS TO COUNT THREE OF THE COMPLAINT

### EXHIBIT 1:

### AFFIDAVIT OF KENNTH "JR" MERLAU

REDACTED CONFIDENTIAL MATERIAL

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                    Plaintiff,

v.

Michele Leonhart,                              Case No.  08 cv 00635(RMC)
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration, et al

                    Defendants.

### AFFIDAVIT OF KENNETH "J.R." MERLAU

I, KENNETH "J.R." MERLAU, declare under penalty of perjury that the following is
true and correct to the best of my knowledge, information, and belief:

1.  I am the Vice President of Product and Compliance Officer for Scheduled Listed

    Chemical (SLC) Products at Novelty, Inc. located at 351 West Muskegon Drive,

    Greenfield, IN (hereinafter "Novelty").

2.  I have been a Novelty employee, holding various positions, since 2004.  I have

    been the Compliance Officer since 2006.

3.  Until the issuance of the Immediate Suspension Order, Novelty distributed two

    categories of SLCs: ephedrine plus guaifenesin and pseudoephedrine plus

    guaifenesin.

4.  The ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮count packages of

    ephedrine (12.5mg/dose) and guaifenesin (200 mg/dose).  Attachment 1:

    Transcript at 2243. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

    ▮▮▮▮▮▮▮▮▮▮▮▮and guaifenesin (200 mg/dose) ▮▮▮▮▮▮▮▮▮▮▮

1

REDACTED CONFIDENTIAL MATERIAL

pseudoephedrine (30 mg/dose) and guaifenesin (200 mg/dose). Id. at 616. All of the above were sold only in blister packs after the enactment of the Combat Methamphetamine Act of 2005.

5.  In anticipation of supply reductions resulting from the Combat Methamphetamine Act of 2005, Novelty created a 12.5 mg ephedrine line approximately 2 years ago. Attachment 1: Transcript at 617. That change reduces the risk of diversion of Novelty products and the quantitative amount of product sold in Novelty's customers' stores.

6.  Novelty's ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████ Attachment 1: Transcript at 561 and 616.

7.  As Compliance Officer, I oversee the Novelty employees who handle SLCs. I oversee their training and compliance. I, along with Mark Bledsoe and other Novelty executives, develop and implement Novelty's SLC policies. Attachment 9 to Exhibit 3 (Bledsoe Affidavit)(SLC policy).

8.  Novelty sells its SLC products to various convenience stores, with approximately ████████████████████████████████████████████████ ████████████████████████████ Attachment 1: Transcript at 2228-2229, 2264-2265.

9.  Approximately ████████████████ SLC gross receipts came ████████ ████████████████████████████████████████ hat ████████████████████████████████████████████████

2

REDACTED CONFIDENTIAL MATERIAL

10. Because Novelty has conducted business almost exclusively with convenience stores over the past nearly 30 years, the company has developed a detailed understanding of the convenience store business market.



13. Novelty markets its ability to provide all goods throughout multiple product categories. Therefore, much of Novelty's success in the industry is attributed to its ability to provide a diverse and complete range of products, including SLCs.



REDACTED CONFIDENTIAL MATERIAL

15. The SLC products Novelty sold prior to DEA's January 28, 2007 Order to Show

Cause and Immediate Suspension of Registration of Novelty Distributors, d/b/a

Greenfield Labs ("Immediate Suspension Order") 

16. Since Novelty received the Immediate Suspension Order, several customers have

terminated their overall business relationship with Novelty because Novelty can

no longer supply SLCs. 

Attachments 2 and 3.

18. Customers continue to learn about the DEA's Immediate Suspension Order

because the community of convenience stores is relatively small and news of

interaction with the DEA is a hot topic that spreads rapidly. Word of the

Immediate Suspension Order has come back to us from customers who have

learned of it from their management and from our competitors. The result has

been significant harm to Novelty's business reputation. That DEA has suspended Novelty's registration and has placed Novelty under an Order to Show Cause has stigmatized Novelty as a "bad actor" that is under DEA scrutiny and sanction. Novelty's reputation continues to suffer as customers unjustly believe Novelty must have done something unlawful, such as contribute to the illicit methamphetamine trade, to "deserve" this DEA action. Novelty is unable to compete within the market place with other distributors selling the same products as well as those containing twice the dosage despite those other competitors' reliance on the same or less secure methods of distribution as Novelty.

19. Novelty has never marketed its products for "off-label" uses or uses that are not approved by FDA. All of Novelty's products bear clear labeling instructing on use for approved conditions. None of Novelty's labels of products in inventory that would be sold save the ISO indicate that an ephedrine-containing product should be used for something other than bronchiodilation. None of Novelty's labels of products in inventory that would be sold but for the Immediate Suspension Order indicate that a pseudoephedrine-containing product should be used for something other than nasal dilations. Attachment 4; see also Attachment 1: Transcript 2266-2268.

20. Novelty consistently strives to prevent diversion risk. It has constructed a closed system of distribution that minimizes this risk, especially when compared to big-box stores and similarly situated distributors. Attachment 1: Transcript 642-645.

21. Novelty gratuitously instituted strict safeguards to protect its closed system of SLC distribution. Id.

5

22. The company ensures that its products do not pass through multiple layers of distribution. It controls the SLC product from its contract manufacturer through to the final retail location under the care of its own trained drivers who are Novelty employees and agents. Id.

23. Novelty strictly complies with the dosage limitations of state and federal authorities.



24.

Attachment 1: Transcript 2278-2279.

25.

REDACTED CONFIDENTIAL MATERIAL



████████████████████████████████████████████

████████████████ See Attachment 6 to Exhibit 4 (Polk

Affidavit)(███████████████████and Attachment 6 to Exhibit 3 (Bledsoe

Affidavit)████████████████████████████

26. ████████████████████████████████████████

████████████████████████████████████████ This

means all customers to whom Novelty sells SLC products are known and

validated by Novelty and monitored for adherence to all required training and

self-certifications.

27. ████████████████████████████████████████

████████████████████████████████████████

████████ (Attachment 5), ████████████████████

████████████████████ See Attachment 9 to Exhibit 3(Bledsoe

affidavit)(███████████ ███████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

REDACTED CONFIDENTIAL MATERIAL



███ . A ██████████████████ e is attached to the Affidavit of

our CFO who drafted it, Ryan Polk, Attachment 6 to Exhibit 4; see also

Attachment 1:  642-645 (Testimony of JR Merlau).

28. ████████████████████████████

████████████ Page 60 of Attachment 6 to Exhibit 4. ██████

████████████████████

████████████████████

████████████████████

████████████████████

████████████████████

██████████ Attachment 1:  Transcript 642-645.

29. ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████ Attachment 6 to Exhibit 3.

30. ████████████████████████████

████████████████████████████

[REDACTED]

[REDACTED]    Attachment 6 to Exhibit 3.

31. The first allegation of the DEA Immediate Suspension Order, that the above

distribution method is actually storage of the SLCs at an unregistered location that

creates a risk of diversion is baseless. Novelty believes its distribution method is

exemplary in preventing diversion because it maintains control over SLC products

all the way to the retail shelf. [REDACTED]

[REDACTED]

[REDACTED] When shipment is made

through Federal Express or UPS, SLCs are delivered, sometimes outside the

building in dropoff boxes, are retrieved and stored in the building for hours or

days, before being shipped. See Attachment 1: Testimony at 642-645. In 2004

Novelty filed a complaint in US District Court for the Southern District of

Indiana, Novelty Inc. v. Tandy et al, (04cv-1502-DFH-TAB) seeking a

declaratory judgment concerning its claims under the Administrative Procedure

Act concerning its shipping methods for SLCs. A final order has not yet issued in

this case. Id. at 646-654.

32. After receiving the DEA's Immediate Suspension Order, I investigated the charge

that Novelty sold on three occasions 24-count bottles after April 9, 2006. DEA

alleges that Novelty sold product number 17902 in an instance when it was

unlawful to do so. I learned that this transaction did not in fact occur but was a

coding entry error. Novelty did not sell this product as described by DEA's

Immediate Suspension Order. Novelty's records indicate it last shipped this

product to an RSP over thirteen months prior to the alleged sale. Furthermore, I

have verified that each retail customer in question has no record of sale for this

particular product after April 9, 2006.  See Attachment 1:

Testimony at 2287-289, 2395-2399.

33. I have also investigated the charge in the DEA's Immediate Suspension Order that

Novelty sold tablet form SLCs in Kentucky and North Carolina while it was

unlawful to do so. Novelty last shipped the product in question to an RSP over

thirteen months prior to the alleged sale. Furthermore, I have verified that there

are no retail sales records for this particular product in the retail establishments in

the states in question. This allegation is also the result of a human encoding error,

five out of ██████████████████ during the review period. ██████████

████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████ Attachment 1: Transcript 2285-2294.

34. I was present at Novelty's Greenfield, IN facilities on July 9, 2007. I was present

when DEA executed an administrative inspection warrant. DEA inspected

Novelty's offices for 5 days. See Attachment 1: Transcript at 2215-2226.

REDACTED CONFIDENTIAL MATERIAL

35. Novelty did not refuse DEA access to its facilities; it did not impede DEA's investigation; it offered its assistance with all DEA requests. See Attachment 1: Transcript at 2215-2226.

36. On the first day of the inspection, Novelty executives became concerned of undue bias in the investigation. Among the investigators present was DEA counsel Brian Bayly, then acting as counsel for DEA against Novelty while legal matters in which he was counsel were pending before DEA and were also pending in the United States District Court for the District of Columbia. Also among the investigators present was Investigator Darrell Meador. Meador had filed a false affidavit against Novelty in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU), then pending before the U.S District Court for the District of Columbia. He thus had a personal interest in finding exculpatory evidence. We objected vigorously to the presence of Bayly and Meador. DEA finally removed Meador but only after three days in which he helped execute the warrant. See Attachment 1: Transcript at 2216, 2221-22.

37. The following unusual events during execution of the warrant caused me to confer with our legal counsel and other Novelty executives to determine how best to respond: (1) DEA counsel Brian Bayly then representing DEA in litigation against Novelty participated in the investigation (Attachment 1: Transcript at 2216) and at the start of the investigation gratuitously stated that the execution of the warrant was not in response to Novelty's filing suit against DEA (Attachment 1: Transcript at 2216); (2) DEA investigator Darrell Meador then accused by Novelty in the U.S. District Court for the District of Columbia of submitting a

11

false affidavit participated in execution of the warrant when the warrant embraced content that, if it existed (which it did not) would prove exculpatory of the charge, thus revealing a biased and personal interest (Attachment 1: Transcript at 2217); (3) DEA investigator Lisa Barnhill accused without any basis in fact Novelty CFO Ryan Polk of "scrubbing documents" and DEA investigator Madeline Kuzma accused without any basis in fact of "sanitizing documents" (Attachment 1: Transcript at 2225); (4) DEA investigator Lisa Barnhill demanded production of over 12,000 pages of documents within 3 hours (a physical impossibility); and (5) DEA Investigator Barnhill, without any foundation, threatened to arrest one or more Novelty executives (Attachment 1: Transcript at 2222-25).

38. After conferring with Novelty executives and outside counsel, I decided to create a public record of what I perceived to be an unreasonable execution of the warrant. On July 11, around noon, I installed a video-recorder on a tripod, occupying approximately 3 square feet in the corner of a 12 by 20 foot room so as not to block ingress or egress or DEA access to documents. When DEA agents entered the room, they apparently removed the videorecorder. At approximately 1:15, I saw the recorder with its electrical conduit removed from the wall socket outside the room where the DEA agents were present. I told them that I objected to their preventing the videotaping. They said that they would not allow themselves to be videotaped. See Attachment 1: Transcript at 2219; see also Testimony of Ryan Polk at 2014 (Polk Affidavit, Exhibit 4 at Attachment 1).

39. Later in the afternoon that same day, I entered the room with the same videorecorder and reassembled it on the tripod with the plug in the wall socket. I

REDACTED CONFIDENTIAL MATERIAL

placed the videocamera in the corner on a tripod. DEA agent Darrell Meador was

then in the room. At a rapid gait, he proceeded from a chair at the conference

table in the room around the table and then grabbed the recorder from my hands,

pulled the cord from the socket and removed it from the room. I protested to Mr.

Meador that he had no lawful authority to prevent the videotaping to no avail.

See Attachment 1: Transcript at 2219.

40. I further attempted to tape record the events using a cassette recorder. I placed the

tape recorder on the conference table and left the room. DEA agents dismantled

the audio recording device and removed the batteries from the recorder preventing

its use. I protested to the DEA agents that this action violated our right to record

their actions, to no avail. See Attachment 1: Transcript at 2220.

J.R. Merlau

Dated: 4/11/08

13

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator,**<br>**UNITED STATES DRUG**<br>**ENFORCEMENT ADMINISTRATION;**<br>**et al.,** | Case No.<br><br>1:08-CV-00635<br>Hon. Rosemary M. Collyer |
| **Defendants.** | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT THREE OF THE COMPLAINT**


**EXHIBIT 2:**

**TESTIMONY OF KENNETH "JR" MERLAU**

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ»
                    º
                    º
IN THE MATTER OF:   º
                    º   Docket No. 08-33
NOVELTY DISTRIBUTORS º
                    º
                    º
þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

     The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

TABLE OF CONTENTS

WITNESS            DIRECT CROSS REDIRECT RECROSS

Ryan Polk         2003   2076   2111    2118
   Voir Dire on page 2042
Chris Collins    2170   2209
   Voir Dire on page 2182

J.R. Merlau        2215
   Voir Dire on page 2287

Exhibit No.  Document                    Mark Recd

ALJ

14    Formerly Novelty Exhibit 27
Respondent
9     Iventory                     2265 2268
11    Schematic                    2269 2273

13    SLC Cage Procedures          2275 2280
28    Company Handbook             2281 2284
36    Polk Document                2042 2045
40    Show Cause                   2285 2291
46    email                        2292 2294

Government

1     DEA Registration             2125 2125
8-17  EPIC Charts                  2126 2130
19    Snyder Declaration           2130 2136
22    FDA Proposed Rule            2137 2137
51-55 Witness Testimoy            2138
51                                      2143

52                                      2151
54                                 2148 2151
63    PDR Excerpt                  2152 2152
64    NDH Excerpt                  2153 2155
90    JAMA Sloan Survey            2156 2157
91    CHCPA Document               2157 2158
92    NIH Common Cold FAQs         2158 2159

93    NHLBI Document               2159 2165

Page 2341

UNITED STATES DEPARTMENT OF JUSTICE

\* \* \* \* \* \*

DRUG ENFORCEMENT ADMINISTRATION

\* \* \* \* \* \*

HEARING

\* \* \* \* \* \*

þ ÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ »
                       °
                       °
IN THE MATTER OF:      °
                       °   Docket No. 08-33
NOVELTY DISTRIBUTORS   °
                       °
                       °
þ ÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ ¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Wednesday, April 2, 2008

     The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

Page 2343

TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

J.R. Merlau            2345   2387
Michael Pacin   2409   2451   2469     2471
  Voir Dire on page 2413
Michael Glade    2481
  Voir Dire on page 2500


Thomas Kupiec    2548   2589

  Voir Dire on page 2580


EXHIBIT                          MARK RECD


Government



48                               2385 2386

93    Expert Pane Report         2466

95                               2453

96                               2546 2547


Respondent



1    Pacin Report               2446 2450

3    Document cited by Pacin          2525

22   Bianchi Article                  2580

Page 2215

```
 1        Honor.
 2                    JUDGE RANDALL:  Mr. Emord, you may
 3        call your next witness.
 4                    MR. EMORD:  Yes, Your Honor.  We
 5        next call J.R. Merlau.
 6                    JUDGE RANDALL:  Mr. Merlau, you
 7        remember being sworn in?
 8                    THE WITNESS:  Yes, ma'am.
 9                    JUDGE RANDALL:  All right.  You
10        are still under oath.  You may have a seat.
11                    DIRECT EXAMINATION
12                    BY MR. EMORD:
13            Q    Mr. Merlau, were you -- I'm sorry.
14        Were you present on July 9th, 2007 when DEA
15        investigators arrived at Novelty?
16            A    I was, not when they actually
17        arrived, but I was called in.
18            Q    And when you were called down,
19        shortly thereafter, who did you see from the
20        Drug Enforcement Administration present at
21        Novelty?
22            A    It was Ms. Barnhill, Ms. Kuzman,
23        Agent Harris, Mr. Meador, and Mr. Bayly.
24                    JUDGE RANDALL:  I'm sorry.  I
25        didn't hear the last name.
```

Page 2216

1                    THE WITNESS:  Mr. Bayly.

2                    BY MR. EMORD:

3          Q      Now, did you, at any point in time

4     after first seeing the agents present from

5     DEA, object to the presence of any of those

6     agents?

7          A      Yes.

8          Q      And who did you object to?

9          A      I was in the room with Ryan.  Both

10    of  us had expressed our objections at the

11    very beginning.  It was that Monday morning.

12    Then talking both with yourself, as our

13    counsel, and our local counsel, Mr. Bickham,

14    we expressed the same thing through them, as

15    well.

16         Q      And to whom, among the government

17    agents, did you object to particular ones

18    being present?

19         A      I mean, the ones that I thought

20    were the most inappropriate was, first of all,

21    Mr. Meador because of existing litigation,

22    surrounds his deposition.  And then also Mr.

23    Bayly, which in hindsight, if I had known that

24    he was the government's lead or co-counsel,

25    whatever you want to call it, I think it was

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1              probably even more inappropriate, but he

2              didn't strike me as the worst one.  Mr. Meador

3              was.

4                   Q    Now, during the course of the

5              investigation, did there come a time when you

6              caused a video recorder to be installed in the

7              room?

8                   A    I did.  I mean --

9                   Q    Well, when during the course of

10             the investigation did you cause a video

11             recorder to be placed, what date?

12                  A    It was Wednesday.  It was when the

13             DEA employees were at lunch, was the first

14             time I placed that in a back room right

15             towards the corner.  It was on the tripod.  I

16             placed it in the room, plugged it in, and then

17             left.

18                  Q    And a video recorder placed in the

19             room at that time, was it placed there during

20             a time when government agents were present?

21                  A    No one was present at that time.

22             They were at lunch.

23                  Q    All right.  And it was placed in

24             the back of the room, you said?

25                  A    Yes.  It was kind of a rectangular

Page 2218

```
1        room, so if you figure the door was on the
2        bottom right, right at that white piece of
3        paper, the camera was in kind of the up left.
4             Q    All right.  And did it block
5        ingress or egress from the room?
6             A    No.
7             Q    Did it block access to documents?
8             A    No.
9             Q    Now, subsequent to your placing
10       the video recorder in the room for the first
11       time - let me try to get a temporal frame of
12       reference.  You say lunch time.  Roughly what
13       time did you place the video recorder in
14       there?
15            A    12:30, 1:00, right in that range.
16            Q    And did there come a time when the
17       DEA investigators returned?
18            A    It was slightly after I put it in
19       the room, maybe 15, 20 minutes after, and I
20       didn't note the time, but if I was to guess,
21       it would be maybe 1:15.
22            Q    When they returned to the room,
23       were you present in the room?
24            A    I was not.  I had gone back
25       upstairs and was working on some other things.
```

Page 2219

1          Q     Did you return to the room that
2     same day?
3          A     Yes.
4          Q     Upon your return to the room, did
5     you notice the video recorder had been moved?
6          A     Yes.  When I went down to the
7     room, and I think Ryan might have told me that
8     it had already been taken out, but when I went
9     down I saw that it was still in the hallway.
10    Picked it up at that time, brought it back
11    into the room, was carrying it into the room,
12    plugging it back into the wall to set it up
13    again when Mr. Meador came over to grab it out
14    of my hands, and jerked the plug out of the
15    wall.
16         Q     And then what happened?
17         A     He took it back out of the room.
18    I protested.  He set it in the hallway, and
19    said that they would not allow them to be
20    taped.
21         Q     You say you protested.  In what
22    manner did you protest?
23         A     I told them that our counsel
24    advised that we did have the right to record
25    their actions, and that that was out intent to

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2220

1    do so.

2         Q    And did he respond to that

3    statement?

4         A    He just said they're not going to

5    allow it.

6         Q    And did there come a time

7    thereafter, that same day, in which you placed

8    a audio recorder in the room?

9         A    Yes.  It was later that day,

10   probably near the close of business.  I'm not

11   sure of the exact time, again, but later

12   afternoon.  I took a dictation tape recorder

13   that I have, and took it  into the room,

14   placed it on the end of the table, hit record.

15   Told them I need to do this.  I have the

16   ability, or the right to do this.  I apologize

17   because I know that they were upset, set it on

18   the table, and I walked out.  Ryan told me

19   that when he went in to meet with them later,

20   that the tape had been dismantled.

21        Q    Did anyone from Novelty, to your

22   knowledge, protest that action of the -- or

23   protest the action to the Government of

24   dismantling the recorder?

25        A    Nobody from Novelty was in the

Page 2221

1        room when they took it apart, no.

2             Q    Subsequently, did you mention

3        anything about the recorder to the government

4        agents?

5             A    Honestly, I don't remember.

6             Q    All right.  Now, why did Novelty

7        wish to video record or audio tape the

8        investigators?

9             A    There was a lot of things about

10       the whole, an administrative inspection that

11       we were concerned about.  They didn't seem, as

12       Ryan talked about, there was concerns.  And

13       what we wanted to do is to, kind of a lot of

14       different things.  One, to document the

15       interaction that was happening, that we wanted

16       to be able to show that to our counsel, and

17       then we wanted to have it as a public record,

18       if necessary, as well.

19             Q    Now, you say you had some

20       concerns.  Specifically, what events caused

21       you to have concern?

22             A    I mean, as Ryan had testified, I

23       mean, when the DEA agents, or DEA employees,

24       I'm sorry, first walked into our building and

25       said, start qualifying who's there and why.

Page 2222

1    I mean that right there in itself was -- the

2    bells start going off.  Why is there an

3    attorney?  Why are there two people from

4    Washington Headquarters?  Why is one of those

5    people specifically involved in the allegation

6    of making a false statement that we've

7    contest.  I mean, all those things were very -

8    - I'm just a Novelty guy.  I mean, I'm

9    thinking this is -- this smells bad.

10        Q    Now, are you aware of any threat

11    of arrest having been made by any of the DEA

12    investigators?

13        A    I was not in the room when that

14    happened.  Immediately after it --

15        MR. BARBER:  Objection, Your

16    Honor.  The witness is beginning to narrate a

17    question that was a yes or no, was he aware of

18    any threat of arrest.  And unless a question

19    is posed that allows the Government an

20    opportunity to object, we are again

21    disadvantaged, and I ask that the witness not

22    narrate in a non-responsive manner.

23        Number two, the witness is also

24    incompetent to testify as to this, as he just

25    said he wasn't in the room when whatever it is

Page 2223

1      happened.

2                      JUDGE RANDALL:  Mr. Emord, do you

3      wish to be heard?

4                      MR. EMORD:  Oh, yes.  I'm asking

5      for his understanding, Your Honor.  And he has

6      an understanding, and hearsay is liberally

7      permitted in these proceedings.  It doesn't

8      matter whether he was in the room or not, he

9      heard about it.

10                     JUDGE RANDALL:  Very well.  I will

11     sustain the objections to the extent that it's

12     asking for a narrative, and he's answered the

13     question pending, and ask that you move on

14     with your next question.

15                     MR. EMORD:  Very well, Your Honor.

16                     BY MR. EMORD:

17         Q      Did there come a time when someone

18     from Novelty informed you of a threat of

19     arrest from DEA agents?

20         A      Yes.

21         Q      Who informed you?

22         A      Ryan Polk.

23         Q      And what did he say?

24         A      Immediately after it happened, he

25     came up to my office and explained to me that

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2224

```
 1        he'd just been threatened with arrest.  He was

 2        very upset.

 3                Q     Now, that occurred on what day?

 4                A     That was on Wednesday.

 5                Q     And did that precede the time in

 6        which the video camera was installed?

 7                A     Yes.

 8                Q     By how many hours?

 9                A     Maybe two and a half, right in

10        that range.

11                Q     Did it have an affect upon your

12        interest in relying upon a video camera?

13                A     Absolutely.

14                Q     In what way?

15                A     I mean, it was continued

16        inconsistencies and concerns that were being

17        raised with us.  I mean, that was a great

18        example of something that we felt wasn't

19        right, and that we wanted to have documented

20        actions like that, so that we could actually

21        present them later.  I mean, here not long

22        after this - I mean, we were trying to be

23        cooperative, which meant that sometimes Ryan

24        would be meeting with the DEA employees to

25        provide them other things that they've asked
```

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2225

1          for.  Other times, I was doing it, as we were

2          trying to move through as fast as we could

3          with this process.  I mean, when the tape

4          recording and the video taping was refused, we

5          wound up, at least for some sort of

6          protection, deciding that the both of us

7          needed to go in together and talk to them

8          together, I mean just because that was the

9          only way that we could have any sort of

10         documentation.

11              Q     Now, are you aware of any

12         allegation having been made concerning -- by

13         the government agents concerning scrubbing, or

14         sanitizing the documents?

15              A     Yes.

16              Q     And what is your understanding of

17         the allegation?

18              A     That Ryan was told that the

19         information that he provided was too accurate;

20         so, therefore, it must be scrubbed and

21         cleansed.  I mean, they were accusing him of

22         falsifying records, with no foundation.

23              Q     And when did that occur?

24              A     I believe that was Tuesday, but I

25         have to check.  I don't know for certain if it

Page 2226

```
 1        was Tuesday or late Monday.  I think it was
 2        Tuesday.
 3             Q    Was that prior to the video
 4        taping?
 5             A    Yes.
 6             Q    Was it your intent through video
 7        taping to obtain direct evidence of abuses
 8        present?
 9             A    Yes.  I mean, that was -- it was
10        to document the events that happened. It was
11        to document our concerns of professional, and
12        possible ethical issues, and to have a
13        recorded record of that.
14                  MR. EMORD:  Now, if the Court
15        Clerk will please supply the witness with what
16        has been marked for identification as Novelty
17        Exhibit 5.
18                  BY MR. EMORD:
19             Q    Do you have Novelty Exhibit 5
20        before you, sir?
21             A    I do.
22             Q    Do you know who caused to have
23        this document prepared?
24             A    Ryan Polk.
25                  JUDGE RANDALL:  Just one second,
```

Page 2270

1    schematic is?

2         A    It's a building layout for our

3    Greenfield Support Center.

4         Q    And is this the building that was

5    inspected by Drug Enforcement Administration

6    agents on July 9, 2007?

7         A    Yes.  It's the one on Muskegon

8    Drive.

9         Q    Now, if you could for me, can you

10   identify verbally the room in which the video

11   recorder and audio recorder was present on the

12   schematic?

13        A    Yes.  If you look in the top left-

14   hand corner, it says "main office."  The small

15   conference room that we were using, and that

16   the video camera had been placed in, would be

17   at the bottom left-hand corner of that solid

18   black area.  All right?  So it would have been

19   the office that was immediately inside from

20   our warehouse.

21        Q    Now, this --

22        A    Is that clear?

23        Q    Somewhat.  I'll ask some more

24   questions to try to clarify the record.  This

25   black region -- I notice within the black

Page 2271

1     region there is a white rectangle, and the

2     word "main office" is written there.  Is that

3     entire black region one office?

4           A     The entire black region, and

5     including that white box where the text is, is

6     what we call our east office, and that is a

7     two-story group of offices.

8           Q     How many offices are within that

9     black region?

10          A     Maybe a dozen and a half private

11    offices, and cubicles for another 40 people.

12          Q     And what is the square footage, if

13    you know, of the office into which the video

14    recorder and audio recorder were placed?

15          A     Maybe 250, somewhere in that

16    range.

17          Q     And how much square footage did

18    the video recorder, plus tripod, occupy in

19    that room?

20          A     Three square feet.

21          Q     Now, if you look at that

22    schematic, can you identify for the Court

23    where the caged area is that contained the

24    scheduled listed chemical products?

25          A     Sure.  Taking the black box at the

```
 1        top of the page, it says main office.  If you

 2        look immediately to the right of where it says

 3        main office, you've got three aisles that were

 4        marked there.  It says A01, A01, and -- my

 5        eyes aren't all that great, but let's call it

 6        A02, and an A02.  Those four aisles in that

 7        top right corner, and there's a line drawn

 8        around those, is our SLC cage.

 9                  There's four aisles of product.

10        The open area on the far right is the rework

11        area.  The open area on the left of those four

12        aisles is where we pick and pull our product,

13        keeping it in the caged area until it's ready

14        to go on the trucks, and then there's an

15        outline that's kind of -- it encircles those

16        four aisles marked A01, A01, A02, and A02, and

17        that's a floor-to-ceiling chain fence with two

18        locked gated areas.

19             Q    Is this schematic represented on

20        the first page of Novelty Exhibit 11 an

21        accurate schematic of the structure of the

22        Greenfield, Indiana Novelty facility as of the

23        time of the issuance of the order to show

24        cause in this case?

25             A    Yes.
```

Page 2374

```
 1          room?

 2                  A      It's going to be the same answer

 3          as before.   I don't believe I had any meetings

 4          with them during that period of time.   I

 5          presume that other Novelty employees were.   I

 6          did not ask that question nor was I told that

 7          answer.

 8                  Q      Were you presumed that there were

 9          meetings?   What's the basis for your

10          presumption, Mr. Merlau?

11                  A      I mean that they were there and

12          that Mr. Polk was working with them throughout

13          the day and giving them information.

14                  Q      Now Novelty was concerned about

15          DEA's actions, right?

16                  A      Correct.

17                  Q      And that's why you needed to

18          videotape them, right?

19                  A      That's correct.

20                  Q      And did you instruct the people

21          not to meet with DEA if they were unwilling to

22          allow the videotape to proceed?

23                  A      Say that one more time?

24                  Q      I'm asking you did you instruct

25          your personnel not to meet with DEA unless the
```

Page 2375

1          videotape was rolling?

2               A    We would have never instructed

3          them to do that.  That would have been

4          noncompliant.

5               Q    Specifically, who told you that

6          they met with DEA while there was no video

7          device in the room between that time period

8          we're discussing?

9                    MR. EMORD:  Objection.  It's

10         incoherent, the question, Your Honor.

11                   JUDGE RANDALL:  Overruled.

12                   THE WITNESS:  As I said, I neither

13         asked anyone if they met with the DEA during

14         this time period, nor did anybody tell me that

15         they met with the DEA.

16                   I told you that I presumed that

17         Novelty employees did meet with them during

18         that period of time as part of that on-going

19         dialogue with what was happening in collecting

20         of the information.

21                   BY MR. BARBER:

22               Q    After Mr. Meador unplugged the

23         video camera the second time, were you in the

24         room when that happened?

25               A    I was.

Page 2379

1          Q     Who do you mean?

2          A     Mr. Emord.

3          Q     When the investigators returned on

4     Friday, were you satisfied that there was no

5     longer a need to record the actions of the

6     investigators?

7          A     No.  I would have liked to have

8     had it, as we spoke about it.  We didn't want

9     to appear antagonistic and we were afraid that

10    that's how it was being perceived.  So we just

11    kind of gave up the right to say look, we want

12    to have this record to try and protect

13    ourselves and have information about what's

14    transpiring, but we tried it three times and

15    everybody just seemed to be getting ticked

16    off.

17         Q     Well, let's talk about the

18    Thursday attempt.  On Thursday, who was

19    attempting to videotape the DEA personnel?

20         A     I had one of the interns standing

21    with me, so instead of doing the tripod, he

22    was going to videotape free standing.

23         Q     Was he doing so at your direction,

24    Mr. Merlau?

25         A     Yes.

Page 2380

1          Q     What did the investigators do when
2     they saw the video camera rolling?
3          A     They walked in.  The video camera
4     was there.  One of them said that they weren't
5     going to allow it.  Ms. Barnhill swore and
6     stormed out of the lobby.
7          Q     Did anyone touch the intern who
8     was videotaping from -- did any DEA personnel
9     touch the intern who was doing the
10    videotaping?
11         A     No.
12         Q     Did they prevent you from
13    videotaping?
14         A     No.
15         Q     Now when the investigators
16    returned on Friday, had you and DEA, you being
17    you and the Novelty executive, reached an
18    agreement with DEA with regard to the
19    documents that would be required to be
20    produced?
21         A     I believe that there were still
22    some more changes, even on Friday.
23         Q     Mr. Merlau, when the investigators
24    returned on Friday, had Novelty and DEA agreed
25    about what documents needed to be produced as

Page 2381

1        part of this inspection?

2                MR. EMORD:  Objection, asked and

3        answered.

4                JUDGE RANDALL:  Overruled.

5                THE WITNESS:  Like I said, there

6        were some additional documents that were

7        requested on Friday, so they maybe agreed to

8        some and then it changed again on Friday, is

9        that maybe --

10               BY MR. BARBER:

11        Q    Sure.  And DEA got an extension of

12        the warrant so that Novelty could provide

13        those additional records the following week,

14        right?

15        A    I believe we mutually agreed to

16        that as well, yes.

17        Q    On the first day of the

18        inspection, July 9, DEA diversion

19        investigators were accompanied by a special

20        agent, is that correct?

21        A    I believe it was Mr. Carl Harris,

22        yes.

23        Q    And do you know the difference

24        between a DEA special agent and a DEA

25        diversion investigator?

Page 2387

1        A       I saw no handcuffs.

2        Q       Did any Novelty personnel report

3    to you that DEA personnel displayed handcuffs

4    to them and threatened to arrest them?

5        A       Are those collectively together or

6    --

7        Q       I'll separate them.  That was a

8    compound question and I'll object to my own

9    question.

10               Did any Novelty personnel report

11   to you that DEA investigators display

12   handcuffs to them?

13       A       No.

14               MR. BARBER:  No further questions.

15               JUDGE RANDALL:  All right, just a

16   moment.

17               (Pause.)

18               Redirect, Mr. Emord?

19               MR. EMORD:  Yes, Your Honor.

20                 REDIRECT EXAMINATION

21               BY MR. EMORD:

22       Q       Now on Wednesday, after lunch,

23   when the video recorder was brought by you

24   into the room a second time, I would like to

25   get an idea of where you were positioned and

Page 2388

1          where Mr. Meador was positioned in the first

2          instance.

3                    So can you tell me -- you've

4          testified that the video recorder you had was

5          in the back corner of the room, is that

6          correct?

7                    MR. BARBER:  Objection,

8          mischaracterizes prior testimony.  The witness

9          testified it wasn't in the corner, but by the

10         end of the table.

11                   JUDGE RANDALL:  Sustained.

12                   BY MR. EMORD:

13         Q    Can you tell me where the video

14         recorder was at the time you were in the room

15         after lunch?

16         A    Yes, it was -- maybe the easiest

17         way to try and explain this in words is if you

18         think about a sheet of paper in front of you.

19         The entrance door to the room would be on the

20         bottom right corner of the sheet of paper and

21         I was up in the top left corner, halfway

22         between the end of the table which is going

23         long ways on the paper and that far corner of

24         the room.  I was in that back left corner.

25         Q    Where was Meador?

Page 2389

1          A     Meador was sitting at the first

2     chair inside the door which is now in the

3     bottom right corner, the table center along

4     the room, he was in that bottom chair that was

5     closest to the door on the long side of the

6     table.

7          Q     How many feet was he from you?

8          A     That room is roughly 12 by 20, so

9     he was probably 15 feet from me.

10         Q     When he saw you with the video

11     recorder, what did he do?

12         A     I walked in with the camera and

13     went to the left to go around the other side

14     of the table from where he was sitting, walked

15     back to the back side of the room.  He got up

16     from his chair, came around the table the

17     other way and that was where he grabbed the

18     tripod and I had already plugged it into the

19     wall by that time and he yanked it out of the

20     wall.

21         Q     How rapid was his gait?

22         A     For a short guy, it was pretty

23     rapid.

24         Q     So when he got up from the chair,

25     he proceeded at a rapid gait in your

Page 2390

1          direction?

2                    MR. BARBER:  Objection, leading

3          and asked and answered.

4                    JUDGE RANDALL:  Sustained.

5                    BY MR. EMORD:

6          Q     Did he sprint?

7                    MR. BARBER:  Objection, leading.

8          The witness has already characterized the

9          pace.  This is an attempt to lead the witness.

10                   JUDGE RANDALL:  Sustained.

11                   BY MR. EMORD:

12         Q     All right, what pace did he use?

13                   MR. BARBER:  Objection, asked and

14         answered.

15                   JUDGE RANDALL:  Overruled.

16                   THE WITNESS:  He was moving

17         quickly, enough so that I did think that he

18         might hit me.  I remember commenting that to

19         you as we were talking about the events of the

20         day.  I mean I did think that.

21                   BY MR. EMORD:

22         Q     Now did he physically -- well, how

23         did he remove the video camera from your

24         possession?

25                   MR. BARBER:  Objection, Your

1       Honor.  Misleading.  The witness testified on

2       cross that the video camera was on the tripod.

3                   MR. EMORD:  That's not correct,

4       Your Honor.  That's inconsistent with direct

5       testimony and the earlier testimony given by

6       the witness.

7                   MR. BARBER:  Then it's been asked

8       and answered on direct and the record can show

9       that the discrepancy of this witness's

10      testimony on cross versus direct.

11                  MR. EMORD:  It's very important in

12      light of the questions on cross that we

13      establish the extent to which there was a

14      physical apprehension on the part of this

15      witness of contact that was offensive.

16                  MR. BARBER:  Your Honor, that goes

17      to state of mind.  It doesn't go to the

18      physical act that Mr. Emord has just asked

19      this witness about.

20                  MR. EMORD:  We had better get the

21      facts out.

22                  JUDGE RANDALL:  Overruled,

23      gentlemen.  You may ask the question and the

24      record will speak for itself.

25                  MR. EMORD:  Thank you, Your Honor.

Page 2392

```
 1          Go ahead.
 2                    THE WITNESS:  And I think we're
 3          all talking about the same thing.  The camera
 4          was on top of a tripod.  The tripod was in my
 5          hand.  I was plugging it into the wall, so
 6          both of you are accurate.
 7                    Mr. Meador grabbed the tripod upon
 8          which the camera was placed out of my hand and
 9          pulled the plug from the wall.
10                    BY MR. EMORD:
11               Q    Now when he grabbed -- you used
12          the term grab.
13               A    Yes.
14               Q    Did he politely request that you
15          release the tripod?
16                    MR. BARBER:  Objection, Your
17          Honor.  Leading.
18                    JUDGE RANDALL:  Sustained.
19                    BY MR. EMORD:
20               Q    Please define for me as great as
21          specificity as you possibly can the manner in
22          which Mr. Meador removed the tripod from your
23          possession.
24               A    He came and forcibly took it out
25          of my hands.  I would not say it was a tug of
```

Page 2393

 1       war.  I wasn't going to duke it out with

 2       somebody.  But I mean it was something that he

 3       removed from my hands.  I guess -- specificity

 4       -- if he had not removed it from my hand, it

 5       would still be in my hand.  I didn't have a

 6       loose enough grip on it that it would have

 7       fallen to the floor or anything like that.  I

 8       mean it was removed from my hands.

 9            Q     And was it then -- after it was

10       removed from your hands, what did he do with

11       it?

12            A     He took it back around the table

13       and set it back in the hallway.  Came back in

14       and sat down.

15                 MR. EMORD:  No further questions,

16       Your Honor.

17                 JUDGE RANDALL:  Mr. Barber,

18       anything further?

19                 MR. BARBER:  No, Your Honor.

20                 JUDGE RANDALL:  Just one moment.

21                 (Pause.)

22                 Mr. Merlau, I am going to direct

23       your attention to the allegation in

24       Administrative Law Judge Exhibit 1, so I ask

25       that you be handed Administrative Law Judge

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator,**<br>**UNITED STATES DRUG**<br>**ENFORCEMENT ADMINISTRATION;**<br>**et al.,** | **Case No.**<br><br>1:08-CV-00635<br>Hon. Rosemary M. Collyer |
| **Defendants.** | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT THREE OF THE COMPLAINT**

**EXHIBIT 3:**

**AFFIDAVIT OF RYAN POLK**

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,**<br><br>        **Plaintiff,**<br><br>**v.**<br><br>**Michele Leonhart,**<br>**In her official capacity as**<br>**Acting Administrator of the**<br>**Drug Enforcement Administration, et al**<br><br>        **Defendants.** | **Case No.** |

**AFFIDAVIT OF RYAN POLK**

I, RYAN POLK, declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Chief Financial Officer of Novelty, Inc. ("Novelty"). I have held that position since 2006. I have held various other executive positions at Novelty since December 2001.

2. My responsibilities include managing the financial risk of Novelty and overseeing Novelty's record-keeping procedures. I am responsible for completing and filing Novelty's DEA registration. I ensure Novelty maintains proper records of inventory and records required under DEA regulations.

3. Novelty first received its DEA registration to distribute Schedule Listed Chemicals ("SLC") in 1996. It has applied for and successfully renewed its registration every subsequent year.

4. I have been present when DEA inspected Novelty on several occasions. I was present when DEA executed a search warrant at Novelty's Greenfield, Indiana

facilities on July 9, 2007.  I was present every day during the execution of the

warrant and responded to various DEA requests for records from Novelty.

Attachment 1:  Transcript 1511-1515, 1529-1536, 2022-2033.

5.  When DEA agents arrived unannounced on July 9, 2007, to execute a search

warrant, I was surprised to see present DEA investigator Darrell Meador and

DEA counsel Brian Bayly.  Meador had submitted a false affidavit to the United

States District Court for the District of Columbia in the case Novelty Inc. v.

Tandy et al., 1:07-CV-00191 (RMU).  He had a personal interest in finding

exculpatory evidence and, so, I believed his presence improper.  Brian Bayly was

the DEA lawyer who had appeared on behalf of DEA in a case brought by

Novelty before DEA.  See Attachment 2 (Prehearing order issued by the

Administrative Law Judge on July 9, 2007, the first day of inspection, showing

Mr. Bayly as counsel of record for DEA).  He had represented to the

Administrative Law Judge that no discovery would be allowed in the case.

Likewise, DEA had represented to the United States District Court for the District

of Columbia, in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU),

that discovery was not allowed.  See Attachment 3 (DEA's Opposition to

Novelty's Motion for Limited Discovery in that case).  I therefore thought

Bayly's presence improper and perceived that DEA was in fact performing

discovery without leave of either the DEA ALJ or the U.S. District Court in the

District of Columbia.  I informed the agents present that Novelty objected to the

participation of DEA counsel and Mr. Meador in the investigation.  Both

remained on site assisting with the execution of the warrant until Wednesday, July

11. See Attachment 1: Testimony at 1529-35, 2006-07, 2116-18.

6. On Wednesday, July 11, 2007, DEA investigator Lisa Barnhill demanded that

Novelty produce over 12,000 pages of documents in a format she specified within

three hours, a physical impossibility. Barnhill's demand required Novelty

construction of new computer programming to produce the records in the format

DEA demanded. The data was all in Novelty's normal business records but the

parameters DEA imposed for production were not in the normal format of our

record maintenance. See Attachment 1: Testimony at 1535, 2095-99.

7. Despite our fulfillment of DEA's production demand, DEA agent Barnhill falsely

accused me of "scrubbing documents," and DEA agent Madeline Kuzma falsely

accused me of "sanitizing documents." DEA agent Barnhill also threatened to

arrest a Novelty executive. See Attachment 1: Testimony at 1534-35. DEA agent

Barnhill also falsely stated that an empty product container inside Novelty's

caged, secured SLC product warehouse was likely left over from a

methamphetamine user. See Attachment 1: Transcript at 2010.

8. I informed Novelty executives JR Merlau, Todd Green, and Mark Bledsoe and

Novelty's counsel of the threat of arrest, of the involvement of Meador and Bayly

in the warrant's execution, of the unreasonable document production demands,

and of the false charges of scrubbing, sanitizing, and complicity in the

methamphetamine trade. We decided to videorecord the unreasonable acts to

preserve a record for use in Novelty's defense and to release to the public.

Despite multiple attempts to videorecord and one attempt to audiorecord

interaction with the agents, we were not allowed to do so by DEA. See Attachment 1: Transcript at 2011-22. Indeed, DEA agent Meador forcibly removed a videorecorder from the hands of JR Merlau on the afternoon of Wednesday, July 11, and we later discovered dismantled with tape and batteries removed an audiorecorder JR had placed conspicuously on the table in the same room where videorecording was to take place. See Attachment 1: Transcript at 2020-22.

9.  I am familiar with the DEA's January 27, 2008 Order to Show Cause and Immediate Suspension of Registration of Novelty Distributors, d/b/a Greenfield Labs ("Immediate Suspension Order"). In the Immediate Suspension Order, DEA alleges Novelty could not account for 60,000 dosages of SLC products and had 16 overages. Exhibit 1 to this motion for preliminary injunction. Upon investigation, I discovered the accusation to be false. See Attachment 1: Transcript at 2034-45; Attachment 4 (a chart with my findings and supporting documentation).

10. DEA failed to perform a complete audit at Novelty and excluded from its calculation specific data inputs that revealed its charge of unaccounted for dosages and overages to be false. See Attachment 1: Transcript at 2034-35; Attachment 4 (a chart with my findings and supporting documentation).

11. Novelty gratuitously implemented a sales policy that is far more stringent than the limits set in the CMEA, which limits sales of ephedrine to 3.6 grams per day. Novelty recommends a policy that does not allow for any more than two packages per transaction and only one transaction per day per customer. See Attachment 6

to Exhibit 3 (Bledsoe Affidavit). Novelty includes this policy on every display case. Every log book Novelty supplies contains quantity purchase limit warnings as well.

12. Novelty monitors its self-imposed sales limit to our retailers' stores and reports suspicious sales to law enforcement. Novelty reviews sales reports of its RSPs to ensure they adhere with Novelty's sale limits. It developed a disciplinary system to address violations of this system.

13. I am familiar with the allegation in the DEA's Immediate Suspension Order that Novelty distributed 22 bottles of ephedrine allegedly discovered in 2002 in a methamphetamine lab. DEA relies upon a statement from the manufacturer of the product for the proposition that Novelty distributed all of the products from that lot number. It has no independent records to verify that allegation. While Novelty did purchase, according to our own records 24 cases of this lot number, Novelty has never been given evidence to establish that the bottles in question were actually distributed by Novelty to convenience stores or were sold by convenience stores served by Novelty. The product could have been stolen directly from DMD Pharmaceuticals, stolen from DMD transport vehicles, or delivered to convenience stores not served by Novelty and stolen from there. See Attachment 1: Testimony at 1517-19.

14. Novelty was first informed of the Connecticut meth lab incident by DMD Pharmaceuticals, not by DEA. Attachment 1: Transcript at 1524-26. Indeed, although Kuzma stated that she informed me and Craig Baker of the presence of the bottles in the Connecticut meth lab, my notes of interactions with Kuzma

reveal no such conversation.  Attachment 1:  Transcript 1522-1525.  Attachment 5 [Polk Contemporaneous Notes].

15. Novelty did not receive a "Notice of Diversion" concerning that alleged finding of 22 bottles in a methamphetamine lab.  It was inspected less than one year after that finding and I acted as liaison to the DEA personnel that conducted the inspection.  To the best of my recollection the agents did not raise that finding to me at that time.  I subsequently learned of that allegation from the manufacturer.

16. In our 2002, 2003, and 2005 inspections and again at the July 9, 2007 Administrative Inspection of Novelty, I asked DEA agent Madeline Kuzma if any product distributed by Novelty had ever been found in a meth lab.  She informed me that no product distributed by Novelty had ever been found in any meth labs.  Attachment 1: Testimony at 1526.

17. I wrote the Novelty Training Guide for Route Sales Professionals.  Attachment 6.  "Route Sales Professional" (RSP) is the title of the Novelty employee that is assigned a geographic region in which Novelty's customers are located and then provides those customers with Novelty stock typically twice a month.  During those visits the RSP will consult with the store manager to determine the store's purchase order then actually stock the retail store shelves with the Novelty products the manager orders.  The RSP Training Guide has specific instructions on the handling of SLCs.  Id. at 60-61.  RSPs are trained for handling SLCs with that document and with Novelty's SLC policy statement.  Attachment 6 (Training Guide) and Attachment 9 to Exhibit 3 (Bledsoe Affidavit)(SLC policy statement).

_____
Ryan Polk

Dated: 4/11/08

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                          **Plaintiff,**

v.

MICHELE LEONHART, Administrator,        Case No.
UNITED STATES DRUG
ENFORCEMENT ADMINISTRATION;       1:08-CV-00635
et al.,                                    Hon. Rosemary M. Collyer

                          **Defendants.**

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AS TO COUNT THREE OF THE COMPLAINT

### EXHIBIT 4:

### TESTIMONY OF RYAN POLK

Page 1259

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííííí»
                       °
                       °
IN THE MATTER OF:      °
                       °
                       °  Docket No. 08-33
NOVELTY DISTRIBUTORS   °
                       °
                       °
þííííííííííííííííííííííí¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive
Arlington, VA 22202


Friday, March 28, 2008


        The above entitled matter came on
for hearing, pursuant to notice at 9:00 a.m.


BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

Page 1261

TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

Mark Bledsoe    1272    1323    1401    1414
Voir Dire on page 1355
Lisa Barnhill   1441    1489
Ryan Polk       1508    1521


EXHIBIT                              MARK RECD
Respondent
16                                        1358
34                                        1391
42     Show Cause                         1325
44                                        1365
48     DVD                                1387

57-A                                 1352 1352
10, 38, 54, 14
47, 17                                    1388
34                                        1391

Government
26                                   1462 1463

27                                   1466 1466
28                                   1467 1468
29                                   1469 1471
37                                   1445 1446
38                                   1459 1460
41                                   1480 1482
44                                   1474 1474

45                                   1476 1477

49                                   1481 1485

65                                   1451 1455

66                                   1445 1446

71, 71A, 81, 81A,

   82, 82A                           1485 1480

83                                   1480 1482

Neal R. Gross and Co., Inc.
202-234-4433

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííí»
                     º
                     º
IN THE MATTER OF:    º
                     º   Docket No. 08-33
NOVELTY DISTRIBUTORS º
                     º
                     º
þííííííííííííííííííííí¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL

          Administrative Law Judge

Page 1998

TABLE OF CONTENTS

WITNESS            DIRECT CROSS REDIRECT RECROSS

Ryan Polk        2003   2076   2111    2118
  Voir Dire on page 2042
Chris Collins    2170   2209
  Voir Dire on page 2182

J.R. Merlau        2215
  Voir Dire on page 2287


Exhibit No.  Document                    Mark Recd

ALJ

14     Formerly Novelty Exhibit 27
Respondent
9      Iventory                         2265 2268
11     Schematic                        2269 2273

13     SLC Cage Procedures              2275 2280
28     Company Handbook                 2281 2284
36     Polk Document                    2042 2045
40     Show Cause                       2285 2291
46     email                            2292 2294

Government

1      DEA Registration                 2125 2125
8-17   EPIC Charts                      2126 2130
19     Snyder Declaration               2130 2136
22     FDA Proposed Rule                2137 2137
51-55  Witness Testimoy                 2138
51                                           2143

52                                           2151
54                                      2148 2151
63     PDR Excerpt                      2152 2152
64     NDH Excerpt                      2153 2155
90     JAMA Sloan Survey                2156 2157
91     CHCPA Document                   2157 2158
92     NIH Common Cold FAQs             2158 2159

93     NHLBI Document                   2159 2165

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 1512

1      in a caged in facility, our caged in portion

2      of the facility?

3          Q    And are there two separate areas

4      within that caged facility?

5          A    Yes, there's a -- It's a large

6      rectangular area and on one end of that area

7      there's a section that has been set aside.

8      It's smaller than -- The main area is north of

9      that and larger.

10         Q    What type of products go into the

11     set aside area, the smaller area?

12         A    In there you'll find products that

13     are being stored for future shipment date.

14     You'll also find products that have been set

15     aside for destruction or have been -- are

16     being sorted and returned.  When we had the

17     packaging change in 2006, we used that area of

18     the warehouse to sort out the various bottles

19     that were coming back so that we could have

20     them prepared for destruction.

21         Q    When the DEA investigators were

22     conducting their audit of various chemical

23     products at Novelty in July of 2007, did you

24     assist them?

25         A    Yes.

Page 1513

1          Q      And what, if anything, did you

2     tell them about product that was set aside for

3     destruction, returned, that was not listed in

4     the inventory?

5          A      The product is in -- All the

6     product inside that facility is in our

7     inventory system in a various -- Our inventory

8     system works on locations.  So other product

9     would be in the inventory locations inside our

10     systems.  That product that they wanted to

11     count was not part of what we call the

12     shippable or the saleable inventory.

13          Q      Now did you give the DEA

14     investigators any records relating to the

15     saleable or shippable inventory?

16          A      Yes, that's where they spent most

17     of their time.

18          Q      Did the investigators explain to

19     you what items they were seeking to audit

20     during that investigation?

21          A      Yes, I gave them a complete list

22     of items that are scheduled listed chemicals.

23     They selected from that list about 20 items to

24     audit.

25          Q      Were any of the items that they

Page 1514

1        selected in the non shippable category of

2        products?

3             A     Yes.

4             Q     Did you or members of your staff

5        show them where they could find those items so

6        that they could conduct a physical count of

7        those items?

8             A     Yes.  We completed on Monday night

9        around 9:00 or 9:30 we completed a count of

10       the shippable inventory.  On Tuesday morning

11       on July 10th, our Staff Coordinator Barnhill,

12       Diversion Investigator Kuzma and Staff

13       Coordinator Meador along with three Novelty

14       employees began counting the sort area.

15            Q     And Novelty employees helped count

16       the inventory on hand.  Is that correct?

17            A     Yes.

18            Q     And did your employees do an

19       accurate accounting of what was on hand?

20            A     Yes.

21            Q     Were the DEA investigators given

22       full access to all of the 20 items that they

23       had asked to audit?

24            A     Yes.

25            Q     Did they fail to count any of the

Page 1515

1          product that was part of those 20 items?

2              A     There is not a complete counting

3          of the items there were in the sort area.

4              Q     And how many of the items on the

5          list of 20 that were audited were contained in

6          the sort area?

7              A     I would expect as to which of the

8          20 items or the number of 20 items that would

9          be in that sort area.

10             Q     I'd like to direct your attention

11         to the time frame of the spring of 2003.  Do

12         you recall being visited by DEA diversion

13         investigators in the spring of 2003 regarding

14         finding DMD products in a meth lab?

15             A     No, I don't recall in the spring

16         of 2003 that meeting.  I do recall a May

17         meeting with diversion investigators from the

18         Indianapolis office for a routine inspection.

19             Q     During -- And that would be May of

20         `03, spring?

21             A     Yeah.

22             Q     During that routine inspection,

23         did they mention to you an issue regarding DMD

24         supply being found or DMD scheduled listed

25         chemical products being found in a meth lab?

Page 1516

1           A      I don't recall that.  I recall

2      learning about that from the supplier.

3           Q      From DMD?

4           A      Yes.

5           Q      How long have you had a business

6      relationship with DMD?

7           A      I don't know when that

8      relationship began.

9           Q      Does Novelty still have a business

10     relationship with DMD?

11          A      Yes.

12          Q      Where is DMD located?

13          A      Central Indiana.

14          Q      More specifically, Carmel, Indiana

15     or Carmel?

16          A      Hamilton County, Carmel,

17     Noblesville.

18          Q      Noblesville.

19          A      I'm not sure the exact.

20          Q      How far is Noblesville from

21     Greenfield?

22          A      About 30 minutes, 40 minutes.

23          Q      Highway driving?

24          A      Could be.

25          Q      When you say 30 or 40 minutes,

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1517

1          that's a time I -- Distance wise, is it 30 to

2          -- Is it within a 50 mile range of Greenfield?

3              A     Yes.

4              Q     About the time that you learned

5          about this DMD product being found in a meth

6          lab, why did DMD tell you about that?

7              A     DMD was asking us if we knew where

8          we shipped that lot number.

9              Q     So DMD gave you the lot number?

10             A     Yes.

11             Q     And what did you determine about

12         where you shipped that lot number?

13             A     We determined we shipped it to two

14         different sales representatives in the New

15         England area.

16             Q     And because of Novelty's

17         distribution system, you have no idea what

18         specific lot number goes to specific stores,

19         do you?

20             A     No.

21             Q     Because the sales people

22         determined what product goes to which store.

23         Right?

24             A     That's correct.  We know where the

25         lot numbers are shipped.  We know what area of

1        the country the lot numbers are put into

2        retail locations.

3            Q      Those go to mini warehouses around

4        the country.

5            A      They goes to sales representatives

6        around the country.

7            Q      They go -- When you say they go to

8        sales representatives, what location are they

9        delivered to?

10           A      They're delivered to their storage

11       unit which acts as a transfer point.

12           Q      Did anyone from DEA ever talk to

13       you or did you ever talk to anyone from DEA

14       about the product that DMD brought to you

15       attention?

16           A      I don't recall that.  I reviewed

17       my notes from the meeting in May, but I could

18       not find any record of that topic being

19       brought up during that initial meeting.

20           Q      How about outside of that meeting?

21       Has that topic come up with any DEA employees?

22           A      Yes, whenever I got a chance to

23       meet with the representatives from the Indiana

24       office, 2002, 2003 and then again in 2007,

25       I've always asked have any -- have you found

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1519

1      any of Novelty's products in a methamphetamine

2      arrest.

3              Q      My question is have you ever

4      discussed the DMD products that were -- that

5      DMD told you were found in meth lab with any

6      DEA employees any time?

7              A      I don't recall any conversations,

8      no.

9              Q      When you learned of the

10     possibility that Novelty products might have

11     been in a meth lab what did you do?

12             A      Well, we cooperated with DMD and

13     provided them the information that they

14     required.

15             Q      And, in fact, the lot number DMD

16     gave you did, in fact, come back to showing

17     that it was shipped to Novelty.  Right?

18             A      We had shipped that lot number,

19     yes.

20             Q      When you were the vice president

21     of sales and operations, was there a one case

22     limit in effect with regard to the sales of

23     scheduled listed chemical products?

24             A      Yes.

25             Q      When did that go into effect?

Page 1520

1       **A      One case limit had gone into**
2       **effect sometime in 2005.  I'm speculating. I**
3       **don't have the exact date in memory.**
4       **Q      Were you part of that decision**
5       **making process about putting a one case limit**
6       **on the sales of scheduled listed chemical**
7       **products?**
8       **A      No.**
9       **Q      Were you told why the company put**
10      **a limit on, the one case limit on, scheduled**
11      **listed chemical products?**
12      **A      No.**
13              MR. BARBER:  May I have a moment,
14      Your Honor?
15              JUDGE RANDALL:  Certainly.
16              (Off the record discussion.)
17              MR. BARBER:  That's all I have,
18      Your Honor.
19              JUDGE RANDALL:  Very well.
20              MR. EMORD:  Your Honor, as before
21      we're doing both a cross and a direct.  This
22      witness because of the nature of the
23      scheduling and the unpredictability of the
24      appearance of the witnesses we have asked our
25      expert witness to come in on Monday morning

Page 1521

1          and so with the consent of opposing counsel,

2          we have arranged so that this witness could

3          return after the expert witness testifies and

4          that way she wouldn't have to remain or carry

5          over for any length of time again on Monday.

6          She's been here for some time.  She had to go

7          back to the university and then we'll bring

8          her back in again.

9                         JUDGE RANDALL:  All right.

10                        CROSS EXAMINATION

11                   BY MR. EMORD:

12              **Q      So, Mr. Polk, you testified to a**

13         **May 2003 meeting with the DEA investigators**

14         **which you characterized as a routine meeting**

15         **and you said you took notes about that**

16         **meeting.  Is that right?**

17              **A      Yes.**

18              **Q      Now I'm going to present you with**

19         **a document to refresh your recollection and**

20         **ask you whether indeed these are --**

21                   MR. BARBER:  Objection, Your

22         Honor.  There is no question that he needs his

23         recollection refreshed on yet.  So I would ask

24         that the question be posed to find out if he

25         needs it.

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1522

1                    MR. EMORD:  All right.

2                    JUDGE RANDALL:  Sustained.

3                    MR. EMORD:  With Your Honor's

4        indulgence, I will give a copy of these

5        documents to the Court Reporter to make it

6        easier.

7                    JUDGE RANDALL:  To the Hearing

8        Clerk.

9                    MR. EMORD:  To the Hearing Clerk,

10       I'm sorry.

11                   JUDGE RANDALL:  Yes.  Did you

12       place a copy of the witness --

13                   MR. EMORD:  I did, Your Honor.

14       Yes, I did.

15                   JUDGE RANDALL:  Okay.  Let's

16       retrieve those, shall we?

17                   MR. EMORD:  Okay.

18                   (Off the record comments.)

19                   BY MR. EMORD:

20          Q    All right.  Mr. Polk, you had a

21       meeting on May of 2003 with DEA personnel.  Do

22       you know whether Madeline Kuzma was present at

23       that meeting?

24          A    Yes, she was.

25          Q    Was anyone else present at that

1      meeting?

2          A     I believe Laurie Hollip (Phonetic)

3      was a part of that meeting pertaining to that

4      inspection.

5          Q     And did you take notes during the

6      course of that meeting?

7          A     Yes.

8          Q     And when you meet with DEA

9      officials do you ordinarily take notes?

10         A     Yes.

11         Q     And what do you include in your

12     notes?

13         A     Obviously, what they asked us to

14     provide to them as part of the inspection or

15     any comments they might make pertaining to

16     their efforts.

17         Q     If anything is communicated to you

18     that you regard as important to you do you

19     write it down?

20         A     Yes.

21         Q     And if you were informed in that

22     meeting of a diversion situation with DMD

23     Pharmaceuticals, if you're informed a

24     Connecticut meth lab had product in it by any

25     of those DEA officials would you have written

Page 1524

1    it down?

2         A    Yes.

3         Q    Now you have before you a

4    document.  Could you identify that for me, the

5    first page of the document?

6              MR. BARBER:  Objection.

7              MR. EMORD:  I'm sorry.  You don't

8    have it.  Your Honor, may we place it now?

9              JUDGE RANDALL:  No.  There's no

10   question that he needs his memory refreshed.

11             BY MR. EMORD:

12        Q    All right.  Well, do you recall

13   whether or not you were supplied a notice of

14   inspection?

15        A    Yes, I do.

16        Q    And do you recall whether or not

17   in the course of keeping your records

18   associated your notes with that notice of

19   inspection?

20        A    Yes.

21        Q    And did you keep that from that

22   point in time to the present?

23        A    Yes.

24        Q    And in your notes is there

25   anywhere in your notes a reference to the

Page 1525

1           Connecticut meth lab?

2                   A       No.

3                   Q       And do you recall any statement

4           being made to you by Madeline Kuzma at that

5           meeting informing of product being found in a

6           Connecticut meth lab?

7                   A       I don't recall that conversation.

8                   Q       Now subsequent to that May 2003

9           meeting, did you have subsequent meetings with

10          DEA personnel?

11                  A       Yes.

12                  Q       On how many occasions to the best

13          of your recollection?

14                  A       September 2002, the only one I can

15          recall.

16                  Q       And then July 9th inspection?

17                  A       Yes, in 2003.  Yes, July 9th

18          inspection.

19                  Q       And any other inspection other

20          than 2003?

21                  A       No.

22                  Q       Other than the 2007 inspection?

23                  A       No, in 2005, they came out to

24          discuss a company named Strides with us but it

25          was not a Novelty inspection.

Page 1526

```
 1              Q    Now at each of these occasions was
 2     Marilyn (sic) Kuzma present?  Madeline, excuse
 3     me.
 4              A    Yes, Investigator Kuzma was
 5     present in 2002, 2003 and 2007.
 6              Q    And on each of those occasions did
 7     you ask to the best of your recollection
 8     whether any Novelty product had been found in
 9     a clandestine meth lab?
10              A    Yes, it's normally one of the very
11     first questions that I ask.
12              Q    And the response given to you was?
13              A    In July 2007, the answer was no.
14              Q    And in any other time were you
15     told that there had been to the best of your
16     recollection any Novelty product found in a
17     meth lab?
18              A    No.
19              Q    Now you say that you received the
20     information from -- that Novelty product had
21     been found in a Connecticut meth lab from a
22     conversation with officials from DMD.  Do you
23     remember specifically who you spoke to?
24              A    I don't recall who it was.  The
25     initial communication was an email from DMD to
```

Page 1527

```
 1        Novelty.
 2              Q     What did that email contain?  Do
 3        you recall?
 4              A     It asked where we shipped a
 5        specific lot number.
 6              Q     And --
 7              A     It asked some inventory
 8        information about the lot number.  I don't
 9        recall the exact wording, but it was about a
10        lot number
11              Q     And did you respond?
12              A     I did not directly respond, no,
13        but the company did respond to them, yes.
14              Q     And who to the best of your
15        recollection respond from the company?
16              A     Craig Baker.
17              Q     Craig Baker and what did he tell
18        DMD?
19              A     He told DMD that we shipped to two
20        different sales representatives in the New
21        England area.
22              Q     And he identified those sales
23        representatives?
24              A     No, not that I'm aware of.
25              Q     All right.  And now if we can turn
```

Page 1528

1          to the July 9th inspection.

2                A      Okay.

3                Q      During the course of that

4          inspection, did you receive any what you would

5          consider to be irregularities in the way in

6          which DEA agents behaved?

7                A      Yes.

8                Q      And what were those

9          irregularities?

10               A      It started with a warrant.

11                      MR. BARBER:  Objection, Your

12         Honor, to the characterization that the

13         issuance of, the execution of a warrant in the

14         normal course of business.

15                      MR. EMORD:  It's his perception.

16                      MR. BARBER:  Let me finish my

17         objection.  I object to the characterization

18         of irregular in the question of Mr. Emord to

19         the anticipated testimony of his witness that

20         the execution of a duly issued warrant by DEA

21         investigators is somehow irregular.

22                      JUDGE RANDALL:  Mr. Emord.

23                      MR. EMORD:  It's his perception.

24         It's not my testimony.  I asked him about the

25         irregularities.  If he thinks the warrant

Page 1529

1          issuance is irregular, I mean, that's his

2          view.

3                    JUDGE RANDALL:  It was your view

4          as you asked the question.  Re-ask the

5          question, Mr. Emord.

6                    MR. EMORD:  All right.

7                    JUDGE RANDALL:  I'll sustain the

8          objection.

9                    MR. EMORD:  All right.

10                   BY MR. EMORD:

11            Q     The July 9, 2007 inspection, Mr.

12         Polk, during the course of the inspection, did

13         you perceive what you considered to be an

14         irregularities?

15            A     Yes.

16            Q     And what were those

17         irregularities?

18            A     Well, five people.  No normal

19         inspection documents.  The informal inspection

20         form that we had previously received in 2002

21         and 2003.  The document was replaced by

22         another document.  Three people from the

23         national office.  Comments made by people from

24         the national office that this had nothing to

25         do with lawsuits with Novelty.

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1530

1                    The presence of national people

2        was because the local field people were

3        shorthanded.  Yet there were two field people

4        from Indianapolis there no more than we

5        typically had in any other audit.  Special

6        Agent Carol Harris accompanied Madeline Kuzma

7        at that inspection.

8                    The breadth of items chosen.  The

9        lack of a concise list of information

10       requested was unusual.  The contentiousness of

11       the people asking for the information was

12       unusual.  Thanks to Mr. Barber we were able to

13       settle that down and get a concise list of

14       items that they needed to have.  I think on

15       Thursday morning we were able to get that done

16       on the 12th.  It changed a little bit the

17       afternoon of the 12th.  We went from 23 items

18       back up to 26 items.  But yet we had a concise

19       list of items at last and could supply that to

20       them.  It was a very unusual -- it was unlike

21       any audit we had in 2002 and 2003.

22            Q    Now were you ever threatened with

23       arrest during the course of the investigation?

24            A    Yes.

25            Q    And can you please explain for me

Page 1531

1        and for the Court what was said to you that
2        made you believe that you were subject to
3        arrest and who said that to you?
4              A       Wednesday morning I met with
5        Investigator Kuzma, Staff Coordinator Barnhill
6        and Staff Coordinator Meador in a room that we
7        had set aside for them during the inspection.
8        Investigator Kuzma said to me that the
9        documents that I had provided them on Tuesday
10       looked scrubbed.  Barnhill talked about them
11       being sanitized.
12                     Barnhill then began talking to me
13       about impeding and obstructing the inspection.
14       She pointed out to me -- She handed me a code
15       book and asked me to read two sections of a
16       code book that dealt with the powers they had
17       to act upon people if they felt we're impeding
18       or obstructing the inspection and in that
19       section it talked about arrest.  The
20       concluding comment to me from Barnhill from
21       that exchange was that it won't be one of your
22       attorneys that are arrested.  It will be a
23       Novelty employee.  She then said, "I want all
24       of these documents produced by noon."  And
25       what she was referencing, Your Honor, was

Page 1532

1          about 12,000 pages of documents that she had

2          asked me to provide for her.

3                    What I had given to her prior to

4          that request was a summary list of

5          transactions.  Because in our initial meeting

6          on Monday when we were talking about how they

7          would proceed with the audit, they said and I

8          had written in my notes and recalled from the

9          conversation they wanted a list of the

10         transactions.  They would then select from

11         those transactions specific documents that

12         they wanted to audit which seemed reasonable

13         to me because that's typically a way that an

14         audit is conducted.

15                   That obviously changed Wednesday

16         morning from just sampling the transactions

17         out of 157 page report to 12 -- to everything.

18         They wanted every document that was in the

19         report and so I left the room thinking I had

20         three hours between 9:00 a.m. and 12:00 noon

21         to produce 12,000 pages of shipment records

22         for the DEA.

23              Q    And would it have been physically

24         possible for you through ordinary business

25         records to extract within three hours over

Page 1533

1        12,000 pages of documents?

2              A      No.

3              Q      And did you explain that this

4        would be physically impossible to the agents

5        onsite?

6              A      No.

7              Q      And did they ask you -- Did they

8        at any point in time offer to within that day

9        without the advice of counsel offer to give

10       you an extended period of time to produce

11       those documents?

12             A      No.

13             Q      And were you under the impression

14       that you may well be arrested if you didn't

15       produce those documents within three hours?

16             A      Well, certainly.  I mean, that was

17       just what was communicated to me.  I -- At

18       that point, I had the impression that this

19       needed, that we needed, to get the involvement

20       of some other people and that's when I asked

21       our local counsel in Indianapolis for some

22       assistance.  He was able to get in contact

23       with Mr. Barber and I think that dialogue is

24       what eventually got us back into a much more

25       reasonable conversation.  But for the entire

Page 1534

1       day Wednesday, we were certainly not in a

2       situation where we could in my opinion talk in

3       a reasonable manner.

4               Q     Now, Mr. Polk, your background,

5       you're an accountant?

6               A     Right.

7               Q     You have a Bachelors of Science

8       degree in Accounting.

9               A     Yes.

10              Q     And do you understand general

11      accounting principles that apply in an audit?

12              A     Yes.

13              Q     Now you mentioned the threat of

14      arrest.  You mentioned an accusation of

15      scrubbing, I believe, you said.

16              A     Yes.

17              Q     And what was the other accusation?

18              A     Sanitizing.

19              Q     Now what provoked that charge that

20      you had scrubbed or sanitized documents?

21              A     I'm not sure.  I would be

22      speculating.  I don't know.  I don't know what

23      provoked them to say that.

24              Q     Now what did you do in order to

25      accommodate the demand for the production of

Page 1535

1        the over 12,000 pages of document?  What did

2        you cause to happen within Novelty in order to

3        accommodate that?

4              A     I asked our -- Well, first of all,

5        we weren't going to print it.  We were going

6        to burn it to .PDFs.  So I went to our IT

7        staff to get them working on a computer

8        program that would extract the data, print it

9        into a .pdf form so that we could put those on

10       CD ROMs versus physically printing that volume

11       of documents.

12             Q     Now you mentioned that Mr. Meador

13       was there during the inspections.

14             A     Yes.

15             Q     Now to your knowledge, had any

16       charge been leveled against Mr. Meador by your

17       counsel in the United States District Court

18       for the District of Columbia about an

19       affidavit that Mr. Meador had submitted?

20                   MR. BARBER:  Objection, Your

21       Honor.  Relevance.  Scope.

22                   JUDGE RANDALL:  Overruled.  You

23       may answer the question.

24                   THE WITNESS:  Yes.

25                   BY MR. EMORD:

bd4bdf32-b3d7-48e4-98ef-6390aa27abca

Page 1536

1        Q     And what is that?

2        A     I was aware that he had --

3              MR. BARBER:  Objection, Your

4        Honor.  The witness is preparing to level

5        accusations that are not part of this

6        proceeding against a witness who has not been

7        called to impeach an individual who currently

8        is nothing more than an investigator of the

9        Drug Enforcement Administration and he is

10       under subpoena.  There is no need to impeach

11       a witness who hasn't testified and that is

12       what is about to happen and I object to any

13       further questions regarding this matter.

14              JUDGE RANDALL:  Mr. Emord.

15              MR. EMORD:  Well, this is all

16       relevant to the general environment that has

17       been created by the DEA at Novelty at that

18       time.  The fact that someone was then being

19       charged with having made a false affidavit

20       submission in Federal Court who was at the

21       very time the charge is pending there at

22       Novelty performing the audit when Novelty was

23       the party against him when he was charged

24       raises very serious questions about the

25       personal interests of the person.  But besides

Page 2003

```
1        at 9:06 a.m.)

2                    JUDGE RANDALL:  Back on the

3        record.

4                    Mr. Emord, you may continue.

5                    MR. EMORD:  Thank you, Your Honor.

6        Opposing counsel and I have agreed on a unique

7        format with the witness which is the

8        combination of direct and cross so that I may

9        actually ask the witness certain leading

10       questions.  We truncated the process.  This is

11       one of the witnesses that we did that with for

12       the convenience of the Court.  And so I begin.

13                   JUDGE RANDALL:  All right.  Thank

14       you.  Thank you for putting that back on the

15       record.  I appreciate it.

16                   MR. EMORD:  Thank you, Your Honor.

17                   DIRECT/CROSS EXAMINATION

18                   BY MR. EMORD:

19           Q     Now, Mr. Polk, you previously

20       testified that the week of July 9, 2007, DEA

21       executed a search warrant at Novelty's

22       Greenfield, Indiana facility.  Correct?

23           A     Yes.

24           Q     And at that investigation, did

25       Novelty then have pending -- At the time of
```

Page 2004

1    that investigation, did Novelty then have

2    pending a lawsuit against the Drug Enforcement

3    Administration in the United States District

4    Court for the District of Columbia?

5                MR. BARBER:  Objection, Your

6    Honor, to relevance.

7                JUDGE RANDALL:  Mr. Emord.

8                MR. EMORD:  This is actually where

9    we left off, Your Honor, last time.  Your

10   Honor ruled then that the question could be

11   allowed.  And so I'm proceeding with it.

12               JUDGE RANDALL:  Very well.  I

13   agree and I overrule the objection.  You may

14   inquire into the matters of the events that

15   occurred on July 9, 2007.

16               MR. EMORD:  Thank you, Your Honor.

17   Did you --

18               THE WITNESS:  Yes, I'm aware of

19   it.

20               BY MR. EMORD:

21        Q    And to your knowledge in that

22   suit, did the DEA's Darrell Meador have an

23   affidavit on file with the court?

24        A    Yes.

25        Q    And did Novelty then have pending

1       **in that court a charge that the affidavit**

2       **contained a false statement?**

3                   MR. BARBER:  Objection, Your

4       Honor.  Relevance.  The documents in the court

5       will speak for themselves as to what was

6       pending.  This witness has not -- There is no

7       foundation laid that this witness is an expert

8       in the law and in the meaning of the pleadings

9       that have been filed in other cases and I also

10      note for the record that yesterday Mr. Emord

11      objected on several occasions to references

12      the expert witness report that was filed in

13      other fora and so we also object to

14      introducing this.  It has nothing to do with

15      the execution of the warrant.

16                  MR. EMORD:  Actually, that's

17      exactly why I'm making the inquiry, Your

18      Honor.  It's the environment --

19                  JUDGE RANDALL:  I can't hear you,

20      Mr. Emord.

21                  MR. EMORD:  I'm sorry.  It's the

22      environment at Novelty that we're focusing

23      upon and the facts and circumstances preceding

24      it to the extent necessary to lay a predicate

25      for questions about that environment are

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2006

1    warranted here.

2                We're not going to get into the

3    precise nature of the suit or the charges but

4    the simple fact of the existence of the charge

5    is important to understanding the nature of

6    Mr. Meador's actions that day according to the

7    Respondent.

8                JUDGE RANDALL:  Very well.  Then I

9    will sustain the objection to the extent that

10   you've asked him to form a legal conclusion

11   and that's sustained.  However, I will allow

12   you limited leeway in establishing your

13   foundation.

14               MR. EMORD:  Thank you, Your Honor.

15               BY MR. EMORD:

16       Q    Now is it your understanding that

17   at the time of the investigation at Novelty

18   Novelty had then pending in the United States

19   District Court for the District of Columbia a

20   charge that Darrell Meador had included a

21   false statement in his affidavit?

22       A    Yes.

23       Q    And was Darrell Meador present at

24   Novelty on July 9, 2007?

25       A    Yes.

Page 2007

1          Q     Was he part of the DEA's team

2     executing a warrant?

3          A     Yes.

4          Q     And for how many days did he

5     remain at Novelty's facility?

6          A     He was there Monday, Tuesday and

7     Wednesday.  He was not there on Thursday and

8     Friday, the final two days of their

9     inspection.

10          Q     Did it surprise you that Mr.

11     Meador was present at the investigation?

12                MR. BARBER:  Objection, Your

13     Honor.  Relevance.  The witness's surprise to

14     this event is of no moment.

15                JUDGE RANDALL:  Mr. Emord.

16                MR. EMORD:  Well, actually it is

17     and the facts and circumstances concerning the

18     reaction of people who were looking at these

19     Fourth Amendment, First Amendment issues and

20     so understanding the environment that is

21     present is critical.  Appreciating both the

22     nature of the actions and the reactions to

23     them helps us understand what took place.

24                JUDGE RANDALL:  Very well.  I'm

25     going to sustain the objection.  Let's try to

Page 2008

```
 1        stick with the facts, Mr. Emord.

 2                  BY MR. EMORD:

 3        Q      Now you said that Mr. Meador was

 4    there the first day, July 9th.

 5        A      Right.

 6        Q      And let's talk about the basic

 7    structure of the Novelty facility.  When the

 8    agents entered the building, did they enter a

 9    general public entrance or did they come in

10    through another entrance?

11                  MR. BARBER:  Objection, Your

12    Honor.  Mischaracterizes the facts.  These

13    were diversion investigators and one agent,

14    not multiple agents.

15                  JUDGE RANDALL:  Sustained.

16                  BY MR. EMORD:

17        Q      How many agents arrived on July 9,

18    2007 at Novelty's facility?

19        A      Five DEA employees arrived through

20    a public entrance.

21        Q      What were their names?  Do you

22    know?

23        A      Yes.  Darrell Meador, Staff

24    Coordinator.  Madeline Kuzma, Diversion

25    Investigator.  Lisa Barnhill, Staff
```

Page 2009

```
 1          Coordinator.  Carroll Harris, Special Agent in

 2          the Indianapolis office and Brian Bayly,

 3          Counsel DEA.

 4               Q     And did they enter through a

 5          public entrance?

 6               A     Yes.

 7               Q     And what did they proceed to do?

 8               A     They asked for an officer of the

 9          company and when I was notified they were

10          here, I met them in the lobby.  They handed me

11          their warrant.

12               Q     Now did they enter any area where

13          Novelty keeps its ephedrine and

14          pseudoephedrine containing products?

15               A     Yes.

16               Q     And where was that area in the

17          building?

18               A     It's in the warehouse.  We have a

19          caged in area of the warehouse that contains

20          the ephedrine and pseudoephedrine products and

21          we showed them where that area was and gave

22          them access to that area for their inspection.

23               Q     Now when they were in the caged in

24          area, did they have any -- did they make any

25          statements to you there about any objection
```

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1        concerning the manner in which the ephedrine

2        and pseudoephedrine products were kept?

3            A     No objection to the order of the

4        facility.  There were a couple of statements

5        made about some of the rework area when we

6        were in that part on Tuesday morning counting.

7        Staff Coordinator Barnhill made a comment

8        about an empty bottle, saying that -- I think

9        her exact words were something along the lines

10        that meth heads must have used this and taken

11        it back to the store for credit.  There was

12        some other bantering going on between the DEA

13        employees while they were counting that

14        section.  But other than that, I don't recall

15        any disparaging comments about the condition

16        of the facility or the products.

17            Q     Now did Novelty attempt to

18        videotape the investigation?

19            A     Yes.

20            Q     On what day did Novelty attempt to

21        videotape the investigation?

22            A     That was Wednesday, Wednesday the

23        11th.

24            Q     And why did Novelty attempt to

25        videotape the investigation?

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1          A      Well, previously on the day on

2     Wednesday, we had an exchange about the threat

3     of arrest which I felt was completely without

4     merit and I was a bit concerned for what was

5     going on and I wanted to have some proof or

6     documentation that what was happening was

7     exactly what was ultimately going to come out

8     about what happened that day was truthful.  I

9     felt the best way to do that would be to

10     document that through some form of media.

11          Q      Can you describe for me the

12     videotape recorder?

13          A      Yes, it was just a common, you

14     know, video recorder connected to a tripod.

15          Q      What's the size of the video

16     recorder?

17          A      It's, you know, a handheld, one of

18     those small.  I don't recall the exact brand

19     name that we have in the office, but it's like

20     a small Sony or Canon type handheld video

21     recorder.

22          Q      How much space does the tripod

23     take when it is extended out on the floor?

24          A      Probably no different than what

25     you'd see here with this easel board.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2012

```
 1            Q     Now you've testified that an

 2       attempt was made to videotape the

 3       investigation on Wednesday.  Correct?

 4            A     Right.

 5            Q     And where was the videotape

 6       recorder placed in the room in which the

 7       recording was to take place?

 8            A     At the end of the room.

 9            Q     Do you mean a corner of the room

10       or the center of the room on one side?  What

11       do you mean precisely?

12            A     I mean on the end kind of toward a

13       corner.  It wasn't in the corner but it was

14       away from the door.

15            Q     Did it block ingress or egress to

16       the room?

17            A     No.

18            Q     Did it obstruct access to any

19       documents in the room?

20            A     No.

21            Q     Was the videotape recorder placed

22       in the room prior to the arrival of the DEA

23       agents to your understanding?

24            A     Yes, they were all on lunch break

25       I believe when we placed it in the room the
```

Page 2013

1      first time we attempted to place it in the

2      room.

3              Q      Now after the videotape recorder

4      was placed in the room, was it plugged into

5      the wall and made operative?

6              A      Yes.

7              Q      And what then happened when the

8      DEA agents entered the room?

9              A      It was removed from the room and

10     placed in the hallway.

11             Q      By those agents?

12             A      Yes.

13             Q      Do you know specifically?  Was

14     there one agent or two agents or more who

15     actually removed it from the room or do you

16     know?

17             A      I don't know the specific person

18     that removed it from the room the first time.

19             Q      Is someone -- is there a person in

20     Novelty's, among Novelty's executives who does

21     know that information?

22             A      Yes, sir.

23             Q      And who is that?

24             A      I believe J.R. Merlau knows that.

25             Q      Was the removal of the videotape

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2014

1          recorder against your wishes?

2                A     Yes.

3                Q     Did you -- Did Novelty executives

4          make, to your understanding, did Novelty

5          executives make clear that that was against

6          their wishes?

7                     MR. BARBER:  Objection, Your

8          Honor.  No foundation.  He's asked what other

9          Novelty executives have done.

10                    JUDGE RANDALL:  Overruled.  He

11         stated to this witness's understanding.

12                    THE WITNESS:  Yes.

13                    BY MR. EMORD:

14               Q     And nevertheless, the video

15         recorder was removed over their objections.

16               A     Correct.

17               Q     Was there a second attempt to

18         videotape the investigation?

19               A     Yes.

20               Q     And when did that occur?

21               A     It occurred early in the afternoon

22         on the 11th.  It was after the first, after

23         the recorder had been removed the first time.

24               Q     And was that attempt to video

25         record made in the same room as before?

1        A      Yes, same room, same location.

2        Q      And when -- And where was the

3    video recorder placed the second time the

4    video recording was attempted?

5        A      The same general spot that we had

6    placed it the first time.

7        Q      And how did DEA agents respond to

8    the second attempt to video record the

9    investigation?

10        A      Well, they were present for the

11    second installation of the video camera and

12    immediately seized the equipment and in the

13    course of doing so unplugged the equipment

14    from the wall and removed it from the room and

15    placed it back in the hallway.

16        Q      Now to your knowledge was the

17    equipment at the time it was seized, was it

18    held by any employee of Novelty?

19              MR. BARBER:  Objection, Your

20    Honor.  The beginning of a question that

21    starts with "To your knowledge" doesn't lay a

22    foundation and he's not even testified that he

23    was present when the video was removed the

24    second time, where he was and what the basis

25    of his knowledge is.  It would be

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2016

1          inappropriate to have this witness continue to

2          testify incompetently unless a foundation for

3          this knowledge is established.

4                    MR. EMORD:  Hearsay is liberally

5          permitted.

6                    JUDGE RANDALL:  I'm going to

7          sustain the objection.

8                    BY MR. EMORD:

9          **Q     Do you have any knowledge -- Well,**

10         **let me rephrase the question.  Did there come**

11         **a time when you became aware of how the video**

12         **recorder was used in the room the second**

13         **attempt the video recording was made?**

14         **A     Yes.**

15         **Q     And how did you receive that**

16         **information?**

17         **A     From J.R. Merlau.**

18         **Q     And what did he tell you?**

19                    MR. BARBER:  Objection, Your

20         Honor.  Mr. Merlau is on their witness list

21         and so it is repetitive to have this witness

22         testify about the hearsay which the Government

23         will then cross examine Mr. Merlau on.

24                    JUDGE RANDALL:  Overruled.  You

25         may answer.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2017

1          THE WITNESS:  He told me that

2     Darrell Meador grabbed the equipment, pulled

3     it and removed it from the room.

4          BY MR. EMORD:

5     **Q     Did he tell you whether Darrell**

6     **Meador grabbed the equipment from his physical**

7     **possession or was it from the site where it**

8     **was located separate from his possession?**

9     **A     It was from his possession.  He**

10    **hadn't even had a chance to.**

11    **Q     So J.R. told you that he had**

12    **physical custody of the video recorder and it**

13    **was removed from his hands by Mr. Meador.**

14    **A     Yes.**

15    **Q     And it was then also detached from**

16    **the electrical conduit in the wall.**

17    **A     Yes.**

18    **Q     And then it was removed outside of**

19    **the room?**

20    **A     Yes, it was placed in the hallway.**

21    **Q     And was that against the wishes of**

22    **Novelty?**

23    **A     Yes.**

24         MR. BARBER:  Objection, Your

25    Honor.  Against the wishes of Novelty is

Page 2018

1          vague.  Let's talk about who at Novelty's

2          wishes this witness has knowledge of.

3                    MR. EMORD:  Your Honor, there

4          ought to be -- It's not a foundational

5          objection.  It's a request that a question be

6          asked in a particular way and I ought to be

7          able to do the examination in the order in

8          which I think fits so long as there isn't an

9          appropriate foundational objection.  This is

10         disruptive.

11                   MR. BARBER:  I'll object on

12         foundation, Your Honor.  I apologize for

13         suggesting there's a better way to ask the

14         question.  I'll try and limit my objection to

15         the fact that this witness, no foundation has

16         been laid for this witness' knowledge of who

17         objected, when they objected and they

18         communicated the objection to DEA.  So it

19         would be incompetent for him to testify about

20         the objections in a vague and ambiguous

21         manner.

22                   JUDGE RANDALL:  I'm going to

23         sustain the objection.  Mr. Emord, if you

24         would lay the foundation.

25                   MR. EMORD:  Very well, Your Honor.

Page 2019

1           BY MR. EMORD:

2           Q    Did there come a time that you --

3    Well, did you ever receive information as to

4    whether Novelty, meaning an executive for

5    Novelty, communicated to DEA dissatisfaction

6    with DEA's removal of the video equipment from

7    the room the second attempt videotaping was

8    made?

9           A    No, I did not personally as an

10   executive of the company tell them I was

11   displeased with their removal of the video

12   equipment.

13          Q    But did you come to understand

14   from anyone else at Novelty?

15          A    Yes.

16          Q    And what were you informed?

17               MR. BARBER:  Objection, Your

18   Honor.  There is still no foundation as to the

19   source of his information and when the

20   information was received by this witness.

21               JUDGE RANDALL:  Overruled.  The

22   foundation is adequate.  You may ask those

23   questions on cross, Mr. Barber.

24               THE WITNESS:  Yes.  Yes, it came

25   to my attention that J.R. had told them that

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2020

1           we wanted to that equipment present.

2                   BY MR. EMORD:

3           Q       Now was there a third attempt --

4       Well, excuse me.  Did there come a time when

5       a Novelty executive attempted to audio record

6       the investigation?

7           A       Yes.

8           Q       And what day was that attempt

9       made?

10          A       Wednesday the 9th or Wednesday the

11      11th.

12          Q       And did that occur after the

13      second attempt to video record the

14      investigation?

15          A       Yes.

16          Q       And what happened with the audio

17      recorder?

18          A       The audio recorder was placed at

19      the end of the table, the end of the

20      conference room table.

21          Q       In the same room?

22          A       The same room.  It was placed on

23      the table with the record button depressed or

24      record was activated.  There was a quick

25      disabling or deactivation of the recording.

Page 2021

1           Q      By whom?

2           A      I do not know who disabled the

3    recorder.  But you can tell on the recording

4    it cuts off and then goes on to the previous

5    recording.  When I came into the room around

6    5:00 p.m. or 5:30 p.m. that evening the

7    recorder was laying on the table, batteries

8    removed, tape removed, cover for the batteries

9    apart and laying on the table.

10          Q      And did you have any conversation

11   with another Novelty executive concerning the

12   audio taping attempt?

13          A      Yes.

14          Q      And who was that person?

15          A      J.R. Merlau.

16          Q      And what were you told?

17          A      I was told that he placed it on

18   the end of the table with --

19          Q      Who was he?

20          A      J.R. Merlau told me that he placed

21   the tape recorder on the end of the table with

22   the record function active.

23          Q      And then what happened according

24   to J.R.?  Did he tell you anything else?

25          A      Yes.  He said they verbally

Page 2022

1      objected to it being there and turned it off.

2            Q      And did J.R. tell you whether that

3      was against his wishes?

4            A      Yes.

5            Q      And what did he tell you?

6            A      It was against -- He wanted to

7      keep it on.  I wanted to have it on.  I wanted

8      to have it on when I went into the room at

9      5:00 p.m. or 5:30 p.m. for our next meeting.

10           MR. EMORD:  If the Court Clerk

11     will place before the witness what has been

12     identified ALJ Exhibit 1 as well to save time

13     Novelty Exhibit 36 as well.  I'm sorry I'm

14     having you do that all at once.

15                 (Off the record discussion.)

16                 BY MR. EMORD:

17           Q      Do you have both documents, Mr.

18     Polk?

19           A      Yes, sir.

20           Q      All right.  In a moment, I'm going

21     to ask you questions about them.  Now I

22     believe you previously testified that during

23     the course of the investigation the DEA

24     investigators asked you to produce various

25     documents.

Page 2023

1           A      Correct.

2           Q      And did those DEA agents who asked

3      you to produce documents ever alter their

4      demand for production of documents after you

5      supplied them the documents?

6           A      Yes.

7           Q      How many times did they alter

8      their demand for production of documents after

9      documents were produced?

10          A      I don't have a specific count of

11     times.  I know it was fairly common through

12     Wednesday.  As I said, on Thursday when Mr.

13     Barber got involved in the conversation the

14     occurrence became less.   But we had an email

15     exchange with their national office that dealt

16     around 10 or 11 items that we had typed out a

17     list based upon previous requests made to me

18     by the DEA employees that were there.

19                 When we were done on Thursday,

20     that list was at 23 items.  On Thursday, there

21     were some things added to the list.  When we

22     were done on Friday, it was at 26 items.

23     Typically, in the early in the process,

24     Tuesday and Wednesday, we would give them a

25     document and they would say, "Well, can you

Page 2024

1          add this field into this document" or "Can you

2          add this piece of data to this document" and

3          we would then go back and modify that document

4          according to their request.

5          Q    So from Monday until Wednesday,

6          you would be, correct me if I'm wrong, asked

7          to produce documents and then what?

8          A    Then I'd be asked to produce more

9          documents or to change the documents I had

10         previously given them.

11         Q    And to the best of your

12         recollection, how many times were demands for

13         production of documents altered in this way

14         between Monday and Wednesday?

15                MR. BARBER:  Objection.  Asked and

16         answered and the witness said he doesn't

17         recall a specific number.

18                JUDGE RANDALL:  Sustained.

19                BY MR. EMORD:

20         Q    Now let's take Monday.  Do you

21         recall whether on Monday after an initial

22         document demand was made and you supplied

23         documents in response to it whether the agents

24         then asked you then modify the request for

25         those documents?

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2025

1          A     Yes, on Monday the document we

2     gave them was a list of all of the items we

3     sold containing scheduled listed chemicals.

4     We had presented a list to them and they asked

5     me to change it to add some other information

6     to it.

7          Q     Now to your recollection, did that

8     occur more than once on Monday, the change?

9          A     No, just once.

10         Q     On Tuesday, do you recall being

11    asked for documents by the DEA agents?

12         A     Yes.

13         Q     And after you produced those

14    documents, do you recall being asked to modify

15    the scope of production to produce other

16    documents?

17         A     I don't recall changes to any

18    documents on Tuesday.  The changes came more

19    Wednesday, Thursday and Friday.

20         Q     Now on Wednesday, were you asked

21    to produce documents?

22         A     Yes.  That was the 12,000 page

23    document in a three-hour day.

24         Q     All right.  And after you had

25    produced the documents requested on Wednesday,

1      did they modify or alter their request for

2      production to seek more documents?

3            A     Yes.

4            Q     And to the best of your

5      recollection on Wednesday, how many times did

6      that take place?

7            A     At least once.

8            Q     Now on Thursday, did they ask for

9      documents?

10           A     Yes.

11           Q     And upon receipt of the documents

12     on Thursday, did they modify their request and

13     ask for more documents?

14           A     Yes.  The list grew.  We added

15     three more documents to the list during the

16     day on Thursday, yes.

17           Q     And how many times were you asked

18     to modify the production on Wednesday, excuse

19     me, on Thursday?

20           A     Somewhere between one and five.

21     Thursday was a pretty heavy document prep and

22     exchange day. I don't recall exactly the

23     number, but it was, I'd say, less than five.

24           Q     Did you find the production of the

25     documents in response to the demands

Page 2027

1       **burdensome?**

2                   MR. BARBER:  Objection, Your

3       Honor.  That calls for a legal conclusion with

4       regard to work unless it's being used in a way

5       other than a legal conclusion from burdensome

6       with regard to the reasonableness of a

7       warrant.

8                   JUDGE RANDALL:  Mr. Emord.

9                   MR. EMORD:  Well, the term

10      "burden" is a lay term, Your Honor, and it's

11      used in the laws in a lay way.  It's a matter

12      of reason as is the terms "reasonableness."

13      So the witness has his own perspective as to

14      whether or not it was burdensome.  We didn't

15      get into that.

16                  MR. BARBER:  I'll withdraw the

17      objection if it's used in a layperson's terms,

18      Your Honor.

19                  JUDGE RANDALL:  All right.  Thank

20      you.

21                  MR. EMORD:  You may answer the

22      question.

23                  THE WITNESS:  Yes.  Certainly the

24      manner in which the document were requested

25      was burdensome.  I think the time constraints

1          put on us were burdensome.  The information is
2          available, wasn't necessarily available in the
3          format that the DEA employees were asking for.
4          So to the extent we had to produce formats
5          that met their expectations in the time frame
6          that they were asking for them, I felt like it
7          was burdensome.
8                    The previous inspections didn't
9          come to us through a warrant with a cutoff
10         date and certainly the agents, not agents, the
11         investigators and staff coordinators that were
12         presented were very conscious about the
13         deadline, getting this information from us
14         before this warrant, the time that the warrant
15         ran out.  I think that put some pressure on
16         them that they then transferred to us to get
17         the documents in time.
18                    You know, again through dialogue
19         with Mr. Barber's office we were able to agree
20         to an extension for the warrant deadline.  We
21         had no problem or qualm with cooperating with
22         the inspection.  Certainly at times during the
23         inspection and certainly early on in the
24         inspection, I questioned the appropriateness
25         of some of the people that were there, a

Page 2029

1          lawyer on a case in which we aren't not a

2          lawyer representing the Government in a case

3          in which we're not able to --

4                    MR. BARBER:  Objection, Your

5          Honor.

6                    THE WITNESS:  -- receive, obtain,

7          discovery.

8                    MR. BARBER:  Objection, Your

9          Honor.

10                   JUDGE RANDALL:  Sorry.  Yes, Mr.

11         Barber.

12                   MR. BARBER:  The question was

13         whether or not it was burdensome.  We've now

14         moved far afield into a narrative with no

15         pending question and I believe the question

16         was answered and in order to give the

17         Government a fair opportunity to hear

18         questions before Mr. Polk continues on his

19         narrative, I would ask a question be posed.

20                   JUDGE RANDALL:  Sustained.

21                   THE WITNESS:  Can I respond to the

22         question then?

23                   JUDGE RANDALL:  The burdensome

24         question?

25                   THE WITNESS:  Yes.

Page 2030

```
 1                    JUDGE RANDALL:  I'll let your
 2        counsel ask a question.
 3                    THE WITNESS:  Okay.
 4                    JUDGE RANDALL:  Your question.
 5                    BY MR. EMORD:
 6        Q     Do you wish to provide a further
 7        response to the question about burden?
 8        A     Yes.  The data asked for was not
 9        burdensome.  The manner in which it was asked
10        for was burdensome.
11        Q     Now did you possess all of the
12        data that they requested within your ordinary
13        business files at Novelty?
14        A     Yes.
15        Q     So the difficult as I understand
16        it, correct me if I'm wrong, the difficulty in
17        production lay in manipulating that data to
18        assume a format that the Government wanted?
19        A     Yes.
20        Q     And is it the case that the agents
21        onsite kept alternating the definition of the
22        format?
23        A     On some documents, yes.  When we
24        sat down on Monday, what was told to me was
25        they were going to select a group of items to
```

1       audit and then they would select -- We would

2       do a physical count of those items.  Then they

3       would select a subset of those items to do a

4       more extensive audit and we talked about the

5       definition of an extensive audit.  I said, "I

6       will give you a list of transactions and then

7       you can select from those transactions."  They

8       said, "Yes, that's what we want to do.  You

9       give a list of receipts.  You give us a list

10      of shipments.  You give us a list of

11      transfers.  We'll select individual

12      transactions that we want to audit."  In other

13      words, go get the source document.  Go get the

14      transfer document.  Go get the shipment

15      document. Go get the received document and

16      validate the accuracy or the validity of that

17      document and therefore by sampling these

18      individual transactions and validating some of

19      the individual transactions validate this

20      transaction set as a whole.

21                  That never transpired.  It was

22      continually 20-item initial selection.  Stay

23      with the 20 items.  There was no subset of

24      those items.  "Give me a list of your

25      shipments to the reps."  I gave them a list of

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1          shipments to the reps, 157 pages, Wednesday

2          morning.  "Give me every single one of these

3          shipping documents by noon."  All right.  That

4          wasn't a sample.  That's 12,000 or 12,000

5          pages of documents.  All right.

6                    It never became -- It was not --

7          The conversation that we had on Monday never

8          materialized during the course of the audit.

9          It was unlike previous inspections where it

10         was a very specific list of things, a process

11         that had precedent.  This was a process that

12         had no precedent, at least, from Novelty's

13         perspective and so it was a difficult thing to

14         do to try to figure out exactly what I needed

15         to do to meet their expectations early in the

16         process.

17              Q    Well, it sounds like you produced

18         quite a few documents.  Did --

19                    MR. BARBER:  Objection to the

20         commentary, Your Honor.

21                    JUDGE RANDALL:  Sustained.

22                    BY MR. EMORD:

23              Q    Did the DEA agents do a complete

24         audit of Novelty?

25              A    No.  I believe I testified on

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2033

1    Friday that there was an area of the facility

2    that contained products being sorted that was

3    not counted.

4         Q    Now if you'll turn your attention

5    to what has been identified as or actually

6    what is ALJ Exhibit 1, the Order to Show Cause

7    and Immediate Suspension of Registration, and

8    in particular if you'll turn your attention to

9    page two paragraph four.  Have you seen this

10   document before, Mr. Polk?

11        A    Yes.  Did you -- Looking at the

12   date on the last page four, January 17, 2008,

13   can you tell me to the best of your

14   recollection when you first saw the document?

15        A    January 28, 2008.

16        Q    And the date on the last page is

17   January 17, 2008.  So you're saying that you

18   first saw it roughly ten days after that date?

19        A    Yes.

20        Q    All right.  And when you first saw

21   the document and in particular paragraph four

22   on page two, focusing -- Let me just focus

23   your attention specifically on paragraph four

24   on page two, go ahead and take a moment to

25   read it and when you've done that, let me

1          A     Yes, sir.

2          Q     How many inspections between May

3     of 2003 and July of 2007 did you participate

4     in?

5          A     Zero.  There was one visit in 2005

6     where the DEA was asking questions about a

7     company named Strides, but it was not an

8     inspection of Novelty as a registrant.

9          Q     During the first two days of the

10    inspection did Novelty provide DEA with

11    records that had information in codes on them?

12         A     I don't know what you mean by "in

13    codes".

14         Q     Well, product codes, route sales

15    people codes, those kind of codes -- well, let

16    me back up then, if you don't understand.

17              Does Novelty use codes in the

18    records it's required to keep to comply with

19    DEA regulations?

20         A     Yes, it uses item numbers.  It

21    uses route numbers.  It uses transaction

22    numbers.

23         Q     Now, when DEA asked for the

24    records during the first two days of the

25    inspection, did you give DEA the records that

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2096

1      had codes in them?

2           A     Yes.  I gave them the list of

3      transactions from which they would select

4      detailed documents.

5           Q     Now, at some point during the

6      inspection you gave DEA personnel a CD that

7      had electronic information on it, correct?

8           A     We gave them three CDS.

9           Q     And when did you do that?

10          A     That was probably on the 18th.

11          Q     So that would have been a full

12     week after the dispute over the video and

13     audio recordings?

14          A     Yeah, it would have been one week

15     since that Wednesday, right.

16          Q     And on those CDS were there pdf

17     images of Novelty's electronic records that

18     they're required to keep?

19          A     I don't believe so.  I believe

20     that on Friday the request came to us for

21     sales by route, for sales information from

22     January 1st through July 9th in three different

23     formats.  I don't recall the individual

24     formats, but each CD then, contained the sales

25     records, I believe in Excel format that the

1    DEA had asked for.  It was either in Excel,

2    perhaps it was in pdf, it certainly was made

3    to fit into -- made to fit into one document,

4    one document on each CD.

5              The shipping documents that they

6    demanded by noon on Monday were never really

7    asked for after that.

8         Q    So they asked for documents by

9    noon on Monday but they didn't press you to

10   actually turn them over.

11        A    No, they threatened to arrest me

12   if I didn't have 12,800 pages worth of stuff

13   to them by noon on Monday and let it drop.

14        Q    By noon on Monday?

15        A    Excuse me, by noon on Wednesday,

16   and let it drop.

17        Q    Does Novelty maintain its records

18   on scheduled listed chemical products or at

19   least some of its records in Excel format?

20        A    Yes.

21        Q    Who in Novelty directed the IT

22   personnel to change the format from Excel to

23   pdf prior to giving the information to DEA

24   investigators?

25        A    That would have been me.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2098

1          Q     And you know, as an accountant,

2     that by changing the format of the records to

3     pdf that the records cannot be easily sorted

4     or analyzed, correct?

5          A     I believe there's ways to extract

6     information out of pdf files and then use that

7     information in a more automated process.  It

8     was -- Excel has a limitation.  They asked for

9     more information than would fit inside of an

10    Excel document.  So pdf was a natural format

11    to use.

12         Q     You also could have broken it up

13    into multiple documents, couldn't you and kept

14    it in Excel?

15         A     Yes, that's an option as well,

16    yes.

17         Q     Now, was part of the delay in

18    getting electronic records to DEA attributable

19    to Novelty changing the format from Excel to

20    pdf?

21         A     You know, I'm not sure the

22    information ever got into Excel because it was

23    too large for an Excel file.  We created a

24    routine, sir, to get the information written

25    into a text file that then made its way into

Page 2099

1          a pdf file.  We looked at Excel as an option

2          but the data was too large.

3                  Q     Well, the data that you ended up

4          giving to them, what kind of format is it in,

5          in Novelty's records that it keeps?

6                  A     It's in a SQL server database,

7          Microsoft SQL Server Database.

8                  Q     Is that database compatible with

9          Excel?

10                 A     What do you mean by compatible?

11                 Q     Well, can records be -- when you

12         need to provide records to DEA or any outside

13         entity, can you put the records you maintain

14         in the SQL database into an Excel format?

15                 A     Sure.

16                 Q     The warrant that DEA executed

17         beginning July 9th, 2007, did that warrant

18         permit DEA to require Novelty to give two

19         years worth of records to DEA?

20                 A     I don't recall the specific

21         requirements of the warrant, although that was

22         -- I think DEA started their request on 12/26

23         or 25, 2005, yeah, 12/26/2005.

24                 Q     What records did DEA ask for that

25         weren't permitted by the warrant?

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1        Barnhill, Mr. Meador --

2                    MR. BARBER:  Objection, your

3        Honor, asked and answered.

4                    JUDGE RANDALL:  Sustained.

5                    BY MR. EMORD:

6        Q      Did you find it unusual that three

7        officers from the national office were present

8        for an investigation at Novelty's Greenfield

9        facility?

10                   MR. BARBER:  Objection to

11       relevance of whether this witness considers it

12       unusual and it's also been asked and answered.

13                   JUDGE RANDALL:  Sustained.  It has

14       been asked and answered.

15                   BY MR. EMORD:

16       Q      At any point in time did you or

17       anyone on your behalf object to the presence

18       of Mr. Bayly and Mr. Meador at the Novelty

19       site?

20       A      Yes, on Monday, I made a comment

21       to that extent and began a dialogue with Mr.

22       Meador in front of Madeline Kuzma and Barnhill

23       and Mr. Bayly about the appropriateness of Mr.

24       Meador being there.  Madeline Kuzma quickly

25       interrupted me and said it wasn't the

Page 2118

1        registrant's place to dictate who could and

2        could not conduct the inspection but I had

3        reservations about this man being there.

4              Q    And did you articulate that more

5        than once or just at that first occasion?

6              A    I articulated it at that occasion

7        and then later on Wednesday through counsel.

8              Q    And Mr. Meador remained there

9        until Wednesday; is that correct?

10             A    Yes, he was there Monday, Tuesday

11       and Wednesday, correct.

12                  MR. EMORD:  All right, no further

13       questions, your Honor.

14                  JUDGE RANDALL:  Very well, thank

15       you.  Mr. Barber?

16                  MR. BARBER:  Just one clarifying

17       question.

18       RECROSS EXAMINATION

19                  BY MR. BARBER:

20             Q    When you said you had reservations

21       about this man being there, to whom were you

22       referring?

23             A    Darrell Meador.

24                  MR. BARBER:  No further questions.

25                  JUDGE RANDALL:  All right, thank

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator,**<br>**UNITED STATES DRUG**<br>**ENFORCEMENT ADMINISTRATION;**<br>**et al.,** | Case No.<br><br>1:08-CV-00635<br>Hon. Rosemary M. Collyer<br><br>*CONFIDENTIAL DOCUMENT*<br>*UNDER SEAL* |
| **Defendants.** | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AS TO COUNT THREE OF THE COMPLAINT


### EXHIBIT 5:

### WAREHOUSE MAP OF NOVELTY'S GREENFIELD FACILITIES

**[CONFIDENTIAL DOCUMENT REDACTED]**

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator,<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION;<br>et al.,** | **Case No.**<br><br>1:08-CV-00635<br>Hon. Rosemary M. Collyer |
| **Defendants.** | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT THREE OF THE COMPLAINT**


**EXHIBIT 6:**

**AFFIDAVIT OF DARRELL MEADOR**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOVELTY, INC., | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| KAREN TANDY, in her official capacity; | ) |
| UNITED STATES DRUG | ) |
| ENFORCEMENT ADMINISTRATION; | ) |
| ALBERTO GONZALES, in his official | ) |
| capacity; UNITED STATES | ) |
| DEPARTMENT OF JUSTICE; and the | ) |
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| Defendants. | ) |

Civil Action No. 1:07-CV-00191
(RMU)

## DECLARATION OF DARRELL R. MEADOR

I, DARRELL R. MEADOR, pursuant to 28 U.S.C. § 1746, declare and say:

1.     I am a Staff Coordinator the Office of Enforcement Operations, Dangerous Drugs and Chemicals Section, at DEA Headquarters. My responsibilities include the prevention, detection, and investigation of the diversion of listed chemicals from legitimate channels under the Controlled Substances Act. This includes reviewing DEA Forms 486 (Import/Export Declarations) and answering questions from DEA field offices. I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since February 1986. I was hired by DEA as a Diversion Investigator in February 1986 and attended the Basic Diversion Investigator

School at the FBI Academy in Quantico, Virginia. I have also received additional training at numerous classes administered both by the DEA and by non-DEA entities between 1989 and 2005. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process. Prior to my current position, I was a Diversion Investigator assigned to the Nashville, Tennessee District Office. As part of my duties I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances. I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic. I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals and chemicals diverted to the illicit market. The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products. I have also worked in the regulatory process of List I chemical handlers to include pre-registrant investigations, regulatory investigations, and administrative actions taken against regulated firms.

The following information is based on my personal knowledge and/or information gained in the course of my official duties.

2.     List I chemicals are legitimate chemicals that also may be used in the illicit manufacture of a controlled substance in violation of the Controlled Substances

Act, 21 U.S.C. § 802 (34), 21 CFR § 1310.02(a). Ephedrine and pseudoephedrine are List I chemicals which are commonly used to illegally manufacture methamphetamine, a Schedule II controlled substance. These chemicals have been specifically designated by the Administrator of the Drug Enforcement Administration (DEA Administrator) as two of the listed chemicals subject to the provisions of 21 CFR §§ 1309 and 1313. See 21 CFR § 1310.02 (a).

3.      Pursuant to 21 U.S.C. § 971 (c) and 21 CFR § 1313.41 (a), the DEA Administrator has the authority to suspend any importation or exportation of ephedrine or pseudoephedrine based on evidence that the chemical proposed to be imported or exported may be diverted to the clandestine manufacture of a controlled substance.

4.      Additionally, the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances ("1988 U.N. Convention") requires that parties to the convention "take the measures they deem appropriate to prevent diversion of [listed substances, including ephedrine] used for the purpose of illicit manufacture of narcotic drugs to psychotropic substances, and shall co-operate with one another to this end."

5.      The 1988 U.N. Convention further states that parties "[c]ontrol all persons and enterprises engaged in the distribution of [listed chemicals], license such distributors, and "[r]equire that licensees obtain a permit for conducting [manufacture and distribution]." Art. 12, ¶ 8(b). Parties to the 1988 Convention are further obligated to

3

"[e]stablish and maintain a system to monitor international trade in [listed chemical] in order to facilitate the identification of suspicious transactions." Id. at ¶ 9(a). Parties are also obligated to notify the "competent authorities and services of the Parties concerned if there is reason to believe that the import, export or transit of a [listed chemical] is destined for the illicit manufacture of narcotic drugs or psychotropic substance." Id. at ¶ 9 (c). Though the 1988 U.N. Convention does not specifically mandate that parties adopt a permit system with respect to imports of listed chemicals, parties are obligated to cooperate to prevent diversion of listed chemicals used for the purpose of illicit manufacture of narcotic drugs or psychotropic substance.

6.      The United States has implemented a system by which every regulated person who imports a listed chemical that meets or exceeds the threshold quantities or is a listed chemical for which no threshold has been established, is required to notify the DEA Administrator of the importation not later than 15 days before the importation is to take place. *See* 21 CFR § 1313.12 (a). Unless the notice requirement is waived, the regulated person must complete a DEA Form 486 and deliver it to DEA not later than 15 days prior to the importation. *See* 21 U.S.C. § 971 (a); 21 CFR § 1313.12 (b). The DEA Form 486 must include, among other things, name and address information about the chemical importer and/or broker, the name and description of each listed chemical, the amount of chemical to be shipped, the proposed import date, the foreign port of exportation, and the United States Customs Port of Entry. *See* 21 CFR § 1313.13 (c).

4

7.    In addition to the declaration system described above, the United States has negotiated bilateral agreements with several countries which are the chief sources of bulk listed chemicals. In the early 1990's, large shipments of ephedrine and pseudoephedrine, bound for a fictitious company in Mexico, had been seized by U.S. Customs agents at the Dallas/Fort Worth Airport on or before 1994. The United States subsequently learned that other large shipments of ephedrine and pseudoephedrine were being shipped to this same fictitious company by companies located in the People's Republic of China, India, and the Czech Republic. In an effort to control these shipments and prevent the chemicals from being diverted for the purpose of illicit manufacture of methamphetamine, the United States and the competent authorities in these countries developed a procedure for authorizing the exportation of List I chemicals to and through the United States. This became known as the "LONO" process.

8.    Under the "LONO" process, the competent authorities of China, India, and the Czech Republic ("exporting nations") require that, prior to permitting the export of a List I chemical to and/or through the United States (and issuing a permit to the exporter), the United States must first issue a "LONO," or Letter of No Objection, to the competent authority of the exporting nation. Normally, the LONO consists of a short letter which lists the (1) U.S. importer; (2) exporter; (3) the shipment's DEA control number; (4) name of chemical and quantity to be shipped; and (5) the importer reference number. The LONO further states that "the DEA has no objection to the proposed shipment at this time." The LONO is sent to the competent authority of the exporting country and a copy is sent to the importer. Pursuant to the terms and spirit of the 1988 U.N. Convention, the United States is required, prior to issuing the LONO, to investigate the intended

5

destination and uses of List I chemicals which are imported into and through the United

States. If, after investigating, the United States determines that the List I chemicals may

be diverted for the purpose of illicit manufacture of methamphetamine, under the terms

and spirit of the U.N. Convention, it is obligated to deny the LONO request based on the

same ground stated in 21 U.S.C. § 971 (c). *See* 1988 U.N. Convention, Art. 12, ¶¶ 1 and

8 (b). If the United States issues the LONO, the LONO serves to notify the exporting

country that, based on the evidence possessed by DEA at the time the LONO is issued,

that the shipment or export complies with 21 U.S.C. § 971.


9.    If, after receiving the completed DEA Form 486 and conducting its

investigation, DEA determines that the LONO will be denied, DEA will so notify the

regulated person seeking to import the listed chemical. At this point, DEA will provide

the regulated person with the option of either withdrawing or pursuing the importation. If

the regulated person elects to pursue the importation, DEA may suspend the importation

based on evidence that the chemical proposed to be imported may be diverted to the

clandestine manufacture of a controlled substance. *See* 21 U.S.C. § 971 (c); 21 CFR §

1313.41 (a). However, if the regulated person withdraws the LONO request, DEA will

take no further action. The denial of the LONO itself triggers no legal obligation except

to require the importer to contact DEA if it elects to pursue the importation.


10.    Currently, there is no statutory definition of "evidence that the chemical

proposed to be imported may be diverted to the clandestine manufacture of a controlled

substance." However, through prior adjudication, DEA and the courts have approved the

use of a "totality-of-the-circumstances test" to decide whether substantial evidence exists

to suspend an importation of List I chemicals.  *See PDK Laboratories, Inc. v. United*

*States Drug Enforcement Administration*, 438 F.3d 1184, 1194 (D.C. Cir. 2006); *Indace,*

*Inc., Suspension of Shipments*, 69 Fed. Reg. 67,951, 67,959 (Nov. 22, 2004).


      11.    Moreover, the Attorney General considers the following factors to

determine whether a regulated person, such as the Plaintiff, shall receive a registration to

distribute List I chemicals.  *See* 21 U.S.C. § 823 (h) which provides that the "Attorney

General shall consider--

      (1)    maintenance by the applicant of effective controls against diversion of

listed chemicals into other than legitimate channels;

      (2)    compliance by the applicant with applicable Federal, State, and local law;

      (3)    any prior conviction record of the applicant under Federal or State laws

relating to controlled substances or to chemicals controlled under Federal or State law;

      (4)    any past experience of the applicant in the manufacture and distribution of

chemicals; and

      (5)    such other factors as are relevant to and consistent with the public health

and safety."


      12.    In considering whether "the chemical proposed to be imported may be

diverted to the clandestine manufacture of a controlled substance," the Attorney General

may consider the importer's "downstream" customers.  This includes the person to whom

the bulk chemicals are shipped and any other persons who may receive the chemicals

7

either in bulk or manufactured form. The type of retail establishment that will ultimately

distribute the List I chemical products to member of the public is a substantial and

weighty factor in determining the risk of diversion to clandestine manufacture.

13.    Numerous DEA orders have established that convenience stores and gas

stations constitute the non-traditional retail or "gray market" for legitimate consumers of

ephedrine products. *Wild West Wholesale*, 72 FR 4042, 4044 (2007); *Tri-County Bait*

*Distributors*, 71 FR 52160, 52161 (2006); *D & S Sales*, 71 FR 37607, 37609 2006);

*Branex, Inc.*, 69 FR 8682, 8690-92 (2004). Gray market products, which are labeled as

asthma/cough/cold/allergy relief medications, are often marketed for "off-label" uses,

such as weight loss or staying awake and are not typically found in most supermarkets

and drug stores. DEA has found that there is a substantial risk of diversion of List I

chemicals into the illicit manufacture of methamphetamine when these products are sold

by non-traditional retailers. *Joy's Ideas*, 70 FR 33195, 33199 (2005) (finding that risk of

diversion was "real, substantial and compelling"); *Jay Enterprises*, 70 FR 24620, 24621

(2005) (noting "heightened risk of diversion" should application be granted). DEA has

adjudicated numerous cases in which it has determined that gray market retailers, such as

gas stations and convenience stores, are "sources for the diversion of listed chemical

products." *See Joey Enterprises*, 70 FR 76866, 76867 (2005); *TNT Distributors*, 70 FR

12729, 12730 (2005); *OTC Distribution Co.*, 68 FR 70538, 70541 (2003); *MDI*

*Pharmaceuticals*, 68 FR 4233, 4236 (2003).

14.    DEA has determined that products sold in the non-traditional market pass through multiple layers of distribution.  The products sold are typically stronger than those found in the traditional market and "have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." DEA has also determined that many non-traditional retailers tend to knowingly sell large quantities of List I chemical products to "smurfers," methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy out a store's entire stock of List I chemical products by going to the store at different times or on different days. *T. Young Associates*, 71 FR 60567, 60568 (2006); *K.V.M. Enterprises*, 67 FR 70968, 70969 (2002).

15.    Small capacity clandestine labs continue to dominate law enforcement seizures and environmental cleanups.  Many small illicit laboratories operate with listed chemical products often procured legally or illegally, from non-traditional retailers of over-the-counter drug products, such as gas stations and small retail markets.  Some retailers acquire product from multiple distributors to mask their acquisition of large amounts of listed chemicals. *SPA Dynamic Wholesalers*, 68 FR 61466, 61467 (2003).

16.    On September 25, 2006, DEA received two completed DEA Forms 486 from Spirit Pharmaceuticals, LLC ("Spirit").  On the forms, Spirit declared it intended to import two shipments of ephedrine hydrochloride ("ephedrine HCl"), with a net weight of 2200 kilograms.  Spirit further requested that DEA issue a LONO to the competent authority of India in order to permit the import to take place and attached two purchase

9

orders from AAA Pharmaceutical, Inc. ("AAA"), the company to whom Spirit intended to transfer the ephedrine.

17.     After receiving the DEA Forms 486, Spirit's request for a LONO, and the AAA purchase orders, DEA determined that AAA intended to use the ephedrine HCl to manufacture "solid-dosage" or tablet form over-the-counter (OTC) pharmaceuticals for sale to the Plaintiff and one other company.  DEA obtained photographs of labels of these OTC pharmaceuticals and determined them to be "gray market" items.  DEA further obtained a list of Plaintiff's customers and determined that some of them (i.e. gas stations and convenience stores) were venues in states where the sale of these items is prohibited by state law.  For instance, according to the "Meth-Free Tennessee Act of 2005," which took effect in April 2005, "any immediate methamphetamine precursor may be dispensed only by a licensed pharmacy."  Tenn. Code Ann. § 39-17-431.  Kentucky has passed a similar measure which provides that "[a]ny nonprescription compound, mixture, or preparation contained any detectable quantity of ephedrine … [its] salts or optical isomers … shall be dispensed, sold, or distributed only by a registered pharmacist, a pharmacy intern, or a pharmacy technician."  Ky. Rev. Stat. § 218A.1446.  These states exempt "gel-caps" and liquids from the type of products that must be sold only in pharmacies.  However, the products proposed to be manufactured by AAA and sold by Plaintiff are in tablet form.

18.     Based on Plaintiff's own customer list, which indicates an intention to violate state law, and Plaintiff's intention to sell to "gray market" retailers, DEA

determined that authorizing the importation of ephedrine by Spirit constitutes a risk of diversion to the clandestine manufacture of a controlled substance. For those reasons, the LONO request was denied and Spirit was so notified by letter dated October 10, 2006. Spirit was informed that if it neglected to pursue to importation, its request would be considered withdrawn. Spirit did not respond to DEA's notification. Therefore, DEA has considered the matter to be withdrawn.

19.    In an abundance of caution, by letter dated April 10, 2007, DEA has notified Spirit a second time of its right to pursue the importation and/or to affirmatively withdraw the request for a LONO. If Spirit elects to pursue the request, DEA will order the suspension of the shipments pursuant to 21 U.S.C. § 971 (c) (1) and afford Spirit the opportunity for a hearing. If Spirit withdraws its importation request, DEA has no authority to act any further on the request. However, if Spirit elects to pursue the importation and requests a hearing, Plaintiff will have an opportunity at that point to petition the Administrative Judge for an opportunity to participate and/or intervene in the proceeding in accordance with the hearing procedures in subchapter II of chapter 5 of Title 5.

20.    DEA is aware that, by letter dated November 2, 2006, Plaintiff has sought to pursue Spirit's importation and has since requested a hearing on the denial of Spirit's LONO request. Unlike Spirit, Novelty is not a registered importer pursuant to 21 U.S.C. § 958 (c), and cannot import ephedrine itself. However, the decision on whether to grant Plaintiff a hearing is pending, based on Spirit's response to the second DEA letter. DEA

11

will notify Plaintiff as soon as it determines whether Spirit intends to pursue the importation.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that I have read the foregoing declaration and that the same is true and correct.

Darrell R. Meador
Staff Coordinator
Office of Enforcement Operations,
Dangerous Drugs and Chemicals
Section

Executed this __10__ day of April 2007 at Arlington, Virginia.

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC., D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator, UNITED STATES DRUG ENFORCEMENT ADMINISTRATION; et al.,** | Case No. <br><br> 1:08-CV-00635 <br> Hon. Rosemary M. Collyer |
| **Defendants.** | |

<u>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
AS TO COUNT THREE OF THE COMPLAINT**</u>

**EXHIBIT 7:**

**ADMINISTRATIVE WARRANT**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

NO.    1:07-MJ-0221 2

SEALED

IN THE MATTER OF THE                    )
ADMINISTRATIVE INSPECTION OF            )
                                        )
                                        )
NOVELTY DISTRIBUTORS                    )    WARRANT FOR INSPECTION
D/B/A GREENFIELD LABS                   )
351 W. MUSKEGON DRIVE                   )
GREENFIELD, INDIANA 46140               )

COPY

To Diversion Investigator Madeline J. Kuzma and any other duly authorized Diversion

Investigators of the Drug Enforcement Administration of the United States Department of

Justice.

Application having been made and probably cause as defined by Title 21, Section

880(d)(1), United States Code having been shown by the affidavit of Diversion Investigator

Madeline J. Kuzma of the Drug Enforcement Administration for an inspection of the controlled

premises and place of business described as Novelty Distributors d/b/a Greenfield Labs, 351 W.

Muskegon Drive, Greenfield, Indiana 46140, and it appearing that such inspection is appropriate

pursuant to Title 21, Section 880, of the United States Code.

Therefore, pursuant to Title 21, Section 878 and 880, of the United States Code, you are

hereby authorized to enter the above-described premises during ordinary business hours in order

to, in a reasonable manner and to a reasonable extent, inspect and copy all records,

reports, and other documents required to be kept or made under  Subchapter I of the Controlled

Substances Act. The inspectors are further authorized, within reasonable limits and in a

reasonable manner, to inspect controlled premises and all pertinent equipment, listed chemicals,

and other substances or materials, containers, and labeling found therein, and, except as provided in 21 U.S.C. § 880(b)(4), all other things therein (including records, files, papers, processes, controls, and facilities) appropriate for verification of the records, reports, and documents referred to herein and under 21 U.S.C. § 880(b)(3)(A), or otherwise bearing on the provisions of Subchapter I of the Controlled Substances Act. The inspectors are further authorized to inventory any stock of any listed chemical therein and obtain samples of any such listed chemical. The Diversion Investigator will present her official credentials and written inspection authority as prescribed in Title 21 U.S.C. § 880(b)(2).

You are hereby further authorized to seize from the above-described controlled premises such of the following records, reports, documents, files, and inventories as are appropriate to the effective accomplishment of the inspection and for the purpose of copying or verifying their correctness or that are used or intended to be used in violation of Title 21, Section 881, of the United States Code.

A prompt return shall be made by the inspecting officers to the undersigned magistrate, showing that the inspection has been completed and accounting for all property seized pursuant to this warrant, no later than ten (10) days from the date of issuance of this warrant.

This _____5th_____ day of _____July_____, 2007

_____
KENNARD P. FOSTER
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,** **D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **MICHELE LEONHART, Administrator,** **UNITED STATES DRUG** **ENFORCEMENT ADMINISTRATION;** **et al.,** | **Case No.** 1:08-CV-00635 Hon. Rosemary M. Collyer |
| **Defendants.** | |

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AS TO COUNT THREE OF THE COMPLAINT

### EXHIBIT 8:

### AFFIDAVIT OF MARK BLEDSOE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.,                          )
                                        )
      Plaintiff,                   )
                                        )
v.                                      )    No. 1:07-CV-00191 (RMU)
                                        )
KAREN TANDY, Administrator,             )
U.S. Drug Enforcement Administration,   )
et al.,                                 )
                                        )
      Defendants.                  )

## AFFIDAVIT OF MARK BLEDSOE IN SUPPORT OF NOVELTY'S OPPOSITION TO DEFENDANTS' MOTION AND NOVELTY'S CROSS MOTION

    I, Mark Bledsoe, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am the Director of Category Management for Novelty, Inc., located at 351 West Muskegon Drive, Greenfield, IN 46140 (hereinafter "Novelty").

2. I have been employed with Novelty, Inc. since February 1998. I have been the Director of Category Management for Novelty since June 2004.

3. Prior to being employed with Novelty I was employed as a Merchandiser for Sunoco for eight years, as a buyer for Stop N Go for six years, and as a District Manager for King Kwik for six years.

4. I have over 20 years of experience in the convenience store industry in the operations and marketing aspects of the business practice.

5. During the course of my employment in the convenience store industry, my operational responsibilities have included day to day supervision of eight to twelve convenience stores, category management for products and inventory, pricing negotiation with

DEA 00039

Case 1:07-cv-00191-RMU    Document 17-3    Filed 05/23/2007    Page 3 of 36

vendors, recruitment of new product concepts and vendors, and development of store layouts and displays.

6.  In my current position I am responsible for buying "standard" stock items for our inventory, negotiating prices with vendors, sourcing new vendors, and monitoring Novelty compliance with state and federal regulations governing List 1 products.   I also monitor the sales of List 1 products by dosage strength and formulation in compliance with state-specific List 1 product regulations.

### Novelty's Registration

7.  In approximately 1996 Novelty applied for and received a registration to distribute list 1 chemicals from the DEA.

8.  Every year after 1996 to the present Novelty renewed its registration to distribute List 1 chemicals with DEA.

9.  Novelty's current registration was awarded on September 20, 2006 and is valid through October 31, 2007.

10. Novelty, Inc. has sold over-the-counter products containing a combination of ephedrine and  guaifenesin (an expectorant) to convenience store retail locations in the United States.

### Novelty's Customers and Products

11. Novelty distributes List 1 products to convenience stores exclusively.  It does not sell to distributors.  It sells directly to stores and has established relationships with each store. Its products are created by a contract manufacturer AAA Pharmaceuticals at Novelty's request and under Novelty's private label.  Novelty then transports and sells those products directly to its retail customers without any middle men, one of the critical

DEA 00040

elements in its risk reduction program. Novelty's manufacture and distribution of its products is a "closed system" that meets all of DEA's documentation requirements and regulatory limitations to minimize the risk of diversion.

12. Novelty's List 1 product customers include many of the nation's largest and most well-respected store chains such as Circle K, The Pantry, Village Pantry, and Speedway.

13. Novelty has <u>never</u> received a DEA Warning Letter advising Novelty that any of its products have ever been found in or associated with clandestine manufacturing of illegal substances.

14. Novelty sells List 1 chemical products in some states that limit ephedrine content to 12.5 mg tablet form, in some states that limit ephedrine content to 25 mg tablet form, in some states that limit ephedrine content to 12.5 mg gel capsule form, and in some states that limit ephedrine content to 25 mg gel capsule form.

15. Novelty ensures that the ephedrine form and content sold in a state complies with that state's requirements.

16. Novelty does not manufacture List 1 chemical products for sale in a state that exceeds that state's allowable limits on dosage.

17. Novelty does not sell its List 1 chemical products, and has never sold those products, with any "off label" claims (such as for weight loss or staying awake).

18.   In his affidavit, DEA witness Darrell Meador defines several types of conduct that he says create a risk of ephedrine diversion to the illicit methamphetamine trade and suggests that Novelty engages in that conduct. Meador Affidavit at ¶¶ 13-14. Those statements, as applied to Novelty, are false:

DEA 00041

- Products are labeled as cough/cold relief medications but are "marketed for 'off label' uses, such as weight loss or staying awake." Meador Affidavit at ¶13. Novelty does not market its products for 'off label uses,' such as for weight loss or staying awake.

- "Products pass through multiple layers of distribution." Meador Affidavit at ¶14. This is false. Novelty's products do not pass through multiple layers of distribution. Novelty has a closed system of distribution, obtains the finished product from its contract manufacturer, warehouses the product in its own facilities, and ships the product by its own trucks and under the care of its own, security trained drivers.

- "Products sold are typically stronger than those found in the traditional market." Meador Affidavit at ¶14. Novelty's products are not stronger than those found in the traditional market. Novelty strictly complies with the dosage limitations of state and federal authorities. Novelty's dosage amounts are the same as those found in products sold in pharmacies, grocery stores, or "big box" stores such as Wal-Mart.

- "Products...have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products." Meador Affidavit at ¶14. Novelty has never been notified that its products were found in clandestine lab seizures.

- "Non-traditional retailers tend to knowingly sell large quantities of List 1 chemical products to 'smurfers,' methamphetamine traffickers and/or individuals who work for methamphetamine traffickers who attempt to buy

4

out a store's entire stock of List 1 chemical products by going to the store at different times or on different days." Meador Affidavit at ¶14. Novelty's distribution and sales system prevents its customers from purchasing large quantities of chemical products. Novelty enforces its policy regarding sales by the retailer to the consumer, this policy states; "no more than 2 packages per transaction and 1 transaction per day". This policy is far more stringent than the limit set in the Combat Methamphetamine Epidemic Act of 2005. (CMEA) (Limits ephedrine sales to 3.6 grams per day) Every display case containing Novelty's ephedrine products displays this policy, every log book provided to Novelty's retailers contains this policy on every page of the log book. (Novelty provides these log books to it's customers free of charge) Every training manual (Training required by the CMEA) provided to its customers contains this policy. (Novelty provides these training manuals to it's customers free of charge) .

19. Some of the stores to which Novelty sells its List 1 chemical products are located in Kentucky and Tennessee. Those states allow the tablet form of List 1 chemicals to be sold only in pharmacies. The laws of those states permit the gel capsule form of ephedrine to be sold in convenience stores, within dosage limitations. Novelty sells only its gel capsule form products in those states, and it does so in strict accordance with the laws of those states. The contrary statement made in the affidavit of Darrell Meador attached to the Defendants' Motion to Dismiss or in the alternative for Summary Judgment is utterly false. From the date Kentucky and Tennessee first adopted laws

DEA 00043

prohibiting the tablet form of ephedrine to be sold in convenience stores, Novelty has
never sold that form in those states.

20. Novelty submitted to DEA a customer list at DEA's request. The list does not distinguish
(and was not required to distinguish) which form or dose amount of its List 1 products
(tablets versus gel caps and 12.5 mg per dose versus 25 mg per dose) are sold by which
customers on that list. DEA has never requested that Novelty identify which products are
sold by which customers. All prior customer lists given to DEA when Novelty sought a
LONO likewise did not distinguish tablet States from gel capsule states and were not
required to distinguish in that way. Novelty has consistently adhered to the legal
requirements in each state where its products are sold.

21. Some of our List 1 customers operate stores in several states. In some cases they have
stores in states that do not permit List 1 products to be sold in convenience stores (such as
Iowa). In some cases they have stores located in states that permit ephedrine in 25 mg
tablet form (such as Indiana). In some cases they have stores located in states that permit
ephedrine in 12.5 mg tablet form (such as Michigan). In some cases they have stores
located in states that permit ephedrine in 25 mg gel capsule form (such as Kentucky). In
some cases they have stores located in states that permit ephedrine sold in 12.5 mg gel
capsule form (such as Texas). The LONO requested on September 25, 2006 included
those customers. If Novelty had excluded Circle K from that customer list because they
have stores in Ohio that by law cannot sell ephedrine, or because they have stores in
Kentucky that by law must sell ephedrine in a gel capsule form, then the customer list
would have been misleading, since it was Novelty's intent to sell 25 mg ephedrine tablets
to Circle K's Indiana stores and to sell 12.5 mg tablets to its Michigan stores.

6

22. On or about February 3, 2006, I spoke with DEA employee Lisa R. Barnhill concerning our List 1 chemicals' products customer list. She asked for an explanation of the store or chains listed which had locations in states where sales in convenience stores were prohibited or restricted. I explained that the list does not identify which forms are sold to which customers or, in the case of some chains, does not identify by individual stores in states where sales by convenience stores are prohibited. I informed her of our policy on List 1 chemicals and sent her a copy of it via email, highlighting the sections describing our weekly monitoring of sales by product by State. Attachment A.

### List I Chemical Sales History

23. Because ephedrine is identified as a List 1 chemical by the Drug Enforcement Administration, Novelty, Inc. enforces a strict company-wide policy for all employees and associates governing the handling of ephedrine products.

24. The policy's formal objective is to ensure that the List 1 products held and distributed by Novelty, Inc. are guarded against risk of diversion at every point along the distribution chain up to, and including, the ultimate consumer sale.

25. Novelty, Inc.'s policy mandates that all associates who handle or have access to List 1 products be personally responsible for their actions in compliance. Each must read and sign the policy document acknowledging that he or she understands the provisions of the policy and will abide by the policy in its entirety.

26. In order to preserve the integrity of the inventory stock retained at Novelty, Inc.'s warehouses, all warehouse personnel with access to List 1 products are specially trained, must display employee ID badges indicating their specific position and security level

DEA 00045

(i.e., OTC access authorization), and are subject to a zero tolerance policy for any act of non-compliance.

27. Prior to being hired, Novelty, Inc. conducts extensive criminal background checks and performs standard drug testing for all of its personnel, warehouse human resources, and contract drivers.

### List I Chemical Storage and Sales Procedures

28. The List 1 products area contained within the Novelty, Inc. warehouse is protected by a floor to ceiling chain link fence with two entry/exit gates, and a security system that electronically monitors all parts of the warehouse.

29. The warehouse is monitored by an ADT Focus® Fire & Security system twenty-four hours a day, employing motion detectors throughout the facility. The motion detectors are linked to automatic reporting devices that record the time and location of any potential security breach at the warehouses. Novelty personnel monitor the facility twenty-four hours a day and can be dispatched to the warehouse along with law enforcement on a moment's notice.

30. On receipt of a List 1 product shipment, Novelty, Inc.'s Receiver (B. Cheney) is responsible for checking the Bill of Lading and the Packing List to ensure that all of the information contained within, as well as the physical shipment, perfectly agrees with Novelty, Inc.'s Purchase Order.

31. The Receiver also checks to ensure that all documentation associated with the purchase and shipment of List 1 products contains both Novelty, Inc.'s and the supplier's DEA numbers.

8

DEA 00046

32. If any of the receiving process components do not agree, the shipment is rejected in its entirety.

33. If the Receiver discovers a concealed shortage of a List 1 product, she will then assemble the following documentation and forward it to the Novelty, Inc. Compliance Officer, the Buyer, and Novelty, Inc.'s General Counsel:

   a. Name of the manufacturer;

   b. Item number and description;

   c. Name of the carrier;

   d. Condition of shrink wrap at time of delivery for pallet/box with shortage;

   e. Purchase Order Number

   f. Lot Number

   g. All markings and identifiers on the box that contains a shortage of a List 1 product;

   h. Photographs of all sides of the box that contains the shortage;

   i. Condition of the box and its packaging at the time it was received;

   j. Condition and arrangement of the product inside the box;

   k. Photographs of the inside of the box (displaying contents);

   l. Method of shortage detection;

   m. Whether any/all of the other cases in the same shipment were checked for shortages.

34. The Novelty Receiving Supervisor (B. Cheney) must date-stamp the Packing Slip upon receipt of shipment, notes any discrepancies in the Vendor's paperwork, and sign to acknowledge compliance with all of the receiving requirements.

9

DEA 00047

35. If the List 1 product shipment is accepted by the Receiver, it is immediately placed in the enclosed warehouse OTC area for sorting and labeling.

36. List 1 products are sorted according to the lot number assigned to each product and prepared for storage. This activity is conducted under the aforementioned surveillance.

37. All List 1 products must bear the following information:

   - A barcoded license plate that contains the Lot Number, Item Number, and Case Pack;

   - A Green label with the Item Number and the Lot Number;

   - The expiration date of the product.

38. Once a List 1 product is received by the warehouse, it is entered into the Novelty computer tracking system with the information listed above. The product is then tagged and enclosed in the OTC area of the warehouse where it can only be accessed by authorized personnel bearing the appropriate clearance badges.

39. List 1 products are always kept separate from hazardous materials.

40. When a full case List 1 product is ordered by a Novelty salesperson, Novelty, Inc.'s Order Selector (C. Book) fills the order according to quantity ordered and applies a shipping label bearing the information of the route number.

41. The Order Selector records the date, the amount ordered, Lot number of the products shipped, and the route number to which the product is assigned.

42. The Shipping Auditor checks to ensure that all List 1 product cases are properly sealed, labeled, and sorted for route shipping and delivery.

43. The information regarding the status of the List 1 inventory in the Lot Track book is reported to Inventory Control at the end of each week.

DEA 00048

44. Route Sales Professionals ("RSPs") receive the weekly load shipments of List 1 products to distribute to retail stores on their route. .

45. All delivery/route trucks must be secured and locked when not unloading for delivery.

46. All retail stores who purchase List 1 products from Novelty, Inc. also purchase other types of products stocked by Novelty, Inc.

47. Novelty, Inc. delivers all of its product inventory directly to the retail stores on Novelty trucks. Novelty's trained drivers ensure that all drop-off locations are legitimate business enterprises operating in a retail capacity and that the delivered cases are properly secured, locked, and kept behind the sales counters.

48. All purchasing transactions executed by Novelty, Inc. are recorded by an invoice filing system, with invoices signed by the purchaser. Payment is accepted either via invoice or upon delivery of the product.

49. Payment for purchases of List 1 products is never accepted in cash.

### Sales Limitations Policies

50. Novelty, Inc. requires that Novelty employees who negotiate the purchase of List 1 products obtain and maintain appropriate licensure, permits, and documents required to sell the products, including appropriate documentation required by FDA, DEA, and the State Boards of Pharmacy.

51. Novelty's employees who negotiate for manufacture of its List 1 chemical products are required to contract only with manufacturers licensed by DEA and all orders must be placed with the manufacturer through Novelty, Inc.'s Purchase Order System.

52. To ensure the validity and security of all List 1 product transactions, all Purchase Orders of List 1 products contain the DEA numbers of both the supplier and Novelty, Inc.

11

DEA 00049

53. Novelty, Inc. only delivers List 1 products to retail vendors that have been screened and verified for compliance with federal and state registration and record keeping requirements.

54. Each List 1 product sale must be registered and verified in the Novelty, Inc. invoice system, which includes the listing of the business name, address, item(s), and quantity of product sold.

55. Novelty, Inc. does not sell any List 1 products to individuals or to vendors who are not established and verified Novelty, Inc. customers.

56. Because the states have enacted different legislation regulating the sale of List 1 products, all RSPs are required to review a memo explaining the different regulatory provisions pertaining to List 1 products in individual states and to sign the memo confirming that the RSP has read and understands the provisions.

57. In addition, all newly hired Novelty, Inc. employees are required to read and sign the same memo and participate in state specific training as part of their orientation.

58. Novelty, Inc. does not permit RSPs to sell more than one (1) full case of List 1 product type (brand and count) per transaction to any retail customer outlet. There are no exceptions to this rule.

59. Any RSP violation of Novelty, Inc.'s List 1 product policy is documented by one written warning. RSPs are terminated for any subsequent violations committed after the receipt of a written warning.

### Auditing and Other Security Measures

60. Novelty, Inc. conducts regular self audits for List 1 product inventories to ensure the security and accuracy of all Novelty warehouse stock.

DEA 00050

61. JR Merlau is the Compliance Officer for Novelty, Inc. and is in charge of enforcing the List 1 products policy.

62. As part of standard Novelty, Inc. policy, the Compliance Officer does not have access to change inventory transactions.

63. The Compliance Officer's duties include monitoring and reporting all sales, transactions, or inventory inconsistencies resulting from possible diversion to senior management.

64. In order to avoid potential conflicts of interest, the Compliance Officer does not report to management in the Sales, Warehouse, or Inventory Control departments.

65. The Compliance Officer's duties also include monitoring and updating Novelty, Inc. staff and associates on all state laws and regulatory restrictions relating to List 1 products.

66. These regulatory updates and notices are communicated to the Sales and Delivery teams through memos and other Novelty, Inc. publications, including "Novelty News" and Novelty's "Order Guide."

67. The Compliance Officer is also responsible for reporting all deviations, suspicious transactions, and potential diversion risks to the Novelty, Inc. General Counsel if they are not resolved.

68. The General Counsel, in turn, is required to report all thefts and suspicious sales to the appropriate governmental agencies.

### September 25, 2006 Order

69. On September 25, 2006, Novelty, through its manufacturer AAA Pharmaceutical, Inc. ("AAA"), ordered 2,000 kilograms of ephedrine from its importer Spirit Pharmaceuticals LLC ("Spirit"). Attachment B. I authorized that purchase order on behalf of Novelty.

13

DEA 00051

70. Spirit submitted a DEA Form 486 along with the purchase order from AAA and AAA's registration number. It also identified AAA's customer, Novelty. It requested a letter of no objection (LONO). Attachment B.

71. DEA responded on October 10, 2006 with a letter rejecting the LONO request for the two purchase orders. It did not identify the AAA customers in the letter. Attachment C..

72. Upon receipt of a copy of DEA's October 10, 2006 letter from Spirit via AAA, Novelty, by counsel, filed with DEA on November 2, 2006 a letter stating its intention to pursue the rejection and seek a hearing. Attachment D. Novelty appealed both shipments, not realizing that one shipment was for another AAA customer. I informed Spirit of the appeal.

73. I first learned that the October 10, 2006 letter from DEA rejecting the LONO request included a shipment to AAA intended for another AAA customer on April 16, 2007.

74. Novelty does not seek to contest the LONO denial for AAA's other customer's shipment of ephedrine.

75. Novelty's products to be manufactured from its September 25, 2006 Form 486 would restock its tablet product supplies.

76. Novelty will not sell the ephedrine intended for tablet production that is the subject of the September 25, 2006 Form 486 to any customer in a state where tablet sales through convenience stores are prohibited.

77. Novelty's electronic order filling system does not allow orders to be filled for List 1 chemicals in dosages or forms for states where those dosages or forms cannot be sold by convenience stores.

14

DEA 00052

78. I am responsible for monitoring state laws and updating the order filling system with any changes.

79. Novelty does not sell List 1 chemicals to a customer in a state where state law does not permit sale of that form by that customer.

80. Spirit received DEA's letter dated April 10, 2006. Attachment E. In that letter DEA reiterated its rejection of the LONO and gave three options for a response. Id. Novelty informed Spirit that Novelty was pursuing the rejection of the hearing request and asked, in accordance with the letter's options, that Spirit do nothing so that DEA would issue the notice of suspension. Attachment F.

DEA 00053

_Mark B. Bledsoe_
Mark Bledsoe

_5·22·07_
Date

15

DEA 00054