## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                  Plaintiff,

v.

Michele Leonhart,
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration; et al.

                  Defendants.

Case No. 08cv00635 (RMC)

PUBLIC VERSION

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVELTY DISTRIBUTORS, INC.<br>D/B/A GREENFIELD LABS,<br><br>            Plaintiff,<br><br>v.<br><br>Michele Leonhart,<br>In her official capacity as<br>Acting Administrator of the<br>Drug Enforcement Administration, et al<br><br>            Defendants. | Case No. 08cv00635 (RMC) |

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Novelty, Inc. (hereinafter "Novelty"), by counsel and pursuant to 21 U.S.C. § 824(d) and Federal Rule of Civil Procedure 65, hereby requests immediate issuance of a preliminary injunction against the Defendants to block a suspension order now in effect pursuant to a January 27, 2008 DEA Order to Show Cause and Immediate Suspension of Registration of Novelty Distributors, d/b/a Greenfield Labs (DEA Order). The DEA Order (attached as **Exhibit 1**) lacks a factual basis sufficient to establish an imminent danger to the public health and safety, the statutory burden of proof that DEA must meet to exercise lawfully the extraordinary power of registration suspension. DEA completed the hearing on the DEA Order last week (DEA Docket 08-33). The testimony adduced and documentation admitted into evidence in that proceeding reveal the allegations contained in the DEA Order to be baseless and, in any event, to lack proof of an imminent danger to public health and safety.[1]  Without an imminent danger to public

---

[1] Because discovery was not permitted in that administrative case Novelty did not (and, indeed, could not) learn the bases for Defendants' charges against Novelty until that hearing.  Novelty does not seek this

health and safety, the immediate suspension of Novelty's registration is an abuse of discretion and arbitrary and capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 702. It also deprives Novelty of its property interest in the registration without due process of law in violation of the Fifth Amendment. Thus, the immediate suspension order is invalid and must be vacated, Novelty's registration restored, and its inventory of SLC products immediately released until a final order has issued in the administrative proceeding currently before DEA (DEA Docket 08-33) and all appeals exhausted.

Respectfully submitted,

____/s/_____
Jonathan W. Emord (407414)
Andrea G. Ferrenz (460512)
Peter A. Arhangelsky
*Counsel for Novelty Inc.*

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Date Submitted:  April 16, 2008

---

Court's intervention on the show cause aspect of the order, only on the immediate suspension pursuant to 21 U.S.C. § 824(d).

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,    Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the    PUBLIC VERSION
Drug Enforcement Administration; et al.

        Defendants.

PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
PRELMINARY INJUNCTION (REDACTED)

## TABLE OF CONTENTS

Table of authorities ..........................................................................................v

I.      STANDARD FOR PRELIMINARY INJUNCTION .......................3

II.     CSA REQUIREMENTS FOR IMMEDIATE SUSPENSION.........3

III.    FACTS CONCERNING THE EIGHT CHARGES ........................4

IV.     LEGAL ANALYSIS ....................................................................12

        A. NOVELTY IS LIKELY TO SUCCEED ON THE
           MERITS OF ITS CLAIM THAT THERE IS NO
           IMMINENT DANGER TO PUBLIC HEALTH
           AND SAFETY TO SUPPORT THE IMMEDIATE
           SUSPENSION ORDER ...............................................12

           1.  Novelty Is Likely to Succeed on its
               Administrative Procedure Act Claim.................13

           2.  Novelty Is Likely to Succeed on its Due
               Process Claim ......................................................15

        B. NOVELTY WILL SUFFER IRREPARABLE
           HARM WITHOUT A PRELIMINARY
           INJUNCTION .............................................................17

        C. DEA IS NOT UNDULY BURDENED .........................20

        D. INJUNCTIVE RELIEF WILL SERVE THE
           PUBLIC INTEREST ...................................................20

V.      RELIEF REQUESTED ................................................................22

**Exhibits**
Exhibit 1 –    January 28, 2008 Order of Immediate Suspension and to Show Cause
Exhibit 2 –    March 21, 2008 Affidavit of Todd Green, Novelty Inc.
Exhibit 3 –    April 11, 2008 Affidavit of Kenneth "JR" Merlau, Novelty Inc.
               Attachment 1 – Sections of Merlau testimony from DEA hearing March 24 –
                         April 2, 2008, DEA Docket 08-33
               Attachment 2 – Letter from ███████████ to Novelty Inc.
               Attachment 3 – Letter from ███████ to Novelty Inc.
               Attachment 4 – Labels of Novelty Scheduled Listed Chemical Products
               Attachment 5 – SLC Training Slideshow

Exhibit 4 –     April 14, 2008 Affidavit of Mark Bledsoe, Novelty Inc.
        Attachment 1 – Sections of Bledsoe testimony from March 28, 2008 testimony in
            DEA Docket 08-33
        Attachment 2 – Novelty SLC training materials provided to store customers
        Attachment 3 – Novelty SLC training DVD for Indiana
        Attachment 4 – Sample Log Book created by Novelty and provided to Novelty
            customers that sell SLCs
        Attachment 5 – Sample Bledsoe email directing customer on SLC self-
            certification requirements
        Attachment 6 – ███████████████, Novelty provides for free to
            SLC customers with a locked portion to contain the SLC
            products
        Attachment 7 – Email to Bledsoe from Novelty customer concerning DEA delay
            in issuing certificates for self-certifications
        Attachment 8 – Self certification certificates for 35 stores
        Attachment 9 – Novelty SLC policy
        Attachment 10 – ████████████letter to Novelty employee████████████

Exhibit 5 –     April 11, 2008 Affidavit of Ryan Polk, Novelty Inc.
        Attachment 1 – Excerpts of testimony from March 28, 2008 and April 1, 2008 of
            Polk testimony in DEA Docket 08-33
        Attachment 2 – July 9, 2007 Administrative Law Judge Scheduling Order in DEA
            Docket 07-36
        Attachment 3 –Government's Opposition to Novelty's Motion for Limited
            Discovery in Novelty v. Tandy et al., 07-cv-0191 (RMU)(DDC)
        Attachment 4 – Chart and supporting documentation concerning July 9, 2007
            DEA audit results
        Attachment 5 – Polk contemporaneous notes from 2003 inspection
        Attachment 6 – ████████████████████████

Exhibit 6 –     Excerpts of testimony from March 31, 2008 testimony of Joanna Shepherd, Ph.D.,
        Professor of Law and Economics, Emory University in DEA Docket 08-33

Exhibit 7 –     Declaration of Jonathan Robbin (DEA witness in Docket 08-33) and all
        attachments (Referred to in Exhibit 6 as Government Exhibit 25 and its
        attachments 25A-25E)

Exhibit 8 –     Referred to in Exhibit 6 testimony as Government Exhibit 27

Exhibit 9 –     Referred to in Exhibit 6 testimony as Government Exhibit 38

Exhibit 10 –    Referred to in Exhibit 6 testimony as Government Exhibit 44

Exhibit 11 –    Referred to in Exhibit 6 testimony as Novelty Exhibit 27A, Z Tables of three
        months of SLC sales by Novelty to individual stores by Joanna Shepherd, Ph.D.

Exhibit 12 -    CV of Joanna Shepherd, Ph.D., Referred to in Exhibit 6 testimony as Novelty
        Exhibit 58 or pages 14-18 of Novelty Exhibit 27

Exhibit 13 -    Excerpts from testimony of former Novelty Route Sales Professional and District
        Manager

Exhibit 14 -    Excerpts from testimony of DEA Diversion Investigator Madeline Kuzma

Exhibit 15 -    ALJ Exhibit 15, recreation of demonstrative exhibit created by Dr. Joanna
                Shepherd during her testimony
Exhibit 16 -    Excerpts of testimony of DEA Diversion Investigator Lisa Barnhill
Exhibit 17 -    Excerpts of testimony of Todd Green, Novelty President

## TABLE OF AUTHORITIES

*Cases*
ACLU of Florida, Inc. v. Miami-Dade County School Board, 439 F.Supp. 2d
1242 (S.D. Fla. 2006).................................................................................18

Ashland Oil, Inc. v. FTC, 409 F. Supp. 297 (D.C. Cir. 1976)...........................18

Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,
419 U.S. 281 (1974)..................................................................................14

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962) ................14

Cavel Int'l, Inc. v. Madigan, 500 F.3d 544 (7th Cir. 2007).................................3

Chemicals for Research and Industry v. Thornburgh, 762 F.Supp. 1394
(N.D.Ca. 1991)......................................................................................16,18

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402 (1971)...............14,15

CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738 (D.C. Cir. 1995).............3

Industrial Equipment Ass'n Inc. v. EPA, 837 F.2d 1115 (D.C.Cir. 1988).......................15

Medipharm-RX, Inc. v. Gonzales, M.D. Fla. No. 8:06-CV-2223 (Feb. 16, 2007)
(slip copy), available at, 2007 WL 601722........................................................12

Motor Vehicle Manufacturers Ass'n v. State Farm, 463 U.S. 29 (1983) ..........14

Neil Laboratories, Inc. v. Ashcroft, 217 F.Supp. 2d 80 (D.C. Cir. 2002)...........................4

Norman Bridge v. Banner 529 F.3d 822 (5th Circuit, 1976)..........................3,4,11,14,17

Novelty v. Kiesler, Docket No. 04-cv-1502 (ND IN)............................................5

PDK Labs Inc. v. Reno, 134 F.Supp. 2d 24 (D.D.C. 2001)............................17,19

SEC v. Chenery Corp., 332 U.S. 194 (1947)....................................................15

Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313 (D.C. Cir. 1998)................................3

Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669
(D.C. Cir. 1985) .........................................................................................18

*Constitution, Statutes, Regulations and Rules*

U.S. Constitution, Fifth Amendment, Due Process Clause ................................1,16,21,22

5 U.S.C. § 706(2) ........................................................................................1,15,18,21

21 U.S.C. § 822(c) ..................................................................................................5

21 U.S.C. § 823.......................................................................................................9

21 U.S.C. § 824........................................................................................14,16,17,21,22

21 U.S.C. § 830(e)(1)(A)(vii) ...............................................................................10

21 C.F.R. § 1301.36 (e)............................................................................................3

21 C.F.R. § 1309.21 ................................................................................................5

21 C.F.R. § 1309.23(a);(b)(1) ................................................................................5

21 C.F.R. § 1314.45.................................................................................................8

Federal Rule of Civil Procedure 65 ........................................................................1

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
## PRELIMINARY INJUNCTION

Plaintiff Novelty Distributors, d/b/a Greenfield Labs (hereinafter "Novelty"), by counsel

and pursuant to 21 U.S.C. § 824(d) and Federal Rule of Civil Procedure 65, hereby requests

immediate, preliminary injunctive relief against the Defendants' order summarily suspending

before hearing Novelty's registration to distribute schedule listed chemical (SLC) products.

Defendants' order of immediate suspension (attached as Exhibit 1) is not based on facts

that create an imminent danger to the public health and safety, the standard in 21 U.S.C. § 824(d)

that DEA must satisfy to exercise this extraordinary enforcement power.  DEA has alleged eight

charges and proved none at the DEA hearing conducted March 24, 2008 through April 2, 2008

(DEA Docket 08-33).  The testimony adduced and documentation admitted into evidence in that

proceeding reveal DEA lacks proof of an imminent danger to the public health and safety and is

proceeding in a rush to judgment that threatens to eliminate one of the primary employers in the

town of Greenfield, Indiana.[1]

Because DEA has not satisfied its statutory burden of proof, by first establishing an

imminent danger to public health and safety before acting to suspend Novelty's registration, that

immediate suspension exceeds statutory limits and is an abuse of discretion and arbitrary and

capricious agency action in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

The unlawful suspension also deprives Novelty of its liberty and property interests without Due

Process in violation of the Fifth Amendment.  Thus, the immediate suspension must be vacated,

Novelty's registration restored, and Novelty's inventory of ephedrine and pseudoephedrine-

---

[1]  Because discovery was not permitted in that administrative case, Novelty did not (and, indeed, could not) learn the bases for Defendants' charges against Novelty until the hearing.  Novelty does not seek this Court's intervention on the show cause aspect of the order, only on the immediate suspension pursuant to 21 U.S.C. § 824(d).

containing OTC cough and cold products released for retail sale pending issuance of a final, unappealable order on the merits.

Novelty's continued registration is no threat to the public health and safety. As discussed in detail below, Novelty is likely to succeed on the order to show cause. Without the requested injunction, Novelty will be forced [REDACTED] and cause an additional [REDACTED]

[REDACTED] See Affidavit of Todd Green (attached as Exhibit 2) at ¶¶ 31-33. The immediate suspension order is also causing Novelty irreparable harm by destroying its reputation as an exemplary handler of scheduled listed chemical products. Id. at ¶¶23-25; see also Exhibit 3 ¶ 16-21. The suspension order is causing Novelty to lose its place in the market to competitors. Exhibit 2 at ¶¶ 18, 26-29. Novelty is losing [REDACTED]

[REDACTED] as a result of the suspension order. As the suspension order remains in place pending litigation, the order is likely to cause the complete loss of Novelty's current SLC inventory[2] with a market value of [REDACTED] Id. at ¶16. As explained in detail below, and as supported by the affidavit of Novelty President Todd Green, the suspension order has a stigmatizing effect on Novelty, branding the company with the undeserved moniker of a law violator. The aspersion cast upon the company's good name by the DEA is ruining the company's business, [REDACTED]

[REDACTED]

[REDACTED] See Exhibit 2 at ¶¶ 23-29: Affidavit of Todd Green.

---

[2] As used herein, the term "SLC" or "Scheduled Listed Chemical" refers only to ephedrine and pseudoephedrine-containing over-the-counter cough and cold remedies, the only SLC products sold by Novelty. See Exhibit 3 at ¶3.

## I.    STANDARD FOR PRELIMINARY INJUNCTION

To prevail on a motion for preliminary injunction the movant must ordinarily establish: (1) that it will suffer irreparable injury unless the injunction issues; (2) that the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) that the injunction, if issued, would not be adverse to the public interest; and (4) that there is a substantial likelihood of success on the merits. See Serono Laboratories, Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

The court balances those factors on a sliding scale. Id. at 1318. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." Id. (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); see also Cavel Int'l, Inc. v. Madigan, 500 F.3d 544, 547-548 (7th Cir. 2007) ("court may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party").

## II.    THE STATUTORY STANDARD FOR IMMEDIATE SUSPENSION

When DEA issues an immediate suspension without prior notice or due process, as in this case, it must demonstrate that the registrant's continued registration poses an imminent danger to the public health and safety. See 21 U.S.C. § 824 (d); 21 C.F.R. § 1301.36 (e). Failure to prove that element supersedes and replaces all other injunction elements, as Fifth Circuit held in Norman Bridge v. Banner, 529 F.3d 822, 828 (1976).

In Norman Bridge the court held the absence of requisite proof of imminent harm to the public health and safety vitiated the need to allege each of the various injunction elements. Id. The court stated, "a suspension, or seizure, may be invoked only to avoid imminent danger to the

3

public health and safety. In the absence of that factor there can be no suspension and no seizure without notice and an opportunity to be heard." Id. Therefore, in Norman Bridge, the court was more concerned with the Government's showing of harm than the recitation of injunction elements. Id. Significantly, the court commented:

> In the absence of that indispensable element, imminent danger to the public health and safety, all else was beside the point. It was thus of no moment that in granting the temporary restraining order the district judge omitted a recitation of the magic words generally appearing in such: (1) a substantial likelihood Norman Bridge would prevail on the merits; (2) that the temporary restraining order would not disserve the public interest; and (3) that the threatened injury to Norman Bridge outweighed the injuries appellants would suffer from the temporary restraint.

Norman Bridge, 529 F.3d at 828-29; see also Neil Laboratories, Inc. v. Ashcroft, 217 F.Supp. 2d 80, 85 n.6 (D.C. Cir. 2002) (embracing Norman Bridge)(court denied temporary restraining order in light of particular facts of case).

Within the statutory scheme imminent danger (i.e., immediately prospective danger) is necessarily forward looking, requiring an examination of DEA allegations for their predictive value. As explained below, the DEA Administrator has issued her suspension order without any proof of imminent danger to the public health and safety. She has variously relied on false charges, innuendo, and speculation, none of which draw a nexus between actual actions taken by Novelty and a defined, cognizable danger to public health and safety. Indeed, other than baldly asserting the conclusion that there is an imminent danger to the public health and safety, the DEA Administrator has done nothing to show how her charges correlate with any imminent danger to the public health and safety. Accordingly, she has not met the statutory requirement for use of the extreme remedy of registration suspension before a hearing on the merits.

### III.    FACTS CONCERNING THE EIGHT CHARGES

4

Consider in detail each of the eight grounds alleged in the DEA suspension order. First, the Deputy Administrator charges Novelty with violating 21 USC 822(c); 21 CFR 1309.21 and 1309.23(a);(b)(1) on the argument that Novelty's ███████████████████SLCs from ███████████████ Exhibit 1 at 1. N████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████See Exhibit 3 at ¶¶23-29. There is no evidence that the█████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ presents any increased risk of diversion to the illicit methamphetamine trade. DEA inconsistently holds that drop-offs to unregistered FedEx or UPS locations[3] are permissible but, without notice and comment rule-making, that drop-offs to any other unregistered locations ████████████████████████████████████████████████████████are impermissible. Exhibit 3 at ¶31. The facts of this allegation are not new but have been the subject of litigation between the parties since 2004 in Novelty v. Kiesler in the United States District Court for the Northern District of Indiana. Exhibit 2 at ¶9. No evidence exists to support the government's

---

[3] Novelty employees have testified that the locks used at their drop-off locations are accessible by key only to select Novelty employees (the drivers in question and their supervisors) and to no others. Exhibit 13: Excerpts of testimony of former Novelty Route Sales Professional and District Manager. Novelty executives testified to familiarity with unregistered Fedex and UPS drop-offs, explaining that in those locations SLCs are frequently placed outside the facilities for pick-up, are handled inside the facilities by many individuals, and may be held for days at way-stations. See Exhibit 3 at ¶31.

charge that this system of in-transit cross-docking presents an imminent danger to public health and safety or otherwise increases the risk of diversion beyond the level DEA accepts with drop-offs at Fedex and UPS.  Thus, this allegation does not satisfy the statutory standard for an immediate suspension.

Second, the Deputy Administrator charges Novelty with distributing 22 bottles of ephedrine products found by DEA in a Connecticut meth lab in 2002, six years ago.  Exhibit 1. DEA lacks evidence to prove that the 22 bottles were in fact those distributed by Novelty and likewise lacks evidence to establish that the bottles came from a source other than the manufacturer, ██████████████  DEA has not provided Novelty with any of the documentary evidence upon which its charge is based (itself a violation of Due Process and abuse of agency discretion).  Exhibit 4 at ¶¶13-16 (Affidavit of Novelty CFO Ryan Polk).

Upon its own investigation, Novelty has determined that the 22 bottles found in the Connecticut meth lab were in fact not the Novelty brand (Double Action).  Id.  They bore the brand of the manufacturer, DMD Pharmaceuticals. ████████████████████

████████████████████████████████████

██████████ Id.  The 22 bottles bore the label of████████████and a single lot number.  Id.  No proof exists that the entire production by████████bearing that lot number was sold to Novelty or that, in particular, the 22 bottles in question were ever actually in Novelty's possession, as opposed to stolen from███  Id.; see also Exhibit 14 (testimony of Diversion Investigator Madeline Kuzma).  Thus, that dated allegation is incapable of proving an imminent danger to the public health and safety.  Moreover, without any proof[4] that in fact the

---

[4] The only evidence DEA offers is the bald statement by DMD Pharmaceuticals (without documentary proof) that at least some of the lot in question was sold to Novelty.  That does not prove, however, that these particular 22 bottles were in fact distributed by Novelty or were purchased or stolen from a convenience store supplied by Novelty. Exhibit 14 (Excerpts of Testimony of DEA Diversion Investigator Madeline Kuzma).

bottles came from Novelty or from a convenience store served by Novelty, DEA has jumped to the conclusion that these 22 bottles were "Novelty distributed."

Third, the Deputy Administrator charges Novelty with selling quantitative amounts of SLCs in excess of that appropriate to meet legitimate, therapeutic demand. Exhibit 1. The charge hinges on a projection by one Jonathan Robbin, not a Ph.D., who asserts that any sales of ephedrine and pseudoephedrine-containing SLCs beyond $14.39 per month are, *ipse dixit*, proof of illegitimate sales (i.e., for use in the clandestine methamephetamine trade). Emory University Professor of Law and Economics Joanna Shepherd has established the method used by Robbin to arrive at this conclusion to be erroneous, to underestimate demand grossly, and to depend on an overly simplistic, flawed, and unreliable analysis. Exhibit 6 at 1658-1690. Shepherd shows that Robbin (1) should have used a multi-variant analysis; (2) made an error in his charts (apparent on their face by comparing what should have been identical figures); (3) made a fundamental error in his calculation that skewed results in the DEA's favor; (4) used data that suffered from aggregation bias; and (5) rested his analysis on biased assumptions that lacked empirical evidence. Exhibit 6 at 1641, 1646-1648, 1666-1671, 1675-1677, 1682-1695, 1812-1813, 1835; Exhibits 7-11 (as cited in Exhibit 6), Exhibit 12 (CV of Joanna Shepherd); Exhibit 15 (reproduction of chart created by Dr. Shepherd in testimony in Exhibit 6). Thus, the conclusory assertion that any sales of cough and cold remedies, regardless of environmental differences across the United States (e.g., incidence of asthma, allergy, Chronic Pulmonary Obstructive Disease, or other upper respiratory ailments), above $14.39 is proof of illicit use is grossly incompetent and incapable of supporting a claim that Novelty's continued registration represents an imminent danger to public health and safety.

7

Fourth, the Deputy Administrator charges that some of Novelty's retail store customers may have sold amounts in single transactions in excess of the per person sales limits specified in the Combat Methamphetamine Act (incorporated into the CSA). Exhibit 1. Novelty has never authorized or condoned the sale of any SLCs to consumers in amounts that exceed lawful limits. See Affidavit of J.R. Merlau (attached as Exhibit 2) at ¶23; Affidavit of Mark Bledsoe (attached as Exhibit 3) at ¶¶4-5, 12. To the contrary, it constantly counsels to abide by the limits, even supplying each retail customer with log books that contain commands to avoid sales above limits on every page and supplying each such customer with secure, locked plexiglass cabinets replete with large stickers demanding compliance with statutory limits. See Exhibit 4 at ¶¶4-9. If DEA had evidence of specific customers of convenience stores served by Novelty who are violating the law, it has not given that information to Novelty. If it did, Novelty executives are clear, they would cut off the store in question, preventing its purchase from the company of any SLCs. See Exhibit 17.

In addition, it is a gross leap to presume without any proof whatsoever that any single customer who purchased cough and cold remedies over CSA limits did so to produce methamphetamine rather than to treat asthma, allergy, chronic obstructive pulmonary disease (COPD), upper respiratory ailments, or cough and cold symptoms. Absent proof of diversion, the charge does not approach the level needed to show "imminent danger to the public health and safety." Further, there is no proof that Novelty rather than a rogue customer, caused any (as yet unproven) sale above CMEA limits. DEA's regulations prohibit Novelty from having access to the log books. 21 CFR § 1314.45. It has no way of determining if store employees are selling excessive amounts to individual consumers and whether consumers are exceeding the legal limits of purchase either per day or per month. Id. If DEA had given Novelty Proof of a sale in excess

8

of CMEA limits, the uncontrovered testimony of Novelty executives is that they would cut off supply to any such store. See Exhibit 17. Indeed, Novelty has invested huge sums in a closed system of distribution and in legal training of customers to do all in its power to reduce diversion. Exhibit 2 at ¶36, Exhibit 3 at 19-30; Exhibit 4 at ¶¶4-12. Shortly after passage of the CMEA, Novelty produced an educational video series for all of its retail customers that advised them of federal and state limits on sales. Exhibit 3 at ¶5. That expensive, serious campaign to educate retailers shows that Novelty is maximizing the likelihood that those to whom it sells understand and follow the law. Because, like virtually all distributor registrants, Novelty does not own, operate, or control the retail stores it serves, it cannot *force* the stores to follow the law but it can and does *refuse* to supply those that do not.

Fifth, the Deputy Administrator charges that Novelty has failed to keep accurate records as required in 21 USC 823 and 824. Exhibit 1. Its charge is based on an inexpert "accounting" review of a less than complete sampling of Novelty records. See Exhibit 16 (investigators who tallied the numbers are not trained in inventory accounting). In particular, DEA alleges that 60,000 dosage units of two Novelty ephedrine products are unaccounted for and that overages for 16 different SLCs exist. See Exhibit 1. That charge is entirely false. See Exhibit 5 at ¶¶9-10. The uncontroverted evidence establishes that DEA's figure of 60,000 dosage units unaccounted for is in fact fictive based on evidence showing the arbitrary exclusion of data revealing no such unaccounted for dosages. Id. The uncontroverted evidence likewise shows the 16 overages charge to be false. See Exhibit 5 at ¶¶9-10 (Description and table, Attachment 4 to Exhibit 5, revealing all of the inventory accounting errors made by DEA authored by Novelty's CFO Ryan Polk, an accountant).

9

DEA's reviewers left out several data entries which, when included, show the 60,000 dosage unit figure and the overages are erroneous. See Exhibit 5 at ¶¶9-10. The problem is complicated further by basic math errors that the reviewers made. Id. at ¶9 (in Attachment 1 cited therein). Thus, that allegation is not capable of supporting a claim that Novelty's continued registration represents an imminent danger to public health and safety.

Sixth, DEA alleges that between January 1, 2007 and July 9, 2007 Novelty distributed SLC products on at least 284 occasions to 35 retail outlets that were not self certified as required by 21 U.S.C. 830(e)(1)(A)(vii). Exhibit 1 at 2. That charge too is baseless as would be apparent upon any reasonable inquiry. Before Novelty contracted with any convenience store for the sale of SLCs, Novelty insisted on confirmation of self-certification. See Exhibit 4 at ¶¶10-11. The uncontroverted evidence establishes that every one of the 35 stores in question has in fact given Novelty assurance of self-certification. Id. From January 1 to July 9, 2007, all 35 allegedly not self-certified were in fact self-certified as documentary evidence (including DEA issued certificates of self-certification) established. Id. Novelty Director Mark Bledsoe testified that in no instance had Novelty commenced distribution of SLCs to any convenience store that had not filed for self-certification. Exhibit 4 at ¶10 (in Attachment 1, testimony of Bledsoe). DEA holds the filing of a self-certification submission to be evidence of self-certification upon receipt. Exhibit 4 at ¶10. Indeed, Bledsoe actually assisted prospective customers in understanding and filing the self-certification submissions as a condition precedent to doing business with Novelty. Exhibit 4 at ¶10. DEA does not keep up to date its self-certification filing system, making it difficult for retailers to obtain their own verifications. See Exhibit 4 at ¶10. DEA does not provide public access to any listing of retailers who have filed submissions for self-certification.

See id.. Because this charge, like the one before it, is utterly false, it cannot serve as proof of an imminent danger to public health and safety.

Seventh, DEA alleges that Novelty distributed 24 count bottles of SLCs on three occasions to retail outlets after February 1, 2007 in violation of the statutory requirement that all non-liquid SLC products be sold in blister packs containing no more than two dosage units per blister. Again, the hasty charge has no legs. The uncontroverted evidence establishes that Novelty in fact did not sell any 24-count bottles of SLCs after April 9, 2006. Indeed, it returned products to the manufacturers (Exhibit 5 at Attachment 4 (return of 28,800 units), last shipped the products to Novelty sales people more than 13 months prior to the alleged sale date (Exhibit 3 at ¶¶32), and has confirmed with each convenience store location implicated by DEA's charge that not a one has a record of a single sale of 24 count bottles of the SLCs (id). Because this charge, like the two above-listed before it, is utterly false, it cannot serve as proof of an imminent danger to public health and safety.

Eighth, the Deputy Administrator charges that Novelty distributed tablet form SLCs to retail outlets in two states, Kentucky and North Carolina, that prohibit the sale of non-liquid ephedrine and pseudoephedrine except in a gel-cap product. Exhibit 1. Once again, the charge is baseless.[5] The uncontroverted evidence establishes that Novelty did not sell any tablet form SLCs in retail outlets located in Kentucky and North Carolina in violation of state law. See Exhibit 3 at ¶33. Novelty last shipped product to those states 13 months prior to the alleged sale,

---

[5] The evidence confirms that each of four charges made by the administrator in the DEA Suspension Order is utterly false: (1) the charge that Novelty had 60,000 dosage units unaccounted for and 16 overages; (2) the charge that Novelty sold SLCs between January 1, 2007 through July 9, 2007 to uncertified retail stores; (3) the charge that Novelty distributed 24 count bottles of SLCs on three occasions to retail outlets after February 1, 2007; and (4) the charge that Novelty distributed tablet form SLCs to retail outlets in Kentucky and North Carolina where only gel-cap product forms may be sold. The presence of four utterly false charges reveal a reckless rush to judgment, without a conscientious effort to determine whether evidence supported the accusations, akin to that rush to judgment by this same agency condemned by the Fifth Circuit in Norman Bridge. See 529 F.3d at 828. The fallacious charges prove that DEA has not produced anything more than speculative assertion to meet its statutory burden of proving the existence of imminent danger to public health and safety.

and Novelty's customers have confirmed that they have no sales transactions for those items.  Id. Because the charge, like the three immediately above, is utterly false, it cannot serve as proof of an imminent danger to public health and safety.

## IV.    LEGAL ANALYSIS

Novelty is likely to succeed on its claim that DEA has not demonstrated that Novelty's continued registration poses an imminent danger to the public health and safety. DEA acted recklessly, arbitrarily, capriciously, and against Novelty's Due Process rights by suspending Novelty's registration without notice or hearing and without a sound evidentiary basis to prove imminent public health and safety danger. Novelty now suffers irreparable harm resulting directly from DEA's summary suspension, ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████(Exhibit 2 at ¶¶20-22), ██████████████████████████(Exhibit 2 at ¶22). ███████████ ████████████████████████████████████ ████████████ Exhibit 2 at ¶¶16, 20-34. DEA is not unduly burdened by the lifting of the immediate suspension order because there is no provable imminent danger to public health and safety such that the extraordinary remedy of immediate suspension of Novelty's registration would be statutorily justified.

### A.    NOVELTY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT THERE IS NO IMMINENT DANGER TO THE PUBLIC HEALTH AND SAFETY TO SUPPORT THE IMMEDIATE SUSPENSION ORDER

The question before this Court is whether DEA demonstrated that Novelty's continued registration posed an imminent danger to the public harm and safety when it issued the immediate suspension. See Medipharm-RX, Inc. v. Gonzales, M.D. Fla. No. 8:06-CV-2223, at *2 (Feb. 16, 2007) (slip copy), available at, 2007 WL 601722 or 2006 U.S. Dist. LEXIS 89392 (court overturned temporary restraining order in case involving internet pharmacy issuing

prescriptions based on online questionnaires). The facts alleged in DEA's Order to Show Cause do not allege facts sufficient, let alone demonstrate, imminent danger to the public health and safety. By immediately suspending Novelty's registration, therefore, DEA acted arbitrarily and capriciously under the APA. DEA unlawfully suspended Novelty's registration without notice and prior to a hearing on the merits in violation of 21 U.S.C. § 824(d). DEA also violated Novelty's Due Process rights under the United States Constitution by summarily depriving Novelty of its liberty and property interest in its DEA registration, thus preventing its conduct of business in over-the-counter drugs containing ephedrine and pseudoephedrine and destroying its theretofore excellent reputation as a law-abiding supplier of those OTC products.

By enacting section 824, Congress expressly protected registrants against violation of Due Process through immediate suspensions. See Norman Bridge, 529 F.2d at 828 ("in an effort to preserve constitutional safeguards with reference to the seizure of property or the deprivation of professional status without notice, Congress was careful to prescribe two requirements for the suspension and seizure of property without notice. . ."). In this proceeding, past behavior can demonstrate imminent danger to public health and safety only if that behavior was in fact harmful to the public and is linked to continued behavior in future. There is no proof of the danger, no proof of harm, and no basis therefore for presuming a danger or harm will continue.

Given the specific facts underlying each of the above eight allegations, none of the alleged actions, alone or in the aggregate, supports the conclusion that Novelty's continued registration poses an imminent danger to public health and safety.

1.    NOVELTY IS LIKELY TO SUCCEED ON ITS ADMINISTRATIVE PROCEDURE ACT CLAIM

Since Novelty's continued registration does not present an imminent danger to public health and safety, DEA's issuance of an immediate suspension order was arbitrary and capricious

14

agency action and an abuse of discretion under the Administrative Procedure Act, 5 U.S.C. §

706(2)(A). The scope of review under the "arbitrary and capricious" standard is narrow and a

court is not to substitute its judgment for that of the agency. Motor Vehicle Manufacturers Ass'n

v. State Farm, 463 U.S. 29, 42-43 (1983) (agency presented an inadequate basis and

explanation). The agency is legally obliged to examine all relevant data and articulate a

satisfactory explanation for its action including a "rational connection between the facts found

and the choice made." Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)

(agency made no findings and no analysis to justify the choice made thus there was no indication

of the basis for decision). In reviewing that explanation, courts must "consider whether the

decision was based on a consideration of the relevant factors and whether there has been a clear

error of judgment." Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419

U.S. 281, 285 (1974) (agency order not arbitrary and capricious); Citizens to Preserve Overton

Park v. Volpe, 401 U.S. 402, 416 (1971) (judicial review on agency litigation affidavits was

inadequate although formal findings by agency are not required). "Normally, an agency rule

would be arbitrary and capricious if the agency has relied on factors which Congress has not

intended it to consider, entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or [the rule] is so

implausible that it could not be ascribed to a difference in view or the product of agency

expertise." State Farm, 463 U.S. at 43. The reviewing court should not attempt to make up for

such deficiencies; it may not supply a reasoned basis for the agency's action that the agency itself

has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (agency action was based on

substantial evidence and was consistent with Congressionally granted authority). Moreover, *post*

*hoc* rationalizations to justify agency action are prohibited in an agency review action. Citizens to Preserve Overton Park, 401 U.S. at 419.

In this case, DEA has articulated eight grounds for immediate suspension but has done nothing to explain in its order how any of the eight present an imminent danger to the public health and safety. See Exhibit 1. No nexus exists in the DEA Suspension Order between the charges alleged and actual, imminent danger to public health and safety. Indeed, when examined just beneath the surface, each charge is vacuous, ungirded by facts capable of supporting the conclusion that Novelty's continued registration in any way endangers the public health or safety. See Exhibits 2-6, 13-14 and documents cited therein. Each of the eight charges is either demonstrably false or entirely speculative and none has been linked by the Administrator to a tangible danger to public health and safety. The entire Suspension Order is scurrilous in that it is the product of false facts, speculative assertion, and innuendo, not the grist for responsible legal action under 21 USC 824(d). Lacking proof of a diligent inquiry into the facts and of an association between facts reasonably found and the assertion of imminent danger to public health and safety, the immediate suspension is arbitrary and capricious and its issuance an abuse of discretion.

> 2.    NOVELTY IS LIKELY TO SUCCEED ON ITS DUE PROCESS CLAIM

Without an imminent danger to public health and safety, DEA's issuance of the Immediate Suspension Order violates Novelty's Fifth Amendment Due Process rights. A Due Process violation occurs when (1) there is a protected interest; (2) the government has deprived a party of that interest; and (3) the deprivation occurred without proper procedural protections. Industrial Equipment Ass'n Inc. v. EPA, 837 F.2d 1115 (D.C.Cir. 1988). Novelty has both a

liberty and a property interest in its registration.  Norman Bridge recognized the property interest

a registrant has, indeed one Congress also recognized:

> [W]hat we have in this case is a *statutory scheme specifically mandated by Congress*.  Apparently in an effort to preserve constitutional safeguards with reference to the seizure of property or the deprivation of professional status without notice, Congress was careful to prescribe two requirements for the suspension of registration and the seizure of property without notice, *21 U.S.C. § 824*. Such a suspension, or such a seizure, may be invoked *only* to avoid imminent danger to the public health and safety. In the absence of that factor there can be no suspension and no seizure without notice and an opportunity to be heard. Moreover, when such action is taken, it survives only so long as it goes undissolved by a court of competent jurisdiction.

529 F.2d at 829.  Thus, Novelty has a property interest in its registration that is protected from

immediate suspension where there is no imminent danger to the public health and safety.  That

property interest was deprived without Due Process of law when DEA issued its immediate

suspension order.

Novelty also has a liberty interest in its reputation as a law-abiding registrant that

responsibly handles SLC products.  As discussed in PDK Labs Inc. v. Reno, 134 F.Supp. 2d 24,

32-33 (D.D.C. 2001), a business has a recognized liberty interest in "avoiding the damage to its

reputation and business caused by a stigmatizing suspension" which is harmed when a business

is "labeled not worthy of being trusted with common chemicals" and is "largely precluded from

pursuing its core business activities."   That stigma is "extreme - - arguably tantamount to the

stigma of being criminally prosecuted." Chemicals for Research and Industry v. Thornburgh,

762 F.Supp. 1394, 1399 (N.D.Ca. 1991); see also PDK Labs Inc., 134 F.Supp. 2d at 33.

Novelty is a distributor that sells to convenience stores 

Exhibit 2 at ¶16.

17

▬▬▬▬▬  See Exhibit 2 at ¶12; Exhibit 3 at ¶¶8-9.  Like <u>PDK</u>, Novelty has a liberty interest in

avoiding the damage to its reputation as a trusted and reliable source of cough and cold remedies

containing list 1 chemicals that results from DEA's stigmatizing Suspension Order.  <u>See</u> Exhibit

2 at ¶¶23-29.  That interest is harmed when DEA deems Novelty not worthy of being trusted

with convenience store distribution of the list 1 chemicals.  The distribution of those chemicals

through Novelty's closed system of distribution is a core business activity of Novelty.  <u>Id.</u>  The

moniker of law violator now pinned upon Novelty is in fact causing▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

See Exhibit 3 at ¶¶16-18; Exhibit 2 at ¶¶18, 20.  The reputational harm is not limited to loss of

the SLC business; rather,▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬  See Exhibit 3 at

¶12-14, 16; Exhibit 2 at ¶20.  The stigmatizing impact upon Novelty is thus real, severe, and

irreparable.

DEA acted arbitrarily and capriciously and abused its discretion under the Administrative

Procedure Act, 5 U.S.C. § 706(2)(A), and acted in violation of Novelty's procedural Due Process

rights, when it immediately suspended Novelty's registration before hearing and without a clear

showing that Novelty's continued registration actually posed an imminent danger to the public

health and safety.  Therefore, Novelty has established a substantial likelihood of success on the

merits.

## B.    NOVELTY WILL SUFFER IRREPARABLE INJURY WITHOUT A PRELIMINARY INJUNCTION

To establish irreparable injury, a party seeking injunctive relief must establish "injury

that is great, certain, and actual, not merely theoretical."  <u>See</u> <u>Wisconsin Gas Co. v. Fed. Energy</u>

<u>Regulatory Comm'n</u>, 758 F.2d 669, 674 (D.C. Cir. 1985).  "The injury complained of [must be]

of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." Id. (quoting Ashland Oil, Inc. v. FTC, 409 F. Supp. 297, 207 (D.C. Cir. 1976)). Violation of a constitutional right, without proof of more, such as the violation of Due Process here in issue, is an irreparable injury by operation of law. See, e.g., ACLU of Florida, Inc. v. Miami-Dade County School Board, 439 F.Supp. 2d 1242, 1293 (S.D. Fla. 2006).

Novelty is also suffering irreparable financial and reputational harm that will cause

███████████████████████████████████████████████████

███████████ unless this Court grants the requested preliminary injunction. See Exhibit 2 at ¶¶30-33. The company will lose at a ███████████████████ unless the injunction is granted. See Exhibit 2 at ¶¶16, 20-22. The harm to Novelty's property and liberty interests is irreparable in the absence of an injunction. The harm to Novelty's reputation and goodwill, its liberty interest, is also irreparable. See Exhibit 2 at ¶¶23-29. The undeserved moniker of law violator that DEA now has pinned to Novelty is producing a stigmatizing effect, making Novelty persona non grata, as if it were a criminal enterprise, among the ███████████████

███████████████ That stigmatization, the Courts have held, violates a party's liberty interest in its DEA registration. See Chemicals for Research and Industry v. Thornburgh, 762 F.Supp. 1394, 1398 (N.D.Ca. 1991); see also PDK Labs Inc., 134 F.Supp. 2d at 33.

Novelty, Inc. is currently one of the top employers in Greenfield, Indiana, employing over 120 local residents in that small working-class community. See Exhibit 2 at ¶14. The sale of SLC products currently comprises ███████████████████ id. at ¶16, ███████████████████████████ Id. To reduce shipping costs, convenience store chains prefer to purchase as many of the varied products they stock from one vendor. Exhibit 3 at ¶¶12-14. ███████████████████████████

19



Id; see also Exhibit 2 at ¶¶19-20. Novelty is losing

Id. at ¶¶16-17; Exhibit 2 at ¶¶ 26-29.

Novelty

Exhibit 2 at ¶20.

Id.

Id; see also

Exhibit 3 at ¶¶16-17.

Id. Therefore, the immediate

suspension is causing Novelty to lose business in product categories unrelated to the controlled

substances. Id.

Unless this Court grants Novelty preliminary injunctive relief, Novelty will lose at least

revenue from ephedrine products, and the long-term economic impact may

eliminate the company entirely

Exhibit 2 at ¶¶16-22.

Id. at ¶28.

DEA's suspension continues to stigmatize Novelty with the defamatory moniker of a law

violator. Id. at ¶¶23-29. Novelty's reputation is permanently harmed and will continue to be

reduced in the minds of its customers as more learn of the DEA Suspension Order from

Novelty's competitors. Id.

 Id. at ¶¶30-33.

Floyd Norris ,"Summers:

Recession Is On," New York Times, April 9, 2008,

(http://norris.blogs.nytimes.com/2008/04/09/summers-recession-is-on/?hp) (last visited April 15,

2008)(Norris, chief financial correspondent of the New York Times, citing Larry Summers,

former Treasury Secretary); see also Exhibit 2 at ¶¶ 33, 41.  Families will suffer when funds they

depend upon disappear, when money needed for necessities disappears and critical bills, such as

mortgage payments, go unpaid.

A loss of 

Exhibit 2 at ¶34.

Unless this Court issues injunctive relief promptly, Novelty will continue to suffer

irreparable harm that cannot be alleviated aside from this Court's intervention to prevent

continued DEA violation of 21 USC 824(d), the Administrative Procedure Act, 5 U.S.C. §

706(2)(A); and the Due Process clause of the Fifth Amendment.

### C.    DEA IS NOT UNDULY BURDENED

DEA will not incur harm by allowing Novelty to continue its lawful business practices

because, as a matter of law, the agency is obligated to comply with the limits on the exercise of

its power specified in the CSA, including 21 USC 824(d).  DEA retains its ability to challenge

Novelty's registration at the administrative level.  The preliminary injunction merely preserves

the *status quo* until after Novelty receives a final and unappealable decision on the merits

following from the DEA proceedings now underway.

21

### D.    INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST

The public interest lies in requiring adherence to the rule of law.  21 U.S.C. §824(d).  The

public interest also lies in protecting the availability of ephedrine and pseudoephedrine for

legitimate therapeutic uses.  See 21 C.F.R. § 1315.11.  DEA's rush to judgment, including the

recitation of unsubstantiated and, in four instances, demonstrably false charges is an abuse of

discretion that complies neither with statutory law, 21 U.S.C. § 824(d); APA 5 U.S.C. §

706(2)(A), nor with the Due Process Clause of the Fifth Amendment.  DEA's action does not

protect the public against any provable imminent danger to health and safety.  Instead, DEA's

action forces ███████████████████████████████ imposes severe economic hardship

███████████████████████████████ Exhibit 2 at ¶¶30-33, and deprives people in need

of relief from symptoms (including life-threatening symptoms) of asthma, COPD, and other

respiratory ailments of SLC drugs.  The public interest is disserved when an agency of the

federal government violates its enabling statute, the APA and the Constitution to force

summarily a company out of a line of business in callous disregard of the economic and public

health consequences of its actions.  The public interest is disserved by arbitrary and capricious

agency action and by an abuse of discretion such as this.

Unless this Court issues preliminary injunctive relief, as many ██████████████████

███████████████████████████ depending on the extent of Novelty convenience

store chain customers who turn to competitors.  Assuming those individuals have family

members dependent upon them, thousands of people could well be harmed by DEA's unlawful

immediate Suspension Order.  See Affidavit of Todd Green, attached as Exhibit 2 at ¶¶11 and

41.  The public interest is disserved when honest, hardworking people suffer severe economic

hardship resulting from unlawful acts of their government.

## IV.    RELIEF REQUESTED

In conclusion, Novelty respectfully requests that this Court immediately enter a preliminary injunction order requiring DEA without delay (1) to vacate the immediate suspension order; (2) to reinstate Novelty's registration pending a final and unappealable decision on the merits; and (3) to release Novelty's inventory for sale to its convenience store customers.  A draft order accompanies this motion.

Respectfully submitted,


_/s/_____
Jonathan W. Emord
Andrea G. Ferrenz
Peter A. Arhangelsky
*Counsel for Novelty*

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Date Submitted:  April 15, 2008

## CERTIFICATE OF SERVICE

I, Jonathan W. Emord, hereby certify that I caused to be served on the Respondents via the people identified below the foregoing Motion for Preliminary Injunction, Memorandum in support, draft order, and 17 Exhibits via UPS overnight mail on April 15, 2008.

James I. Crowley
Legal Advisor
Michele M. Leonhart
Deputy Administrator
Drug Enforcement Administration
US Department of Justice
700 Army Navy Drive
Arlington VA 22202

Michele M. Leonhart
Deputy Administrator
Drug Enforcement Administration
US Department of Justice
700 Army Navy Drive
Arlington VA 22202

Michael B. Mukasey
Attorney General
United States Attorney General's Office
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jeffrey A. Taylor
United States Attorney
Judiciary Building
555 Fourth Street, NW
Washington, DC 20530

_____

Jonathan W. Emord

24

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

            **Plaintiff,**

**v.**

**Michele Leonhart,**                    **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**
**Drug Enforcement Administration; et al.**

            **Defendants.**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR
## PRELMINARY INJUNCTION (REDACTED)

## EXHIBIT 1

 U.S. Department of Justice
Drug Enforcement Administration

IN THE MATTER OF

Novelty Distributors
d b a Greenfield Labs
351 West Muskegon Drive
Greenfield, Indiana 46140

JAN 1 7 2008

# ORDER TO SHOW CAUSE AND
## IMMEDIATE SUSPENSION OF REGISTRATION

PURSUANT to Sections 303 and 304 of the Controlled Substances Act, Title 21, United States Code, Sections 823 and 824,

NOTICE is hereby given: (1) to inform Novelty Distributors, d b a Greenfield Labs ("Novelty"), of the immediate suspension of its Drug Enforcement Administration (DEA) Certificate of Registration, 003563NSY, as a distributor of list I chemicals, because such registration constitutes an imminent danger to the public health and safety, pursuant to 21 U.S.C. § 824(d); and (2) to afford Novelty an opportunity to Show Cause before DEA, at 600 Army Navy Drive, Arlington, Virginia, on March 24, 2008, at 9:00 a.m., as to why DEA should not revoke its registration pursuant to 21 U.S.C. § 824(a)(4), and deny any pending applications for renewal or modification of such registration pursuant to 21 U.S.C. § 823(h), because Novelty's continued registration is inconsistent with the public interest, as that term is used in 21 U.S.C. §§ 823(h) and 824(a)(4). The basis for this Order to Show Cause and Immediate Suspension of Registration is set forth in the following non-exhaustive summary of facts.

1. Novelty is registered with DEA as a distributor of the List I chemicals pseudoephedrine and ephedrine under DEA number 003563NSY, and its sole DEA registered location is 351 W. Muskegon Drive, Greenfield, Indiana 46140. Novelty's current DEA registration expires on October 31, 2008.

2. Novelty distributed, and continues to distribute, List I chemicals (specifically, scheduled listed chemical products) from over 100 unregistered locations in violation of 21 U.S.C. § 822(e) and 21 C.F.R. §§ 1309.21 and 1309.23(a). Novelty stores scheduled listed chemical products at unregistered storage facilities and other locations throughout the United States. Novelty's employees or agents then distribute scheduled listed chemical products directly from these unregistered locations to regulated sellers. Violating Federal laws relating to the handling of List I chemicals is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(2) and 824(a)(4).

Received  1-22  ( 8
Office of Administrative
Law Judge
Drug Enforcement Administration

ALJ Exhibit _____1_____
Docket No. _08-33_
Date _____

I

Exhibit 1
1 of 4

3. Novelty has distributed, and continues to distribute, large quantities of scheduled listed chemical products to small retail outlets such as convenience stores. The quantity of scheduled listed chemical products that Novelty sells to some convenience stores far exceeds what those retail outlets could be expected to sell for legitimate, therapeutic purposes. The scheduled listed chemical products distributed by Novelty in large quantities have been, and are likely to continue being, diverted to the clandestine manufacture of methamphetamine as indicating by following non-exhaustive facts.

a. In November 2002, 22 bottles of ephedrine products distributed by Novelty were found at an illicit methamphetamine laboratory in Connecticut.

b. Small retail outlets that receive large quantities of scheduled listed chemical products from Novelty sell such products to individuals in amounts that cannot be attributed to legitimate individual needs. For example, some of the retail outlets allow customers to make multiple purchases of scheduled listed chemical products within a single week, and in some cases, within a single day. Some customers of these retail outlets purchased more than 9 grams of ephedrine or pseudoephedrine base within 30 days in violation of 21 U.S.C. § 844(a).

Excessive sales of scheduled listed chemical products that are or may be diverted to the clandestine manufacture of methamphetamine is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(1), 823(h)(5) and 824(a)(4); *T. Young Associates, Inc.; Revocation of Registration*, 71 Fed. Reg. 60,567 (2006); *Holloway Distributing; Revocation of Registration*, 72 Fed. Reg. 42,118 (2007); *Planet Trading, Inc., d/b/a United Wholesale Distributors, Inc.; Denial of Application*, 72 Fed. Reg. 11,055 (2007).

4. In July 2007 DEA conducted an audit of Novelty's records and inventory for 20 scheduled listed chemical products distributed by Novelty. Novelty could not account for more than 60,000 dosage units of two ephedrine products. The audit also revealed overages for 16 different scheduled listed chemical products. Novelty failed to maintain accurate records of its distributions and receipts of scheduled listed chemical products in violation of 21 U.S.C. § 830(a) and 21 C.F.R. § 1310.04. Failure to comply with the record keeping requirements of Federal law is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(2) and 824(a)(4).

5. From January 1, 2007, through July 9, 2007, Novelty distributed scheduled listed chemical products on at least 284 occasions to 35 retail outlets that were not self-certified under 21 U.S.C. § 830(e)(1)(A)(vii). Regulated sellers must be self-certified in order to sell any scheduled listed chemical product at retail. See 21 USC § 830(e)(1)(B)(i). Distributing scheduled listed chemical products to retail outlets that are not self-certified, and therefore cannot lawfully sell scheduled listed chemical products, is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(2), 823(h)(5) and 824(a)(4).

6. Novelty distributed 24-count bottles of scheduled listed chemical products on three occasions to retail outlets after February 1, 2007. As of April 9, 2006, non-liquid schedule listed chemicals could not be lawfully sold at retail except when packaged in blister packs containing

Exhibit 1
2 of 4

no more than two dosage units per blister. See 21 U.S.C. § 830(d)(2). Distributions of 24-count bottles of scheduled listed chemical products to retail outlets that cannot lawfully sell bottles of such products is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(5) and 824(a)(4).

‟ Novelty distributed tablet form scheduled listed chemical products to retail outlets located in two states, Kentucky and North Carolina, that prohibit the sale of non-liquid ephedrine and pseudoephedrine except in a gel-cap product. Distribution of scheduled listed chemical products in violation of state law is conduct that is inconsistent with the public interest. See 21 U.S.C. §§ 823(h)(2) and 824(a)(4).

IN view of the foregoing, and pursuant to 21 U.S.C. § 824(d), I find that the scheduled listed chemical products distributed by Novelty have been, and are likely to continue to be, diverted into the illicit manufacture of methamphetamine. Novelty has failed to maintain effective controls against such diversion as required by 21 U.S.C. § 823(h)(1). Novelty's failure to maintain effective controls against diversion, including its distribution of large amounts of scheduled listed chemical products that far exceed legitimate demand, contribute to the illicit manufacture of methamphetamine. The illegal manufacture and abuse of methamphetamine pose a grave threat to public health and safety.

Therefore, it is my preliminary conclusion that Novelty's continued registration during the pendency of these proceedings would constitute an imminent danger to the public health and safety. Pursuant to the provisions of 21 U.S.C. § 824(d) and 21 C.F.R. 1309.44(a), and the authority granted to me under 28 C.F.R. §§0.100 and 0.104, DEA Certificate of Registration 003563NSY is hereby suspended, effective immediately, with said suspension to remain in effect until a final determination is reached in these proceedings.

Pursuant to 21 U.S.C. § 824(f) and 21 C.F.R. § 1309.44(b), the Special Agents and Diversion Investigators of the DEA who serve this Order to Show Cause and Immediate Suspension of Registration are authorized to place under seal and to remove for safekeeping all listed chemicals which Novelty possesses pursuant to the registration which I have herein suspended. The said Agents and Investigators are also directed to take into their possession Novelty's DEA Certificate of Registration.

THE following procedures are available to Novelty in this matter:

1. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension, Novelty may file with the Deputy Administrator of the DEA a written request for a hearing in the form set forth in 21 C.F.R. § 1316.47. See 21 C.F.R. § 1309.46(d). If Novelty fails to file such a request, the hearing set for March 24, 2008, shall be cancelled in accordance with paragraph 3 below.

2. Within 30 days after the date of receipt of this Order to Show Cause and Immediate Suspension of Registration, Novelty may file with the Deputy Administrator a waiver of hearing together with a written statement regarding Novelty's position on the matters of fact and law involved. See 21 C.F.R. §1309.53(b).

Exhibit 1
3 of 4

3   Should Novelty decline to file a request for a hearing or, should it request a hearing and then fail to appear at the designated hearing, Novelty shall be deemed to have waived the hearing and the Deputy Administrator may cancel such hearing, and may enter her final order in this matter without a hearing and based upon the investigative file and the record of this proceeding as it may then appear.  See 21 C.F.R. §§ 1309.53(c) and (d).

Correspondence concerning this matter, including requests referenced in paragraphs 1 and 2 above, should be addressed to the Hearing Clerk, Office of Administrative Law Judges, Drug Enforcement Administration, Washington, D.C. 20537.  Matters are deemed filed upon receipt by the Hearing Clerk.  See 21 C.F.R. § 1316.45.

Michele M. Leonhart     1/17/08
Deputy Administrator

cc:  Hearing Clerk
     Office of Administrative Law Judges

4

Exhibit 1
4 of 4

# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **NOVELTY DISTRIBUTORS, INC.,**<br>**D/B/A GREENFIELD LABS,** | |
| **Plaintiff,** | |
| **v.** | |
| **Michele Leonhart,** | **Case No. 08cv00635 (RMC)** |
| **In her official capacity as** | |
| **Acting Administrator of the** | **PUBLIC VERSION** |
| **Drug Enforcement Administration; et al.** | |
| **Defendants.** | |

# PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 2 (REDACTED)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NOVELTY, INC.                          )
                                       )
        Plaintiff                      )
                                       )
v.                                     )        Case No. 08 cv 00635 (RMC)
                                       )
MICHELLE M. LEONHART, Deputy           )
Administrator, U.S. Drug Enforcement   )
Administration, et al.,                )
                                       )
        Defendants.                    )

## AFFIDAVIT OF TODD GREEN IN SUPPORT OF NOVELTY'S MOTION FOR PRELMINARY INJUNCTION

        I, TODD GREEN, declare under penalty of perjury that the following is true and
correct to the best of my knowledge, information and belief:

1.    I am the President and founder of Novelty, Inc. (hereinafter "Novelty"). I oversee

      all day to day operations of the company. I also oversee all of the company's

      business planning and product development.

2.    The company started in 1980 as Todd's Custom Hats from my parent's house.

      Novelty Inc. was started while I was in college.

3.    I named the company after the type of products that we sell, i.e., novelty items that

      are primarily trend products designed to be impulse purchases.

4.    Novelty started mostly from my sale of baseball caps. Business flourished and I

      decided to devote all my efforts to the company.

5.    

6.  In response to customer demand, I developed Novelty Distributors to help furnish stores with new novelty merchandise.

7.  By 1999, I turned my small garage business into a ▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓

●  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

10. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

11. From my small garage company, I have grown Novelty, Inc. into a business
    employing approximately ▓▓▓▓▓▓▓ worldwide. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓

12. Novelty has about ▓▓▓▓▓▓▓▓▓ in the United States and Canada.  Most of
    Novelty's customers are ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

13. In 1999 Ernst & Young named me Entrepreneur of the Year. Indiana Business Journal listed me in its "40 under 40" list.

14. Novelty is currently one of the top employers in Greenfield, Indiana, employing over ██████ residents in this small working-class community.

15. In 1996, Novelty began selling over-the-counter products containing List 1 chemicals (ephedrine and pseudoephedrine) to meet convenience store demand for cough and cold remedies.

16. The sale of those OTC products currently comprises ███████████████ total annual revenue. In the 52 weeks prior to January 28, 2008, Novelty's gross sales income for this product ████████████████

17. Convenience stores, ███████████████ prefer to purchase as many of the varied products they sell from one vendor who can deliver goods direct to store.

18. DEA's recent suspension of Novelty's registration has prevented Novelty from providing its convenience store customers with ephedrine and pseudoephedrine-containing OTC products, ████████████████████████████

    ██████████████████████████████████

    ██████████████████████████████████

19. Novelty has historically ██████████████████████████

    ████████ Accordingly, Novelty appeals to cust ██████████████████

    ██████████████████████████████████

    ████████

20. ████████████████████████████████████

    ████████████████████████████████████

████████████████████████████████████████████

███████████████████████ The loss of ephedrine and pseudoephedrine-

containing OTC products means Novelty cannot fulfill the terms of its contract. The

███████████████████████████████████████████

███████████████████████████████████████████

Therefore the immediate suspension has caused Novelty to lose business in product

categories unrelated to controlled substances. ████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████

21. Unless the suspension order is enjoined, Novelty stands to lose an estimated

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

22. In addition to this loss of income, Novelty has current inventory purchased to fulfill

our customers' requirements and as allowed by the law. The current value at cost of

this inventory is ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

23. As owner of Novelty Inc., I have worked very hard to build a great reputation for my

company. Novelty is respected as an honest and law-abiding corporation.

4

24. DEA's suspension order stigmatizes Novelty with the defamatory moniker of a law violator, suggesting that dealing with the company invites, at a minimum, greater DEA scrutiny and, at a maximum, adverse law enforcement.

25. Our reputation is permanently harmed and will continue to diminish as customers learn of our difficulties and there is no shortage of interest in spreading word of those difficulties by Novelty's competitors. It is nearly impossible to place a value on Novelty's good reputation that took me over 30 years to cultivate, and I stand to lose that reputation due to DEA's suspension. More importantly to me, I am forced to make the difficult decision of terminating trusted and beloved employees of this company because of the revenue shortfalls. Those people are losing jobs in the middle of the current recession. They have families and they will suffer mightily when the funds they depend upon disappear, money needed for necessities disappears, bills go unpaid, and homes go into foreclosure. They are innocent victims of the suspension order.

26. ██████████

27. ██████████ Our competitors are taking advantage of Novelty's current inability to sell this high margin category to sign long-term contracts with our customers. ██████ that will preclude us from

5

doing any business with these customers for many years for not only ephedrine but our entire product line including novelties, sunglasses, lighters, and non-SLC items.

28. Once shelf space is occupied by a competing product, that customer becomes a total loss that cannot be replaced by any of the rotational items sold by Novelty.

29. With every day that DEA's suspension remains in place, Novelty loses more customers due to loss of reputation and the loss of Novelty's ability to properly service the customers' needs.

30. In addition to its warehouse staff, Novelty employs approximately ▮▮▮▮▮▮▮ who sell scheduled listed products for Novelty.

31. Novelty cannot lose ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Those changes are devastating for the employees and this company..

32. The loss of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮

33. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In this time of economic downturn, the loss of those jobs will certainly burden families and the local economy.

34. A loss of ▮▮▮▮▮ of Novelty's total revenue also alters fundamentally Novelty's business by forcing the company to revise its overall product offerings, quantities of

6

product in inventory, distribution methods, and compensation plans because revenues derived from the company's sale of OTC products help sustain each of the foregoing operations.

35.  For over 30 years, I have strived to operate Novelty in an honest and lawful fashion. The reputation of my company depends upon those values and so does the continued employment of Novelty's workforce and sales route professionals.

36.  Novelty has self-imposed many procedural safeguards on its scheduled listed chemical business,

37.  Novelty has always been willing to work with DEA, and Novelty remains committed to altering its operations to help guard against diversion.

38.  Novelty is amenable to conditions on its registration that allow for heightened DEA supervision of its business practices and that require steps to reduce diversion risk even further. Pursuant to the outcome of pending litigation,

With access to the DEA database of self-certifications, we are willing to limit sales, as we have done principally in the past several years, to only those convenience stores that are self-certified under DEA's self-certification program. We are willing to use additional security and tracking measures to increase

surveillance of product from Novelty, Inc.'s Greenfield headquarters to its

convenience store customers. ████████████████████████████████████

████████████████████████████████████████████████████

████████████

39.  Because of our willingness to take responsible action to protect the public and our

commitment to continue taking those steps, Novelty deserves to have its DEA

registration continued with conditions, not revoked.  The suspension now in place

achieves a temporary revocation that DEA plans to make permanent through a

revocation hearing.

40.  Our experts confirm to me that if DEA succeeds in eliminating Novelty, that will not

cause a single clandestine meth lab to discontinue operation or reduce a single

methamphetamine transaction anywhere in the United States.  The quantity of

ephedrine for clandestine use that comes from convenience stores is estimated, even

by DEA's administrator, to be miniscule.  I have learned that the overwhelming

source of ephedrine for meth labs is pure ephedrine smuggled into the United States

in enormous quantities from countries like Mexico.  As Novelty is replaced in the

market place there will only be a shift of Novelty's business to new suppliers and no

net decrease in the total quantities sold. ████████████████████████████

████████████████████████████████████████████████████

████████████

41.  While destruction of Novelty will do nothing to protect public health and safety and

reduce the production and use of methamphetamine, it will cause up ████████████

████████ of any wrongdoing to lose their employment in the middle of a recession.

8

████████████████████████████████████

████████████████████ The public interest will be disserved and in

very real terms a lot of honest, hardworking people will suffer severe economic

hardship. This will occur while the marketplace will change to sell 25mg product

and double the volume of ephedrine within the trade. The shift of business will be

from my company as a single well structured and capable supplier to dozens of

lesser companies with far fewer controls and capabilities.

Todd Green

Executed on: 3/11/08

9

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                    Plaintiff,

v.

Michele Leonhart,                          Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the                PUBLIC VERSION
Drug Enforcement Administration; et al.


                    Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 3 (REDACTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

Plaintiff,

v.

Michele Leonhart,                                    Case No.  08 cv 00635 (RMC)
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration, et al

Defendants.

## AFFIDAVIT OF KENNETH "J.R." MERLAU

I, KENNETH "J.R." MERLAU, declare under penalty of perjury that the following is
true and correct to the best of my knowledge, information, and belief:

1.   I am the Vice President of Product and Compliance Officer for Scheduled Listed

     Chemical (SLC) Products at Novelty, Inc. located at 351 West Muskegon Drive,

     Greenfield, IN (hereinafter "Novelty").

2.   I have been a Novelty employee, holding various positions, since 2004.  I have

     been the Compliance Officer since 2006.

3.   Until the issuance of the Immediate Suspension Order, Novelty distributed two

     categories of SLCs: ephedrine plus guaifenesin and pseudoephedrine plus

     guaifenesin.

4.   The ███████████████████████████████ count packages of

     ephedrine (12.5mg/dose) and guaifenesin (200 mg/dose).  Attachment 1:

     Transcript at 2243.  ████████████████████████████████

     ████████████████ and guaifenesin (200 mg/dose) ████████████

1

Exhibit 3
1 of 13

pseudoephedrine (30 mg/dose) and guaifenesin (200 mg/dose). Id. at 616. All of
the above were sold only in blister packs after the enactment of the Combat
Methamphetamine Act of 2005.

5.  In anticipation of supply reductions resulting from the Combat Methamphetamine
    Act of 2005, Novelty created a 12.5 mg ephedrine line approximately 2 years ago.
    Attachment 1: Transcript at 617. That change reduces the risk of diversion of
    Novelty products and the quantitative amount of product sold in Novelty's
    customers' stores.

6.  Novelty's  Attachment 1: Transcript at 561 and 616.

7.  As Compliance Officer, I oversee the Novelty employees who handle SLCs. I
    oversee their training and compliance. I, along with Mark Bledsoe and other
    Novelty executives, develop and implement Novelty's SLC policies. Attachment
    9 to Exhibit 3 (Bledsoe Affidavit)(SLC policy).

8.  Novelty sells its SLC products to various convenience stores, with approximately
     Attachment 1: Transcript at 2228-
    2229, 2264-2265.

9.  Approximately ▇▇▇ SLC gross receipts came ▇▇▇
    ▇▇▇ that
    ▇▇▇

Exhibit 3
2 of 13

10. Because Novelty has conducted business almost exclusively with convenience stores over the past nearly 30 years, the company has developed a detailed understanding of the convenience store business market.

11. 

12. Novelty

13. Novelty markets its ability to provide all goods throughout multiple product categories. Therefore, much of Novelty's success in the industry is attributed to its ability to provide a diverse and complete range of products, including SLCs.

14. 

3

Exhibit 3
3 of 13

15. The SLC products Novelty sold prior to DEA's January 28, 2007 Order to Show Cause and Immediate Suspension of Registration of Novelty Distributors, d/b/a Greenfield Labs ("Immediate Suspension Order")



16. Since Novelty received the Immediate Suspension Order, several customers have terminated their overall business relationship with Novelty because Novelty can no longer supply SLCs.

Attachments 2 and 3.

18. Customers continue to learn about the DEA's Immediate Suspension Order because the community of convenience stores is relatively small and news of interaction with the DEA is a hot topic that spreads rapidly. Word of the Immediate Suspension Order has come back to us from customers who have learned of it from their management and from our competitors. The result has

4

Exhibit 3
4 of 13

been significant harm to Novelty's business reputation. That DEA has suspended Novelty's registration and has placed Novelty under an Order to Show Cause has stigmatized Novelty as a "bad actor" that is under DEA scrutiny and sanction. Novelty's reputation continues to suffer as customers unjustly believe Novelty must have done something unlawful, such as contribute to the illicit methamphetamine trade, to "deserve" this DEA action. Novelty is unable to compete within the market place with other distributors selling the same products as well as those containing twice the dosage despite those other competitors' reliance on the same or less secure methods of distribution as Novelty.

19. Novelty has never marketed its products for "off-label" uses or uses that are not approved by FDA. All of Novelty's products bear clear labeling instructing on use for approved conditions. None of Novelty's labels of products in inventory that would be sold save the ISO indicate that an ephedrine-containing product should be used for something other than bronchiodilation. None of Novelty's labels of products in inventory that would be sold but for the Immediate Suspension Order indicate that a pseudoephedrine-containing product should be used for something other than nasal dilations. Attachment 4; see also Attachment 1: Transcript 2266-2268.

20. Novelty consistently strives to prevent diversion risk. It has constructed a closed system of distribution that minimizes this risk, especially when compared to big-box stores and similarly situated distributors. Attachment 1: Transcript 642-645.

21. Novelty gratuitously instituted strict safeguards to protect its closed system of SLC distribution. Id.

5

Exhibit 3
5 of 13

22. The company ensures that its products do not pass through multiple layers of

distribution. 

Id.

23. Novelty strictly complies with the dosage limitations of state and federal

authorities. 

24.

Attachment 1: Transcript 2278-2279.

25. 

6

Exhibit 3
6 of 13



See Attachment 6 to Exhibit 4 (Polk Affidavit)( and Attachment 6 to Exhibit 3 (Bledsoe Affidavit)(

26. This means all customers to whom Novelty sells SLC products are known and validated by Novelty and monitored for adherence to all required training and self-certifications.

27. (Attachment 5), See Attachment 9 to Exhibit 3(Bledsoe affidavit)(

7

Exhibit 3
7 of 13



. A███████████████████e is attached to the Affidavit of

our CFO who drafted it, Ryan Polk, Attachment 6 to Exhibit 4; see also

Attachment 1:  642-645 (Testimony of JR Merlau).

28. ████████████████████████████

████████████████████Page 60 of Attachment 6 to Exhibit 4.█████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████Attachment 1:  Transcript 642-645.

29. ████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████Attachment 6 to Exhibit 3.

30. ████████████████████████████

████████████████████████████

8

Exhibit 3
8 of 13



y.    Attachment 6 to Exhibit 3.

31. The first allegation of the DEA Immediate Suspension Order, that the above
distribution method is actually storage of the SLCs at an unregistered location that
creates a risk of diversion is baseless.  Novelty believes its distribution method is
exemplary in preventing diversion because it maintains control over SLC products
all the way to the retail shelf. ███████████████████████
███████████████████████████████
█████████████████████ When shipment is made
through Federal Express or UPS, SLCs are delivered, sometimes outside the
building in dropoff boxes, are retrieved and stored in the building for hours or
days, before being shipped.  See Attachment 1: Testimony at 642-645.  In 2004
Novelty filed a complaint in US District Court for the Southern District of
Indiana, Novelty Inc. v. Tandy et al, (04cv-1502-DFH-TAB) seeking a
declaratory judgment concerning its claims under the Administrative Procedure
Act concerning its shipping methods for SLCs.  A final order has not yet issued in
this case.  Id. at 646-654.

32. After receiving the DEA's Immediate Suspension Order, I investigated the charge
that Novelty sold on three occasions 24-count bottles after April 9, 2006.  DEA
alleges that Novelty sold product number 17902 in an instance when it was
unlawful to do so.  I learned that this transaction did not in fact occur but was a
coding entry error.  Novelty did not sell this product as described by DEA's
Immediate Suspension Order.  Novelty's records indicate it last shipped this

9

Exhibit 3
9 of 13

product to an RSP over thirteen months prior to the alleged sale. Furthermore, I have verified that each retail customer in question has no record of sale for this particular product after April 9, 2006.



See Attachment 1: Testimony at 2287-289, 2395-2399.

33. I have also investigated the charge in the DEA's Immediate Suspension Order that Novelty sold tablet form SLCs in Kentucky and North Carolina while it was unlawful to do so. Novelty last shipped the product in question to an RSP over thirteen months prior to the alleged sale. Furthermore, I have verified that there are no retail sales records for this particular product in the retail establishments in the states in question. This allegation is also the result of a human encoding error, five out of █████████████ during the review period. ██████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████ Attachment 1: Transcript 2285-2294.

34. I was present at Novelty's Greenfield, IN facilities on July 9, 2007. I was present when DEA executed an administrative inspection warrant. DEA inspected Novelty's offices for 5 days. See Attachment 1: Transcript at 2215-2226.

10

Exhibit 3
10 of 13

35. Novelty did not refuse DEA access to its facilities; it did not impede DEA's investigation; it offered its assistance with all DEA requests. See Attachment 1: Transcript at 2215-2226.

36. On the first day of the inspection, Novelty executives became concerned of undue bias in the investigation. Among the investigators present was DEA counsel Brian Bayly, then acting as counsel for DEA against Novelty while legal matters in which he was counsel were pending before DEA and were also pending in the United States District Court for the District of Columbia. Also among the investigators present was Investigator Darrell Meador. Meador had filed a false affidavit against Novelty in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU), then pending before the U.S District Court for the District of Columbia. He thus had a personal interest in finding exculpatory evidence. We objected vigorously to the presence of Bayly and Meador. DEA finally removed Meador but only after three days in which he helped execute the warrant. See Attachment 1: Transcript at 2216, 2221-22.

37. The following unusual events during execution of the warrant caused me to confer with our legal counsel and other Novelty executives to determine how best to respond: (1) DEA counsel Brian Bayly then representing DEA in litigation against Novelty participated in the investigation (Attachment 1: Transcript at 2216) and at the start of the investigation gratuitously stated that the execution of the warrant was not in response to Novelty's filing suit against DEA (Attachment 1: Transcript at 2216); (2) DEA investigator Darrell Meador then accused by Novelty in the U.S. District Court for the District of Columbia of submitting a

11

Exhibit 3
11 of 13

false affidavit participated in execution of the warrant when the warrant embraced content that, if it existed (which it did not) would prove exculpatory of the charge, thus revealing a biased and personal interest (Attachment 1: Transcript at 2217); (3) DEA investigator Lisa Barnhill accused without any basis in fact Novelty CFO Ryan Polk of "scrubbing documents" and DEA investigator Madeline Kuzma accused without any basis in fact of "sanitizing documents" (Attachment 1: Transcript at 2225); (4) DEA investigator Lisa Barnhill demanded production of over 12,000 pages of documents within 3 hours (a physical impossibility); and (5) DEA Investigator Barnhill, without any foundation, threatened to arrest one or more Novelty executives (Attachment 1: Transcript at 2222-25).

38. After conferring with Novelty executives and outside counsel, I decided to create a public record of what I perceived to be an unreasonable execution of the warrant. On July 11, around noon, I installed a video-recorder on a tripod, occupying approximately 3 square feet in the corner of a 12 by 20 foot room so as not to block ingress or egress or DEA access to documents. When DEA agents entered the room, they apparently removed the videorecorder. At approximately 1:15, I saw the recorder with its electrical conduit removed from the wall socket outside the room where the DEA agents were present. I told them that I objected to their preventing the videotaping. They said that they would not allow themselves to be videotaped. See Attachment 1: Transcript at 2219; see also Testimony of Ryan Polk at 2014 (Polk Affidavit, Exhibit 4 at Attachment 1).

39. Later in the afternoon that same day, I entered the room with the same videorecorder and reassembled it on the tripod with the plug in the wall socket. I

12

Exhibit 3
12 of 13

placed the videocamera in the corner on a tripod. DEA agent Darrell Meador was then in the room. At a rapid gait, he proceeded from a chair at the conference table in the room around the table and then grabbed the recorder from my hands, pulled the cord from the socket and removed it from the room. I protested to Mr. Meador that he had no lawful authority to prevent the videotaping to no avail. See Attachment 1: Transcript at 2219.

40. I further attempted to tape record the events using a cassette recorder. I placed the tape recorder on the conference table and left the room. DEA agents dismantled the audio recording device and removed the batteries from the recorder preventing its use. I protested to the DEA agents that this action violated our right to record their actions, to no avail. See Attachment 1: Transcript at 2220.

J.R. Merlau

Dated: 4/11/08

13

Exhibit 3
13 of 13

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                    **Plaintiff,**

**v.**

Michele Leonhart,                            **Case No. 08cv00635 (RMC)**
In her official capacity as
Acting Administrator of the                     **PUBLIC VERSION**
Drug Enforcement Administration; et al.

                    **Defendants.**

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 1 TO EXHIBIT 3 (REDACTED)

TESTIMONY MERLAU

Page 283

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pIIIIIIIIIIIIIIIIIIIIIII*
                         *
                         *
IN THE MATTER OF:     *
                      *  Docket No. 08-33
NOVELTY DISTRIBUTORS  *
                      *
pIIIIIIIIIIIIIIIIIIIII4


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, March 25, 2008

        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
Attachment 1

---

TESTIMONY MERLAU

Page 285

T-A-B-L-E O-F C-O-N-T-E-N-T-S

| Government Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jonathan Robbin | 291 | 453 | 506 | 508 |
| Stephen Hussion | 528 | | | |
| J.R. Merlau | 542 | | | |

| EXHIBIT NO. | DESCRIPTION | MARK | RECD |
|---|---|---|---|
| Government | | | |
| 23 | NACS Report | | 336 |
| 24 | Robbin CV | 382 | 383 |
| 25 | Robbin Declaration | 382 | |

Neal R. Gross and Co., Inc.
202-234-4433

---

TESTIMONY MERLAU

Page 612

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pIIIIIIIIIIIIIIIIIIIIIII*
                         *
                         *
IN THE MATTER OF:     *
                      *  Docket No. 08-33
NOVELTY DISTRIBUTORS  *
                      *
pIIIIIIIIIIIIIIIIIIIII4


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Wednesday, March 26, 2008

        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

---

TESTIMONY MERLAU

Page 614

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J.R. Merlau | 616 | 640 | 663 696 | 682 699 |
| Dexter McGee | 704 | 750 | 779 | 775 781 |
| Daniel Gillen | 785 | 819 | | |
| Voir Dire on page 811 | | | | |
| Louis Colosimo | 847 | 886 | | |

| EXHIBIT NO. | DESCRIPTION | MARK | RECD |
|---|---|---|---|
| Government | | | |
| 44 | Log Summary | | 797 |
| 46 | Summary | 735 | 735 |
| 50 | Smith Co. Registration | | 744 |
| 70 | Mountain Candy DEA regis- | | |
| | tration record | | 807 |
| 75 | Log Book | | 749 |
| 79 | Invoices | | 749 |
| 80 | Summary | 732 | 732 |

Neal R. Gross and Co., Inc.
202-234-4433

TESTIMONY MERLAU

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pïïïïïïïïïïïïïïïïïïïïïïï»
                        *
                        *
IN THE MATTER OF:       *
                        *  Docket No. 08-33
NOVELTY DISTRIBUTORS    *
                        *
                        *
pïïïïïïïïïïïïïïïïïïïïïï¬


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

    The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

---

TESTIMONY MERLAU

Page 1998

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ryan Polk | 2003 | 2076 | 2111 | 2118 |
| Voir Dire on page 2042 | | | | |
| Chris Collins | 2170 | 2209 | | |
| Voir Dire on page 2182 | | | | |
| J.R. Merlau | 2215 | | | |
| Voir Dire on page 2287 | | | | |

| Exhibit No. | Document | Mark | Recd |
|---|---|---|---|
| ALJ | | | |
| 14 | Formerly Novelty Exhibit 27 | | |
| Respondent | | | |
| 9 | Iventory | 2265 | 2268 |
| 11 | Schematic | 2269 | 2273 |
| 13 | SLC Cage Procedures | 2275 | 2280 |
| 28 | Company Handbook | 2281 | 2284 |
| 36 | Polk Document | 2042 | 2045 |
| 40 | Show Cause | 2285 | 2291 |
| 46 | email | 2292 | 2294 |
| Government | | | |
| 1 | DEA Registration | 2125 | 2125 |
| 8-17 | EPIC Charts | 2126 | 2130 |
| 19 | Snyder Declaration | 2130 | 2136 |
| 22 | FDA Proposed Rule | 2137 | 2137 |
| 51-55 | Witness Testimony | 2138 | |
| 51 | | | 2143 |
| 52 | | | 2151 |
| 54 | | 2148 | 2151 |
| 63 | PDR Excerpt | 2152 | 2152 |
| 64 | NDH Excerpt | 2153 | 2155 |
| 90 | JAMA Sloan Survey | 2156 | 2157 |
| 91 | CHCPA Document | 2157 | 2158 |
| 92 | NIH Common Cold FAQs | 2158 | 2159 |
| 93 | NHLBI Document | 2159 | 2165 |

Neal R. Gross and Co., Inc.
202-234-4433

---

TESTIMONY MERLAU

Page 2341

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pïïïïïïïïïïïïïïïïïïïïïïï»
                        *
                        *
IN THE MATTER OF:       *
                        *  Docket No. 08-33
NOVELTY DISTRIBUTORS    *
                        *
                        *
pïïïïïïïïïïïïïïïïïïïïïï¬


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Wednesday, April 2, 2008

    The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc
202-234-4433

---

TESTIMONY MERLAU

Page 2343

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| J.R. Merlau | | 2345 | 2387 | |
| Michael Pacin | 2409 | 2451 | 2469 | 2471 |
| Voir Dire on page 2413 | | | | |
| Michael Glade | 2481 | | | |
| Voir Dire on page 2500 | | | | |
| Thomas Kupiec | 2548 | 2589 | | |
| Voir Dire on page 2580 | | | | |

| EXHIBIT | | MARK | RECD |
|---|---|---|---|
| Government | | | |
| 48 | | 2385 | 2386 |
| 93 | Expert Pane Report | 2466 | |
| 95 | | 2453 | |
| 96 | | 2546 | 2547 |
| Respondent | | | |
| 1 | Pacin Report | 2446 | 2450 |
| 3 | Document cited by Pacin | 2525 | |
| 22 | Bianchi Article | 2580 | |

Neal R. Gross and Co., Inc.
202-234-4433

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 542

```
 1              JUDGE RANDALL:  Thank you.  Please
 2   be seated.
 3              MR. BARBER:  Good afternoon, sir.
 4              THE WITNESS:  Hi.
 5              MR. BARBER:  My name is Linden
 6   Barber.  I'm one of the Government Counsel, as
 7   you know.  Am I pronouncing your name
 8   correctly, Merlau or is it Merlot?
 9              THE WITNESS:  It's Merlau.
10              MR. BARBER:  Merlau.
11              THE WITNESS:  Merlot is a little
12   classier.
13                  (Laughter.)
14                  DIRECT EXAMINATION
15              BY MR. BARBER:
16        Q    Mr. Merlau, what is your current
17   position at Novelty?
18        A    Vice President of Product.
19              JUDGE RANDALL:  I'm sorry.  Vice
20   President of what?
21              THE WITNESS:  Of Product.
22              JUDGE RANDALL:  Thank you.
23              BY MR. BARBER:
24        Q    And how long have you been with
25   Novelty?
```

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 543

```
 1        A    Just a little bit over four years.
 2        Q    Have you always held the position,
 3   Vice President of Product, or have you held
 4   other positions?
 5        A    I've had some different titles,
 6   Vice President of Licensing, as well as
 7   Business Development.
 8        Q    Have you had different duties as
 9   those titles have changed, or have your duties
10   remained the same?
11        A    It's pretty much the same duties,
12   I just keep adding jobs to what I do.
13        Q    Would you briefly tell the Court
14   what it is you do as Vice President of
15   Product, currently?
16        A    Yes.  As far as product, I am in
17   charge of our product development team,
18   directly running half of the total group.
```



TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 544



```
 7        Q    What are your duties with regard
 8   to scheduled listed chemical products?
 9        A    Compliance Officer, and I'm also
10   Coordinator of our litigation efforts.
11        Q    How long have you been the
12   Litigation Coordinator?
13        A    Since our in-house counsel left,
14   so probably two and a half years, two years,
15   in that range.
16        Q    Now, with reference to being a
17   Compliance Officer, what are your duties with
18   regard to compliance with DEA regulations and
19   the Controlled Substances Act?
20        A    It's to be familiar with it, it's
21   too monitor our processing and oversight of
22   individual people in working within our
23   company to insure compliance.
24        Q    As the Compliance Officer, how
25   would you describe your familiarity with the
```

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 545

```
 1   Controlled Substances Act, and the DEA
 2   regulations?
 3        A    Very familiar with it.
 4        Q    Who within Novelty is ultimately
 5   responsible for compliance with the Controlled
 6   Substances Act, and the DEA regulations?
 7        A    Todd Green.
 8              JUDGE RANDALL:  I'm sorry.  I
 9   didn't hear that.
10              THE WITNESS:  Todd Green, the
11   President of the company.
12              BY MR. BARBER:
13        Q    And you were present yesterday
14   when Mr. Green testified in this proceeding?
15        A    I was.
16        Q    And after Mr. Green, who -- and
17   Mr. Green is the President of Novelty.  Is
18   that correct?
19        A    Correct.
20        Q    Sole shareholder?
21        A    Correct.
22        Q    Other than Mr. Green, who is
23   ultimately responsible as the President and
24   sole shareholder, who is next in line within
25   the company structure, as far as compliance?
```

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 546

```
 1         A    There's really three of us that
 2  work each within our respective roles, myself,
 3  Ryan Polk, our CFO who will work on our record
 4  keeping, as well as inventory aspects, and
 5  Mark Bleodsoe is going to work on the product
 6  side, documentation, training, things of that
 7  nature.  Todd mentioned that he delegates many
 8  of his things.  I think the word was
 9  "command", and we're those guys that get that
10  command.
11         Q    All right.  With regard to
12  registration issues, who's responsible within
13  Novelty for registration?
14         A    Ryan Polk actually completes the
15  registrations every year.
16         Q    Based on your position as the
17  Compliance Officer, what is your -- how many
18  DEA registrations does Novelty need to
19  maintain in order to comply with the
20  regulations?
21         A    One within the warehouse where we
22  store product.
23         Q    And I'll try not to belabor any
24  points that Mr. Green testified to, but he
25  indicated he wasn't sure.  Do you know for
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 13 of 155

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 547

```
 1  sure how many registrations Novelty -- DEA
 2  registrations Novelty has?
 3         A    I haven't verified in our office,
 4  but I believe it is one.
 5         Q    And that would be at the address
 6  in Greenfield, Indiana?
 7         A    Muskegon Drive in Greenfield.
 8  Correct.
 9         Q    What role, if any, do you play in
10  determining what scheduled listed chemical
11  products Novelty distributes, or you
12  distributed prior to the immediate suspension?
13         A    Not really all that much.  I mean,
14  I don't pick the product, the dosage.  I make
15  recommendations.  I mean, the final decision
16  is ultimately by Todd Green.  Mark Bleodsoe is
17  probably his doer, as far as that side of the
18  product.  Much like I create the novelties,
19  Mark's kind of category manager, and he's
20  director of category management, and
21  responsible for that group of items.
22         Q    As the Vice President of Product,
23  are you familiar with the full range of
24  products that Novelty sells to convenience
25  stores?
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 14 of 155

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 548



```
 1         A    Some of them more than others, but
 2  the majority, yes.
 3         Q
 5         A
 8         Q
10         A
13         Q
15         A    Yes.
16         Q
19         A
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 15 of 155

TESTIMONY MERLAU                    TUESDAY, MARCH 25, 2008

Page 556



```
 1  location when they're destined for deliveries
 2  to stores that sell scheduled listed chemical
 3  products?  What range of products?
 4         A
11         Q    And when you say SKU, what do you
12  mean?
13         A    Stock Keeping Unit, individual
14  items.  I might have made 20 different styles
15  of hats that all had different item numbers.
16  I might have made six different light-up yo-
17  yos that had all different numbers.  I might
18  have made 50 different styles of sunglasses.
19         Q    And how many new products was
20  that?
21         A
23         Q    Were any of those scheduled listed
24  chemical products?
25         A    No.
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 16 of 155

Page 283

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pIIIIIIIIIIIIIIIIIIIIIIIIi*
                          *
                          *
IN THE MATTER OF:    *
                     *  Docket No. 08-33
NOVELTY DISTRIBUTORS *
                     *
                     *
pIIIIIIIIIIIIIIIIIIIIIIIIi4


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, March 25, 2008

        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  1 of 155
c8ef11821-71cb-49a4-843b-ade3da6326a6

---

Page 285

T-A-B-L-E O-F C-O-N-T-E-N-T-S


Government

Witness          Direct Cross Redirect Recross

Jonathan Robbin   291   453   506    508

Stephen Hussion   528


J.R. Merlau       542

EXHIBIT NO.        DESCRIPTION      MARK RECD

Government

23        NACS Report                    336

24        Robbin CV           382  383

25        Robbin Declaration  382

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  2 of 155
c8ef11821-71cb-49a4-843b-ade3da6326a6

---

Page 612

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pIIIIIIIIIIIIIIIIIIIIIIIIi*
                          *
                          *
IN THE MATTER OF:    *
                     *  Docket No. 08-33
NOVELTY DISTRIBUTORS *
                     *
                     *
pIIIIIIIIIIIIIIIIIIIIIIIIi4


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Wednesday, March 26, 2008

        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  3 of 155
825a74d0-e119-4516-8d60-989f5f2a9e1f

---

Page 614

TABLE OF CONTENTS

WITNESS     DIRECT CROSS REDIRECT RECROSS
J.R. Merlau   616    640   663     682
                           696     699
Dexter McGee  704    750   779     775
                                   781

Daniel Gillen 785    819

Voir Dire on page 811

Louis Colosimo 847   886

EXHIBIT NO.        DESCRIPTION      MARK RECD


Government

44        Log Summary                    797
46        Summary                  735   735
50        Smith Co. Registration         744
70        Mountain Candy DEA regis-

          tration record                 807
75        Log Book                       749
79        Invoices                       749
80        Summary                  732   732

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  4 of 155
825a74d0-e119-4516-8d60-989f5f2a9e1f

---

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

IN THE MATTER OF:       *
                        *
NOVELTY DISTRIBUTORS    *   Docket No. 08-33
                        *
                        *

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

      The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE: GAIL A. RANDALL
        Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  8 of 188

---

Page 1998

TABLE OF CONTENTS

WITNESS      DIRECT CROSS REDIRECT RECROSS

Ryan Polk       2003   2076   2111   2118
   Voir Dire on page 2042
Chris Collins   2170   2209
   Voir Dire on page 2182

J.R. Merlau     2215
   Voir Dire on page 2287

Exhibit No.  Document                Mark Recd

ALJ

14      Formerly Novelty Exhibit 27
Respondent
9       Iventory                    2265 2268
11      Schematic                   2269 2273

13      SLC Cage Procedures         2275 2280
28      Company Handbook            2281 2284
36      Polk Document               2042 2045
40      Show Cause                  2285 2291
46      email                       2292 2294

Government

1       DEA Registration            2125 2125
8-17    EPIC Charts                 2126 2130
19      Snyder Declaration          2130 2136
22      FDA Proposed Rule           2137 2137
51-55   Witness Testimoy            2138
51                                  2143

52                                  2151
54                                  2148 2151
63      PDR Excerpt                 2152 2152
64      NDH Excerpt                 2153 2155
90      JAMA Sloan Survey           2156 2157
91      CHCPA Document              2157 2158
92      NIH Common Cold FAQs        2158 2159

93      NHLBI Document              2159 2165

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  8 of 188

---

Page 2341

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

IN THE MATTER OF:       *
                        *
NOVELTY DISTRIBUTORS    *   Docket No. 08-33
                        *
                        *

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Wednesday, April 2, 2008

      The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE: GAIL A. RANDALL
        Administrative Law Judge

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  7 of 188

---

Page 2343

TABLE OF CONTENTS

WITNESS      DIRECT CROSS REDIRECT RECROSS

J.R. Merlau        2345   2387
Michael Pacin      2409   2451   2469   2471
   Voir Dire on page 2413
Michael Glade      2481
   Voir Dire on page 2500

Thomas Kupiec      2548   2589

   Voir Dire on page 2580

EXHIBIT                             MARK RECD

Government

48                                  2385 2386
93      Expert Pane Report          2466
95                                  2453
96                                  2546 2547

Respondent

1       Pacin Report                2446 2450
3       Document cited by Pacin     2525
22      Bianchi Article             2580

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  8 of 188

Page 542

```
1              JUDGE RANDALL:  Thank you.  Please
2    be seated.
3              MR. BARBER:  Good afternoon, sir.
4              THE WITNESS:  Hi.
5              MR. BARBER:  My name is Linden
6    Barber.  I'm one of the Government Counsel, as
7    you know.  Am I pronouncing your name
8    correctly, Merlau or is it Merlot?
9              THE WITNESS:  It's Merlau.
10             MR. BARBER:  Merlau.
11             THE WITNESS:  Merlot is a little
12   classier.
13             (Laughter.)
14             DIRECT EXAMINATION
15   BY MR. BARBER:
16        Q    Mr. Merlau, what is your current
17   position at Novelty?
18        A    Vice President of Product.
19             JUDGE RANDALL:  I'm sorry.  Vice
20   President of what?
21             THE WITNESS:  Of Product.
22             JUDGE RANDALL:  Thank you.
23             BY MR. BARBER:
24        Q    And how long have you been with
25   Novelty?
```

Page 543

```
1         A    Just a little bit over four years.
2         Q    Have you always held the position,
3    Vice President of Product, or have you held
4    other positions?
5         A    I've had some different titles,
6    Vice President of Licensing, as well as
7    Business Development.
8         Q    Have you had different duties as
9    those titles have changed, or have your duties
10   remained the same?
11        A    It's pretty much the same duties,
12   I just keep adding jobs to what I do.
13        Q    Would you briefly tell the Court
14   what it is you do as Vice President of
15   Product, currently?
16        A    Yes.  As far as product, I am in
17   charge of our product development team,
18   directly running half of the total group.
```



Page 544



```
7         Q    What are your duties with regard
8    to scheduled listed chemical products?
9         A    Compliance Officer, and I'm also
10   Coordinator of our litigation efforts.
11        Q    How long have you been the
12   Litigation Coordinator?
13        A    Since our in-house counsel left,
14   so probably two and a half years, two years,
15   in that range.
16        Q    Now, with reference to being a
17   Compliance Officer, what are your duties with
18   regard to compliance with DEA regulations and
19   the Controlled Substances Act?
20        A    It's to be familiar with it, it's
21   too monitor our processing and oversight of
22   individual people in working within our
23   company to insure compliance.
24        Q    As the Compliance Officer, how
25   would you describe your familiarity with the
```

Page 545

```
1    Controlled Substances Act, and the DEA
2    regulations?
3         A    Very familiar with it.
4         Q    Who within Novelty is ultimately
5    responsible for compliance with the Controlled
6    Substances Act, and the DEA regulations?
7         A    Todd Green.
8              JUDGE RANDALL:  I'm sorry.  I
9    didn't hear that.
10             THE WITNESS:  Todd Green, the
11   President of the company.
12             BY MR. BARBER:
13        Q    And you were present yesterday
14   when Mr. Green testified in this proceeding?
15        A    I was.
16        Q    And after Mr. Green, who -- and
17   Mr. Green is the President of Novelty.  Is
18   that correct?
19        A    Correct.
20        Q    Sole shareholder?
21        A    Correct.
22        Q    Other than Mr. Green, who is
23   ultimately responsible as the President and
24   sole shareholder, who is next in line within
25   the company structure, as far as compliance?
```



Page 546

```
 1        A      There's really three of us that
 2   work each within our respective roles, myself,
 3   Ryan Polk, our CFO who will work on our record
 4   keeping, as well as inventory aspects, and
 5   Mark Bleodsoe is going to work on the product
 6   side, documentation, training, things of that
 7   nature.  Todd mentioned that he delegates many
 8   of his things.  I think the word was
 9   "command", and we're those guys that get that
10   command.
11        Q      All right.  With regard to
12   registration issues, who's responsible within
13   Novelty for registration?
14        A      Ryan Polk actually completes the
15   registrations every year.
16        Q      Based on your position as the
17   Compliance Officer, what is your -- how many
18   DEA registrations does Novelty need to
19   maintain in order to comply with the
20   regulations?
21        A      One within the warehouse where we
22   store product.
23        Q      And I'll try not to belabor any
24   points that Mr. Green testified to, but he
25   indicated he wasn't sure.  Do you know for
```



Page 547

```
 1   sure how many registrations Novelty -- DEA
 2   registrations Novelty has?
 3        A      I haven't verified in our office,
 4   but I believe it is one.
 5        Q      And that would be at the address
 6   in Greenfield, Indiana?
 7        A      Muskegon Drive in Greenfield.
 8   Correct.
 9        Q      What role, if any, do you play in
10   determining what scheduled listed chemical
11   products Novelty distributes, or you
12   distributed prior to the immediate suspension?
13        A      Not really all that much.  I mean,
14   I don't pick the product, the dosage.  I make
15   recommendations.  I mean, the final decision
16   is ultimately by Todd Green.  Mark Bleodsoe is
17   probably his doer, as far as that side of the
18   product.  Much like I create the novelties,
19   Mark's kind of category manager, and he's
20   director of category management, and
21   responsible for that group of items.
22        Q      As the Vice President of Product,
23   are you familiar with the full range of
24   products that Novelty sells to convenience
25   stores?
```



Page 548

```
 1        A      Some of them more than others, but
 2   the majority, yes.
 3        Q
 4
 5        A
 6
 7
 8        Q
 9
10        A
11
12
13        Q
14
15        A      Yes.
16        Q
17
18
19        A
20
21
22
23
24
25
```



Page 556

```
 1   location when they're destined for deliveries
 2   to stores that sell scheduled listed chemical
 3   products?  What range of products?
 4        A
 5
 6
 7
 8
 9
10
11        Q      And when you say SKU, what do you
12   mean?
13        A      Stock Keeping Unit, individual
14   items.  I might have made 20 different styles
15   of hats that all had different item numbers.
16   I might have made six different light-up yo-
17   yos that had all different numbers.  I might
18   have made 50 different styles of sunglasses.
19        Q      And how many new products was
20   that?
21        A
22
23        Q      Were any of those scheduled listed
24   chemical products?
25        A      No.
```



Page 557

```
1        Q    And a SKU is the bar scan
2    category.  Is that right?
3        A    Well, it stands for Stock Keeping
4    Unit.
5        Q    Okay.  That's what the acronym
6    stands for, but just so that we understand, is
7    that the bar scan code on a product?
8        A    Yes.
9        Q
12       A
14       Q    Well, that's the term that was
15   used.  You and I were both here.
16       A    Right.  So if you want to keep
17   using that one, that's fine.
18       Q    All right.  And you also heard Mr.
19   Hussion testify recently.
20       A
22       Q
24       A
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 558

```
1        Q
4        A
7        Q    Are you familiar with the volume
8    of ephedrine combination products that Novelty
9    distributes to its retail customers?
10       A    Yes.
11       Q    And are you also familiar with the
12   volume of pseudoephedrine combination products
13   that Novelty distributes to its retail
14   customers?
15       A    Yes.
16       Q    What is the percentage, if you
17   combine the two, what is the percentage of
18   sales that is allocated to ephedrins, versus
19   the overall ephedrine/pseudoephedrine
20   combination?
21       A
24   it's in that range.
25       Q    That's the total ephedrine, and
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 616

```
1    Merlau.
2            THE WITNESS:  Good morning.
3            JUDGE RANDALL:  You're reminded
4    that you're still under oath.
5            THE WITNESS:  Yes, ma'am.
6            JUDGE RANDALL:  And will you just
7    take your seat there?
8    WHEREUPON,
9                J.R. MERLAU
10   HAVING BEEN PREVIOUSLY SWORN, WAS RECALLED AND
11   TESTIFIED AS FOLLOWS:
12           DIRECT EXAMINATION (CONTINUED)
13           BY MR. BARBER:
14       Q    Good morning, Mr. Merlau.
15       A    Good morning.
16       Q    We'll try and jump right back in
17   where we left off yesterday.
18
20       A
21       Q    And what else?
22       A
23       Q
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 617

```
1
2        A    Yes.
3        Q    When did that change?
4        A    I'm not sure of the exact date.
5    It was a couple of years ago, a year and a
6    half, two years ago.
7        Q    Since you've been at Novelty, you
8    said that's been approximately four years, is
9    that correct?
10       A    Four years.
11       Q    Since you've been at Novelty, have
12   there been states into which Novelty during
13   your tenure with them discontinued
14   distributing ephedrine products?
15       A    States wouldn't distribute
16   ephedrine?
17       Q    No, are there states into which
18   Novelty at one time distributed ephedrine,
19   during your four year tenure Novelty stopped
20   distributing into those states, to customers
21   that were present in those states?
22       A    Yes.
23       Q    Now what states are those that
24   Novelty has ceased distribution to?
25       A    I don't know the whole list.
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 618

```
1     Arizona is one that comes to mind.
2          Q    Do any others come to mind?
3          A    I think Nevada.
4          Q    Any others?
5          A    I don't know the list.  I could
6    get it.
7          Q    Yesterday, we talked about Ohio
8    and generally about not selling in certain
9    states.  Why is it with Arizona that Novelty
10   quit selling ephedrine in those states?
11         A    I'd have to guess on the exact
12   details.  I know that there's a local
13   regulation.
14         Q    What about Nevada?
15         A    I believe theirs was Schedule V.
16         Q
17
18
19
20
21         A    Yes.
22         Q
23
24         A
25         Q
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 619

```
1          A    That's it.
2          Q    And by SLCs you mean scheduled
3    listed chemical products?
4          A    Correct.
5          Q    And just to clarify by those you
6    mean ephedrine or pseudoephedrine containing
7    products that are sold over-the-counter?
8          A    Correct.
9          Q
10
11         A    I'm not sure again of the exact
12   date, I recall it was a couple of years ago.
13         Q    I'm not going to hold you to a
14   particular date, but when you say a couple of
15   years ago, do you mean approximately two years
16   ago?
17         A    Yes, I'd say two years.
18         Q    Prior to the imposition of this
19   limit, did
20
21
22         A    I wouldn't have that data.
23         Q    Who would?
24         A    We'd have to run it.  Nobody is
25   going to know that off the top of their head.
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 620

```
1          Q
2
3
4          A    I was part of the process, yes.
5          Q
6
7
8
9          A    It's our goal to limit the amount
10   of product that we're putting in stores as
11   part of a conscious effort and a conscientious
12   effort to eliminate any risk.
13         Q    Any risk of what?
14         A    Diversion, excessive sales.
15         Q    And when you say limit the risk of
16   diversion, what do you mean by diversion?
17         A    Diversion has been defined to us
18   that it's product that is making its way to
19   meth labs.
20         Q
21
22
23
24         A
25         Q
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 621

```
1          A    Yes.
2          Q
3          A
4
5
6          Q    Do you have any convenience store
7    customers that sell just ephedrine who do not
8    also sell pseudoephedrine products distributed
9    by Novelty?
10         A    I'm sure the answer to that is
11   yes, but I don't know 100 percent.
12         Q
13
14
15
16         A
17         Q
18
19
20
21
22         A    No.
23         Q
24
25
```

Neal R. Gross and Co., Inc.
202-234-4433



Page 622

```
1       ████████████████████
2       ██
3       A     Can you rephrase that?
4       Q     ████████████████████
5       ██
6       ██
7       ██
8       A     One more time?
9       Q     ██
10      ██
11      ██████████████████████████
12      ██████████████████████████
13      ██████████████████████████
14      ██
15      A     Of a particular item is what
16  you're asking me, yes.
17      Q     Are there times where Novelty
18  sells its one case internal limit to a
19  particular convenience store?
20      A     I'm sure there is.  I'd have to
21  pull the report to see how many times that
22  happens, but I'm sure there is.
23      Q     Now when Novelty sells its one
24  case limit to a convenience store, are there
25  times where it also sells other products
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 25 of 108



Page 623

```
1   outside that product line that contain
2   ephedrine or pseudoephedrine to a convenience
3   store?
4       A     Yes.
5       Q     How many different SKUs and help
6   me again, what does that mean, SKU means?
7       A     Stock-keeping unit.
8       Q     Stock-keeping unit, is that
9   correct?
10      A     Yes.
11      Q     Thank you.  How many SKUs were
12  carried in Novelty's ephedrine line prior to
13  the immediate suspension?
14      A     ██
15      ██████████████████████████
16      ██████████████████████████
17      ██████████████████████████
18      Q     ████████████████████
19      ██████████████████████████
20      A     That would be sold to the same
21  store, yes.
22      Q     How many product lines did Novelty
23  sell to any particular convenience store, how
24  many product lines of scheduled listed
25  chemical products?
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 26 of 108

Page 624

```
1       A     Are you asking how many different
2   items I might have sold to a store at a time?
3       Q     No.  I'm asking within the SKUs,
4   how many different SKUs would Novelty sell to
5   one particular convenience store with
6   reference to scheduled listed chemical
7   products?
8       A     ██████████████████
9       ██
10      ██
11      Q     ██████████████████████
12      ██
13      ██
14      A     Yes.
15      Q     ██
16      ██████████████████████████
17      ██
18      ██████████████████████████
19      ██
20      ██████████████████████████
21      A     Correct.
22      Q     How many drop off points have you
23  visited during your four years with Novelty?
24      A     Two.
25      Q     When did you make those visits?
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 27 of 108

Page 625

```
1       A     First week I started working
2   there.
3       Q     How many of Novelty's convenience
4   store customers have you visited?
5       A     A lot.  I mean I'd have no way to
6   give you a number.  Hundreds.
7       Q     When you visited Novelty's
8   convenience store customers did you observe
9   what other products were on the shelves that
10  competed against Novelty's products?
11      A     Yes.
12      Q     And with regard to scheduled
13  listed chemical products, what if any
14  competitors' products were carried by the
15  convenience stores?
16      A     You're asking what other brands
17  I've seen in some of our stores also?
18      Q     Yes.
19      A     I've seen a number of different
20  brands.
21      Q     Give us a couple of examples,
22  please?
23      A     Rapid Action which is CB
24  Distributors.  I've seen BDI product and DMD
25  products that we were distributing at the
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 28 of 108



Page 626

1  time.
2      Q    When you saw competitors'
3  scheduled listed chemical products in your
4  convenience stores, what action did Novelty
5  take with respect to those convenience stores?
6      A    [redacted]
9      Q    [redacted]
13     A    [redacted]
16     Q    [redacted]
20     A    [redacted]

Neal R. Gross and Co., Inc.
202-234-4433



Page 627

1  [redacted]
2      Q    Okay. Let me be more precise than
3  with my question.
4      A    Okay.
5      Q    [redacted]
9      A    Yes.
10     Q    [redacted]
14     A    I didn't see any others.
15     Q    What, if any, ephedrine mist
16  products did you see?
17     A    I didn't look for that. I usually
18  don't spend any time in the HBC area.
19     Q    What do you mean by HBC area?
20     A    Health and beauty. It's pretty
21  inconsequential in that area.
22     Q    [redacted]
24     A    [redacted]

Neal R. Gross and Co., Inc.
202-234-4433



Page 628

1  [redacted]
14     Q    [redacted]
17     A    I haven't been to all of them. I
18  mean I would say yes, but --
19     Q    Do you know why the individuals
20  who purchased from convenience stores
21  purchased Novelty's ephedrine products?
22     A    Ephedrine is a bronchial dilator,
23  asthma-related. Beyond that I'm not a doctor.
24     Q    I'm asking do you know why
25  they purchase it?

Neal R. Gross and Co., Inc.
202-234-4433

Page 629

1      Q    Has Novelty determined why
2  individuals purchase Novelty's products?
3      A    I can't guess why somebody
4  ultimately buys something. I know that it's
5  sold as a bronchial dilator.
6      Q    And by that you're referring to
7  the labeling?
8      A    Correct, which is what I control.
9      Q    Has Novelty undertaken any studies
10  to determine why individuals purchase
11  Novelty's scheduled listed chemical products?
12     A    [redacted]
14     Q    [redacted]
16     A    In summary, yes. Frankly, some of
17  it I don't get. I'm not that smart. I'm just
18  a Novelty guy.
19     Q    Let's talk about the sales of
20  scheduled listed chemical products and
21  particularly, ephedrine.
22     A    Okay.
23     Q    [redacted]



Neal R. Gross and Co., Inc.
202-234-4433

Case 1:08-cv-00635-RMC     Document 19-4     Filed 05/03/2008     Page 28 of 65



Page 630

```
 1        A    Say that one more time so I make
 2   sure I understand.
 3        Q
 7        A
 8        Q
12        A
14        Q    When you say the store manager,
15   you're referring to whom?
16        A    The manager of the store.
17        Q    The convenience store, not a
18   Novelty employee?
19        A
21        Q
24        A
```



Page 631

```
 1
 6        Q
 8        A
 9        Q
12        A
19        Q
23        A
```



Page 632

```
 1        Q
 5        A
 7        Q
11        A
13        Q
17             MR. EMORD:  Objection, Your Honor.
18   Confusing and ambiguous.
19             JUDGE RANDALL:  I'm going to
20   sustain.  Could you clarify that for the
21   record, please.
22             BY MR. BARBER:
23        Q    Let me ask you this and then we'll
24   come back to it.  Who keeps the record, the
25   required records of distribution of scheduled
```

Page 641

```
 1   certification by convenience stores served by
 2   Novelty.  Do you recall that question?
 3        A    Yes, I do.
 4        Q    Now if you'll take a look at the
 5   Order to Show Cause, it's ALJ Exhibit 1, if
 6   you turn your attention to page 2, numbered
 7   paragraph 5, take a moment and read that
 8   paragraph and then I have a question for you.
 9             (Pause.)
10        A    Okay.
11        Q    Now in that paragraph Novelty is
12   charged with distributing scheduled listed
13   chemical products on at least 284 occasions to
14   35 retail outlets that were not self certified
15   under 21 U.S.C. Section 83(a)(1)(a)(7).
16             Did there come a time when you
17   became aware of the charge that Novelty was
18   distributing product to distributors -- excuse
19   me, to retail outlets that were not self
20   certified?
21        A    The first we heard of it was with
22   the suspension order.  We received a list of
23   those locations.  I remember I think the last
24   -- the first I saw of it was late Thursday
25   night before we came out here.  The way to
```

Page 642

```
1     look at that and now research it, we knew what
2     those were.  We pulled up each of those store
3     numbers, pulled from our records as well as
4     contacting one of our customers who maintained
5     their own records and gave us a database of
6     what was sent to the DEA and we got copies of
7     every one of those 35 self certifications.  I
8     mean that allegation is false.
9          Q
```



```
17          Do you recall testifying about
18   that yesterday?
19     A    Yes.
20     Q
```

```
24     A
```

Page 643



Page 644



```
21     Q    Why don't you use FedEx and UPS?
22     A    We don't have control of the
23   product.  Their models are going to be less
24   reliant and there's many holes in that process
25   where we are not in control of the product.
```

Page 645

```
1     The product could sit in a FedEx center for an
2     unknown period of time, sitting in the back
3     room where anybody could pick it up.
```

```
20     Q
```

```
23     A    Not the FDA.  The DEA.
24     Q    Excuse me, I'm sorry.  Thank you
25   for correcting that.  I have FDA on the brain
```

Page 646

1    today. I'm sorry, Your Honor.
2         A    What you're talking about is
3    you're talking about the Raber letter. We
4    might as well just kind of lay it out.
5    There's a couple real points to this, right?
6    The Raber letter is a letter that was written
7    a diversion supervisor that says that we are
8    not following regulations by conducting our
9    business the way we are. Novelty is very
10   conscious and very concerned about making sure
11   that we do follow the laws. As soon as we
12   receive that letter, we immediately gave it to
13   our counsel and took it to the Court to try
14   and understand is this the law? Is this what
15   we need to follow and if so, let's talk about
16   it because we don't believe that this is
17   better then what we're doing today and we'd
18   like an opportunity to show -- this is all
19   about controlling the product, eliminating the
20   risk of diversion of the product.
21        So this letter which, first of
22   all, we don't view as the law, we believe we
23   are following it. If we're told that it is,
24   we'll follow that too, but we believe that
25   this method that we were asked to try and

Page 647

1    follow from a letter if we present what we
2    have and we can prove it. So that's what
3    we're trying to do in a Court now so we can
4    get that clarity and we can all move on with
5    business.
6         Q    The letter, to your knowledge, was
7    this letter that you're referring to have
8    allowed direct shipment through UPS or FedEx?
9         A    Yes.
10        Q    But it wouldn't allow your method
11   of distribution?
12        A    No.
13        Q    And so in response to the letter
14   you say you went to Court over it?
15        A    Yes.
16        Q    And you've asked a Court to
17   determine what the law is?
18        A    That's correct.
19        Q    And if the Court determines you're
20   wrong and that the DEA is correct on the
21   interpretation, what will you do?
22        MR. BARBER:  Objection, Your
23   Honor. Calls for a hypothetical, speculative
24   -- it's irrelevant to what Novelty has done in
25   the past which is the whole point of these

Page 649

1    BY MR. EMORD:
2         Q    Now you testified that the -- what
3    you referred to as the Raber letter was a
4    letter that was sent to you from an agent of
5    the Drug Enforcement Administration and
6    described generally that that letter raised an
7    issue with your method of transportation.
8         To the best of your recollection,
9    what was the gist, if I might ask, of the
10   Raber letter, do you recall its content?
11        A    Yes. I mean without it in front
12   of me, I mean the letter is addressed to
13   Registrants. I don't believe it was addressed
14   directly to Novelty and it spells out some
15   different steps of what the Agency -- I don't
16   know if it said requires or just states that
17   this is what needs to be done. And it talks
18   about a method of distribution that is
19   specifically different than ours, the closed
20   loop, that they want product direct shipped,
21   that they wanted product if not kept on a
22   truck, but sent back to another location.
23   
24   
25        As soon as we received it, like I

Page 650

1    said we took it to the Court to say let's get
2    a ruling on this to decide. If this letter is
3    policy, and if so, from day one it's been our
4    intent to follow that.
5         Q    Now to the best of your
6    recollection, all right, Your Honor, if I may
7    we have previously exchanged and marked for
8    identification a two-page letter from the
9    United States Department of Justice, signed by
10   Dan E. Raber, Diversion Group Supervisor. And
11   if I may I will -- I guess the Court may
12   provide the witness with a copy of what we've
13   previously marked and exchanged as Novelty
14   Exhibit 43.
15        (Pause.)
16        Sir, do you have before you what
17   was identified as Novelty Exhibit 43?
18        A    I do.
19        Q    Is that the Raber letter that you
20   were referring to?
21        A    Yes.
22        Q    If you could take a moment and
23   familiarize yourself with the content of the
24   letter and when you feel as though you're
25   sufficiently familiarized with it, let me

Page 651

```
1    know.
2              (Pause.)
3              This is the letter you were
4    referring to as the Raber letter, sir?
5         A    Yes.
6         Q    And have you familiarized yourself
7    with it such that it refreshes your
8    recollection?
9         A    Yes.
10        Q    And do you have anything to add to
11   your earlier statements about what the gist or
12   meaning of that letter is as you understand
13   it?
14             MR. BARBER:  Objection, Your
15   Honor.  We don't object to this document being
16   admitted into evidence, but the witness's
17   characterization adds nothing and is
18   irrelevant.  It simply speaks for itself as to
19   what the letter says.  His characterization is
20   not helpful.
21             MR. EMORD:  I'm simply looking for
22   his understanding as a foundation for
23   questioning.
24             JUDGE RANDALL:  I'll overrule.
25             THE WITNESS:  This letter talks
```

Page 652

```
1    about various distribution levels that are
2    different than our own.  It was issued as a
3    letter.  It kind of says the same thing, I
4    mean that this is a letter which is different
5    than our model.  We believe that our model is
6    better, that this is not the only way to do it
7    and the best way to distribute these products,
8    and as I said immediately upon receipt of
9    this, this is why we went to the Court to seek
10   clarification.  If the DEA and the Court says
11   that this is how we have to do it because they
12   truly believe this is better, then we will
13   follow it.  Otherwise, in the meantime, we're
14   going to say this is why we do our process as
15   we do and why we believe it's better.  We want
16   to do the right thing.  It's important.  We
17   don't believe that this letter is in the best
18   interest.
19             BY MR. EMORD:
20        Q    So is it the case then -- could
21   you please tell me to the best of your
22   knowledge the name of the suit that was filed
23   by Novelty and where it was filed?
24        A    It's Indianapolis and I don't
25   remember the exact name of it.
```

Page 653

```
1         Q    And you understand that suit to
2    concern the Raber letter?
3         A    That's all that suit is about,
4    yes.
5         Q    And the legal applicability of the
6    Raber letter to Novelty?
7         A    Absolutely.  This was a letter
8    that was issued by a supervisor, not policy,
9    not law.  If it makes sense, we will, of
10   course, follow it.  If it doesn't make sense,
11   it's not presented as the law or the
12   regulation and that's why we went to Court.
13             Not to be argumentative or not
14   follow the rules, but to seek clarity of what
15   they are, and it's really all about trying to
16   make sure that we do what's the right thing
17   which is control this product.
18        Q    On the event that a Court thinks
19   that what you consider to be -- to make, as
20   you describe it, not make sense, is in fact,
21   the law, what will Novelty do?
22        A    We will absolutely change our
23   model and put in whatever is agreed upon that
24   we need to do.
25        Q    And if the Court here were to
```

Page 654

```
1    address the point and determine that it was
2    required of you in order to keep your
3    registration, to change your distribution,
4    your transportation model, would you abide by
5    that rule?
6         A    I would try and impress upon the
7    Court why I believe that our method is better,
8    but I mean if you were to say that you can
9    continue doing business, but I want you to
10   change it in this way, this is what I'm going
11   to say on the rules we will follow.
12        Q    And is it your understanding that
13   that is the corporate position of Novelty?
14        A    Absolutely.  I mean I've worked
15   for the company for four years.  I've known
16   Todd Green for 20 years and I mean there's
17   never anything in the company's history that
18   has given me any indication other than he's in
19   the business for the sheer pleasure of
20   business and he wants to be a legitimate
21   concern.  He has created this from scratch
22   into something that is substantial and you
23   don't get there, you don't do that by not
24   doing good business.  Good business means
25   following the laws, following the regulations,
```



Page 655

```
1    treating your employees well, investing in
2    your company, and that's what it's all about.
3         Q      When you were asked a series of
4    questions today about what you explained is
5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6
7         A      Yes.
8         Q      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9    ▓▓▓▓▓▓▓▓▓▓▓▓▓
10        A      No.
11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12   ▓▓▓▓▓▓
13        A      We put that in place as a good
14   business practice.  What you're kind of
15   hinting around, Jonathan, is really our other
16   piece of this entire thing, it's quantities
17   and distribution.  That's what it's all about
18   at the end of the day.
19              Much like this latter.  There are
20   some debates about the quantity.  Mr. Robbin
21   was up here we have our thoughts of his
22   testimony, but I mean there's a debate about
23   what is the quantity that is legitimate within
24   this marketplace. ▓▓▓▓▓▓▓▓
25   we wanted to ensure is following what we deem
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 49 of 155



Page 656

```
1    is -- I want to make sure I say this the right
2    way --
3    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
4    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13        Q      ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
14   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
15   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
17   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
18        A      Yes.
19        Q      Even if you thought that the
20   determination was at a level that was beneath
21   what you considered to be sensible or in the
22   company's view they thought was sensible, you
23   would abide by that limit?
24        A      The answer to that is yes.  We're
25   not going to be told that this is the law,
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 50 of 155

Page 657

```
1    this is the regulation and we're not going to
2    follow that.  And we are going to ask to
3    present our side and that that be considered.
4    We view the Robbin report as flawed. ▓▓▓▓
5    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8    ▓▓▓▓▓▓        So we've got no reason to believe that
9    this is an illegitimate volume or illegitimate
10   demand.  We believe day in and day out that
11   we're proving that there is a legitimate
12   demand because we sell it.  It's not because
13   we're pushing it.  It's because we provide the
14   product to the retailers and their customers
15   have a legitimate need for it and buy it.
16        Q      You just testified that your
17   brand, the Novelty brand or the Greenfield
18   Labs brand, to your knowledge has never been
19   found in a meth lab.  How many units of those
20   products have been sold to the best of your
21   knowledge, overall?
22        A      I haven't run over all.  I know in
23   the last 52 weeks, ▓▓▓▓▓▓▓▓▓▓▓▓
24        Q      Even beyond that, can you give me
25   your best estimate of the overall volume of
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 51 of 155

Page 658

```
1    units that have been sold in the history of --
2    well, as far back as you can remember?
3         A      We looked at a report further back
4    than just my memory.  We looked at a report
5    total tablets dividing that back into package
6    quantities, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ sold in the
8    last seven years.  We have been told one time
9    that a product that was manufactured by
10   another distributor was found in a lab.  Our
11   product has never been found there.  Those are
12   the things that lead to our basis that we are
13   not part of the problem.
14        Q      Now you mentioned in testimony in
15   response to direct that -- Mr. Barber's direct
16   -- he's always direct with me, but that you
17   mentioned that you have since the suspension
18   order was issued, you have lost customers, of
19   course, to other distributors.
20        A      That's correct. ▓▓▓▓▓▓▓▓▓▓
21   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
24   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
25        Q      Now what, if any, knowledge do you
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 52 of 155

---

Page 659

1  have about the competing sales of those
2  products?
3      A    Right.  We were talking about this
4  before we came out here that --
5      MR. BARBER:  Objection, Your
6  Honor.  The sales of Novelty's competitors is
7  irrelevant and beyond the scope of cross
8  examination.  If you will recall, the specific
9  issue about competitors was limited to the
10  period of time where Novelty was selling
11  product to a convenience store, did Mr. Merlau
12  see competitors' products in the store at the
13  same time and so we're dealing with other
14  registrants that are irrelevant to this
15  proceeding.
16      JUDGE RANDALL:  Mr. Emord?
17      MR. EMORD:  Well, the question --
18  he opened the door to the question about
19  competitors when he asked about the
20  competitors' products in the stores.  And it's
21  fair game now.
22      JUDGE RANDALL:  I'll sustain the
23  objection.  He didn't open the door that wide.
24      BY MR. EMORD:
25      Q    Now you did mention in examination

---

Page 660

1  Novelty cabinets.  You had mentioned in
2  response to direct examination that Novelty
3  had certain cabinets that were in the stores
4  that Novelty serves and you said those were
5  Novelty cabinets to the best of your
6  knowledge.  Am I correctly --
7      A



17      Q    Can you -- perhaps we can get a
18  copy of the exhibit about the cabinets?
19      MR. EMORD:  Pardon me, Your Honor.
20      BY MR. EMORD:
21      Q    Can you for the benefit of the
22  Court in light of the testimony given on
23  direct concerning the presence of these
24  cabinets, can you please explain what the
25  cabinets look like?  Give me as best a

---

Page 661

1  description, as good a description as you can
2  of the design and utility of a Novelty
3  cabinet?
4      A



12      Over the course of time,
13  everything now is currently clear.  I think
14  we've done some colored cabinets people have
15  told me.
16      Q
17
18      A    Yes.
19      Q    Describe that for the Court?
20      A
21
22      Q
23      A
24      Q
25

---

Page 662

1      A

5      Q    Now during direct you were asked
6  about your record keeping practices, excuse
7  me, record keeping policies.  Were you ever
8  informed by the DEA for the issuance of the
9  Order to Show Cause that DEA had a problem
10  with Novelty's record keeping policies?
11      A    No.
12      Q    If you had been informed by the
13  DEA that the DEA had any problem with
14  Novelty's record keeping policies, would you
15  change them?
16      A    Absolutely.  Ryan Polk would
17  probably be the one to best speak to this.  As
18  our CFO he works with all of our record
19  keeping.  I know that administrative
20  inspections, he's been our lead on that.  He
21  has worked with the DEA on a dialogue for any
22  additional documentation, any clarifications
23  to any of our inventory transactions that have
24  been asked for.
25      Again, it comes back to us wanting



Page 663

```
 1   to ensure that we're doing what is asked of us
 2   and it's being a good business.  We're shown
 3   that there's something lacking within our
 4   process, we would like a dialogue for that and
 5   if it's deemed we need to change it because
 6   there's a better way to do it, then that's
 7   what we're all about doing.
 8              Our company is built on continuing
 9   moving forwards, not just doing the same thing
10   day after day.  If Todd had done that, he'd
11   still be at his parents' house making
12   baseball caps.
13              MR. EMORD:  Thank you, Your Honor,
14   no further questions.
15              JUDGE RANDALL:  Redirect?
16              MR. BARBER:  Thank you, Your
17   Honor.
18              REDIRECT EXAMINATION
19   BY MR. BARBER:
20        Q    So Novelty would have changed its
21   records if DEA had told them there was a
22   record keeping problem?
23        A    We would have to see what the
24   problem is and if we looked and said hey, you
25   need to do this differently, yes.  There's no
```

Page 664

```
 1   reason for us not to.
 2        Q    And is that Novelty's attitude
 3   about compliance generally if DEA tells you
 4   there's a problem, you'll change it?
 5        A    And you're going to try and trip
 6   me up here with this Raber letter thing --
 7        Q    No, I'm not going to trip you up.
 8   I'm going directly there after this question,
 9   but I'd like you to answer the question before
10   you.
11        A    We want to be in compliance with
12   the regulations and that is our company
13   directive.
14        Q    When DEA sent you the Raber letter
15   that you referred to on cross, dated May 5,
16   2004, what did you do to change your
17   distribution model?
18        A    We took it to Court seeking a
19   judicial ruling.  We do not believe that that
20   Raber distribution letter is a better model
21   than what we have.
22        Q    I ask you to respond to my
23   question.
24        A    Okay.
25        Q    What did Novelty do to change its
```

Page 665

```
 1   distribution model after receiving the Raber
 2   letter, what you've referred to as the Raber
 3   letter?
 4        A    Nothing.
 5        Q    And what Court has told you that
 6   DEA is wrong?
 7        A    It's pending.
 8        Q    What Court has told you DEA is
 9   wrong?
10              MR. EMORD:  Objection, asked and
11   answered?
12              JUDGE RANDALL:  Overruled.
13              THE WITNESS:  No Court has told me
14   it's right or wrong, yet.
15   BY MR. BARBER:
16        Q    Has any Court told you that
17   Novelty's position is correct?
18        A    I just answered that.  No Court
19   has told me whether we're right or wrong.
20        Q    ████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
24              MR. EMORD:  Objection, calls for a
25   legal conclusion.  He's not been qualified as
```

Page 666

```
 1   a legal expert.
 2              JUDGE RANDALL:  Overruled.  I'll
 3   allow the witness to answer to the extent that
 4   he can.
 5              THE WITNESS:  We are not storing
 6   product in those locations.  We understand the
 7   regulation and we are not storing product in
 8   unregulated, unregistered locations.  I'm sorry,
 9   unregistered locations.
10   BY MR. BARBER:
11        Q    So it is your testimony than today
12   that the product is never stored in any -- and
13   has never been for the time that you've been
14   at Novelty, the product has never been stored
15   for minutes, hours, days, any length of time
16   in any storage facility?
17        A    That's a nonsense question.  Now
18   you're coming back into the definition of what
19   is storage.  We're not storing the product in
20   that location --
21              MR. EMORD:  Objection, Your Honor,
22   he's talking over the witnesses answer.
23              JUDGE RANDALL:  Sustained.
24              MR. BARBER:  I apologize, Your
25   Honor.
```



Page 667

1           MR. EMORD:  Thank you, Your Honor.
2  And the witness hasn't completed his answer.
3           JUDGE RANDALL:  All right.
4           THE WITNESS:  I can talk again?
5           JUDGE RANDALL:  Yes.
6           THE WITNESS:  We are -- we
7  understand the regulation.  It does not allow
8  us to store that product in unregistered
9  locations.  I mean we do not store that
10  product in unregistered locations.
11           BY MR. BARBER:
12      Q
17      A
19      Q
21      A    Absolutely not.
22      Q
24      A    Yes.
25      Q    It might stay there in some cases

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 81 of 155



Page 668

1  for days?
2      A    A few days, yes.
3      Q    And then the product is loaded on
4  a
7      A
17      Q    What DEA regulation allows you to
18  keep in these storage units for any period of
19  time in these unregistered locations, what
20  regulation in DEA allows you keep product
21  there without having those locations be
22  registered?
23      A    You're using keep synonymous with
24  store.  We're not doing that.
25      Q    I'd ask that the witness be

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 82 of 155

Page 669

1  instructed to answer the question.  It is a
2  common term.  This is not a term of art.  He
3  objected to the use of the term store, so I
4  would ask him to answer my question.
5           MR. EMORD:  Your Honor, I'm going
6  to object because of the fact that the witness
7  has adequately explained and has said that the
8
9
10           An academic debate as to the
11  legal meaning of the term storage is not
12  something that is an adduction of fact and so
13  it's beyond the scope of my cross and it is
14  certainly argumentative.
15           The witness is not qualified to be
16  a lawyer.  He's testified that this issue is
17  before a Court and the insinuation that the
18  issue is resolved, the insinuation that the
19  Raber letter is law, is not established in
20  fact.
21           JUDGE RANDALL:  Thank you.  I
22  overrule the objection.  However, Mr. Barber,
23  it's obvious to me that you need to rephrase
24  the question.
25           MR. EMORD:  Thank you.

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 83 of 155

Page 670

1           BY MR. BARBER:
2      Q    What DEA regulation do you rely
3  upon that allows you to keep for whatever
4  period of time it is, to keep scheduled listed
5  chemical products in
6
7      A    Same thing I've answered.  We're
8  not keeping it there.  We're not storing it
9  there.
10
11      Q    That question has been asked and
12  I'm asking you what regulation you rely on
13  that allows you to keep for whatever period of
14  time as you just testified happens that the
15  product is
16  doors for some period of time, what DEA
17  regulation permits Novelty to do that?
18           MR. EMORD:  I'm going to object on
19  foundational grounds.  He's not -- first of
20  all, the question goes in to the question of
21  law.  But foundation -- there's a real
22  foundation problem.  It presumes a fact not in
23  evidence, that is, that there is a specific
24  regulation on point that defines precisely how
25  one must transport a product by truck from one

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 84 of 155



location to another and if he wants to try to establish that foundation that this witness knows of such a thing, all right. But in the absence of that foundational question this is really argumentative.

JUDGE RANDALL: Mr. Barber, I'm going to sustain the objection. You may lay the foundation.

BY MR. BARBER:

Q Are you the compliance officer for Novelty?

A Yes.

Q Are you familiar with the DEA regulations regarding the requirement that every principal place of business involving the distribution of scheduled listed chemical products be a registered location?

A Yes.

Q Now, in light of that, what regulatory authority do you rely upon that allows Novelty to for whatever period of time scheduled listed chemical products are kept at the unregistered storage facility, what regulatory provision do you rely upon as the compliance officer for your authority to do

029a74d0-e116-4516-8d88-0091f3b6e1f

so?

MR. EMORD: Objection.

JUDGE RANDALL: Overruled. You may answer the question.

THE WITNESS: There is no regulation talking about this because - -I'm sorry, that's not right.

There's a regulation that talks about the distribution of products. We follow that regulation. If you're asking is there a regulation that says that we can store product in an unregistered facility, there isn't, right? Because we can't do that. We are not storing or keeping or whatever words you want to try and use, product in these warehouses, against the law. We're not doing it. I don't know how else to answer this.

You're asking if there's a regulation that says that we can do what we're doing. No. We followed the regulation as it is that says we keep the product, we store the product in a registered facility. We've got a cage in security and alarms and cameras and special training programs in that facility to control that product.

029a74d0-e116-4516-8d88-0091f3b6e1f

BY MR. BARBER:

Q And you have none of that in the public storage facilities, correct?

A [redacted]

Q What cages do you have in your storage facilities for the scheduled listed chemical products to be segregated from other products?

A There isn't. A storage facility is the size of a walk-in closet. It's got a big lock on the front of it.

Q Why didn't Novelty simply get a registration for each of the storage facilities when it got the Raber letter?

A Because it's not necessary.

Q Who is the Agency charged with regulating the handling of scheduled listed chemical products?

A It's the DEA.

Q Did I understand you correctly

029a74d0-e116-4516-8d88-0091f3b6e1f

Emord?

MR. EMORD: Yes, Your Honor.

RECROSS EXAMINATION

BY MR. EMORD:

Q Mr. Merlau, you discussed a lot about transportation of product of Novelty's registered location at this plant to the store and just so we understand what truck transportation is all about, first let me ask you, I take it from your testimony that transportation in issue is truck transportation?

A Correct.

Q Now can you please explain to me what ordinary truck transportation involves in the distribution of the product from Novelty's registered location to the store location?

A Sure. I'm not a transportation manager, but through everything we're doing I mean I understand the process.

The product starts in our warehouse. In Greenfield, we've got a large caged area. Orders come to us, we put them into our system. [redacted]

029a74d0-e116-4516-8d88-0091f3b6e1f

```
 4        Q      When trucks leave the drop off of
 5   the product and proceed on to the store, are
 6   there ever instances where trucks stop along
 7   the way?
 8        A      I mean there are -- our
 9   transportation managers will be able to talk
10   to this, but I know that drivers can only
11   drive a certain number of hours in a day.
12   Other than that they have to pull over and
13   they have to rest.  I mean there's going to be
14   instances where a truck will be loaded and
15   will leave out the next day.  I know that
16   there's going to be instances where a truck
17   can break down in the road.  He's going to
18   have to pull over and fix.  And there's a lot
19   of instances, if you're talking about the
20   movement of product where it won't be in
21   constant motion for the time that it leaves
22   that cage to the time it's in the store,
23   there's going to be stops along the way that
24   are part of getting it from point A to the
25   store.
```

```
 1        Q      Refueling?
 2        A      Refueling, eating, sleeping,
 3   repair, simple logistics of say hey, I can't
 4   be here until Sunday morning.  It's now Sunday
 5   afternoon or it's now Saturday afternoon.  I
 6   have to just sit and wait and there's stuff
 7   like that.
 8        Q      It's the nature of truck
 9   transportation?
10        A      Yes.
11             MR. EMORD:  Thank you, Your Honor.
12   No further questions.
13             JUDGE RANDALL:  All right, thank
14   you.
15             I have a few questions and then
16   I'll allow counsel one last time.
17             I have a question about the
18   distribution process.  I believe you gave
19   testimony that you
20                      is that correct?
21             THE WITNESS:  Yes, ma'am.
22                                        They
23   have multiple stores
24
25             JUDGE RANDALL:  All right.  When
```



```
 1   SLC product is being sold to           , does it
 2   go to the              for their
 3   distribution to their individual stores?
 4             THE WITNESS:  No, ma'am.  The
 5   chains that we sell to and you might be
 6   thinking of what Todd Green was testifying
 7   about about some of them have their own
 8   warehouse and different things.  All the
 9   customers that we sell to were DSD.  DSD
10   stands for direct store delivery.  We don't
11   sell products -- we do sell some.  We sell no
12   SLCs wholesale.
13             We kind of talked about that where
14   I might send it to your warehouse and now
15   you're going to be distributing it.  All of
16   our SLCs are in our facility and then it's our
17   route sales professional that's in that store
18   giving them the invoice from what he puts in.
19   The manager checks that invoice.
```



Page 687

```
1    so the long-winded answer to your question,
2    I'll try not to do that to you again, is we're
3    putting the product into their stores, whether
4    they're chain or not chain.
5         JUDGE RANDALL:  You testified
6    about the one case per stop sales limit.  Does
7    the Novelty Corporation leave it up to the
8    sales rep to ensure that policy is followed?
9         THE WITNESS:  We have sales
10   reports that we look at and issue warning
11   letters.  We have a discipline process which
12   is several steps, if employees do exceed that
13   limit.  Mark Bloodsoe is helping with me.
14   Actually issues letters to employees that
15   violate that process.  So the answer to your
16   question is no, we don't just leave it, we
17   follow it.  We manage it.  We monitor it and
18   we enforce it.
19        JUDGE RANDALL:  In terms of the
20   record flow, the flow of records back and
21   forth,
```



Page 688

```
1         THE WITNESS:
6    paper that goes back and forth where we're
7    sending product to them, they're able to check
8    it off.                            We have some
13        Again, it's an electronic society,
14   but at the end of the day if one of our stores
15   says hey, you said you gave me these, even
16   though my manager said he got them, I don't
17   believe you.  And in that case we have to
18   actually take that paper invoice, we have them
19   all -- we pull them out, scan it, it has the
20   manager's signature on it.
21        So in answer to your question, I
22   mean the whole flow is that they'll receive
23   the product.
```



Page 689

```
1    of that.
5         JUDGE RANDALL:
9         THE WITNESS:
16        JUDGE RANDALL:  All right, I
17   believe we had testimony that in some
18   circumstances the truck will arrive on a
19   Saturday.  If that discrepancy occurs on a
20   Saturday, is there someone at corporation that
21   can respond to that phone call?
22        THE WITNESS:
```



Page 690

```
8         That's the same thing we do, that we're going
9    to reconcile it and it's either going to be
10   that it didn't get picked, didn't get put on
11   the truck, it was delivered to another route.
12   I mean there are occasional errors and we
13   reconcile every one of them.
14        JUDGE RANDALL:  During the past
15   year to your knowledge has Novelty made any
16   theft reports to the DEA of product that's
17   been sold off of either of the two types of
18   Novelty trucks?
19        Let me start over.  That didn't
20   make sense to me either.
21        In the past year, to your
22   knowledge, have there been any theft reports
23   made of SLC product stolen off of your truck
24   going from the warehouse to the drop off
25   point?
```



Page 691

1      THE WITNESS: Stolen off of our
2  truck from the warehouse to the drop off
3  point? I don't think there's ever been any
4  thefts in that channel.
5      JUDGE RANDALL: In the past year,
6  have there been any reports of SLC product
7  stolen from the truck going from the drop off
8  point to the store?
9      THE WITNESS: The little trucks?
10      JUDGE RANDALL: Right.
11      THE WITNESS: I believe there has
12  been. Ryan Polk does the actual reporting.
13  And going by memory on this, I believe that
14  it's all done to a local level, local law
15  enforcement, as we have to file a theft report
16  and those different things.
17      JUDGE RANDALL: All right. Now I
18  direct your attention to the self
19  certification sequence of questions related to
20  Administrative Law Judge Exhibit 1, paragraph
21  five, which is that ALJ Exhibit 1 that you
22  have in front of you.
23      I believe your testimony was that
24  you confirmed that the 35 entities identified
25  had, in fact, been self certified. Is that



Page 692

1  correct?
2      THE WITNESS: Yes, ma'am.
3      JUDGE RANDALL: Did you correlate
4  the date of the self certification with the
5  date of the alleged delivery to ensure that
6  the self certification had occurred before the
7  product actually got to that destination?
8      THE WITNESS: I have not. I
9  pulled the self certifications. I didn't.
10      JUDGE RANDALL: Okay, fine.
11  Thanks.
12  ███████████████████████████
13  ██ ███████████████████████
14  ██ █████████████████████
15  ██ ████████████████████████
16      THE WITNESS: Mark Bloodsoe.
17      JUDGE RANDALL: Is he also the
18  person responsible for its implementation?
19      THE WITNESS: Yes, ma'am.
20      JUDGE RANDALL: ███████████████
21  ██ ██████████████████████████
22  ██ ██████████████████████████████
23  ██
24      THE WITNESS: No, no.
25      JUDGE RANDALL: I'm sorry I'm



Page 693

1  jumping around, so I'm trying to give you a
2  context. ████████████████████
3  ██ ██████████████████████████
4  ██ ███████████████████████
5      THE WITNESS: Yes.
6      JUDGE RANDALL: ████████████
7  ██ ████████████████████████████
8  ██ ███████████████████████████
9  ██ ███████████████████████████
10      THE WITNESS: ████████████████
11  ██ █████████████████████
12      JUDGE RANDALL: █████████████
13  ██
14      THE WITNESS: Yes, most times. I
15  want to say it the right way. We have a team
16  of direct employees. We will use sometimes a
17  contract driver for an overflow situation.
18      JUDGE RANDALL: █████████████████
19  ██ ████████████████████████████
20  ██ ████████████████████████████
21  ██ ████████████████████████████
22  ██ ████████████████████████████
23  ██ ████████████████████████████
24  ██ ████████████████████████████
25  ██ ████████████████████████



Page 694

1      THE WITNESS: That timing, they
2  don't match up one to one. It would be load
3  sheets to the actual receipt of the product to
4  our route. That is reconciled.
5      JUDGE RANDALL: █████████████████
6  ██ ████████████████████████████
7  ██ ████████████████████
8      THE WITNESS: Yes, ma'am.
9      JUDGE RANDALL: █████████████████
10  ██ ████████████████████████████
11  ██ ████████████████████
12      THE WITNESS: Those two are --
13      JUDGE RANDALL: At any point in
14  your record-keeping process. I don't mean
15  simultaneously.
16      THE WITNESS: Inventory control,
17  Ryan would probably be able to talk to this
18  better than I.████████████████████
19  ██ ████████████████████████████
20  ██ ████████████████████████████
21  ██ ████████████████████████████
22  ██ ████████████████████████████
23  ██ ████████████████████████
24      JUDGE RANDALL: Thank you. I
25  appreciate that.

Page 695

```
1                 My last line of questions.  I
2    believe there was testimony, you gave some
3    testimony towards the end that on occasion
4    Novelty uses Federal Express or UPS.  Could
5    you explain to me why that would happen?
6                 THE WITNESS:  I mean there's going
7    to be limited times where maybe if something
8    was not entered on an order that should have
9    been so we're going to have to ship product to
10   a route sales professional, samples, things
11   like that.  It's all pretty rare.  Like I
12   said, we try and make sure all that product is
13   controlled through our internal.
14                JUDGE RANDALL:  All right, thank
15   you.
16                In light of my questioning, Mr.
17   Barber?  Actually, does anyone need a break at
18   this point, does anyone need a comfort break?
19                MR. BAYLEY:  Judge Randall may I
20   pipe in here?  I don't think we're going to be
21   too much longer with this witness.  Maybe I'm
22   jumping the gun a little bit, but the next
23   witness is going to involve --
24                JUDGE RANDALL:  I'm sorry, we'll
25   go off the record.
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1-81 of 150

Page 2215

```
1    Honor.
2                 JUDGE RANDALL:  Mr. Emord, you may
3    call your next witness.
4                 MR. EMORD:  Yes, Your Honor.  We
5    next call J.R. Merlau.
6                 JUDGE RANDALL:  Mr. Merlau, you
7    remember being sworn in?
8                 THE WITNESS:  Yes, ma'am.
9                 JUDGE RANDALL:  All right.  You
10   are still under oath.  You may have a seat.
11                DIRECT EXAMINATION
12                BY MR. EMORD:
13        Q    Mr. Merlau, were you -- I'm sorry.
14   Were you present on July 9th, 2007 when DEA
15   investigators arrived at Novelty?
16        A    I was, not when they actually
17   arrived, but I was called in.
18        Q    And when you were called down,
19   shortly thereafter, who did you see from the
20   Drug Enforcement Administration present at
21   Novelty?
22        A    It was Ms. Barnhill, Ms. Kusman,
23   Agent Harris, Mr. Meador, and Mr. Bayly.
24                JUDGE RANDALL:  I'm sorry.  I
25   didn't hear the last name.
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1-83 of 150

Page 2216

```
1                 THE WITNESS:  Mr. Bayly.
2                 BY MR. EMORD:
3         Q    Now, did you, at any point in time
4    after first seeing the agents present from
5    DEA, object to the presence of any of those
6    agents?
7         A    Yes.
8         Q    And who did you object to?
9         A    I was in the room with Ryan.  Both
10   of us had expressed our objections at the
11   very beginning.  It was that Monday morning.
12   Then talking both with yourself, as our
13   counsel, and our local counsel, Mr. Bickham,
14   we expressed the same thing through them, as
15   well.
16        Q    And to whom, among the government
17   agents, did you object to particular ones
18   being present?
19        A    I mean, the ones that I thought
20   were the most inappropriate was, first of all,
21   Mr. Meador because of existing litigation,
22   surrounds his deposition.  And then also Mr.
23   Bayly, which in hindsight, if I had known that
24   he was the government's lead or co-counsel,
25   whatever you want to call it, I think it was
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1-82 of 150

Page 2217

```
1    probably even more inappropriate, but he
2    didn't strike me as the worst one.  Mr. Meador
3    was.
4         Q    Now, during the course of the
5    investigation, did there come a time when you
6    caused a video recorder to be installed in the
7    room?
8         A    I did.  I mean --
9         Q    Well, when during the course of
10   the investigation did you cause a video
11   recorder to be placed, what date?
12        A    It was Wednesday.  It was when the
13   DEA employees were at lunch, was the first
14   time I placed that in a back room right
15   towards the corner.  It was on the tripod.  I
16   placed it in the room, plugged it in, and then
17   left.
18        Q    And a video recorder placed in the
19   room at that time, was it placed there during
20   a time when government agents were present?
21        A    No one was present at that time.
22   They were at lunch.
23        Q    All right.  And it was placed in
24   the back of the room, you said?
25        A    Yes.  It was kind of a rectangular
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1-84 of 150

Page 2218

1    room, so if you figure the door was on the
2    bottom right, right at that white piece of
3    paper, the camera was in kind of the up left.
4        Q    All right.  And did it block
5    ingress or egress from the room?
6        A    No.
7        Q    Did it block access to documents?
8        A    No.
9        Q    Now, subsequent to your placing
10   the video recorder in the room for the first
11   time - let me try to get a temporal frame of
12   reference.  You say lunch time.  Roughly what
13   time did you place the video recorder in
14   there?
15       A    12:30, 1:00, right in that range.
16       Q    And did there come a time when the
17   DEA investigators returned?
18       A    It was slightly after I put it in
19   the room, maybe 15, 20 minutes after, and I
20   didn't note the time, but if I was to guess,
21   it would be maybe 1:15.
22       Q    When they returned to the room,
23   were you present in the room?
24       A    I was not.  I had gone back
25   upstairs and was working on some other things.

Page 2219

1        Q    Did you return to the room that
2    same day?
3        A    Yes.
4        Q    Upon your return to the room, did
5    you notice the video recorder had been moved?
6        A    Yes.  When I went down to the
7    room, and I think Ryan might have told me that
8    it had already been taken out, but when I went
9    down I saw that it was still in the hallway.
10   Picked it up at that time, brought it back
11   into the room, was carrying it into the room,
12   plugging it back into the wall to set it up
13   again when Mr. Meador came over to grab it out
14   of my hands, and jerked the plug out of the
15   wall.
16       Q    And then what happened?
17       A    He took it back out of the room.
18   I protested.  He set it in the hallway, and
19   said that they would not allow them to be
20   taped.
21       Q    You say you protested.  In what
22   manner did you protest?
23       A    I told them that our counsel
24   advised that we did have the right to record
25   their actions, and that that was out intent to

Page 2220

1    do so.
2        Q    And did he respond to that
3    statement?
4        A    He just said they're not going to
5    allow it.
6        Q    And did there come a time
7    thereafter, that same day, in which you placed
8    a audio recorder in the room?
9        A    Yes.  It was later that day,
10   probably near the close of business.  I'm not
11   sure of the exact time, again, but later
12   afternoon.  I took a dictation tape recorder
13   that I have, and took it into the room,
14   placed it on the end of the table, hit record.
15   Told them I need to do this.  I have the
16   ability, or the right to do this.  I apologize
17   because I know that they were upset, set it on
18   the table, and I walked out.  Ryan told me
19   that when he went in to meet with them later,
20   that the tape had been dismantled.
21       Q    Did anyone from Novelty, to your
22   knowledge, protest that action of the -- or
23   protest the action to the Government of
24   dismantling the recorder?
25       A    Nobody from Novelty was in the

Page 2221

1    room when they took it apart, no.
2        Q    Subsequently, did you mention
3    anything about the recorder to the government
4    agents?
5        A    Honestly, I don't remember.
6        Q    All right.  Now, why did Novelty
7    wish to video record or audio tape the
8    investigators?
9        A    There was a lot of things about
10   the whole, an administrative inspection that
11   we were concerned about.  They didn't seem, as
12   Ryan talked about, there was concerns.  And
13   what we wanted to do is to, kind of a lot of
14   different things.  One, to document the
15   interaction that was happening, that we wanted
16   to be able to show that to our counsel, and
17   then we wanted to have it as a public record,
18   if necessary, as well.
19       Q    Now, you say you had some
20   concerns.  Specifically, what events caused
21   you to have concern?
22       A    I mean, as Ryan had testified, I
23   mean, when the DEA agents, or DEA employees,
24   I'm sorry, first walked into our building and
25   said, start qualifying who's there and why.

Page 2222

```
1    I mean that right there in itself was -- the
2    bells start going off.  Why is there an
3    attorney?  Why are there two people from
4    Washington Headquarters?  Why is one of those
5    people specifically involved in the allegation
6    of making a false statement that we've
7    contest.  I mean, all those things were very -
8    - I'm just a Novelty guy.  I mean, I'm
9    thinking this is -- this smells bad.
10       Q    Now, are you aware of any threat
11   of arrest having been made by any of the DEA
12   investigators?
13       A    I was not in the room when that
14   happened.  Immediately after it --
15            MR. BARBER:  Objection, Your
16   Honor.  The witness is beginning to narrate a
17   question that was a yes or no, was he aware of
18   any threat of arrest.  And unless a question
19   is posed that allows the Government an
20   opportunity to object, we are again
21   disadvantaged, and I ask that the witness not
22   narrate in a non-responsive manner.
23            Number two, the witness is also
24   incompetent to testify as to this, as he just
25   said he wasn't in the room when whatever it is
```

Page 2223

```
1    happened.
2            JUDGE RANDALL:  Mr. Emord, do you
3    wish to be heard?
4            MR. EMORD:  Oh, yes.  I'm asking
5    for his understanding, Your Honor.  And he has
6    an understanding, and hearsay is liberally
7    permitted in these proceedings.  It doesn't
8    matter whether he was in the room or not, he
9    heard about it.
10           JUDGE RANDALL:  Very well.  I will
11   sustain the objections to the extent that it's
12   asking for a narrative, and he's answered the
13   question pending, and ask that you move on
14   with your next question.
15           MR. EMORD:  Very well, Your Honor.
16           BY MR. EMORD:
17       Q    Did there come a time when someone
18   from Novelty informed you of a threat of
19   arrest from DEA agents?
20       A    Yes.
21       Q    Who informed you?
22       A    Ryan Polk.
23       Q    And what did he say?
24       A    Immediately after it happened, he
25   came up to my office and explained to me that
```

Page 2224

```
1    he'd just been threatened with arrest.  He was
2    very upset.
3        Q    Now, that occurred on what day?
4        A    That was on Wednesday.
5        Q    And did that precede the time in
6    which the video camera was installed?
7        A    Yes.
8        Q    By how many hours?
9        A    Maybe two and a half, right in
10   that range.
11       Q    Did it have an affect upon your
12   interest in relying upon a video camera?
13       A    Absolutely.
14       Q    In what way?
15       A    I mean, it was continued
16   inconsistencies and concerns that were being
17   raised with us.  I mean, that was a great
18   example of something that we felt wasn't
19   right, and that we wanted to have documented
20   actions like that, so that we could actually
21   present them later.  I mean, here not long
22   after this - I mean, we were trying to be
23   cooperative, which meant that sometimes Ryan
24   would be meeting with the DEA employees to
25   provide them other things that they've asked
```

Page 2225

```
1    for.  Other times, I was doing it, as we were
2    trying to move through as fast as we could
3    with this process.  I mean, when the tape
4    recording and the video taping was refused, we
5    wound up, at least for some sort of
6    protection, deciding that the both of us
7    needed to go in together and talk to them
8    together, I mean just because that was the
9    only way that we could have any sort of
10   documentation.
11       Q    Now, are you aware of any
12   allegation having been made concerning -- by
13   the government agents concerning scrubbing, or
14   sanitizing the documents?
15       A    Yes.
16       Q    And what is your understanding of
17   the allegation?
18       A    That Ryan was told that the
19   information that he provided was too accurate;
20   so, therefore, it must be scrubbed and
21   cleansed.  I mean, they were accusing him of
22   falsifying records, with no foundation.
23       Q    And when did that occur?
24       A    I believe that was Tuesday, but I
25   have to check.  I don't know for certain if it
```

Page 2226

```
 1    was Tuesday or late Monday.  I think it was
 2    Tuesday.
 3         Q    Was that prior to the video
 4    taping?
 5         A    Yes.
 6         Q    Was it your intent through video
 7    taping to obtain direct evidence of abuses
 8    present?
 9         A    Yes.  I mean, that was -- it was
10    to document the events that happened.  It was
11    to document our concerns of professional, and
12    possible ethical issues, and to have a
13    recorded record of that.
14         MR. EMORD:  Now, if the Court
15    Clerk will please supply the witness with what
16    has been marked for identification as Novelty
17    Exhibit 5.
18         BY MR. EMORD:
19         Q    Do you have Novelty Exhibit 5
20    before you, sir?
21         A    I do.
22         Q    Do you know who caused to have
23    this document prepared?
24         A    Ryan Polk.
25         JUDGE RANDALL:  Just one second,
```

Page 2227

```
 1         Mr. Emord.  Thank you.  You may continue.
 2              BY MR. EMORD:
 3         Q    Have you had an opportunity to
 4    review this document before you appeared
 5    today?
 6         A    Yes.
 7         Q    And do you understand what it
 8    lists upon it?
 9         A    Yes, I do.
10         Q    What does it list upon it?
11         MR. BARBER:  Objection, Your
12    Honor, relevance, and it's beyond the scope of
13    the Pre-Hearing Statement.
14         JUDGE RANDALL:  Just a moment.
15    Mr. Emord?
16              MR. EMORD:
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉ it's perfectly fair to ask
20    this gentleman about the distributors of the
21    company.
22         JUDGE RANDALL:  Overruled.  You
23    may continue.
24              BY MR. EMORD:
25         Q    Now, can you tell me, what is upon
```

Page 2228

```
 1    this document?
 2         A    I mean, this is -- it's a number
 3    of different things, but it's our customer
 4    listing of all of our retail customers, the
 5    internal code which we associate or we
 6    describe them by, their corporate address,
 7    city, state, zip.
 8         Q    And this document is kept in the
 9    ordinary course of business at Novelty?
10         A    Yes.
11         Q    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
15         A    Yes.
16         Q    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
18         A    At this time, it appears to be.
19         Q    When you say "at this time", what
20    time is that?
21         A    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
```

Page 2229

```
 1    accurate as of that date.
 2         Q    ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
 4         A    There are -- if I was to quickly
 5    add it up, I mean, I would guess that - it's
 6    not a guess.
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
        ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉
14         Q    Now, is it true that as of the
15    time of the issuance of the suspension order,
16    that Novelty continued to ▉▉▉▉▉▉▉▉▉
18         MR. BARBER:  Objection, Your
19    Honor.  This is leading, and I've not objected
20    to much of the leading questions, but this is
21    inappropriate on direct.
22         MR. EMORD:  All right.  I'll
23    withdraw the question, Your Honor.
24         JUDGE RANDALL:  Very well.  Thank
25    you.
```



Page 2239

```
 1   articulated with regard to 823/824 remain on
 2   the record with regard to this line of
 3   questioning.
 4           JUDGE RANDALL:  Certainly.
 5           MR. BARBER:  Thank you.
 6           JUDGE RANDALL:  So noted.  Mr.
 7   Emord, you may continue.
 8           MR. EMORD:  Thank you, Your Honor.
 9           BY MR. EMORD:
10       Q
15       A
21
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  87 of 198



Page 2240

```
 1   thinking about, and I wasn't sure how to talk
 2   about this before -- and they may cut me off,
 3   too -- most of the suppliers to whom --
 4           MR. BARBER:  Objection, Your
 5   Honor.  I will cut him off, because he has
 6   answered the question pending before him, and
 7   he's running into a narrative.
 8           THE WITNESS:  It actually --
 9           JUDGE RANDALL:  Excuse me, Mr.
10   Merlau.
11           THE WITNESS:  Yes, ma'am.
12           JUDGE RANDALL:  Mr. Emord?
13           MR. EMORD:  Thank you, Your Honor.
14           JUDGE RANDALL:  You may ask an
15   additional question.
16           BY MR. EMORD:
17       Q
20       A   Without having the list in front
21   of me,
                                    I look
25   down through this list -- all together I've
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  88 of 198

Page 2241

```
 3       Q   How much, in annual dollar
 4   revenues, has the company lost as a result of
 5   those companies leaving?
 6       A   I mean, it will be -- I don't
 7   remember the exact number
                                    I don't think I've added
10   up the rest of them.
11       Q   Has the company come to a
12   determination as to how many employees of the
13   company will have to be laid off, if any?
14       A   I mean, it's going to be -- we're
15   kind of waiting for the dust to settle.  We've
16   been subsidizing people right now.  But, I
17   mean,                            There's just --
19   there's no way to do it.  We've been trying,
20   but it doesn't exist.
21       Q   Is there any economic impact upon
22   the pay received by the route sales
23   professionals?
24       A   Absolutely.  We paid, in 2007,
25
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  89 of 198



Page 2242

```
 1                     Even with the new pay plan that
 2   is increasing, commission rates on other
 3   categories -- novelties specifically -- it's
 4   not going to be able to offset that

 7       Q   Now, of those chain convenience
 8   stores that carried SLCs, have they in any
 9   instance gone to competitors that -- to your
10   competitors?
11           MR. BARBER:  Objection, Your
12   Honor.  Lack of foundation.
13           JUDGE RANDALL:  Sustained.
14           BY MR. EMORD:
15       Q   You mentioned in your testimony
16
17   as customers as a result of the suspension
18   order?
19       A   Correct.
20       Q   And is it the case, to your
21   knowledge, that those
22   have sought to employ the services of other
23   distributors of SLCs?
24           MR. BARBER:  Objection, Your
25   Honor.  Lack of foundation.
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  100 of 198



**Page 2243**

1    JUDGE RANDALL:  Overruled.  You

2  may answer the question.

3    THE WITNESS:

11    BY MR. EMORD:

12    Q

20    talked to at some of our largest customers has

21  been -- has told me that they're getting only

22  25 milligram products.  They are not getting

23  as many varieties of tablet counts, dosage

24  counts, within the product.  They are getting

25  mostly 24s or 24 and six count in blister

---

**Page 2244**

1    packs.

2    They've also told me that they

3  have some quantities which are some maximum

4  quantities that they can get shipped as well.

5    Q    And do those maximum quantity

6  levels -- excuse me.  Are those maximum

7  quantity levels the same as Novelty's?

8    MR. BARBER:  Objection, Your

9  Honor.  Lack of foundation.  Again, we don't

10  know who his source of information is and when

11  he got it, how he got it.

12    JUDGE RANDALL:  Mr. Emord?

13    MR. EMORD:  I'll withdraw the

14  question, Your Honor.

15    JUDGE RANDALL:  Very well.

16    BY MR. EMORD:

17    Q    You've mentioned that you have

18  received information concerning your

19  competitors with regard to the customers that

20  have left Novelty to go to competitors,

21  correct?

22    A    Correct.

23    Q    Where does that information come

24  from?

25    A    In talking with our customers, one

---

**Page 2245**

1    of the names that was talked about earlier is

2

3    Our staff will talk with them

4  daily, in that they are our largest customer.

5

6

7    They are being supplied by another

8  distributor.  I mean, he has, you know, asked

9  us questions as they're working with these

10  people to make sure that they are being taken

11  care of the way they need to be done.  And

12  we've given him the information that he needs

13  based upon our experience with his stores.

14    He is the one that has told me

15  that they're getting six and 24-count

16  packages.  He's the one that has told me that

17  they're getting 25 milligrams combined

18  product, 25 milligram, 200 milligram -- I

19  can't say the, the G word.

20    Q    Guaifenesin?

21    A    That one.  And he is also the one

22  that told me that they can ship -- it's no

23  more than 48 six-counts and 72 24-counts every

24  two weeks.  The new supplier that they're

25  working with can only ship that to their

---

**Page 2246**

1    stores.  So that's -- they've got a quantity

2  amount that's been set.

3    Q    And other than          have

4  you conversed with customers concerning their

5  service received by other competitors?

6    MR. BARBER:  Objection, Your

7  Honor.  This is beyond the economic harm to

8  Novelty, now moving to service rendered by

9  competitors to convenience stores.  And so it

10  is beyond the scope of Mr. Green's testimony,

11  and it goes beyond -- and it's irrelevant.

12    MR. EMORD:  Actually, Your Honor,

13  it's highly relevant, because to the extent

14  that, as he just testified about

15  the suspension order has had the effect of

16  causing convenience stores to move from

17  Novelty and go to others who have none of the

18  constraints on quantities, on dosage amounts,

19  etcetera.

20    That does have a direct bearing

21  upon the risk of diversion and may,

22  ironically, lay a foundation for argument that

23  the risk of diversion has been increased by

24  the suspension order rather than decreased.

25    JUDGE RANDALL:  Could you address



Page 2247

```
1    why this line of questioning is not beyond the
2    scope of Green's testimony that has been
3    predisclosed?
4           MR. EMORD:  It is directly
5    mentioned -- my able co-counsel has provided
6    me, from the prehearing statement of Todd
7    Green, on page 9, that -- pardon me, Your
8    Honor.
9           (Pause.)
10          The specific language is that,
11   "And those companies have terminated their
12   contracts with Novelty and entered into
13   business relationships with other suppliers
14   for both SLCs and Novelty items."
15          JUDGE RANDALL:  Mr. Barber,
16   anything further?
17          MR. BARBER:  Yes.  Simply, Your
18   Honor, that the question posed was with regard
19   to the service, it was not with regard to
20   which -- and Mr. Merlau has already covered
21   the line that Mr. Emord just read, so, again,
22   it's still beyond the scope.
23          JUDGE RANDALL:  I'm going to
24   sustain the objection and allow you to
25   rephrase.
```

Page 2248

```
1           MR. EMORD:  All right, Your Honor.
2    BY MR. EMORD:
3        Q    Do you have any information as to
4    ██████████████████████████████
5    ██
6    relationships with competitors of Novelty?
7        A    Yes.
8        Q    And what information -- who
9    supplied you with that information?
10       A    It's a lot of different things --
11   customers with whom we're talking about.  I
12   ████████████████████  They had
13   actually sent us a termination letter, and
14   then called us and let us know who their new
15   supplier for their entire program was going to
16   be, █████████████████████████████
17   █████████████████████  same distribution
18   model, etcetera.
19          They were going to be taking over
20   their business.  Their letter that they sent
21   to us cited that we breached our contract with
22   them by not being able to provide them all of
23   the items that were listed in our terms of
24   agreement that we would be able to sell to
25   them, specifically SLCs.
```

Page 2249

```
1           So with that, they immediately
2    terminated the contract and signed with a
3    competitor.
4        Q    Any other companies that have
5    severed their contracts with Novelty and
6    discontinued their business relationship with
7    Novelty in favor of another competitor of
8    Novelty's?
9        A    I mean, there are -- like I said,
10   I'd have to pull up the list.  I think there
11   ████████████████████  that have either
12   been -- their business in entirety OTC,
13   including scheduled as well as non-List I
14   products, or, you know, just the shift to
15   SLCs, nearly every one of our customers.  I
16   think we had -- at the date of the suspension
17   order ████████████████████████████
18   ██        And I can only think of a couple
19   of those who, when I had last talked to them,
20   had not found a new supplier yet.  It's not
21   that they're staying with; you know, they just
22   haven't found somebody yet that's going to be
23   able to take care of them.
24          Everybody else that I have talked
25
```

Page 2250

```
1    to has obtained a new supplier.  They are
2    getting, as I said, 25 milligram products.
3    The amounts that they're buying are
4    quantitatively higher than I was selling them.
5    I mean, that's pretty much what we've seen
6    everywhere.
7           MR. EMORD:  Now, the Court
8    Reporter -- or the Court Clerk, please place
9    before Mr. Merlau a copy of ALJ Exhibit 1.
10   BY MR. EMORD:
11       Q    You previously testified
12   concerning ALJ Exhibit 1 in this proceeding.
13   Do you remember, Mr. Merlau?
14       A    Yes.
15       Q    And I'm not going to go over the
16   same questions that we went over before, to
17   spare everyone the redundancy.  But if you'll
18   turn to page 2, and if you'll look in
19   particular to numbered paragraph -- or
20   numbered Roman -- or Arabic numeral 3 on page
21   2, at the top, before the first full
22   paragraph, and then if you'll take a moment
23   and read that down to subpart A, including
24   subpart A.  And then, after you've done that,
25   let me know.
```

Page 2251

```
1         A    Okay.
2         Q    Now, did there come a time when
3    you -- after you had first read subpart 3A
4    that you investigated to determine the
5    validity of subpart 3A?
6         A    When we got -- when we got the
7    suspension order, we started going back and
8    checking everything. From this, in itself, we
9    never had anything to really check from. I
10   mean, it said that there was 22 bottles of
11   product, it says specifically distributed by
12   Novelty, were found in an illicit meth lab.
13        When we got the government
14   exhibits for this, we were actually able to
15   find out what that item -- what those products
16   were and obtain a lot number. We went back
17   and we researched this, and we had bought the
18   only 24 cases of this given lot number.
19        I -- you know, I don't have any
20   way to prove or disprove that we have actually
21   distributed this product. It seems unlikely
22   that 24 cases constituted an entire
23   manufacturer run of product.
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 2252

```
2         I mean, 24 -- and I haven't
3    checked the particular item, but it -- most
4    every item is at most 144 pieces per case.
5    All right? So if we bought 24 cases, 144 is
6    what, 1,800-some bottles. It doesn't seem
7    logical that this was it.
8         In reading the government exhibits
9    about the same topic, there is no information
10   from DMD other than the fact that they told
11   the DEA, when they were contacted about this
12   product being found, that they sold it all to
13   Novelty. I mean, there is no manufacturing
14   information, tracking, lot information
15   identifying how much product they actually
16   produced for each one of those lots.
17        So, I mean, I can't -- I can't say
18   whether this happened or it didn't happen. I
19   know, as a company, I mean, everything we do
20   is to prevent this from happening. But I
21   can't tell you today that, you know, our
22   products weren't sold to retail and, you know,
23   potentially legitimately bought and wound up
24   in a meth lab. We sure didn't put them there,
25   and I'm not even sure if it's product we
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 2253

```
1    distributed, based on what I know about the
2    manufacturing in the industry.
3         Q    And has the DEA ever presented
4    Novelty with information to establish that in
5    fact the 22 bottles were distributed by
6    Novelty?
7         A    That's what I was just saying. In
8    the exhibits for this, which is the first time
9    that we really ever got any information, not
10   as a result of this or anything else, saying
11   that there is this lot number, this is the
12   first time that we've ever seen a lot number
13   that we could go back and start checking.
14        It's my understanding from
15   testimony that Ryan was making that he was
16   involved with a discussion earlier where they
17   looked up this lot number and, you know, asked
18   who it was sold to.
19        But I think that was really where
20   that ended, that he gave, you know, to DMD,
21   through somebody that worked with him, gave to
22   DMD the particular salespeople who sold some
23   of that lot number without getting into the
24   information about, you know, what the lot
25   number was, that it was indeed found in the
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 2254

```
1    lab, and going back and researching how many
2    total packages were bought by us.
3         Q    Are you familiar with how DMD
4    ships product to Novelty and to convenience
5    stores?
6         A    I don't know convenience stores.
7    I know that our products come in from -- every
8    manufacturer or distributor that we buy from
9    come in on common carriers, people like
10   Overnight Trucking, who is now owned by UPS,
11   and, you know, FedEx Freight and Yellow
12   Freight, any of the common carrier trucking
13   companies.
14        Q    And at the time, in 2002, are you
15   aware of whether DMD put locks on its trucks
16   or otherwise secured the trucks in transport?
17        MR. BARBER:  Objection, Your
18   Honor. This is beyond the scope of Mr.
19   Green's and Mr. Merlau's proposed testimony.
20        MR. EMORD:  Well, let me take a
21   look at the document in here. Pardon me.
22        JUDGE RANDALL:  Certainly.
23        (Pause.)
24        MR. EMORD:  All right. It's under
25   J.R. Merlau's section of the prehearing
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 2258

```
1    sustain the objection.  He answered the
2    question.  Let's move on to another question.
3            MR. EMORD:  All right, Your Honor.
4            BY MR. EMORD:
5        Q     Now, what, if any, information do
6    you have to cause you to question the charge
7    in 3A that 22 bottles of ephedrine products
8    were distributed by Novelty -- distributed by
9    Novelty were found at an illicit meth
10   amphetamine lab in Connecticut?
11           MR. BARBER:  Objection, Your
12   Honor.  The question is so broad.  What, if
13   any, information within your knowledge do you
14   have to -- it is so vague and ambiguous as to
15   allow this witness to commence on the
16   narration that we just objected to.  Asking an
17   overly broad question is not a way to get
18   around an objection that has been sustained.
19           MR. EMORD:  Well, it's not my
20   intent, but I'll withdraw the question and ask
21   another question.
22           JUDGE RANDALL:  Very well.  Thank
23   you.
24           BY MR. EMORD:
25       Q     Now, when you reviewed 3A and --
```

Page 2259

```
1    well, roughly when did you review the content
2    in 3A for the first time?
3        A     I mean, on January 28th when we
4    went through each of these points, as I said,
5    I didn't have any of the facts to really
6    understand what was based upon this until
7    those started coming up as we reviewed the
8    government exhibits and were able to go back
9    and start piecing this together, find out that
10   it was DMD product, that it was product that
11   we bought these 24 cases of, you know.
12       Q     Did [   ], to your knowledge, ever
13   supply -- are you aware of communications
14   between DMD and Novelty concerning 22 bottles
15   of ephedrine products allegedly distributed by
16   Novelty?
17       A     The e-mail that I read back
18   through on this -- Ryan sent to me that he had
19   from Craig Baker, I believe only talks about
20   that product was -- I'm not sure if it says
21   that product was found.  I know that they
22   asked where we sold a given lot number, and we
23   provided our route salespeople to whom that
24   had been shipped and gave the geography that
25   would be around the area.
```

Page 2260

```
1            I don't remember what the city was
2    in Connecticut where the product was found, so
3    that presumably [   ] was going to be able to
4    provide that back to the DEA and give them the
5    potential stores from which that could have
6    been obtained, you know, legally, stolen,
7    whatever it may have been.
8            As this came up in the suspension
9    order, and we started looking at it, that's
10   when we went back and researched the lot
11   number, and, as I said, found the 24 cases.
12   It seems bizarrely low as a manufacturer
13   quantity of an entire lot.
14           The dialogue of the discussions
15   between the DEA and [   ] about what transpired
16   and the -- I was reading that about a week
17   before this hearing started, was the first
18   time that I had seen that inner dialogue of --
19   that DEA sent a letter to [   ].
20           [   ] told them that they sold all
21   the product to Novelty, told them that they
22   came by and met with Novelty, which, as best
23   as I've been able to find out, there was just
24   an e-mail exchange about who were our
25   salespeople in that area that had sold that
```

Page 2261

```
1    lot number.  That's kind of all I know in
2    trying to figure out if there's any validity
3    to 3A.
4        Q     Did Madeline Kusma ever inform you
5    that there had been a suspected find of 22
6    bottles in a Connecticut meth lab by DEA of
7    Novelty-distributed product?
8        A     No.  I was present in the July '07
9    inspection, which is where a lot of this kind
10   of struck me by surprise, but --
11           MR. BARBER:  Objection, Your
12   Honor.  The witness is now moving into
13   narrative.  He said no to the question posed.
14   There is no question for this witness to
15   narrate on.
16           JUDGE RANDALL:  Sustained.
17           BY MR. EMORD:
18       Q     In July of 2003, is it -- well,
19   let me ask you this.  Prior to the issuance of
20   the show cause order, and before the July 2007
21   inspection of Novelty, were you ever present
22   at a time when Investigator Kusma was present
23   at Novelty?
24       A     No, I was not.  My first one was
25   the '07, July '07 inspection.
```



Page 2262

```
 1        Q    And at the time of the July '07
 2   inspection, did Ms. Kuzma inform you that
 3   Novelty -- that 22 bottles of Novelty product,
 4   allegedly distributed by Novelty, product
 5   allegedly distributed by Novelty, had been
 6   found in a Connecticut meth lab?
 7             MR. BARBER:  Objection, Your
 8   Honor.  Asked and answered.
 9             JUDGE RANDALL:  Overruled.  You
10   may answer the question.
11             THE WITNESS:  No, she did not.
12   Ryan and I both asked her at the very
13   beginning of the -- kind of the introductions,
14   as we were sitting in the small conference
15   room, if any of our product had ever been
16   found, and she specifically said no.
17        BY MR. EMORD:
18        Q    And did any other DEA official
19   communicate to you, from the time of your --
20   the start of your employment at Novelty to the
21   present, that a Novelty product had ever been
22   found in a meth lab?
23        A    No.
24        Q    And to this date, has any DEA
25   official provided you with any information,
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 117 of 158

Page 2263

```
 1   beyond what is contained in paragraph 3A of
 2   page 2 of the order to show cause, concerning
 3   the 22 bottles of ephedrine product allegedly
 4   distributed by Novelty that were found in an
 5   illicit methamphetamine lab in Connecticut?
 6        A    No.
 7        Q    Okay.  Now, you were present in
 8   the courtroom during the testimony of
 9   diversion investigators, correct?
10        A    Correct.
11        Q    And those diversion investigators
12   had conducted in-store visits and phone
13   contacts with convenience stores served by
14   Novelty, correct?
15        A    That's correct.
16        Q    Of the stores to which they
17   testified, are those stores typical or
18   representative of the stores Novelty serves?
19        A    The answer to that is going to be
20   a yes and no.  The stores that Ms. Kuzma --
21   that she visited, those are representative of
22   our customer mix.
23   ███████████████████████████
24   ███████████████████████████
25   All of the other diversion investigators, the
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 118 of 158

Page 2264

```
 1   stores that the were visiting were really kind
 2   of anomalies.  ███████████████
 3   ██████████████████████████
 4        Q    Okay.  Now, during the July 2008
 5   -- or, excuse me, 2007 investigation of
 6   Novelty's headquarters, to your knowledge did
 7   Novelty ever fail to supply the DEA agents
 8   with documents they requested?
 9        A    Absolutely not.
10        Q    Now, to your knowledge, are the
11   convenience stores that Novelty serves --
12   well, first of all, do you have an
13   understanding of the proximity of the
14   convenience stores that Novelty serves to
15   major thoroughfares?
16        A    I haven't been in all of them.  I
17   know the volume of stores that support our
18   type of program are the higher volume, larger
19   format stores that are located in, you know,
20   higher traffic areas.
21        Q    And do you have an understanding
22   of the location of Novelty -- the convenience
23   stores Novelty serves to major cities?
24        A    Yes.  And it's going to be part of
25   the overall volume scheme of our stores, yes.
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 119 of 158

Page 2265

```
 1        Q    And what is that understanding?
 2        A    They are high traffic,
 3   predominantly not urban, but innercity,
 4   bodega-style that's on the corner.  They are
 5   going to be large format, relatively new, you
 6   know, open.  Almost every one of them is with
 7   gas.
 8             If you think about the customers
 9   -- I'm not sure if everybody has looked down
10   through here.  ████████████████████
11   ████████████████████████████
12   ████████████████████████████
13   ████████████████████████████
14   ████████████████████████████
15   ████████████████████████████
16   ████████████████  So, I mean, those
17   are the types of customers that we have.
18             MR. EMORD:  Now, I'd ask the Court
19   Clerk if she might supply what has previously
20   been marked as Novelty Exhibit 9 to the
21   witness.
22             (Whereupon, the above-
23             referred to document was
24             marked as Respondent's
25             Exhibit No. 9 for
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1 120 of 158

Page 2271

```
1    region there is a white rectangle, and the
2    word "main office" is written there.  Is that
3    entire black region one office?
4        A    The entire black region, and
5    including that white box where the text is, is
6    what we call our east office, and that is a
7    two-story group of offices.
8        Q    How many offices are within that
9    black region?
10       A    Maybe a dozen and a half private
11   offices, and cubicles for another 40 people.
12       Q    And what is the square footage, if
13   you know, of the office into which the video
14   recorder and audio recorder were placed?
15       A    Maybe 250, somewhere in that
16   range.
17       Q    And how much square footage did
18   the video recorder, plus tripod, occupy in
19   that room?
20       A    Three square feet.
21       Q    Now, if you look at that
22   schematic, can you identify for the Court
23   where the caged area is that contained the
24   scheduled listed chemical products?
25       A    Sure.  Taking the black box at the
```

Page 2281

```
1    didn't hear that.
2        MR. EMORD:  I'm sorry.  Novelty
3    Exhibit 28, Your Honor.
4            (Whereupon, the above-
5            referred to document was
6            marked as Respondent's
7            Exhibit No. 28 for
8            identification.)
9        BY MR. EMORD:
10       Q    Mr. Merlau, do you recognize --
11   oh, I'm sorry, Your Honor.
12       JUDGE RANDALL:  Just one second.
13       (Pause.)
14       You may continue.
15       BY MR. EMORD:
16       Q    Mr. Merlau, do you recognize what
17   has been previously identified as Novelty
18   Exhibit 28?
19       A    Yes, it's our company training
20   handbook.
21       Q    And how is this handbook used?
22       A    All new hires are given this
23   handbook, instructed and walked through how to
24   read it, how to use it, and then use this in
25   their on-the-job training as well.  They
```

Page 2282

```
1    accept in a written form that they have
2    received this, that they understand it, that
3    they've read it.
4        Q    And, in particular, does this
5    Novelty Exhibit 28 provide instruction to
6    route sales professionals as to SLC handling
7    procedures?
8        A    It does.
9        MR. BARBER:  Objection, Your
10   Honor.  This is leading, and it is also unduly
11   repetitive of both Mr. Bledsoe's and Mr.
12   Polk's testimony.
13       JUDGE RANDALL:  Mr. Emord?
14       MR. EMORD:  Well, it's not unduly
15   repetitive, and it's not leading.  It's a
16   simple question. ████████████████████
17
18       JUDGE RANDALL:  I'll overrule the
19   objection.
20       BY MR. EMORD:
21       Q    You can answer the question.
22       A    Okay.  I think I kind of did.  It
23   does.  It starts on page 60, and there's a
24   two-page section there that talks about, you
25   know, chemical product handling with employee
```

Page 2283

```
1    acceptance on the end.
2        Q    Now, I notice on page 60 there are
3    a series of what might be referred to as
4    bullet points under the second full paragraph
5    there.  And, in particular, I draw your
6    attention to bullet point 3 -- that is, the
7    third one down from the top.  Why, to your
8    knowledge -- well, do you have any
9    understanding as to why bullet point 3 is
10   included in the training manual?
11       A    Which one are you using as bullet
12   point 3?
13       Q    █████████████
14
15       A    ████████████
16
17
18       Q    Do you have knowledge as to why
19   that was included within the training manual?
20       A    ████████████████
```

Page 2285

```
1    Novelty Exhibit 40.
2                        (Whereupon, the above-
3                        referred to document was
4                        marked as Respondent's
5                        Exhibit No. 40 for
6                        identification.)
7    BY MR. EMORD:
8         Q    And please take a moment to
9    quickly skim through Novelty Exhibit 40.
10        A    Okay.
11        Q    Now, turning your attention to
12   what has been marked ALJ Exhibit 1 -- that is
13   the order to show cause, it's not -- that's
14   another document up there.
15        A    Correct.
16        Q    If you'll focus your attention
17   upon page 3, Arabic numeral 7 in the text,
18   which is the first full paragraph up at the
19   top, you previously testified to your actions
20   in response to reading paragraph 7, which
21   paragraph refers to the distribution of tablet
22   form scheduled listed chemical products to
23   retail outlets located in Kentucky and North
24   Carolina that prohibit the sale of non-liquid
25   ephedrine and pseudoephedrine, except in
```

Page 2286

```
1    gelcaps.
2              Now, in the course of your
3    testimony you mentioned that you undertook a
4    review of certain documentation.  And what I
5    would like you to inform me is whether what
6    has been identified as Novelty Exhibit 40 had
7    anything to do with your assessment of your
8    response to paragraph 7.
9         A    It does.  On page 152 of Novelty
10   Exhibit 40, where the three sales of our Item
11   17902 were shown, which is a result of the
12   typo that we talked about, an entry error in
13   our handheld computer of a wrong digit.
14        Q    And now, was that what we have
15   identified as Novelty Exhibit 40 a document
16   supplied to the DEA agents during their
17   inspection?
18        A    It was.
19        Q    And is it kept in the normal
20   course of business -- that is, Novelty Exhibit
21   40 -- at Novelty?
22        A    Yes.
23        Q    And it was retrieved from the
24   business files at Novelty for submission to
25   the DEA investigators during the July 9, 2007
```

Page 2287

```
1    investigation?
2         A    Yes, it was.
3              MR. EMORD:  Your Honor, I would
4    move for the admission of Novelty Exhibit 40.
5              MR. BARBER:  May I voir dire, Your
6    Honor?
7              JUDGE RANDALL:  You may voir dire.
8              VOIR DIRE EXAMINATION
9    BY MR. BARBER:
10        Q    Mr. Merlau, can you just discuss
11   items on page 152?
12        A    Sure.
13        Q    What codes did you claim were
14   inaccurately put into this document?
15        A    17902.  There's about -- it's
16   right near the bottom, there's three lines.
17        Q
```



```
20        A
25        Q    Right.  I'm asking you about the
```

Page 2288

```
1    document, though.
2         A    Okay.
3         Q
7         A
15             Does that answer --
16        Q    I think it does.
17        A    Okay
18        Q    But I want to ask another
19   question.  You said that the information in
20   this document was erroneous because of an
21   entry into a handheld computer.
22        A    I'm sorry.  I didn't say that -- I
23   didn't speak that as well as I should have.
24   On page 152, the items are referenced there
25   that were the items in the ISO that were
```

Page 2289

```
 1    alleged that we sold that we should not have.
 2    On this report, on page 152, it shows the last
 3    shipments of those items occurring early in
 4    '06, which is part of the investigation that
 5    I had done to prove that this did not happen
 6    as the suspension order contents.
 7              Was that nothing like what you
 8    asked?
 9         Q    That was nothing like what I
10    asked.  Is this the document you gave to DEA
11    at the time of the administrative inspection?
12         A    Yes, this was the shipments
13    document.  Correct.
14         Q    How did the number 17902 end up
15    appearing in this document?  Who made that
16    entry into this document?
17         A    All right.  That was from our
18    computer system, and we did ship 17902.  All
19    right.  There were three shipments in this
20    roll forward period.  One of them is dated
21    January 9, 2006, and then there was two
22    shipments dated January 16, 2006.
23              Those are three shipments of Item
24    17902 that did occur and are reported on this
25    report about shipments.  I think where I
```

Page 2290

```
 1    confused things is I started talking about the
 2    alleged sale, and I probably just veered off
 3    track there.
 4         Q    Is Novelty Exhibit 40, and in
 5    particular page 152, an accurate record of
 6    what actually transpired?
 7         A    Yes.
 8         Q    When you mentioned, then, on --
 9    when Mr. Emord was asking you about the
10    document, what data entry errors were you
11    referring to?
12         A    In the suspension order, we were
13    talking about paragraph -- was it 6 or 7?
14         Q    I'm not asking you about the
15    suspension order.
16         A    Okay.  You asked me what I was
17    talking about, though, and I was talking about
18    the suspension order.
19         Q    Okay.  Then, please -- when you
20    talked about the data entry errors.
21         A    Okay.  All right.  This document,
22    Novelty Exhibit 40, shows Item Number 17902,
23    there's three lines on it, shows that the last
24    shipments of those occurred on January 9th of
25    '06 and two shipments on January 16th of '06.
```

Page 2291

```
 1              In the suspension order,
 2    paragraph 6, it says, "Novelty distributed 24-
 3    count bottles of scheduled listed chemical
 4    products on three occasions to retail outlets
 5    after February 4th of '07."  All right?  That
 6    is the allegation -- it is paragraph 6 in the
 7    ISO -- that I'm saying did not happen.  This
 8    shipment information here is one piece of how
 9    I validated that that did not happen.  It is
10    simply a typo on the sales record.  All right?
11    Not included here, the sales information.  All
12    right?
13         Q    So the typo appeared not on this
14    document but in the sales records that Novelty
15    gave to DEA?
16         A    Yes.
17              MR. BARBER:  Okay.  Thank you,
18    Your Honor.  I have no objection to this going
19    in.
20              JUDGE RANDALL:  Very well.  I
21    accept into the record Respondent's Exhibit
22    40.
23              (Whereupon, the above-
24              referred to document,
25              previously marked as
```

Page 2292

```
 1              Respondent's Exhibit
 2              No. 40 for
 3              identification, was
 4              received into evidence.]
 5              MR. EMORD:  Now, with your
 6    indulgence again, and the Court Reporter --
 7    Clerk, sorry -- if you might provide the
 8    witness with what has previously been
 9    identified as Novelty 46.  Thank you.
10              (Whereupon, the above-
11              referred to document was
12              marked as Respondent's
13              Exhibit No. 46 for
14              identification.)
15              DIRECT EXAMINATION (cont'd)
16    BY MR. EMORD:
17         Q    Do you recognize what has been
18    identified as Novelty Exhibit 46, Mr. Merlau?
19         A    I do.
20         Q    Now, did there come a time when
21    you were investigating the allegation
22    contained in the order to show cause at
23    paragraph 7, that you communicated with any
24    stores concerning that charge?
25         A    Sure.  In paragraph 6 and 7, this
```

Page 2293

```
1    e-mail talks about both of those.  When I --
2         Q    Let me ask a question.
3         A    Okay.
4         Q    Now, can you please explain to me
5    whether or not the contents in Novelty 46
6    constitutes communication from you and to you?
7         A    Yes.
8         Q    It does.  And what does that
9    communication concern?
10        A    I asked our customers to whom the
11   ISO talked about we sold product, and I
12   confirmed with each one of them, and each of
13   the stores that were listed in the government
14   exhibits, if they had any scan data that had
15   shown that they sold any of those alleged
16   items that we had sold to those stores.
17            And this is where I'm asking by
18   store number that was listed and what our item
19   numbers were and asking them to confirm if
20   they had any scan sales of that item any time
21   from Fabruary 1st on.  And both of them
22   confirmed -- it was two customers.  Both of
23   them confirmed that they had no scan sales
24   transactions of those items in those stores.
25        Q    And is this the complete set of
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  133 of 150

Page 2294

```
1    e-mail correspondence that you engaged in
2    concerning this confirmation?
3         A    Yes, it is.
4              MR. EMORD:  Your Honor, I would
5    move for the admission of Novelty Exhibit 46.
6              MR. BARBER:  No objection, Your
7    Honor.
8              JUDGE RANDALL:  Very well.  I
9    accept into the record Respondent's Exhibit
10   46.
11              (Whereupon, the above-
12              referred to document,
13              previously marked as
14              Respondent's Exhibit
15              No. 46 for
16              identification, was
17              received into evidence.)
18              MR. EMORD:  Your Honor, I have no
19   further questions of the witness.
20              JUDGE RANDALL:  All right.  Very
21   well.
22              Mr. Barber, we'll go off the
23   record for purposes of scheduling.
24              (Whereupon, the proceedings in the
25              foregoing matter went off the
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  134 of 150

Page 2378

```
1    recording device in the conference room, what
2    interrogations of Novelty personnel were
3    conducted by DEA in that conference room?
4         A    I'm not sure I understand the
5    interrogations, but I know there was the
6    meeting that we just talked about with Ryan
7    and the inventory review.
8         Q    Were you present when the audio
9    tape was removed from the tape recorder?
10        A    I was walking out of the room as
11   they grabbed that and started to disassemble
12   it.  I wasn't there watching them take it
13   apart.
14        Q    And when the investigators were
15   doing that, you were leaving the room, were
16   there any Novelty personnel in the room?
17        A    There were not at that time.
18        Q    So your sole purpose in the audio
19   recording was to record the conversations that
20   DEA personnel were having between themselves,
21   is that correct?
22        A    Absolutely not.
23        Q    Whose idea was it to install the
24   recording devices?
25        A    Our counsel.
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  135 of 150

Page 2388

```
1    where Mr. Meador was positioned in the first
2    instance.
3             So can you tell me -- you've
4    testified that the video recorder you had was
5    in the back corner of the room, is that
6    correct?
7             MR. BARBER:  Objection,
8    mischaracterizes prior testimony.  The witness
9    testified it wasn't in the corner, but by the
10   end of the table.
11             JUDGE RANDALL:  Sustained.
12             BY MR. EMORD:
13        Q    Can you tell me where the video
14   recorder was at the time you were in the room
15   after lunch?
16        A    Yes, it was -- maybe the easiest
17   way to try and explain this in words is if you
18   think about a sheet of paper in front of you.
19   The entrance door to the room would be on the
20   bottom right corner of the sheet of paper and
21   I was up in the top left corner, halfway
22   between the end of the table which is going
23   long ways on the paper and that far corner of
24   the room.  I was in that back left corner.
25        Q    Where was Meador?
```

Neal R. Gross and Co., Inc.
202-234-4433

Exhibit 3
A1  136 of 150

Page 2389

```
1          A    Meador was sitting at the first
2   chair inside the door which is now in the
3   bottom right corner, the table center along
4   the room, he was in that bottom chair that was
5   closest to the door on the long side of the
6   table.
7          Q    How many feet was he from you?
8          A    That room is roughly 12 by 20, so
9   he was probably 15 feet from me.
10         Q    When he saw you with the video
11  recorder, what did he do?
12         A    I walked in with the camera and
13  went to the left to go around the other side
14  of the table from where he was sitting, walked
15  back to the back side of the room.  He got up
16  from his chair, came around the table the
17  other way and that was where he grabbed the
18  tripod and I had already plugged it into the
19  wall by that time and he yanked it out of the
20  wall.
21         Q    How rapid was his gait?
22         A    For a short guy, it was pretty
23  rapid.
24         Q    So when he got up from the chair,
25  he proceeded at a rapid gait in your
```

Page 2390

```
1   direction?
2              MR. BARBER:  Objection, leading
3   and asked and answered.
4              JUDGE RANDALL:  Sustained.
5              BY MR. EMORD:
6          Q    Did he sprint?
7              MR. BARBER:  Objection, leading.
8   The witness has already characterized the
9   pace.  This is an attempt to lead the witness.
10             JUDGE RANDALL:  Sustained.
11             BY MR. EMORD:
12         Q    All right, what pace did he use?
13             MR. BARBER:  Objection, asked and
14  answered.
15             JUDGE RANDALL:  Overruled.
16             THE WITNESS:  He was moving
17  quickly, enough so that I did think that he
18  might hit me.  I remember commenting that to
19  you as we were talking about the events of the
20  day.  I mean I did think that.
21             BY MR. EMORD:
22         Q    Now did he physically -- well, how
23  did he remove the video camera from your
24  possession?
25             MR. BARBER:  Objection, Your
```

Page 2391

```
1   Honor.  Misleading.  The witness testified on
2   cross that the video camera was on the tripod.
3              MR. EMORD:  That's not correct,
4   Your Honor.  That's inconsistent with direct
5   testimony and the earlier testimony given by
6   the witness.
7              MR. BARBER:  Then it's been asked
8   and answered on direct and the record can show
9   that the discrepancy of this witness's
10  testimony on cross versus direct.
11             MR. EMORD:  It's very important in
12  light of the questions on cross that we
13  establish the extent to which there was a
14  physical apprehension on the part of this
15  witness of contact that was offensive.
16             MR. BARBER:  Your Honor, that goes
17  to state of mind.  It doesn't go to the
18  physical act that Mr. Emord has just asked
19  this witness about.
20             MR. EMORD:  We had better get the
21  facts out.
22             JUDGE RANDALL:  Overruled,
23  gentlemen.  You may ask the question and the
24  record will speak for itself.
25             MR. EMORD:  Thank you, Your Honor.
```

Page 2392

```
1   Go ahead.
2              THE WITNESS:  And I think we're
3   all talking about the same thing.  The camera
4   was on top of a tripod.  The tripod was in my
5   hand.  I was plugging it into the wall, so
6   both of you are accurate.
7              Mr. Meador grabbed the tripod upon
8   which the camera was placed out of my hand and
9   pulled the plug from the wall.
10             BY MR. EMORD:
11         Q    Now when he grabbed -- you used
12  the term grab.
13         A    Yes.
14         Q    Did he politely request that you
15  release the tripod?
16             MR. BARBER:  Objection, Your
17  Honor.  Leading.
18             JUDGE RANDALL:  Sustained.
19             BY MR. EMORD:
20         Q    Please define for me as great as
21  specificity as you possibly can the manner in
22  which Mr. Meador removed the tripod from your
23  possession.
24         A    He came and forcibly took it out
25  of my hands.  I would not say it was a tug of
```

Exhibit 3
A1 137 of 155

Exhibit 3
A1 138 of 155

Exhibit 3
A1 139 of 155

Exhibit 3
A1 142 of 155

Page 2397

```
1              17904 is a 24-count blister pack
2    of that item that actually happens to have a
3    higher cost so if the store happened to see
4    it, it's not going to come up as a variance
5    because it was a lower cost and they normally
6    take my money and say okay, this is fine.  So
7    that's probably how that error in the typo of
8    entering that invoice did not get caught.
9              JUDGE RANDALL:  So it's your
10   testimony that what that invoice should have
11   said was 17904?
12             THE WITNESS:  Yes, ma'am.
13             JUDGE RANDALL:  Okay.  Would that
14   have been more than one invoice?
15             THE WITNESS:  I believe it was
16   three.  And we've subsequently to this added
17   to our computer system so there's a
18   validation.  So if somebody types in a 17902
19   which was a discontinued item, those
20   discontinued items weren't blocked, even
21   though you couldn't have the physical product,
22   they weren't blocked in our system, so if
23   somebody did make that typographical error,
24   they could put that number in and it would
25   give them a warning, it would beep at them and
```

Page 2398

```
1    say wait a minute, this isn't a legitimate
2    item.  Check it.  We've since made those
3    changes now so that that does happen so that
4    going forward so that there's disability in
5    having a typo, doesn't exist.
6              JUDGE RANDALL:  All right.
7    Because I have these two confused, let me ask
8    you then on paragraph seven --
9              THE WITNESS:  Yes, ma'am.
10             JUDGE RANDALL:  What is the basis
11   for Novelty's belief, if you know, that this
12   allegation is not true?
13             THE WITNESS:  It's going to be the
14   same things as with number six.  We checked
15   the last time we shipped.  This item number in
16   17 -- I'm sorry, this item number in paragraph
17   seven --
18             JUDGE RANDALL:  Yes.
19             THE WITNESS:  Is our item number
20   17550.  We went back and we checked last
21   shipments for that -- last shipments for this
22   product were I think 14 months prior.  We
23   checked inventory and we also checked at the
24   retail if they showed any sales of this item
25   in their store from February 1, '07 on and all
```

Page 2399

```
1    of those things show that the product wasn't
2    shipped to our routes any time 13 months prior
3    to this.  It was not on hand.  It was not an
4    active item and that our retail customers
5    don't show that they have any retail scans of
6    this.
7              It was the same two customers
8    involved in six and seven,
     ████
     ███████████████████████████████████████████
     ███████████████████████████████████████████
     ██████         They have scanners much
13   like a Kroger or a Winn-Dixie or whomever.
14             JUDGE RANDALL:  Am I understanding
15   correctly, however, that it's still your
16   testimony that the documents given to DEA in
17   July of '07 did reflect that the tableted
18   listed chemical products were actually sent to
19   retail outlets located in Kentucky and North
20   Carolina?
21             THE WITNESS:  Yes.
22             JUDGE RANDALL:  Okay, thanks.
23             [Pause.]
24             JUDGE RANDALL:  Mr. Merlau, am I
25   correct that you began working for Novelty in
```

Page 2400

```
1    2004?
2              THE WITNESS:  I started there I
3    think it was March 4th of 2004.
4              [Pause.]
5              JUDGE RANDALL:  Going back to ALJ
6    Exhibit 1, paragraph 7, what is the product
7    code number that you believe was actually
8    shipped to Kentucky and North Carolina?
9              THE WITNESS:  I haven't researched
10   that to get that answer.  I can't tell you
11   what number I believe it is.
12             JUDGE RANDALL:  All right.
13             THE WITNESS:  In about a week, I
14   could figure out what it is, but --
15             JUDGE RANDALL:  That's fine.
16             THE WITNESS:  -- I didn't check
17   that.  I'm sorry.
18             JUDGE RANDALL:  That's fine.
19   Thank you.
20             Now I want to direct your
21   attention to Government Exhibit 48.
22             THE WITNESS:  Okay.
23             JUDGE RANDALL:  Did you have any
24   personal involvement in the actions that led
25   up to the preparation of this letter?
```

## Page 2401

1  Do you understand my question?
2  THE WITNESS:  I don't exactly.  I
3  think I know what you're asking, but it's not
4  --
5  JUDGE RANDALL:  Were you involved
6  in the decision making process to implement
7  the procedure that is represented in
8  Government Exhibit 48?  That's too
9  complicated.  Let me start over.
10  THE WITNESS:  Okay.
11  JUDGE RANDALL:  What activities
12  did you engage in leading up to the issuance
13  of Government Exhibit 48?
14  THE WITNESS:  That's a good one.
15  JUDGE RANDALL:  Okay, thank you.
16  THE WITNESS:  Yes.  Novelty, when
17  the ISO was issued, Novelty explored a lot of
18  different options, one of which includes a
19  potential role as a sales agent, exploring the
20  legality of it to make sure that it is
21  something that we can do and looking at
22  different options for that.
23  This letter really isn't
24  procedure.  When business is kind of up in the
25  air and in turmoil, one of the things that you

## Page 2402

1  want to try and do so your customers just
2  don't start jumping ship on you is somewhat
3  sell that hey, look, we're trying to figure
4  something out.  We've got some ideas, but to
5  an extent this is hope.  There is something
6  that we're working on.  Here are some ways
7  that it can be done.
8  This isn't an outline of something
9  that's going to go into place.  Rather, this
10  is talking about what we kind of discussed
11  that we're trying to figure out how to do this
12  and how it can work.  But I mean, this is
13  specifically sales agent role.
14  Mr. Barber asked if I was involved
15  in discussions with ▇▇▇  You know, I was.  I
16  mean, we were contemplating, you know, if our
17  sales person is in the store, can he take the
18  order, send it through us to them, that they
19  fulfill.
20  My definition of sales, we're not
21  involved in the distribution of the product.
22  But our sales people are that store
23  functioning as an agent.  That's what's the
24  background to this.
25  JUDGE RANDALL:  In that role as

## Page 2403

1  sale agent, then would ▇▇▇ ship the product to
2  whom?
3  THE WITNESS:  In what we were
4  talking about, ▇▇▇ would have shipped the
5  product to our customer.  Invoiced us for that
6  product, right, so that we could provide as a
7  sales agent role, collective invoicing to our
8  customer through the same ▇▇▇ right, that
9  they're used to working with.
10  The end result is, and I'm not
11  sure if it was because of pressure from
12  outside or what, but ▇▇▇ refused to do this.
13  JUDGE RANDALL:  So this sales
14  agent activity was never implemented?
15  THE WITNESS:  It was never
16  implemented.  Something that we're still
17  continuing to explore.  I don't want to, but
18  are doing it now?  No.  Do I have any plans
19  starting it tomorrow?  No.
20  (Pause.)
21  JUDGE RANDALL:  Thank you.  That
22  concludes my questions.
23  In light of my questions, Mr.
24  Emord, anything further?
25  MR. EMORD:  No, Your Honor.

## Page 2404

1  JUDGE RANDALL:  Mr. Barber,
2  anything further?
3  MR. BARBER:  Briefly, Your Honor.
4  JUDGE RANDALL:  You may continue.
5  BY MR. BARBER:
6  Q  Mr. Marlau, in response to the
7  Judge, you talked about your shipping records
8  with regard to product 17902 and 17550.  Would
9  you clarify, are the shipping records that you
10  talked about and in particular, Novelty
11  Exhibit 40, the records of shipments to your
12  route salespersons?
13  A  These are records in Exhibit 40 is
14  shipments to route sales.  I spoke with the
15  Judge about the allegations in paragraph 6 and
16  7, ALJ Exhibit 1, and the ISO, which is based
17  upon sales, not shipments.
18  Q  Do I understand correctly that
19  part of your defense is that your shipment
20  records show shipments that are 13 or 14
21  months prior to the alleged dates and that's
22  the last time you shipped those particular
23  products referenced in paragraph 6 and 7 of
24  ALJ Exhibit 1?
25  A  That's one piece of why I say that



Page 2405

```
1    6 and 7 are wrong, correct.
2         Q     Now the other piece is, or at
3    least one of the other pieces you testified
4    about is information you received from
5    particular convenience stores, right?
6         A     From the five, eight specific
7    stores which happen to be part of two chains,
8    yes.
9         Q     Now if the convenience store
10   personnel made the same error that your
11   personnel did with regard to inputting the
12   wrong codes, can you be certain that these
13   products were not actually sold by the
14   convenience store?
15             MR. EMORD:  Objection, lack of
16   foundation.  Calls for speculation.
17             JUDGE RANDALL:  Sustained.
18             BY MR. BARBER:
19        Q     Mr. Merlau,
20
21
22   stores, correct?
23        A     No.
24        Q
25        A
```

Page 2406

```
1
2         Q     Are you familiar with the
3    convenience store scanning methods by your
4    customers?
5             MR. EMORD:  Objection, beyond the
6    scope of Your Honor's examination.
7             JUDGE RANDALL:  Overruled.
8             THE WITNESS:  In overview, yes.  I
9    work with Price Book.  Price Book is where I
10   send the information.  They load it into their
11   computers so that when they scan an item it
12   comes up.
13             BY MR. BARBER:
14        Q     And if an item doesn't scan, can
15   they manually enter it?
16        A
17   cannot.  They have to somehow get it set up in
18   their Price Book and that's where we get calls
19   and they've got a method that they contact us.
20   We send them information.  They load it into
21   their system and it's live.  Everything is
22   validated that they actually put it into
23   their, when they put products in, they're all
24   working electronically.  This isn't like the
25   bodega, the guy is sitting there punching in
```

Page 2407

```
1    the number on his cash register.
2         Q     Are you familiar with the practice
3    in the retail industry of having books of bar
4    codes in the event that a particular products
5    bar code doesn't scan having that available at
6    the register?
7         A     I've seen that, mostly on food
8    products where sometimes you have the --
9    there's not enough contrast with the UPC code.
10             MR. BARBER:  No further questions.
11             JUDGE RANDALL:  Mr. Emord?
12             MR. EMORD:  No further questions,
13   Your Honor.
14             JUDGE RANDALL:  Very well, is my
15   understanding correct that Mr. Merlau is going
16   to remain for the remainder of the hearing?
17             MR. EMORD:  Yes, Your Honor.
18             JUDGE RANDALL:  All right.  Thank
19   you, Mr. Merlau.  You may step down.
20             THE WITNESS:  Thank you.
21             (The witness was excused.)
22             MR. EMORD:  Your Honor, Mr.
23   Arhangelsky will be asking questions of the
24   next witness.
25             JUDGE RANDALL:  All right, very
```

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,               Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the      PUBLIC VERSION
Drug Enforcement Administration; et al.

        Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 2 TO EXHIBIT 3 (REDACTED)

*********** -COMM. JOURNAL- *********** DATE FEB-06-2008 ***** TIME 16:36 *** P.01

MODE = MEMORY TRANSMISSION          START=FEB-06 16:35    END=FEB-06 16:36

FILE NO.= 008

STN NO.   COM   ABBR NO.   STATION NAME/TEL.NO.    PAGES   DURATION

221   OK   8                                       001/001 00:00'30'

                                                   -NOVELTY           --

************************************ -        - ***** -    4623749- **********

February 5, 2008

Todd Green
President
Novelty, Inc.
351 West Muskegon
Greenfield, Indiana 46140

Re:                                           entered into by and between
                and Novelty, Inc. ("Novelty") --

Dear Todd:

This will confirm receipt of your letter, dated January 29, 2008, in connection with the referenced matter.

As you know, products that contain Ephedrine and Pseudoephedrine are a
                          and gross profit and of the products sold and to
under the terms of the referenced agreement (the "Agreement")
customers to wait for a period of any duration or until Novelty's current legal issues with the DEA are
resolved if, in fact, they are ever resolved.

Based upon the referenced notification,          has made the decision to pursue a General
Merchandise vendor that can supply it with all of the products that it is legally allowed to sell and that its
customers have come to expect in its stores, including those products that are the subject of the Agreement.

Novelty's failure to sell ephedrine products                    or



Exhibit 3
Attachment 2

DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                  Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the        PUBLIC VERSION

Drug Enforcement Administration; et al.

                Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 3 TO EXHIBIT 3 (REDACTED)

February 11, 2008

Mr. Doug Hayes
Novelty Inc
351 W. Muskegon Dr
Greenfield, IN 46140

Dear Doug,

As a follow-up to our phone conversation this afternoon,

This decision was a very difficult one considering our companies long history and the respect that I have personally for you and your organization

Today, it is clearly much more difficult to not only generate year over year sales growth, it is extremely difficult to generate year over year profit improvement with the high volume competitors we currently face. Therefore, we must constantly look for ways to improve our business and category management is one of them

I don't need times just store #, day of pick-up and in what order the stores will be visited   Please, no pick-ups can occur after 3PM.

Doug, it has been a pleasure working with you and I wish you and Novelty Inc. only the best in the future. If you should have further questions, please give me a call.

**DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

                    **Plaintiff,**

**v.**

**Michele Leonhart,**                    **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**          **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

                    **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 4 TO EXHIBIT 3 (OMITTED)**

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Attachment 4 to Exhibit 3 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction includes 18 pages of color copies of Novelty, Inc.'s product labels. The entire document contains proprietary business information to be protected in accordance with the Protective Order Granted by Judge Rosemary M. Collyer, April 18, 2008. When redacted, this document comprises 18 entirely redacted pages. Therefore, it has been omitted.

18 pages omitted

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

           **Plaintiff,**

**v.**

**Michele Leonhart,**                  **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**       **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

           **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## ATTACHMENT 5 TO EXHIBIT 3 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                    Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the        PUBLIC VERSION
Drug Enforcement Administration; et al.


                Defendants.

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### ATTACHMENT 5 TO EXHIBIT 3 (OMITTED)
SLC Training Slideshow

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

        Attachment 5 to Exhibit 3 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a printout of a slideshow used for training purposes.  The entire document contains proprietary business information to be protected in accordance with the Protective Order Granted by Judge Rosemary M. Collyer, April 18, 2008.  When redacted, this document comprises 7 entirely redacted pages.  Therefore the document has been omitted.


                7 pages omitted

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

               **Plaintiff,**

**v.**

**Michele Leonhart,**                      **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**              **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

               **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## ATTACHMENT 1 TO EXHIBIT 4 (REDACTED)

---

Page 1259

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

pfffffffffffffffffffffffff*
                              *
                              *
IN THE MATTER OF:             *
                              *   Docket No. 08-33
NOVELTY DISTRIBUTORS          *
                              *
                              *
pffffffffffffffffffffffff4


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive
Arlington, VA 22202


Friday, March 28, 2008


            The above entitled matter came on
for hearing, pursuant to notice at 9:00 a.m.


BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

---

Page 1261

TABLE OF CONTENTS

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mark Bledsoe | 1272 | 1323 | 1401 | 1414 |
| Voir Dire on page 1355 | | | | |
| Lisa Barnhill | 1441 | 1489 | | |
| Ryan Polk | 1508 | 1521 | | |

| EXHIBIT | | MARK | RECD |
|---|---|---|---|
| Respondent | | | |
| 16 | | | 1358 |
| 34 | | | 1391 |
| 42 | Show Cause | | 1325 |
| 44 | | | 1365 |
| 48 | DVD | | 1387 |
| 57-A | | 1352 | 1352 |
| 16, 38, 54, 14 | | | |
| 47, 17 | | | 1388 |
| 34 | | | 1391 |
| Government | | | |
| 26 | | 1462 | 1463 |
| 27 | | 1466 | 1466 |
| 28 | | 1467 | 1468 |
| 29 | | 1469 | 1471 |
| 37 | | 1445 | 1446 |
| 38 | | 1459 | 1460 |
| 41 | | 1480 | 1482 |
| 44 | | 1474 | 1474 |
| 45 | | 1476 | 1477 |
| 49 | | 1481 | 1485 |
| 65 | | 1451 | 1455 |
| 66 | | 1445 | 1446 |
| 71, 71A, 81, 81A, | | | |
| 82, 82A | | 1485 | 1480 |
| 83 | | 1480 | 1482 |

---

Page 546

```
 1        A    There's really three of us that
 2   work each within our respective roles, myself,
 3   Ryan Polk, our CFO who will work on our record
 4   keeping, as well as inventory aspects, and
 5   Mark Bledsoe is going to work on the product
 6   side, documentation, training, things of that
 7   nature.  Todd mentioned that he delegates many
 8   of his things.  I think the word was
 9   "command", and we're those guys that get that
10   command.
11        Q    All right.  With regard to
12   registration issues, who's responsible within
13   Novelty for registration?
14        A    Ryan Polk actually completes the
15   registrations every year.
16        Q    Based on your position as the
17   Compliance Officer, what is your -- how many
18   DEA registrations does Novelty need to
19   maintain in order to comply with the
20   regulations?
21        A    One within the warehouse where we
22   store product.
23        Q    And I'll try not to belabor any
24   points that Mr. Green testified to, but he
25   indicated he wasn't sure.  Do you know for
```

---

Page 1329

```
 1        Q    Now, when you first examined the
 2   document and became aware of Paragraph 5, did
 3   you undertake any effort to determine the
 4   validity of Paragraph 5?
 5        A    Yes.
 6        Q    And what did you do?
 7        A    We determined which 35 retail
 8   locations that were in question, and that
 9   became available to us approximately a week
10   ago, at which point in time that we became
11   aware of which 35 retail locations were in
12   questions, we then began doing some internal
13   review of paperwork, and discovered that, in
14   fact, we have self-certification certificates
15   for each and every one of the 35 locations in
16   question.
17        Q    Now, if you could elevate your
18   voice and move the microphone closer.
19        A    I'm sorry.
20        Q    Actually, move the microphone very
21   close to your lips, and it will help
22   audibility.
23        A    Okay.
24        Q    Okay.  Excellent.  Now, the 35
25   self-certifications, did you actually obtain
```

Page 1330

```
 1    the actual self-certifications?
 2         A    If my memory is correct, we
 3    obtained 34 of the 35, and J.R. Merlau was
 4    working on the last of the 35.  And I think we
 5    obtained the last one, but I wouldn't --
 6    couldn't say for certain that we did.
 7         Q    Before a retail outlet is supplied
 8    with any schedule listed chemical by Novelty,
 9    what process does Novelty undertake, if any,
10    to ascertain whether the store is self-
11    certified?
12         A    Well, in most situations, I am
13    heavily involved and helping that retail chain
14    become self-certified.  Our retailers, by and
15    large, are not familiar with the CMEA, and the
16    details involved with that, so what we do is
17    attempt to take them by the hand and lead them
18    through the process to insure that they dot
19    all the Is, and cross all the Ts.
```



Page 1331

```
 1
 2                   We provide that in a written form.
 3
 4
 5
 6
 7
 8
 9         Q    All right.  And is it the case
10    that in no instance has Novelty, since the
11    enactment of the CMEA, allowed any of its
12    products to be distributed to a retail store
13    that has not confirmed that it is self-
14    certified?
15         A    That is correct.
16         Q    And you know that because it is a
17    part of your normal way of doing business to
18    insure that the confirmation of self-
19    certification exists before a retail store is
20    served by Novelty?
21         A    That is correct.
22         Q    Now, we've exchanged with counsel,
23    marked for identification as Novelty Exhibit
24    57A, a document that I don't believe the
25    witness has in front of him.
```

Page 1332

```
 1              MR. EMORD:  May I approach, Your
 2    Honor?
 3              JUDGE RANDALL:  You may approach.
 4              MR. EMORD:  Thank you.  I've
 5    handed the witness a copy of a set of
 6    documents that have been marked and exchanged
 7    as Novelty Exhibit 57, and the witness already
 8    has before him a document that has been marked
 9    Novelty Exhibit 57.
10              BY MR. EMORD:
11         Q    Now, sir, if you would take a look
12    at Novelty Exhibit 57, and what has been
13    marked Novelty Exhibit 57A, and explain to me
14    what these documents are, I would appreciate
15    it.
16         A    Let me do the easy one first.  It
17    looks like 57A is copies of self-certification
18    certificates, and without having checked the
19    individual store numbers, I'm assuming that
20    these are the 35 self-certification
21    certificates that are in question.
22         Q    Sir, if you will look in 57, you
23    will note in the back of 57, there are
24    additional self-certification certificates.
25    Do you see that?
```

Page 1333

```
 1         A    Yes.
 2         Q    And is it the case that those
 3    self-certification certificates, when combined
 4    with ----- well, excuse me.  Those self-
 5    certification certificates that are contained
 6    in Novelty Exhibit 57, when combined with the
 7    self-certification certificates that are
 8    contained in Novelty 57A, constitute all self-
 9    certification certificates for the 35 retail
10    outlets?
11         A    I believe that to be true, yes.
12         Q    And could you please describe for
13    me the remaining documentation that is not the
14    self-certification documents, but the
15    remaining documents that are contained within
16    57, and their import?
17         A    Yes.  There's a letter to Angie
18    Gray with the DEA, and this is a required
19    letter that retailers are asked to send to Ms.
20    Gray when they are self-certifying their
21    retail locations.  When they are self-
22    certifying in excess of 10 retail locations,
23    they have the option of either self-certifying
24    each individual location on-line, or they can,
25    through documentation of an Excel spreadsheet
```

Page 1334

1  then loaded to a disk sand multiple locations
2  to the DEA at one time, along with a cover
3  letter, such as this, informing the DEA that
4  all the information described within is
5  complete and accurate, and affirming that all
6  their store employees have been trained to
7  meet the DEA qualifications for training on
8  selling of SLC products.
9      Q    And is it your testimony that you
10 guide the retail outlets in putting together
11 the information necessary to satisfy the
12 requirements and complying with those
13 requirements for self-certification?
14     A    Yes.
15     Q    And, sir, if you could then tell
16 us what the 57, pages 2-13 are?
17     A    This specifically is the self-
18 certification for Speedway Stores, a chain of
19 convenience stores located in the Midwest that
20 we sold schedule listed chemicals to, in the
21 States of Indiana, Kentucky, and Minnesota.
22 They operate in several states beyond that,
23 but at this particular time, they were simply
24 self-certifying for those states only.  And I
25 was involved in intimate detail with them in

Page 1335

1  bringing them through the process up to, and
2  including, checking all of this prior to the
3  sending of it to the DEA to insure that all
4  the information was true and accurate, as
5  communicated back and forth between myself,
6  the buyer, Jason Harris.
7      Q    Now, Mr. Bledsoe, what is your
8  understanding of the way in which DEA handles
9  the self-certifications when it receives them?
10     A    If --
11          MR. BARBER:  Objection; calls for
12 speculation.  There's no foundation that he
13 knows how DEA handles things.
14          JUDGE RANDALL:  Overruled.  The
15 question was, what is his understanding.  He
16 knows his understanding.  I'll allow it.
17          BY MR. EMORD:
18     Q    You may answer the question, Mr.
19 Bledsoe.
20     A    Assuming that it's a retailer with
21 in excess of 10 locations, and it's a retailer
22 that is submitting that information to the DEA
23 on a CD, upon receipt of that information at
24 the DEA's headquarters, the retailer is
25 considered to be "self-certified" at that

Page 1336

1  point in time.  The DEA does not require that
2  the retailer receive actual hard copies of the
3  self-certification certificate before the
4  retailer is permitted to sell schedule listed
5  chemical products.
6      Q    Now, does the DEA publish anywhere
7  a master list, to your knowledge, of all of
8  the retail establishments that are self-
9  certified for the public?  Let me rephrase the
10 question.
11          Do you know of any public listing
12 or posting of the retail establishments that
13 DEA considers to be self-certified?
14     A    They do not list that information
15 for public knowledge.  However, I was at a
16 chemical conference in Louisville, Kentucky
17 back several years ago when they shared, in
18 general, that information.  For example, at
19 that point in time they showed that just over
20 50 percent of the pharmacies in the United
21 States had been self-certified.
22     Q    But with regard to the convenience
23 stores here in question, the 35 retail
24 outlets, are you aware of any DEA public
25 listing via the web, or otherwise, of whether

Page 1337

1  the DEA had determined them to be self-
2  certified?
3      A    No.  There is -- that information
4  is not available to the public, to registrants
5  deliberately.  That is not information they
6  share.
7      Q    So in order to determine whether a
8  retail outlet is self-certified, Novelty seeks
9  confirmation from that retail outlet, rather
10 than from the DEA?
11     A    Correct.
12     Q    And having performed your
13 assessment, having read the content of
14 Paragraph 5 on page 2 of ALJ Exhibit 1, and
15 having performed your own internal
16 investigation to determine its validity, what
17 did you conclude, sir?
18          MR. BARBER:  Objection, Your
19 Honor; calls for the ultimate conclusion
20 before this Court as to the validity of the
21 allegation.
22          JUDGE RANDALL:  Overruled.  He
23 asked if this witness concluded.  I will allow
24 the witness to answer the question.
25          THE WITNESS:  It's my conclusion

TESTIMONY OF BLEDSOE                    MARCH 28, 2008

Page 1338

```
1     that that is a false statement; that, in fact,
2     we do have self-certification certificates on
3     file for these 35 locations.  And that no, we
4     did not sell to 284 -- on 284 occasions to 35
5     separate locations.
6              BY MR. EMORD:
7         Q    Now, you'll notice in particular,
8     sir, the time frame specified in Paragraph 5.
9     It says from January 1, 2007 through July 9,
10    2007.  Do you see that?
11        A    Yes.
12        Q    And did you confirm that Novelty
13    did not distribute schedule listed chemical
14    products on at least 284 occasions to 35
15    retail outlets that were not self-certified
16    during that period of time?
17        A    That's where you get into a bit of
18    a sticky wicket, as I indicated prior to.  The
19    DEA considers a retail location to be self-
20    certified at the point in time that the
21    information is received the DEA.  Since the
22    CMEA has gone into effect, there have been
23    many times when the DEA has been backlogged,
24    or for whatever reason, slow in issuing self-
25    certification certificates.  Sometimes they
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 13 of 41

TESTIMONY OF BLEDSOE                    MARCH 28, 2008

Page 1339

```
1     have been backlogged or in delay as much as
2     six months, so it becomes somewhat problematic
3     to determine exactly the time frame.  But we
4     do ask from the retailer prior to distributing
5     product have they sent that information to the
6     DEA, and we receive a positive response from
7     that retailer prior to selling that product.
8         Q    And, as you've testified, you
9     assist the retail outlet in fulfilling that
10    obligation.  Is that correct?
11        A    That is correct.
12        Q    And in the case of these 35
13    outlets, did you assist in the fulfillment of
14    that obligation?
15        A    In respect to Speedway, I assisted
16    in great detail.  The remaining, quite
17    honestly, when we broke up this task at the
18    office, I took care of Speedway and J.R. took
19    care of the rest of them, so I honestly don't
20    recall even who they were.
21        Q    But at the time these accounts
22    came on to Novelty, or were about to come on,
23    I should say.  Let me rephrase the question.
24    At the time you were contemplating taking on
25    these accounts, that task were performed; that
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 14 of 41

TESTIMONY OF BLEDSOE                    MARCH 28, 2008

Page 1341

```
1     time to Paragraph 6 on page 2.  And when
2     you've had an opportunity to read Paragraph 6,
3     please inform me, and then I'll begin asking
4     questions.
5         A    Yes.
6         Q    Now, in Paragraph 6 the charge
7     reads, "Novelty distributed 24-count bottles
8     of schedule listed chemical products on three
9     occasions to retail outlets after February 1,
10    2007."  Do you see that?
11        A    Yes.
12        Q    Now, when you first read that
13    sentence, did you then undertake to determine
14    its validity?
15        A    Yes.
16        Q    And what did you do?
17        A    By the point in time that I became
18    involved with it, J.R. had been involved with
19    it, to some extent, before that, but at the
20    point in time that I became involved with it,
21    it was already known that the item numbers in
22    question were 17902, if my memory is correct,
23    and that is a bottle of ephedrins, as opposed
24    to 17904, again, if my memory is correct,
25    which was a 24-count package.  And after
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 15 of 41

TESTIMONY OF BLEDSOE                    MARCH 28, 2008

Page 1342



```
1     research and seeing exactly what our sales
2     records showed,
10    And it was quite obvious to us in looking at
11    it, that it was simply a sales person who had
12    keyed the wrong item number.
13        Q    Now, did you do anything to
14    determine -- well, did you take any further
15    step to determine whether, indeed, your
16    assumption that it was an error, whether,
17    indeed, that assumption was borne out by the
18    facts?
19        A    Yes.
20        Q    What did you do?
21        A    When then look to see exactly when
22    we last shipped the item number that was
23    recorded to have been sold, and we discovered
24    that we had not shipped that item number to
25    any sales person for them to have any
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 16 of 41

Page 1343

```
1    opportunity to have sold that item in excess
2    of a year prior to this.
3         Q    And did you contact the stores in
4    question to determine whether or not they had
5    any sales data concerning the alleged sale of
6    the 24-count bottles?
7         A    I personally did not, but I am
8    aware that J.R. Marlau did, and I'm aware that
9    he reported to me that, in fact, they had no
10   such sales record of such a purchase of
11   product.
12        Q    And from all of that information,
13   what is your understanding of the validity of
14   the charge contained in Paragraph 6?
15        MR. BARBER:  I'm going to object,
16   Your Honor, and I appreciate the Court's
17   indulgence, since you've overruled this
18   objection once.  This is opinion testimony,
19   which is covered under 1316.59 of Title 21
20   Code of Federal Regulations, and this witness
21   is not properly qualified to give an opinion.
22   And it also goes to the ultimate issue of
23   fact.
24        JUDGE RANDALL:  Thank you, Mr.
25   Barber.  I'm going to overrule the objection.
```

Page 1344

```
1    I find that this witness' understanding is
2    relevant to the issue of what the company
3    understood, the information they had before it
4    meant.  I'm not offering it for the purpose of
5    saying that this is evidence of an
6    interpretation or an opinion being offered to
7    assist the Trier of Fact, or any reviewer of
8    this testimony.  I'm only accepting it for the
9    limited purpose of understanding what the
10   company understood the facts to mean to them.
11        MR. EMORD:  Thank you, Your Honor.
12        BY MR. EMORD:
13        Q    You may answer the question.
14        A    I'm sorry.  Could you repeat it?
15        Q    All right.  Paragraph 6, sir.  In
16   Paragraph 6, after you had conducted your
17   internal investigation concerning Paragraph 6,
18   what was your understanding of the validity of
19   the charge contained in Paragraph 6?
20        A    My understanding is that the
21   charge was inaccurate, and that, in fact, it
22   was nothing more than a sales person who keyed
23   the wrong item number.  And there was no
24   validity to the charge in item 6.
25        Q    Sir, I draw your attention to ALJ
```

Page 1345

```
1    Exhibit 1 and 2, page 3, Paragraph 7.  Please
2    read Paragraph 7.  And when you've completed
3    it, please let me know.
4         A    May I expand upon my last answer?
5         Q    Yes, please do.
6         A    I guess to show further the intent
7    that Novelty had in regard to insuring that we
8    did not sell bottles or packets of products
9    after the --
10        MR. BARBER:  I'm going to object,
11   Your Honor.  One of the natures of question
12   and answer format is that counsel gets to know
13   what the general subject matter is before, and
14   this open-ended expansion puts the Government
15   at a disadvantage to knowing what the witness
16   plans to testify to.  There's no question
17   before him.
18        JUDGE RANDALL:  I'll sustain that
19   objection.
20        MR. EMORD:  Yes, Your Honor.
21        BY MR. EMORD:
22        Q    Sir, with regard to Paragraph 6,
23   if you have not completed your response with
24   respect to your intentions, could you please
25   do so now?
```

Page 1346

```
1         MR. BARBER:  Objection, Your
2    Honor; intentions as to what?  It's too vague
3    for Government to know what's being asked.
4         MR. EMORD:  Very well.  I'll
5    rephrase the question, Your Honor.
6         JUDGE RANDALL:  Thank you.  I'll
7    sustain the objection.
8         BY MR. EMORD:
9         Q    With regard to Paragraph 6, could
10   you please restate your intentions with
11   respect to your understanding of its import
12   and meaning to you, and to the company?
13        A    Yes.  To further show that it was
14   never Novelty's intent to sell bottles or
15   packets of SLC products beyond - and I
16   apologize for the date here, but I think it
17   was April the 6th of 2006, when the CMEA in
18   that point in time made it illegal to sell
19   that product in those two package forms.
20   Novelty spent a great deal of money in
21   returning literally thousands, and thousands,
22   and thousands of bottles and packets off the
23   market, returning those to our warehouse.  So
24   the simple review of seeing the quantity of
25   products that we removed off the market
```

Page 1347

1  certainly shows that it was never our intent
2  to sell bottles and packets beyond April the
3  6th of 2006, or exactly whatever date it was
4  that the CMEA went into effect pertaining to
5  packaging requirements for SLC products.
6      Q     Thank you.  Now, concerning
7  Paragraph 7, I have asked you to take a moment
8  and review Paragraph 7.  Have you had a chance
9  to review the content of that paragraph?
10     A     Yes.
11     Q     And you'll notice that in
12 Paragraph 7, the charge is made that "Novelty
13 distributed tablet form schedule listed
14 chemical products to retail outlets located in
15 two states, Kentucky and North Carolina, that
16 prohibitive sale of non-liquid ephedrine and
17 pseudoephedrine, except in a gel cap product."
18 Do you see that charge?
19     A     Yes.
20     Q     Now, upon first reading that
21 charge, did you undertake to determine its
22 validity?
23     A     Yes.
24     Q     And what did you do?
25     A     We ran sales reports showing all

Page 1348

1  item numbers that were tablet forms sold into
2  retail outlets located in those two states
3  during that time frame.  And from that,
4  discovered that there were a number of
5  situations that our sales records indicated a
6  transaction occurred of an item number that
7  was not a gel cap sold into both -- either
8  North Carolina and Kentucky.  That item number
9  was ████████████ and it showed on three
10 separate occasions where that item had been
11 sold into, I don't recall if the store was
12 North Carolina or Kentucky, but that we had
13 sold on three separate occasions item number
14 17550 during the year 2007.
15     Q     And from your inquiry into this
16 matter, did you determine whether, indeed, any
17 non-liquid ephedrine, pseudoephedrine, except
18 in a gel cap product, was sold within the
19 States of Kentucky and North Carolina?
20     A     Yes.  When I discovered that the
21 item number was ████████ I realized
22 that that was an item number that we had not
23 sold in an extended period of time, and it was
24 an item number that we had discontinued.  So,
25 at that point in time, I went back again, and

Page 1349

1  determined when the last time we shipped to
2  any route ████████████ to where it could
3  possibly have been sold anywhere.  And, again,
4  I discovered that we had not shipped item
5  number ████ to any route for more than a year
6  prior to the time which these three instances
7  showed in our sales record, where those items
8  had been sold to a store in either North
9  Carolina or Kentucky.  Again, leading to the
10 exact same conclusion, that, unfortunately, we
11 had a sales person who entered the wrong item
12 number when making that sale.
13     Q     And, so, it is -- are you saying
14 today with certainty that Novelty did not
15 distribute tablet form schedule listed
16 products to retail outlets located in Kentucky
17 and North Carolina that prohibit the sale of
18 non-liquid ephedrine and pseudoephedrine,
19 except in a gel cap product?
20     A     Yes, based upon the fact that we
21 had not shipped that to the sales person, to
22 where the sales person could possibly have
23 sold in greater than a year, beyond the
24 fact that we went to the retailers asking
25 them if they had sold that item during that

Page 1350

1  time frame, since they do scan product, and
2  their response back to us was no, that they
3  had not sold that item.  Yes, I am telling you
4  that those items were not sold into those
5  three locations.
6      I should expand and say that in
7  addition to those three locations where we
8  showed positive sales going into those
9  locations, there was also approximately four
10 locations where we showed credits coming out
11 of that item number.  I can only speculate as
12 to why we had credits on those item numbers.
13 My speculation is that --
14     MR. BARBER:  Objection, Your
15 Honor.  The witness has now said he's getting
16 ready to speculate.
17     JUDGE RANDALL:  I'll sustain.  You
18 may ask the question, Mr. Emord.
19     MR. EMORD:  Thank you, Your Honor.
20     BY MR. EMORD:
21     Q     Let me draw your attention then to
22 documents that you previously discussed, 57
23 and 57A, the self-certification documentation,
24 and the sheets with which stores are
25 identified who are self-certified.  And let me

Page 1351

1  ask you, sir, with 57 and 57A, does this
2  constitute, in your judgment, the complete
3  foundation of your testimony concerning self-
4  certification, in addition to your testimony,
5  the complete documentary foundation for your
6  testimony here today, or is there another
7  document?
8       A    For self-certification purposes?
9       Q    Yes, sir.
10      A    Yes, there's -- I mentioned
11  things, such as training videos that we've
12  done.  I mentioned things, such as the
13  training manuals that we've put together, log
14  books, all those types of things, I assume is
15  what you're referring to.
16      Q    Yes.  And as far as the
17  certifications possessed that you have
18  obtained in response to your own internal
19  investigation, are those contained in 57A and
20  57?  And is it complete in that regard?
21      A    In so much as, in reference back
22  to Exhibit 1 and point number five, yes.
23           MR. EMORD:  Your Honor, I would
24  move for the admission of 57 and 57A at this
25  time.

Page 1377

1       Q    But, nonetheless, you then --
2  Novelty, as a company, then chose to go to
3  court, obviously.
4       A    Yes, we chose to seek guidance
5  from the court to determine if our
6  understanding was correct, or whether this
7  field supervisor was correct.
8       Q    Now, to shift to the training that
9  is in this case, the training manual, you said
10  in your earlier testimony there's a manual
11  that was created by Novelty for the purpose of
12  training who?
13      A    For the purpose of training the
14  employees of a retail establishment selling
15  SLC products.
16      Q    And you said, also, that there was
17  a video that was created in addition for the
18  purpose of training of those same people.
19      A    Correct.
20      Q    And are those documents given to
21  every convenience store that Novelty serves?
22      A    That sells SLC products?  Yes.
23      Q    And when was the video created?
24      A    We have created approximately 10
25  different videos.  The original video was

Page 1378

1  created in approximately September or October
2  of '06, just as the CMEA was being enacted,
3  and that was a video that was designed to
4  encompass all the states, and all the
5  customers that we had, regardless of what
6  state they were operating in, that would
7  pertain to them.  And it's really getting into
8  a lot of detail when I make that statement.
9           For example, the State of Indiana
10  allows 25 milligram ephedrine in tablet form
11  to be sold.  Kentucky allows ephedrine to be
12  sold in 25 milligram in a gel capsule form.
13  Texas allows 12-1/2 milligrams, so when we did
14  this initially we made one, and then at the
15  end of it, had specific breakouts for each
16  state.  We didn't elaborate as we were going
17  through it.
18           Through later videos that we made,
19  we began telling not the broad specific, but
20  the specific statement to that particular
21  state that, for example, in Kentucky you can
22  only sell ephedrine in the gel capsule form.
23           Also, I should state that when we
24  say that we developed these and so forth, that
25  may be somewhat misleading in so much as the

Page 1379

1  DEA provided the guidelines on this
2  information, this training, and we were --
3   after discussing it with the DEA, we realized
4  that we had to leave that information in tact
5  exactly as they had prepared it.  We could add
6  to their information, but we could not
7  subtract from, so what Novelty did was
8  provided their information, added to it for
9  clarifications to the retailers.
10      Q    Now, you were supplying, as you
11  testified, the manuals to each of the
12  convenience stores.  Why did you feel it
13  necessary to also give them the video
14  presentations?
15      A    Convenience.  It is oftentimes
16  easier to have a group come in, if a
17  particular chain is training 15 people at a
18  given time, to have all 15 people watch this
19  training video, and then answer questions.  We
20  just felt as though it was a more convenient,
21  and a more -- a faster way of obtaining a good
22  training class.
23      Q    Now, if you look at Novelty
24  Exhibit 48, which is in there.  It is a little
25  DVD.  Could you please identify those

Page 1380

1    documents for me?
2        A      Yes.  These are the various DVDs
3    that we created to assist our retailers in the
4    training process.
5        Q      Is it a representative example of
6    the DVDs?
7        A      Yes.
8        Q      And is one of those DVDs for the
9    State of Indiana?
10       A      Yes.
11       Q      That's in the package.
12       A      Yes.
13              MR. EMORD:  All right.  Your
14   Honor, without objection, I would like to play
15   the DVD for the State of Indiana.  It is not
16   a long presentation, and it will be
17   descriptive, I think, of what he's talking
18   about.
19              MR. BARBER:  Prior to the play,
20   Your Honor, I would like to make an objection
21   as to the relevance.  Again, this -- none of
22   this goes to the issues before Your Honor.
23   The training program that Novelty has with its
24   retail customers is not an issue that, as Your
25   Honor has framed it in the pre-hearing order,

Page 1381

1    and so the Government objects to these
2    exhibits, to the showing of them, its
3    relevancy, and also to the marking of them as
4    confidential and protected, in as much as the
5    witness has said they give them to their
6    retail customers.
7              MR. EMORD:  As to the marking of
8    it, I would quite agree, that's an over-
9    zealous marking.
10             (Counsel confer.)
11             MR. EMORD:  Oh, it is confidential
12   and protected to this extent, Your Honor; that
13   the information, if duplicated from a public
14   record by competitors, would afford them an
15   enormous benefit without the cost of
16   production that went into these things.
17             As far as the objection is
18   concerned, I think it's always relevant in
19   these cases to examine the extent to which the
20   registrant is dutifully taking steps to
21   insure, as best it possibly can, compliance
22   with the law by its retail customers.  And
23   evidence to that effect should be accepted
24   into the record, because it shows that effort.
25             Furthermore, it has been the

Page 1382

1    general impression given from cross
2    examination that -- and even arising from the
3    Order to Show Cause, that this company is not
4    of that kind, that it is stigmatized by the
5    notion that it has violated the law in various
6    ways.  So for Your Honor's benefit to
7    ascertain the extent to which this company is
8    committed to compliance, the information
9    should --
10             JUDGE RANDALL:  Anything further,
11   Mr. Barber?
12             MR. BARBER:  Your Honor, it's no
13   more relevant than Novelty's security cage, or
14   any other matters that aren't raised in the
15   Order to Show Cause.  The DEA bears the burden
16   of proof in this, not the Respondent.  And the
17   specific allegations and the issue that is
18   framed by Your Honor are what guide these
19   proceedings, and we will be here until the
20   cows come home, so to speak, if Novelty puts
21   in every piece of evidence that goes to what
22   it has tried to do to help its customers
23   comply with the law, or its compliance with
24   the law in a number of areas.  The DEA is not
25   disputing those.  We bear the burden of proof,

Page 1383

1    not the Respondent.
2              MR. EMORD:  Well, I quite agree,
3    Your Honor, that we would be here until the
4    cows come home, and probably until they come
5    home several months from now if we were to put
6    in every stitch of evidence about this
7    company's efforts to be a good law-abiding
8    citizen under the law and the CMEA, but we are
9    not.  We are presenting select documents for
10   the purpose of showing the extraordinary
11   efforts to which it has gone to do its level
12   best to insure compliance with the law.  And
13   it will not take much time to consider these
14   things.  And we're moving along rather
15   quickly.  We have but five more exhibits.
16   We've been very conscientious in our
17   indulgence of Government Counsel and its
18   ability to present material in a timely
19   manner, and I think we ought to be given the
20   same courtesy.
21             JUDGE RANDALL:  All right.  Just a
22   moment.  I believe the unique nature of this
23   witness procedurally within this hearing has
24   caused a bit of difficulty.  Because this
25   witness is testifying just once as a witness

Page 1384

1  for both sides, the Respondent has been placed
2  in a position of guessing what exactly the
3  Government is going to totally elicit from
4  this witness.  That being said, I note that
5  the public interest standards that are going
6  to be used to determine whether or not the
7  continued registration of this company is in
8  the public interest, as documented in 21
9  United States Code, Section 823(h), do have an
10 element of compliance by the applicant with
11 applicable federal, state, and local law.
12              Therefore, I do find it relevant
13 that this witness, given the witness' posture
14 in this proceeding, is being asked these
15 questions, and that this information is being
16 offered for the purpose stated by the
17 Respondent, so I will allow that.  However, I
18 am also very sensitive, Mr. Barber, to your
19 concerns, and I do have a question before we
20 go having a moment of Show and Tell, and that
21 is, how long exactly is this DVD?
22              MR. EMORD:  Ten minutes, Your
23 Honor.
24              THE WITNESS:  Eight to ten?  I
25 believe it's 10 minutes.

Neal R. Gross and Co., Inc.
202-234-4433

Page 33 of 41

Page 1390



1             BY MR. EMORD:
2        Q    Could you please explain for us -
3  there's been much discussion about a
4
5
6
7
8        A    Yes.
9        Q    And does it supply it to the
10 convenience stores
11
12
13       Q
14
15       A    Yes.
16       Q
17
18
19       A    Yes.
20       Q    And you have before you Novelty
21 Exhibit 34.  Is this a, as best as can be done
22 with a photocopy, an accurate image of the
23
24
25       A    Yes.

Neal R. Gross and Co., Inc.
202-234-4433

Page 34 of 41

Page 1391



1        Q    And just to be clear,
2
3
4
5
6        Q    Thank you very much for that.  All
7  right.  Moving right along --
8             JUDGE RANDALL:  Excuse me.  Before
9  you move right along, is it your intent to
10 offer then Respondent's Exhibit 34?
11            MR. EMORD:  Oh, yes.  Did we
12 agree?
13            MR. BARBER:  Without objection.
14            MR. EMORD:  Oh, yes.  It was
15 without objection, Your Honor.  I'm sorry.
16            JUDGE RANDALL:  Very good.  I
17 accept into the record Respondent's Exhibit
18 34.
19            (Whereupon, Respondent's
20            Exhibit 34 was
21            admitted.)
22            BY MR. EMORD:
23       Q    Now, you testified during Mr.
24 Barber's examination that as to the price --
25 oh, no, you didn't.  All right.  I'm going to

Neal R. Gross and Co., Inc.
202-234-4433

Page 35 of 41

Page 1392

1  have to ask you this.
2             Novelty has set certain suggested
3  retail prices for its ephedrine-containing
4  products.  Is that correct?
5        A    Yes.
6        Q    Can you please describe for me in
7  detail the different Novelty products by
8  selling unit so that we have a clear
9  understanding of what the ephedrine products
10 are, what the pseudoephedrine products are,
11 the counts, and then their prices that you
12 suggest to retail customers?  If that is too
13 overwhelming a task, tell me.  I'm just trying
14 to clarify the record.
15       A    Let me start with the packet sizes
16 that we sell.
17
18
19
20                      , and for me to tell
21 you the other retails, I would need to look
22 for that information.  I do not recall that
23 off the top of my head.
24             As far as the ephedrine is
25 concerned, we sell ephedrine in a 6-count, a

Neal R. Gross and Co., Inc.
202-234-4433

Page 36 of 41

Page 1393

```
 1    12-count, and a 24-count package, or we did up
 2    until the suspension order, in those package
 3    sizes.
 4         Q      And can you tell me, is there any
 5    particular reason why the company chose to
 6    reduce the -- did the company at one time have
 7    a 24-count, but not a 2, 6, and 12-count of
 8    pseudoephedrine?
 9         A      No.
10         Q      The company has always had 2, 6,
11    and 12-counts, in addition to 24-count?
12         A      For pseudoephedrine?
13         Q      Yes.
14         A      Prior to the CMEA, we carried
15    pseudoephedrine in a single ingredient only in
16    a 6-count packet, and that was the only
17    package size we sold in pseudoephedrine, and
18    it was single ingredient.  After the CMEA, and
19    after which point in time that the DEA had
20    rejected Novelty's request for a ▼(12:37:40)
21    to import ephedrine - excuse me - to import
22    the raw material for ephedrine to be
23    manufactured, at that point in time, Novelty
24    began carrying the 2, 4, 6 - excuse me - the
25    2, 6, 12, and 24-count
```

Page 1394

```
 1    pseudoephedrine/Guaifenesin mix.
 2         Q      And what is the maximum per-pill
 3    quantitative amount of pseudoephedrine in
 4    those pseudoephedrine products you sell?
 5         A      The active ingredient is 30
 6    milligrams.
 7         Q      Have you ever sold a 60 milligram
 8    pseudoephedrine tablet?
 9         A      No.
10         Q      Now please proceed with the
11    ephedrine side.
12         A      As far as ephedrine is concerned,
13    we sell ephedrine in a 6-count, 12-count, and
14    a 24-count package size.  We sell ephedrine in
15    12-1/2 milligram, and 25 milligram tablets.
16    We sell ephedrine in a 12-1/2 milligram, and
17    a 25 milligram gel capsule.  And the gel
18    capsule states we do not offer the 12-count
19    package, we only offer the 6-count, and the
20    24-count package.
21         Q      Do you have a system in place that
22    prevents the sale of forms of ephedrine that
23    are prohibited in specific states?
24         A      Yes.
25         Q      And what is that system?
```

Page 1395

```
 1         A      As it -- with the CMEA and the
 2    changes in the laws, and so forth, as time
 3    went on, we realized that it was asking an
 4    awful lot of a sales person to be able to
 5    remember all this, so at that point in time we
 6    began developing software that would prevent
 7    a sales person from selling the wrong item
 8    number into a particular store located inside
 9    a state.  The handheld computer that the sales
10    person carries knows what state that store is
11    in, and if, for example, the sales person is
12    in the State of Kentucky, that only allows
13    ephedrine to be sold in a 25 milligram gel
14    capsule form, then it would prevent that sales
15    person from entering an item number that was
16    of a tablet form, or would prevent that sales
17    person from entering an item that was in a
18    pseudoephedrine.
19         Q      Just for a point of clarification,
20    the voice that we heard in the video that was
21    the male voice, was that your voice?
22         A      Yes.
23         Q      All right.  And does Novelty keep
24    records of the stores, and addresses of stores
25    to which each of its route sales professionals
```

Page 1396

```
 1    provides product?
 2         A      Yes.
 3         Q      Are Novelty's Ship-To numbers in
 4    the Government Exhibit 35, which I believe you
 5    still have up there.  Do you have it?
 6         A      I do not have it any longer, but I
 7    think I recall the document you're referring
 8    to.
 9                (Counsel and clerk confer.)
10                BY MR. EMORD:
11         Q      Taking a look at that document, if
12    you'll look in the graph that's there, there's
13    a Ship-To category.  Do you see it?
14         A      Yes.
15         Q      Are Novelty's Ship-To numbers in
16    Government Exhibit 35, do those numbers
17    correspond with information kept by Novelty of
18    the store names, and store addresses?
19         A      I wouldn't put it in that way,
20    but, yes, we could go back to that.  What this
21    Ship-To references is the sales person, or the
22    route number that we are shipping the product
23    to, and to that trans-shipment point, and/or
24    mini-warehouse that we are shipping to.
25                That being said, we then also know
```

Page 1397

1    what stores that specific sales person

2    services, so yes, through that in totality, we

3    would have that information.

4          Q    Thank you.  Now, Government

5    Exhibit 28, I don't know whether that is still

6    before you.

7              (Off the record comments.)

8              MR. EMORD:  I'm sorry.  Just one

9    moment.  I've got the wrong exhibit number.

10   Pardon me for that.

11             (Off the record comments.)

12             MR. EMORD:  Pardon me, Your Honor.

13   It's Novelty Exhibit 28.

14             (Off the record comments.)

15             BY MR. EMORD:

16         Q    On page 4 of Novelty Exhibit 28,

17   please turn to that page, Mr. Bledsoe.

18         A    Yes.

19             JUDGE RANDALL:  I'm sorry, Mr.

20   Emord.  You are now in Novelty's Exhibit 28 at

21   page what?

22             MR. EMORD:  Four, Your Honor.

23             JUDGE RANDALL:  Thank you.

24             BY MR. EMORD:

25         Q    Now, if you'll look at page 4, Mr.

b44bef33-b3d7-4fbf-86c8-6398aa271dac8

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**            **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**      **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


        **Defendants.**


**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 2 TO EXHIBIT 4 (OMITTED)**

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

          **Plaintiff,**

v.

Michele Leonhart,                        **Case No. 08cv00635 (RMC)**
In her official capacity as
Acting Administrator of the             **PUBLIC VERSION**
Drug Enforcement Administration; et al.


          **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 2 TO EXHIBIT 4 (OMITTED)**
Novelty SLC Training Materials Provided to Store Customers

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

       Attachment 2 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a proprietary training manual generated by Novelty.  As redacted, the document consists of 33 entirely redacted pages.  Therefore, it has been omitted.

<div align="center">33 pages omitted</div>

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

               **Plaintiff,**

v.

Michele Leonhart,                       **Case No. 08cv00635 (RMC)**
In her official capacity as
Acting Administrator of the            **PUBLIC VERSION**
Drug Enforcement Administration; et al.

               **Defendants.**

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 3 TO EXHIBIT 4 (DVD)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

               Plaintiff,

v.

Michele Leonhart,                      Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the         PUBLIC VERSION
Drug Enforcement Administration; et al.


               Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 3 TO EXHIBIT 4 (DVD)

Attachment 3 to Exhibit 4 is a DVD of a Novelty training program approximately 10 minutes in length, filed with leave of court pursuant to an April 18, 2008 Minute Order. This DVD is proprietary business information, to be protected from public disclosure under the April 18, 2008 Protective Order.

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

     Plaintiff,

v.

Michele Leonhart,       Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the    PUBLIC VERSION
Drug Enforcement Administration; et al.


     Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 4 TO EXHIBIT 4 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                      Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the          PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 4 TO EXHIBIT 4(OMITTED)
Sample Log Book created by Novelty and provided to Novelty Customers that sell SLC's

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

       Attachment 4 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a copy of the proprietary sample log book created by Novelty for its customers.  Both pages comprising this document are proprietary business information to be protected from public disclosure pursuant to the April 18, 2008 Protective Order.

2 pages omitted

# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

            **Plaintiff,**

**v.**

**Michele Leonhart,**                    **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**         **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

            **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### ATTACHMENT 5 TO EXHIBIT 4 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

          **Plaintiff,**

v.

Michele Leonhart,                         **Case No. 08cv00635 (RMC)**
In her official capacity as
Acting Administrator of the               **PUBLIC VERSION**
Drug Enforcement Administration; et al.

          **Defendants.**

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 5 TO EXHIBIT 4 (OMITTED)
Sample Bledsoe Email directing customer on SLC self-certification requirements

# Proprietary and Confidential Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

       Attachment 5 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is an email to a customer that contains both confidential and proprietary business information, including proprietary training materials attached as Attachment 2 to Exhibit 4.  All 27 pages of this document represent proprietary business information to be protected from public disclosure pursuant to the April 18, 2008 Protective Order of Judge Rosemary M. Collyer. As redacted, this document would be comprised of 27 entirely-redacted pages.  Therefore, it has been omitted from the public record.

                    27 pages omitted

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**               **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**        **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

        **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 6 TO EXHIBIT 4 (OMITTED)**

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

          **Plaintiff,**

**v.**

**Michele Leonhart,**                **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**       **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

          **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 6 TO EXHIBIT 4 (OMITTED)**
Images of Plexiglass cabinet that Novelty provides for free to SLC customers

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

       Attachment 6 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction includes 4 pages of images of Novelty's proprietary system for distributing.  Each page contains proprietary business information.  The entirety of the document contains proprietary information.  As redacted, the document comprises four completely redacted pages.  Therefore, it has been omitted from the public record.

<div align="center">4 pages omitted</div>

### UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**               **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**       **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

        **Defendants.**


### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### ATTACHMENT 7 TO EXHIBIT 4 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                       Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the          PUBLIC VERSION
Drug Enforcement Administration; et al.

                Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 7 TO EXHIBIT 4 (OMITTED)
Emails regarding Novelty Policies

# Proprietary and Confidential Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Attachment 7 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction includes 5 pages of emails regarding Novelty's proprietary business practices.  All five pages also contain confidential business information regarding Novelty's customers. Redaction of this document results in 5 pages that are nearly entirely redacted.  Therefore, the document has been omitted from the public record.

5 pages omitted

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

              **Plaintiff,**

**v.**

**Michele Leonhart,**                  **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**          **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

              **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## ATTACHMENT 8 TO EXHIBIT 4 (REDACTED)

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008

19



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

Exhibit 4

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008

05



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#           69
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008

72

# Self-Certification of Compliance



is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18,USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#          59
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

**COMBAT METHAMPHETAMINE
EPIDEMIC ACT REQUIREMENTS**

Self-Certified by

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#   57
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 USC 1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 52
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#                    33
Expires: July 31, 2008

# Self-Certification of Compliance



is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 USC 1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 90
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#        87
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598

Granted: July 05, 2007

ID# ████████ 72

Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 70
Expires: July 31, 2008

# Self-Certification of Compliance



is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

**COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS**

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598

Granted: July 05, 2007

ID#

Expires: July 31, 2008

69



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#          66
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18,USC,1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

**COMBAT METHAMPHETAMINE
EPIDEMIC ACT REQUIREMENTS**

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

58

DEA-598
Granted: July 05, 2007

ID# 46
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 35
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 26
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 U.S.C. 1001 penalties.

DEA-598
Granted: July 05, 2007

ID#  12
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified  by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID# ▮▮▮▮▮ 00
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008

# Self-Certification of Compliance



is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 U.S.C. 1001 penalties.

DEA-598
Granted: July 05, 2007

ID# 88
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008



30

# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008    77



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE
## EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 U.S.C. 1001 penalties.

DEA-598
Granted: July 05, 2007

ID #
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine

as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: July 05, 2007

ID#
Expires: July 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 U.S.C. 1001 penalties.

DEA-598
Granted: October-11-2006

ID# ███ 3
Expires: January-31-2008



## Self-Certification of Compliance

is hereby granted to

The above referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: October-06-2006

ID#       3
Expires: January-31-2008



## Self-Certification of Compliance

is hereby granted to

The above referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: November 01, 2006

ID# [    ] 17
Expires: November 30, 2007



# Self-Certification of Compliance

### is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18 USC 1001 penalties.

DEA-598
Granted: October 10, 2006

ID# .32
Expires: December 31, 2007



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

DEA-598
Granted: March-08-2007



# Self-Certification of Compliance

### is hereby granted to



The above referenced entity self-certifies that it is in compliance w
related to the sale of ephedrine, pseudoephedrine, or phenylpr
## as required by the

# COMBAT METHAMPHETAMINE
# EPIDEMIC ACT REQUIREMENTS

## Self-Certified by



The certifier affirms that he/she understands and agrees to comply with all the re
the Title 21 United States Code, Section 830. Fraudulent statements are subject to

https://www.deadiversion.usdoj.gov/webforms/jsp/cmea/actions/confirmation.do          3/8/2007

DEA-598
Granted: February-09-2007

ID# _____90
Expires:   June-30-2008



# Self-Certification of Compliance

is hereby granted to

The above referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC. 1001 penalties.

DEA-598
Granted: October 04, 2006

ID# | 34
Expires: January 31, 2008



# Self-Certification of Compliance

is hereby granted to

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

# COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.



DEA-598
Granted: October 06, 2006

ID# 02
Expires: February 29, 2008



# Self-Certification of Compliance

The above-referenced entity self-certifies that it is in compliance with all provisions related to the sale of ephedrine, pseudoephedrine, or phenylpropanolamine as required by the

## COMBAT METHAMPHETAMINE EPIDEMIC ACT REQUIREMENTS

Self-Certified by

The certifier affirms that he/she understands and agrees to comply with all the requirements specified in the Title 21 United States Code, Section 830. Fraudulent statements are subject to 18.USC.1001 penalties.

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

              **Plaintiff,**

**v.**

**Michele Leonhart,**                      **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**             **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

              **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 9 TO EXHIBIT 4 (OMITTED)**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                     Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the       PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 9 TO EXHIBIT 4 (OMITTED)
Novelty SLC Policy

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Attachment 9 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a document setting out Novelty's SLC policy.  The entire document is proprietary business information.  When redacted, this document comprises 8 fully redacted pages.  Therefore, it has been omitted from the public record.

8 Pages Omitted

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration; et al.


        Defendants.

Case No. 08cv00635 (RMC)

PUBLIC VERSION

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 9 TO EXHIBIT 4 (OMITTED)
Novelty SLC Policy

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Attachment 9 to Exhibit 4 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a document setting out Novelty's SLC policy. The entire document is proprietary business information. When redacted, this document comprises 8 fully redacted pages. Therefore, it has been omitted from the public record.

8 Pages Omitted

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

               Plaintiff,

v.

Michele Leonhart,                    Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the         PUBLIC VERSION
Drug Enforcement Administration; et al.


              Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 10 TO EXHIBIT 4 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

                    **Plaintiff,**

**v.**

**Michele Leonhart,**                            **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**                  **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

                    **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**ATTACHMENT 10 TO EXHIBIT 4 (OMITTED)**

        Attachment 10 to Exhibit 4 is sample disciplinary letter to a Novelty employee for violating Novelty Policy.  This document, in its entirety, is confidential and proprietary business information developed by Novelty.  Therefore it has been omitted pursuant to Her Honor's April 18, 2008 Protective Order.

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                    Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the        PUBLIC VERSION
Drug Enforcement Administration; et al.


                Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 5 (REDACTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                     Case No.
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration, et al

                Defendants.

## AFFIDAVIT OF RYAN POLK

I, RYAN POLK, declare under the penalty of perjury that the following is true and
correct to the best of my knowledge, information, and belief:

1. I am the Chief Financial Officer of Novelty, Inc. ("Novelty"). I have held that

   position since 2006. I have held various other executive positions at Novelty

   since December 2001.

2. My responsibilities include managing the financial risk of Novelty and overseeing

   Novelty's record-keeping procedures. I am responsible for completing and filing

   Novelty's DEA registration. I ensure Novelty maintains proper records of

   inventory and records required under DEA regulations.

3. Novelty first received its DEA registration to distribute Schedule Listed

   Chemicals ("SLC") in 1996. It has applied for and successfully renewed its

   registration every subsequent year.

4. I have been present when DEA inspected Novelty on several occasions. I was

   present when DEA executed a search warrant at Novelty's Greenfield, Indiana

Exhibit 5
1 of 7

facilities on July 9, 2007. I was present every day during the execution of the warrant and responded to various DEA requests for records from Novelty. Attachment 1: Transcript 1511-1515, 1529-1536, 2022-2033.

5. When DEA agents arrived unannounced on July 9, 2007, to execute a search warrant, I was surprised to see present DEA investigator Darrell Meador and DEA counsel Brian Bayly. Meador had submitted a false affidavit to the United States District Court for the District of Columbia in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU). He had a personal interest in finding exculpatory evidence and, so, I believed his presence improper. Brian Bayly was the DEA lawyer who had appeared on behalf of DEA in a case brought by Novelty before DEA. See Attachment 2 (Prehearing order issued by the Administrative Law Judge on July 9, 2007, the first day of inspection, showing Mr. Bayly as counsel of record for DEA). He had represented to the Administrative Law Judge that no discovery would be allowed in the case. Likewise, DEA had represented to the United States District Court for the District of Columbia, in the case Novelty Inc. v. Tandy et al., 1:07-CV-00191 (RMU), that discovery was not allowed. See Attachment 3 (DEA's Opposition to Novelty's Motion for Limited Discovery in that case). I therefore thought Bayly's presence improper and perceived that DEA was in fact performing discovery without leave of either the DEA ALJ or the U.S. District Court in the District of Columbia. I informed the agents present that Novelty objected to the participation of DEA counsel and Mr. Meador in the investigation. Both

Exhibit 5
2 of 7

remained on site assisting with the execution of the warrant until Wednesday, July

11. See Attachment 1: Testimony at 1529-35, 2006-07, 2116-18.

6. On Wednesday, July 11, 2007, DEA investigator Lisa Barnhill demanded that

Novelty produce over 12,000 pages of documents in a format she specified within

three hours, a physical impossibility. Barnhill's demand required Novelty

construction of new computer programming to produce the records in the format

DEA demanded. The data was all in Novelty's normal business records but the

parameters DEA imposed for production were not in the normal format of our

record maintenance. See Attachment 1: Testimony at 1535, 2095-99.

7. Despite our fulfillment of DEA's production demand, DEA agent Barnhill falsely

accused me of "scrubbing documents," and DEA agent Madeline Kuzma falsely

accused me of "sanitizing documents." DEA agent Barnhill also threatened to

arrest a Novelty executive. See Attachment 1: Testimony at 1534-35. DEA agent

Barnhill also falsely stated that an empty product container inside Novelty's

caged, secured SLC product warehouse was likely left over from a

methamphetamine user. See Attachment 1: Transcript at 2010.

8. I informed Novelty executives JR Merlau, Todd Green, and Mark Bledsoe and

Novelty's counsel of the threat of arrest, of the involvement of Meador and Bayly

in the warrant's execution, of the unreasonable document production demands,

and of the false charges of scrubbing, sanitizing, and complicity in the

methamphetamine trade. We decided to videorecord the unreasonable acts to

preserve a record for use in Novelty's defense and to release to the public.

Despite multiple attempts to videorecord and one attempt to audiorecord

3

Exhibit 5
3 of 7

interaction with the agents, we were not allowed to do so by DEA. See

Attachment 1: Transcript at 2011-22. Indeed, DEA agent Meador forcibly

removed a videorecorder from the hands of JR Merlau on the afternoon of

Wednesday, July 11, and we later discovered dismantled with tape and batteries

removed an audiorecorder JR had placed conspicuously on the table in the same

room where videorecording was to take place. See Attachment 1: Transcript at

2020-22.

9. I am familiar with the DEA's January 27, 2008 Order to Show Cause and

Immediate Suspension of Registration of Novelty Distributors, d/b/a Greenfield

Labs ("Immediate Suspension Order"). In the Immediate Suspension Order, DEA

alleges Novelty could not account for 60,000 dosages of SLC products and had 16

overages. Exhibit 1 to this motion for preliminary injunction. Upon

investigation, I discovered the accusation to be false. See Attachment 1:

Transcript at 2034-45; Attachment 4 (a chart with my findings and supporting

documentation).

10. DEA failed to perform a complete audit at Novelty and excluded from its

calculation specific data inputs that revealed its charge of unaccounted for

dosages and overages to be false. See Attachment 1: Transcript at 2034-35;

Attachment 4 (a chart with my findings and supporting documentation).

11. Novelty gratuitously implemented a sales policy that is far more stringent than the

limits set in the CMEA, which limits sales of ephedrine to 3.6 grams per day.

████████████████████████████████████████████████

████████████████████████████████████ See Attachment 6

4

Exhibit 5
4 of 7

to Exhibit 3 (Bledsoe Affidavit).



13. I am familiar with the allegation in the DEA's Immediate Suspension Order that Novelty distributed 22 bottles of ephedrine allegedly discovered in 2002 in a methamphetamine lab. DEA relies upon a statement from the manufacturer of the product for the proposition that Novelty distributed all of the products from that lot number. It has no independent records to verify that allegation. While Novelty did purchase, according to our own records 24 cases of this lot number, Novelty has never been given evidence to establish that the bottles in question were actually distributed by Novelty to convenience stores or were sold by convenience stores served by Novelty. The product could have been stolen directly from DMD Pharmaceuticals, stolen from DMD transport vehicles, or delivered to convenience stores not served by Novelty and stolen from there. See Attachment 1: Testimony at 1517-19.

14. Novelty was first informed of the Connecticut meth lab incident by DMD Pharmaceuticals, not by DEA. Attachment 1: Transcript at 1524-26. Indeed, although Kuzma stated that she informed me and Craig Baker of the presence of the bottles in the Connecticut meth lab, my notes of interactions with Kuzma

5

Exhibit 5
5 of 7

reveal no such conversation. Attachment 1: Transcript 1522-1525. Attachment 5 [Polk Contemporaneous Notes].

15. Novelty did not receive a "Notice of Diversion" concerning that alleged finding of 22 bottles in a methamphetamine lab. It was inspected less than one year after that finding and I acted as liaison to the DEA personnel that conducted the inspection. To the best of my recollection the agents did not raise that finding to me at that time. I subsequently learned of that allegation from the manufacturer.

16. In our 2002, 2003, and 2005 inspections and again at the July 9, 2007 Administrative Inspection of Novelty, I asked DEA agent Madeline Kuzma if any product distributed by Novelty had ever been found in a meth lab. She informed me that no product distributed by Novelty had ever been found in any meth labs. Attachment 1: Testimony at 1526.

17.  Attachment 6 (Training Guide) and Attachment 9 to Exhibit 3 (Bledsoe Affidavit)(SLC policy statement).

6

Exhibit 5
6 of 7

Ryan Polk

Dated: 4/11/08

Exhibit 5
7 of 7

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

               Plaintiff,

v.

Michele Leonhart,                           Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the               PUBLIC VERSION
Drug Enforcement Administration; et al.


               Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 1 TO EXHIBIT 5 (REDACTED)

## Page 2 of 103

Page 1261

TABLE OF CONTENTS

WITNESS   DIRECT CROSS REDIRECT RECROSS

Mark Bledsoe  1272  1323  1401  1414
  Voir Dire on page 1355
Lisa Barnhill  1441  1489
Ryan Polk    1508  1521

EXHIBIT                  MARK RECD
Respondent
16                      1358
34                      1391
42   Show Cause          1325
44                      1365
48   DVD                 1387

57-A                   1352 1352
10, 38, 54, 14
47, 17                 1388
34                      1391

Government
26                      1462 1463

27                      1466 1466
28                      1467 1468
29                      1469 1471
37                      1445 1446
38                      1459 1460
41                      1480 1482
44                      1474 1474

45                      1476 1477
49                      1481 1485
65                      1451 1455
66                      1445 1446

71, 71A, 81, 81A,
  82, 82A               1485 1480
83                      1480 1482

---

## Page 3 of 103

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

IN THE MATTER OF:     Docket No. 08-33

NOVELTY DISTRIBUTORS

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

    The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
          Administrative Law Judge

---

## Page 4 of 103

Page 1998

TABLE OF CONTENTS

WITNESS   DIRECT CROSS REDIRECT RECROSS

Ryan Polk     2003  2076  2111  2118
  Voir Dire on page 2042
Chris Collins  2170  2209
  Voir Dire on page 2182

J.R. Merlau   2215
  Voir Dire on page 2287

Exhibit No. Document        Mark Recd

ALJ

14  Formerly Novelty Exhibit 27
Respondent
9   Iventory           2265 2268
11  Schematic          2269 2273

13                    2275 2280
28                    2281 2284
36  Polk Document      2042 2045
40  Show Cause        2285 2291
46  email             2292 2294

Government

1   DEA Registration     2125 2125
8-17 EPIC Charts        2126 2130
19  Snyder Declaration   2130 2136
22  FDA Proposed Rule   2137 2137
51-55 Witness Testimony  2138
51                      2143

52                      2151
54                    2148 2151
63  PDR Excerpt        2152 2152
64  NDH Excerpt        2153 2155
90  JAMA Sloan Survey   2156 2157
91  CHCPA Document     2157 2158
92  NIH Common Cold FAQs 2158 2159

93  NHLBI Document      2159 2165

---

## Page 5 of 103

Page 1508

```
 1   handling the next witness.  The Government
 2   calls Ryan Polk.
 3           (Witness enters courtroom.)
 4           JUDGE RANDALL:  Good afternoon,
 5   Mr. Polk.
 6           THE WITNESS:  Good afternoon.  How
 7   are you?
 8           JUDGE RANDALL:  Fine.
 9   WHEREUPON,
10                  RYAN POLK
11   was called as a witness by Counsel for the
12   Government and, having been first duly sworn,
13   assumed the witness stand, was examined and
14   testified as follows:
15           JUDGE RANDALL:  Thank you.  Please
16   be seated.
17           DIRECT EXAMINATION
18        BY MR. BARBER:
19   Q     Good afternoon, Mr. Polk.  My name
20   is Linden Barber and I represent the
21   Government.  We just met.  Would you please
22   state your name and spell your last name for
23   the record?
24   A     It's Ryan Polk.  P-O-L-K.
25   Q     How are you employed, Mr. Polk?
```

Exhibit 5
A1 1

Page 1509

1    A    Employed by Novelty, Inc. as the
2   chief financial officer.
3    Q    How long have you been employed
4   there?
5    A    I've been employed with Novelty
6   since December 19 -- Excuse me.  It's December
7   2001.
8    Q    What was your position when you
9   first came to Novelty?
10   A    Chief financial officer.
11   Q    Have you held any other positions
12  at Novelty?
13   A    Yes.
14   Q    What other positions have you
15  held?
16   A    Vice President of Sales and
17  Operations.
18   Q    And for what period of time did
19  you hold that job?
20   A    February 2003 through September of
21  2006.
22   Q    Since September of 2006, has your
23  sole title been chief financial officer?
24   A    Yes, sir.
25   Q    Would you briefly describe what

Page 1510

1   your duties are as chief financial officer at
2   Novelty?
3    A    I'm responsible for the accounting
4   and financial reporting.
5    Q    When you were Vice President of
6   Sales and Operations, what additional duties
7   did you take on?
8    A
9
10
11   Q
12
13   A
14
15
16
17
18        MR. BARBER:  Madame Clerk, would
19  you show the witness Government Exhibit 7
20  please.
21        JUDGE RANDALL:  I'm sorry.  Seven?
22        MR. BARBER:  Yes, Your Honor.
23        JUDGE RANDALL:  Thank you.
24        BY MR. BARBER:
25   Q    Mr. Polk, do you recognize

Page 1511

1   Government Exhibit 7?
2    A    No.
3    Q    You've never seen a document like
4   that before?
5    A    No, I've not seen this document
6   before.
7    Q    Have you seen one substantially
8   similar to that document before?
9    A    No.
10   Q    What, if any, role do you have in
11  ensuring compliance with the Controlled
12  Substances Act and DEA regulations as a member
13  of the Novelty staff?
14   A    My responsibility would be for the
15  inventory accounting.
16   Q    When DEA executed an
17  administrative inspection warrant in Novelty
18  in July of 2007 were you present?
19   A    Yes, sir.
20   Q    Would you describe for the
21  administrative law judge where the scheduled
22  listed of chemical products were kept on July
23  9, 2007?
24   A

Page 1512

1
2
3    Q
4
5    A
6
7
8
9
10   Q
11
12
13
14
15
16
17
18
19
20
21   Q    When the DEA investigators were
22  conducting their audit of various chemical
23  products at Novelty in July of 2007, did you
24  assist them?
25   A    Yes.

Exhibit 5
A1 2

Page 1513

```
 1       Q     And what, if anything, did you
 2   tell them about product that was set aside for
 3   ███████████████████████████████████████████
 4   █████████?
 5       A   ████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
     ███████████████████████████████████████████████
13       Q     Now did you give the DEA
14   investigators any records relating to the
15   ███████████████████████████████████████████
16       A     Yes, that's where they spent most
17   of their time.
18       Q     Did the investigators explain to
19   you what items they were seeking to audit
20   during that investigation?
21       A     Yes, I gave them a complete list
22   of items that are scheduled listed chemicals.
23   They selected from that list about 20 items to
24   audit.
25       Q     Were any of the items that they
```

---



Page 1514

```
 1   selected in the ███████████████████████████
 2   ██████████
 3       A     Yes.
 4       Q     Did you or members of your staff
 5   show them where they could find those items so
 6   that they could conduct a physical count of
 7   those items?
 8       A     Yes.  We completed on Monday night
 9   around 9:00 or 9:30 we completed a count of
10   the shippable inventory.  On Tuesday morning
11   on July 10th, our Staff Coordinator Barnhill,
12   Diversion Investigator Kuzma and Staff
13   Coordinator Meador along with three Novelty
14   employees began counting the ██████████████
15       Q     And Novelty employees helped count
16   the inventory on hand.  Is that correct?
17       A     Yes.
18       Q     And did your employees do an
19   accurate accounting of what was on hand?
20       A     Yes.
21       Q     Were the DEA investigators given
22   full access to all of the 20 items that they
23   had asked to audit?
24       A     Yes.
25       Q     Did they fail to count any of the
```

---

Page 1515

```
 1   product that was part of those 20 items?
 2       A     There is not a complete counting
 3   of the items there were in the ██████████████
 4   ███████████████████████████████████████████
 5   ███████████████████████████████████████████
 6   ███████████████████████████████████████████
 7   ███████████████████████████████████████████
 8   ███████████████████████████████████████████
 9   ███████████████████████████████████████████
10       Q     I'd like to direct your attention
11   to the time frame of the spring of 2003.  Do
12   you recall being visited by DEA diversion
13   investigators in the spring of 2003 regarding
14   finding ███████████ in a meth lab?
15       A     No, I don't recall in the spring
16   of 2003 that meeting.  I do recall a May
17   meeting with diversion investigators from the
18   Indianapolis office for a routine inspection.
19       Q     During -- And that would be May of
20   `03, spring?
21       A     Yeah.
22       Q     During that routine inspection,
23   did they mention to you an issue regarding DMD
24   supply being found or ███████████ listed
25   chemical products being found in a meth lab?
```

---



Page 1516

```
 1       A     I don't recall that.  I recall
 2   learning about that from the supplier.
 3       Q     ██████████
 4       A     Yes.
 5       Q     How long have you had a business
 6   relationship ██████████
 7       A     I don't know when that
 8   relationship began.
 9       Q     ████████████████████████████████████
10   ███████████████████████████████████████████
11       A     Yes.
12       Q     Where is ██████
13       A     ████████████████████████████████████
     ███████████████████████████████████████████████
     ██████  ██  █████████████████
     ██████  ██  █████████████
     ██████  ██  █████████████
19       A     I'm not sure the exact.
20       Q     How far is ██████████ from
21   Greenfield?
22       A     About ██████████████████.
23       Q     Highway driving?
24       A     Could be.
25       Q     When you say ██████████████
```

Exhibit 5
A1 3

Page 1517



```
 1   that's a time I -- Distance wise,
 2                                          ?
 3        A    Yes.
 4        Q    About the time that you learned
 5   about this
 6
 7        A                              where
 8   we shipped that lot number.
 9        Q          you the lot number?
10        A    Yes.
11        Q    And what did you determine about
12   where you shipped that lot number?
13        A    We determined we shipped it to two
14   different sales representatives in the New
15   England area.
16        Q    And because of Novelty's
17
18
19   do you?
20        A    No.
21        Q
22
23
24        A
                               We know what area of
```

---

Page 1518



```
 1   the
 2
 3        Q
 4
 5
 6   around the country.
 7        Q
 8                          what location are they
 9   delivered to?
10        A
11
12        Q    Did anyone from DEA ever talk to
13   you or did you ever talk to anyone from DEA
14   about the product that          to you
15   attention?
16        A    I don't recall that.  I reviewed
17   my notes from the meeting in May, but I could
18   not find any record of that topic being
19   brought up during that initial meeting.
20        Q    How about outside of that meeting?
21   Has that topic come up with any DEA employees?
22        A    Yes, whenever I got a chance to
23   meet with the representatives from the Indiana
24   office, 2002, 2003 and then again in 2007,
25   I've always asked have any -- have you found
```

---

Page 1519



```
 1   any of Novelty's products in a methamphetamine
 2   arrest.
 3        Q    My question is have you ever
 4   discussed the                      -- that
 5           told you were found in meth lab with any
 6   DEA employees any time?
 7        A    I don't recall any conversations,
 8   no.
 9        Q    When you learned of the
10   possibility that Novelty products might have
11   been in a meth lab what did you do?
12        A    Well, we cooperated with      and
13   provided them the information that they
14   required.
15        Q    And, in fact, the lot number
16   gave you did, in fact, come back to showing
17   that it was shipped to Novelty.  Right?
18        A    We had shipped that lot number,
19   yes.
20        Q    When you were the vice president
21   of sales and operations, was there a one case
22   limit in effect with regard to the sales of
23   scheduled listed chemical products?
24        A    Yes.
25        Q    When did that go into effect?
```

---

Page 1520

```
 1        A    One case limit had gone into
 2   effect sometime in 2005.  I'm speculating. I
 3   don't have the exact date in memory.
 4        Q    Were you part of that decision
 5   making process about putting a one case limit
 6   on the sales of scheduled listed chemical
 7   products?
 8        A    No.
 9        Q
10
11
12        A    No.
13        MR. BARBER:  May I have a moment,
14   Your Honor?
15        JUDGE RANDALL:  Certainly.
16        (Off the record discussion.)
17        MR. BARBER:  That's all I have,
18   Your Honor.
19        JUDGE RANDALL:  Very well.
20        MR. EMORD:  Your Honor, as before
21   we're doing both a cross and a direct.  This
22   witness because of the nature of the
23   scheduling and the unpredictability of the
24   appearance of the witnesses we have asked our
25   expert witness to come in on Monday morning
```

Exhibit 5
A1 4

Page 1521

```
 1    and so with the consent of opposing counsel,
 2    we have arranged so that this witness could
 3    return after the expert witness testifies and
 4    that way she wouldn't have to remain or carry
 5    over for any length of time again on Monday.
 6    She's been here for some time.  She had to go
 7    back to the university and then we'll bring
 8    her back in again.
 9         JUDGE RANDALL:  All right.
10              CROSS EXAMINATION
11         BY MR. EMORD:
12         Q    So, Mr. Polk, you testified to a
13    May 2003 meeting with the DEA investigators
14    which you characterized as a routine meeting
15    and you said you took notes about that
16    meeting.  Is that right?
17         A    Yes.
18         Q    Now I'm going to present you with
19    a document to refresh your recollection and
20    ask you whether indeed these are --
21         MR. BARBER:  Objection, Your
22    Honor.  There is no question that he needs his
23    recollection refreshed on yet.  So I would ask
24    that the question be posed to find out if he
25    needs it.
```

Page 1522

```
 1         MR. EMORD:  All right.
 2         JUDGE RANDALL:  Sustained.
 3         MR. EMORD:  With Your Honor's
 4    indulgence, I will give a copy of these
 5    documents to the Court Reporter to make it
 6    easier.
 7         JUDGE RANDALL:  To the Hearing
 8    Clerk.
 9         MR. EMORD:  To the Hearing Clerk,
10    I'm sorry.
11         JUDGE RANDALL:  Yes.  Did you
12    place a copy of the witness --
13         MR. EMORD:  I did, Your Honor.
14    Yes, I did.
15         JUDGE RANDALL:  Okay.  Let's
16    retrieve those, shall we?
17         MR. EMORD:  Okay.
18         (Off the record comments.)
19         BY MR. EMORD:
20         Q    All right.  Mr. Polk, you had a
21    meeting on May of 2003 with DEA personnel.  Do
22    you know whether Madeline Kuzma was present at
23    that meeting?
24         A    Yes, she was.
25         Q    Was anyone else present at that
```

Page 1523

```
 1    meeting?
 2         A    I believe Laurie Hollip (Phonetic)
 3    was a part of that meeting pertaining to that
 4    inspection.
 5         Q    And did you take notes during the
 6    course of that meeting?
 7         A    Yes.
 8         Q    And when you meet with DEA
 9    officials do you ordinarily take notes?
10         A    Yes.
11         Q    And what do you include in your
12    notes?
13         A    Obviously, what they asked us to
14    provide to them as part of the inspection or
15    any comments they might make pertaining to
16    their efforts.
17         Q    If anything is communicated to you
18    that you regard as important to you do you
19    write it down?
20         A    Yes.
21         Q    And if you were informed in that
22    meeting of a diversion situation with ████
23    ██████████████ if you're informed a
24    Connecticut meth lab had product in it by any
25    of those DEA officials would you have written
```

Page 1524

```
 1    it down?
 2         A    Yes.
 3         Q    Now you have before you a
 4    document.  Could you identify that for me, the
 5    first page of the document?
 6         MR. BARBER:  Objection.
 7         MR. EMORD:  I'm sorry.  You don't
 8    have it.  Your Honor, may we place it now?
 9         JUDGE RANDALL:  No.  There's no
10    question that he needs his memory refreshed.
11         BY MR. EMORD:
12         Q    All right.  Well, do you recall
13    whether or not you were supplied a notice of
14    inspection?
15         A    Yes, I do.
16         Q    And do you recall whether or not
17    in the course of keeping your records
18    associated your notes with that notice of
19    inspection?
20         A    Yes.
21         Q    And did you keep that from that
22    point in time to the present?
23         A    Yes.
24         Q    And in your notes is there
25    anywhere in your notes a reference to the
```

Exhibit 5
A1 5

Case 1:08-cv-00635-RMC   Document 19-6   Filed 05/05/2008   Page 15 of 58

Page 1525

```
 1    Connecticut meth lab?
 2        A    No.
 3        Q    And do you recall any statement
 4    being made to you by Madeline Kuzma at that
 5    meeting informing of product being found in a
 6    Connecticut meth lab?
 7        A    I don't recall that conversation.
 8        Q    Now subsequent to that May 2003
 9    meeting, did you have subsequent meetings with
10    DEA personnel?
11        A    Yes.
12        Q    On how many occasions to the best
13    of your recollection?
14        A    September 2002, the only one I can
15    recall.
16        Q    And then July 9th inspection?
17        A    Yes, in 2003.  Yes, July 9th
18    inspection.
19        Q    And any other inspection other
20    than 2003?
21        A    No.
22        Q    Other than the 2007 inspection?
23        A    No, in 2005, they came out to
24    discuss a company named Strides with us but it
25    was not a Novelty inspection.
```

Page 1526

```
 1        Q    Now at each of these occasions was
 2    Marilyn (sic) Kuzma present?  Madeline, excuse
 3    me.
 4        A    Yes, Investigator Kuzma was
 5    present in 2002, 2003 and 2007.
 6        Q    And on each of those occasions did
 7    you ask to the best of your recollection
 8    whether any Novelty product had been found in
 9    a clandestine meth lab?
10        A    Yes, it's normally one of the very
11    first questions that I ask.
12        Q    And the response given to you was?
13        A    In July 2007, the answer was no.
14        Q    And in any other time were you
15    told that there had been to the best of your
16    recollection any Novelty product found in a
17    meth lab?
18        A    No.
19        Q    Now you say that you received the
20    information from -- that Novelty product had
21    been found in a Connecticut meth lab from a
22    conversation with officials from ███  Do you
23    remember specifically who you spoke to?
24        A    I don't recall who it was.  The
25    initial communication was an email ███ to
```

Page 1527

```
 1    Novelty.
 2        Q    What did that email contain?  Do
 3    you recall?
 4        A    It asked where we shipped a
 5    specific lot number.
 6        Q    And --
 7        A    It asked some inventory
 8    information about the lot number.  I don't
 9    recall the exact wording, but it was about a
10    lot number
11        Q    And did you respond?
12        A    I did not directly respond, no,
13    but the company did respond to them, yes.
14        Q    And who to the best of your
15    recollection respond from the company?
16        A    Craig Baker.
17        Q    ███████████████████████████
18    ███ ██ █ ████████ that we shipped to two
19
20    different sales representatives in the New
21    England area.
22        Q    And he identified those sales
23    representatives?
24        A    No, not that I'm aware of.
25        Q    All right.  And now if we can turn
```

Page 1528

```
 1    to the July 9th inspection.
 2        A    Okay.
 3        Q    During the course of that
 4    inspection, did you receive any what you would
 5    consider to be irregularities in the way in
 6    which DEA agents behaved?
 7        A    Yes.
 8        Q    And what were those
 9    irregularities?
10        A    It started with a warrant.
11        MR. BARBER:  Objection, Your
12    Honor, to the characterization that the
13    issuance of, the execution of a warrant in the
14    normal course of business.
15        MR. EMORD:  It's his perception.
16        MR. BARBER:  Let me finish my
17    objection.  I object to the characterization
18    of irregular in the question of Mr. Emord to
19    the anticipated testimony of his witness that
20    the execution of a duly issued warrant by DEA
21    investigators is somehow irregular.
22        JUDGE RANDALL:  Mr. Emord.
23        MR. EMORD:  It's his perception.
24    It's not my testimony.  I asked him about the
25    irregularities.  If he thinks the warrant
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 25 of 103

Exhibit 5
A1 6

bd4bdf32-b3d7-48e4-98ef-6390aa27abca



Page 1529

1  issuance is irregular, I mean, that's his

2  view.

3           JUDGE RANDALL:  It was your view

4  as you asked the question.  Re-ask the

5  question, Mr. Emord.

6           MR. EMORD:  All right.

7           JUDGE RANDALL:  I'll sustain the

8  objection.

9           MR. EMORD:  All right.

10           BY MR. EMORD:

11      Q    The July 9, 2007 inspection, Mr.

12  Polk, during the course of the inspection, did

13  you perceive what you considered to be an

14  irregularities?

15      A    Yes.

16      Q    And what were those

17  irregularities?

18      A    Well, five people.  No normal

19  inspection documents.  The informal inspection

20  form that we had previously received in 2002

21  and 2003.  The document was replaced by

22  another document.  Three people from the

23  national office.  Comments made by people from

24  the national office that this had nothing to

25  do with lawsuits with Novelty.

---

Page 1530

1           The presence of national people

2  was because the local field people were

3  shorthanded.  Yet there were two field people

4  from Indianapolis there no more than we

5  typically had in any other audit.  Special

6  Agent Carol Harris accompanied Madeline Kuzma

7  at that inspection.

8           The breadth of items chosen.  The

9  lack of a concise list of information

10  requested was unusual.  The contentiousness of

11  the people asking for the information was

12  unusual.  Thanks to Mr. Barber we were able to

13  settle that down and get a concise list of

14  items that they needed to have.  I think on

15  Thursday morning we were able to get that done

16  on the 12th.  It changed a little bit the

17  afternoon of the 12th.  We went from 23 items

18  back up to 26 items.  But yet we had a concise

19  list of items at last and could supply that to

20  them.  It was a very unusual -- it was unlike

21  any audit we had in 2002 and 2003.

22      Q    Now were you ever threatened with

23  arrest during the course of the investigation?

24      A    Yes.

25      Q    And can you please explain for me

---

Page 1531

1  and for the Court what was said to you that

2  made you believe that you were subject to

3  arrest and who said that to you?

4      A    Wednesday morning I met with

5  Investigator Kuzma, Staff Coordinator Barnhill

6  and Staff Coordinator Meador in a room that we

7  had set aside for them during the inspection.

8  Investigator Kuzma said to me that the

9  documents that I had provided them on Tuesday

10  looked scrubbed.  Barnhill talked about them

11  being sanitized.

12           Barnhill then began talking to me

13  about impeding and obstructing the inspection.

14  She pointed out to me -- She handed me a code

15  book and asked me to read two sections of a

16  code book that dealt with the powers they had

17  to act upon people if they felt we're impeding

18  or obstructing the inspection and in that

19  section it talked about arrest.  The

20  concluding comment to me from Barnhill from

21  that exchange was that it won't be one of your

22  attorneys that are arrested.  It will be a

23  Novelty employee.  She then said, "I want all

24  of these documents produced by noon."  And

25  what she was referencing, Your Honor, was

---

Page 1532

1  about 12,000 pages of documents that she had

2  asked me to provide for her.

3           What I had given to her prior to

4  that request was a summary list of

5  transactions.  Because in our initial meeting

6  on Monday when we were talking about how they

7  would proceed with the audit, they said and I

8  had written in my notes and recalled from the

9  conversation they wanted a list of the

10  transactions.  They would then select from

11  those transactions specific documents that

12  they wanted to audit which seemed reasonable

13  to me because that's typically a way that an

14  audit is conducted.

15           That obviously changed Wednesday

16  morning from just sampling the transactions

17  out of 157 page report to 12 -- to everything.

18  They wanted every document that was in the

19  report and so I left the room thinking I had

20  three hours between 9:00 a.m. and 12:00 noon

21  to produce 12,000 pages of shipment records

22  for the DEA.

23      Q    And would it have been physically

24  possible for you through ordinary business

25  records to extract within three hours over

Exhibit 5
A1 7

**Page 1533**

1  12,000 pages of documents?

2      A   No.

3      Q   And did you explain that this

4  would be physically impossible to the agents

5  onsite?

6      A   No.

7      Q   And did they ask you -- Did they

8  at any point in time offer to within that day

9  without the advice of counsel offer to give

10  you an extended period of time to produce

11  those documents?

12      A   No.

13      Q   And were you under the impression

14  that you may well be arrested if you didn't

15  produce those documents within three hours?

16      A   Well, certainly. I mean, that was

17  just what was communicated to me. I -- At

18  that point, I had the impression that this

19  needed, that we needed, to get the involvement

20  of some other people and that's when I asked

21  our local counsel in Indianapolis for some

22  assistance. He was able to get in contact

23  with Mr. Barber and I think that dialogue is

24  what eventually got us back into a much more

25  reasonable conversation. But for the entire

**Page 1534**

1  day Wednesday, we were certainly not in a

2  situation where we could in my opinion talk in

3  a reasonable manner.

4      Q   Now, Mr. Polk, your background,

5  you're an accountant?

6      A   Right.

7      Q   You have a Bachelors of Science

8  degree in Accounting.

9      A   Yes.

10      Q   And do you understand general

11  accounting principles that apply in an audit?

12      A   Yes.

13      Q   Now you mentioned the threat of

14  arrest. You mentioned an accusation of

15  scrubbing, I believe, you said.

16      A   Yes.

17      Q   And what was the other accusation?

18      A   Sanitizing.

19      Q   Now what provoked that charge that

20  you had scrubbed or sanitized documents?

21      A   I'm not sure. I would be

22  speculating. I don't know. I don't know what

23  provoked them to say that.

24      Q   Now what did you do in order to

25  accommodate the demand for the production of

**Page 1535**

1  the over 12,000 pages of document? What did

2  you cause to happen within Novelty in order to

3  accommodate that?

4      A   I asked our -- Well, first of all,

5  we weren't going to print it. We were going

6  to burn it to .PDFs. So I went to our IT

7  staff to get them working on a computer

8  program that would extract the data, print it

9  into a .pdf form so that we could put those on

10  CD ROMs versus physically printing that volume

11  of documents.

12      Q   Now you mentioned that Mr. Meador

13  was there during the inspections.

14      A   Yes.

15      Q   Now to your knowledge, had any

16  charge been leveled against Mr. Meador by your

17  counsel in the United States District Court

18  for the District of Columbia about an

19  affidavit that Mr. Meador had submitted?

20      MR. BARBER: Objection, Your

21  Honor. Relevance. Scope.

22      JUDGE RANDALL: Overruled. You

23  may answer the question.

24      THE WITNESS: Yes.

25      BY MR. EMORD:

**Page 2003**

1  at 9:06 a.m.)

2      JUDGE RANDALL: Back on the

3  record.

4      Mr. Emord, you may continue.

5      MR. EMORD: Thank you, Your Honor.

6  Opposing counsel and I have agreed on a unique

7  format with the witness which is the

8  combination of direct and cross in that I may

9  actually ask the witness certain leading

10  questions. We truncated the process. This is

11  one of the witnesses that we did that with for

12  the convenience of the Court. And so I begin.

13      JUDGE RANDALL: All right. Thank

14  you. Thank you for putting that back on the

15  record. I appreciate it.

16      MR. EMORD: Thank you, Your Honor.

17      DIRECT/CROSS EXAMINATION

18      BY MR. EMORD:

19      Q   Now, Mr. Polk, you previously

20  testified that the week of July 9, 2007, DEA

21  executed a search warrant at Novelty's

22  Greenfield, Indiana facility. Correct?

23      A   Yes.

24      Q   And at that investigation, did

25  Novelty then have pending -- At the time of

Neal R. Gross and Co., Inc.
202-234-4433

Page 33 of 103

Exhibit 5
A1 8

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2004

1    that investigation, did Novelty then have

2    pending a lawsuit against the Drug Enforcement

3    Administration in the United States District

4    Court for the District of Columbia?

5           MR. BARBER:  Objection, Your

6  Honor, to relevance.

7           JUDGE RANDALL:  Mr. Emord.

8           MR. EMORD:  This is actually where

9  we left off, Your Honor, last time.  Your

10  Honor ruled then that the question could be

11  allowed.  And so I'm proceeding with it.

12          JUDGE RANDALL:  Very well.  I

13  agree and I overrule the objection.  You may

14  inquire into the matters of the events that

15  occurred on July 9, 2007.

16          MR. EMORD:  Thank you, Your Honor.

17  Did you --

18          THE WITNESS:  Yes, I'm aware of

19  it.

20          BY MR. EMORD:

21    Q    And to your knowledge in that

22  suit, did the DEA's Darrell Meador have an

23  affidavit on file with the court?

24    A    Yes.

25    Q    And did Novelty then have pending

Page 2005

1    in that court a charge that the affidavit

2    contained a false statement?

3           MR. BARBER:  Objection, Your

4  Honor.  Relevance.  The documents in the court

5  will speak for themselves as to what was

6  pending.  This witness has not -- There is no

7  foundation laid that this witness is an expert

8  in the law and in the meaning of the pleadings

9  that have been filed in other cases and I also

10  note for the record that yesterday Mr. Emord

11  objected on several occasions to references

12  the expert witness report that was filed in

13  other fora and so we also object to

14  introducing this.  It has nothing to do with

15  the execution of the warrant.

16          MR. EMORD:  Actually, that's

17  exactly why I'm making the inquiry, Your

18  Honor.  It's the environment --

19          JUDGE RANDALL:  I can't hear you,

20  Mr. Emord.

21          MR. EMORD:  I'm sorry.  It's the

22  environment at Novelty that we're focusing

23  upon and the facts and circumstances preceding

24  it to the extent necessary to lay a predicate

25  for questions about that environment are

Page 2006

1  warranted here.

2          We're not going to get into the

3  precise nature of the suit or the charges but

4  the simple fact of the existence of the charge

5  is important to understanding the nature of

6  Mr. Meador's actions that day according to the

7  Respondent.

8          JUDGE RANDALL:  Very well.  Then I

9  will sustain the objection to the extent that

10  you've asked him to form a legal conclusion

11  and that's sustained.  However, I will allow

12  you limited leeway in establishing your

13  foundation.

14          MR. EMORD:  Thank you, Your Honor.

15          BY MR. EMORD:

16    Q    Now is it your understanding that

17  at the time of the investigation at Novelty

18  Novelty had then pending in the United States

19  District Court for the District of Columbia a

20  charge that Darrell Meador had included a

21  false statement in his affidavit?

22    A    Yes.

23    Q    And was Darrell Meador present at

24  Novelty on July 9, 2007?

25    A    Yes.

Page 2007

1    Q    Was he part of the DEA's team

2  executing a warrant?

3    A    Yes.

4    Q    And for how many days did he

5  remain at Novelty's facility?

6    A    He was there Monday, Tuesday and

7  Wednesday.  He was not there on Thursday and

8  Friday, the final two days of their

9  inspection.

10    Q    Did it surprise you that Mr.

11  Meador was present at the investigation?

12          MR. BARBER:  Objection, Your

13  Honor.  Relevance.  The witness's surprise to

14  this event is of no moment.

15          JUDGE RANDALL:  Mr. Emord.

16          MR. EMORD:  Well, actually it is

17  and the facts and circumstances concerning the

18  reaction of people who were looking at these

19  Fourth Amendment, First Amendment issues and

20  so understanding the environment that is

21  present is critical.  Appreciating both the

22  nature of the actions and the reactions to

23  them helps us understand what took place.

24          JUDGE RANDALL:  Very well.  I'm

25  going to sustain the objection.  Let's try to

Exhibit 5
A1 9

Page 2008

```
 1   stick with the facts, Mr. Emord.
 2          BY MR. EMORD:
 3     Q    Now you said that Mr. Meador was
 4   there the first day, July 9th.
 5     A    Right.
 6     Q    And let's talk about the basic
 7   structure of the Novelty facility.  When the
 8   agents entered the building, did they enter a
 9   general public entrance or did they come in
10   through another entrance?
11          MR. BARBER:  Objection, Your
12   Honor.  Mischaracterizes the facts.  These
13   were diversion investigators and one agent,
14   not multiple agents.
15          JUDGE RANDALL:  Sustained.
16          BY MR. EMORD:
17     Q    How many agents arrived on July 9,
18   2007 at Novelty's facility?
19     A    Five DEA employees arrived through
20   a public entrance.
21     Q    What were their names?  Do you
22   know?
23     A    Yes.  Darrell Meador, Staff
24   Coordinator.  Madeline Kuzma, Diversion
25   Investigator.  Lisa Gross, Staff
```

Page 2009

```
 1   Coordinator.  Carroll Harris, Special Agent in
 2   the Indianapolis office and Brian Bayly,
 3   Counsel DEA.
 4     Q    And did they enter through a
 5   public entrance?
 6     A    Yes.
 7     Q    And what did they proceed to do?
 8     A    They asked for an officer of the
 9   company and when I was notified they were
10   here, I met them in the lobby.  They handed me
11   their warrant.
12     Q    Now did they enter any area where
13   Novelty keeps its ephedrine and
14   pseudoephedrine containing products?
15     A    Yes.
16     Q    And where was that area in the
17   building?
18     A    It's in the warehouse.  We have a
19   caged in area of the warehouse that contains
20   the ephedrine and pseudoephedrine products and
21   we showed them where that area was and gave
22   them access to that area for their inspection.
23     Q    Now when they were in the caged in
24   area, did they have any -- did they make any
25   statements to you there about any objection
```

Page 2010

```
 1   concerning the manner in which the ephedrine
 2   and pseudoephedrine products were kept?
 3     A    No objection to the order of the
 4   facility.  There were a couple of statements
 5   made about some of the rework area when we
 6   were in that part on Tuesday morning counting.
 7   Staff Coordinator Barnhill made a comment
 8   about an empty bottle, saying that -- I think
 9   her exact words were something along the lines
10   that meth heads must have used this and taken
11   it back to the store for credit.  There was
12   some other bantering going on between the DEA
13   employees while they were counting that
14   section.  But other than that, I don't recall
15   any disparaging comments about the condition
16   of the facility or the products.
17     Q    Now did Novelty attempt to
18   videotape the investigation?
19     A    Yes.
20     Q    On what day did Novelty attempt to
21   videotape the investigation?
22     A    That was Wednesday, Wednesday the
23   11th.
24     Q    And why did Novelty attempt to
25   videotape the investigation?
```

Page 2011

```
 1     A    Well, previously on the day on
 2   Wednesday, we had an exchange about the threat
 3   of arrest which I felt was completely without
 4   merit and I was a bit concerned for what was
 5   going on and I wanted to have some proof or
 6   documentation that what was happening was
 7   exactly what was ultimately going to come out
 8   about what happened that day was truthful.  I
 9   felt the best way to do that would be to
10   document that through some form of media.
11     Q    Can you describe for me the
12   videotape recorder?
13     A    Yes, it was just a common, you
14   know, video recorder connected to a tripod.
15     Q    What's the size of the video
16   recorder?
17     A    It's, you know, a handheld, one of
18   those small.  I don't recall the exact brand
19   name that we have in the office, but it's like
20   a small Sony or Canon type handheld video
21   recorder.
22     Q    How much space does the tripod
23   take when it is extended out on the floor?
24     A    Probably no different than what
25   you'd see here with this easel board.
```

Exhibit 5
A1 10

Page 2012

```
 1        Q    Now you've testified that an
 2   attempt was made to videotape the
 3   investigation on Wednesday.  Correct?
 4        A    Right.
 5        Q    And where was the videotape
 6   recorder placed in the room in which the
 7   recording was to take place?
 8        A    At the end of the room.
 9        Q    Do you mean a corner of the room
10   or the center of the room on one side?  What
11   do you mean precisely?
12        A    I mean on the end kind of toward a
13   corner.  It wasn't in the corner but it was
14   away from the door.
15        Q    Did it block ingress or egress to
16   the room?
17        A    No.
18        Q    Did it obstruct access to any
19   documents in the room?
20        A    No.
21        Q    Was the videotape recorder placed
22   in the room prior to the arrival of the DEA
23   agents to your understanding?
24        A    Yes, they were all on lunch break
25   I believe when we placed it in the room the
```

Page 2013

```
 1   first time we attempted to place it in the
 2   room.
 3        Q    Now after the videotape recorder
 4   was placed in the room, was it plugged into
 5   the wall and made operative?
 6        A    Yes.
 7        Q    And what then happened when the
 8   DEA agents entered the room?
 9        A    It was removed from the room and
10   placed in the hallway.
11        Q    By those agents?
12        A    Yes.
13        Q    Do you know specifically?  Was
14   there one agent or two agents or more who
15   actually removed it from the room or do you
16   know?
17        A    I don't know the specific person
18   that removed it from the room the first time.
19        Q    Is someone -- is there a person in
20   Novelty's, among Novelty's executives who does
21   know that information?
22        A    Yes, sir.
23        Q    And who is that?
24        A    I believe J.R. Merlau knows that.
25        Q    Was the removal of the videotape
```

Page 2014

```
 1   recorder against your wishes?
 2        A    Yes.
 3        Q    Did you -- Did Novelty executives
 4   make, to your understanding, did Novelty
 5   executives make clear that that was against
 6   their wishes?
 7             MR. BARBER:  Objection, Your
 8   Honor.  No foundation.  He's asked what other
 9   Novelty executives have done.
10             JUDGE RANDALL:  Overruled.  He
11   stated to this witness's understanding.
12             THE WITNESS:  Yes.
13             BY MR. EMORD:
14        Q    And nevertheless, the video
15   recorder was removed over their objections.
16        A    Correct.
17        Q    Was there a second attempt to
18   videotape the investigation?
19        A    Yes.
20        Q    And when did that occur?
21        A    It occurred early in the afternoon
22   on the 11th.  It was after the first, after
23   the recorder had been removed the first time.
24        Q    And was that attempt to video
25   record made in the same room as before?
```

Page 2015

```
 1        A    Yes, same room, same location.
 2        Q    And when -- And where was the
 3   video recorder placed the second time the
 4   video recording was attempted?
 5        A    The same general spot that we had
 6   placed it the first time.
 7        Q    And how did DEA agents respond to
 8   the second attempt to video record the
 9   investigation?
10        A    Well, they were present for the
11   second installation of the video camera and
12   immediately seized the equipment and in the
13   course of doing so unplugged the equipment
14   from the wall and removed it from the room and
15   placed it back in the hallway.
16        Q    Now to your knowledge was the
17   equipment at the time it was seized, was it
18   held by any employee of Novelty?
19             MR. BARBER:  Objection, Your
20   Honor.  The beginning of a question that
21   starts with "To your knowledge" doesn't lay a
22   foundation and he's not even testified that he
23   was present when the video was removed the
24   second time, where he was and what the basis
25   of his knowledge is.  It would be
```

Exhibit 5
A1 11

TESTIMONY OF POLK    TUESDAY, APRIL 1, 2008
Case 1:08-cv-00635-RMC   Document 19-6   Filed 05/09/2008   Page 21 of 50
TESTIMONY OF POLK    TUESDAY, APRIL 1, 2008

Page 2016

```
 1   inappropriate to have this witness continue to
 2   testify incompetently unless a foundation for
 3   this knowledge is established.
 4              MR. EMORD:  Hearsay is liberally
 5   permitted.
 6              JUDGE RANDALL:  I'm going to
 7   sustain the objection.
 8              BY MR. EMORD:
 9      Q    Do you have any knowledge -- Well,
10   let me rephrase the question.  Did there come
11   a time when you became aware of how the video
12   recorder was used in the room the second
13   attempt the video recording was made?
14      A    Yes.
15      Q    And how did you receive that
16   information?
17      A    From J.R. Merlau.
18      Q    And what did he tell you?
19              MR. BARBER:  Objection, Your
20   Honor.  Mr. Merlau is on their witness list
21   and so it is repetitive to have this witness
22   testify about the hearsay which the Government
23   will then cross examine Mr. Merlau on.
24              JUDGE RANDALL:  Overruled.  You
25   may answer.
```

Page 2017

```
 1              THE WITNESS:  He told me that
 2   Darrell Meador grabbed the equipment, pulled
 3   it and removed it from the room.
 4              BY MR. EMORD:
 5      Q    Did he tell you whether Darrell
 6   Meador grabbed the equipment from his physical
 7   possession or was it from the site where it
 8   was located separate from his possession?
 9      A    It was from his possession.  He
10   hadn't even had a chance to.
11      Q    So J.R. told you that he had
12   physical custody of the video recorder and it
13   was removed from his hands by Mr. Meador.
14      A    Yes.
15      Q    And it was then also detached from
16   the electrical conduit in the wall.
17      A    Yes.
18      Q    And then it was removed outside of
19   the room?
20      A    Yes, it was placed in the hallway.
21      Q    And was that against the wishes of
22   Novelty?
23      A    Yes.
24              MR. BARBER:  Objection, Your
25   Honor.  Against the wishes of Novelty is
```

Page 2018

```
 1   vague.  Let's talk about who at Novelty's
 2   wishes this witness has knowledge of.
 3              MR. EMORD:  Your Honor, there
 4   ought to be -- It's not a foundational
 5   objection.  It's a request that a question be
 6   asked in a particular way and I ought to be
 7   able to do the examination in the order in
 8   which I think fits so long as there isn't an
 9   appropriate foundational objection.  This is
10   disruptive.
11              MR. BARBER:  I'll object on
12   foundation, Your Honor.  I apologize for
13   suggesting there's a better way to ask the
14   question.  I'll try and limit my objection to
15   the fact that this witness, no foundation has
16   been laid for this witness' knowledge of who
17   objected, when they objected and they
18   communicated the objection to DEA.  So it
19   would be incompetent for him to testify about
20   the objections in a vague and ambiguous
21   manner.
22              JUDGE RANDALL:  I'm going to
23   sustain the objection.  Mr. Emord, if you
24   would lay the foundation.
25              MR. EMORD:  Very well, Your Honor.
```

Page 2019

```
 1              BY MR. EMORD:
 2      Q    Did there come a time that you --
 3   Well, did you ever receive information as to
 4   whether Novelty, meaning an executive for
 5   Novelty, communicated to DEA dissatisfaction
 6   with DEA's removal of the video equipment from
 7   the room the second attempt videotaping was
 8   made?
 9      A    No, I did not personally as an
10   executive of the company tell them I was
11   displeased with their removal of the video
12   equipment.
13      Q    But did you come to understand
14   from anyone else at Novelty?
15      A    Yes.
16      Q    And what were you informed?
17              MR. BARBER:  Objection, Your
18   Honor.  There is still no foundation as to the
19   source of his information and when the
20   information was received by this witness.
21              JUDGE RANDALL:  Overruled.  The
22   foundation is adequate.  You may ask those
23   questions on cross, Mr. Barber.
24              THE WITNESS:  Yes.  Yes, it came
25   to my attention that J.R. had told them that
```

Exhibit 5
A1 12

Page 2020

```
 1    we wanted to that equipment present.
 2           BY MR. EMORD:
 3       Q    Now was there a third attempt --
 4    Well, excuse me.  Did there come a time when
 5    a Novelty executive attempted to audio record
 6    the investigation?
 7       A    Yes.
 8       Q    And what day was that attempt
 9    made?
10       A    Wednesday the 9th or Wednesday the
11    11th.
12       Q    And did that occur after the
13    second attempt to video record the
14    investigation?
15       A    Yes.
16       Q    And what happened with the audio
17    recorder?
18       A    The audio recorder was placed at
19    the end of the table, the end of the
20    conference room table.
21       Q    In the same room?
22       A    The same room.  It was placed on
23    the table with the record button depressed or
24    record was activated.  There was a quick
25    disabling or deactivation of the recording.
```

Page 2021

```
 1       Q    By whom?
 2       A    I do not know who disabled the
 3    recorder.  But you can tell on the recording
 4    it cuts off and then goes on to the previous
 5    recording.  When I came into the room around
 6    5:00 p.m. or 5:30 p.m. that evening the
 7    recorder was laying on the table, batteries
 8    removed, tape removed, cover for the batteries
 9    apart and laying on the table.
10       Q    And did you have any conversation
11    with another Novelty executive concerning the
12    audio taping attempt?
13       A    Yes.
14       Q    And who was that person?
15       A    J.R. Merlau.
16       Q    And what were you told?
17       A    I was told that he placed it on
18    the end of the table with --
19       Q    Who was he?
20       A    J.R. Merlau told me that he placed
21    the tape recorder on the end of the table with
22    the record function active.
23       Q    And then what happened according
24    to J.R.?  Did he tell you anything else?
25       A    Yes.  He said they verbally
```

Page 2022

```
 1       A    Correct.
 2       Q    And did those DEA agents who asked
 3    you to produce documents ever alter their
 4    demand for production of documents after you
 5    supplied them the documents?
 6       A    Yes.
 7       Q    How many times did they alter
 8    their demand for production of documents after
 9    documents were produced?
10       A    I don't have a specific count of
11    times.  I know it was fairly common through
12    Wednesday.  As I said, on Thursday when Mr.
13    Barber got involved in the conversation the
14    occurrence became less.  But we had an email
15    exchange with their national office that dealt
16    around 10 or 11 items that we had typed out a
17    list based upon previous requests made to me
18    by the DEA employees that were there.
19           When we were done on Thursday,
20    that list was at 23 items.  On Thursday, there
21    were some things added to the list.  When we
22    were done on Friday, it was at 26 items.
23    Typically, in the early in the process,
24    Tuesday and Wednesday, we would give them a
25    document and they would say, "Well, can you
```

```
 1    objected to it being there and turned it off.
 2       Q    And did J.R. tell you whether that
 3    was against his wishes?
 4       A    Yes.
 5       Q    And what did he tell you?
 6       A    It was against -- He wanted to
 7    keep it on.  I wanted to have it on.  I wanted
 8    to have it on when I went into the room at
 9    5:00 p.m. or 5:30 p.m. for our next meeting.
10           MR. EMORD:  If the Court Clerk
11    will place before the witness what has been
12    identified ALJ Exhibit 1 as well to save time
13    Novelty Exhibit 36 as well.  I'm sorry I'm
14    having you do that all at once.
15           (Off the record discussion.)
16           BY MR. EMORD:
17       Q    Do you have both documents, Mr.
18    Polk?
19       A    Yes, sir.
20       Q    All right.  In a moment, I'm going
21    to ask you questions about them.  Now I
22    believe you previously testified that during
23    the course of the investigation the DEA
24    investigators asked you to produce various
25    documents.
```

Page 2023

```
 1       A    Correct.
 2       Q    And did those DEA agents who asked
 3    you to produce documents ever alter their
 4    demand for production of documents after you
 5    supplied them the documents?
 6       A    Yes.
 7       Q    How many times did they alter
 8    their demand for production of documents after
 9    documents were produced?
10       A    I don't have a specific count of
11    times.  I know it was fairly common through
12    Wednesday.  As I said, on Thursday when Mr.
13    Barber got involved in the conversation the
14    occurrence became less.  But we had an email
15    exchange with their national office that dealt
16    around 10 or 11 items that we had typed out a
17    list based upon previous requests made to me
18    by the DEA employees that were there.
19           When we were done on Thursday,
20    that list was at 23 items.  On Thursday, there
21    were some things added to the list.  When we
22    were done on Friday, it was at 26 items.
23    Typically, in the early in the process,
24    Tuesday and Wednesday, we would give them a
25    document and they would say, "Well, can you
```

Exhibit 5
A1 13

Case 1:08-cv-00635-RMC   Document 19-6   Filed 05/05/2008   Page 23 of 50

Page 2024

```
 1      add this field into this document" or "Can you
 2      add this piece of data to this document" and
 3      we would then go back and modify that document
 4      according to their request.
 5          Q      So from Monday until Wednesday,
 6      you would be, correct me if I'm wrong, asked
 7      to produce documents and then what?
 8          A      Then I'd be asked to produce more
 9      documents or to change the documents I had
10      previously given them.
11          Q      And to the best of your
12      recollection, how many times were demands for
13      production of documents altered in this way
14      between Monday and Wednesday?
15              MR. BARBER:  Objection.  Asked and
16      answered and the witness said he doesn't
17      recall a specific number.
18              JUDGE RANDALL:  Sustained.
19              BY MR. EMORD:
20          Q      Now let's take Monday.  Do you
21      recall whether on Monday after an initial
22      document demand was made and you supplied
23      documents in response to it whether the agents
24      then asked you then modify the request for
25      those documents?
```

---

Page 2025

```
 1          A      Yes, on Monday the document we
 2      gave them was a list of all of the items we
 3      sold containing scheduled listed chemicals.
 4      We had presented a list to them and they asked
 5      me to change it to add some other information
 6      to it.
 7          Q      Now to your recollection, did that
 8      occur more than once on Monday, the change?
 9          A      No, just once.
10          Q      On Tuesday, do you recall being
11      asked for documents by the DEA agents?
12          A      Yes.
13          Q      And after you produced those
14      documents, do you recall being asked to modify
15      the scope of production to produce other
16      documents?
17          A      I don't recall changes to any
18      documents on Tuesday.  The changes came more
19      Wednesday, Thursday and Friday.
20          Q      Now on Wednesday, were you asked
21      to produce documents?
22          A      Yes.  That was the 12,000 page
23      document in a three-hour day.
24          Q      All right.  And after you had
25      produced the documents requested on Wednesday,
```

---

Page 2026

```
 1      did they modify or alter their request for
 2      production to seek more documents?
 3          A      Yes.
 4          Q      And to the best of your
 5      recollection on Wednesday, how many times did
 6      that take place?
 7          A      At least once.
 8          Q      Now on Thursday, did they ask for
 9      documents?
10          A      Yes.
11          Q      And upon receipt of the documents
12      on Thursday, did they modify their request and
13      ask for more documents?
14          A      Yes.  The list grew.  We added
15      three more documents to the list during the
16      day on Thursday, yes.
17          Q      And how many times were you asked
18      to modify the production on Wednesday, excuse
19      me, on Thursday?
20          A      Somewhere between one and five.
21      Thursday was a pretty heavy document prep and
22      exchange day. I don't recall exactly the
23      number, but it was, I'd say, less than five.
24          Q      Did you find the production of the
25      documents in response to the demands
```

---

Page 2027

```
 1      burdensome?
 2              MR. BARBER:  Objection, Your
 3      Honor.  That calls for a legal conclusion with
 4      regard to work unless it's being used in a way
 5      other than a legal conclusion from burdensome
 6      with regard to the reasonableness of a
 7      warrant.
 8              JUDGE RANDALL:  Mr. Emord.
 9              MR. EMORD:  Well, the term
10      "burden" is a lay term, Your Honor, and it's
11      used in the laws in a lay way.  It's a matter
12      of reason as is the terms "reasonableness."
13      So the witness has his own perspective as to
14      whether or not it was burdensome.  We didn't
15      get into that.
16              MR. BARBER:  I'll withdraw the
17      objection if it's used in a layperson's terms,
18      Your Honor.
19              JUDGE RANDALL:  All right.  Thank
20      you.
21              MR. EMORD:  You may answer the
22      question.
23              THE WITNESS:  Yes.  Certainly the
24      manner in which the document were requested
25      was burdensome.  I think the time constraints
```

Exhibit 5
A1 14

Page 2028

```
 1    put on us were burdensome.  The information is
 2    available, wasn't necessarily available in the
 3    format that the DEA employees were asking for.
 4    So to the extent we had to produce formats
 5    that met their expectations in the time frame
 6    that they were asking for them, I felt like it
 7    was burdensome.
 8              The previous inspections didn't
 9    come to us through a warrant with a cutoff
10    date and certainly the agents, not agents, the
11    investigators and staff coordinators that were
12    presented were very conscious about the
13    deadline, getting this information from us
14    before this warrant, the time that the warrant
15    ran out.  I think that put some pressure on
16    them that they then transferred to us to get
17    the documents in time.
18              You know, again through dialogue
19    with Mr. Barber's office we were able to agree
20    to an extension for the warrant deadline.  We
21    had no problem or qualm with cooperating with
22    the inspection.  Certainly at times during the
23    inspection and certainly early on in the
24    inspection, I questioned the appropriateness
25    of some of the people that were there, a
```

Page 2029

```
 1    lawyer on a case in which we aren't not a
 2    lawyer representing the Government in a case
 3    in which we're not able to --
 4              MR. BARBER:  Objection, Your
 5    Honor.
 6              THE WITNESS:  -- receive, obtain,
 7    discovery.
 8              MR. BARBER:  Objection, Your
 9    Honor.
10              JUDGE RANDALL:  Sorry.  Yes, Mr.
11    Barber.
12              MR. BARBER:  The question was
13    whether or not it was burdensome.  We've now
14    moved far afield into a narrative with no
15    pending question and I believe the question
16    was answered and in order to give the
17    Government a fair opportunity to hear
18    questions before Mr. Polk continues on his
19    narrative, I would ask a question be posed.
20              JUDGE RANDALL:  Sustained.
21              THE WITNESS:  Can I respond to the
22    question then?
23              JUDGE RANDALL:  The burdensome
24    question?
25              THE WITNESS:  Yes.
```

Page 2030

```
 1              JUDGE RANDALL:  I'll let your
 2    counsel ask a question.
 3              THE WITNESS:  Okay.
 4              JUDGE RANDALL:  Your question.
 5              BY MR. EMORD:
 6         Q    Do you wish to provide a further
 7    response to the question about burden?
 8         A    Yes.  The data asked for was not
 9    burdensome.  The manner in which it was asked
10    for was burdensome.
11         Q    Now did you possess all of the
12    data that they requested within your ordinary
13    business files at Novelty?
14         A    Yes.
15         Q    So the difficult as I understand
16    it, correct me if I'm wrong, the difficulty in
17    production lay in manipulating that data to
18    assume a format that the Government wanted?
19         A    Yes.
20         Q    And is it the case that the agents
21    onsite kept alternating the definition of the
22    format?
23         A    On some documents, yes.  When we
24    sat down on Monday, what was told to me was
25    they were going to select a group of items to
```

Page 2031

```
 1    audit and then they would select -- We would
 2    do a physical count of those items.  Then they
 3    would select a subset of those items to do a
 4    more extensive audit and we talked about the
 5    definition of an extensive audit.  I said, "I
 6    will give you a list of transactions and then
 7    you can select from those transactions."  They
 8    said, "Yes, that's what we want to do.  You
 9    give a list of receipts.  You give us a list
10    of shipments.  You give us a list of
11    transfers.  We'll select individual
12    transactions that we want to audit."  In other
13    words, go get the source document.  Go get the
14    transfer document.  Go get the shipment
15    document.  Go get the received document and
16    validate the accuracy or the validity of that
17    document and therefore by sampling these
18    individual transactions and validating some of
19    the individual transactions validate this
20    transaction set as a whole.
21              That never transpired.  It was
22    continually 20-item initial selection.  Stay
23    with the 20 items.  There was no subset of
24    those items.  "Give me a list of your
25    shipments to the reps."  I gave them a list of
```

Exhibit 5
A1 15

Page 2032

```
 1    shipments to the reps, 157 pages, Wednesday
 2    morning.  "Give me every single one of these
 3    shipping documents by noon."  All right.  That
 4    wasn't a sample.  That's 12,000 or 12,000
 5    pages of documents.  All right.
 6              It never became -- It was not --
 7    The conversation that we had on Monday never
 8    materialized during the course of the audit.
 9    It was unlike previous inspections where it
10    was a very specific list of things, a process
11    that had precedent.  This was a process that
12    had no precedent, at least, from Novelty's
13    perspective and so it was a difficult thing to
14    do to try to figure out exactly what I needed
15    to do to meet their expectations early in the
16    process.
17        Q    Well, it sounds like you produced
18    quite a few documents.  Did --
19              MR. BARBER:  Objection to the
20    commentary, Your Honor.
21              JUDGE RANDALL:  Sustained.
22              BY MR. EMORD:
23        Q    Did the DEA agents do a complete
24    audit of Novelty?
25        A    No.  I believe I testified on
```

Page 2033

```
 1    Friday that there was an area of the facility
 2    that contained products being sorted that was
 3    not counted.
 4        Q    Now if you'll turn your attention
 5    to what has been identified as or actually
 6    what is ALJ Exhibit 1, the Order to Show Cause
 7    and Immediate Suspension of Registration, and
 8    in particular if you'll turn your attention to
 9    page two paragraph four.  Have you seen this
10    document before, Mr. Polk?
11        A    Yes.  Did you -- Looking at the
12    date on the last page four, January 17, 2008,
13    can you tell me to the best of your
14    recollection when you first saw the document?
15        A    January 28, 2008.
16        Q    And the date on the last page is
17    January 17, 2008.  So you're saying that you
18    first saw it roughly ten days after that date?
19        A    Yes.
20        Q    All right.  And when you first saw
21    the document and in particular paragraph four
22    on page two, focusing -- Let me just focus
23    your attention specifically on paragraph four
24    on page two, go ahead and take a moment to
25    read it and when you've done that, let me
```

Page 2034

```
 1    know.
 2        A    Okay.
 3        Q    Now are you familiar with
 4    paragraph four?  Do you remember paragraph
 5    four?
 6        A    Yes.
 7        Q    Now after you read paragraph four,
 8    did you do anything in response to it?
 9        A    Yes.  I immediately went to the
10    inventory calculations that I had prepared
11    based upon the data I had given to the DEA to
12    understand where they were reach this
13    conclusion or how they would reach this
14    conclusion.
15        Q    Now in paragraph four it says, "In
16    July 2007, DEA conducted an audit of Novelty's
17    records and inventory for 20 scheduled listed
18    chemical products distributed by Novelty.
19    Novelty could not account for more than 60,000
20    dosage units of two ephedrine products."  Do
21    you see that?
22        A    Yes.
23        Q    Now with regard to the statement
24    that Novelty could not account for more than
25    60,000 dosage units of two ephedrine products,
```

Page 2035

```
 1    did you undertake any activity as the CFO of
 2    Novelty to determine whether that statement
 3    was valid?
 4        A    Yes.
 5        Q    What did you do?
 6        A    Well, I looked at my calculation,
 7    my inventory Rule 4, from the beginning number
 8    to calculate the ending number compared to the
 9    physical counts that we conducted with the DEA
10    on the 9th to try to find what items, what two
11    items, were 60,000 short.  I could not find
12    two items totally 60,000 units short on the
13    calculations that I had prepared.
14        Q    And with regard to the next
15    sentence, "The audit also revealed overages
16    for 16 different scheduled listed chemical
17    products."  Did you do anything to determine
18    the validity of that sentence?
19        A    Yes.  Again, my calculation didn't
20    have 16 items over either.  But at that point,
21    I didn't know what particular items the
22    Government thought were short or which
23    particular items the Government thought were
24    over.  So I was not able to precisely identify
25    what may have been an error.
```

Exhibit 5
A1 16

Case 1:08-cv-00635-RMC   Document 19-6   Filed 05/05/2008   Page 26 of 50

Page 2036

```
 1        Q    Now did there come a time when you
 2   evaluated in detail and put in writing your
 3   assessment of the 60,000 dosage units and the
 4   16 overages charged from paragraph four?
 5        A    Yes.  When I was able to see I
 6   think it's Government Exhibit 4 or part of
 7   Government Exhibit 4, the schedule prepared by
 8   the DEA as part of their inspection, I learned
 9   they thought Item No. 17902 was short by about
10   30,000 units and Item No. 17903 was short by
11   about 30,000 units and I looked at their list
12   first to see if they had included all of the
13   transactions.
14
15
16
17
18   had in our inventory after the blister pack
19   date or just ahead of when the blister pack
20   date was going to into effect.
21        We returned those items to ███ and
22   I had given that information to the DEA as
23   part of their document request which excluded
24   that which led them to believe that we should
25   have had about 2████ items on hand when in
```

Page 2037

```
 1   fact we would not have had those because we
 2   sent them back to ███
 3        Q    Now if you'll look at what has
 4   been identified as Novelty Exhibit 36.  Can
 5   you please explain for the Court to your
 6   understanding Novelty Exhibit 36 is?
 7        A    Yes, it's a list of transactions
 8   for items that were audited that were excluded
 9   from the calculation prepared in Government
10   Exhibit 4.
11        Q    Now who prepared Novelty Exhibit
12   36?
13        A    I did.
14        Q    Why did you prepare it?
15        A    To explain the differences between
16   the calculation that includes all of the data,
17   the accurate calculation, and the Government's
18   calculation which excluded data.
19        Q    Can you please explain for the
20   Court your findings contained in Novelty 36?
21        A    Yes.  In summary, there were three
22   sets of data that were excluded.  One set of
23   data were the returns to vendors.  A second
24   set of data were items that were removed to
25   the expired or obsolete inventory area.  And
```

Page 2038

```
 1   the third set were some miscellaneous
 2   transfers or adjustments.  Those, for example,
 3   were here Item 1███.
 4        The -- something else that the
 5   Government did that I thought was interesting,
 6   but I thought that it was a proper technique
 7   to use in an audit, but their conclusions I
 8   thought were interesting.  The proper
 9   technique I thought, Your Honor, was to go to
10   our suppliers and say, "Give us what you think
11   your sales information to Novelty" and then
12   use that to validate our receipts.  I think
13   that's a proper audit technique.  But they
14   either misread that report or for whatever
15   reason excluded some of the receipt
16   information when they were doing some
17   matching.
18        You know, their Government Exhibit
19   4 broke out four items on the bottom of their
20   report that they, I think, allude to as doing
21   a second audit.  In that second audit, they're
22   using the vendor sales records versus our
23   receipt records.  In a couple of the items,
24   ███████, they exclude a very large
25   receipt that's on the sales record from those
```

Page 2039

```
 1   suppliers.  ████████████████████
 2   ██████.  That's the name of the supplier.
 3   I think it was ███ units were listed on
 4   the report as sold to Novelty but excluded by
 5   the Government in their second audit of ███
 6   ████   Now Item
 7   ███████████████████████
 8
 9   Because I couldn't identify which specific
10   transactions the Government excluded because
11   there were no transactions, no single
12   transaction equal to the total error that was
13   made of about 160,000 units.
14        So I can't state -- I don't know
15   why these transactions were excluded.  The
16   information was given to the Government and it
17   certainly needed to be included if you were
18   going to accurately calculate what our
19   inventory is.
20        Q    Now as I see this Novelty Exhibit
21   36, what's identified as Novelty Exhibit 36,
22   I see that you have in the lefthand column a
23   title "Product Code."
24        A    Yes.
25        Q    And then you list product codes
```

Exhibit 5
A1 17

Page 2040

```
1    down the lefthand side on both of the pages.
2    Why did you include these various product
3    codes?
4         A    These were the products chosen by
5    the DEA for audit.
6         Q    And then in a second column to the
7    right you have listed there, "Quantity in
8    Error" and then you have a series of numbers
9    listed under that title "Quantity in Error."
10   What does that show?
11        A    Can you repeat that question
12   please?
13        Q    Yes.  You have your document that
14   you've identified as something you've prepared
15   here, Novelty Exhibit 36.
16        A    Yes.
17        Q    You have a second column to the
18   right of the "Product Code" column.
19        A    Right.
20        Q    And that column is entitled
21   "Quantity in Error."
22        A    Yes.
23        Q    What do you show in this column?
24        A    I'm showing the total amount of
25   the -- the total units that were excluded from
```

Page 2041

```
1    the calculation by the Government.
2         Q    Erroneously excluded.
3         A    Yes.
4         Q    And then under the title
5    "Explanation" which is the third column, there
6    is there written an explanation.  Is it the
7    case that the explanation that is being
8    provided there is an explanation of the
9    errors?
10        A    Yes.
11        Q    And then on the furthest column on
12   the right, it says, "Supporting Documentation
13   Found on Attached Pages."  Now and the pages
14   appear to be listed throughout that column.
15   Now are the page references to documents that
16   are appended to this exhibit?
17        A    Yes.
18        Q    And are these pages which are
19   variously numbered at the bottom of the page
20   three through 98 the specific documents that
21   you used to support your explanation of the
22   errors made?
23        A    Yes.
24             MR. EMORD:  Your Honor, at this
25   time, I would move for admission Novelty
```

Page 2042

```
1    Exhibit 36.
2                       (Whereupon, the document
3                       referred to was marked
4                       as Novelty Exhibit No.
5                       36 for identification.)
6             JUDGE RANDALL:  Any objections?
7             MR. BARBER:  Your Honor, I just
8    ask that briefly I be able to voir dire the
9    witness regarding two matters on this
10   document.
11            JUDGE RANDALL:  You may voir dire.
12            VOIR DIRE EXAMINATON
13   BY MR. BARBER:
14        Q    And good morning again, Mr. Polk.
15   Are all of the supporting documents that you
16   used in calculating the first two pages of
17   Novelty Exhibit 36 attached to this document?
18        A    I think in a couple of instances I
19   couldn't -- I did not include the pages in
20   this, for example, Item ████████
21   ████████████████████████████████
22        Q    Which line are you referring to?
23        A    This would be the sixth line down
24   in Exhibit 36.
25        Q    On page one of Exhibit 36?
```

Page 2043

```
1         A    Yes, page one.
2         Q    You're referring to the product
3    code ████ and the sixth line down has --
4         A    No, 1██ the fifth line down.
5    I'm sorry.
6         Q    Okay.
7         A    Where it's noted n/a, Mr. Barber,
8    I did not include the supporting document.
9         Q    Do you have supporting documents
10   for your assertion in that line?
11        A    Yes.  I would go to -- If you want
12   some explanation here, I would look at
13   Government 32.  I would look at Government 4
14   to do a comparison.  My explanation notes
15   those two documents, if you compare those two
16   documents you'll find the discrepancy.
17        Q    So there are no internal documents
18   to Novelty that you used to calculate that?
19        A    No.  It wasn't necessary because
20   it was a Government document.  The Government,
21   Mr. Barber, used vendor sales records to try
22   and validate our receipts and when they used
23   those sales records, they used them
24   erroneously.
25        Q    I understand.  I'm just trying to
```

Exhibit 5
A1 18

TESTIMONY OF POLK     TUESDAY, APRIL 1, 2008

Case 1:08-cv-00635-RMC   Document 19-6    Filed 05/09/2008    Page 28 of 50

**Page 2044**

```
 1    figure out if everything that you used is
 2    either attached to this document or for
 3    example the line you just spoke about, you
 4    make reference to Government documents that
 5    are part of this proceeding.
 6         A    Yes.
 7         Q    Are there any documents outside
 8    those that you've either listed here or
 9    referred to that are Government exhibits that
10    were included in your calculation that you
11    used to create pages one and two?
12         A    Not that I'm aware of.  I'd say
13    one thing though to answer your question.
14    That is, the Government did not provide in
15    their exhibits sales information from ▮▮▮
16    You do have a difference in what Novelty's
17    receipt documents say from ▮▮▮ and what the
18    Government says.  But I can't identify what
19    that difference is because I never go the
20    Government's sales for ▮▮▮
21              MR. BARBER:  No objection, Your
22    Honor.
23              JUDGE RANDALL:  Very well.  I
24    accept into the record Respondent's Exhibit
25    36.
```

202-234-4433

Page 74 of 103

**Page 2045**

```
 1              (The document referred
 2              to having been
 3              previously marked for
 4              identification as
 5              Respondent Exhibit No.
 6              36, was received in
 7              evidence.)
 8         MR. EMORD:  Thank you, Your Honor.
 9         JUDGE RANDALL:  And I note that
10    it's already marked confidential and
11    protected.
12         MR. EMORD:  Thank you.
13         DIRECT/CROSS EXAMINATION
14    BY MR. EMORD:
15         Q    Now following your assessment in
16    Novelty Exhibit 36, did you come to a
17    conclusion as to the validity of paragraph
18    four on page two of ALJ Exhibit 1?
19         A    That it's wrong.
20         MR. BARBER:  Objection, Your
21    Honor.  This calls for a conclusion with
22    regard to one of the allegations that is a
23    matter for Your Honor to decide.  This is not
24    an expert witness, but a fact witness.  So his
25    conclusion about what the facts show is
```

202-234-4433

Page 75 of 103

TESTIMONY OF POLK        TUESDAY, APRIL 1, 2008

**Page 2046**

```
 1    irrelevant.
 2              JUDGE RANDALL:  Overruled.  I'll
 3    allow him to answer.
 4              THE WITNESS:  Yes, I think it's
 5    wrong.
 6              BY MR. EMORD:
 7         Q    Now from your earlier testimony, I
 8    understand that Novelty ▮▮▮▮▮▮▮▮▮▮
 9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Correct?
10         A    Correct.
11         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12         A    Yes.
13         Q    These are the folks if I have
14    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16         A    Yes.
17         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19    ▮▮▮▮
20         A    Yes.
21         Q    And who are those individuals?
22         A    ▮▮▮▮▮▮▮▮▮▮▮▮
23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
```

202-234-4433

Page 76 of 103

TESTIMONY OF POLK        TUESDAY, APRIL 1, 2008

**Page 2047**



```
 1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 3         A    It's typically five.
 4         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 5    ▮▮▮▮▮▮▮▮▮▮
 6         A    ▮▮▮▮▮▮
 7    ▮▮▮
 8         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
 9    ▮▮▮▮▮▮▮▮▮▮
10         A    ▮▮▮▮▮▮▮▮▮▮▮
11         Q    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12    ▮▮▮▮▮▮▮
13    ▮▮▮▮
14    ▮▮▮▮▮▮
15         Q    ▮▮▮▮▮▮▮
16    ▮▮▮▮▮▮
17         A    ▮▮▮▮▮▮▮▮▮
18    ▮▮▮
19    ▮▮▮▮
20         A    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21    ▮▮▮▮▮▮▮
22    ▮▮▮▮
23    ▮▮▮▮▮
24         A    ▮▮▮▮▮
25         Q    ▮▮▮▮▮▮▮▮▮▮
```

202-234-4433

Page 77 of 103

Exhibit 5
A1 19

**TESTIMONY OF POLK**      TUESDAY, APRIL 1, 2008

Page 2048



```
1                                      ?
2        A
4        Q      And who is that?
5        A
6               JUDGE RANDALL:  I'm sorry.  I
7    didn't hear that answer.
8               THE WITNESS:
9               BY MR. EMORD:
10       Q
11       A      He reports to the president, Todd
12   Green.
13       Q      All right.  Now what, if anything,
14
16       A      We monitor a lot of things with
17
25       A      Yes.
```

**TESTIMONY OF POLK**      TUESDAY, APRIL 1, 2008

Page 2049

```
1        Q      And how are they trained?
2        A      They're trained in two ways.  One
3
6                                           cases on
7    their own reading a training manual.
8               MR. EMORD:  Now you have before
9    you what is marked as Novelty Exhibit 28.
10   Please take a moment to familiarize -- I'm
11   sorry.  You don't have that.  Pardon me.  You
12   will soon though.
13              (Off the record discussion.)
14              BY MR. EMORD:
15       Q      Do you have what has been
16   identified as Novelty Exhibit 28 before you?
17       A      Yes.
18       Q      Take a moment to look through that
19   document.  Please don't try to read all of the
20   pages.  You'll be here for a week and let me
21   know if it is familiar to you.
22       A      Yes, it is.
23       Q      Take a look -- If you'll go
24   through from page one to 64.
25       A      Okay.
```

**TESTIMONY OF POLK**      TUESDAY, APRIL 1, 2008

Page 2050

```
1        Q      Actually, up to page 63, pages one
2    to 63 first.
3        A      Okay.
4        Q      Can you please tell me what pages
5    one to 63 are?
6               MR. BARBER:  Objection, Your
7    Honor.  There is not only a lack of foundation
8    with regard to this witness's role in the
9    training, but this goes well beyond the scope
10   of the disclosed topics on which this witness
11   will testify.  He has testified that he's the
12   CFO.  I've reviewed his proposed testimony
13   from the prehearing statement and find nothing
14   about going into Novelty's training of its
15   route sales professionals in this disclosure.
16              MR. EMORD:  As I understand it,
17   I've been given the unique position of being
18   both a person doing direct and cross and as a
19   consequence, questions arose during Mr.
20   Barber's direct concerning the training of
21   Novelty's route sales professionals and so I'm
22   merely exploring that.
23              MR. BARBER:  Your Honor, I'll
24   object then if this is cross that it's well
25   beyond the scope of the direct.  There were no
```

**TESTIMONY OF POLK**      TUESDAY, APRIL 1, 2008

Page 2051

```
1    questions about this training of Novelty sales
2    representatives.  That was with a different
3    witness.
4               MR. EMORD:  I should also note
5    that my colleague has pointed out that Mr.
6    Barber is in error as to what was disclosed.
7    "Ryan Polk," it says in the prehearing
8    statement, "will testify concerning Novelty's
9    inventory control system and managing its
10   inventory of
                          He will testify concerning
12                                        Are those
13   the two sentences?  Which provides a
14   sufficient enough foundation for the
15   information.  Of course, these documents were
16   exchanged also well in advance of the hearing.
17              JUDGE RANDALL:  Before I rule on
18   the objection, Mr. Emord, would you lay a
19   foundation please?
20              MR. EMORD:  Yes, Your Honor.
21              BY MR. EMORD:
22       Q      Now, Mr. Polk, if you'll take a
23   look at the Novelty Exhibit 28, specifically
24   those pages that run from one through 63 that
25   we're discussing now.  Did you have any
```

Exhibit 5
A1 20

Page 2052

```
 1   involvement in the creation of this document?
 2        A    Yes.
 3        Q    And what involvement did you have
 4   in the creation of the document?
 5        A    The initial -- I had this
 6   document.  I supervised the revision of this
 7   document in 2004.  I participated in the -- I
 8   didn't supervise but did participate in the
 9   revision of this document in 2007.
10        Q    Do you make use of this document
11   in the ordinary course of your work for
12   Novelty?
13        A    As vice president of sales and
14   operations, yes, I did make use of this
15   document.
16        Q    And do you have a personal
17   understanding as to the content of the
18   document as to why Novelty chose to include it
19   within the document?
20        A    Yes.
21        Q    And what is your understanding of
22   the purpose of this document?
23        A
```

Page 2053



```
 1                                          .
 2        Q    And with regard to scheduled
 3   listed chemicals,
 4
 5
 6                                  .
 7        Q    And what does that subsection
 8   provide in sum?
 9        A    In sum, it --
10             MR. BARBER:  Objection, Your
11   Honor.  Now we're moving back into the
12   substance of the document and this goes to
13   testimony that again has not been disclosed in
14   the prehearing statement.  It's not a matter
15   within inventory and auditing practices.
16             This goes to training which
17   another witness has already testified about.
18   So it is also repetitive.  In addition to Mr.
19   Polk's testimony, Mr. Bledsoe has already
20   testified about this document, its use in
21                              .  But
22   primarily we object because it's not within
23   the scope of disclosed testimony.
24             JUDGE RANDALL:  Mr. Emord.
25             MR. EMORD:  It is within the scope
```

Page 2057

```
 1   comments.)
 2             BY MR. EMORD:
 3        Q    Now, concerning -- Well, you
 4   testified that the
 5
 6
 7                     .  Is the document that
 8   is identified as Novelty Exhibit 28 from pages
 9   one through the segment we're talking about,
10   from pages one through 63,
11                          Yes.
12        Q    All right.  And now as part of
13   Novelty Exhibit 28, there is another set of
14   pages beginning at page 64 and continuing to
15   page 68, excuse me, yes, 68 or, excuse me, 67,
16   64 to 67.  Please take a moment and find that
17   portion of the document.
18        A    Okay.
19        Q    Now did you have any involvement
20   in the creation of the pages 64 to 67?
21        A    I created 64 and 65.  I supervised
22   the creation 66 and 67.
23        Q    And can you tell me what the
24   purpose of 64 through 67 is?
25        A    Yes, 64 and 65 is actually -- I
```

Page 2058



```
 1   actually put that document together like this
 2   and laminated it and gave
 3
 4
 5   67 are just some commonly asked questions
 6
 7        Q    So this is -- Is it fair to say
 8   that both Novelty pages one through 63 and
 9   Novelty pages 64 through 67 are used as
10
11
12        A    Yes.
13        Q    And in what way is it used by
14        -- Excuse me.  In what way is it
15   intended for use
16
17        A
```

Exhibit 5
A1 21



Page 2059

```
1
2        Q    Now if you'll examine the final
3   pages in this exhibit, Exhibit 28, pages 68
4   through 130, did you have any involvement in
5   the creation of that document which at 68
6   bears the title "
8        A    Yes, I created it.
9        Q    You created this entire document.
10       A    Yes.
11       Q    What is the purpose of this
12  document?
13       A
                    We actually called it the 602
25  is what we called, but that's why it has this
```



```
1   title.
2        Q
7        Q    And that is all part of your
8   inventory control system.
9        A
20       Q
                                        the
23
                                        h
```

Page 2061

```
1                          .
2        Q    If inventory -- Well, first of
3   all,
6        A    Yes.
7        Q    And what does the company do to
10       A    We have a report that is sent to
21       Q    And if someone is
                              , what is
23  done then?
24       A    Well,
```



Page 2062

```
1
6                         s.  Commonly, what we'll find is
    that somebody
10       Q
13       A    Yes.
16       Q    And is that evaluation to
17  determine whether
20       A    Yes.
21       Q
22       A    Yes.
23       Q
25       A    Yes.
```

Exhibit 5
A1 22





Case 1:08-cv-00635-RMC   Document 19-6   Filed 05/09/2008   Page 32 of 50

TESTIMONY OF POLK          TUESDAY, APRIL 1, 2008

Page 2063

```
 1      ███████████████████████████,
 2   yes.
 3           Q      ██████  -- And I say this to
 4   distinguish -- I want to be clear.  There is
 5   ██████████████████."  Correct?
 6           A      Yes.
 7           Q      And then there's another entity
 8   separate from it, entirely separate, which is
 9   ██████████████████████
10           A      There's a company called
     ████████████- They are based in
12   ██████████  large publicly traded company
13   on the New York Stock Exchange.
     ██████████████████████
     ██████████████████████
     ██████████████████████.
17           Q      Now in the vernacular at Novelty,
18   do they refer to both ██████ or just one?
19           A      Just -- We just refer to -- Well,
20   we have The Pantry and Village Pa█████████
     ██████████████████████████
22           Q      All right.  So ██████████
     ██████████████████████
24           A      No.
25           Q      All right.  Now are you aware of
```

---

Page 2064

```
 1   whether ██████████s SLC sales?
 2           MR. BARBER:  Objection.  Reports
 3   to whom?  There is -- This is vague.  I'm
 4   sorry.  The question is vague and ambiguous.
 5   I won't suggest how to ask the question, Your
 6   Honor.
 7           JUDGE RANDALL:  Sustained.
 8           BY MR. EMORD:
 9           Q      Are you aware of whether
     ██████ reports its SLC sales to entities that
11   gather information about SLC sales for
12   reporting to the public?
13           MR. BARBER:  Objection, Your
14   Honor.  This is well beyond disclosed
15   testimony.  It's an attempt to bolster the
16   testimony of the witness called by the
17   Respondent yesterday and the Government has
18   been given zero notice that this witness would
19   testify about what purports to be Census
20   Bureau data reported by Novelty's customers.
21           JUDGE RANDALL:  Just a moment.
22   Mr. Emord.
23           MR. EMORD:  The customers of
24   Novelty and how they report information and to
25   whom they report information about their SLC
```

---

Page 2076

```
 1   Honor.
 2           MR. EMORD:  Yes, your Honor.  Your
 3   Honor asked us to examine the records and
 4   determine whether or not there had been
 5   examination of Mr. Polk concerning the details
 6   of the t████████████████████
     ██████████
 8           JUDGE RANDALL:  Yes.
 9           MR. EMORD:  And we have gone
10   through the transcript and I must report now
11   that Mr. Barber's recollection is better than
12   mine.  There is nothing in here about the
13   details of the ████████████████
     ████████████ wanted to make sure the
15   Court was apprised.
16           JUDGE RANDALL:  Very well, thank
17   you.  However -- never mind, go ahead, Mr.
18   Barber.  You may continue.
19           MR. LEAR:  Thank you, your Honor.
20   CROSS EXAMINATION
21           BY MR. BARBER:
22           Q      Good morning, Mr. Polk.  I want to
23   ask you some questions both about the
24   examination that occurred today as well as
25   some things Mr. Emord asked you about on
```

---

Page 2077

```
 1   Friday.  And I would ask you if you do not
 2   recall certain things from Friday that you
 3   simply state that.
 4           With regard to the hand-held
 5   system you testified about moments ago, does
 6   ██████████████████████
     ██████████████████████
 8           A      Yes.
 9           Q      ██████████████████████
     ██████████████████████
12           A      Yes, sir.
13           Q      Did there come a time where
14   Novelty, I may use the wrong term, re-
15   ██████████████████████
     ██████████████████████
     ██████████████████████
18           A      There was not a reconfiguration of
19   ██████████████████████
     ██████████████████████
21           Q      ██████████████████████
     ██████████████████████
     ██████████████████████
24           A      Yeah.  The change was made,
25
```

Exhibit 5
A1 23

Page 2078

```
 1   ████████████████████████
     ████████████████████████
     █
 4      Q    With regard to the paperwork that
 5   you testified ████████████████████████
     █
     ████████████████████████
     █                              ████████
     Do
 9   ████████████████████████
10      A    ████████████████████████
     █
     ████████████████████████
     █
14      Q    ████████████████████████
16      A    Yes.
17      Q    ████████████████████████
     ████████████████████████
     █
20      A    Yes, sir.
21      Q    And when the ████████████
     █
     ████████████████████████
     █
     █
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 94 of 103

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

---

Page 2095

```
 1      A    Yes, sir.
 2      Q    How many inspections between May
 3   of 2003 and July of 2007 did you participate
 4   in?
 5      A    Zero.  There was one visit in 2005
 6   where the DEA was asking questions about a
 7   company named ████ , but it was not an
 8   inspection of Novelty as a registrant.
 9      Q    During the first two days of the
10   inspection did Novelty provide DEA with
11   records that had information in codes on them?
12      A    I don't know what you mean by "in
13   codes".
14      Q    Well, product codes, route sales
15   people codes, those kind of codes -- well, let
16   me back up then, if you don't understand.
17           Does Novelty use codes in the
18   records it's required to keep to comply with
19   DEA regulations?
20      A    Yes, it uses item numbers.  It
21   uses route numbers.  It uses transaction
22   numbers.
23      Q    Now, when DEA asked for the
24   records during the first two days of the
25   inspection, did you give DEA the records that
```

Neal R. Gross and Co., Inc.
202-234-4433

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

---

Page 2096

```
 1   had codes in them?
 2      A    Yes.  I gave them the list of
 3   transactions from which they would select
 4   detailed documents.
 5      Q    Now, at some point during the
 6   inspection you gave DEA personnel a CD that
 7   had electronic information on it, correct?
 8      A    We gave them three CDS.
 9      Q    And when did you do that?
10      A    That was probably on the 18th.
11      Q    So that would have been a full
12   week after the dispute over the video and
13   audio recordings?
14      A    Yeah, it would have been one week
15   since that Wednesday, right.
16      Q    And on those CDS were there pdf
17   images of Novelty's electronic records that
18   they're required to keep?
19      A    I don't believe so.  I believe
20   that on Friday the request came to us for
21   sales by route, for sales information from
22   January 1st through July 9th in three different
23   formats.  I don't recall the individual
24   formats, but each CD then, contained the sales
25   records, I believe in Excel format that the
```

Neal R. Gross and Co., Inc.
202-234-4433

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

---

Page 2097

```
 1   DEA had asked for.  It was either in Excel,
 2   perhaps it was in pdf, it certainly was made
 3   to fit into -- made to fit into one document,
 4   one document on each CD.
 5           The shipping documents that they
 6   demanded by noon on Monday were never really
 7   asked for after that.
 8      Q    So they asked for documents by
 9   noon on Monday but they didn't press you to
10   actually turn them over.
11      A    No, they threatened to arrest me
12   if I didn't have 12,800 pages worth of stuff
13   to them by noon on Monday and let it drop.
14      Q    By noon on Monday?
15      A    Excuse me, by noon on Wednesday,
16   and let it drop.
17      Q    Does Novelty maintain its records
18   on scheduled listed chemical products or at
19   least some of its records in Excel format?
20      A    Yes.
21      Q    Who in Novelty directed the IT
22   personnel to change the format from Excel to
23   pdf prior to giving the information to DEA
24   investigators?
25      A    That would have been me.
```

Neal R. Gross and Co., Inc.
202-234-4433

Page 95 of 103

Exhibit 5
A1 24

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2098

```
 1        Q    And you know, as an accountant,
 2   that by changing the format of the records to
 3   pdf that the records cannot be easily sorted
 4   or analyzed, correct?
 5        A    I believe there's ways to extract
 6   information out of pdf files and then use that
 7   information in a more automated process.  It
 8   was -- Excel has a limitation.  They asked for
 9   more information than would fit inside of an
10   Excel document.  So pdf was a natural format
11   to use.
12        Q    You also could have broken it up
13   into multiple documents, couldn't you and kept
14   it in Excel?
15        A    Yes, that's an option as well,
16   yes.
17        Q    Now, was part of the delay in
18   getting electronic records to DEA attributable
19   to Novelty changing the format from Excel to
20   pdf?
21        A    You know, I'm not sure the
22   information ever got into Excel because it was
23   too large for an Excel file.  We created a
24   routine, sir, to get the information written
25   into a text file that then made its way into
```

Page 2099

```
 1   a pdf file.  We looked at Excel as an option
 2   but the data was too large.
 3        Q    Well, the data that you ended up
 4   giving to them, what kind of format is it in,
 5   in Novelty's records that it keeps?
 6        A    It's in a SQL server database,
 7   Microsoft SQL Server Database.
 8        Q    Is that database compatible with
 9   Excel?
10        A    What do you mean by compatible?
11        Q    Well, can records be -- when you
12   need to provide records to DEA or any outside
13   entity, can you put the records you maintain
14   in the SQL database into an Excel format?
15        A    Sure.
16        Q    The warrant that DEA executed
17   beginning July 9th, 2007, did that warrant
18   permit DEA to require Novelty to give two
19   years worth of records to DEA?
20        A    I don't recall the specific
21   requirements of the warrant, although that was
22   -- I think DEA started their request on 12/26
23   or 25, 2005, yeah, 12/26/2005.
24        Q    What records did DEA ask for that
25   weren't permitted by the warrant?
```

Page 2113

```
 1        BY MR. EMORD:
 2        Q    Now, when you say "lawsuits", what
 3   do you understand that to mean?
 4        MR. BARBER:  Objection, your
 5   Honor.  This is beyond the scope of the cross.
 6        THE COURT:  Overruled.
 7        THE WITNESS:  There's two.
 8   There's one that was filed in 2004 by Novelty
 9   and one that made its way through the
10   administrative process and then to US District
11   Court of a DC.  So there were two matters
12   pending in Federal Court at the time the
13   inspection occurred in July, 2007.
14        BY MR. EMORD:
15        Q    All right, you say Mr. Bayly
16   brought up the term "lawsuits".  Prior to that
17   time, did any Novelty employee in your
18   presence say to Mr. Bayly anything about
19   lawsuits?
20        A    Not at the initial introductions,
21   that was not the case.  There was -- you know,
22   typically an inspection had been done by two -
23   - one or two local diversion investigators and
24   I think they understood that the presence of
25   three people from the national office was
```

Page 2114

```
 1   abnormal.  They made statements about it.
 2   "This has nothing to do with the lawsuits.
 3   We're here because the field is short-handed
 4   on loan from the national office to help
 5   conduct the inspection".
 6        So certainly they were the first
 7   ones to mention anything about the lawsuits.
 8        Q    Now during the course of the days
 9   in which Mr. Bayly was present, did Mr. Bayly
10   interact with the other DEA agents there?
11        A    Yeah, he was in the room during
12   most of the meetings on Monday.
13        Q    Was he -- let's talk specifically
14   about the instance where the threat of arrest
15   was made.  Was that made at the time Mr. Bayly
16   was in the room or no?
17        A    No.
18        Q    So Mr. Bayly was not present in
19   the room where the threat of arrest was made?
20        A    No, I believe Mr. Bayly was not
21   even -- no, he wasn't on site.
22        Q    He wasn't on site then.  Now, with
23   regard to the charge that Ms. Barnhill made
24   about scrubbing documents, and the charge
25   about sanitizing documents you previously
```

Exhibit 5
A1 25

Page 2116

```
 1        Q     All right, so all of that occurred
 2   after Mr. Bayly was onsite.
 3        A     Yes.
 4        Q     All right.  Now, did any
 5   irregularity, what you would consider to be an
 6   irregularity, in the inspection take place
 7   when Mr. Bayly was present onsite?
 8        A     Other than the first meeting where
 9   there was discussion about lawsuits and
10   shortages in the field and excuses for why
11   national agents were present for a local
12   inspection, I don't recall any irregularities
13   during the inspection.
14        Q     Now, Mr. Meador and Mr. Bayly were
15   present that first day?
16        A     Oh, yes, yes.
17        Q     Was anyone else from the national
18   office present that day?
19             MR. BARBER:  Objection, your
20   Honor, asked and answered.  He gave us the
21   full list and the positions of people that
22   were present.
23             JUDGE RANDALL:  Sustained.
24             BY MR. EMORD:
25        Q     As I understand it, it was Ms.
```

Page 2117

```
 1   Barnhill, Mr. Meador --
 2             MR. BARBER:  Objection, your
 3   Honor, asked and answered.
 4             JUDGE RANDALL:  Sustained.
 5             BY MR. EMORD:
 6        Q     Did you find it unusual that three
 7   officers from the national office were present
 8   for an investigation at Novelty's Greenfield
 9   facility?
10             MR. BARBER:  Objection to
11   relevance of whether this witness considers it
12   unusual and it's also been asked and answered.
13             JUDGE RANDALL:  Sustained.  It has
14   been asked and answered.
15             BY MR. EMORD:
16        Q     At any point in time did you or
17   anyone on your behalf object to the presence
18   of Mr. Bayly and Mr. Meador at the Novelty
19   site?
20        A     Yes, on Monday, I made a comment
21   to that extent and began a dialogue with Mr.
22   Meador in front of Madeline Kuzma and Barnhill
23   and Mr. Bayly about the appropriateness of Mr.
24   Meador being there.  Madeline Kuzma quickly
25   interrupted me and said it wasn't the
```

Page 2118

```
 1   registrant's place to dictate who could and
 2   could not conduct the inspection but I had
 3   reservations about this man being there.
 4        Q     And did you articulate that more
 5   than once or just at that first occasion?
 6        A     I articulated it at that occasion
 7   and then later on Wednesday through counsel.
 8        Q     And Mr. Meador remained there
 9   until Wednesday; is that correct?
10        A     Yes, he was there Monday, Tuesday
11   and Wednesday, correct.
12             MR. EMORD:  All right, no further
13   questions, your Honor.
14             JUDGE RANDALL:  Very well, thank
15   you.  Mr. Barber?
16             MR. BARBER:  Just one clarifying
17   question.
18   RECROSS EXAMINATION
19             BY MR. BARBER:
20        Q     When you said you had reservations
21   about this man being there, to whom were you
22   referring?
23        A     Darrell Meador.
24             MR. BARBER:  No further questions.
25             JUDGE RANDALL:  All right, thank
```

Page 2119

```
 1   you.  Just one moment.  Mr. Polk, I just want
 2   to make sure I understand correctly, directing
 3   your attention to the incident involving the
 4   audio recording, how did you know where this
 5   audio recorder was placed in the conference
 6   room?
 7             THE WITNESS:  From what Mr. Merlau
 8   told me.
 9             JUDGE RANDALL:  Do you remember
10   what the date was when the Drug Enforcement
11   Administration served the order to show cause
12   and immediate suspension at Novelty?
13             THE WITNESS:  January 28th, a
14   Monday.
15             JUDGE RANDALL:  I direct your
16   attention to the testimony about route sales
17   representatives.  In that testimony you refer
18   to something called a service record.
19             THE WITNESS:  Uh-huh.
20             JUDGE RANDALL:  What is a service
21   record?
22             THE WITNESS:  We give them a
23   schedule of stores to visit each week and we
24   check their actual visits against the expected
25   visits and we call that comparison the service
```

Exhibit 5
A1 26

Case 1:08-cv-00635-RMC    Document 19-6    Filed 05/03/2008    Page 36 of 58

```
 1        you.  Just one moment.  Mr. Polk, I just want
 2        to make sure I understand correctly, directing
 3        your attention to the incident involving the
 4        audio recording, how did you know where this
 5        audio recorder was placed in the conference
 6        room?
 7                    THE WITNESS:  From what Mr. Merlau
 8        told me.
 9                    JUDGE RANDALL:  Do you remember
10        what the date was when the Drug Enforcement
11        Administration served the order to show cause
12        and immediate suspension at Novelty?
13                    THE WITNESS:  January 28th, a
14        Monday.
15                    JUDGE RANDALL:  I direct your
16        attention to the testimony about route sales
17        representatives.  In that testimony you refer
18        to something called a service record.
19                    THE WITNESS:  Uh-huh.
20                    JUDGE RANDALL:  What is a service
21        record?
22                    THE WITNESS:  We give them a
23        schedule of stores to visit each week and we
24        check their actual visits against the expected
25        visits and we call that comparison the service
```

87c43f4e4cbd-4d28-8dba-89b296fc0e13

Exhibit 5
A1 27 of 27

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                            Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the                  PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 2 TO EXHIBIT 5

UNITED STATES DEPARTMENT OF JUSTICE

Drug Enforcement Administration

In the Matter of

**SPIRIT PHARMACEUTICALS, LLC**
c/o NOVELTY, INC.

Docket No. 07-36

## ORDER FOR PREHEARING STATEMENTS

On June 22, 2007, the Deputy Administrator of the Drug Enforcement Administration ("DEA" or "Government") issued an Order to Suspend Shipment on Spirit Pharmaceuticals, LLC.

On July 5, 2007, Novelty, Inc. ("Respondent") filed a Request for Hearing. Therein, the Respondent argued that it is "a regulated person to whom an order applies" under 21 U.S.C. § 971(c)(2).

I, Gail A. Randall, have been assigned as the presiding officer in this matter.

On July 6, 2007, I held a conference call with Counsel for the Government and Counsel for the Respondent in this matter[1] for the purpose of discussing the scheduling timeline. I note that pursuant to 21 C.F.R. § 1313.56 (2007), "a hearing will be scheduled no later than 45 days after the request is made, unless the regulated person requests an extension to this date." During the conference call, Counsel for the Respondent agreed to request such extension, and he further agreed that the hearing would commence on August 27, 2007.

---

[1] I note that as of this date, Spirit Pharmaceuticals has not filed a Request for Hearing.

1

Exhibit 5
A2 1 of 4

In light of the extended hearing date, and upon consideration of the Order to Suspend Shipment of Spirit Pharmaceuticals, LLC, and of the request for a hearing filed by the Respondent, it is hereby

ORDERED that the Government, on or before July 20, 2007, and the Respondent, on or before August 3, 2007, file with the Hearing Clerk, in triplicate, and serve on each other, a written statement containing the following:

1. **Issue(s).** Statement of the perceived issues.

2. **Requested relief.** Statement of the relief requested.

3. **Stipulations.** Proposed stipulations and admissions of fact.

4. **Witnesses.** Names and addresses of all witnesses whose testimony is to be presented; counsel should note that if a representative for a corporate entity intends to testify, that representative must be listed as a witness, and a summary of proposed testimony as described below must be provided.

5. **Summary of testimony.** Brief summary of the testimony of each witness (the Government to indicate clearly each and every act, omission or occurrence upon which it relies in imposing suspension; the Respondent to indicate clearly each and every matter as to which it intends to introduce evidence in opposition to suspension). The summaries are to state what the testimony will be, rather than merely listing the areas to be covered. Counsel are reminded that testimony not disclosed in the prehearing statements or pursuant to subsequent rulings is likely to be excluded at the hearing.

6. **Documents.** List of all documentary evidence, including affidavits and other exhibits to be offered in evidence, specifying the number of pages in each. Counsel should number or letter each exhibit with the designation to be used at the hearing.

7. **Other matters.** Any other matters that counsel consider relevant.

2

Exhibit 5
A2 2 of 4

8.  **Best estimate as to time required for presentation of own case**; and it is further

ORDERED that the hearing will commence on August 27, 2007, and will be held in the second floor hearing room at DEA Headquarters, 600 Army Navy Drive, Arlington, Virginia; and it is further

ORDERED that all proceedings will be governed by the provisions of 21 C.F.R. § 1313.51 through 1313.57, and 1316.41 *et seq.* (2007); and it is further

ORDERED that any requests for enlargement of time to file must be made by written motion. Attention is directed to 21 C.F.R. § 1316.45 (2007), which provides that papers are "deemed filed upon receipt by the Hearing Clerk." The Hearing Clerk's address and facsimile number are:

> Office of Administrative Law Judges
> Drug Enforcement Administration
> Washington, D.C. 20537
> Fax: (202) 307-8198

The parties are cautioned that failure to file timely a prehearing statement as directed above may be considered a waiver of hearing and an implied withdrawal of a request for hearing. The parties are cautioned that documents are to be filed in triplicate.


Dated: July 6, 2007


_Gail A. Randall_
Gail A. Randall
Administrative Law Judge


3

Exhibit 5
A2 3 of 4

## CERTIFICATE OF SERVICE

This is to certify that the undersigned, on July 9, 2007, caused a copy of the foregoing to be transmitted, via facsimile, and placed in the interoffice mail addressed to Brian Bayly, Esquire, Office of Chief Counsel, Drug Enforcement Administration, Washington DC 20537, and a copy to be transmitted, via facsimile, and sent first class mail, postage prepaid, to the Respondent's Counsel, Jonathan W. Emord, Esq., Emord & Associates P.C., 11808 Wolf Run Lane, Clifton, VA 20124.

Katherine C. Esposito
Attorney Advisor to
The Honorable Gail A. Randall

4

Exhibit 5
A2 4 of 4

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

          Plaintiff,

v.

Michele Leonhart,              Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the     PUBLIC VERSION
Drug Enforcement Administration; et al.


          Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 3 TO EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NOVELTY, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>KAREN TANDY, in her official capacity;<br>UNITED STATES DRUG<br>ENFORCEMENT ADMINISTRATION;<br>ALBERTO GONZALES, in his official<br>capacity; UNITED STATES<br>DEPARTMENT OF JUSTICE; and the<br>UNITED STATES OF AMERICA,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. 1:07-CV-00191 (RMU)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
DISCOVERY OF DEFENDANTS' WITNESS**

**INTRODUCTION**

Several weeks after filing for summary judgment but before production of an administrative

record, plaintiff Novelty, Inc. ("Novelty") seeks production of documents and to depose a

government official on matters irrelevant to plaintiff's claims. Because the motion was filed prior

to production of an administrative record, plaintiff moved for discovery without having found any

defects in the record. Plaintiff is not entitled to discovery at all in this case because plaintiff

challenges agency action, reviewable upon an administrative record. Second, subsequent agency

action has rendered the information sought wholly immaterial. Third, even if plaintiff could identify

some defect in the record relevant to the present dispute, plaintiff still cannot obtain discovery after

moving for summary judgment because plaintiff has taken the position that there are no genuine

Exhibit 5
A3 1 of 9

issues of material fact. Finally, if there is to be discovery in this matter, it would be most reasonable to delay such discovery until the Court has resolved threshold issues of jurisdiction and final agency action.

## FACTUAL BACKGROUND

Counts I and II of the Amended Complaint challenge specific actions by the Drug Enforcement Administration ("DEA") regarding an importation of ephedrine by a third party importer, Spirit Pharmaceuticals ("Spirit"). In September 2006, Spirit submitted DEA Form 486 and requested a letter of no objection ("LONO") for two shipments of ephedrine from India. See Am. Compl. ¶ 17; Declaration of Darrell Meador ¶ 16 (submitted June 25, 2007) ("Meador Decl."); AR 0003-0006. (The DEA Form 486 is the notification required by statute and regulation for importation of ephedrine; the LONO is required by the exporting country. See Defs. Motion to Dismiss at 2-9.) In October 2006, DEA refused to issue the LONO and instructed Spirit to contact DEA if it wished to pursue the importation. AR 0021-22. Spirit did not do so, and DEA therefore considered the notification withdrawn. Meador Decl. ¶ 18. Spirit intended to sell that shipment to AAA Pharmaceuticals ("AAA"), who intended to sell manufactured drug products to Novelty. AR 0002-0008. On April 10, 2007, DEA contacted Spirit again in order to make certain that Spirit had a full opportunity to pursue the importation and that DEA was not ignoring an active request. Spirit Pharmaceuticals was told that it had to take affirmative action within five days to withdraw the application or DEA would issue a suspension order. AR 0028-0029; Meador Decl. ¶ 19. On June 22, 2007, DEA suspended the shipment in question. AR 0056-59. Novelty requested a hearing in

2

Exhibit 5
A3 2 of 9

order to pursue the importation of Spirit in its own name.[1]  AR 0025-26.  On June 25, 2007,

Novelty's request for a hearing in its own right was denied, with no prejudice to Novelty's right to

participate in a hearing should Spirit request one.  AR 0060-61.

The Amended Complaint challenges, for the first time, specific agency actions in the Spirit

matter, namely, the decision to refuse a LONO to Spirit and the decision to deny Novelty a hearing.

Am. Compl. ¶¶ 34-51.  Plaintiff moved for summary judgment on those issues (as well as the other

counts of the Complaint) on May 23, 2007, and moved for a preliminary injunction regarding only

the first Count of the Amended Complaint on June 12, 2007.[2]  Plaintiff now seeks discovery only

on the factual underpinnings of the LONO refusal.

## ARGUMENT

First, Counts I and II of the Amended Complaint, see Am. Compl. ¶¶ 34-51, if they state a

claim at all, are challenges to agency action, reviewable upon an administrative record.[3]  See 5

---

[1]      Novelty could not literally pursue the importation because it is not a registered importer. Meador Decl. ¶ 28. The requested hearing could not be held in any event unless and until there was a suspension order because the statute only directs DEA to hold hearings on suspension orders. 21 U.S.C § 971(c). The statute states that regulated persons to whom a suspension order applies are entitled to a hearing. See 21 U.S.C. § 971(c).

[2]      Defendants originally moved to dismiss (or in the alternative for summary judgment) on the original Complaint on April 10, 2007.  This motion did not address the propriety of DEA's refusal of a LONO, either to Spirit specifically or more generally.  That motion was withdrawn on May 29, 2007, in response to plaintiff's filing of an Amended Complaint, and defendants filed another Motion to Dismiss (or in the alternative for summary judgment) on June 25, 2007.

[3]      Defendants have explained that all counts of the Amended Complaint, if they state a claim at all, are reviewable only in the Courts of Appeal.  See Defs. Motion to Dismiss or in the Alternative for Summary Judgment (filed June 25, 2007).  Plaintiff does not argue that the information sought is relevant in any way to Counts III and IV of the Amended Complaint because those counts do not challenge any specific agency action.  If plaintiff does eventually seek discovery regarding those counts, defendants will likely oppose discovery on them as well.

3

Exhibit 5
A3 3 of 9

U.S.C. § 706; see Florida Power & Light v. Lorion, 470 U.S. 729, 743-44 (1985) (a reviewing court's task is to apply the appropriate APA standard of review to the agency decision "based on the record the agency presents to the reviewing court"); Camp v. Pitts, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"). See also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (the Court should not "substitute its judgment for that of the agency"). There are limited exceptions to review solely upon an administrative record without further discovery. Common Sense Salmon Recovery v. Evans, 217 F. Supp. 2d 17, 20 (D.D.C. 2002) (finding that "because a court's review of an agency's decision is confined to the administrative record," "[i]n the administrative law context courts uniformly have held that discovery typically is not permitted"); Nat'l Law Ctr. on Homelessness and Poverty v. Dep't of Veterans Affairs, 736 F. Supp. 1148, 1152 (D.D.C. 1990) (reasoning that "discovery is not [generally] permitted prior to a court's review of the legality of agency action").[4]

---

[4]    The defendants recognize that plaintiff also raised a constitutional claim. The parties seem to agree, however, that Novelty was denied an independent hearing. Thus, the only question is whether Novelty was entitled to a hearing under the Due Process Clause. Even if discovery on that claim was appropriate for some reason, the information sought in these discovery requests is wholly irrelevant to the constitutional claim. Plaintiff alleges that the material sought from defendants is relevant to its motion for a preliminary injunction and therefore urgent because "[i]t is the Defendants' position that Novelty should not be granted a hearing on the merits in part because Defendant allegedly determined through investigation that Novelty is intent on violating the laws of Kentucky and Tennessee and is intent on selling its ephedrine products to 'gray market' retailers." Pls. Motion for Discovery at 3. That is incorrect. Mr. Meador's findings regarding a risk of diversion are wholly irrelevant to the finding that Novelty is not entitled to a hearing. Novelty is not entitled to a hearing because it is not a "person to whom an order applies" under 21 U.S.C. § 971. The reasons for finding of a risk of diversion do not affect that analysis.

4

Exhibit 5
A3 4 of 9

Discovery is not generally permitted in such a case because the Court does not revisit the agency's factual findings de novo. See Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1225 (D.C. Cir. 1993) (explaining that "[t]he district court sits as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding" whether the basis for an agency's decision "was factually flawed"). For this reason, district courts in APA cases eschew discovery, including oral testimony, except in "very unusual circumstances." See American Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1084 (D.C. Cir. 2001).

At the time plaintiff filed its motion, the administrative record had not been certified and filed. Accordingly, plaintiff's motion was, at best, premature, and plaintiff obviously could not have identified any defect in the record.[5] Instead, without having seen the record, the plaintiff sought discovery on the factual basis for a DEA official's initial conclusions that the shipment of ephedrine may be diverted to the illicit manufacture of controlled substances. See Pl. 1st Set of Document Production Requests (filed as Errata, June 22, 2007) ; see also 21 U.S.C. § 971(c). The administrative record has now been filed with the court and should more than satisfy plaintiff's request for information.[6] The factual basis and rationale for Mr. Meador's conclusions in the LONO

---

[5]    In addition to the use of agency declarations to contextualize and explain the record, see Local 814, Int'l Brotherhood of Teamsters v. NLRB, 546 F.2d 989, 992 (D.C. Cir. 1976) (considering "amplified articulation" of agency rationale), there are limited, narrow exceptions to record review which can allow discovery under extraordinary circumstances. See Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998) (internal citation omitted) (holding that the APA "limits review to the administrative record except when there has been a 'strong showing of bad faith or improper behavior,' or when the record is so bare that it prevents effective judicial review."). If plaintiff should identify some defect in the record in its reply brief, defendants would like the opportunity to respond.

[6]    That record was not provided to the Court with the previous motion to dismiss because, in the original Complaint, plaintiff had not challenged those specific decisions and because final action was still pending.

5

Exhibit 5
A3 5 of 9

refusal are described in both of the declarations submitted in this matter. See Meador Decl. ¶¶ 17, 20 (filed June 25, 2007); Previous Meador Decl. ¶¶ 17-18 (originally filed April 10, 2007). The actual documentary evidence he relied upon is part of the administrative record, rendering the motion moot. See AR 007-016.[7]

Second, the motion should be denied because plaintiff seeks wholly irrelevant material. Mr. Meador's findings underpinning the LONO refusal have been superseded by subsequent agency action. On June 22, 2007, DEA issued a suspension order to Spirit and stated reasons for the finding of a risk of diversion that do not hinge on Meador's initial conclusion that Novelty intended to sell tablet-form products in states where it is illegal to do so. For the purposes of this shipment, DEA elected to accept Mr. Bledsoe's sworn assurances that he has no intention of selling such products in those states. Accordingly, the suspension order was not based on those grounds. See AR 056-59; Meador Decl. ¶ 20. The suspension order supersedes the LONO refusal as agency action on the suspension at issue in the Spirit matter. Accordingly, Mr. Meador's initial conclusions, while reasonable, no longer form the basis for any alleged agency action and are not relevant to this lawsuit.

Third, plaintiff's claim that it needs discovery is inconsistent with its motion for summary judgment. In moving for summary judgment, the plaintiff necessarily took the position that there are no genuine issues of material fact that require discovery. See Fed. R. Civ. P. 56(c). The appropriate procedure for seeking discovery after a motion for summary judgment has been filed is a motion pursuant to Rule 56(f), Fed. R. Civ. P. "The purpose of Rule 56(f) is to prevent railroading

---

[7]    Any discovery beyond what has been provided could only possibly inquire improperly into internal agency deliberations. See, e.g., Morgan v. United States, 304 U.S. 1, 18 (1938); Hinckley v. United States, 140 F.3d 277, 284-85 (D.C. Cir. 1998).

Exhibit 5
A3 6 of 9

the non-moving party through a premature motion for summary judgment before the non-moving

party has had the opportunity to make full discovery." Globalaw Ltd. v. Carmon & Carmon Law

Office, 452 F. Supp. 2d 1, 23 (D.D.C. 2006) (internal citations and quotation marks omitted).

Plaintiff is, of course, a moving party here and was the first party to move for summary judgment

on the issues at stake. See Pls. Motion for Summ. J. at (describing both how defendants had not

moved for summary judgment on substantive issues and how plaintiff was moving for summary

judgment). Accordingly, there is no possible concern that plaintiff has been railroaded into summary

judgment proceedings without necessary discovery.[8]

At the very least, plaintiff must make a showing under Rule 56(f) to identify the specific facts

necessary to oppose summary judgment, and demonstrate "how additional discovery will provide

those facts, not simply assert that 'certain information' and 'other evidence' may exist and may be

obtained through discovery." Richardson v. National Rifle Ass'n, 871 F. Supp. 499, 501-02 (D.D.C.

1994). It is not sufficient to assert that discovery is required to cross-examine or "test" the opposing

party's theory of the case. See Strang v. United States Arms Control and Disarmament Agency, 864

F.2d 859, 861 (D.C. Cir. 1989) (Ruth Bader Ginsburg, J.). Plaintiff has not attempted to make such

a showing.

---

[8]      Plaintiff's arguments regarding discovery prior to a 26(f) conference are largely
irrelevant. Because this is an action for review on an administrative record, see Fed. R. Civ. P.
26(a)(1)(E)(i), the parties are exempt from Rule 26(f), see Fed. R. Civ. P. 26(f) (exempting from
discovery conference the proceedings listed in Rule 26(a)(1)(E)). Defendants recognize that the
Court's Standing Order encourages the parties to submit a joint case management report even
where the rule does not apply "where doing so would promote efficient case management." The
government is doubtful that such a conferral would be useful in this matter because plaintiff
apparently believes that full-blown discovery may be warranted in the future, and because the
government is likely to oppose any discovery.

7

Exhibit 5
A3 7 of 9

Finally, there is a pending motion to dismiss on jurisdictional and 12(b)(6) issues, and at a minimum, a delay of discovery until resolution of these issues would conserve the resources of the Court and the parties. There is no possible urgency to the factual matters identified in plaintiff's motion, and they are wholly irrelevant to the motion for a preliminary injunction. A DEA official's reasons for refusing a LONO could only be relevant to Count II of the Amended Complaint (challenging denial of a LONO to Spirit), not to the threshold questions of jurisdiction and final agency action, see Defs. Motion to Dismiss at 13-29; Pls. Motion for a Preliminary Injunction at (emphasizing that the plaintiff does not seek a preliminary injunction on the substantive question of whether the LONO should have been refused).[9]    Delaying discovery pending the outcome of a motion to dismiss is especially appropriate where, as here, that motion challenges the court's jurisdiction to hear some or all of the counts of the complaint. See 8 C. Wright, A. Miller, & R. Marcus, Federal Practice and Procedure § 2040 (2d ed. 1994) ("[A] a court may decide that in a particular case it would be wise to stay discovery on the merits until challenges to jurisdiction have been resolved."); see also U.S. Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 79-80 (1988) ("It is a recognized and appropriate procedure for a court to limit discovery proceedings at the outset to a determination of jurisdictional matters."). Accordingly, the parties and the court could avoid devoting resources to discovery disputes if the Court delayed discovery until after resolution of the threshold issues raised by defendants' motion.

---

[9]    Plaintiff has also raised a threshold question of sorts, i.e., whether it is entitled to a hearing in the Spirit matter. If plaintiff were correct, then the Court should remand to the agency for a hearing on the merits of the suspension order, and no discovery in this Court would be necessary or appropriate. See Pls. Motion for a Preliminary Injunction (seeking injunctive relief directing the agency to hold a hearing on the suspension order).

8

Exhibit 5
A3 8 of 9

## CONCLUSION

For the foregoing reasons, plaintiff's Motion for Discovery should be denied.

Dated: June 29, 2007                          Respectfully Submitted,

                                              PETER D. KEISLER
                                              Assistant Attorney General

                                              JEFFREY A. TAYLOR
                                              United States Attorney

                                              ARTHUR R. GOLDBERG
                                              Assistant Director
                                              Federal Programs Branch


                                              /s _____
                                              AMY E. POWELL
                                              Attorney (NY Bar)
                                              U.S. Department of Justice
                                              Civil Division, Federal Programs Branch
                                              20 Massachusetts Avenue, N.W. Rm. 7322
                                              Washington, D.C. 20530
                                              Telephone: (202) 514-9836
                                              Facsimile: (202) 616-8202
                                              Email: amy.powell@usdoj.gov

                                              *Attorneys for Defendant*

9

Exhibit 5
A3 9 of 9

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

                 **Plaintiff,**

**v.**

**Michele Leonhart,**                    **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**         **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

                 **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## ATTACHMENT 4 TO EXHIBIT 5 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                    Plaintiff,

v.

Michele Leonhart,                          Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the                PUBLIC VERSION
Drug Enforcement Administration; et al.


                    Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 4 TO EXHIBIT 5 (OMITTED)
Chart and supporting documentation concerning July 9, 2007 DEA audit Results

# Proprietary and Confidential Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Attachment 4 to Exhibit 5 to Plaintiff's Memorandum in Support of its Motion for Preliminary Injunction is a chart DEA audit results. The entire document contains proprietary and confidential business information, including copies of customer invoices, and a chart describing proprietary methods of inventory. The document contains both proprietary and confidential business information to be protected pursuant to the April, 18, 2008 Protective order. As such, all 98 pages would be redacted. Therefore, this document has been omitted from the public record.

98 Pages Omitted

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**                    **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**          **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

        **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## ATTACHMENT 5 TO EXHIBIT 5 (REDACTED)

U.S. DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

| | |
|---|---|
| **NOTICE OF INSPECTION OF CONTROLLED PREMISES** | **DEA USE ONLY** |
| | **FILE NUMBER** I2-02-2029 |

| NAME OF INDIVIDUAL RYAN POLK | TITLE CFO |
|---|---|

| NAME OF CONTROLLED PREMISES NOVELTY DISTRIBUTORS | DEA REGISTRATION NO. 003563NSY |
|---|---|
| NUMBER AND STREET 351 W. MUSKEGON DR. | DATE 5/7/03 |

| CITY AND STATE GREENFIELD    INDIANA | ZIP CODE 46140 | TIME *(initial inspection)* |
|---|---|---|

## STATEMENT OF RIGHTS

1. You have a constitutional right not to have an administrative inspection made without an administrative inspection warrant.
2. You have the right to refuse to consent to this inspection.
3. Anything of an incriminating nature which may be found may be seized and used against you in a criminal prosecution.
4. You shall be presented with a copy of this Notice of Inspection.
5. You may withdraw your consent at any time during the course of the inspection.

## ACKNOWLEDGEMENT AND CONSENT

I, RYAN POLK _____, have been advised of the above Statement of Rights
    *(Name)*

by DEA D/I's LAURIE KAUFMANN & MADELINE KUZMA _____, who
    *(Title and Name)*

has identified himself/herself to me with his/her credentials and presented me with this Notice of Inspection containing a copy of sections 302(f) and 510(a), (b) and (c) of the Controlled Substances Act (21 U.S.C. 822(f) and 21 U.S.C. 880(a), (b) and (c), printed hereon, * authorizing an inspection of the above-described controlled premises. I hereby acknowledge receipt of this Notice of Inspection. In addition, I hereby certify that I am the_____ CFO _____
                                                *(President)   (Manager)   (Owner)*

for the premises described in this Notice of Inspection; that I have read the foregoing and understand its contents; that I have authority to act in this matter and have signed this Notice of Inspection pursuant to my authority.

I understand what my rights are concerning inspection. No threats or promises have been made to me and no pressure of any kind has been used against me. I voluntarily give consent for inspection of these controlled premises.

_____
*(Signature)*

_____5/13/03_____
*(Date)*

**WITNESSES:**

_____        5/13/03
*(signed)*                                *(date)*

_____        5-13-03
*(signed)*                                *(date)*

                                                                * See Reverse

✓ Need copy of price sheet

✓ training manual section on ephedrine

✓ list of routes - sales pers~, # , ~~~~~~~ address, DOB, SSN (state)

✓ list of stores — store, address, name

A. Need ephedrine month accounting

end = β + shipments + credits — sales +/ transfers

✓- ▮ & ▮ & ▮

      purchases for 2002 & 2003

✓- sales of ▮

Exhibit 5
Attachment 5

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

                Plaintiff,

v.

Michele Leonhart,                        Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the             PUBLIC VERSION
Drug Enforcement Administration; et al.


                Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 6 TO EXHIBIT 5 (OMITTED)

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

           Plaintiff,

v.

Michele Leonhart,                  Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the       PUBLIC VERSION
Drug Enforcement Administration; et al.


           Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

ATTACHMENT 6 TO EXHIBIT 5 (OMITTED)
Training Guide for Route Sales Professionals

# Proprietary Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

      Attachment 6 to Exhibit 5 to Plaintiff's Memorandum is a Training Guide Novelty has developed for its route sales professionals. The entire document is proprietary business information to be protected pursuant to the April 18, 2008 Protective order.  All of the 63 pages would be redacted.   Therefore, this document has been omitted from the public record.

63 Pages Omitted

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

          **Plaintiff,**

**v.**

**Michele Leonhart,**               **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**        **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

          **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 6 (REDACTED)

Page 1582

UNITED STATES DEPARTMENT OF JUSTICE

+ + + + +

DRUG ENFORCEMENT ADMINISTRATION

+ + + + +

HEARING

+ + + + +

```
                              :
IN THE MATTER OF:             :   Docket No.
                              :    08-33
NOVELTY DISTRIBUTORS          :
                              :
```

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123

600 Army Navy Drive
Arlington, Virginia  22202

Monday, March 31, 2008

          The above-entitled matter came on
for hearing, pursuant to notice, at 9:00 a.m.

BEFORE:     GAIL A. RANDALL,
            Administrative Law Judge

---

Page 1584

TABLE OF CONTENTS

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Joanna Shepherd | 1596 | 1727 | | |
| | | 1906 | | |
| VOIR DIRE | 1604 | | | |

| EXHIBITS | | MARK | RECD |
|---|---|---|---|
| Government | | | |
| 25 | Ricercar Estimate | | 1595 |
| 90 | Sloan Survey | | 1782 |
| 91 | FAQ RE Methamphetamine | | 1762 |
| 92 | | | 1749 |
| 93 | | | 1807 |
| Respondent | | | |
| 27A | Shepherd Report | 1718 | 1718 |
| 58 | Shepherd Report p14-18 | 1726 | 1726 |
| ALJ | | | |
| 14 | Respondent 27 | 1832 | 1832 |

---

Page 1635

```
 1   expertise is not necessary.
 2          JUDGE RANDALL:  Just a moment.
 3          (Pause.)
 4          Very well.  Thank you, Mr. Barber.
 5   I am going to overrule the objection.  Maybe
 6   the math is simple, but figuring out what
 7   numbers to choose and what to do with them
 8   might not be quite so simple.
 9          So I find under Federal Rule of
10   Evidence 702 as a guiding principle that her
11   expertise in reviewing that data from her
12   particular area of statistics and applied
13   statistics will, in fact, be helpful in
14   analyzing the expert testimony we received
15   from Mr. Robbin and in analyzing Government
16   Exhibit 25, to determine what, if any, weight
17   to give that evidence.
18          So I will allow this witness to
19   testify as an expert witness in statistics and
20   applied statistics.
21          You may continue, Mr. Emord.
22          MR. EMORD:  Thank you, Your Honor.
23          DIRECT EXAMINATION (cont'd)
24   BY MR. EMORD:
25      Q    You previously testified that you
```

---

Page 1636

```
 1   have an opinion concerning the reliability of
 2   the evaluation presented by Jonathan Robbin in
 3   Exhibit 25 and in his testimony?
 4      A    Yes.
 5      Q    And what is that opinion?
 6          MR. BARBER:  Objection, Your
 7   Honor.  There is no foundation for this
 8   opinion at this point.  She is perhaps
 9   qualified as an expert, but needs to lay a
10   foundation.
11          JUDGE RANDALL:  Sustained.
12          BY MR. EMORD:
13      Q    Now, have you read the expert
14   report of Jonathan Robbin?
15      A    The Declaration of Jonathan
16   Robbin, yes.
17      Q    Yes, I'm sorry, The Declaration of
18   Jonathan Robbin at Government Exhibit 25.
19      A    Yes.
20      Q    And have you read his testimony in
21   this case?
22      A    Yes.
23      Q    And do you understand the overall
24   methodology that Jonathan Robbin is using in
25   Government Exhibit 25?
```

Exhibit 6
1

Page 1637

1     A     In light of -- it's not that clear
2   from The Declaration of Jonathan Robbin, but
3   in light of the questions that you asked him,
4   and the testimony he gave, then, yes, I do
5   understand.
6     Q     And based on your understanding of
7   the testimony of Jonathan Robbin, and as it
8   also may be reflected in the expert report of
9   -- or, excuse me, Government Exhibit 25, do
10  you have an opinion as to the reliability of
11  the analysis he presents?
12    A     Yes.
13    Q     And what is that opinion?
14          MR. BARBER:  Objection, Your
15  Honor.  Again, no foundation has been laid.
16          JUDGE RANDALL:  I'm going to
17  overrule the objection.  I will allow you to
18  develop this witness' testimony.  And if, at
19  the conclusion of the development of it, you
20  still believe that the foundation is missing,
21  I'll let you again object.  So at this point,
22  I'm overruling.
23          MR. EMORD:  Thank you, Your Honor.
24          BY MR. EMORD:
25    Q     Proceed.

Page 1638

1     A     Yes.  For various reasons, which
2   I'll explain, I find it to be unreliable.
3     Q     Please explain.
4          MR. BARBER:  Objection, Your
5   Honor.  The question is so vague as to give
6   the Government no opportunity to know what
7   this witness is going to testify about.  A
8   narrative -- putting a witness on the stand to
9   give a narrative is inappropriate.  We ask
10  that a question be asked.
11          JUDGE RANDALL:  Mr. Emord?
12          MR. EMORD:  Well, Your Honor, we
13  know what Jonathan Robbin testified to.  It's
14  not a secret.  And we know what is contained
15  in Exhibit 25.  And I can go through, in
16  exhaustive detail, every paragraph and every
17  line of his testimony and establish what her
18  opinion is with respect to it.
19          But I believe, for the convenience
20  of the Court and the parties, we ought to be
21  able to hear what her expert opinion is on
22  that testimony and the analysis contained
23  therein.
24          JUDGE RANDALL:  Very well.  I
25  overrule the objection.  You may continue.

Page 1639

1          THE WITNESS:  Should I go through
2   everything now, or do you want me to -- okay.
3   I will.  Here I go.
4          MR. BARBER:  Your Honor, I object
5   again, and this time I renew it, because the
6   witness doesn't even understand what --
7          MR. EMORD:  Okay.  All right.
8          MR. BARBER:  -- the questioner
9   wants.
10          MR. EMORD:  Okay.
11          JUDGE RANDALL:  All right.
12  Gentlemen, thank you.  Mr. Emord, you may ask
13  your question.
14          MR. EMORD:  Where is 25?  Pardon
15  me, Your Honor.
16          JUDGE RANDALL:  Certainly.
17          BY MR. EMORD:
18    Q     Do you have a copy of The
19  Declaration of Jonathan Robbin, Government
20  Exhibit 25, before you?
21    A     Yes, I do.
22    Q     Now, if you'll take a look at the
23  first two pages of the document concerning the
24  analysis that is proposed therein -- excuse
25  me, the first three pages.

Page 1640

1     A     Yes.
2     Q     Have you had an opportunity to
3   refresh your recollection?
4     A     Right.  That's where he talks
5   about the traditional versus non-traditional
6   market.
7     Q     Yes.  And then, if you'll proceed
8   along through pages 4, in particular, to
9   page 8, with a specific emphasis on 7 and 8.
10    A     Right.  This is where he estimates
11  the -- what he refers to as the legitimate
12  sales, what should be sold per year per month,
13  at convenience stores.
14    Q     And having read through pages 1
15  through 8, and having assessed the extent to
16  which he refers to his research methodology,
17  do you have an opinion concerning the approach
18  that he has used?
19    A     Yes.  As I will show -- and I can
20  do that now or later --
21    Q     Please do.
22    A     Okay.  Well, the first thing I
23  would like to point out are some problems in
24  some of his tables, and this goes specifically
25  to Mr. Robbin's defining the traditional

Page 1641

```
1    versus non-traditional market.
2             Appended to The Declaration of
3    Jonathan Robbin there is various tables, and
4    right now I'll be talking about two tables,
5    Table C and Table D, which I think at least
6    here is numbered page 2 and page 3 of the
7    tables.
8             And, again, this is relevant only
9    to the kind of traditional versus non-
10   traditional market.  There is a lot of
11   inconsistencies in these tables.
12            JUDGE RANDALL:  I'm sorry.  Excuse
13   me.  I don't know --
14            THE WITNESS:  Oh, sorry.
15            JUDGE RANDALL:  Are you talking --
16   I don't have a table on Government Exhibit 25,
17   page 2 and 3.  So could we get to what we're
18   talking about?
19            BY MR. EMORD:
20       Q    Yes.  Could you please take a
21   moment and identify for the Court precisely
22   which table you're referring to?
23       A    Sure.  I think in the back of the
24   declaration he has like, I don't know, 40
25   pages of tables.  And I guess it's the second
```

Page 1642

```
1    page of those tables and the third page of
2    those tables.
3        Q    Do you have a copy of Government
4    Exhibit 25 before you?
5        A    Yes.
6        Q    Would you please identify for the
7    Court the tables you're referring to?
8        A    Sure.  One is called Table C
9    Continued, 2002, U.S. Economic Census.  And I
10   believe that's the second table.  And then,
11   the next one is called Table D, United States
12   Economic Census Data for 1997 and 2002, and
13   here this is numbered 3, which I assume means
14   Table 3.
15            JUDGE RANDALL:  All right.  Thank
16   you.
17            THE WITNESS:  So I'll just give a
18   little bit of background on the Census, the
19   Economic Census data.  In regards to this
20   information, the Census -- the Economic Census
21   reports all sorts of numbers, including most
22   relevantly here sales numbers, for different
23   types of retail establishments in different
24   types of merchandise lines.
25            And so for all of the retail
```

Page 1643

```
1    establishments which they cover, they report
2    information, including sales, on the category
3    called health and beauty products -- drugs,
4    health aids, beauty aids, including cosmetics.
5    I'll just call it health and beauty products.
6    They report that for all retail
7    establishments.
8             They also report information on
9    non-prescription drugs -- sales again -- but
10   they only do that for some of the retail
11   establishments.  And so what Mr. Robbin has
12   done in Table D is he has looked at -- the
13   Census does report non-prescription drug sales
14   for convenience stores.  They don't report
15   that for gasoline stations with convenience
16   stores.  I'll just call those gasoline
17   stations.
18            And so what he has done is he
19   takes the percentage of the drug health and
20   beauty that are non-prescription drugs for
21   convenience stores, and that number is 62.99
22   percent -- you can see in Table 3 -- and then
23   he applies that same percentage, 62.99
24   percent, to the drug health and beauty
25   category sales for gasoline stations, and says
```

Page 1644

```
1    that it's likely that somewhere around the
2    same amount will be for non-prescription drugs
3    at gasoline stations.
4             He has no -- no reason to think
5    that they would be different.  That would be
6    an appropriate way to do this estimate.
7    Absent any sort of information that you know
8    gasoline stations would sell more or less than
9    the percentage of convenience stores, that
10   would be appropriate.
11            And so on the bottom -- on Table
12   D, again, there is two sections of Table D,
13   2002 Census, 1997 Census.  The very last line
14   at the 2002 Census says non-prescription
15   medications, it's estimated, which he says
16   using these numbers, and he actually explains
17   in the note at the very bottom of the page
18   that he estimated it in this method.
19            And so if you go over a couple of
20   columns, you see this -- the number of
21   establishments handling the retail line.  He
22   says there is 25,702 gas stations who handle
23   non-prescription drugs.  That's 62.99 percent
24   of 40,805.  He gets that 62.99 percent from --
25   you can jump up a couple of lines -- that same
```

Exhibit 6
3

Page 1645

```
1    ratio for convenience stores.
2              And he does that the entire line
3    at the bottom of this 2002 part of the table
4    -- non-prescription medications.  It's just
5    imputed using, again, the same proportions
6    from the convenience stores.  A very good way
7    to estimate those.
8              And so there's a few numbers I'll
9    call your attention to -- the 25,000
10   convenience stores that carry the lines, the
11   total sales of the establishment of it looks
12   like $33 billion, the line sales of non-
13   prescription drugs of $237 million.  Those are
14   kind of the first three columns there of data
15   presented.
16             But then, if you look at Table C,
17   he does the same thing.  Here he has
18   convenience stores, gasoline stations with
19   convenience stores.  He has conveniently
20   outlined them, so we can see where they are.
21   And he, in the notes, says that he is doing
22   the same thing.
23             He's going to apply the
24   proportions of these numbers that apply to
25   convenience stores, and he's going to apply --
```

Page 1646

```
1    he's going to apply that proportion to
2    gasoline stations.  So the exact same
3    methodology, the notes are the same.
4              But the problem is is he has
5    completely different numbers in Table C as he
6    does in Table D.  Instead of saying there is
7    25,702 gasoline stations which carry non-
8    prescription drugs, like he says in Table D,
9    in Table C he says there is only 8,419
10   establishments that carry those.
11             And, again, in his notes he says
12   he has done this the exact same way, the same
13   methodology, same data, same computation, very
14   different number.
15             If you look at the fourth column
16   in Table C, it says total sales of
17   establishment -- oh, I'm sorry, not the fourth
18   column, the fifth column -- total sales of
19   establishments with line 20162, that's the
20   non-prescription drugs.  Here he says the
21   total sales of these establishments is $3
22   billion, but in Table D he says the total
23   sales of these establishments is over $33
24   billion.  So that's off by a factor of 10.
25             Moving over one column, in Table
```

Page 1647

```
1    C, he says the line sales of non-prescription
2    drugs are $32 million, but in Table D he says
3    the line sales of non-prescription drugs are
4    about $238 million, again off by an order of
5    magnitude.
6              Now, and then, over in the last
7    few columns on Table C, he does various kind
8    of percentages using those numbers.  Now, this
9    is important because in his testimony he talks
10   about the traditional and non-traditional
11   market, and he refers specifically -- refers
12   the reader to Table C to show that convenience
13   stores and gasoline stations have these
14   numbers, which are quite low down the table,
15   and they're lower than a lot of these stores,
16   which he defines as the traditional market.
17             The problem is, if you used, in
18   Table C, Mr. Robbin's numbers from Table D,
19   which are computed the way he claims in both
20   notes that he computed them, then gasoline
21   stations would actually move quite farther up
22   the table, and they would move above some of
23   the retail establishments which he defines as
24   the traditional market.
25             And so, A, I don't know how he
```

Page 1648

```
1    does the same methodology on the same data and
2    gets totally different numbers, but, B, it is
3    a little bit misleading in my opinion to
4    present different numbers, which then makes
5    gasoline stations look less non-traditional
6    than actually they are, if you used his
7    numbers from Table D, which again would be the
8    way that most statisticians would compute
9    these figures.
10             So that's the first thing I'd like
11   to point to with the tables.
12             The second thing --
13             JUDGE RANDALL:  Just one moment.
14             THE WITNESS:  Oh, sure.
15             (Pause.)
16             JUDGE RANDALL:  All right.  Thank
17   you.  You may continue.
18             THE WITNESS:  Sure.  The second
19   thing I would like to talk to is the data that
20   he is going to use when he estimates the
21   legitimate sales, and he talks to this
22   throughout The Declaration of Jonathan Robbin
23   and also in his own transcript.  So he uses
24   data from the Economic Census, from the
25   National Association of Convenience Store
```

---

---

---

---

## Page 1649

surveys, and then from both MRI and IRI.

And you asked him a little bit about kind of the -- you know, what the respondent rate is on these, and he didn't know. I do know that specifically now for the Census Bureau 37 percent of convenience stores returned their survey form, so 37 percent are responding.

For the National Association of Convenience Stores, which is actually where most of his data comes from, 15 percent of the convenience stores respond. And then, for Mediamark, Mediamark is 50,000 customers, that's about .02 percent of consumers in the U.S.

JUDGE RANDALL: Just a second.

THE WITNESS: Oh, sure.

(Pause.)

JUDGE RANDALL: Could you give the MRI again, please?

THE WITNESS: Sure. It's .02 percent.

JUDGE RANDALL: And the rest of your statement?

THE WITNESS: Oh, sure. The

---

## Page 1650

Mediamark survey is a survey of about 50,000 consumers, which is about --

JUDGE RANDALL: All right. Thank you.

THE WITNESS: -- .02 percent.

JUDGE RANDALL: Thank you. You may continue.

THE WITNESS: That being said, I mean, that would be, you know, for a lot of this -- for lots of surveys -- obviously, people don't survey every person in the U.S., but an additional problem with some of these data sources, which I'll talk about later why this is a problem, is that this data is all self-reported. It's survey data.

And any time there is self-reported data, there is going to be problems with people misreporting things.



---

## Page 1651

MR. BARBER: Objection, Your Honor. The witness is now testifying as a fact witness about information without laying a foundation. She's getting ready to testify about what -- apparently hearsay upon hearsay, what two customers reported to Novelty, who reported to the witness that they reported on Census Bureau data or on NACS data.

And at a minimum -- I hate to interrupt this expert witness, and I'll try and keep my objections to a minimum -- but I think a foundation ought to be laid before she becomes a fact witness as well as an expert witness.

MR. EMORD: Your Honor, this is not offered for the purpose of establishing the facts. It's offered for the purpose of -- well, she is explaining her application an analysis of Robbin's data.

To the extent that Robbin erred in his application or analysis of data, that necessarily will involve explication of specific factual information, but she is using

---

## Page 1652

it as a basis for an expert opinion. No expert opinion can be offered without reference to factual information. She is giving information that she apparently has at her disposal. She can be cross examined about it, but --

JUDGE RANDALL: Thank you, Mr. Emord. I don't need to hear any more. I sustain the objection. To the extent that I can even follow, let alone weigh, what she is going to say, I need to know where these numbers are coming from. So I sustain the objection. Please lay the foundation.

MR. EMORD: Thank you, Your Honor.

BY MR. EMORD:

Q    Let me ask you: how did you come up with the information concerning how The

A    What I'm talking about right now

A    Yes.

---

Neal R. Gross and Co., Inc.
202-234-4433
Page 17 of 90
Page 18 of 90
Page 19 of 90
Page 20 of 90
0352d362-9af9-410b-a85c-e18777125cbf

Case 1:08-cv-00635-RMC    Document 19-7    Filed 05/05/2008    Page 6 of 24

Exhibit 6 5

Page 1653

```
 1        Q       How did you acquire the
 2    ████████████████████████████████
 4             MR. BARBER:  Objection, Your
 5    Honor.  This is a factual matter not disclosed
 6    in the prehearing statement, not disclosed in
 7    the report, and now we're getting into factual
 8    matters.  And, at a minimum, Respondent needs
 9    to disclose this information, so the
10    Government can be prepared to cross examine.
11    Every --
12             JUDGE RANDALL:  Well, I'm going to
13    overrule the objection.  To the extent that
14    the Government needs more time after hearing
15    the testimony, they may have the time to
16    prepare for cross examination.
17             You may continue, Mr. Emord.
18             MR. EMORD:  Thank you, Your Honor.
19             BY MR. EMORD:
20        Q       What is the source of the
21    information that you're relying upon
22    ████████████████████████████████
23        A       I have talked to some of the
24    executives of Novelty, and they -- I have a
25    lot of -- a lot of data.  I don't specifically
```

Page 1654

```
 1    have my own data on the way these people have
 2    reported their things, but after talking to
 3    the executives of Novelty I was informed that
 4    -- that at least two of these customers, and
 5    not more -- if not more, do self-report
 6    differently than, you know -- based on some of
 7    the Census Bureau data.
 8        Q       And, specifically, what do you
 9    understand is their reporting?
10             MR. BARBER:  Objection, Your
11    Honor.  the Novelty executives are listed as
12    witnesses, and so now we're dealing with
13    hearsay upon hearsay.  This is so attenuated
14    as to be unreliable, and it also does not give
15    the Government an opportunity to cross examine
16    the source of the information, who is in fact
17    biased in the sense that it is the Respondent
18    in this case.
19             JUDGE RANDALL:  Mr. Emord?
20             MR. EMORD:  Well, Your Honor will
21    take these factors into consideration as to
22    weight.  The witness is going to tell us the
23    source of the information.  The Government, as
24    is the case with Jonathan Robbin's numerous
25    items not disclosed, can fend for itself when
```

Page 1655

```
 1    it comes to that.  It's a weight issue, not an
 2    admissibility issue.
 3             JUDGE RANDALL:  Mr. Barber,
 4    anything further?
 5             MR. BARBER:  Your Honor, it goes
 6    well beyond weight, that the source of the
 7    information, as the witness just testified, is
 8    our executives whose names appear on the
 9    witness list.
10             MR. EMORD:  Which is all the more
11    reason for having an opportunity to examine
12    them concerning it.  We haven't presented our
13    direct case as to those witnesses.  We can
14    have a full and fair opportunity to examine
15    them on these points.
16             JUDGE RANDALL:  Very well.  I'll
17    overrule the objection.  You may answer the
18    question, if you can remember it.
19             THE WITNESS:  Sure.  So based on
20    these two customers, which account for 55
21    percent of the sales of Novelty's ephedrine
22    products, they report their sales as sales of
23    general merchandise.  And why that's important
24    is that -- and, again, this is -- would happen
25    in any survey.  When people are self-reporting
```

Page 1656

```
 1    their data --
 2             BY MR. EMORD:
 3        Q       Are you -- I'm sorry to interrupt.
 4        A       Sure.
 5        Q       Are you saying that the ephedrine
 6    and pseudoephedrine sales are reported in --
 7        A       Sorry.  Yes.  They're not --
 8             MR. BARBER:  Objection, Your
 9    Honor.  There's a lack of foundation.  This --
10    she can report what people told her that they
11    heard from other people about what they
12    reported, but she can't testify to a fact that
13    particular people reported in a certain way
14    unless she has personal knowledge of it.
15             MR. EMORD:  It's within context.
16    It's quite clear, Your Honor.
17             JUDGE RANDALL:  Let's start over,
18    shall we?  Because I don't see the clarity of
19    it.  You may ask the foundational questions,
20    and then you may ask the follow-on from that.
21    But let's do it in the right order, shall we?
22             MR. EMORD:  All right.
23             BY MR. EMORD:
24        Q       So, Dr. Shepherd, did there come a
25    time when you were informed of the reporting
```

Exhibit 6
6

Page 1657

1  ████████████████████████
2       A    Yes.
3       Q    And who supplied you with that
4  information?
5       A    Novelty executives.
6       Q    And did that information pertain
7  to the reporting of ephedrine and
8  pseudoephedrine-containing OTC products?
9       A    Yes.
10      Q    And what was your understanding of
11 ████████████████████████████████████
12 █
13      A    Right.
14           MR. BARBER:  Objection, Your
15 Honor. ████████████████████████████
16 █████████████████████████ and the source
17 of her information, who were the Novelty
18 executives.
19           JUDGE RANDALL:  Sustained.
20           BY MR. EMORD:
21      Q    Do you understand how the Novelty
22 executives became aware of the information
23 ████████████████████████████████
24      A    Yes.  I was told that these
25 ████████████████████████████████

---

Page 1658

1  ████████ people who are responsible for
2  reporting -- I guess it's the executives --
3  had told the Novelty executives the way that
4  they reported their data to NACS and the
5  Census Bureau.
6       Q    And what was that way?
7       A    They reported the sales of
8  ephedrine and pseudoephedrine products.
9  Instead of listing them as sales of cough and
10 cold, sales of non-prescription medication,
11 they just record that on these survey forms as
12 sales of general merchandise.
13      Q    Now, if you'll look on page 8 of
14 the document marked Government Exhibit 25, The
15 Declaration of Jonathan Robbin --
16      A    Right.
17      Q    -- there is there listed a figure
18 of $14.39.  Do you see that?
19      A    Yes, I do.
20      Q    Now, what is your understanding of
21 that figure?  What is Jonathan Robbin
22 presenting that figure to be in this report?
23      A    Well, he is presenting an estimate
24 of legitimate sales, which he feels like
25 convenience stores should -- that should be

---

Page 1659

1  the expected amount of sales.  That number
2  refers to the monthly sales number.
3           And then, he goes on in this
4  report -- he is actually talking about ████
5  ███, a completely different thing
6  from Novelty, but he compares, then, the sales
7  ███████████ to this number of expected
8  sales, to basically assert that there is a
9  strong potential for diversion when their
10 actual sales numbers are much greater than his
11 $14.39 expected sales.
12      Q    Now, you have described his
13 analysis with regard to the $14.39 figure.  Is
14 that analysis, in your judgment, accurate?
15      A    No.  As I'll explain in a second,
16 the way he computes this has -- has problems.
17      Q    How does he compute the data, and
18 what problems exist with it?
19      A    May I use the --
20           JUDGE RANDALL:  You may.  Do you
21 want a marker?
22           THE WITNESS:  I do.  I do.  Yes,
23 thank you.
24           Actually, I think it's actually a
25 little bit easier to understand from page 5 of

---

Page 1660

1  The Declaration of Jonathan Robbin, if the
2  court would like to refer to that.
3           JUDGE RANDALL:  Thank you.
4           THE WITNESS:  So I will direct
5  your attention to page 5 on the declaration.
6  And also, again, in the tables that are
7  appended to the back of the text, there is --
8  and I -- let's see, how can I -- it's called
9  -- the title of it is "2007 NACS State of the
10 Industry Survey."  My number here does not
11 seem to have any sort of other number.  It's
12 a big, long table, with kind of a shaded gray
13 area in the middle.
14           JUDGE RANDALL:  Just a minute.
15 Let me find that.
16           THE WITNESS:  Sure.
17           MR. EMORD:  Unfortunately, these
18 are not properly numbered, Your Honor.  And as
19 a result, it's difficult to identify it by
20 number.
21           However, will the witness please
22 count the pages, beginning with the first
23 table, which is identified as Table C, behind
24 the signature of Jonathan Robbin, count the
25 number of pages from there, so that we may be

Exhibit 6
7

Page 1661

```
 1    all on the same page.  Unfortunately, my -- do
 2    you have a copy with numbers, page numbers on
 3    it?  Is it up at the top?
 4              JUDGE RANDALL:  It's entitled
 5    "2007 NACS State of the Industry Survey."  Is
 6    that the document?
 7              THE WITNESS:  That is.  There is
 8    actually two -- one, and then the second page
 9    has one as well.  One has various gray lines
10    kind of throughout it, and the other just has
11    a big gray section.  And I'll refer to the one
12    that has the big gray section.
13              JUDGE RANDALL:  Very well.
14    According to mine, it's marked as Government
15    Exhibit 27B.  But then, that exhibit is not
16    marked.  It's not numbered.
17              MR. BARBER:  Your Honor,  I
18    believe it's marked 25B, and it's three pages.
19    It is -- 25B is an attachment to 25.
20              JUDGE RANDALL:  All right.  And
21    we're on page 1 of 25B, is that correct?  Is
22    that what everyone --
23              THE WITNESS:  I think so.  It
24    might have gotten a little bit out of order,
25    but I think that's right.
```

Page 1662

```
 1              JUDGE RANDALL:  Mr. Emord, do you
 2    agree that's where we are?
 3              MR. EMORD:  May I approach, Your
 4    Honor?
 5              JUDGE RANDALL:  You may approach.
 6              THE WITNESS:  Yes, that's it.
 7    That's it.
 8              MR. EMORD:  The witness has
 9    identified that she is, in fact, on the first
10    page of the three pages that the Government
11    has -- of Government Exhibit 25B.
12              JUDGE RANDALL:  All right.  Thank
13    you.  You may continue.
14              THE WITNESS:  Okay.  So we can see
15    in his -- on page 5, he refers to -- he gives
16    us various figures that are directly from this
17    table, and so he says, for example, health and
18    beauty category merchandise accounts for 1.21
19    percent of total in-store sales.  That is
20    actually -- that number is actually in his
21    gray area at the bottom.  It says 1.22, but
22    close enough to 1.21.
23              He talks about 17 percent of
24    health and beauty category sales consist of
25    cough and cold remedies, and you can see that
```

Page 1663

```
 1    is the middle column of numbers, and it's
 2    actually the slightly darker area within the
 3    -- within this lighter gray area.  It says
 4    that 17 percent of cough and cold -- 17
 5    percent of health and beauty care products are
 6    -- sales are for cough and cold remedies.
 7              And so, then, he says, for
 8    example, two -- that means two-tenths of a
 9    percent of in-store sales are accounted for by
10    cough and cold remedies, and you can see
11    that's the last number here, .21 percent.  So
12    he's directly referring to this table.
13              BY MR. EMORD:
14        Q    And by "this table," you're
15    referring to Government Exhibit 25B, the first
16    page thereof?
17        A    Yes.  Yes, that's what I'm
18    referring to.
19        Q    And I would ask that you refer to
20    any subsequent page, if you are going to refer
21    to it, by a number, and that that number be
22    two or three --
23        A    Okay.
24        Q    -- of Government Exhibit 25B.
25        A    I think I won't, actually, but I
```

Page 1664

```
 1    will.
 2        Q    All right.
 3              JUDGE RANDALL:  Also -- I'm sorry
 4    -- this is moving a little more quickly than
 5    my brain does.  Could we go back, and could
 6    you identify the line numbers you're using
 7    from Government Exhibit 25B, one, to get the
 8    numbers that you are quoting?
 9              THE WITNESS:  Sure.  Line 30,
10    where there is various numbers for cough and
11    cold remedies.
12              JUDGE RANDALL:  Yes.
13              THE WITNESS:  And then, in the
14    bottom part of the table, the very small
15    little table at the bottom --
16              JUDGE RANDALL:  Yes.
17              THE WITNESS:  -- line 5.
18              JUDGE RANDALL:  Thank you.  That's
19    helpful.
20              THE WITNESS:  Sure.  And so all
21    I'm showing now is that he's just using --
22    that's where he's getting these numbers is
23    from this table.
24              And so -- so he basically -- the
25    next thing he says is that at most eight
```

Page 1665

```
 1     percent of the sales of cough and cold
 2     products -- this is from the declaration -- at
 3     most eight percent of the sales of cough and
 4     cold products could be for ephedrine products.
 5           Now, that's one of these numbers
 6     that we don't know where he gets them.
 7     Presumably, they are from the MRI survey or
 8     the IRI data.  But he says that eight percent
 9     of the cough and cold would be for ephedrine
10     products.
11           And then, he goes on to compute
12     this in-store -- this per store expectation of
13     legitimate sales.  And so using this table,
14     what he does is there's $292 million of sales
15     of cough and cold products in the total
16     industry.  And he says at most eight percent
17     of that could be for ephedrine products.
18           And then, he divides that by the
19     number of convenience stores and -- across the
20     nation, which is 140,000, which he testified
21     to as well.  And from that he generates a per
22     store annual number, which is $172, which he
23     -- in The Declaration of Jonathan Robbin he
24     says legitimate sales are $172 per year, which
25     is about $14.40, $14.39 a month.  So that's a
```

Page 1666

```
 1     year, that's a month.  So that's the way he
 2     generates it.
 3           It's very simple.  It's just these
 4     three numbers.  This is from -- right here
 5     from this NACS survey.  This is from we don't
 6     know where, but probably Mediamark or IRI.
 7     And the 140,000 is how many convenience stores
 8     there are, and that's how he generates this
 9     annual in-store number.
10           And so I'm going to kind of take
11     each of these numbers individually and talk
12     about issues with that.  The first thing, and
13     really the most fundamental error in his
14     analysis, is this number right here.  So he
15     divides industry sales of cough and cold
16     products, really industry sales of ephedrine
17     products, by all convenience stores.
18           But the problem is is that in his
19     own report he reports that the majority of
20     convenience stores don't sell cough and cold
21     products, and the majority of stores don't
22     sell ephedrine products.  And so if we look
23     back at Table D that I referred to earlier,
24     here he shows that about 39,000 -- we'll say
25     40,000 to round up -- about 40,000 convenience
```

Page 1667

```
 1     stores and gasoline stations carry non-
 2     prescription drugs, not 140,000 but 40,000.
 3           And so what he's doing here is
 4     he's basically coming up with an average.  And
 5     so we all remember from second grade how we
 6     come up with an average.  We add up the values
 7     from each of our observations, and then we
 8     divide by the number of observations.
 9           But what he's doing here is he's
10     adding up the value of some of our
11     observations, but then he's dividing by a
12     completely different number, and it's a number
13     of observations that is actually about three
14     or four times as large as it should be.
15           And so what this is equivalent to
16     is, if we hired a statistician to come up with
17     the average speed of cars on a highway -- and
18     let's say all the cars on the highway were
19     going 70 miles per hour, and the statistician
20     took those cars' observations, their speeds,
21     but then he also went to a parking garage a
22     mile away and looked at the parked cars, who
23     obviously would have a speed of zero, and he
24     included those in the denominator of his
25     average, and so a third of his observations
```

Page 1668

```
 1     are parked cars, two-thirds of his -- I'm
 2     sorry, a third of his observations are highway
 3     cars, two-thirds of his observations are
 4     parked cars.
 5           He would actually generate an
 6     average miles per hour of 23 miles per hour,
 7     instead of the 70 which we know the highway
 8     cars are going.  And so you're just dividing
 9     by a completely different number than what
10     numbers are actually contributing your
11     observations.  It's just a very fundamental
12     error.
13           And so based on his Table C -- I'm
14     sorry, Table D, he says there is 40,000
15     convenience stores which sell non-prescription
16     drugs.  If we actually look at his Table C,
17     that number is actually about 20,000, but I've
18     already said Table C and Table D are
19     inconsistent, so to be conservative I'll use
20     his numbers from Table D.
21           And so if we divide this by a
22     different number, so 292 by .08, divided by
23     the 40,000, again, maximum convenience stores
24     that sell any non-prescription medicine, we
25     would get a number which is, let's see, $600
```

Exhibit 6
9

Page 1669

1    a year or $50 a month.
2         So, again, this is all the stores
3    that sell any non-prescription drug.  Now, we
4    know that a lot of convenience stores don't
5    sell ephedrine products.  There's 12 states
6    where the sale of ephedrine products in
7    convenience stores is either prohibited by
8    state law or it's made extremely difficult
9    with city ordinances and various things like
10   that.
11        In those 12 states that
12   essentially, you know, make it extremely
13   difficult or impossible to sell ephedrine in
14   convenience stores, based on the NACS data,
15   there is -- 23 percent of convenience stores
16   are in those stores -- sorry, are in those
17   states that basically prohibit the sale of
18   ephedrine.
19        And so if we assumed that in all
20   of the other states where ephedrine can be
21   sold in convenience stores, all of those
22   convenience stores carry ephedrine, which we
23   actually know not to be the case, because we
24   know that a lot of the stores supplied by
25   Novelty don't carry ephedrine products, even

Page 1670

1    though they're in states that they could, but
2    let's just assume, to be conservative, again,
3    that all of those convenience stores sell
4    ephedrine products, but yet in the 23 percent
5    of convenience stores that are in states where
6    it's prohibited, they don't, that would mean
7    that we should actually take 77 percent of
8    this number, 100 minus 23, right?  And so that
9    would be 31,000.
10        So, again, maximum 31,000
11   convenience stores could even be selling
12   ephedrine products.  When we do that, we get
13   an expected legitimate sales of $775 a year,
14   which is $65 a month.  So this number is five
15   times Mr. Robbin's estimate.  So that's the
16   first thing I'd like to note.  That's the
17   first -- that's the problem with this bottom
18   number.
19        And now I'll address each of these
20   top two numbers as well.  First, I'll talk
21   about this eight percent.  So this eight
22   percent -- again, Mr. Robbin never tells us
23   where he gets this, but I'll assume it's from
24   the MRI or the IRI.
25        The MRI and IRI data are -- they

Page 1671

1    show us, they reveal sales figures to us for
2    all retail establishments.  It's not
3    particular to convenience stores.  And so if
4    that eight percent number is from those
5    documents, what it would say is that over all
6    retail establishments in the U.S.
7    approximately eight percent of the sales of
8    cough and cold products would be for ephedrine
9    products.
10        Now, this number is likely -- is
11   not the right number to use for convenience
12   stores for the following reason.  We know that
13   in supermarkets and pharmacies they sell
14   numerous -- numerous, a wide variety of cough
15   and cold products.  And so it's not -- I guess
16   not surprising that only a smaller subset of
17   those would actually contain ephedrine.
18        But convenience stores sell a very
19   limited number of cough and cold products, and
20   so --
21        MR. BARBER:  Objection, Your
22   Honor.  The witness is now moving -- because
23   we're allowing narrative, and I'm trying not
24   to object, she has moved into an area where
25   she has not laid a foundation for her

Page 1672

1    assumption that convenience stores don't carry
2    a wide variety of products, and now she is
3    becoming a fact witness without, again, giving
4    us the underlying data.
5         So I would ask that at least --
6    and I'll try not to object -- I'm letting her
7    narrate a fair bit here, but that this witness
8    not be permitted to testify without a proper
9    foundation on her opinion about what range of
10   products convenience stores carry.
11        JUDGE RANDALL:  Mr. Emord?
12        MR. EMORD:  Well, she is
13   explaining her analysis, and it is appropriate
14   cross examination to go into the details of
15   her analysis.  And she is explaining the .08.
16   I don't see any reason to interrupt her
17   testimony as to that.  When she completes her
18   testimony, if you wish to cross examine her
19   about any particular figure that is derived
20   from the Robbin report, you can.
21        She has already explained her
22   understanding of the .08 figure from the
23   Robbin report and her problems with it.  She
24   is not testifying as to specific factual
25   information.  She is saying why she questions

Exhibit 6
10

Page 1673

```
 1    it.  And, of course, fact necessarily is a
 2    predicate for one's statement why one
 3    questions anything.
 4              But it's all a part of her
 5    explanation.  If he doesn't -- if he has a
 6    problem with it, he can cross examine her
 7    about it.
 8              JUDGE RANDALL:  Right.  I sustain
 9    the objection.  Would you please lay the
10    foundation for why the assumption she is
11    asserting at this point she asserts, her
12    source of information to support that
13    assumption?
14              MR. EMORD:  All right, Your Honor.
15              BY MR. EMORD:
16         Q    The .08 figure that you have
17    placed upon the board there, where -- you said
18    that came from Jonathan Robbin's Declaration
19    of Jonathan Robbin, is that correct?
20         A    Yes.
21         Q    And what is -- as best you can
22    understand, does Jonathan Robbin identify a
23    source for that figure?
24         A    He did not.  And in the -- in your cross of him
25    declaration, in the -- in your cross of him
```

Page 1674

```
 1    when he was on the stand, you asked him
 2    various sources where he got his data, and not
 3    -- not in regards to any specific number, but
 4    what sources, and there he talked about the
 5    MRI and the IRI.
 6              And I know that this number didn't
 7    come from the NACS or the Census, because I
 8    have all of that data.  And so I'm presuming
 9    that it must have come from the MRI or IRI
10    data.
11         Q    Now, do you have a specific
12    factual reason to question the reliability --
13    factual basis to question the reliability of
14    the .08 figure?
15         A    Yes.  It's based on my knowledge
16    of --
17         Q    What is that?  What is that
18    foundation?
19         A    It's, as Mr. Robbin testifies, and
20    as I know from my own research, IRI and MRI
21    represent national average numbers for all
22    retail establishments.  And so what I will
23    talk about is just why that one national
24    average that applies to all retail
25    establishments may not be appropriate when
```

Page 1675

```
 1    we're talking about convenience stores.
 2         Q    All right.  Please explain
 3    precisely what it is that makes that figure
 4    not appropriate for use in assessing
 5    convenience stores that sell ephedrine and
 6    pseudoephedrine-containing products.
 7         A    Okay.  It's actually what Mr.
 8    Barber was talking about earlier when he was
 9    questioning me about aggregation bias.  What's
10    going on here is aggregation bias.  We're
11    assuming that the percentage of cough and cold
12    products that carry ephedrine in some retail
13    establishments would apply to all retail
14    establishments, and that's kind of the
15    definition of aggregation bias, when we assume
16    one aggregate number applies across the board.
17              And for various reasons, which
18    I'll talk about, that is likely a very
19    incorrect assumption with convenience stores.
20    According to the NACS survey, convenience
21    stores have an average of 2,700 square feet of
22    retail space, retail sales space, which is,
23    you know, tiny compared to pharmacies and
24    supermarkets, warehouse clubs, all of the
25    other retail establishments that would be
```

Page 1676

```
 1    included in the IRI and MRI data.
 2              And so it is necessarily the case
 3    that with smaller square footage you don't
 4    carry as much of a variety of products.  It
 5    would be impossible to do so.
 6              And then, when you have the
 7    products that contain ephedrine, they would
 8    make up a larger percentage of the smaller
 9    variety of products that are sold.
10              Specifically, we know in an
11    affidavit from Mark Bledsoe, which we have, he
12    says that in his convenience stores 60 percent
13    of the cough and cold products carry
14    ephedrine.  And so that would -- with the
15    proper disclaimers, that will apply to
16    Novelty's convenience stores.  But I guess
17    that's the relevant number here, right, is
18    Novelty's convenience stores.
19              And so as this .08 we know is
20    necessarily wrong, because, again, it suffers
21    from the aggregation bias, which Mr. Barber
22    talked about.
```

---

Page 1677

1  
6                                          bias
7   inherent in this eight percent, and why it
8   would be more -- it would be more appropriate
9   to use a number that applied specifically to
10  convenience stores.
11          Again, this number only applies to
12  Novelty's specific convenience stores.  But as
13  we're talking about Novelty, that's more
14  appropriate than this aggregated number.
15      Q    Now, if you were to start from
16  scratch --
17      A    Can I -- I have one more.  Can I
18  keep --
19      Q    Well --
20      A    Well, okay.  Go ahead.
21      Q    I have to ask the questions.
22      A    Sure.  That's right.
23      Q    If you were to start from scratch
24  to determine what constituted legitimate sales
25  here, what data inputs would you have to rely

---

Page 1678

1   upon to obtain that figure?
2           MR. BARBER:  Objection, Your
3   Honor.  In voir dire, the witness testified
4   that she didn't do any of her own econometric
5   modeling or methods and apply them to the
6   facts.  And so this is pure speculation now,
7   and will be of now value, and in fact will
8   tend to mislead, because, once again, this was
9   not disclosed in the prehearing statement.
10          Apparently, she is not here to
11  testify about the report that was disclosed,
12  and so it would be inappropriate to allow her
13  to speculate as to how to start.
14          JUDGE RANDALL:  Mr. Emord?
15          MR. EMORD:  This is precisely what
16  expert testimony is for.  I mean, if we can't
17  understand -- she has explained in detail now
18  based on his oral testimony, which we did not
19  have in advance, based on the report
20  information, which we did, the problems, the
21  methodological problems and assumptions that
22  are erroneous in his analysis.
23          Now I think we need to understand
24  how, from her vantage point as a statistician,
25  this should have been done.  And that's fair.

---

Page 1679

1   Hypotheticals are appropriate for experts to
2   testify to.
3           JUDGE RANDALL:  Mr. Barber,
4   anything in response to that?
5           MR. BARBER:  Simply, Your Honor,
6   that this witness testified on voir dire that
7   she didn't do anything of this manner, and the
8   disclosure of the Government's oral testimony
9   of Jonathan Robbin was a matter that should
10  have been objected to at the time.
11          This witness' testimony constitute
12  -- the proposed testimony, Your Honor, as I
13  count it, is 12 lines long on page 13, and
14  there is nothing in the disclosed testimony
15  about how she might go about doing this if she
16  were in fact to do it.  And she on voir dire
17  said she hasn't done it.  So this is
18  unreliable testimony.
19          MR. EMORD:  This is part of --
20          MR. BARBER:  And has not been
21  disclosed.
22          MR. EMORD:  It's part of the
23  explanation of the flaw in someone else's work
24  as to what they should have done.  And that's
25  clearly explained there.  You don't -- we

---

Page 1680

1   don't apply a precise litmus test to every
2   single statement contained in this.  It's to
3   apprise someone of the nature of the
4   testimony, not to give an exact -- a
5   description of exactly what that testimony
6   will entail.
7           JUDGE RANDALL:  Mr. Barber, you
8   cite to page 13.  Is it page 13 of the
9   Respondents' prehearing statement, or
10  supplemental?
11          MR. BARBER:  It is page 13 of
12  Respondents' prehearing statement, Your Honor.
13          MR. EMORD:  And there's also a
14  supplement to that prehearing statement.
15          (Pause.)
16          JUDGE RANDALL:  And, Mr. Emord,
17  you believe that you have also addressed it in
18  the supplemental prehearing statement?
19          MR. EMORD:  No, apparently we have
20  not.  This is the item to look at, Your Honor.
21          JUDGE RANDALL:  All right.  I --
22  my biggest concern is the lack of notice
23  through the prehearing statement.  I do
24  acknowledge that the Respondents' prehearing
25  statement discloses areas to be testified

Page 1681

```
 1   about and not specific data that's going to be
 2   analyzed, but I also acknowledge that such
 3   disclosure in the type of witness and evidence
 4   this witness is is not so egregious as to say
 5   the disclosure was inadequate in order to
 6   allow this witness to testify.
 7              However, I do note that, since the
 8   Government has not been given access to the
 9   specific information, if the Government needs
10   additional time to prepare their rebuttal case
11   to this, that certainly would be within the
12   realm of appropriate.
13              As to the other aspects of the
14   objection, I'm going to overrule it.  At this
15   point, it's unclear to me if her answer to
16   that would have been her own model or if it's
17   just going to be an analysis of the flaws she
18   perceives in Mr. Robbin's model.  So I'm going
19   to allow inquiry into that area.
20              You may continue, Mr. Emord.
21         BY MR. EMORD:
22      Q    Do you remember the question
23   asked?
24      A    No.
25         MR. EMORD:  I have forgotten it as
```

Page 1682

```
 1   well.  Madam Reporter, could you please read
 2   the question that was asked before the
 3   objection was raised?
 4              (Whereupon, the proceedings in the
 5              foregoing matter went off the
 6              record briefly while the previous
 7              question was played back by the
 8              Court Reporter.)
 9         THE WITNESS:  There's various
10   things that should have been controlled for
11   here.  As I've already discussed, based on his
12   computation, I've pointed out the problems
13   with this number, the problem with this
14
15         JUDGE RANDALL:  I'm sorry.  In
16   order for the transcript to make any sense --
17         THE WITNESS:  I'm sorry.
18         JUDGE RANDALL:  -- you have to say
19   the numbers.
20         THE WITNESS:  I pointed out the
21   problems with using $140,000 -- 140,000 stores
22   as the denominator, the eight percent, as one
23   of the numerator multipliers.  And, similarly,
24   there's problems with the $292 million in
25   industry sales.
```

Page 1683

```
 1              As I discussed earlier, any time
 2   we have survey data there's problems in self-
 3   reporting, and we know that often there is
 4   miscategorization of sales.
 5
 6
 7
 8
 9   So those would not be included here.  They
10   would be included in some completely different
11   category.
12              And so if I were to assume that
13   that was the same for other companies as well,
14   not just Novelty's customers but other
15   companies' customers as well, that, you know,
16   over half of their -- of their customers did
17   not report ephedrine here, but under somewhere
18   else, then actually these numbers would be
19   even different.
20              Instead of -- okay.  Instead of --
21   I would basically multiply this numerator by
22   two --
23         BY MR. EMORD:
24      Q    Can you please explain what
25   numerator you're referring to for the record?
```

Page 1684

```
 1      A    So if I multiply this out, this is
 2   175 million here, 292 times
 3
 4   large as it should be --
 5      Q    "This" being?
 6      A             This is half as
 7   large as it should be, because a lot of the
 8   convenience stores don't report their sales of
 9   ephedrine as cough and cold, they report it as
10   general merchandise, like we know Novelty's
11   customers do.
12              Then, actually, this number may be
13   -- and this is, again, relying on the Novelty-
14   specific data as large as 350 million.
15   It's 175 times two.
16              And then, when we divide that by
17   31,000, we
18
19                         sing completely Mr.
20   Robbin's methodology here, the first -- the
21   first correction I did, correcting 140,000 to
22   31-, is just -- that's just fundamental.
23   That's just computing an average using the
24   right observations instead of the wrong
25   observations.
```

Page 1685

1         These other two bottom numbers,
2  when I multiply ▮▮▮▮▮ when I then
3  basically divide -- multiply the numerator by
4  two, that is based on assumptions trying to
5  not introduce aggregation bias in the .08,
6  coming up with kind of convenience store
7  specific numbers instead of a number that
8  would apply to all retail establishments.
9         When we do that, we see these
10  three numbers which are, by the way, five
11  times as large as Mr. Robbin's estimate, 33
12  times as large as Mr. Robbin's estimate, and
13  66 times as large as Mr. Robbin's estimate.
14         And so -- so the first issue would
15  be just if you're going to get an aggregate
16  number that is going to apply to all stores,
17  to get it in the best method possible, to not
18  introduce any unnecessary aggregation bias, if
19  you can avoid it, to make sure you divide by
20  the correct number instead of an incorrect
21  number.
22         But that being said, there still
23  is a problem with coming up with one number,
24  whatever that number is, and applying it to
25  all convenience stores, because we know -- I

---

Page 1686

1  mean, it doesn't -- and, again, it doesn't
2  take, you know, a -- I don't know, a rocket
3  scientist to know that convenience stores are
4  different.
5         There is a difference between
6  convenience stores that are on a big highway,
7  have thousands and thousands of customers a
8  day, and some convenience stores that are in
9  some back woods and, you know, in some rural
10  town or whatever.
11         And so what we typically do, what
12  applied -- not typically, what we always do --
13  applied statisticians -- in this area when
14  we're trying to predict a number, whatever
15  that number is -- here it's sales, and we're
16  trying to predict it for different kinds of
17  stores which are not all the same is we do
18  what's called multivariate statistics.
19         And Mr. Robbin talked a lot about
20  multivariate statistics in The Declaration of
21  Jonathan Robbin, but he didn't actually -- but
22  then, when you pressed him on it, he said he
23  didn't actually do it. And he talked about a
24  lot of the variables that should be included
25  in a multivariate statistical analysis.

---

Page 1687

1         If you look in The Declaration of
2  Jonathan Robbin, on page 7, he talks about
3  including things such as size, location,
4  hours, advertising expenditures, management
5  practices. But when you asked him if he
6  included that, he said he actually didn't.
7         So what a multivariate statistical
8  analysis is, specifically a multiple
9  regression analysis, is it predicts a number
10  -- here it would be sales -- while considering
11  all -- as many of the factors as you can that
12  actually affect sales.
13         And so this is the standard
14  analysis that is done in any court case when,
15  you know, there's a breach of contract or
16  there's antitrust or whatever and we're
17  talking about predicting sales. People do
18  multiple regression analysis; that has been
19  standard for decades.
20         And so, you know, the things that
21  are typically included in any multiple
22  regression analysis of any sales data would be
23  things like the hours, the location, here --
24  is it near a highway, is it not, the customer
25  case, do they have a lot of customers, do they

---

Page 1688

1  not have a lot of customers. Again, how many
2  hours they're open, advertising expenditures,
3  things like that.
4         When we're talking about sales of
5  ephedrine products, obviously, there is other
6  variables that are also very important for how
7  much ephedrine do we sell.
8         We know that asthma, which is I
9  guess what ephedrine is sold for, varies a lot
10  by region, it varies a lot by time of year, is
11  most prevalent in certain times of year in
12  certain regions and not in others, depending
13  on environmental factors, and so --
14         MR. BARBER: Objection, Your
15  Honor. We are now moving into medical
16  evidence that this witness is not qualified
17  for. And, again, I'm trying to let her
18  narrate, but there's no foundation for her
19  statements. I ask that Your Honor disregard
20  her statements about what she knows about
21  asthma without laying some foundation.
22         JUDGE RANDALL: Overruled. You
23  may continue.
24         THE WITNESS: From the National
25  Institute of Allergy and Infectious Disease,

Exhibit 6
14

Page 1689

```
 1    we know that asthma prevalence does vary a
 2    lot.  It's more prevalent -- according to
 3    them, it's more prevalent in the fall and
 4    winter in southern, warmer regions.  It's more
 5    prevented -- more prevalent in the fall and
 6    spring in norther regions.
 7              The environments -- how many
 8    particles in the air matters a lot.  And so if
 9    we were going to predict ephedrine sales,
10    obviously, it's going to matter how much
11    asthma do people get in certain areas.  And so
12    the proper technique that would be done --
13    and, again, which is done in court cases any
14    time we're talking about estimating sales --
15    is to do a multiple regression analysis where
16    we predict sales while considering all of
17    these factors which we know to impact sales.
18              And so that would be the
19    appropriate way to do this.  By doing that, we
20    would get different numbers for different
21    types of convenience stores, depending on
22    their size, are they near a highway or not,
23    are they in the north, are they in the south,
24    is it spring, is it winter, and we would be
25    then comparing, as Mr. Robbin does, their
```

Page 1690

```
 1    actual sales to these predictions which are
 2    based on considering other factors rather than
 3    comparing actual sales to one number, which is
 4    supposed to be a one size fits all applied to
 5    all years, all seasons in the year, all
 6    convenience stores, regardless of their
 7    location.  It would be really the only way to
 8    do this accurately.
 9              BY MR. EMORD:
10        Q    Now, Mr. Robbin refers to a Z-
11    score.  What is a Z-score?
12        A    A Z-score analysis -- and he does
13    this for ███████████████████████████
14    ███████████████ -- a Z-score analysis looks
15    at actual numbers.  Here we're talking about
16    actual sales.  And it says, "Are these numbers
17    different enough from our expectation -- are
18    the actual sales different enough from the
19    expectation that we can conclude that they
20    didn't happen by chance?"
21              And so what that means is that --
22    and, again, there is naturally going to be
23    variation across stores, across seasons.  Not
24    every store is going to have exactly your
25    expectation every month.  There is going to be
```

Page 1691

```
 1    variation.
 2              A lot of that variation is random.
 3    But what a Z-score analysis does is it tells
 4    us:  is this actual sale so different from our
 5    expectation that there is no way it could have
 6    happened randomly?  And so that's what a Z-
 7    score analysis does, and that's what he does
 8    for CBS Distributors in the declaration.
 9        Q    Do you disagree with the way in
10    which he has performed his Z-score analysis?
11        A    Yes, I do.  You know, basically,
12    it's just, again, he's comparing -- a Z-score
13    compares actual sales to expected sales.
14    That's his number of expected sales.
15        Q    What is "that"?
16        A    Sorry.  172 is his annual number
17    of expected sales, so he is comparing actual
18    sales to his expected number, which is 172, or
19    $14.39 a month, which, as I show here, there's
20    -- you know, this is fundamentally wrong in
21    this denominator.
22              And then, if also -- even the
23    numerator is based on various assumptions when
24    it introduces aggregation bias.  If you did a
25    Z-score analysis using different numbers and
```

Page 1692

```
 1    -- you know, which are more accurate than Mr.
 2    Robbin's, you would come up with very
 3    different ██████████████
 4    ██ ███████████████████████████
 5    ██ ████████████ convenience stores that were
 6    selling ephedrine products in the fall.  I did
 7    the Z-score analysis based on that.  And just
 8    using these three other figures --
 9              MR. BARBER:  Objection, Your
10    Honor.  Now we are getting into statistical
11    work that the witness has said she didn't do
12    with regard to Z-scores.  And, again, it's not
13    disclosed.
14              This witness is being called as a
15    rebuttal, and we ask that at this point the
16    witness, at a minimum, disclose to the
17    Government the documentary evidence.  But we
18    object to her testifying about things she said
19    she didn't do.
20              JUDGE RANDALL:  Mr. Emord?
21              MR. EMORD:  Well, she's going
22    through analyzing what we first heard in
23    testimony from Jonathan Robbin, which was not
24    disclosed to us, concerning the use of Z-
25    scores, which he used for the first time in
```

Page 1693

```
 1    his description in detailed testimony -- makes
 2    passing reference to it in his report -- in
 3    detailed testimony from the stand.
 4              And this is all part of a shell
 5    game where you hide certain information -- the
 6    Government has -- denies us access to that
 7    information, presents bits of it during the
 8    course of the testimony of Jonathan Robbin,
 9    and expects us to be in a position to
10    seasonably and timely respond instantaneously
11    to it.
12              And what we are now seeing is how
13    adept we were at actually doing that thing,
14    taking the information, limited as it is, and
15    expounding upon it.
16              In this instance, Your Honor, he
17    has testified from the stand about the Z-score
18    analysis.  And he applied it our client here,
19    to Novelty.  And he based his ultimate
20    conclusion on an application of that that
21    Novelty was outside of his Z-score analysis,
22    which is not specifically articulated in
23    detail in the material that you supplied, but
24    was articulated in sufficient detail to rebut
25    in testimony here today.  We should be
```

Page 1694

```
 1    permitted the opportunity to rebut it.
 2              JUDGE RANDALL:  Very well.  I'm
 3    going to take our mid-morning recess and
 4    consider this.  We'll be recess until 11:00.
 5    We're in recess.
 6              (Whereupon, the proceedings in the
 7              foregoing matter went off the
 8              record at 10:52 a.m. and went back
 9              on the record at 11:11 a.m.)
10              JUDGE RANDALL:  Thank you, please
11    be seated.  Mr. Emord, I have a question about
12    Respondent's Exhibit 27 which is the report by
13    Dr. Shepherd.  Did the Respondent exchange
14    this document in a timely fashion?
15              MR. EMORD:  Yes, your Honor.
16              JUDGE RANDALL:  And Mr. Barber,
17    you acknowledge, you did receive it.
18              MR. BARBER:  Absolutely, your
19    Honor.
20              JUDGE RANDALL:  All right, thank
21    you.  Very well, I'm going to overrule the
22    objection.  I believe Respondent's Exhibit 27
23    gives the Government adequate notice about
24    this line of questioning and I'm going to
25    allow it.  You may continue, Mr. Emord.
```

Page 1695

```
 1              MR. EMORD:  Thank you, your Honor.
 2    BY MR. EMORD:
 3        Q    Now, you were testifying to your
 4    understanding of Mr. Robbin's Z-score
 5    analysis.
 6        A    Right.
 7        Q    And did you evaluate that Z-score
 8    analysis?
 9        A    Yes, in the declaration of
10    Jonathon Robbin, he did it for the CBS
11    Distributor.  It was a different company, but
12    then when he was on the stand you asked him to
13    look at some of the government documents and
14    he talked about the Z-score analysis as it
15    related to those as well.
16        Q    Now, if you'll -- I think you
17    already have before you Government Exhibits 38
18    and 44.
19        A    Yes.
20        Q    Now, is it your understanding from
21    the testimony of Jonathan Robbin that he, in
22    his testimony referred to Government Exhibits
23    38 and 44 as the basis for information
24    pertaining to Novelty for use in extrapolation
25    to the Z-score analysis?
```

Page 1696

```
 1        A    Yes, he did.
 2        Q    What is your understanding of how
 3    he applied his Z-score analysis of that
 4    information?
 5        A    Well, again, I mean, the Z-score
 6    is basically just a way of comparing an
 7    expected number to an actual number to note
 8    whether or not the actual number is too far
 9    away from the expected number.  And so I
10    believe, and I suppose we could read the
11    transcript specifically, but when Mr. Barber
12    gave him the documents, he said kind of based
13    on other Z-score analysis he had done, looking
14    at these monthly sales figures --
15        Q    These monthly sales figures --
16        A    These are Novelty's monthly sales
17    figures.
18        Q    And you are now referring to what
19    document?
20        A    I'm sorry, I'm sorry, Government
21    Exhibits, well both 38 and 44 have monthly
22    sales data for Novelty.  And he said based on
23    other Z-score analyses he had done, comparing
24    actual sales like the ones on Government's
25    Exhibits 38 and 44, to his expected sales,
```

Page 1697

1  based on that, he believes that these would be
2  not random, they would be too far from
3  expectation.
4      Q    Now, how many stores to your
5  knowledge, having looked at Government's
6  Exhibits 38 and 44, how many novelty stores
7  are represented on those pages?
8      A    There are six stores, Government
9  Exhibit 38 has sales data from five stores and
10 Government Exhibit 44 has the sales data from
11 one store.
12     Q    So a total of six stores.
13     A    Yes.
14     Q    Out of a universe of?
15     A    ████
16 ████ when the registration was whatever
17 the proper verb is, to use.  In the past it
18 ████
20         Now, did you understand from Mr.
21 Robbin's testimony that he concluded based on
22 Government's Exhibits 38 and 44 that Novelty
23 sales were outside of the predicted Z-score
24 for those sales figures?
25     A    Yes, I believe he did.

Page 1698

1      Q    And do you have an opinion as to
2  the accuracy or reliability of that analysis
3  by Robbin?
4      A    Right, well, when -- if he did a
5  Z-score analysis on these using Mr. --
6  comparing these actual sales to Mr. Robbin's
7  expectation, then a lot of them very well do
8  look like they'd be too high, that it would be
9  not random, but when you actually do the same
10 analyses using some of these other estimates,
11 then a lot of them don't look -- I mean, most
12 of them fall within the range, I guess except
13 for this one store, BPM55, the other five
14 stores' monthly sales data are definitely
15 within this range.
16 ████████ is above this range and I
17 should note that ████
18 ████
21 ████ d in addition, without
22 doing, as I talked about the multi-various
23 statistical analysis, we can't control for
24 things that may explain these higher sales
25 like their location, how many hours, how many
25 customers they have, those sorts of other

Page 1699

1  variables.
2      Q    When you do a Z-score analysis, do
3  you anticipate that there will be an accepted
4  range of outliers that will not be indicative
5  of establishing for the universe that you
6  study that all of them were outliers?
7      A    Right, well, a Z-score analysis,
8  it really does the same so there's kind of --
9  there's a distribution of whatever number
10 you're looking at and we're talking about
11 sales.  And that you have an expectation, so
12 from Mr. Robbin that was like 172 annually and
13 then there is this area where you presume that
14 stores that lie with -- values, values of
15 sales that lie within this area are not that
16 different enough to be --
17     Q    Please describe for the Court
18 Reporter the area you're referring to.
19     A    The shaded area on the -- the
20 shaded area under the curve, this kind of
21 shaded area in the middle of the curve.  The
22 values of sales that lie anywhere within this
23 area would not be so different from your
24 expectation for you to be able to conclude
25 that there is something statistically

Page 1700

1  significantly different but when they fall
2  outside of that range in the two tails of the
3  distribution then you would conclude
4  statistically that those numbers are different
5  enough that you would conclude that they are
6  not -- that it's not random and that they are
7  different from your expectation.
8         Here, within the shaded area under
9  the distribution you cannot conclude, a
10 statistician cannot conclude that the values
11 are different, statistically different from
12 your expectation because of randomness.  When
13 they're in the white tails, then you can
14 conclude that they are statistically
15 different.  Again, that doesn't mean that they
16 are illegitimate.  There could be reasons why
17 they're different, legitimate reasons why
18 they're different but you could conclude that
19 they are statistically different.
20     Q    How did Robbin define the range?
21     A    So basically, and this would be
22 standard for any statistician, he says that
23 anything outside of two standard deviations,
24 that would be a positive 2, that would be a
25 negative 2, anything with a Z-score higher

Case 1:08-cv-00635-RMC  Document 19-7  Filed 05/05/2008  Page 19 of 24

Page 1701

1    than 2, would be considered out of the range

2    and what that means statistically, is that in

3    any distribution, you're going to have 2.5

4    percent of the observations here, 2.5 percent

5    of the observations here --

6        Q    "Here" is where?

7        A    I'm sorry, in the two tails, and

8    that actually is based on randomness.

9        Q    So you place -- let me just stop

10    you for a second.  You placed upon your easel

11    there a bell-shaped curve, correct?

12        A    Yes.

13        Q    And in the center of the bell-

14    shaped curve you've drawn a line from the top

15    of the bell to the bottom flat line.

16        A    Right.

17        Q    And that is your mid-point.

18        A    Yes.

19        Q    And at that point, what does

20    Robbin predict?

21        A    Robbin here would predict $14.39 a

22    month or $172.00 a year.

23        Q    And then you have what you refer

24    to as tails, which are small lines at either the

25    outer most edge of the bell on the right and

Page 1702

1    on the left.

2        A    Right.

3        Q    And on the right, what would

4    Robbin have?

5        A    Well, that is where he says that

6    any observation that was greater than two

7    standard deviations from his expectation of

8    1439 would lie in that range.

9        Q    And on the left what did Robbin

10    do?

11        A    It would be the same thing.  It

12    would be any actual sales data which was two

13    standard deviations below 1439 would lie in

14    that range.

15        Q    Now, do you have an opinion as to

16    the analysis that Robbin has made with regard

17    to the Z-score that you've presented on the

18    board?

19        A    Well, I mean, the Z-score analysis

20    just fundamentally is a valid analysis when

21    you are really only looking at one variable

22    and you don't think that there's anything else

23    effecting those variables.  If you think that

24    there's other things that could explain why

25    sales would be greater or less than 1439, then

Page 1703

1    again, as I said, you would do some sort of

2    multiple regression so if you're just

3    comparing numbers to numbers, you think that

4    they should all be the same.  You think that

5    all convenient stores should have the same

6    numbers, then this is -- a Z-score analysis is

7    a standard way of doing this.  And what this

8    basically means is like if we had 1,000

9    observations, you should actually randomly get

10    2.5 percent of those observations in the upper

11    most right-hand tail and 2.5 percent of those

12    observations at the lowest most left-hand

13    tail.  And that again, would be random but

14    nevertheless, with the Z-score analysis, what

15    we say is that if you have any one value and

16    it happens to be so far away that it's in a

17    tail, then you conclude that it's

18    statistically different and that's kind of the

19    end of the conclusion.  And then you would

20    rely on more information to answer why is it

21    statistically different.

22        Q    Would you have performed the Z-

23    score analysis differently than Robbin did

24    given the data?

25        A    Well, Robbin didn't actually -- he

Page 1704

1    only talked about Z-score analysis in regards

2    to these six stores.  And, yes, well,

3    obviously the way I would have done it would

4    be instead of -- you know, I'm going to

5    actually -- I'll give you the equation for Z-

6    score analysis.  What you do is you take the

7    expected -- the actual sales and you --

8        Q    Would you mind using a black magic

9    marker, just because my poor eyes can't --

10        A    Sure.

11        Q    -- perceive the red.

12        A    It's a very easy equation.  It's

13    actual sales so it's actual monthly sales,

14    minus the expected sales which is again, Mr.

15    Robbin's 14.39 a month and I have different

16    numbers, and you divide that by the standard

17    deviations.  And that produces a Z-score

18    analysis, that gives you a Z number and as Mr.

19    Robbin says and as would be standard, in Court

20    cases, we typically use a Z-score analysis of

21    two or three to denote something that

22    statistically -- Mr. Robbin talks about two,

23    a very appropriate number.

24        If the Z is greater than positive

25    two or less than negative two, we would

Page 1705

1    conclude that it's statistically different.
2        Q    Is it an error because it relies
3    on the actual sales and expected sales figures
4    that you faulted in this morning?
5        A    Yes, by using as expected sales,
6    actual sales that could be well within my
7    range, my range of numbers but when comparing
8    them to a low number of expected sales which
9    is based on at least some errors and other
10   potential errors, you would get Z's that are
11   artificially biased upwards.
12       Q    ██████████████████████████████
     ███████████████████████████████████████
     ███████████████████████████████████████
15       A    It is an error to draw conclusions
16   about Novelty based on those six stores.  You
17   could do a Z-score analysis for every
18   individual store of Novelty's and I've done
19   that as well, but I would not draw a
20   conclusion unless █████████████████████████
     ███████████████████████████████████████
22       Q    And what -- you've done that
23   analysis yourself?
24       A    Yes.
25       Q    And what is the result of your

Page 1706

1    analysis?
2        A    Well, just using this formula
3    here, I --
4            MR. BARBER:  Objection, your
5    Honor.  Once again we are beyond the scope of
6    the proposed testimony and we have no
7    underlying documents.  We have Government or
8    I'm sorry Novelty 27 which doesn't have data,
9    doesn't have equations, and notwithstanding
10   Mr. Emord's prior objection, I do note that
11   Mr. Robbin did provide his fairly detailed
12   Table A which is Government Exhibit 25E.
13           And prior to this witness
14   testifying, I asked that at a minimum, I
15   understand the leeway your Honor wants to give
16   Respondents here, that we get the data she's -
17   - or the calculations she's using in advance
18   so that we can at least properly object and
19   cross examine.
20           JUDGE RANDALL:  Just a moment.
21           (Pause)
22           JUDGE RANDALL:  Mr. Emord?
23           MR. EMORD:  I believe your Honor
24   has ruled that this is within the scope of the
25   disclosure given and I also reiterate my

Page 1707

1    earlier point which is that not until Mr.
2    Robbin testified did we know how and even then
3    we don't know fully how, he applied his Z-
4    score analysis and as a consequence we are not
5    able in an anticipatory manner to predict the
6    rebuttal.  And as a consequence because the
7    testimony was live, the rebuttal testimony
8    must be live and sufficient notice, as your
9    Honor found, had been given for the Government
10   in this subject area.
11           JUDGE RANDALL:  Mr. Barber, could
12   you respond to the specifics that Mr. Emord
13   asserted in his response to your objection?
14           MR. BARBER:  I will, indeed, your
15   Honor, if I may have a moment.
16           JUDGE RANDALL:  You may have a
17   moment.
18           (Pause)
19           MR. BAYLEY:  Judge Randall, we're
20   just looking for the summary of Jonathon
21   Robbin's testimony and our prehearing
22   statement.
23           JUDGE RANDALL:  Very well.
24           (Pause)
25           MR. BARBER:  Well, your Honor, in

Page 1708

1    response to Mr. Emord's objection, the
2    Government did, in fact, give a fairly lengthy
3    written declaration, not only outlining Mr.
4    Robbin's qualifications, but also setting out
5    in significant detail his analysis in another
6    case, how he got there, and then Mr. Robbin
7    testified on the stand how he used similar
8    analysis with regard to the limited
9    information that was asked of him with regard
10   to Novelty sales.
11           In this case, we have no
12   disclosure either in Novelty Exhibit 27 or in
13   the proposed testimony of Dr. Shepherd that
14   she would be testifying about Z-scores that
15   she ran with regard to Novelty.  And so, at a
16   minimum we would ask one, that your Honor not
17   permit this; two, if she's going to, that we
18   at least get a copy of her Z-score analysis
19   and the data that she used much like was given
20   in Government Exhibit 25 for Mr. Robbin.  And
21   number three, that the Government, if you do,
22   in fact, let her testify to these matters,
23   that the Government be given some leeway on
24   cross examination to explore this area.
25           JUDGE RANDALL:  All right, Mr.

Page 1709

```
 1   Emord.
 2        MR. EMORD:  Yes, your Honor, we're
 3   happy to supply the Government with any
 4   document that Dr. Shepherd may have on her Z-
 5   score analysis.  I just want to note with the
 6   aid of my co-counsel, we've examined the
 7   Government's prehearing statement which itself
 8   does not mention Jonathon Robbin but then in
 9   a supplement that was filed on March the 5th,
10   they do mention Jonathon Robbin but nowhere in
11   the supplement do they mention that they will
12   adduce testimony concerning his Z-score
13   analysis.  There's nothing in here about his
14   methodology or approach in the Z-score
15   analysis.  In the declaration of Jonathon
16   Robbin, which is Government Exhibit 25, I also
17   find no reference to his Z-score analysis and
18   as a consequence there was no prior disclosure
19   of that analytical method that first arose in
20   live testimony from Jonathon Robbin on the
21   stand.  As a consequence, we could not have
22   anticipated that and so having had the benefit
23   of Jonathon Robbin's testimony, we think we
24   should have the equal opportunity to present
25   our expert's testimony.
```

Page 1710

```
 1        The last point is on the
 2   documentation, as I say, if there
 3   documentation, we will be happy to exchange it
 4   with the Government, but in any event, we
 5   received no such courtesy from the Government
 6   in advance of the appearance of Jonathan
 7   Robbin.
 8        JUDGE RANDALL:  Mr. Barber, you're
 9   on your feet.  You have a remark?
10        MR. BARBER:  If I may, I have just
11   one matter, your Honor.  Mr. Emord has
12   inaccurately stated that there was no
13   disclosure about the Z-score.  Table 25E
14   attached to Exhibit 25 specifically set forth
15   the data that was going to be used.  In fact,
16   not surprisingly, Dr. Shepherd has just drawn
17   a bell curve and explained what purports to be
18   a representation of what Mr. Robbin disclosed
19   on page 4 of 25E.  So the Government has, in
20   fact, disclosed a substantial portion of what
21   Mr. Emord claims they had no notice of and
22   this was not surprise live testimony by the
23   Government witness.  What Dr. Shepherd is
24   doing is surprise live testimony.
25        JUDGE RANDALL:  Very well, I've
```

Page 1711

```
 1   heard enough.  I'm going to overrule the
 2   objection and allow this line of questioning.
 3   However, I will afford Government counsel
 4   leeway in cross examination.  I find that
 5   notice on the side of both parties has been
 6   adequate so that the parties could know where
 7   the two expert witnesses were going.  I also
 8   find that both parties have acknowledged that
 9   Mr. Robbin's application of his Z-score
10   analysis to the Respondent's sales actually
11   occurred live on the stand and therefore, I'm
12   going to allow this witness to do likewise.
13   Please continue.
14        MR. EMORD:  Thank you, your Honor.
15        BY MR. EMORD:
16   Q    So, Dr. Shepherd, have you
17   performed a Z-score analysis of all of
18   Novelty's sales?
19   A    Yes, based -- I was given Novelty
20   sales data for the three months prior to when
21   they stopped selling ephedrine products and
22   from that I computed their average monthly
23   sales and compared that to my three different
24   numbers of expected sales along with the
25   standard deviation computed from that -- the
```

Page 1712

```
 1   data that I was given by Novelty to compute Z-
 2   ████████████████████████
 3   Q    And without belaboring the point,
 4   what were your findings?
 5        JUDGE RANDALL:  I'm sorry, I'm
 6   going to need to ask a foundation question.
 7   In terms of the sales, the three-month prior
 8   sales, was that -- were those statistics given
 9   to you in written form?
10        THE WITNESS:  Electronic.  I have
11   those on an Excel spreadsheet.
12        JUDGE RANDALL:  All right.
13        THE WITNESS:  But, yes, it's able
14   to be reproduced in a hard copy.
15        JUDGE RANDALL:  And Mr. Emord, is
16   this document on sales data that this witness
17   has relied upon to prepare her forthcoming
18   testimony, has that been exchanged with the
19   Government?
20        MR. EMORD:  It has not, your
21   Honor, but we are happy to do it.
22        JUDGE RANDALL:  All right, stop.
23   Now, let me hear it from Mr. Barber.  If the -
24   - the Respondent says they will give you this
25   data.  What is your response to that?
```

Exhibit 6
20

Page 1713

1             MR. BARBER:  Your Honor, I

2  understand --

3             MR. EMORD:  Your Honor, I'm sorry.

4  I made a misstatement and my colleague, Andrea

5  Ferrenz is familiar with the specific facts.

6  Rather than me articulate something in error

7  to the Court, Ms. Ferrenz ill speak to the

8  Court directly, Andrea.

9             MS. FERRENZ:  I'm sorry.

10            MR. EMORD:  One moment, I'm sorry,

11  your Honor.

12            MR. BARBER:  Shall I wait until

13  Ms. Ferrenz speaks on this, your Honor?

14            JUDGE RANDALL:  Please.

15        (Pause.)

16            MR. EMORD:  Dr. Shepherd, please

17  don't mark on the exhibit until after --

18            THE WITNESS:  I'm sorry.  I'm

19  moving back and forth, I'm sorry.

20            MR. EMORD:  All right, your Honor,

21  I am correct.  The Government does not have

22  that specific three-month data.  We're happy

23  to give them that data for that three months.

24  They do have data from prior to the three-

25  month period.

Page 1714

1             JUDGE RANDALL:  Let me see if I

2  understand what you're saying.  The data that

3  Dr. Shepherd relied upon does not exist in

4  written form?

5            MR. EMORD:  It does exist in

6  written form.  We're happy to exchange it but

7  we have not prior to today exchanged it.

8            JUDGE RANDALL:  I see, okay.  All

9  right, now, Mr. Barber.

10            MR. BARBER:  Your Honor, without

11  actually seeing it, I don't know how to

12  comment upon this other than to say we need it

13  to first determine whether or not to object

14  and then to know how to proceed from here.

15            MR. EMORD:  Here is an entire

16  copy, your Honor, which was are now

17  exchanging.

18         (Pause)

19            JUDGE RANDALL:  The procedure I

20  want to follow is, Mr. Emord, when you get

21  whatever it is that you believe this witness

22  relied upon, I want you to show it to the

23  witness to confirm that is the correct

24  document she relied upon and then if you're so

25  offering, give it to the Government.

Page 1715

1             MR. EMORD:  Thank you, your Honor.

2  Unfortunately, it does not have page numbers,

3  your Honor.  I'm going to, as per your

4  instructions, supply a copy to the witness, to

5  Government counsel at the same time and verify

6  whether, indeed, this is the document she's

7  referring to.  Please take a moment to look at

8  that document.

9         (Witness proffered document.)

10        (Pause)

11            MR. EMORD:  Your Honor, with your

12  indulgence, I'll supply the Court Reporter

13  with the same copy I supplied the witness.

14            JUDGE RANDALL:  Very well.

15            MR. EMORD:  Thank you, your Honor.

16            JUDGE RANDALL:  You're giving it

17  to the Hearing Clerk?

18            MR. EMORD:  Yes, I'm sorry, the

19  Hearing Clerk.

20          BY MR. EMORD:

21     **Q    You've had an opportunity to look**

22  **at that data that I've just handed to you.**

23     **A    Yes.**

24     **Q    And is that the sum total of the**

25  **data upon which you relied for your Z-score**

Page 1716

1  **analysis?**

2     **A    Yes, this is the first column, the**

3  **average monthly sales, was --**

4            JUDGE RANDALL:  Wait, don't go

5  over it.

6            THE WITNESS:  Oh, yes, it is, yes.

7            MR. EMORD:  It is.

8            JUDGE RANDALL:  Now, Mr. Barber,

9  do you wish to be heard?

10            MR. BARBER:  Just, I need a

11  moment, your Honor.

12         (Pause)

13            MR. BARBER:  Your Honor, I ask

14  just one indulgence of the Court and counsel

15  in this matter.  As the purpose of this

16  tribunal is to seek the truth, I think it

17  might be indeed helpful to hear from Dr.

18  Shepherd on this.  It is impossible in a

19  timely manner to use this data unless it's

20  provided in electronic format and by that I

21  mean, Excel spreadsheet, not pdf, and so I

22  would ask that your Honor order that to be

23  provided to Government counsel so that we may

24  have appropriate access to the data and can

25  verify numbers and use things in electronic

Exhibit 6
21

Case 1:08-cv-00635-RMC   Document 19-7   Filed 05/05/2008   Page 23 of 24
TESTIMONY OF JOANNA SHEPHERD    MONDAY, MARCH 31, 2008

Page 1717

```
 1    data.
 2              Other than that, I do not object
 3    to Dr. Shepherd using this information.
 4              JUDGE RANDALL:  All right, Mr.
 5    Emord, is it possible to provide this
 6    information to the Government in an electronic
 7    form?
 8              MR. EMORD:  Yes, your Honor, and I
 9    would like to report when that can be done.
10    Within the hour, we'll transmit an e-mail to
11    Mr. Barber containing the information, your
12    Honor.
13              MR. BARBER:  That's fine, your
14    Honor.
15              JUDGE RANDALL:  Very good.  Thank
16    you both for working together on that.  I
17    appreciate that.  And I agree with you, Mr.
18    Barber, it is important that the facts include
19    this data and the analysis of it.  So going at
20    the speed of common sense and not the speed of
21    an economist, I will allow you to continue on
22    with your testimony.
23              MR. EMORD:  Thank you, your Honor.
24    For the convenience of the Court and the
25    parties, we would ask that the document be
```

---

Page 1718

```
 1    marked for identification as Novelty Exhibit
 2    27A.
 3                   (Respondent Exhibit 27A
 4                   was marked for
 5                   identification.)
 6              MR. EMORD:  Thank you very much,
 7    protected and confidential my opposing counsel
 8    says, and he's quite right, under the
 9    protective order and he's indicated no
10    objection to the admission of the document.
11              MR. BARBER:  Correct, no objection
12    go admitting it, your Honor.
13              JUDGE RANDALL:  All right.
14              MR. EMORD:  So we so move.
15              JUDGE RANDALL:  You're offering it
16    at this point?
17              MR. EMORD:  Yes, your Honor.
18              JUDGE RANDALL:  All right, just a
19    moment.  Very well, then, I accept into the
20    record Respondent's Exhibit 27A.  You may
21    continue, Mr. Emord.
22                   (Respondent Exhibit 27A
23                   previously marked for
24                   identification was
25                   received in evidence.)
```

---

Page 1719

```
 1              MR. EMORD:  Thank you, your Honor.
 2              BY MR. EMORD:
 3         Q    Does 27A contain your Z-score
 4    analysis, Dr. Shepherd?
 5         A    Yes, 27 -- I prepared 27A based on
 6    the first column of data that was given to me
 7    by the Novelty executives.
 8         Q    Could you please explain to the
 9    Court and to the parties what 27A is?
10         A    Well, 27A is essentially the same
11    analysis that Mr. Robbin did on a different
12    company,              .  On the back, well,
13    lots of pages of his declaration, he performed
14    this Z-score analysis and       and so I've
15    now done the same thing for     f
16    Novelty Stores, comparing their actual average
17    monthly sales data over this three-month
18    period to my three estimates of legitimate
19    sales instead of to Mr. Robbin's estimate.
20         Q    And what did you conclude?
21         A    Based on -- and I certainly won't
22    go through this.  I'll just give you some kind
23    of, you know, general numbers.  From the
24    previous page, we can see that I come up with
25    based on correcting each one of these three
```

---

Page 1720



```
 1    numbers in his computation, I come up with
 2    three different estimates, the first one being
 3    the most conservative, where I've only
 4    corrected the most, you know, fundamental
 5    error.  The next ones would be larger because
 6    they correct for aggregation bias as well.
 7    And so I come up with three different
 8    estimates;
 9
10
11
12                                    So these are
13    my three estimates.  And I've done the Z-score
14    analysis comparing each store sales to each of
15    these.  You can see in the latter three
16    columns, and when you do this, what you find
17    is that for the most conservative estimate,
18    approximately              Stores have Z-
19    scores greater than two, which again, would
20    mean that they are statistically different
21    from the expectation.
22                   We don't know why they're
23    different but they are different.
24
25    Novelty's customers.
```

Exhibit 6
22

```
1           When we move onto the next one,
2   the first aggregation bias, we see that
3   approximately     of Novelty's stores have Z-
4   scores greater than two.  They're
5   statistically different.  We don't know why.
6   That's about              of Novelty's
7   customers.
8           And when we use the largest
9   estimate which is corrected all three of those
10  numbers, we see that approximately
11
12                           have sales that produce these
13  scores greater than 2 meaning they're
14  statistically different.
15          And so I'd like to remind you that
16  randomly we should have 2.5 percent of the
17  stores there, just random, just based on
18  random variation, monthly, store-by-store
19  data.  And so this 2.7 is really very -- only
20  slightly greater than what would be expected
21  randomly.  The other numbers are slightly
22  more, but you can see              was the
23  store whose sales were reported in Government
24  Exhibit 38, is at the very top and actually
25  has sales significantly greater than even the
```

```
1   second highest seller much less the majority
2   of Novelty Stores, so it truly is not
3   representative of Novelty's sales.
4           Q    Is it in error or does it create
5   bias for Jonathon Robbin to have included that
6   BP store among the six that he relied upon?
7           A    Well, it's not incorrect to do a
8   Z-score analysis on each individual store.
9   That's what I've done here and that's what he
10  did with those six.  So just doing a Z-score
11  analysis on      is not incorrect.  What
12  would be incorrect would be the bias inherent
13  in your conclusion if then you drew a
14  conclusion about Novelty's customers based on
15  relying on the outlier, the highest seller.
16          Q    And did Jonathon Robbin do that
17  very thing?
18          A    He -- I'm not -- when he answered
19  questions, I do believe that in his own way,
20  he did elude to the fact that he believes that
21  these sales were out of line with expectation
22  and thus, were Novelty's clients.
23          MR. EMORD:  One moment, your
24  Honor.
25          (Pause)
```

Exhibit 6
23

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

     **Plaintiff,**

v.

Michele Leonhart,       Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the     PUBLIC VERSION
Drug Enforcement Administration; et al.

     **Defendants.**

### PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### EXHIBIT 7 (OMITTED)

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**
**In her official capacity as**
**Acting Administrator of the**
**Drug Enforcement Administration; et al.**

        **Defendants.**

**Case No. 08cv00635 (RMC)**

**PUBLIC VERSION**

---

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 7**
**Declaration of Jonathan E. Robbin (DEA Witness in DEA Docket 08-33) and all attachments (Referred to in Exhibit 6 as Government Exhibit 25 and its attachments 25A-25 E)**

**43 pages omitted**

# This Document Contains Proprietary and Confidential Business Information Protected from Public Disclosure by Protective Order Dated April 18, 2008

# This Document is Also Protected as "Confidential" Under the March 19, 2008 Protective Order By DEA ALJ Gail Randall in DEA Docket 08-33

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**              **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**      **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


        **Defendants.**


## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 8



For comparison, Lisa Barnhill compared pharmacies sales of OTC List I products.  The Hannaford Pharmacy, Latham, New York, sold the following (in boxes) in 2007:

| Month | Pseudoephedrine | Ephedrine | Ephedrine mist |
|---|---|---|---|
| March 10- April 1 | 96 boxes | 0 | 0 |
| April | 97 | 1 | 0 |
| May | 104 | 1 | 1 |
| June | 96 | 0 | 0 |
| July | 62 | 1 | 3 |
| August | 75 | 0 | 2 |
| September | 107 | 1 | 1 |
| Total | 537 | 4 | 7 |

Exhibit 8

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**              **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**     **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


        **Defendants.**


## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 9 (REDACTED)



## Comparison of Novelty's sales of List I chemicals to sales
for all other products to convenience-store customers

| Store | Invoice # | Date | List I - $ | Other Items - $ | Total $ Sales | % of List I vs Other Items |
|-------|-----------|------|------------|-----------------|---------------|----------------------------|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

Exhibit 9



Exhibit 9

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

                   **Plaintiff,**

**v.**

**Michele Leonhart,**                        **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**            **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


                   **Defendants.**


**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 10 (OMITTED)**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the      PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 10 (OMITTED)
Referred to in Exhibit 6 Testimony as Government Exhibit 44 (Chart of wholesale
purchases of one convenience store)

# Proprietary and Confidential Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

Exhibit 10 is a chart of ephedrine and total merchandise purchased by one of Novelty's customers, and includes 19 pages of copies of receipts. The entire document contains confidential business information to be protected from public disclosure in accordance with the April 18, 2008 protective order. Redacted, this document comprises 22 completely redacted pages. Therefore, the document has been omitted.

22 pages omitted

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

           **Plaintiff,**

**v.**

**Michele Leonhart,**                **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**        **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


           **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 11 (OMITTED)**

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                        Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the           PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.


PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 11 (OMITTED)
Referred to in Exhibit 6 testimony as Novelty Exhibit 27A, Z tables of 3 months of SLC
sales by Novelty to individual stores by Joanna Shepherd, Ph.D.

# Proprietary and Confidential Business Information to be Protected from Public Disclosure Pursuant to April 18, 2008 Order

      Exhibit 11 is a chart of Z tables comparing the average retail sales of ephedrine of Novlety's convenience store customers November 2007-January 2008.  The entirety of this document contains confidential and proprietary business information, to be protected from public disclosure pursuant to the April 18, 2008 Order.   Redacted, this document comprises 73 entirely redacted pages.  Therefore, this document has been omitted from the public record.

            73 pages omitted

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,                Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the
Drug Enforcement Administration; et al.


        Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 12

CURRICULUM VITAE                                          August, 2007

# JOANNA M. SHEPHERD

Emory University School of Law
Atlanta, GA 30322-2770
404-727-8957
jshepherd@law.emory.edu

## ACADEMIC EMPLOYMENT:

Assistant Professor of Law, Emory University School of Law, Fall 2005 – present
   (Visiting Assistant Professor in 2004).

Assistant Professor of Economics, Clemson University, 2002 - 2004.

## PUBLICATIONS:

### Law Journal Publications

- *Tort Reform's Dark Side: Death and Discrimination.* UCLA LAW REVIEW __
  (2008) (forthcoming).

- *The Demographics of Tort Reform,* with Paul H. Rubin. THE REVIEW OF LAW &
  ECONOMICS __ (2008) (forthcoming).

- *Blakely's Silver Lining: Sentencing Guidelines, Judicial Discretion, and Crime* 58
  HASTINGS LAW JOURNAL 533 (2007*).*

- *Tort Reform and Accidental Deaths,* with Paul H. Rubin. 50 THE JOURNAL OF
  LAW & ECONOMICS 221 (2007).
      *subject of* Op-Ed, *Tort Reform Saves Lives,* WALL STREET JOURNAL   by
      Rubin, Oct. 8, 2005.

- *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among
  States*, 104 MICHIGAN LAW REVIEW 203 (2005).
      *subject of* Op-Ed, *Why Not All Executions Deter Murder,* THE CHRISTIAN
      SCIENCE MONITOR, Dec. 14, 2005.

- *An Empirical Study of Public Defender Effectiveness: Self-Selection by the
  "Marginally Indigent,"* with Judge Morris B. Hoffman and Paul H. Rubin. 3
  OHIO STATE JOURNAL OF CRIMINAL LAW 223 (2005).
      *subject of* Op-Ed, *Free-Market Justice,* THE NEW YORK TIMES,
      by Hoffman, Jan. 8, 2007.

- *Murders of Passion, Execution Delays, and the Deterrence of Capital
  Punishment*, 33 THE JOURNAL OF LEGAL STUDIES 283 (2004).

- *Does Capital Punishment Have a Deterrent Effect? New Evidence from Postmoratorium Panel Data*, with Paul Rubin and Hashem Dezhbakhsh. 5 AMERICAN LAW AND ECONOMICS REVIEW 344 (2003)
  *reprinted in* BEZPIECZNE PANSTWO. NOWE TRENDY W POLITYCE KARN (2006).

- *Police, Prosecutors, Criminals, and Determinate Sentencing: The Truth about Truth-in-Sentencing Laws*, 45 THE JOURNAL OF LAW & ECONOMICS 505 (2002).

- *Fear of the First Strike: The Full Deterrent Effect of California's Two- and Three-Strikes Legislation*, 31 THE JOURNAL OF LEGAL STUDIES 159 (2002).
  *reprinted in* BEZPIECZNE PANSTWO. NOWE TRENDY W POLITYCE KARNEJ (2006)

### Other Scholarly Articles

- *The Economics of Deterrence,* in CRIMINAL LAW AND ECONOMICS ___ (Nuno Garoupa ed., 2008) (forthcoming)

- *The Economics of Crime*, with Erling Eide and Paul H. Rubin, 2 FOUNDATIONS AND TRENDS IN MICROECONOMICS 291 (2006).

- *The Relationship between Prison Populations and Crime: Causes and Impacts*, 5 CRIMINOLOGY AND PUBLIC POLICY 285 (2006).

- *The Deterrent Effect of Capital Punishment: Evidence from a Judicial Experiment*, with Hashem Dezhbakhsh, 44 ECONOMIC INQUIRY 512 (2006).

- *Antitrust and Market Dominance*, with William G. Shepherd and George B. Shepherd, 46 THE ANTITRUST BULLETIN 835 (2002).

### Books

- THE ECONOMICS OF INDUSTRIAL ORGANIZATION, with William G. Shepherd (2003).

### Under Submission

- *Finger to the Wind: The Influence of Retention Politics on Judges' Decisions*, submitted to THE JOURNAL OF LEGAL STUDIES.

- *Cross-Monitoring and Corporate Governance*, with Frederick Tung and Albert Yoon, submitted to THE JOURNAL OF LAW & ECONOMICS.

- *Sentencing Guidelines, Judges, and Parole Boards: Do Guidelines Change the Balance of Power?,* with Nuno Garoupa and Dhammika Dharmapala, submitted to THE RAND JOURNAL OF ECONOMICS.

## CONGRESSIONAL TESTIMONY:

- *Testimony on Crime and Deterrence: Hearing on H.R. 2934, The Terrorist Penalties Enhancement Act of 2003. Before the House Judiciary Committee; Subcommittee on Crime, Terrorism, and Homeland Security*, 108th Cong. (2004).

**EDUCATION:**

- Emory University, Atlanta, GA, Ph.D. in Economics; Fields of Specialization: Law & Economics & Econometrics (study at Emory School of Law), 2002. Woodruff Scholar (1 of 7 students university-wide to receive Emory's top merit award).

- Baylor University, Waco, TX, BBA in Economics and International Business, 1997 (GPA: 4.0; Summa Cum Laude)

**TEACHING EXPERIENCE:**

- Torts; Law and Economics; Analytical Methods for Lawyers; Statistics for Lawyers; Economics and Public Policy; Econometrics; Statistics; Advanced Microeconomics; Introduction to Microeconomics

**SELECTED SCHOLARLY PRESENTATIONS:**

*University Presentations*

- University of Southern California School of Law, Law & Econ Colloquium (2007)
  *Finger to the Wind: The Influence of Retention Politics on Judges' Decisions*
- University of North Carolina School of Law, Faculty Colloquium (2007)
  *Finger to the Wind: The Influence of Retention Politics on Judges' Decisions*
- NYU School of Law, Comparative Law & Economics Forum (2007)
  *Finger to the Wind: The Influence of Retention Politics on Judges' Decisions*
- University of Michigan School of Law, Law & Econ Colloquium (2007)
  *The Demographics of Tort Reform*
- Northwestern University School of Law, Law & Econ Colloquium (2006)
  *The Demographics of Tort Reform*
- Florida State University School of Law, Law & Econ Colloquium (2007)
  *Cross-Monitoring and Corporate Governance*
- Stanford Law School, Law & Econ Colloquium (2006)
  *Tort Reform and Accidental Deaths*
- Univ. of Illinois College of Law, Comparative Law & Economics Forum (2005)
  *Tort Reform and Accidental Deaths*
- George Mason University, Law & Econ Colloquium (2005)
  *Tort Reform and Accidental Deaths*
- University of Georgia, Law & Econ Colloquium (2005)
  *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*
- University of Alabama, Department of Economics Faculty Colloquium (2004)
  *Diversity, Segregation, and Crime: An Industrial Organization Analysis of Competition*
- University of Toronto School of Law, Law & Economics Colloquium (2004)
  *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*

- Georgetown University Law School, Olin Law & Economics Workshop (2004)
  *Capital Punishment and Deterrence: Evidence from a Judicial Experiment*
- Georgia Tech University, Department of Economics Faculty Colloquium (2001)
  *Police, Prosecutors, Criminals, and Determinate Sentencing*
- Technical University of Dresden, Germany (2001)
  *Capital Punishment and Deterrence*

### Conferences and Meetings

- American Law & Economics Association Annual Meetings, Boston, MA (2007)
  *The Demographics of Tort Reform*
- European Association of Law and Economics Annual Conference, Madrid (2007)
  *The Demographics of Tort Reform*
- Law and Society Association Annual Meetings, Baltimore, MD (2006)
  *Cross-Monitoring and Corporate Governance*
- Canadian Law and Economics Association Annual Meetings, Toronto, CA (2006)
  *Cross-Monitoring and Corporate Governance*
- American Law & Economics Assoc. Annual Meetings, New York, NY (2005)
  *Blakely's Silver Lining: Sentencing Guidelines, Judicial Discretion, and Crime*
- American Economics Association Annual Meetings, Washington, D.C. (2005)
  *Blakely's Silver Lining: Sentencing Guidelines, Judicial Discretion, and Crime*
- National Academy of Sciences, National Research Council Semi-Annual Meeting, Washington, D.C. (2004)
  *Capital Punishment and Deterrence*
- American Law & Economics Assoc. Annual Meetings, New York, NY (2005)
  *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*
- Southern Economics Association Annual Conference, New Orleans, LA (2004)
  *Deterrence versus Brutalization: Capital Punishment's Differing Impacts Among States*
- Southern Economics Association Annual Conference, New Orleans, LA (2004)
  *Diversity & Segregation: An Industrial Organization Analysis of Competition*
- American Law & Economics Assoc. Annual Meetings, Chicago, IL (2004)
  *Capital Punishment and Deterrence*
- American Law & Economics Assoc. Annual Meetings, Toronto, CA (2003)
  *Major League Baseball, Market Regulations, and the Export of Employment*
- American Law & Economics Assoc. Annual Meetings, Washington, D.C. (2001)
  *The Deterrent Effect of California's Two- and Three-Strikes Legislation*

## OTHER PROFESSIONAL ACTIVITIES:

- Statistical Expert for the American Civil Liberties Union in *U.S. v. Patel* (Operation Meth Merchant).
- Peer-Reviewer (Referee) for: JOURNAL OF LEGAL STUDIES, REVIEW OF LAW & ECONOMICS, INTERNATIONAL REVIEW OF LAW & ECONOMICS, SUPREME COURT ECONOMIC REVIEW, ECONOMICA, JOURNAL OF INDUSTRIAL ORGANIZATION, MANAGERIAL & DECISION ECONOMICS, CONTEMPORARY ECONOMIC POLICY, PUBLIC FINANCE REVIEW.

- Interviewed about empirical analyses of legal changes on CNN International and BBC.

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

        **Plaintiff,**

**v.**

**Michele Leonhart,**            **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**     **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


        **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 13 (REDACTED)**

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííí»
                          º
                          º

IN THE MATTER OF:    º
                          º   Docket No. 08-33
NOVELTY DISTRIBUTORS  º
                          º
                          º
þíííííííííííííííííííí¼

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, March 25, 2008

      The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

Exhibit 13
1 of 4

T-A-B-L-E O-F C-O-N-T-E-N-T-S

| Government Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Jonathan Robbin | 291 | 453 | 506 | 508 |
| Stephen Hussion | 528 | | | |
| J.R. Merlau | 542 | | | |

| EXHIBIT NO. | DESCRIPTION | MARK | RECD |
|---|---|---|---|
| Government | | | |
| 23 | NACS Report | | 336 |
| 24 | Robbin CV | 382 | 383 |
| 25 | Robbin Declaration | 382 | |

Page 535

1    **Manager, having access to these public storage**

2    **lockers, did that also include Novelty**

3    **pseudoephedrine and ephedrine products?**

4        **A    Yes, sir.**

5            MR. BAYLEY:  No further questions.

6    Thank you, Mr. Hussion.

7            THE WITNESS:  Thank you.

8            JUDGE RANDALL:  Just one moment.

9            MR. EMORD:  No questions, Your

10   Honor.

11           JUDGE RANDALL:  Okay.  Just one

12   second.

13           THE WITNESS:  No problem.

14           JUDGE RANDALL:  I have a few

15   questions, and then I'll allow counsel another

16   opportunity.

17           THE WITNESS:  Okay.

18           JUDGE RANDALL:  ████████████████

████████████████████████████████████████

████████████████████████████

21           THE WITNESS:  ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Exhibit 13
3 of 4

Page 536

1    ███████████████████████████████

2    ██████████████████████ to be reduplicated.

3            JUDGE RANDALL: █████████████

4    ████████████████████████████

5            THE WITNESS:  When I was the

6    District Manager.  Yes, ma'am.

7            JUDGE RANDALL:  Okay.

8            THE WITNESS: ███████████████

9    ██████████████████████████████

10           JUDGE RANDALL:  How did they do

11   that?  How do they separate that?

12           THE WITNESS: █████████████

13   ██████████████████████████████

14   ██████████████████████████████

15   ████████████

16           JUDGE RANDALL: ████████████████

17   ███████████████████████████████

18           THE WITNESS:  Yes, ma'am.

19           JUDGE RANDALL:  Okay.

20           THE WITNESS:  Yes, ma'am.

21           JUDGE RANDALL: ██████████████

22   ████████████████

23           THE WITNESS:  Yes, ma'am.  I'm

24   sorry.  Yes.

25           JUDGE RANDALL:  Okay.  Thanks.  I

# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

       **Plaintiff,**

**v.**

**Michele Leonhart,**               **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**       **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

       **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 14 (REDACTED)

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííí»
                            º
                            º
IN THE MATTER OF:     º
                            º   Docket No. 08-33
NOVELTY DISTRIBUTORS  º
                            º
                            º
þíííííííííííííííííííí¼

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Thursday, March 27, 2008

     The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL

           Administrative Law Judge

TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

Vincent Tomei      943   957
Kimberly Rogers    972   981      988
Marie Gelin        991  1018     1032      1033
                                 1035

Voir Dire on page 1042

Madeline Kuzma    1049  1084     1110      1111
Lisa Barnhill     1120

EXHIBIT NO.            DESCRIPTION        MARK RECD
Government
4                                         1163 1166
27A    Hannaford Pharmacy Log Book             1044

20     Barnhill Declaration                    1123
30-33  Verification Documents             1192 1195
34     Report                             1167 1171
35     Sales Report                       1168 1170
36     Product List                       1171 1174
39-40                                          1220
47     Inventory Papers                   1177 1179

59     Log                                1054
60     Interview Questionaire                  1058
61     Interview Questionaire             1064 1075
69     Spreadsheet                        1188 1191
77     Log Books                          1048 1066

Administrative Law Judge

10     Respondent's Motion in Limine      1149
11     Government's Response to Motion    1149
       in Limine
12     Respondent's Motion to Suppress    1149
       Evidence During July 9, 2007
       Inspection

13     Respondent's Interlocutory         1150
       Appeal of the Order Denying
       the Motion to Exclude
       Government Counsel
14     Deputy Administrator's denial      1150
       of the interlocutory appeal

Page 1099

```
 1           Q     Now turning our attention to your

 2    testimony concerning█████████████████ now

 3    as I understand it from your testimony you

 4    discovered in 2002 that a lot number which you

 5    give as 02G091H for an ephedrine-containing

 6    product was associated with ephedrine that had

 7    been found in a Connecticut meth lab.  Is that

 8    right?

 9           A     That's correct.

10           Q     Now -- and DEA agents apparently

11    discovered this product in a meth lab in

12    Thompson, Connecticut?

13           A     Yes.

14           Q     Now you've said that you had

15    discussion with a person at ████ who identified

16    that lot number as being associated with an

17    entire lot that had been sold to Novelty?

18           A     Yes.

19           Q     Now did you undertake -- I

20    understand -- first, let's get a little

21    foundation here.  Who was that individual who

22    informed you that the entire lot had been sold

23    to Novelty?

24           A     ████████████████

25           Q     ████████████████  And he's an employee
```

```
 1      of ████████

 2           A     He's the compliance manager for

 3      ████████

 4           Q     All right.  Did you ask to see the

 5      records establishing that the entire lot had

 6      been sent to Novelty?

 7           A     No.

 8           Q     Did you examine the ████ batch

 9      records for the batch that contained the 22

10      bottles?

11           A     No.

12           Q     Did you examine the ████ shipping

13      records that contained the 22 bottles?

14           A     No.

15           Q     Did you examine the ████

16      destruction records for the time period the

17      batch that contained the 22 bottles were made?

18           A     No.

19           Q     Did you examine any ████ documents

20      that record loss or theft to determine if any

21      bottles from the batch that contained the 22

22      bottles were recorded as lost or stolen?

23           A     No.

24           Q     Did you compare any batch records

25      from ████ to any shipping records from DMD?
```

Page 1101

```
 1              A    No.

 2              Q    So is it -- did you, or to your

 3      knowledge, anyone else at DEA establish which

 4      retail establishments were sold any of the lot

 5      number 02G091H?

 6              A    Retail meaning convenience stores?

 7              Q    Yes.

 8              A    No,        does not distribute to

 9      retail level stores.  They distribute to other

10      DEA registrants who distribute to retail level

11      stores.

12              Q    Did you or to your knowledge

13      anyone else at DEA establish which specific

14      retail establishments that is, convenience

15      stores, sold the 22 bottles?

16              A    No.

17              Q    When you were informed that

18      Novelty

19      -- when you informed Novelty of the diversion

20      of the 22 bottles, did you at that point tell

21      Novelty to stop selling SLCs to any stores in

22      Connecticut?

23              A    No.

24              Q    To your knowledge, did anyone else

25      at the DEA advise or recommend that Novelty
```

Page 1102

1      discontinue sales of ephedrine-containing

2      products to any store in Connecticut?

3           A     Not that I'm aware of.

4           Q     Did you inform Novelty that it

5      needed to change its SLC distribution method

6      at that time?

7           A     We advised there needed to be

8      scrutiny of where the product was going.

9           Q     Did you recommend any change in

10     distribution method at that time?

11          A     Not that I recall.

12          Q     To your knowledge, did anyone else

13     in the DEA recommend a change in Novelty's

14     distribution method?

15          A     Not that I'm aware of.

16          Q     Did you give Novelty a notice of

17     diversion concerning the 22 bottles?

18          A     No.

19          Q     Did anyone else at DEA give

20     Novelty a notice of diversion concerning the

21     22 bottles?

22          A     No.

23          Q     Have you ever given Novelty a

24     notice of diversion concerning the SLC

25     products that it sells?

1          MR. BAYLEY:  Objection, out of the

2    scope.

3          JUDGE RANDALL:  Sustained.

4          BY MR. EMORD:

5     Q     Now in the course of assessing

6    this incidence of diversion, you mentioned

7    that you had occasion to visit with principals

8    and employees of Novelty, correct?

9     A     Yes.

10    Q     And who did you visit with in

11   particular?

12    A     In communicating this information,

13   I believe it was to Mr. Polk and Mr. Baker.

14    Q     Now did Mr. Polk and Mr. Baker to

15   your knowledge offer to cooperate fully with

16   the DEA in assisting to discover the source of

17   the diversion?

18    A     I believe they made efforts to

19   identify to the extent they could where the

20   product went and that's when they advised us

21   of the two names of the route salesmen and of

22   this lot number what the respective men had

23   been, what had been shipped to them.

24    Q     Were they fully cooperative, in

25   your view?

Page 1104

1        A       I had no reason to think

2    otherwise.

3        Q       And did they express a willingness

4    to identify as best they could who might be

5    responsible within Novelty, within the Novelty

6    route sales professional staff for this

7    incident?

8        A       Yes.

9        Q       At the time of your visit, did you

10   provide them with any definitive information

11   establishing that, in fact, the entire lot

12   number and issue had been distributed by

13   Novelty?

14       A       Did I provide them information

15   that they had distributed the entire lot?

16       Q       Yes.

17       A       No.

18       Q       And did they inform you that they

19   understood that they had distributed the

20   entire lot number from ███████████████

21       A       They didn't advise otherwise that

22   they did not receive that entire lot.

23       Q       But did they advise you that they

24   understood Novelty had purchased the entire

25   lot number?

Exhibit 148 of 14

1          A       I don't specifically recall that.

2          Q       All right.  Now, you mentioned

3     that you spoke to Ryan Polk and Mr. Baker at

4     Novelty about the ███ warning letter.  Did you

5     supply them with a copy of the ███ warning

6     letter?

7          A       No.

8          Q       Now to your knowledge, well,

9     Novelty supplied DEA with the names of two

10    route sales professionals -- was it at that

11    visit at Novelty?

12         A       In May of '03?

13         Q       Yes.

14         A       Yes.

15         Q       And did Mr. Polk supply you with

16    those names?

17         A       I'm not exactly sure.

18         Q       It was Polk or Baker, one of the

19    two?

20         A       Those were the two we advised.

21         Q       Yes.  And they supplied you with

22    the names of the route sales professionals.

23    To your knowledge, did DEA then do anything to

24    contact those two route sales professionals?

25         A       Not that I'm aware of.

Page 1106

1          Q     Did DEA conduct any investigation

2     associated with those two route sales

3     professionals?

4                MR. BAYLEY:  Your Honor, we're

5     getting into investigation techniques and

6     information about the investigations that

7     really should not go beyond the scope.  It

8     should remain confidential as well.

9                JUDGE RANDALL:  Very well, then

10    the testimony to these questions will be so

11    marked.  *** I believe this testimony needs to

12    be marked proprietary.

13                MR. EMORD:  Thank you, Your Honor.

14                BY MR. EMORD:

15          Q     Do you know whether DEA conducted

16    an investigation of either of these two

17    individuals?

18          A     Not that I'm aware of.

19          Q     So basically after that visit when

20    you informed Novelty there was to your

21    knowledge no subsequent action taken by DEA

22    against either of the two route sales

23    professionals, is that correct?

24          A     Yes, not that I'm aware of.

25          Q     Now do you know whether DEA took

1     **any action against any one else, not a Novelty**

2     **employee, but against anyone else that was in**

3     **association with that meth lab for**

4     **distribution of the lot number?**

5                    MR. BAYLEY:  Your Honor --

6                    JUDGE RANDALL:  Mr. Bayley?

7                    MR. BAYLEY:  Yes, Your Honor.

8     This is getting beyond the scope and it's

9     getting repetitive as well.

10                    And it's not relevant.

11                    JUDGE RANDALL:  Just a second.

12                    (Pause.)

13                    JUDGE RANDALL:  State your

14    objection again, Mr. Bayley?

15                    MR. BAYLEY:  I'm going to object

16    on the basis of relevancy, beyond the scope,

17    and it's getting into investigation that

18    shouldn't be disclosed and it's also area that

19    has already been covered.

20                    MR. EMORD:  Can I be heard, Your

21    Honor?

22                    JUDGE RANDALL:  Yes, just a

23    moment.

24                    (Pause.)

25                    Yes, Mr. Emord?

```
 1                    MR. EMORD:  The question is not

 2        designed to elicit any specific information

 3        about any DEA operation.  It's a general

 4        question whether indeed DEA to her knowledge

 5        has taken any action against anyone else in

 6        relationship to this matter who is involved in

 7        the distribution of the lot number.

 8                    The importance of that is that if,

 9        in fact, not that DEA has taken action against

10        someone other than Novelty's people which she

11        said that they didn't take any action against

12        the Novelty people identified by Mr. Polk,

13        that would be rather powerful evidence

14        potentially that they discovered additional

15        information leading them to believe that

16        someone else was responsible for the

17        diversion.  And that would be exculpatory in

18        nature and very, very powerful.

19                    I think it is highly relevant.

20        The inquiry is carefully worded so as not to

21        elicit information about any specific

22        operation.

23                    JUDGE RANDALL:  Very well.  I'm

24        going to overrule the objection and allow the

25        witness to the extent that she knows to answer
```

Page 1109

1          that.

2                    THE WITNESS:  Can you restate it,

3          please?

4                    BY MR. EMORD:

5               Q     I will, as best I can.  I know

6          it's a little bit -- are you aware of whether

7          DEA has taken any action against any person

8          other than the route sales professionals

9          identified by Novelty in association with

10         enforcement against the diversion of the

11         product for distribution.

12                    Let me rephrase the question.

13                    Are you aware of any DEA action

14         against any individuals other than those

15         identified by Novelty for an alleged diversion

16         of this product to the Connecticut meth lab?

17              A     I am not aware.

18              Q     Now you mentioned that the meth

19         lab was in Connecticut.  Was any effort

20         undertaken by DEA to determine precisely which

21         convenience stores may have been the source of

22         the diversion to your knowledge?

23              A     I can't speak to anything that

24         occurred in Connecticut.  So my answer to that

25         or any subsequent questions is I don't know.

1       I don't have any knowledge.

2               Q       All right, no further questions,

3       Your Honor.

4                       JUDGE RANDALL:  Redirect, Mr.

5       Bayley?

6                       MR. BAYLEY:  Yes, thank you, Judge

7       Randall,  Just briefly.  I know we're getting

8       towards lunch here.

9                       JUDGE RANDALL:  That's fine.

10                       REDIRECT EXAMINATION

11                      BY MR. BAYLEY:

12              Q       Investigator Kuzma, as a diversion

13      investigator, do registrants have a legal

14      obligation to report thefts and loss of List

15      1 chemicals?

16              A       Yes.

17              Q       Do you have any reason to believe

18      that ▮▮▮▮ is a company that does not abide by

19      this regulation?

20              A       I have no reason to believe so.

21              Q       Do you have any reason not to --

22      do you have any reason to question the

23      information that ▮▮▮▮▮▮▮▮ gave you

24      concerning the lot number in question about

25      the meth lab seizure in Thompson, Connecticut?

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

             **Plaintiff,**

**v.**

**Michele Leonhart,**               **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**       **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

             **Defendants.**

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### EXHIBIT 15 (OMITTED)

**UNITED STATES DISTRICT COURT FOR THE**
**DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

                **Plaintiff,**

**v.**

**Michele Leonhart,**                       **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**               **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


                **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 15 (OMITTED)**

      Exhibit 15 is ALJ Exhibit 15 in DEA Docket No. 08-33.  It is a recreation of a demonstrative exhibit created by Dr. Joanna Shepherd during her testimony.  The entirety of this document contains confidential and proprietary business information.  Therefore, it has been omitted in accordance with Her Honor's April 18, 2008 Protective Order.  This information has also been designated as Confidential in DEA Docket No. 08-33.

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

               Plaintiff,

v.

Michele Leonhart,                      Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the         PUBLIC VERSION
Drug Enforcement Administration; et al.

               Defendants.

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT 16 (REDACTED)

Page 1259

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííí»
                              º
                              º
IN THE MATTER OF:             º
                              º
                              º    Docket No. 08-33
NOVELTY DISTRIBUTORS          º
                              º
                              º
þíííííííííííííííííííí¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive
Arlington, VA 22202


Friday, March 28, 2008


          The above entitled matter came on
for hearing, pursuant to notice at 9:00 a.m.



BEFORE:  GAIL A. RANDALL

          Administrative Law Judge

Page 1261

## TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

Mark Bledsoe    1272    1323    1401    1414
Voir Dire on page 1355
Lisa Barnhill   1441    1489
Ryan Polk       1508    1521


EXHIBIT                          MARK RECD
Respondent
16                                    1358
34                                    1391
42    Show Cause                      1325
44                                    1365
48    DVD                             1387

57-A                             1352 1352
10, 38, 54, 14
47, 17                                1388
34                                    1391

Government
26                               1462 1463

27                               1466 1466
28                               1467 1468
29                               1469 1471
37                               1445 1446
38                               1459 1460
41                               1480 1482
44                               1474 1474

45                               1476 1477

49                               1481 1485

65                               1451 1455

66                               1445 1446

71, 71A, 81, 81A,

    82, 82A                      1485 1480

83                               1480 1482

Page 1491

1        Q      Now in calculating those figures,

2    did you calculate an error rate?  Do you know

3    what I'm referring to?

4        A      No.

5        Q      When you went through a mass

6    quantity of documents like that, did you

7    assume that in your assessment there might be

8    an error in the information upon which you

9    relied such that you would need to determine

10    an error rate to apply to the calculation?

11        A      No, we don't do that.

12        Q      And by we don't do that, you mean,

13    the Drug Enforcement Administration in

14    performing this function does not do it or

15    particular people within the DEA with whom you

16    work do not do it?

17        A      No, it's not a DEA practice.

18        Q      Now, Ms. Barnhill, we received

19    information on your background training to be

20    and the positions that you're in in the Drug

21    Enforcement Administration.  I would like to

22    ask you whether you have received a degree in

23    accounting.

24        A      No, I have not.

25        Q      Have you taken any college

Page 1492

1        accounting courses?

2            A     Yes, I have.

3            Q     And what courses are those?

4            A     It's standard basic accounting.

5            Q     And what was the length of time of

6        that course?  Was it a semester?

7            A     I believe I took three semesters

8        of accounting courses.

9            Q     And was that -- At what university

10       did you --

11           A     George Mason University.

12           Q     And did you take any courses in

13       forensic accounting?

14           A     No, I did not.

15           Q     Now can you explain for me what

16       generally accepted accounting principles are

17       applied for inventory evaluations?

18           A     I'm not sure I know what you mean.

19           Q     Are there generally accepted

20       accounting principles for inventory?  Do you

21       know?

22           A     I still don't know what you mean.

23           Q     All right.  Let me ask you this.

24       Is it possible that you made a mistake in your

25       calculations of unaccounted for dosage units?

Page 1493

1          A      In the audit or in the inventory?

2          Q      In the audit.

3          A      There's always that possibility.

4          Q      Okay.  And is it possible that you

5     made a mistake in your calculations of

6     overages?

7          A      With the records that we were

8     given, no, I don't.

9          Q      Is it possible that you made more

10    than one mistake in your calculations of

11    unaccounted for dosage units?

12         A      It's always possible, but with the

13    records I was given, no, I don't.

14         Q      So you're quite confident you made

15    no mistake in your calculation of unaccounted

16    for dosage units.

17         A      There's always that possibility,

18    but I'm confident with our figures.

19         Q      Now did an accountant ever

20    evaluate your work?

21         A      No.

22         Q      Did you count all of the physical

23    inventory on Novelty's premises when you

24    inspected the Novelty plant in July of 2007?

25         A      ████████████████████████████████

Exhibit 16
5 of 9

Page 1494

1

16

17        Q

19        A

Exhibit 16
6 of 9

Page 1495

1    ████████████████████████████████

2    They weren't necessary in resalable condition.

3         Q      But you did not go through each

4    and every package to determine its state in

5    the ████████████████████

6         A      That's correct because we stopped

7    counting after we found out how the

8    information came into the company.

9         Q      Now have you taken any college

10   courses in statistics?

11        A      Yes, I have.

12        Q      And in college, did you ever take

13   a class in which you were taught how to

14   perform an unbiased survey?

15        A      No.

16        Q      Are you familiar with the term

17   bias as it is used in the field of statistics?

18        A      No.

19        Q      Who created Government Exhibit 68?

20        A      I'm not sure which exhibit that

21   is.

22               MR. EMORD:  Can the court reporter

23   please place before the witness Government

24   Exhibit 68.  Thank you.

25               BY MR. EMORD:

Page 1496

1          Q      Before we begin the examination

2     related to Government Exhibit 68, you

3     mentioned that you had taken some college

4     courses in statistics.  What college courses

5     did you take in statistics?

6          A      I don't even remember.  It was 21

7     years ago.

8          Q      Was it at the undergraduate level?

9          A      Yes.

10         Q      And was it an introduction to

11    statistics?

12         A      Yes.

13         Q      Was it more than one course?

14         A      No.

15         Q      Now who created Government Exhibit

16    68?

17         A      I did.

18         Q      Did anyone else participate in the

19    creation of Government Exhibit 68?

20         A      I'm not sure we're talking about

21    the same exhibit.

22              MR. EMORD:  All right.  Government

23    Exhibit 68 that I have.  And may I approach,

24    Your Honor?

25              JUDGE RANDALL:  You may approach.

Page 1497

```
 1                    BY MR. EMORD:

 2           Q      If we can compare, this is the

 3      exhibit I have.  Is that what you have?

 4           A      Yes, it is.

 5           Q      All right.  So we're looking at

 6      the same document.  Very well.  Who created

 7      Government Exhibit 68?

 8           A      I did.

 9           Q      Did anyone else participate in the

10      creation of Government Exhibit 68?

11           A      Yes.

12           Q      Who were those other individuals?

13           A      It was Investigator Darrell

14      Meador.

15           Q      You and Darrell Meador created

16      Government Exhibit 68.  Anyone else?

17           A      No.

18           Q      And who chose the cities to list

19      in the City category?

20           A      The cities just came off of

21      Novelty records.  When we were looking at the

22      data we were primarily looking at the store

23      name and what they purchased.

24           Q      So was it you or was it Darrell

25      Meador who actually chose to use these
```

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

v.

Michele Leonhart,             Case No. 08cv00635 (RMC)
In her official capacity as
Acting Administrator of the      PUBLIC VERSION
Drug Enforcement Administration; et al.


        Defendants.


## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 18 (OMITTED)

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

**NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,**

                    **Plaintiff,**

**v.**

**Michele Leonhart,**                       **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**         **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**

                   **Defendants.**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**EXHIBIT 18 (OMITTED)**

       Exhibit 18 is the Surrebuttal Declaration of Dr. Joanna Shepherd in DEA Docket No. 08-33, and associated exhibits.  This Exhibit and the Attachments thereto are protected as Confidential under a Protective Order in that administrative hearing.  Therefore, Exhibit 18 and the attachments thereto have been omitted from the public docket pursuant to Her Honor's April 18, 2008 Protective Order.

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

**NOVELTY DISTRIBUTORS, INC.,**
**D/B/A GREENFIELD LABS,**

            **Plaintiff,**

**v.**

**Michele Leonhart,**                  **Case No. 08cv00635 (RMC)**
**In her official capacity as**
**Acting Administrator of the**        **PUBLIC VERSION**
**Drug Enforcement Administration; et al.**


            **Defendants.**


## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## EXHIBIT 17 (REDACTED)

UNITED STATES DEPARTMENT OF JUSTICE

\* \* \* \* \* \*

DRUG ENFORCEMENT ADMINISTRATION

\* \* \* \* \* \*

HEARING

\* \* \* \* \* \*

þíííííííííííííííííííí»
                                    º
                                    º
IN THE MATTER OF:          º
                                    º   Docket No. 08-33
NOVELTY DISTRIBUTORS       º
                                    º
                                    º
þíííííííííííííííííííí¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202


Monday, March 24, 2008


        The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.


BEFORE:  GAIL A. RANDALL

         Administrative Law Judge

Exhibit 17
1 of 5

APPEARANCES:

For Novelty Distributors:

JONATHAN W. EMORD, ESQ.
ANDREA G. FERRENZ, ESQ.

PETER A. ARHANGELSKY, ESQ.

of:    Emord & Associates, P.C.

11808 Wolf Run Lane

Clifton, VA 20124

(202) 466-6937

For the Drug Enforcement Administration:

LINDEN BARBER, ESQ.

BRIAN BAYLEY, ESQ.

WAYNE PATRICK, ESQ.

PAUL SOEFFING, ESQ.

Drug Enforcement Administration

Office of Chief Counsel

600 Army Navy Drive

Arlington, VA 22202

(202) 307-8010

Exhibit 17
2 of 5

TABLE OF CONTENTS


OPENING STATEMENT:


MR. BAYLEY, PAGE 29

MR. EMORD, PAGE 37

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Todd Green | 62 | 139 | 160 | |
| Jonathan Robbin | 164 | | | |

| EXHIBIT | MARK | RECD |
|---|---|---|
| 1-9 | 8 | 9 |

```
 1              A      Yes.

 2              Q      That's your limit.

 3              A      Right.

 4              Q      And as I understand it, that is

 5      the limit that you've had for how long?

 6              A      Two or three years.

 7              Q      All right.  If you were informed

 8      of a store exceeding the limit, what would

 9      your response be?

10                     MR. BARBER:  Objection.  Calls for

11      speculation, hypothetical, and again goes to

12      the Respondent's case in chief, not to the

13      cross examination of the Government's exam.

14                     MR. EMORD:  I think it's directly

15      derived out of the cross exam -- or the direct

16      examination concerning the quantity.  He

17      opened the door when he asked -- started

18      asking these questions about the quantitative

19      amount of the cases that are delivered.  If

20      the quantitative amount --

21                     JUDGE RANDALL:  Let me answer

22      this.

23                     MR. EMORD:  Yes.

24                     JUDGE RANDALL:  I'll overrule the

25      objection.  However, Mr. Emord, lay the
```

Exhibit 17
4 of 5

Page 159

1    foundation.

2              MR. EMORD:  All right.  Thank you,

3    Your Honor.

4              BY MR. EMORD:

5         Q    **Now, sir, you were asked during**

6    **your direct examination the quantitative**

7    **amount of cases that you deliver** ▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆    **Do you remember that?**

9         A    **Yes.**

10        Q    **And your answer for that was?**

11        A    ▆▆▆▆▆▆▆▆▆

12        Q    **Now, in the event that you --** ▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆    ▆▆▆▆▆▆▆▆▆▆▆▆▆

18              MR. EMORD:  I have no further

19   questions at this time, Your Honor, but this

20   witness will be asked to come back on direct.

21              JUDGE RANDALL:  Very well.

22              MR. BARBER:  I'll be very brief,

23   Your Honor.

24              JUDGE RANDALL:  Yes, Mr. Barber,

25   you may redirect.