# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,<br><br>      Plaintiff,<br><br>      v.<br><br>MICHELE LEONHART,<br>In her official capacity as Acting Administrator<br>of the Drug Enforcement Administration, *et al.*,<br><br>      Defendants. | No. CV 08-00635 (RMC) |

## <u>DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

C. LEE REEVES
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

## TABLE OF CONTENTS

**PAGE(S)**

INTRODUCTION.................................................................................................... 1

STATUTORY AND REGULATORY BACKGROUND............................................... 2

FACTUAL BACKGROUND. ................................................................................... 4

ARGUMENT. ........................................................................................................ 9

I.     THIS COURT LACKS JURISDICTION OVER ALL OF
NOVELTY'S CLAIMS. ................................................................................. 9

II.    NOVELTY CANNOT CARRY ITS BURDEN TO SHOW THAT IT IS
ENTITLED TO A PRELIMINARY INJUNCTION......................................... 14

     A.    Novelty Has Failed To Demonstrate That It Will Suffer
Irreparable Harm. ............................................................................ 15

          1.    Requiring Novelty to Exhaust Its Administrative
Remedies Does Not Constitute Irreparable Harm..................... 15

          2.    Novelty's Delay In Seeking Relief Belies Its Assertion
Of Irreparable Harm. ................................................................. 16

     B.    Because Novelty Cannot Demonstrate That DEA's § 824(d)
Suspension Order Was Arbitrary Or Capricious, It Cannot Show
A Likelihood Of Success On The Merits.............................................. 21

     C.    The DEA Would Be Substantially Injured By The
Entry Of A Preliminary Injunction...................................................... 24

     D.    The Public Interest Requires That Novelty Follow
The Dispute Resolution Procedures Congress
Established. ....................................................................................... 27

CONCLUSION. ...................................................................................................... 28

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **PAGE(S)**

*Apotex, Inc. v. Food & Drug Admin.*,
    449 F.3d 1249 (D.C. Cir. 2006). ..................................................................... 15

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006). ...................................................................... 15

*Citibank v. Citytrust & Cititrust Bancorp, Inc.*,
    756 F.2d 273 (2d Cir. 1985)........................................................................ 17, 18

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)................................................................................ 23

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
    58 F.3d 738 (D.C. Cir. 1995). ................................................................... 14, 15

*City of Las Vegas v. Lujan*,
    891 F.2d 927 (D.C. Cir. 1989). ...................................................................... 15

*Doe v. Gonzalez*,
    2006 WL 1805685 (D.D.C. 2006). ................................................................. 13

*Dorfmann v. Boozer*,
    414 F.2d 1168 (D.C. Cir. 1969). .................................................................... 14

*\*FCC v. ITT World Communications, Inc.*,
    466 U.S. 463 (1984)................................................................................ 11

*Fort Worth National Corporation v. Federal Savings & Loan Insurance Corporation*,
    469 F.2d 47 (5th Cir. 1972). .................................................................... 11, 12

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975). ............................................................... 17, 18

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998).............................................................. 17

*Independent Bankers Ass'n of America v. Federal Home Loan Bank Bd.*,
    557 F. Supp. 23 (D.D.C. 1982). .................................................................. 11

*\*John Doe, Inc. v. Drug Enforcement Admin.*,
    484 F.3d 561 (D.C. Cir. 2007). ...................................................... 10, 11, 12, 13

-ii-

*Maine Public Utilities Com'n v. F.E.R.C.,*
  454 F.3d 278 (D.C. Cir. 2006). .................................................................... 23
*Mazurek v. Armstrong,*
  520 U.S. 968 (1997). .................................................................... 14, 18

*Medipharm-RX, Inc. v. Gonzales,*
  2007 WL 601722 (M.D. Fla. 2007). .................................................................... 21

*Natural Resources Defense Council v. Pena,*
  147 F.3d 1012 (D.C. Cir. 1998). .................................................................... 17, 18

*Newdow v. Bush,*
  355 F. Supp. 2d 265 (D.D.C. 2005). .................................................................... 17, 18

*Port City Properties v. Union Pacific R. Co.,*
  518 F.3d 1186 (10th Cir. 2008). .................................................................... 21

*\*Randolph-Sheppard Vendors of America v. Weinberger,*
  795 F.2d 90 (D.C. Cir. 1986). .................................................................... 15, 16, 27, 28

*Smith v. Illinois Bell Telephone Co.,*
  270 U.S. 587 (1926). .................................................................... 15, 16

*\*Telecommunications Research and Action Ctr. v. FCC,*
  750 F.2d 70 (D.C. Cir. 1984). .................................................................... 10

*Ty, Inc. v. Jones Group, Inc.,*
  237 F.3d 891 (7th Cir. 2001). .................................................................... 17

*Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n,*
  259 F.2d 921 (D.C. Cir. 1958). .................................................................... 14

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
  559 F.2d 841 (D.C. Cir. 1977). .................................................................... 14

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2). .................................................................... 13

12 U.S.C. § 1730a(k). .................................................................... 11

21 U.S.C. § 802(34)(C). .................................................................... 2

21 U.S.C. § 802(34)(K). .................................................................... 2

-iii-

21 U.S.C. § 802(38). .......................................................................................... 2

21 U.S.C. § 822(e). ........................................................................................... 3

21 U.S.C. § 822(f). ........................................................................................ 3, 6

21 U.S.C. § 824. ......................................................................................... *passim*

21 U.S.C. § 830(a). ........................................................................................ 7, 8

21 U.S.C. § 830(a). ........................................................................................... 3

21 U.S.C. § 823(h). ........................................................................................... 3

21 U.S.C. § 830(e)(1)(A)(vii). ........................................................................... 7

21 U.S.C. § 843(a)(9). ....................................................................................... 2

21 U.S.C. § 877. ............................................................................. 10, 11, 12, 26

28 U.S.C. § 510. ............................................................................................... 2

## RULES AND REGULATIONS

21 C.F.R. § 1301.37(c). ............................................................................. 19, 22

21 C.F.R. § 1301.42. ....................................................................................... 23

21 C.F.R. § 1309.21. ..................................................................................... 2, 6

21 C.F.R. § 1309.23(b)(1). ................................................................................ 3

21 C.F.R. § 1309.23-24. .................................................................................... 3

21 C.F.R. § 1309.44(a). ................................................................................. 4, 17

21 C.F.R. § 1309.71-73. .................................................................................... 3

21 C.F.R. § 1310. ............................................................................................. 3

21 C.F.R. § 1310.04. ......................................................................................... 7

21 C.F.R. § 1310.05(a)(1). ................................................................................. 3

21 C.F.R. § 1316.03. ......................................................................................... 3

28 C.F.R. § 0.100. ................................................................................................................................ 2

28 C.F.R. § 0.104. ................................................................................................................................ 2

## INTRODUCTION

Plaintiff Novelty Distributors, Inc. d/b/a/ Greenfield Labs ("Novelty" or "Plaintiff") was a licensed distributor of ephedrine and pseudoephedrine, both of which are list I chemicals subject to regulation by defendant Drug Enforcement Administration ("DEA"). Following an administrative inspection and investigation of Novelty's facilities and records, DEA determined that Novelty had failed to take sufficient precautions to ensure that the ephedrine and pseudoephedrine it sold and distributed was not unlawfully diverted to methamphetamine labs. Accordingly, DEA determined that Novelty's continued operation posed an "imminent danger" to the public health and safety and, by order dated January 17, 2008, suspended Novelty's registration to distribute ephedrine and pseudoephedrine.

Some three months later, Novelty now seeks a preliminary injunction reversing the DEA's suspension pending the outcome of administrative proceedings. It does so notwithstanding the fact that its administrative challenge to the DEA's suspension remains ongoing, and notwithstanding the fact that judicial review of DEA agency action is proper only in the court of appeals.

Even if review were proper in this Court, which it is not, Novelty has failed to demonstrate that it is entitled to the extraordinary relief it seeks. Novelty offers no explanation whatsoever for why it waited three months to seek a preliminary injunction. Even ignoring this unexplained and unexcused delay, Novelty's claim that it will suffer irreparable harm by having to exhaust its administrative remedies fails as a matter of law. On the merits, Novelty's arguments amount to nothing more than an improper attempt to re-litigate the administrative hearing in this judicial forum. For these reasons, DEA respectfully requests that Novelty's

1

motion for a preliminary injunction be denied.

## STATUTORY AND REGULATORY BACKGROUND

Both ephedrine and pseudoephedrine are List I chemicals which are often illegally

diverted for use in the clandestine manufacture of methamphetamine, a controlled substance.  In

an effort to stem illegal methamphetamine production, Congress has passed a number of

comprehensive measures, including the Chemical Diversion and Trafficking Act of 1988

("CDTA"), the Domestic Chemical Diversion Control Act of 1993, the Comprehensive

Methamphetamine Control Act of 1996, and the Combat Methamphetamine Epidemic Act of

2005 (collectively "the Acts"),[1] all of which impose upon distributors and sellers of list I

chemicals various duties to control theft, loss, and otherwise illegal diversion of list I chemicals

to clandestine laboratories.

The DEA regulates ephedrine and pseudoephedrine pursuant to the Controlled Substances

Act ("CSA"), as amended by, *inter alia*, the CDTA.[2]  21 U.S.C. § 802(34)(C), (K).  Any

individual or entity who wishes to import, export, or distribute list I chemicals must first register

with DEA.  21 U.S.C. §§ 802(38), 843(a)(9); *see also* 21 C.F.R. § 1309.21 (DEA regulations

requiring registration).  Registration serves multiple purposes.  In order to strike a balance

between allowing distributors to pursue legitimate business while limiting the availability of

---

[1]21 U.S.C. § 801, *et seq*.

[2]Although the pertinent statutes grant the authority to regulate controlled substances to the Attorney General, the Attorney General has delegated that authority to the DEA pursuant to 28 U.S.C. § 510.  ("The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.").  *See also* 28 C.F.R. §§ 0.100 and 0.104 (similar delegation of authority from Attorney General to DEA).

chemicals for illicit production of controlled substances, the Acts require list I chemical distributors to take specific measures to prevent illegal diversion of their products. For instance, they must (i) obtain proof of identity from their customers; (ii) maintain retrievable receipt and distribution records; (iii) report to DEA any suspicious orders; and (iv) provide controls and procedures to guard against theft and diversion. 21 U.S.C. §§ 830(a), (b)(1), 823(h); *see also* 21 C.F.R. §§ 1310; 1310.05(a)(1); 1309.71-73. DEA also has the authority to conduct inspections of registrants' places of business, including warehouses and factories, where regulated persons lawfully distribute list I chemicals. 21 U.S.C. § 822(f); 21 C.F.R. § 1316.03.

When a distributor of list I chemicals maintains multiple locations for distributing and selling list I chemicals, a separate registration is required for each location. *See* 21 U.S.C. § 822(e); 21 C.F.R. § 1309.23-24. This is necessary because, without separate registrations, DEA would be unable to identify or inspect all locations from which list I chemicals were distributed. There are only two exceptions to the separate registration requirement. First, a registered distributor who stores chemicals at a warehouse is exempt from registering the warehouse only if no chemicals are distributed from the warehouse and the chemicals are returned to the registered location prior to distribution. 21 C.F.R. § 1309.23(b)(1). Second, a separate registration is not required for a location used by an agent of the registrant to merely solicit sales as long as the agent does not use the location as a distribution point or storage facility. *Id.* at § 1309.23(b)(2). In other words, if no list I chemicals are distributed from or manufactured at a particular location, a separate registration is generally not required.

The DEA has the authority to revoke or suspend a party's registration for a variety of reasons. *See* 21 U.S.C. § 824(a) (articulating five grounds for revocation or suspension of

3

registration).  A suspension or revocation pursuant to § 824(a) is not automatic; prior to

suspending or revoking a party's registration, the DEA must issue an order to show cause

containing the DEA's basis for initiating proceedings and provide an administrative hearing

within 30 days.  *See* 21 U.S.C. § 824(c).

In cases where the DEA has reason to believe that a registrant's continued operation

would pose "an imminent danger to the public health or safety," the DEA has the discretion to

suspend that party's registration immediately, prior to an administrative hearing.  21 U.S.C.

§ 824(d).  As with § 824(a) suspensions, the DEA must provide the basis for its suspension in the

order to show cause.  21 U.S.C. § 824(d); 21 C.F.R. § 1309.44(a).  Pursuant to DEA regulations,

the registrant is entitled to request an expedited administrative hearing.  21 C.F.R. § 1309.44(c).

By statute, a § 824(d) suspension remains in effect until the DEA issues a final order unless the

suspension is withdrawn by the Attorney General or dissolved by a court of competent

jurisdiction.  21 U.S.C. § 824(d).

## FACTUAL BACKGROUND

Novelty, as a distributor of ephedrine and pseudoephedrine, must obtain a registration

from DEA every year to distribute list I chemicals ("chemicals").  In order to verify that

distributors of controlled substances are complying with the various obligations imposed by

statute and DEA regulations, DEA routinely conducts administrative inspections of distributors'

facilities and records.  Barnhill Decl. at ¶ 33.  Novelty's sole registered location is 351 W.

Muskegon Drive, Greenfield, Indiana  46140.  *Id.* at ¶ 32.  On July 9, 2007, DEA investigators

went to Novelty's Greenfield facility to execute an administrative inspection warrant.  *Id.* at ¶ 33.

During the first three days of this inspection, Novelty repeatedly failed to comply with DEA

4

inspectors' requests to provide the records Novelty was legally required to maintain.  *Id.* at ¶ 35.
The records that Novelty did produce initially were "coded," such that DEA investigators could
not discern what products Novelty was distributing, or to whom it was distributing those
products.  *Id.*  DEA investigators informed Novelty representative Ryan Polk that the records
Novelty provided were insufficient.  *Id.*

On the fourth day of the inspection, Polk informed DEA investigators that Novelty would
need more time to produce "uncoded" records from which the DEA could trace sales of
particular chemicals from Novelty to specific retail customers.  Barnhill Decl. at ¶ 36.
Ultimately, Novelty and DEA agreed that Novelty would produce only those records pertaining
to the period of time between January 1, 2007 and July 9, 2007, as opposed to the entire two-year
audit period.  *Id.*  Polk, on Novelty's behalf, represented to DEA investigators that the requisite
records would be available to DEA the following day, July 13, 2007.  *Id.*

On July 13, 2007, Polk provided Novelty's records to DEA.  Upon receipt of these
records, DEA investigators inquired whether Novelty had not produced any records which would
be needed to permit DEA to make a full and complete audit.  Barnhill Decl. at ¶ 37.  Polk replied
that Novelty had not yet produced all such records, but that Novelty would furnish DEA with all
records necessary for a complete and accurate audit.  *Id.*  On July 18, 2007, Polk provided the
remaining records to DEA.  *Id.* at ¶ 38.

Based on the records Novelty furnished, as well as other aspects of DEA's investigation
conducted pursuant to the administrative inspection, DEA determined that there was reason to
believe that Novelty had failed to comply with its obligations to ensure that the chemicals it
distributed were not unlawfully diverted.  More precisely, the DEA audit and investigation

yielded evidence that would tend to support a finding that Novelty had committed several
separate and independent violations, each of which supported DEA's determination that
Novelty's continued operation posed an imminent danger to public health or safety.

First, DEA concluded that there was evidence that Novelty had distributed chemicals
from over 100 unregistered locations in violation of 21 U.S.C. §§ 822(e) and 841(a)(1) and 21
C.F.R. §§ 1309.21 and 1309.23(a). Novelty's sole registered location is 351 W. Muskegon
Drive, Greenfield, Indiana 46140. Barnhill Decl. at ¶ 33. According to at least one Novelty
employee interviewed during the administrative investigation, Novelty would store chemicals at
other, unregistered storage facilities and other locations throughout the United States, sometimes
for days at a time. Barnhill Decl. at ¶ 40A. Novelty's employees or agents would then distribute
the chemicals directly from these unregistered locations to regulated sellers. *Id.*

Second, DEA concluded that there was evidence that the amount of chemicals Novelty
had distributed to some convenience stores far exceeded any amount that these convenience
stores reasonably could be expected to sell for legitimate purposes. Barnhill Decl. at ¶ 40B. The
DEA further concluded that some of these retail outlets permitted their customers to purchase the
chemicals Novelty had distributed in unlawfully large quantities. *See id.* (citing 21 U.S.C. §
844(a)).

Third, DEA concluded that there was evidence that Novelty had failed to maintain
adequate records pertaining to its distribution of chemicals. DEA conducted an audit of
Novelty's sales and distribution records and inventory for 20 scheduled listed chemical products
which Novelty distributes. Barnhill Decl. at ¶ 40C. After a review of the records Novelty
furnished, DEA investigators concluded that Novelty could not account for more than 60,000

6

dosage units of two different ephedrine products it distributed.  *Id.*  The audit also revealed that

Novelty lacked sufficient documentation for overages of 16 different scheduled listed chemical

products in violation of 21 U.S.C. § 830(a) and 21 C.F.R. § 1310.04.

Fourth, DEA concluded that there was evidence that Novelty had distributed list I

chemical products to retail outlets that were not that were not self-certified under 21 U.S.C.

§ 830(e)(1)(A)(vii).[3]  By law, a regulated seller must be self-certified in order to sell a scheduled

listed chemical product.  *See* 21 U.S.C. § 830(e)(1)(B)(i).  Using the records Novelty furnished,

DEA conducted "spot checks" of certain customers listed on Novelty records.  Based on these

spot checks, DEA found that the addresses of the customers as listed in Novelty's records did not

match the addresses submitted by customers who filed self-certification forms with DEA.  Based

on this disparity, DEA determined that there was evidence to suggest that Novelty had distributed

chemicals to 35 retail outlets retails who were not self-certified on at least 284 occasions.

Barnhill Decl. at ¶ 40D.

Fifth, based on the records Novelty provided, DEA concluded that there was evidence

that after February 1, 2007, Novelty had distributed 24-count bottles of scheduled listed chemical

---

[3]Self-certification requires that the retailer submit a self-certification that all its
employees involved in the sale of list I chemical products have undergone specific training to
ensure that its employees understand the legal requirements specified in 21 U.S.C. §§ 830 (d)-(e).
For instance, employees must understand that (i) list I products must not be displayed where
customers have direct access to them; (ii) records must be maintained regarding all sales of list I
products, including the quantity sold and, in some cases, the names and addresses of purchasers;
(iii) in some cases, the purchaser's identification must be verified and the purchaser must sign a
logbook; (iv) logbook entries must be maintained and preserved for at least two years; (v)
retailers are prohibited from selling more than 3.6 grams of ephedrine or pseudoephedrine base to
a single customer in a single day; and (vi) retailers may not sell ephedrine or pseudoephedrine in
a nonliquid form unless the product is packaged in "blister" packs containing not more than 2
dosage units or unless blister packaging is technically infeasible.  21 U.S.C. §§ 830(d)-(e).

products on three occasions to retail outlets.  Barnhill Decl. at ¶ 40E.  This was in violation of

federal law which states that, as of April 9, 2006, non-liquid listed chemicals cannot lawfully be

sold at retail establishments unless they are packaged in blister packs containing no more than

two dosage units per blister.  *See* 21 U.S.C. § 830(d)(2).

Sixth, based on the records Novelty provided, DEA investigators determined that Novelty

was also distributing tablet form chemicals to retail outlets in two states (Kentucky and North

Carolina) where the sale of non-liquid ephedrine and pseudoephedrine (except in a gel-cap form)

are prohibited.  Barnhill Decl. at ¶ 40F.

In view of the totality of these charges, the DEA determined that there was a sufficient

basis to conclude that Novelty's distribution practices posed a serious risk that list I controlled

substances would be diverted to the illegal manufacture of methamphetamine.  Given Novelty's

failure to maintain effective safeguards against diversion as well as its distribution of large

amounts of chemicals from more than 100 unregistered sites, the DEA concluded that Novelty's

continued registration posed an imminent danger to the public health and safety.  For these

reasons, the DEA suspended Novelty's registration by Order dated January 17, 2008 pursuant to

21 U.S.C. § 824(d).  The Suspension Order recounted each of the reasons stated above as the

reasons on which DEA relied in making its "imminent danger" determination.  *See generally* Pl.

Ex. 1.

On February 29, 2008, DEA counsel and Novelty counsel participated in a telephone

conference with the Administrative Law Judge ("ALJ").  Prior to this call, Novelty had requested

an expedited hearing in advance of the March 24, 2008 hearing date set in the Suspension Order.

Barber Decl. at ¶ 5.  During this call, however, Novelty informed the ALJ that it wished to

proceed with the March 24, 2008 hearing date set in the Suspension Order. *Id.* at ¶ 5.

An administrative hearing pertaining to DEA's suspension of Novelty's registration commenced on March 24, 2008. The hearing lasted eight days, and concluded on April 2, 2008. Barber Decl. at ¶ 3. The DEA has not yet issued a final determination regarding Novelty's suspension. DEA anticipates receiving a final decision no later than August 2008. *Id.* at ¶ 6.

One week after the conclusion of the hearing, on April 9, 2008, Novelty filed its complaint against the DEA. On April 16, 2008, some three months after DEA suspended Novelty's registration, Novelty filed the instant motion for emergency relief. Novelty seeks a preliminary injunction on the grounds (i) that the DEA acted arbitrarily and capriciously in violation of § 702 of the Administrative Procedure Act when it suspended Novelty's registration pursuant to § 824(d); and (ii) that DEA's suspension unlawfully deprived Novelty of its property interest in its registration without due process of law in violation of the Fifth Amendment.[4]

## ARGUMENT

## I.     THIS COURT LACKS JURISDICTION OVER ALL OF NOVELTY'S CLAIMS

Novelty asks this Court to grant a preliminary injunction reinstating its registration to distribute ephedrine and pseudoephedrine pending the outcome of DEA administrative proceedings. In so doing, Novelty essentially disregards the process for challenging registration suspensions Congress expressly established. Besides flouting the statutory review scheme Congress designed, Novelty's attempted end run, if permitted, would invite a host of practical problems into the review process. This Court therefore cannot and should not exercise

---

[4]Although Novelty also asserts a First Amendment claim in its complaint, it does not seek a preliminary injunction on that basis.

jurisdiction over Novelty's preliminary injunction motion.

Congress has set out a two-part review process for parties challenging pre-hearing suspensions made pursuant to 21 U.S.C. § 824(d). First, an aggrieved party may challenge its suspension administratively. *See id.* (providing for the "institution of [administrative] proceedings" simultaneously with the issuance of an suspension on imminent harm grounds). Second, should the administrative process not adequately redress the aggrieved party's concerns, the party has a statutory right to pursue an direct appeal in the courts of appeals. 21 U.S.C. § 877 states that:

> All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located
> . . . .

In short, Congress mandated that a party aggrieved by an § 824(d) suspension would first seek redress from the DEA, and, if necessary, thereafter from the courts of appeals. Because no part of this review process involves the district court, this Court lacks jurisdiction over Novelty's preliminary injunction motion. *See John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 568-70 (D.C. Cir. 2007) (concluding that review of DEA agency action is proper in the court of appeals, not in the district court). As the D.C. Circuit held in *Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984), "a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute." Because § 877 makes clear that exclusive review of DEA administrative proceedings lies in the courts of appeals, "[l]itigants may not evade these [jurisdictional] provisions by requesting the

10

District Court to enjoin action that is the outcome of the agency's order." *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984).[5]  Accordingly, this Court lacks authority to grant Novelty the relief it seeks.

That the § 824(d) order in issue here is not final agency action does not change the jurisdictional analysis.  Because this Court lacks authority to review the DEA's decision on the merits (*i.e.*, the final agency decision), it similarly lacks jurisdiction to entertain Novelty's preliminary injunction motion.  *See Independent Bankers Ass'n of America v. Federal Home Loan Bank Bd.,* 557 F. Supp. 23, 27-28 (D.D.C. 1982) (citing with approval *Fort Worth National Corporation v. Federal Savings & Loan Insurance Corporation*, 469 F.2d 47 (5th Cir. 1972)).  In *Fort Worth*, the district court issued a preliminary injunction notwithstanding the fact that by statute, the court of appeals had exclusive jurisdiction over the appeal of an adverse decision by the Federal Savings & Loan Insurance Corporation.  *See Fort Worth*, 469 F.2d at 52 (citing 12 U.S. C. § 1730a(k)).[6]  The Fifth Circuit reversed, holding that "[w]hen Congress has prescribed a particular method of review, that procedure is exclusive."  *Id.*  While the *Fort Worth* Court

---

[5]In light of § 877's direct-review provision, it is unsurprising that "as a matter of practice almost all cases challenging DEA decisions under the CSA have been filed directly in the courts of appeals pursuant to 21 U.S.C. § 877."  *John Doe, Inc.*, 484 F.3d at 568 (D.C. Cir. 2007).

[6]The jurisdictional provision in issue in *Fort Worth* is materially identical to the jurisdictional language in § 877.  *Compare Fort Worth*, 469 F.2d at 52 (quoting 12 U.S.C. § 1730a(k) as "'any party aggrieved by an order of the Corporation under this section may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, or in the United States Court of Appeals for the District of Columbia Circuit . . . .'") *with* 21 U.S.C. § 877 ("All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located . . . .").

11

conceded that in rare instances district court intervention might be appropriate in cases "in which the statutory review procedure is inadequate," *id.*, it concluded that that was not such a case. Nor is this such a case. There is not even an allegation — let alone evidence — that the statutory procedures Congress has created for review of § 824(d) suspensions are inadequate. Even if this process were somehow deficient, however, jurisdiction would still not be proper in this Court. As the *Fort Worth* Court made clear, "it is beyond question that the Court of Appeals would have been able to issue any type of preliminary relief necessary to protect the rights of the parties pending final resolution of the merits on appeal." *Id.* at 53. So too here. There is no reason to believe (nor does Novelty offer any) that the courts of appeals would be unable to grant Novelty the relief it seeks. Accordingly, Novelty has failed to carry its burden to show that this Court has jurisdiction over its preliminary injunction motion.

Several pragmatic considerations also counsel against this Court exercising jurisdiction over Novelty's request for injunctive relief. As the D.C. Circuit correctly recognized, the practical consequence of a district court entertaining Novelty's challenge to the DEA's suspension decision while administrative proceedings remain ongoing would be to "encourage[] dissatisfied claimants to 'jump the gun' by going directly to the district court to develop their case instead of exhausting their administrative remedies before the agency." *John Doe, Inc.*, 484 F.3d at 570 (D.C. Cir. 2007). In addition to promoting forum shopping, this Court's exercise of jurisdiction would also complicate matters at the appellate level, as the court of appeals would have to review both a district court and an agency record once the DEA does issue a final decision (assuming an appeal is filed). This attempt to circumvent the congressionally-crafted review process would therefore create "duplicative and potentially conflicting review, and the

12

delay and expense incidental thereto." *Id.* For all of these reasons, jurisdiction is not proper in this Court.[7]

No different result does or should obtain with respect to Novelty's Fifth Amendment-based claim for injunctive relief. That Novelty has styled its cause of action as a constitutional claim does not take it outside the realm of the APA. *See* 5 U.S.C. § 706(2)(B) (authorizing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be contrary to constitutional right . . .").

Common sense further bolsters the result compelled by the plain language of the APA. It is undisputed that Novelty's Fifth Amendment claim and its § 702 claim for injunctive relief arise out of the same the factual basis (or lack thereof). Given this commonality, it would be anomalous for this Court to treat Novelty's Fifth Amendment claim for injunctive relief any differently than its APA-based claim with respect to jurisdiction. Were this Court to do so, direct-review provisions would be meaningless, as plaintiffs could easily evade jurisdictional limitations by labeling their challenges as constitutional rather than as APA claims. This is particularly true for challenges arising out of § 824(d) suspensions, because a pre-hearing suspension almost by definition ensures that an aggrieved party will suffer some loss at least until

---

[7]Although some district courts have offered various rationales for exercising jurisdiction over challenges to agency action notwithstanding the existence of a statute providing for direct appellate review, the D.C. Circuit made clear that the rationales these district courts offered for doing so were unpersuasive. *See John Doe, Inc.*, 484 F.3d at 568-70 (rejecting various reasons district courts offered to justify asserting jurisdiction to review DEA determinations under the CSA); *accord Doe v. Gonzalez* [sic], No. 06-966, 2006 WL 1805685 at *22 (D.D.C. 2006) ("Section 877 . . . seems to explicitly vest exclusive jurisdiction in the courts of appeals over *any* CSA-based agency determination that could properly be before a federal court.") (*aff'd sub nom John Doe, Inc.*, 484 F.3d at 568-70) (emphasis added).

the conclusion of administrative proceedings, thereby giving rise to a Fifth Amendment claim.[8]

Accordingly, this Court lacks jurisdiction over Novelty's motion for a preliminary injunction, no

matter how Novelty has styled its claim for relief.

## II.    NOVELTY CANNOT CARRY ITS BURDEN TO SHOW THAT IT IS ENTITLED TO A PRELIMINARY INJUNCTION

Even if this Court determines that it does have jurisdiction over Novelty's motion, this

Court should not grant Novelty the relief it seeks.  A preliminary injunction "is an extraordinary

and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries

the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in

original).  Given the steep burden that the movant must carry, it is unsurprising that courts have

been exceedingly reluctant to grant preliminary injunctions.  *See Dorfmann v. Boozer*, 414 F.2d

1168, 1173 (D.C. Cir. 1969) (cautioning that "the power to issue a preliminary injunction . . .

should be sparingly exercised") (internal quotations omitted).  For Novelty to prevail on its

motion for a preliminary injunction, it must demonstrate: (i) that it has a substantial likelihood of

success on the merits; (ii) that it would suffer irreparable injury if the injunction is not granted;

(iii) that an injunction would not substantially injure other interested (non-moving) parties; and

(iv) that the public interest would be furthered by the injunction.  *CityFed Fin. Corp. v. Office of

Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995); *see also, e.g.*, *Wash. Metro. Area Transit

Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977); *Va. Petroleum Jobbers

Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).  Plaintiff must satisfy all four

factors, and the court must also find that the four factors together justify the drastic intervention

---

[8]This is not to suggest that such claims have merit either generally or in Novelty's case in particular.  *See infra* pp. 21-24 (discussing likelihood of success on the merits).

14

of a preliminary injunction.  *See CityFed*, 58 F.3d at 747; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 304 (D.C. Cir. 2006).  A failure to show either irreparable harm or a likelihood of success on the merits obviates the need for the court to address the remaining factors.  *See Apotex, Inc. v. Food & Drug Admin.*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (affirming denial of preliminary injunction based solely on ground that the movant had little likelihood of success on the merits); *City of Las Vegas v. Lujan*, 891 F.2d 927, 935 (D.C. Cir. 1989) (affirming district court's denial of preliminary injunction without addressing irreparable injury because appellant had insufficient likelihood of success on the merits).  *CityFed*, 58 F.3d at 747 (declining to reach district court's consideration of other factors where movant made no showing of irreparable injury).  For the reasons that follow, Novelty has failed to carry its burden to show that any of these factors — let alone all of them — cut in favor of issuing a preliminary injunction.

### A.    Novelty Has Failed To Demonstrate That It Will Suffer Irreparable Harm

#### 1.    Requiring Novelty to Exhaust Its Administrative Remedies Does Not Constitute Irreparable Harm

Novelty argues that it will suffer irreparable harm in the absence of a preliminary injunction reinstating its license to distribute ephedrine and pseudoephedrine pending the outcome of the administrative process.  *See generally* Pl. Mem. at 18-20.  This assertion fails as a matter of law.  Absent some lengthy and unexplained delay not present here, "[t]he usual time and effort required to pursue an administrative remedy does not constitute irreparable injury." *Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 108 (D.C. Cir. 1986).[9]

---

[9]The Supreme Court has found administrative delays of two years to constitute irreparable harm.  *See Smith v. Illinois Bell Telephone Co.*, 270 U.S. 587, 589-90 (1926); *see also*

Novelty does not even attempt to argue that the administrative delay here is unreasonable or excessive, nor could it. The DEA held a prompt hearing on Novelty's challenge to the DEA's suspension decision last month — less than two months DEA served the Suspension Order on January 28, 2008[10] — and anticipates making a final decision no later than this August. Barber Decl. at ¶ 6. Given that the DEA anticipates completing the entire administrative review process in approximately seven months, Novelty's case does not present the "narrow circumstance" in which administrative delay could constitute irreparable harm. *Weinberger*, 795 F.2d at 108. Because Novelty has not even attempted to make a "clear showing of irreparable injury *on some additional basis* [besides delay], the failure to exhaust administrative remedies serves as a bar to judicial intervention in the agency process." *Id.* (emphasis added and internal quotations and citations omitted).

2.   <u>Novelty's Delay In Seeking Relief Belies Its Assertion Of Irreparable Harm</u>

Even if it were generally permissible to short-circuit the administrative process on the theory that requiring administrative exhaustion would cause irreparable harm (which it is not), Novelty could not make the requisite showing of harm needed to justify the exceptional relief it seeks here. Indeed, Novelty's own conduct undermines its assertion that a preliminary injunction is necessary to forestall irreparable harm.

---

*Weinberger*, 795 F.2d at 108 (characterizing *Smith* as a case in which the agency "for a period of two years, remained practically dormant; and nothing in the circumstances suggests that it had any intention of going further with the matter" and in which "no reason or excuse [for the agency's delay] has been given").

[10]In its motion, Novelty incorrectly identifies the date of this Order as January 27, 2008. *See* Pl. Motion for Preliminary Injunction at 1. Exhibit 1 to Plaintiff's Motion makes clear that this Order issued January 17, 2008. *See* Pl. Ex. 1, at 1, 4.

16

It is well settled that the primary purpose of a preliminary injunction is to stave off immediate and irreversible harm to a party's interests.  Consequently, a failure to act promptly to safeguard these interests implies that the putative harm is not, in fact, as serious or as imminent as is alleged.  *Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) ("If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court should be reluctant to award relief."); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.").[11]

The DEA issued an immediate suspension of Novelty's registration to distribute ephedrine and pseudoephedrine by Order dated January 17, 2008.  The suspension Order set an administrative hearing for March 24, 2008, at which time Novelty could challenge the suspension.  *See* Pl. Ex. 1 at 3.  DEA regulations authorized Novelty to seek an earlier hearing. *See* 21 C.F.R. § 1309.44(c) ("Any registrant whose registration is suspended under this section may request a hearing on the revocation or suspension of his registration at a time earlier than specified in the order to show cause pursuant to Section 1309.46, which request shall be granted by the Administrator, who shall fix a date for such hearing as early as reasonably possible.").  Although Novelty did file a request for an expedited hearing, it later withdrew this request.  In a

---

[11]*See also Fund for Animals v. Frizzell,* 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one."); *Citibank v. Citytrust & Cititrust Bancorp, Inc.*, 756 F.2d 273, 276 (2d Cir. 1985) ("Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action."); *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered.").

17

telephone conference with the DEA and the ALJ on February 29, 2008, although the parties

discussed the possibility of an expedited hearing, Novelty decided to proceed with the March 24,

2008 hearing date set in the Suspension Order.  Barber Decl. at ¶ 5.

On April 16, 2008, some three months after the issuance of the Suspension Order, and

after the completion of the administrative hearing, Novelty filed its motion for a preliminary

injunction.  Novelty now claims, for the first time, that it is in danger of immediate irreparable

harm.  Novelty offers no explanation whatsoever — let alone a reasonable one — either for its

failure to seek an expedited hearing, or for its three month delay in seeking a preliminary

injunction.

Taking Novelty at its word about the myriad of harms it has already suffered and will

continue to suffer absent a preliminary injunction, its complete failure to seek more prompt relief

completely undercuts its assertion that the "extraordinary and drastic" relief it now seeks is

necessary.  *Mazurek*, 520 U.S. at 972.  *See Pena*, 147 F.3d at 1026 ("If the plaintiff has failed to

prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its

delay, the district court should be reluctant to award relief."); *Newdow*, 355 F. Supp. 2d at 292

("An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial

because such delay implies a lack of urgency and irreparable harm.").  Indeed, numerous courts

have refused to excuse shorter delays than the one in issue here.  *See, e.g.*, *Newdow,* 355 F. Supp.

2d at 292 (delay of roughly one month); *Frizzell*, 530 F.2d at 987 (delay of 44 days

"inexcusable"); *Citibank*, 756 F.2d at 276 (ten-week delay from notice); *Gidatex, S.r.L. v.

Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("Courts typically decline

to grant preliminary injunctions in the face of unexplained delays of more than two months.").[12]

In a footnote, Novelty argues that "[b]ecause discovery was not permitted in that administrative case, Novelty did not (and, indeed, could not) learn the bases for Defendants' charges against Novelty until the hearing." Pl. Mem. at 1, n.1. To begin with, this assertion is belied by Plaintiff's own exhibits. The January 17, 2008 Suspension Order clearly articulated why DEA had revoked Novelty's registration. *See generally* Pl. Ex. 1. While it is true that DEA explained these reasons in greater detail at the administrative hearing, nothing in § 824(d) (or, for that matter, DEA regulations or the caselaw) requires DEA to make comprehensive findings prior to acting to protect the public from imminent harm. To the contrary, § 824(d) contemplates that a suspension on imminent harm grounds coincides with "the institution of [administrative] proceedings" — not the completion of proceedings; *accord* 21 C.F.R. § 1301.37(c) (DEA must provide in the immediate suspension order "a statement of the legal basis for such hearing and for the denial, revocation, or suspension of registration and a *summary* of the matters of fact and

---

[12] While only Novelty knows its reasons for this delay, the timing of this motion suggests a bit of gamesmanship on Novelty's part. Novelty's motion, coming as it does on the heels of the recently-completed administrative hearing, perhaps indicates that Novelty is not optimistic about its chances of prevailing administratively. Perceiving its first horse to be fading down the stretch, Novelty seeks another mount. Novelty thus comes careening into court, clamoring that relief — relief it long delayed seeking, for reasons entirely unexplained — now simply cannot wait.

In any case, even now that it has filed its motion for a preliminary injunction, Novelty does not seek expedited briefing, although that is expressly permitted under District of Columbia Local Rules. *Compare* D.C. Local Rule 65.1(c) (requiring opposition to motion to preliminary injunction to be filed 5 days after service) *with* D.C. Local Rule 7 (requiring opposition to motion to be filed within 11 days of service). At every turn thus far, Novelty has declined to avail itself of the regulatory and procedural avenues by which it might have expedited the relief it now claims it so urgently needs. In light of this apparent casualness, Novelty's assertions of irreparable harm fall significantly short.

law asserted." (emphasis added). Accordingly, Novelty cannot rely on the DEA's failure to provide exhaustive findings prior to the administrative hearing to excuse its failure to seek prompt relief.

This reading of § 824(d) and pertinent DEA regulations conforms with common sense. If DEA were required to make exhaustive, trial-type findings as a prerequisite for issuing a suspension under § 824(d), the discretion Congress vested in the DEA under § 824(d) to prevent imminent harm to the public would be nullified. It defies logic to think that Congress would have vested the DEA with the agility and flexibility to move quickly to safeguard the public from imminent danger, and yet made the exercise of this discretion so cumbersome as to render it ineffective. Furthermore, it is not clear what purpose the administrative process would serve under this interpretation of § 824(d), as the agency would essentially have to conduct a full-blown investigation prior to issuing a suspension under this provision.

Even accepting *arguendo* that Novelty could not discern, prior to a hearing, why the DEA suspended its registration, this begs the question why Novelty failed to act more promptly. If Novelty truly had no idea why DEA suspended its registration, and accepting as true Novelty's assertions regarding the gravity of harm this suspension caused, it would seem that Novelty would have had all the more incentive to seek an expedited hearing or prompt injunctive relief, neither of which it did.

Novelty's unexcused delay aside, the harm Novelty alleges does not qualify as irreparable. Here, Novelty alleges that this suspension threatens only a small fraction of Novelty's overall revenue. *See* Pl. Mem. at 19 (stating that Novelty's loss of its registration threatens 15% of its overall revenue). Other than its own speculation, Novelty offers nothing to

show that it will go out of businesses absent a preliminary injunction, or that it could not redeploy resources formerly occupied with Novelty's distribution and sale of chemicals to other aspects of Novelty's business not impacted by the contested suspension. Courts in analogous circumstances have concluded that this sort of harm does not qualify as irreparable. *See, e.g.*, *Port City Properties v. Union Pacific R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) (affirming denial of preliminary injunction where suspension impacted only "small part" of aggrieved party's business, and where the injunction would not put the challenging party out of business). For this multitude of reasons, Novelty has failed to demonstrate that it will suffer irreparable harm absent a reinstatement of its registration.

B.    **Because Novelty Cannot Demonstrate That DEA's § 824(d) Suspension Order Was Arbitrary Or Capricious, It Cannot Show A Likelihood Of Success On The Merits**

On the issue of success on the merits, Novelty asserts that "[t]he question before this Court is whether DEA demonstrated that Novelty's continued registration posed an imminent danger to the public harm [sic] and safety when it issued the immediate suspension." Pl. Mem. at 13. Novelty is wrong.

There is no statutory, regulatory, or caselaw requirement that the DEA present or proffer the full measure of its reasons supporting its suspension decision in the Suspension Order.[13] To

---

[13]Plaintiff cites *Medipharm-RX, Inc. v. Gonzales*, 2007 WL 601722 (M.D. Fla. 2007). It is not clear how this case helps Novelty, as the Court in that case denied the registrant's motion for a preliminary injunction overturning an § 824(d) suspension. Novelty states that in *Medipharm* the Court "overturned [a] temporary restraining order in case [sic] involving internet pharmacy issuing prescriptions based on online questionnaires." Pl. Mem. at 13-14. While the Court noted that Defendants "presented unrefuted evidence" that the plaintiffs there had violated federal law, there is nothing in *Medipharm* to suggest that the evidence presented went beyond what was disclosed in the suspension order there. 2007 WL 601722 at *2.

the contrary, the DEA need only provide to Novelty at the time of the suspension "a statement of the legal basis for such hearing and for the denial, revocation, or suspension of registration and a *summary* of the matters of fact and law asserted." 21 C.F.R. § 1301.37(c) (emphasis added). Even the most cursory examination of the Suspension Order here reveals that the DEA has met this modest burden.[14]  *See generally* Pl. Ex. 1 (listing various reasons supporting suspension decision).

    As explained previously, Novelty's argument, if taken seriously, would frustrate the statutory scheme Congress established for the issuance and review of registration § 824(d) suspension decisions.  If Novelty is correct, and the DEA had to prove that a registrant's continued operation posed an "imminent danger" to public health or safety as a prerequisite for a § 824(d) suspension, DEA would essentially have to carry a trial-type burden to initiate an § 824(d) suspension.[15]  This result would hamstring the DEA in its efforts to combat dangers to public health or safety.  For all of these reasons, Novelty is not correct that the validity of the DEA's suspension decision turns on what DEA has "demonstrated" in the Suspension Order.

    Based on Novelty's misapprehension of the legal issue presented, it is unsurprising that Novelty spills much ink in its opening brief trying to demonstrate why none of the several reasons the DEA stated in its Suspension Order are valid.  *See* Pl. Mem. at 4-18.  For the reasons stated previously, these arguments, as well as the voluminous mass of exhibits Novelty offers to buttress them, are entirely beside the point for purposes of this motion.

_____

    [14]Moreover, the Suspension Order expressly states that the statement of facts contained therein was "non-exhaustive."  Pl. Ex. 1 at 1.

    [15]*See supra*, pp. 19-20.

It bears repeating that Novelty seeks to overturn a pre-hearing suspension the DEA imposed pursuant to § 824(d).  The ultimate correctness of DEA's reasons for suspending Novelty are not in issue; that is what the decision following the administrative hearing will determine.  *Cf.* 21 C.F.R. § 1301.42 ("The [DEA] shall hold a hearing for the purpose of receiving factual evidence regarding the issues involved in the denial, revocation, or suspension of any registration . . . .").  The question, rather, is whether the DEA acted arbitrarily or capriciously in exercising its discretion to suspend Novelty as an imminent danger to public health or safety *based on what DEA knew at the time it issued the suspension*.  *See* 21 U.S.C. § 824(d) (committing to DEA's discretion the authority to issue pre-hearing suspension to party whose continued operation poses "imminent danger" to public health or safety).

Under this "highly deferential" standard, this Court is required to affirm agency action — here, the DEA's "imminent danger" designation — unless the agency "failed to consider relevant factors or made a clear error of judgment."  *Maine Public Utilities Com'n v. F.E.R.C.*, 454 F.3d 278, 286 (D.C. Cir. 2006) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971) (internal quotations omitted).  In this context, the parties agree that a "clear error of judgment" must mean that the DEA exercised its discretion in an arbitrary or capricious matter.  *See* Pl. Mem. at 1 (recognizing that the issue is whether the DEA acted arbitrarily and capriciously in suspending Novelty pursuant to § 824(d)).  Novelty does not come close to making such a showing, nor could it.  The DEA's suspension decision was based largely on its evaluation of records Novelty had provided and DEA interviews of Novelty employees.  While it is certainly true that Novelty disagrees with the conclusions DEA drew from its investigation, it in no way follows from this that DEA's interpretation was so utterly misguided as to qualify as

23

arbitrary and capricious.

In the final analysis, Novelty's arguments on this prong amount to nothing more than an improper attempt to re-litigate the administrative hearing in this Article III forum.  *See, e.g.*, Pl. Mem. at 14 ("Given the specific facts underlying each of the above eight allegations, none of the alleged actions, alone or in the aggregate, supports the conclusion that Novelty's continued registration poses an imminent danger to public health and safety.").  Other than its conclusory assertions that the DEA acted unlawfully, Novelty offers no evidence — let alone the requisite quantum — to demonstrate that the DEA's § 824(d) suspension was arbitrary or capricious.  Accordingly, Novelty has failed to demonstrate that it is likely to prevail on the merits.

C.    **The DEA Would Be Substantially Injured By The Entry Of A Preliminary Injunction**

As the party seeking relief, Novelty must show that the DEA would not be unduly harmed by the entry of a preliminary injunction.  Novelty hardly tries.  In an argument spanning all of six lines, Novelty argues (i) that the "DEA retains its ability to challenge Novelty's registration at the administrative level"; and (ii) that the preliminary injunction "merely preserves the status quo until after Novelty receives a final and unappealable decision on the merits following from the DEA proceedings now underway."  Pl. Mem. at 21.  Neither argument comprehends the full measure of the issues at stake.

While it is true that "the DEA retains its ability to challenge Novelty's registration at the administrative level," Pl. Mem. at 21, that is beside the point for purposes of § 824(d).  The entire point of § 824(d) is to allow DEA to effect a *pre-hearing* suspension of entities the continued operation of which, in DEA's view, pose an imminent danger to public health or

safety.  In Novelty's case, DEA believed that a suspension pursuant to § 824(d) was warranted because Novelty took insufficient precautions to ensure that ephedrine and pseudoephedrine it distributed was not improperly diverted to methamphetamine labs.  *See generally* Barnhill Decl. ¶ 40A-F.  While a party in Novelty's position is surely burdened by being unable to operate during the pendency of the administrative process, this is the balance Congress struck between the potential harm to the public on the one hand and harm to the distributor or manufacturer on the other.  If Novelty could prevail simply by showing that it suffered the very harm that the statutory text makes clear it must bear, DEA's authority to issue pre-hearing suspensions under § 824(d) would be gutted.  This Court cannot and should not reallocate the balance of harms inherent in the statute as Congress wrote it.

Novelty further argues that "the preliminary injunction merely preserves the status quo until after Novelty receives a final and unappealable decision on the merits following from the DEA proceedings now underway."  Pl. Mem. at 21.  As an initial matter, this argument rests on two obvious factual misstatements.  First, a preliminary injunction would not "preserve the status quo," — quite the opposite.  By the Suspension Order, DEA stripped Novelty of its registration, thereby prohibiting it from distributing ephedrine and pseudoephedrine pending the outcome of an administrative hearing.  Novelty seeks a reinstatement of its registration — essentially, a judicial declaration reversing the DEA and declaring that Novelty is back in the business of ephedrine and pseudoephedrine distribution and sales, at least until administrative proceedings conclude.  Second, Novelty's claim that the administrative proceedings will culminate in a "final and unappealable decision on the merits" is also wrong.  Should Novelty not prevail at the administrative level, it has a statutory right to appeal any adverse agency finding to the Court of

Appeals. *See* 21 U.S.C. § 877 (providing for direct review of DEA determinations in the courts of appeals).

More fundamentally, Novelty fails to grasp the implications of its arguments for DEA's authority to issue pre-hearing registration suspensions. As before, Novelty does not acknowledge that its arguments, taken to their logical extent, would dramatically alter the balance of harms Congress struck in drafting § 824(d). Assuming for the sake of argument that Novelty prevails on its motion for a preliminary injunction (thereby winning a reinstatement of its registration), but subsequently receives an unfavorable agency decision on the merits (thereby losing its registration again), what then? Presumably Novelty would be right back before this Court, making the same arguments in support a reinstatement of its registration pending appeal. Its arguments having carried the day the first time, it is not clear why Novelty (or other similarly situated entities) would not be allowed to continue in business pending the outcome of its appeal, right up until a final decision or a denial of certiorari from the Supreme Court. Thus, Novelty's arguments for relief, if accepted, would not merely restore its registration pending the conclusion of agency proceedings. To the contrary, Novelty's arguments would seemingly allow a party to parry an § 824(d) suspension decision for months or years while the appeals process grinds on, notwithstanding the DEA's considered judgment that the party poses an imminent danger to public health or safety. That cannot be the result Congress had in mind when it authorized pre-hearing registration suspensions pursuant to § 824(d). For these reasons, Novelty has failed to demonstrate that the balance of harms cuts in its favor.

26

**D.    The Public Interest Requires That Novelty Follow The Dispute Resolution Procedures Congress Established**

The final factor this Court must consider is the public interest.  In this respect, Novelty argues that "[t]he public interest lies in requiring adherence to the rule of law."  Pl. Mem. at 22. Indeed it does.  Where, as here, the DEA exercises its congressionally-granted discretion to suspend the registration of a distributor of a controlled substance pursuant to § 824(d), Congress has required that the DEA immediately initiate administrative proceedings.  *See* 21 U.S.C. § 824(d) ("The Attorney General may, in his discretion, suspend any registration simultaneously with the institution of proceedings under this section, in cases where he finds that there is an imminent danger to the public health or safety.").  While DEA regulations flesh out the contours of the administrative review process, Congress has established by statute the basic process by which challenges to § 824(d) suspensions should be resolved.  Accordingly, there is "a strong presumption that the statutory dispute resolution mechanism should be followed." *Weinberger*, 795 F.2d at 109.  Novelty, for its part, surely disputes the validity of the DEA's underlying reasons for declaring Novelty's continued operation an imminent threat to public health or safety. But this is a reason why Novelty should seek to vindicate itself through the administrative process, not a reason for disregarding the administrative process altogether.  As the D.C. Circuit made clear in *Weinberger*, "the statutory dispute resolution mechanism is properly viewed as part and parcel of the right granted appellants under the Act.  By creating such a statutory [] scheme, Congress must have contemplated that with the benefit of the statutory right, appellants should accept the relative burden of an administrative, as opposed to an immediate judicial, remedy." *Id.*  In other words, Novelty must take the bitter with the sweet.  Having chosen to distribute

27

substances regulated by Congress, Novelty must accept the dispute resolution system Congress expressly established to resolve disagreements arising out of such distribution.

The remainder of Novelty's argument with respect to public interest amounts to nothing more than a series of self-serving, overwrought assertions. *See* Pl. Mem. at 22 (accusing DEA of, *inter alia*, acting "in callous disregard of the economic and public health consequences of its actions" and causing "honest, hardworking people [to] suffer severe economic hardship" due to DEA's allegedly illegal actions). All of these assertions are premised not merely on the assumption that the DEA's initial suspicions about Novelty's misconduct are misplaced, but on the unsupported and unsupportable assertion that the DEA acted irrationally or maliciously in suspending Novelty. Because Novelty has failed to rebut the "strong presumption" that this Court should allow the congressionally-established administrative process to run its course, *Weinberger*, 795 F.2d at 109, the public interest factor, too, cuts against granting Novelty's motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's motion for a preliminary injunction.

Dated: May 7, 2008                    Respectfully Submitted,

                                      JEFFREY A. TAYLOR
                                      United States Attorney

                                      ARTHUR R. GOLDBERG
                                      Assistant Director
                                      Federal Programs Branch


                                      _____/s/_____
                                      C. LEE REEVES

28

Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

DECLARATION OF LISA R. BARNHILL

I, Lisa R. Barnhill, hereby declare as follows:

1. I am a Diversion Investigator and Staff Coordinator assigned to the Dangerous Drugs and Chemicals Section of the Drug Enforcement Administration ("DEA").

2. As part of my duties for DEA, I coordinate investigations of alleged violations of the Controlled Substances Act. With respect to the Plaintiff in this case, I investigated and oversaw other investigators engaged in the investigation of the dispensing practices of Novelty Distributors, Inc. ("Novelty").

3. I have reviewed DEA's investigative file on Novelty, and discussed the investigation with DEA personnel who conducted the investigation. Every factual allegation contained in the Order to Show Cause and Immediate Suspension of Registration dated January 17, 2008, is supported by or based upon information compiled in the ordinary course of DEA's investigation of the subject entities and is duly documented in DEA's investigative file by those with knowledge of the facts set forth with information traceable to others.

4. I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

_____

LISA R. BARNHILL
DIVERSION INVESTIGATOR/STAFF
COORDINATOR

Executed this 6th day of May 2008 in Arlington, Virginia.

### DECLARATION OF LISA R. BARNHILL
### STAFF COORDINATOR
### DANGEROUS DRUGS AND CHEMICALS SECTION

I, Lisa R. Barnhill, hereby declare as follows:

1. I am a Staff Coordinator assigned to the Dangerous Drugs and Chemicals Section of the Office of Enforcement Operations, Drug Enforcement Administration ("DEA"). I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since July 1988.

2. With regard to my educational and training background, I graduated from George Mason University in Fairfax, Virginia in 1987, where I obtained a bachelors degree in law enforcement. Shortly thereafter, I was hired by DEA as a Diversion Investigator, and upon my hire, I attended a ten-week Basic School. In addition to the extensive training I received during Basic School, I also attended two sessions of the DEA (two-week) Advanced School for Diversion Investigators at the FBI Academy in Quantico, Virginia, as well as numerous training seminars and refresher courses between 1990 and 2003. Among the courses I have taken was one involving chemical hazards and familiarization. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process.

1

3. As noted above, I have attended several training seminars, most notably the National Association of Drug Diversion Investigators which took place in Los Angeles in June 1991. Among the topics discussed at these seminars were national and regional chemical diversion and enforcement strategies.

4. Prior to my current position, I was a Diversion Investigator assigned to the Denver, Los Angeles and San Francisco Field Divisions. As part of my duties in the above field divisions, I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances. I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic. I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals.

5. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals, and the diversion of those imported materials into clandestine settings, mostly in the State of Colorado. The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products. I have also worked cooperative chemical diversion investigations with state authorities, most notably the Denver Police Department ("DPD").

6. In my current position as a Staff Coordinator, I have also become familiar with the marketing of pseudoephedrine and ephedrine products in the United States, and their eventual use in the

illicit manufacture of methamphetamine and amphetamine. I developed my knowledge in this area through my review of investigative reports relating to chemicals, as well as cables that were received from field offices around the country documenting clandestine laboratory seizures or listed chemical products found in illicit settings. These reports are sent into DEA headquarters on a daily basis. Illicit methamphetamine settings can range from dump sites to storage lockers. I have also researched data from the National Association of Convenience Stores.

7. As part of its enforcement posture, DEA has centralized authority to register chemical applicants at its headquarters in Washington, D.C. As Staff Coordinator, I am responsible for the supervision of preregistration investigations of persons or entities seeking DEA registrations to handle listed chemicals. When applications for DEA registration are submitted, the agency's field offices conduct investigations, and document their findings in investigative reports. These reports are then forwarded to DEA headquarters, and submitted to my attention for review. I log in each of the reports, attach a vetting sheet to them, and then review them to ensure that the potential registrant has met the requirements of a DEA registration. I also evaluate recommendations on applications and make final determinations as to whether or not a DEA application for registration as a chemical handler will be approved, returned to the originating office for follow-up investigation, or recommended for order to show cause proceedings.

8. My duties also include monitoring the activities of several DEA field division offices, including those located in Denver, Colorado; Newark, New Jersey; New York, New York; St. Louis, Missouri, as well as the Seattle Field Division. I monitor these offices with respect to

3

their ongoing investigations of activities involving listed chemicals. My related duties in this regard involve processing letters of non-objection ("LONOs") with respect to importers of list I chemicals, and conducting investigations upon the receipt by DEA of Import/Export declaration forms, also known as "DEA-486" forms. DEA-486 forms are to be submitted to DEA by an importer or exporter of list I chemicals fifteen days prior to their import or export. Once the 486 forms are received by DEA, I then contact the importer to obtain information about their customers. If there are several levels of distribution, I will typically contact the multiple distributors to develop information about their customer base, with the goal of determining the identity of the ultimate end user of the product.

9. My tenure in three DEA field divisions as well as my current tour of duty in DEA headquarters has provided me with a unique vantage point with respect to DEA's monitoring of the importation and subsequent distribution of list I chemical products. I have provided support in criminal and civil investigations relating to regulatory matters of the registrant population.

10. I have also held numerous discussions with various representatives in the pharmaceutical and chemical industry regarding their distribution of pseudoephedrine and ephedrine products. These discussions normally relate to inquiries regarding DEA approval of pending chemical applications, interpretation of DEA statutes and regulations, questions regarding LONOs and DEA-486 forms.

11. With respect to regulated transactions of the list I chemicals ephedrine and pseudoephedrine,

4

and pseudoephedrine-based and ephedrine-based products, DEA distinguishes the distribution practices of what is referred to as the "traditional" market versus the "non-traditional" market. The "traditional" market is characterized by a very short chain of distribution, with over-the-counter products typically sold from the manufacturer through one layer of distribution directly to the retailer. Traditional outlets are typically large chain grocery stores such as Giant, Safeway and Food Lion, or nationally recognized pharmacy chains like Rite Aid, Kroger, Eckerds and CVS, just to name a few. These traditional products are also sold in larger convenience stores such as 7-11 and Dairy Mart, as well as large retail outlets such as Wal-Mart and K-Mart.

12. One example of a firm that follows the traditional distribution pattern is Warner-Lambert, now known as Pfizer; a DEA registered manufacturer and distributor of controlled substances and listed chemicals. I have held discussions with, and read affidavits from regulatory officials from Pfizer, and have obtained information that the company sells its 30 milligram pseudoephedrine products directly to supermarket and pharmacy chains, and nationally recognized wholesalers, such as Bergen Brunswig and Cardinal. More important, DEA is not aware of any accounts by Pfizer with firms considered part of the "non-traditional" market.

13. DEA has also developed information with respect to the so-called "non-traditional" market, as it relates to regulated transactions involving list I chemicals. The non-traditional market began to develop in the mid-1990s, as DEA imposed tighter restrictions on the sale of pseudoephedrine and ephedrine products, and imposed registration requirements on those selling these products. With respect to the "non-traditional" market, there is a markedly different chain of distribution.

Manufacturers and wholesalers who serve the non-traditional market will often have their product pass through several layers of distribution before it reaches the retail level. In these instances, the downstream non-traditional establishments are typically head shops, liquor stores, small convenience stores and gas stations, video stores, and other retail establishments where consumers would not normally purchase over-the-counter medications. Non-traditional stores also tend to knowingly sell in large quantities to "smurfers"; these are groups of individuals affiliated with methamphetamine traffickers who frequent these establishments at different times or on different dates with the aim of buying out a store's supply of over-the-counter medications, while avoiding detection and suspicion. Previously, non-traditional establishments sometimes marketed pseudoephedrine and ephedrine products in higher strengths: for example, pseudoephedrine products sold by these establishments were sometimes single entity, 60 milligram tablets and packaged in larger quantities of 36, 48, or 60-count bottle sizes. Non-traditional establishments also sold 60 milligram pseudoephedrine tablets in 36 count blister plus packs, as well as six and two-count packs.

14. By the late 1980s, traffickers and clandestine lab operators discovered the ease with which ephedrine could be converted to methamphetamine. Bulk ephedrine powder eventually was encountered with greater frequency in clandestine lab seizures. Both l-ephedrine and d-pseudoephedrine, which have very similar chemical structures, can be used to produce d-methamphetamine.

15. In 1988, the Uniformed Controlled Substances Act (CSA) was amended to include the

6

Chemical Diversion and Trafficking Act (CDTA). The CDTA imposed reporting, record keeping and import/export notification requirements for regulated transactions in controlled chemicals. Under this law, bulk ephedrine became regulated; however, the law exempted over-the-counter ephedrine products such as tablets and capsules which are legally marketed or distributed under the Food, Drug and Cosmetic Act.

16. Within a month of the enactment of the CDTA and the controls it placed upon ephedrine powder, the first encounter with ephedrine tablets at a clandestine methamphetamine lab seizure occurred. Traffickers quickly realized that non-controlled ephedrine tablets could easily be purchased in large quantities for conversion to methamphetamine. It became evident that the ephedrine tablet exemption contained in the CDTA provided traffickers a loophole that would have to be closed.

17. Recognizing that additional authority under the law was required to deal with rogue chemical companies, in addition to closing the ephedrine loophole, Congress passed the Domestic Chemical Diversion Control Act of 1993 (DCDCA), which became effective April 16, 1994. The DCDCA removed the record keeping and reporting exemption for single entity ephedrine products and required registration for distributors of these products.

18. Illicit traffickers reacted quickly to the change in the laws regarding single-entity ephedrine products and began using over-the-counter combination products containing ephedrine as precursors to manufacturing methamphetamine. However, the most dramatic effect of the

7

passage of the DCDCA was the manner in which it led to the increased diversion of

pseudoephedrine tablets for the illicit production of methamphetamine. Because of their

chemical similarity, the illicit use of either ephedrine or pseudoephedrine yields the same

quantity of controlled substance. In response to the increased diversion of pseudoephedrine

tablets, Congress passed the Comprehensive Methemphetamine Control Act of 1996 (CMCA)

which expanded regulatory control of lawfully marketed drug products containing ephedrine,

pseudoephedrine, and phenylpropanolamine.

In response to DEA enforcement efforts, more and more "traditional" firms such as Pfizer and

the Perrigo Company (the nation's largest generic manufacturer of non-prescription

pharmaceutical and nutritional products) have discontinued their marketing of 60 milligram

pseudoephedrine and similar over-the-counter medications in bottle sizes with a single-active

ingredient. These traditional outlets also began packaging their over-the-counter products in

smaller quantities (i.e., blister packs), and maintained a 30 milligram strength for

pseudoephedrine products. However, even smaller blister packs are increasingly diverted to

illicit uses, in addition to over-the-counter products packaged in large blister packs and large

bottle sizes, with single active ingredients.

19. Despite the trend towards smaller packaging sizes and quantities in the traditional market,

non-traditional market operators began looking to manufacturers and distributors who sell these

over-the-counter products in large quantities. DEA has seen the apparent rise of a rogue market

in which manufacturers and wholesalers have sold listed chemicals to non-traditional outlets in

8

case quantities. In addition, these products are typically sold under brand names that are not nationally recognized.

20. I have reviewed data where the DEA Salt Lake City Resident Office conducted an analysis of traditional vs. non-traditional sales of pseudoephedrine. Their data for the year 1999 reveals that approximately one dozen non-traditional distributors sold three times as much pseudoephedrine as Pfizer and Perrigo combined. As noted above, I have also reviewed National Association of Convenience Stores annual data, which indicates that over-the-counter, non-prescription medication constitutes less that 2% of sales by convenience stores. Cough and cold products containing pseudoephedrine and ephedrine make up less than one half of one percent of convenience store sales.

21. I have also reviewed seizure data involving pseudoephedrine and ephedrine products found at clandestine settings. This data suggest that increased DEA enforcement efforts involving pseudoephedrine products may have redirected the attention of methamphetamine traffickers back to combination ephedrine products. Unfortunately, non-traditional outlets have been ready and willing to feed the demands of customers with ties to these illicit traffickers. I reviewed major market manufacturer's data regarding the combination ephedrine/guaifenesin products and learned that demand for the tableted version of the product was shrinking. The total year 2002 sales for these products at retail were equivalent to about one-tenth of the legitimate single entity pseudoephedrine market. I know that despite this small demand, many gray market distributors sell this product in amounts that would appear to make them competitors of the two major

9

manufacturers, yet their products do not display any attributes of national competition or distribution.

22. I have learned that the primary market shares for sales of combination ephedrine products belong to the manufacturers of Primatene and Bronkaid products and the national sales of these products in tablet forms have been on the decline for several years, since end-users prefer an inhalant version. DEA has developed information that the nationwide sales of combination ephedrine in the traditional market are much smaller than the market for other traditional cough and cold remedies, including products containing pseudoephedrine. DEA has also learned that some of these combination ephedrine products are marketed and sold through non-traditional outlets, not for their therapeutic uses as a broncho-dilator, but for use as a diet aid and stimulant, which are not uses approved by the Food and Drug Administration.

23. I have further reviewed the DEA investigative files with respect to the pending applications of most current applicants who have been referred for an Order to Show Cause. I have also reviewed investigative findings with respect to the types of listed chemical products that have been sold in the areas that these applicants wish to do business, the customers that have purchased these products, and the presence of large scale diversion of these products to the illicit manufacture of methamphetamine. I have also reviewed the ownership structure of these companies and the types of listed chemical products that they propose to sell should they become registered with DEA.

10

24. As noted in my declaration above, non-traditional establishments are typically liquor stores, small convenience stores, gas stations and other retail establishments where consumers would not normally purchase over-the-counter medications. The "non-traditional" market is comprised of establishments where over-the-counter medications are typically a minute percentage of the company's retail sales, or where listed chemical products would not be typically sold. Several recent marketing analyses by the Bethesda, Maryland firm Ricercar have concluded that almost all of these "gray market" sales are far in excess of what could be expected in the traditional market for stores of these kinds.

25. In addition to its numerous gas stations, mini-marts and convenience store accounts, the "non-traditional" entities of note to which sales of listed chemical products occur have also included meat markets, health food stores, beauty parlors, dress shops, fish tackle and bait shops, gift shops, and other atypical outlets for cough and cold remedies. Based upon my experience in matters pertaining to regulated transactions of listed chemicals, it is my assessment that many gray market participants indiscriminately distribute list I chemical products to entities that are directly involved with the illicit manufacture of methamphetamine.

26. I am aware that in such states as Tennessee, Missouri, Arkansas and Oklahoma, wholesalers distribute 25 milligram ephedrine products that are notoriously popular among methamphetamine traffickers, such as "MiniThin" and "Mini Twin", as well as ephedrine combination products by the brand names of "Max Brand," "Xtreme," and "Mini Two Way."

11

27. As noted above, these are brand names that are not nationally recognized, however, they have been identified as favorites of illicit methamphetamine lab operators, in part because the ephedrine and pseudoephedrine products are composed of a single (entity) active ingredient. As a result, these rogue product brands have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products, and account in part for the large number of clandestine seizures involving products distributed to the convenience store and gas station arena.

28. My experience in matters involving handlers of list I chemicals leads me to conclude that many new applicants are seeking entry into the non-traditional market to replace previous DEA chemical handler registrants who have been revoked, surrendered or left the market as a result of criminal actions. Most of these new applicants intend to engage predominantly in the business of supplying brands of listed chemicals products that are not nationally recognized, to "non-traditional" outlets, and in quantities that are obviously greater than expected sales to that market segment, i.e. convenience and related store markets. Many of the applicants plan to carry and supply only listed chemical products in strengths and sizes most desirable to methamphetamine lab operators.

29. In response to the growing number of methamphetamine lab incidents, several jurisdictions around the country, including Oklahoma and Tennessee have passed laws designed to curb the illicit conversion of listed chemicals to methamphetamine. These newly enacted laws typically restrict the sale of listed chemical products to pharmacies; require that these products be placed

behind a pharmacy counter when being sold; and further require customers who purchase these products to sign a log sheet. These new laws have apparently had the desired effect in reducing the number of methamphetamine lab seizures: For example, according DEA seizure data for May of 2005, the number of methamphetamine lab seizures across Tennessee decreased by 39 percent compared to May of 2004. The following month saw an even greater decrease of 59 percent compared to June of 2004. The State of Oklahoma has similarly experienced a dramatic decline in the number of methamphetamine lab seizures since the passage of its anti-methamphetamine law.

30. In light of the passage of anti-methamphetamine laws in various states around the country, DEA has monitored methamphetamine lab seizures, and the impact, if any, these initiatives have had. As with the preliminary data from Oklahoma and Tennessee, DEA has noted an apparent decrease in the number of illicit methamphetamine labs in other states where listed chemical products are no longer available to non-pharmacy business entities. It has become apparent that limiting the ability of distributors to sell listed chemical products to known sources of diversion (i.e., gas stations, convenience stores, etc.) has had a demonstrable impact in stemming the flow of these products towards the illicit manufacture of methamphetamine.

31.     DEA has further noted, however, that despite the restrictions that have been placed on the sale of pseudoephedrine and ephedrine tablets by the passage of various anti-methamphetamine initiatives around the country, individuals engaged in the illicit manufacture of

13

methamphetamine are again seeking creative alternatives to produce their illicit product. To that end, DEA anticipates a market shift towards listed chemical products in gelatin cap form, which despite their exempted status under various state anti-methamphetamine laws, can be converted to methamphetamine. In 2005, DEA witnessed examples of this emerging market shift and noted instances involving methamphetamine lab seizures in Oregon, Tennessee and Alabama where exempted gelatin cap forms of listed chemical products have been found.

32. With respect to the Plaintiff in this case, I participated in the investigation of the distribution practices of Novelty Distributors, Inc. ("Novelty"), d/b/a/ Greenfield Labs. Novelty's sole registered location is 351 W. Muskegon Drive, Greenfield, Indiana 46140.

33. In order to verify that distributors of controlled substances are complying with the various obligations imposed by statute and DEA regulations, DEA routinely conducts administrative inspections of distributors' facilities and records. On July 9, 2007, DEA investigators went to Novelty's registered location to execute an Administrative Inspection Warrant. However, DEA investigators were initially denied access to Plaintiff's complete records of receipt and distribution of List I chemicals. Despite repeated requests, Plaintiff's representative continued to fail to provide investigators with all the requested records for the first three days of the inspection.

34. One of the key areas that DEA investigators focused on was Plaintiff's use of storage

14

locations for List I chemicals. When investigators asked Plaintiff's representatives to provide the names of sales representatives and storage location addresses, Plaintiff's representatives initially refused to provide the information.

35. For three full days, DEA investigators continued to ask Plaintiff's representatives to provide distribution records. By the end of three days, Plaintiff's representative still had not fully complied. For instance, Plaintiff's representatives initially provided investigators with "coded" records which did not indicate, standing alone, which products were being distributed and where those products were being distributed. Plaintiff's representatives also failed to provide (1) the locations of approximately 150 unregistered storage lockers; (2) the names and addresses of warehouse employees who had access to the List I chemicals; (3) the names and addresses of the truck drivers who delivered the List I chemicals to the storage lockers; (4) the names and addresses of approximately 150 sales representatives who handle List I chemical products; (5) records showing returns of List I chemicals by Plaintiff's retail customer; (6) records regarding drug destruction; and (7) a list of Federal Express locations where Plaintiff sends its List I chemicals. DEA investigators informed Novelty representative Ryan Polk that the records Novelty provided were insufficient.

36. On the fourth day of the inspection, Plaintiff's representative, Ryan Polk,. stated that he would need more time to produce detailed records of actual sales which trace the distribution of List I chemical products to the individual retail customer. It was then agreed that Plaintiff would only have to produce the records for the period between January 1, 2007, and July 9, 2007

instead of the entire audit period of approximately two years. It was agreed that these records
would be available to DEA by the afternoon of the inspection's fifth day, July 13, 2007.

37. On July 13, 2007, Plaintiff produced a volume of records. Upon receipt of these records,
Mr. Polk was then asked if there were any other records of receipt or distribution that DEA had
not requested which would be necessary to make the audit complete and accurate. Mr. Polk
replied that DEA would be provided *all* the records necessary to conduct and complete the audit.

38. On July 17, 2007, because Plaintiff had not yet provided all the records necessary for the
DEA audit, DEA Diversion Investigator (DI) Madeline Kuzma obtained an extension of the
Administrative Inspection Warrant. The following day, on July 18, 2007, DI Kuzma went to
Plaintiff's business and retrieved the remaining records.

39. On January 17, 2008, DEA issued an Order to Show Cause and Immediate Suspension of
Registration ("the Order") against Plaintiff. Exhibit 1. As stated in the Order, the Deputy
Administrator found that the "listed chemical products distributed by Novelty have been, and are
likely to continue to be, diverted into the illicit manufacture of methamphetamine. Novelty has
failed to maintain effective controls against such diversion as required by 21 U.S.C. § 823(h)(1).
Novelty's failure to maintain effective controls against diversion, including its distribution of
large amounts of scheduled listed chemical products, contribute to the illicit manufacture of
methamphetamine. The illegal manufacture and abuse of methamphetamine pose a grave threat
to public health and safety. The Deputy Administrator further concluded that "Novelty's

16

continued registration during the pendency of these proceedings would constitute an imminent danger to the public health and safety."

40. As stated in the Order, the Deputy Administrator's decision to suspend Plaintiff's registration was based on the following allegations, which are contained in the order:

A. "Novelty distributed, and continues to distribute, List I chemicals (specifically, scheduled listed chemical products) from over 100 unregistered locations in violation of 21 U.S.C. §§ 822(e) and 841(a)(1) and 21 C.F.R. §§ 1309.21 and 1309.23(a). Novelty stores scheduled list I chemical products at unregistered storage facilities and other locations throughout the United States. Novelty's employees or agents then distribute scheduled listed chemical products directly from these unregistered locations to regulated sellers. Violating Federal laws relating to the handling of List I chemicals is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(2) and 824(a)(4)." Ex. 1 at ¶ 2.

These allegations were based on interviews conducted by DEA investigators with Plaintiff Novelty employees. According to at least one employee, Novelty would ship List I chemical products to unregistered storage facilities. Instead of immediately being transferred over to a sales representative, the List I chemical products would remain in the facility, sometimes for several days, before being distributed from that unregistered location.

B. "Novelty has distributed, and continues to distribute, large quantities of scheduled listed chemical products to small retail outlets such as convenience stores. The quantity of scheduled listed chemical products that Novelty sells to some convenience stores far exceeds what those retail outlets could be expected to sell for legitimate, therapeutic purposes. Excessive sales of scheduled listed chemical products that are or may be diverted to the clandestine manufacture of methamphetamine is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(1), 823(h)(5) and 824(a)(4); *T. Young Associates, Inc.; Revocation of Registration*, 71 Fed. Reg. 60,567 (2006); *Holloway Distributing; Revocation of Registration*, 72 Fed. Reg. 42,118 (2007); *Planet Trading, Inc., d/b/a/ United Wholesale Distributors, Inc.; Denial of Application*, 72 Fed. Reg. 11,055 (2007)." Ex. 1 at ¶ 3.

The allegations above are based on DEA's analysis of the sales and distribution records which Plaintiff provided during the execution of the Administrative Inspection Warrant. The records were then reviewed by DEA's expert, who performed a market analysis to determine if the quantities of List I chemical products being distributed by Novelty were in accordance with the expected demand for those products when used for legitimate, therapeutic purposes.

DEA also determined that the scheduled listed chemical products distributed by Novelty in large quantities have been, and are likely to continue being, diverted to the clandestine manufacture of methamphetamine. This was based on an investigation which concluded that, in November 2002, 22 bottles of ephedrine products were found at an illicit methamphetamine laboratory in Connecticut. Those bottles were traced to Plaintiff's business. Ex. 1 at ¶ 3(a). Moreover, DEA learned that small retail outlets that receive large quantities of scheduled listed chemical products from Novelty sell such products to individuals in amounts that cannot be attributed to legitimate

18

individual needs. For example, some of the retail outlets allow customers to make multiple purchases of scheduled listed chemical products within a single week, and in some cases, within a single day. Some customers of these retail outlets purchased more than 9 grams of ephedrine or pseudoephedrine base within 30 days in violation of 21 U.S.C. § 844(a). Ex. 1 at ¶ 3(b).

C. "In July 2007 DEA conducted an audit of Novelty's records and inventory for 20 scheduled listed chemical products distributed by Novelty. Novelty could not account for more than 60,000 dosage units of two ephedrine products. The audit also revealed overages for 16 different scheduled listed chemical products. Novelty failed to maintain accurate records of its distributions and receipts of scheduled listed chemical products in violation of 21 U.S.C. § 830(a) and 21 C.F.R. § 1310.04. Failure to comply with the record keeping requirements of Federal law is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(2) and 824(a)(4)." Ex. 1 at ¶ 4.

This allegation was based on an analysis of the sales and distribution records provided by Plaintiff as a result of the Administrative Inspection Warrant.

D. "From January 1, 2007, through July 9, 2007, Novelty distributed schedule listed chemical products on at least 284 occasions to 35 retail outlets that were not self-certified under 21 U.S.C. § 830(e)(1)(A)(vii). Regulated seller must be self-certified in order to sell any scheduled listed chemical product at retail. *See* 21 USC § 830(e)(1)(B)(i). Distributing scheduled listed chemical products to retail outlet that are not self-certified, and therefore cannot lawfully sell scheduled listed chemical products, is conduct that is inconsistent with the public interest. *See* 21 U.S.C.

19

§§ 823(h)(2), 823(h)(5) and 824(a)(4)."  Ex. 1 at ¶ 5.

This allegation was based on a list of retail customers provided by Plaintiff as a result of the

Administrative Inspection Warrant.  When DEA "spot checked" certain customers on the list, it

found that the addresses of the customers provided by Plaintiff did not match the addresses of

customers who filed self-certification forms with DEA.  DEA also had no record of self

certification forms being filed by businesses whose addresses matched those of the 35 retail

customers Plaintiff provided.


E.  "Novelty distributed 24-count bottles of scheduled listed chemical products on three

occasions to retail outlets after February 1, 2007.  As of April 9, 2006, non-liquid schedule listed

chemicals could not be lawfully sold at retail except when packaged in blister packs containing

no more than two dosage units per blister.  *See* 21 U.S.C. § 830(d)(2).  Distributions of 24-count

bottles of scheduled listed chemical products to retail outlets that cannot lawfully sell bottles of

such products is conduct that is inconsistent with the public interest.  *See* 21 U.S.C. §§ 823(h)(5)

and 824(a)(4)."  Ex. 1 at ¶ 6.

This allegation was based on records provided by Plaintiff as a result of the Administrative

Inspection Warrant.


F.  "Novelty distributed tablet form scheduled listed chemical products to retail outlets located in

two states, Kentucky and North Carolina that prohibit the sale of non-liquid ephedrine and

pseudoephedrine except in a gel-cap product.  Distribution of scheduled listed chemical products

in violation of state law is conduct that is inconsistent with the public interest.  *See* 21 U.S.C. §§

823(h)(2) and 824(a)(4)." Ex. 1 at ¶ 7.

This allegation was based on records provided by Plaintiff as a result of the Administrative Inspection Warrant.

I personally participated in the investigation which led to the Order to Show Cause and Immediate Suspension of Registration against Plaintiff, dated January 17, 2008. I have also reviewed DEA's investigative file on Novelty, and discussed the investigation with DEA personnel who assisted with the investigation. Every factual allegation contained in the Order to Show Cause and Immediate Suspension of Registration dated January 17, 2008, is supported by or based upon information compiled in the ordinary course of DEA's investigation of Plaintiff and is duly documented in DEA's investigative file by those with knowledge of the facts set forth with information traceable to others.

I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

_____
Lisa R. Barnhill
Staff Coordinator
Drug Enforcement Administration

DIVERSION INVESTIGATOR

Executed this 6th day of May 2008 in Arlington, Virginia.

21

<u>DECLARATION OF D. LINDEN BARBER</u>

I, D. Linden Barber, hereby declare as follows:

1.   I am the Associate Chief Counsel for the Diversion and Regulatory Litigation Section within the Office of Chief Counsel, Drug Enforcement Administration (DEA).

2.   As part of my duties for DEA, I represent DEA in regulatory enforcement matters before DEA's Administrative Law Judges.  I also supervise the other members of the Diversion and Regulatory Litigation Section.

3.   In the case of *In the Matter of Novelty Distributors*, Docket No. 08-33, I served as Agency co-counsel and represented DEA during the hearing which commenced March 24, 2008. That hearing lasted approximately eight (8) days and concluded on April 2, 2008.

4.   Consistent with the applicable statutes and DEA regulations, DEA issued an Order to Show Cause to Novelty accompanied by an Order immediately suspending Novelty's DEA registration as a distributor of list I chemicals.  The Order to Show Cause set a hearing date for March 24, 2008.  DEA regulations permit a party whose registration has been suspended to request an expedited hearing (that is, the party may request to begin the hearing on a date earlier than the hearing date established in the Order to Show Cause).  *See* 21 C.F.R. § 1309.44(c).

5.   On February 29, 2008, I participated in a pre-hearing telephone conference with the Administrative Law Judge and Novelty's counsel.  Novelty raised the prospect of pursuing an expedited hearing in accordance with its prior written request for an expedited hearing (Attachment A).  However, Novelty, through its counsel, informed the Administrative Law Judge that Novelty wished to proceed with the hearing on March 24, 2008, the date established in the Order to Show Cause.

6.   The DEA has not yet issued a final order in the Novelty case.  Based upon my experience and my knowledge of the agency's commitment to providing a prompt post-deprivation final order in cases involving Immediate Suspension Orders, I anticipate that DEA will issue a final order in the Novelty case on or before August 30, 2008.

7.   I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

D. LINDEN BARBER
Associate Chief Counsel
Diversion and Regulatory Litigation Section
Drug Enforcement Administration

Executed this **7th** day of May 2008 at DEA Headquarters in Arlington, Virginia.



11808 WOLF RUN LANE
CLIFTON, VA 20124

2750 S. VAL VISTA DRIVE
SUITE 117
GILBERT, AZ 85295

1050 SEVENTEENTH STREET, N.W.
SUITE 600
WASHINGTON, D.C. 20036
202.466.6937 • FAX 202.466.6938
www.emord.com

February 19, 2008

**VIA OVERNIGHT MAIL**
Hearing Clerk
Office of Administrative Law Judges
Drug Enforcement Administration
Washington, DC  20537

## REQUEST FOR EXPEDITED HEARING

Dear Sir or Madam:

Novelty Inc., by counsel, hereby requests an administrative hearing in response to DEA's January 17, 2008 Order to Show Cause and Immediate Suspension of DEA Registration No. 00356NSY.  *See* 21 C.F.R. §1309.46(d).  In accordance with 21 C.F.R. §1309.44(c), Novelty requests an expedited hearing at the earliest possible date.  *See also* 21 C.F.R. §1316.47.

Pursuant to 21 C.F.R. §1316.47, Novelty States the following:

Novelty's Interest in the Proceeding:

Novelty, Inc. (hereinafter "Novelty") is a company that sells products containing List I Scheduled Chemicals (ephedrine and pseudoephedrine containing cough and cold remedies) to retail establishments, including specific convenience stores and gas stations in the United States.  Novelty conducted business under the auspices of a valid DEA Registration pursuant to 21 U.S.C. §823.  On January 17, 2008, Deputy Administrator Lionhart issued Novelty an Order to Show Cause and Immediate Suspension of Registration.  Novelty has a statutory right to an expedited hearing.  *See* 21 C.F.R. §§ 1316.47, 1309.44(c) ("request shall be granted by the Administrator, who shall fix a date for such hearing as early as reasonably possible").

Novelty's Objections and Issues:

Novelty desires to be heard on all allegations contained in the DEA's January 17, 2008 Order to Show Cause and Suspension.

Novelty's Position with Regard to Particular Objections and Issues:

The DEA has not met its burden of demonstrating Novelty's business is inconsistent with the public interest. *See* 21 U.S.C. § 824(d). Novelty's record is exemplary. Novelty holds itself to the strictest standards and uses security measures, including a closed system of distribution, and detailed monitoring of its inventory that guard against the risk of diversion.

DEA is attempting to amend agency regulations improperly through case-by-case adjudication. The Controlled Substances Act provides no specific prohibitions regarding the sale of listed chemical products to gas stations or convenience stores. Nevertheless, DEA attempts to impose a complete ban on this market, irrationally discriminating in favor of pharmacies, big box stores, and supermarket chains.

DEA's revocation of Novelty's registration is arbitrary and capricious agency action, not backed by substantial evidence in violation of the Administrative Procedure Act and the Fifth Amendment to the United States Constitution.

All notices to be sent pursuant to the proceeding should be addressed to:

Jonathan W. Emord
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124

Respectfully submitted,

Jonathan W. Emord
Andrea G. Ferrenz
Peter A. Arhangelsky
Jackie L. Kurtis

cc:    Administrator
       Drug Enforcement Administration
       United States Department of Justice
       Washington, DC 20537
       Attn: DEA Federal Register Representative

       D. Linden Barber
       Drug Enforcement Administration

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVELTY DISTRIBUTORS, INC., | ) | |
| D/B/A GREENFIELD LABS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. CV 08-00635 (RMC) |
| | ) | |
| MICHELE LEONHART, | ) | |
| In her official capacity as Acting Administrator | ) | |
| of the Drug Enforcement Administration, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## [Proposed] ORDER

Upon consideration of Defendants' Response to Plaintiff's Motion for a Preliminary

Injunction, it is hereby ORDERED that Plaintiff's Motion is DENIED.

Dated: _____.

_____

UNITED STATES DISTRICT JUDGE

Pursuant to D.C. Local Rule 7(k), below is a list of counsel to be notified:

Counsel for Plaintiff:

Jonathan W. Emord, Esq.
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
Tel: (202) 466-6937

Counsel for Defendants:

C. Lee Reeves, Esq.
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: (202) 514-4805