# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVELTY DISTRIBUTORS, INC., D/B/A GREENFIELD LABS, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. CV 08-00635 (RMC) |
| MICHELE LEONHART, In her official capacity as Acting Administrator of the Drug Enforcement Administration, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), defendants in the above-captioned action respectfully move this Court for an order dismissing plaintiff's complaint on the grounds of lack of subject matter jurisdiction and failure to state a claim. In support of this motion, defendants respectfully refer the Court to the accompanying memorandum of points and authorities. A proposed order and declarations are also attached.

Filed: June 5, 2008

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

_____/s/_____
C. LEE REEVES
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109

Washington, D.C. 20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,<br><br>Plaintiff,<br><br>v.<br><br>MICHELE LEONHART,<br>In her official capacity as Acting Administrator<br>of the Drug Enforcement Administration, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. CV 08-00635 (RMC) |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

JEFFREY A. TAYLOR
United States Attorney

ARTHUR R. GOLDBERG
Assistant Director
Federal Programs Branch

C. LEE REEVES
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

## TABLE OF CONTENTS

PAGE(S)

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.      THIS COURT LACKS JURISDICTION OVER ANY OF
           NOVELTY'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

         A.    Review Of DEA Action Is Proper Only In The Court Of Appeals. . . . 8

         B.    Novelty Cannot Bring Its First Amendment Claim
              Outside Of The Review Process Congress Established. . . . . . . . . . . 13

         C.    Because Novelty's First Amendment Claim Fails To
              Present A Substantial Question Of Federal Law,
              Federal Jurisdiction Is Lacking Over That Cause
              Of Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         D.    Even If Novelty Has Articulated A Cognizable First
              Amendment Claim, It Cannot Show That It Suffered
              Any Injury That Would Be Redressed By A Favorable Decision. . . . 19

    II.     NOVELTY'S FIRST AMENDMENT CLAIM FAILS TO
           STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED. . . . . . . . . 20

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Bell Atlantic v. Twombly*,
    127 S. Ct. 1955 (2007). ................................................................. 20

*Bell v. Hood*,
    327 U.S. 678 (1946). ..................................................................... 16

*Bowles v. Russell*,
    127 S.Ct. 2360 (2007). ................................................................ 14

*Decatur Liquors, Inc. v. District of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007). ............................................... 15, 16

*Doe v. Gonzalez*,
    No. 06-966, 2006 WL 1805685 (D.D.C. 2006) ............................ 11

*FCC v. ITT World Communications, Inc.*,
    466 U.S. 463 (1984). ....................................................................... 9

*Florida Power & Light Co. v. Lorion*,
    470 U.S. 729 (1985). ..................................................................... 15

*Fort Worth National Corporation v. Federal Savings & Loan Insurance Corporation*,
    469 F.2d 47 (5th Cir. 1972). ..................................................... 9, 10

*Hagans v. Lavine*,
    415 U.S. 528 (1974). ..................................................................... 16

*Independent Bankers Ass'n of America v. Federal Home Loan Bank Bd.*,
    557 F. Supp. 23 (D.D.C. 1982). ..................................................... 9

*\*John Doe, Inc. v. Drug Enforcement Admin.*,
    484 F.3d 561 (D.C. Cir. 2007). .............................................. *passim*

*Massachusetts v. E.P.A.*,
    127 S.Ct. 1438, 1453 (2007). ...................................................... 19

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975). ..................................................................... 17

*Neil Laboratories, Inc. v. Ashcroft*,
    217 F.Supp. 2d 80 (D.D.C. 2002). ............................................... 12

*Norman Bridge Drug Company v. Banner*,
     529 F.2d 822 (5th Cir. 1976). .................................................................... 12

*Norris & Hirshberg v. Securities and Exchange Commission*,
     163 F.2d 689 (D.C. Cir. 1947). .................................................................. 17

*Penick Corp. Inc., v. Drug Enforcement Admin.*,
     491 F.3d 483 (D.C. Cir. 2007). ........................................................ 8, 10, 13

*Portland  Audubon Society v. Endangered Species Comm.*,
     984 F.2d 1534 (9th Cir. 1993). .................................................................. 17

*\*Telecommunications Research and Action Ctr. v. FCC*,
     750 F.2d 70 (D.C. Cir. 1984). ............................................................ *passim*

*Virginia v. Black,*
     538 U.S. 343 (2003). .................................................................................. 17

*Washington Post v. Robinson,*
     935 F.2d 282 (D.C. Cir. 2007). ..................................................................17

*We The People Foundation, Inc. v. United States,*
     485 F.3d 143 (D.C. Cir. 2007). ..................................................................17

*Wilbur v. Harris*,
     53 F.3d 542 (2d Cir. 1995). ....................................................................... 14

## STATUTES AND REGULATIONS

5 U.S.C. § 706(2)(B). .......................................................................................... 11

12 U.S.C. § 1730a(k). ........................................................................................... 9

21 U.S.C. § 801. .................................................................................................... 2

21 U.S.C. § 802(34)(C),(K). ................................................................................. 2

21 U.S.C. § 802(38). ............................................................................................. 2

21 U.S.C. § 822(e). ................................................................................................ 3

21 U.S.C. § 822(f)..................................................................................................... 3

21 U.S.C. § 823(h)..................................................................................................... 3

21 U.S.C. § 824(a)................................................................................................... 3, 4

21 U.S.C. § 824(c)...................................................................................................... 4

21 U.S.C. § 824(d).............................................................................................. *passim*

21 U.S.C. § 830(a),(b)(1)........................................................................................... 3

21 U.S.C. §843(a)(9)................................................................................................. 2

21 U.S.C. § 877................................................................................................... 8, 9, 15

28 U.S.C. § 510................................................................................................... *passim*

28 U.S.C. § 1331............................................................................................... 13, 14

21 C.F.R. § 1309.21.................................................................................................. 2

21 C.F.R. § 1309.23(b)(1).......................................................................................... 3

21 C.F.R. § 1309.23-24............................................................................................. 3

21 C.F.R. § 1309.44(a).............................................................................................. 4

21C.F.R. § 1309.44(c).............................................................................................. 4

21 C.F.R. § 1309.71-73............................................................................................. 3

21 C.F.R. § 1310...................................................................................................... 3

21 C.F.R. § 1310.05(a)(1).......................................................................................... 3

21 C.F.R. § 1316.03................................................................................................. 3

28 C.F.R. § 0.100..................................................................................................... 2

28 C.F.R. § 0.104..................................................................................................... 2

iv

Fed. R. Civ.  P. 12(b)(1)..............................................................................................  1

Fed. R. Civ. P. 12(b)(6).............................................................................................. 2

## INTRODUCTION

Plaintiff Novelty Distributors, Inc. d/b/a/ Greenfield Labs ("Novelty" or "Plaintiff") was a licensed distributor of ephedrine and pseudoephedrine, both of which are list I chemicals subject to regulation by defendant Drug Enforcement Administration ("DEA").  Following an administrative inspection and investigation of Novelty's facilities and records, DEA determined that Novelty had failed to take sufficient precautions to ensure that the ephedrine and pseudoephedrine it sold and distributed was not unlawfully diverted to methamphetamine labs.  Accordingly, DEA determined that Novelty's continued operation posed an "imminent danger" to the public health and safety and, by Order dated January 17, 2008, suspended Novelty's registration to distribute ephedrine and pseudoephedrine.

Novelty filed suit in this District Court on April 9, 2008.  In its complaint, Novelty seeks a declaratory judgment and injunctive relief reversing the DEA's suspension and reinstating its registration.  Novelty further seeks a declaration that DEA's refusal to allow Novelty to record its deliberations during the administrative inspection violated Novelty's First Amendment rights.  Novelty asserts these claims notwithstanding the fact that judicial review of DEA agency action is proper only in the court of appeals.

Even if review were proper in this Court, which it is not, Novelty's First Amendment claim would fail as a matter of law.  Stated simply, Novelty does not have a First Amendment right to videotape or otherwise record internal agency deliberations, even when conducted on Novelty's premises.  And even if the First Amendment did afford Novelty such a right, Novelty would lack standing to bring such a claim in any case.  For these reasons, defendants respectfully request that this Court dismiss plaintiff's complaint in its entirety pursuant to Rules 12(b)(1) and

1

12(b)(6) of the Federal Rules of Civil Procedure.

## STATUTORY AND REGULATORY BACKGROUND

Both ephedrine and pseudoephedrine are list I chemicals which are often illegally diverted for use in the clandestine manufacture of methamphetamine, a controlled substance.  In an effort to stem illegal methamphetamine production, Congress has passed a number of comprehensive measures, including the Chemical Diversion and Trafficking Act of 1988 ("CDTA"), the Domestic Chemical Diversion Control Act of 1993, the Comprehensive Methamphetamine Control Act of 1996, and the Combat Methamphetamine Epidemic Act of 2005 (collectively "the Acts"),[1] all of which impose upon distributors and sellers of list I chemicals various duties to control theft, loss, and otherwise illegal diversion of list I chemicals to clandestine laboratories.

The DEA regulates ephedrine and pseudoephedrine pursuant to the Controlled Substances Act ("CSA"), as amended by, *inter alia*, the CDTA.[2]  21 U.S.C. § 802(34)(C), (K).  Any individual or entity who wishes to import, export, or distribute list I chemicals must first register with DEA.  21 U.S.C. §§ 802(38), 843(a)(9); *see also* 21 C.F.R. § 1309.21 (DEA regulations requiring registration).  Registration serves multiple purposes.  In order to strike a balance between allowing distributors to pursue legitimate business while limiting the availability of

---

[1]21 U.S.C. § 801, *et seq*.

[2]Although the pertinent statutes grant the authority to regulate controlled substances to the Attorney General, the Attorney General has delegated that authority to the DEA pursuant to 28 U.S.C. § 510  ("The Attorney General may from time to time make such provisions as he considers appropriate authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General.").  *See also* 28 C.F.R. §§ 0.100 and 0.104 (similar delegation of authority from Attorney General to DEA).

2

chemicals for illicit production of controlled substances, the Acts require list I chemical

distributors to take specific measures to prevent illegal diversion of their products.  For instance,

they must (i) obtain proof of identity from their customers; (ii) maintain retrievable receipt and

distribution records; (iii) report to DEA any suspicious orders; and (iv) provide controls and

procedures to guard against theft and diversion.  21 U.S.C. §§ 830(a), (b)(1), 823(h); *see also* 21

C.F.R. §§ 1310; 1310.05(a)(1); 1309.71-73.  DEA also has the authority to conduct inspections

of registrants' places of business, including warehouses and factories, where regulated persons

lawfully distribute list I chemicals.  21 U.S.C. § 822(f); 21 C.F.R. § 1316.03.

When a distributor of list I chemicals maintains multiple locations for distributing and

selling list I chemicals, a separate registration is required for each location.  *See* 21 U.S.C.

§ 822(e); 21 C.F.R. § 1309.23-24.  This is necessary because, without separate registrations,

DEA would be unable to identify or inspect all locations from which list I chemicals were

distributed.  There are only two exceptions to the separate registration requirement.  First, a

registered distributor who stores chemicals at a warehouse is exempt from registering the

warehouse only if no chemicals are distributed from the warehouse and the chemicals are

returned to the registered location prior to distribution.  21 C.F.R. § 1309.23(b)(1).  Second, a

separate registration is not required for a location used by an agent of the registrant to merely

solicit sales as long as the agent does not use the location as a distribution point or storage

facility.  *Id.* at § 1309.23(b)(2).  In other words, if no list I chemicals are distributed from or

manufactured at a particular location, a separate registration is generally not required.

The DEA has the authority to revoke or suspend a party's registration for a variety of

reasons.  *See* 21 U.S.C. § 824(a) (articulating five grounds for revocation or suspension of

registration).  A suspension or revocation pursuant to § 824(a) is not automatic; prior to suspending or revoking a party's registration, the DEA must issue an order to show cause containing the DEA's basis for initiating proceedings and provide an administrative hearing within 30 days.  *See* 21 U.S.C. § 824(c).

In cases where the DEA has reason to believe that a registrant's continued operation would pose "an imminent danger to the public health or safety," the DEA has the discretion to suspend that party's registration immediately, prior to an administrative hearing.  21 U.S.C. § 824(d).  As with § 824(a) suspensions, the DEA must provide the basis for its suspension in the order to show cause.  21 U.S.C. § 824(d); 21 C.F.R. § 1309.44(a).  Pursuant to DEA regulations, the registrant is entitled to request an expedited administrative hearing.  21 C.F.R. § 1309.44(c).  By statute, a § 824(d) suspension remains in effect until the DEA issues a final order unless the suspension is withdrawn by the Attorney General or dissolved by a court of competent jurisdiction.  21 U.S.C. § 824(d).

## **FACTUAL BACKGROUND**

Novelty, as a distributor of ephedrine and pseudoephedrine, must obtain a registration from DEA every year to distribute list I chemicals ("chemicals").  In order to verify that distributors of controlled substances are complying with the various obligations imposed by statute and DEA regulations, DEA routinely conducts administrative inspections of distributors' facilities and records.  Barnhill Decl. at ¶ 33.  Novelty's sole registered location is 351 W. Muskegon Drive, Greenfield, Indiana 46140.  *Id.* at ¶ 32.  On July 9, 2007, DEA investigators went to Novelty's Greenfield facility to execute an administrative inspection warrant.  *Id.* at ¶ 33.

Novelty provided DEA agents a dedicated workspace while the administrative inspection

4

was being conducted.  *See* Pl. Mem. in Support of Mot. for Partial Summary Judgment at 3 ("To

accommodate the inspection team, Novelty provided agents use of a 12 by 20 foot conference

room as a workspace.").  "[A]round noon on July 11, while agents vacated the conference room

for lunch, Novelty executives installed a video-recorder on a tripod at the far end of the

conference room."  *Id.* at 4.  DEA agents unplugged the camera upon returning from lunch and

refused to allow Novelty to videotape its deliberations.  *Id.* at 5  ("At around 1:15 PM July 11,

Novelty executives discovered that DEA agents had unplugged the video-recorder and removed

it to the outside hallway where it was left inoperable.").  On two more occasions, Novelty

attempted to record DEA deliberations in the conference room, both of which the DEA thwarted.

*Id.*

     During the first three days of this inspection, Novelty repeatedly failed to comply with

DEA inspectors' requests to provide the records Novelty was legally required to maintain.

Barnhill Decl. at ¶ 35.  The records that Novelty did produce initially were "coded," such that

DEA investigators could not discern what products Novelty was distributing, or to whom it was

distributing those products.  *Id.*  DEA investigators informed Novelty representative Ryan Polk

that the records Novelty provided were insufficient.  *Id.*

     On the fourth day of the inspection, Polk informed DEA investigators that Novelty would

need more time to produce "uncoded" records from which the DEA could trace sales of

particular chemicals from Novelty to specific retail customers.  Barnhill Decl. at ¶ 36.

Ultimately, Novelty and DEA agreed that Novelty would produce only those records pertaining

to the period of time between January 1, 2007 and July 9, 2007, as opposed to the entire two-year

audit period.  *Id.*  Polk, on Novelty's behalf, represented to DEA investigators that the requisite

records would be available to DEA the following day, July 13, 2007.  *Id.*

On July 13, 2007, Polk provided Novelty's records to DEA.  Upon receipt of these records, DEA investigators inquired whether Novelty had not produced any records which would be needed to permit DEA to make a full and complete audit.  Barnhill Decl. at ¶ 37.  Polk replied that Novelty had not yet produced all such records, but that Novelty would furnish DEA with all records necessary for a complete and accurate audit.  *Id.*  On July 18, 2007, Polk provided the remaining records to DEA.  *Id.* at ¶ 38.

Based on the records Novelty furnished, as well as other aspects of DEA's investigation conducted pursuant to the administrative inspection, DEA determined that there was reason to believe that Novelty had failed to comply with its obligations to ensure that the chemicals it distributed were not unlawfully diverted.  More precisely, the DEA audit and investigation yielded evidence suggesting that Novelty had committed several separate and independent statutory and regulatory violations.

Based upon this evidence, DEA determined that there was a sufficient basis to conclude that Novelty's distribution practices posed a serious risk that list I controlled substances would be diverted to the illegal manufacture of methamphetamine.  And, given Novelty's failure to maintain effective safeguards against diversion as well as its distribution of large amounts of chemicals from more than 100 unregistered sites, DEA concluded that Novelty's continued registration posed an imminent danger to the public health and safety.  For these reasons, the DEA suspended Novelty's registration by Order dated January 17, 2008 pursuant to 21 U.S.C. § 824(d).  The Suspension Order recounted each of the grounds stated above as the grounds on which DEA relied in making its "imminent danger" determination.  *See generally* Pl. Ex. 1 to Pl.

Mot. for Preliminary Injunction.

An administrative hearing pertaining to DEA's suspension of Novelty's registration commenced on March 24, 2008.  The hearing lasted eight days, and concluded on April 2, 2008.  Barber Decl. at ¶ 3.

One week after the conclusion of the hearing, on April 9, 2008, Novelty filed its complaint against the DEA.  Novelty seeks declaratory and injunctive relief on the grounds (i) that the DEA acted arbitrarily and capriciously in violation of § 702 of the Administrative Procedure Act when it suspended Novelty's registration pursuant to § 824(d); (ii) that DEA's suspension unlawfully deprived Novelty of its property interest in its registration without due process of law in violation of the Fifth Amendment; and (iii) that DEA violated Novelty's First Amendment rights by refusing to allow Novelty to record its deliberations during the administrative search.

By decision dated May 21, 2008, a DEA Administrative Law Judge recommended that DEA reinstate Novelty's registration.  The DEA has not yet issued a final determination regarding Novelty's suspension.  Barber Decl. at ¶ 6.

## ARGUMENT

I.     **THIS COURT LACKS JURISDICTION OVER ANY OF NOVELTY'S CLAIMS[3]**

Novelty seeks a declaratory judgment that DEA acted improperly in suspending Novelty's

---

[3]Defendants are in receipt of this Court's Order to Show Cause dated June 5, 2008 why the Court should not grant plaintiff's motion for summary judgment on the issue of jurisdiction. While defendants' jurisdictional arguments are set forth in this memorandum and in its previously-filed opposition to plaintiff's motion for a preliminary injunction, defendants will respond to plaintiff's motion for summary judgment by the June 12 deadline set by this Court's Order.

registration pursuant to § 824(d) and injunctive relief reinstating its registration.  By seeking

review of DEA agency action in this Court, Novelty disregards not only the plain language of the

APA, but also the process for challenging registration suspensions Congress expressly

established.  Besides flouting the statutory review scheme Congress designed, Novelty's

attempted end run, if permitted, would invite a host of practical problems into the review process.

 This Court therefore cannot and should not exercise jurisdiction over any of Novelty's claims.

### A.    Review Of DEA Action Is Proper Only In The Court Of Appeals

Congress has set out a two-part review process for parties challenging pre-hearing

suspensions made pursuant to 21 U.S.C. § 824(d).  First, an aggrieved party may challenge its

suspension administratively.  *See id.*  (providing for the "institution of [administrative]

proceedings" simultaneously with the issuance of an suspension on imminent harm grounds).

Second, should the administrative process not adequately redress the aggrieved party's concerns,

the party has a statutory right to pursue an direct appeal in the courts of appeals.  21 U.S.C. § 877

provides that:

> All final determinations, findings, and conclusions of the Attorney General under
> this subchapter shall be final and conclusive decisions of the matters involved,
> except that any person aggrieved by a final decision of the Attorney General may
> obtain review of the decision in the United States Court of Appeals for the District
> of Columbia or for the circuit in which his principal place of business is located
> . . . .

In short, Congress mandated that a party aggrieved by a § 824(d) suspension would first seek

redress from the DEA, and, if necessary, thereafter from the courts of appeals.  Because no part

of this review process involves the district court, this Court lacks jurisdiction over Novelty's

claims. *See John Doe, Inc. v. Drug Enforcement Admin.*, 484 F.3d 561, 568-70 (D.C. Cir. 2007)

(concluding that review of DEA agency action is proper in the court of appeals, not in the district court).  As the D.C. Circuit held in *Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984), "a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute."  Because § 877 makes clear that exclusive review of DEA administrative proceedings lies in the courts of appeals, "[l]itigants may not evade these [jurisdictional] provisions by requesting the District Court to enjoin action that is the outcome of the agency's order."  *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 468 (1984).[4]  Accordingly, this Court lacks authority to grant Novelty the relief it seeks.

That the § 824(d) order in issue here is not final agency action does not change the jurisdictional analysis.  Because this Court lacks authority to review the DEA's decision on the merits (*i.e.*, the final agency decision), it *a fortiorari* lacks jurisdiction to entertain any challenge to the administrative process that precedes final agency action.  *See Independent Bankers Ass'n of America v. Federal Home Loan Bank Bd.,* 557 F. Supp. 23, 27-28 (D.D.C. 1982) (citing with approval *Fort Worth National Corporation v. Federal Savings & Loan Insurance Corporation*, 469 F.2d 47 (5th Cir. 1972)).  In *Fort Worth*, the district court issued a preliminary injunction notwithstanding the fact that by statute, the court of appeals had exclusive jurisdiction over the appeal of an adverse decision by the Federal Savings & Loan Insurance Corporation.  *See Fort*

---

[4]In light of § 877's direct-review provision, it is unsurprising that "as a matter of practice almost all cases challenging DEA decisions under the CSA have been filed directly in the courts of appeals pursuant to 21 U.S.C. § 877."  *John Doe, Inc.*, 484 F.3d at 568 (D.C. Cir. 2007).

*Worth*, 469 F.2d at 52 (citing 12 U. S. C. § 1730a(k)).[5]  The Fifth Circuit reversed, holding that "[w]hen Congress has prescribed a particular method of review, that procedure is exclusive." *Id.* While the *Fort Worth* Court conceded that in rare instances district court intervention might be appropriate in cases "in which the statutory review procedure is inadequate," *id.*, it concluded that that was not such a case.

Nor is this such a case.  There is not even an allegation — let alone evidence — that the statutory procedures Congress has created for review of § 824(d) suspensions are inadequate. Even if this process were somehow deficient, jurisdiction would still not be proper in this Court. As the *Fort Worth* Court made clear, "it is beyond question that the Court of Appeals would have been able to issue any type of preliminary relief necessary to protect the rights of the parties pending final resolution of the merits on appeal." *Id.* at 53.  So too here.  There is no reason to believe (nor does Novelty offer any) that the courts of appeals would be unable to grant Novelty the relief it seeks.  Accordingly, Novelty has failed to carry its burden to show that this Court has jurisdiction over its claims for relief.[6]  *See TRAC*, 750 F.2d at 78 ("Where statutory review is

_____

[5]The jurisdictional provision in issue in *Fort Worth* is materially identical to the jurisdictional language in § 877.  *Compare Fort Worth*, 469 F.2d at 52 (quoting 12 U.S.C. § 1730a(k) as "'any party aggrieved by an order of the Corporation under this section may obtain a review of such order by filing in the court of appeals of the United States for the circuit in which the principal office of such party is located, or in the United States Court of Appeals for the District of Columbia Circuit . . . .'") *with* 21 U.S.C. § 877 ("All final determinations, findings, and conclusions of the Attorney General under this subchapter shall be final and conclusive decisions of the matters involved, except that any person aggrieved by a final decision of the Attorney General may obtain review of the decision in the United States Court of Appeals for the District of Columbia or for the circuit in which his principal place of business is located . . . .").

[6]In a prior filing, Novelty asserted that jurisdiction is proper in this Court because § 824(d) provides that a pre-hearing suspension may be "dissolved by a court of competent jurisdiction."  Novelty Reply in Support of Motion for Preliminary Injunction at 13 (emphasis

10

available in the Court of Appeals it will rarely be inadequate.").

Several pragmatic considerations also counsel against this Court exercising jurisdiction over Novelty's claims.  As the D.C. Circuit correctly recognized, the practical consequence of a district court entertaining Novelty's challenge to the DEA's suspension decision while administrative proceedings remain ongoing would be to "encourage[] dissatisfied claimants to 'jump the gun' by going directly to the district court to develop their case instead of exhausting their administrative remedies before the agency."  *John Doe, Inc.*, 484 F.3d at 570 (D.C. Cir. 2007).  In addition to promoting forum shopping, this Court's exercise of jurisdiction would also complicate matters at the appellate level, as the court of appeals would have to review both a district court and an agency record once the DEA does issue a final decision (assuming an appeal is filed).  This attempt to circumvent the congressionally-crafted review process would therefore create "duplicative and potentially conflicting review, and the delay and expense incidental thereto."  *Id.*  (quoting *TRAC*, 750 F.2d at 78).  For all of these reasons, jurisdiction is not proper in this Court.[7]

---

deleted).  But § 824(d) simply begs the question.  By its terms, § 824(d) does not indicate which courts are "of competent jurisdiction."  For the reasons explained previously, § 877 makes clear that Congress intended only the courts of appeals to exercise jurisdiction over suspension orders DEA issued pursuant to § 824(d).

[7]Although some district courts have offered various rationales for exercising jurisdiction over challenges to agency action notwithstanding the existence of a statute providing for direct appellate review, the D.C. Circuit made clear that the rationales these district courts offered for doing so were unpersuasive.  *See John Doe, Inc.*, 484 F.3d at 568-70 (rejecting various reasons district courts offered to justify asserting jurisdiction to review DEA determinations under the CSA); *accord Doe v. Gonzalez* [sic], No. 06-966, 2006 WL 1805685 at *22 (D.D.C. 2006) ("Section 877 . . . seems to explicitly vest exclusive jurisdiction in the courts of appeals over *any* CSA-based agency determination that could properly be before a federal court.") (*aff'd sub nom John Doe, Inc.*, 484 F.3d at 568-70) (emphasis added).

11

No different result does or should obtain with respect to Novelty's Fifth Amendment-based claim for injunctive relief. That Novelty has styled its cause of action as a constitutional claim does not take it outside the realm of the APA. *See* 5 U.S.C. § 706(2)(B) (authorizing a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be contrary to constitutional right . . . .").

Common sense further bolsters the result compelled by the plain language of the APA. It is undisputed that Novelty's Fifth Amendment claim and its § 702 claim for injunctive relief arise out of the same the facts. Given this commonality, it would be anomalous for this Court to treat Novelty's Fifth Amendment claim any differently than its APA-based claim with respect to jurisdiction. Were this Court to do so, direct-review provisions would be meaningless, as plaintiffs could easily evade jurisdictional limitations by labeling their challenges as constitutional rather than as APA claims. This is particularly true for challenges arising out of § 824(d) suspensions, because a pre-hearing suspension almost by definition ensures that an aggrieved party will suffer some loss at least until the conclusion of administrative proceedings, thereby giving rise to a Fifth Amendment claim. Accordingly, this Court lacks jurisdiction over Novelty's complaint, no matter how Novelty has styled its claims for relief.

In a prior filing, Novelty asserted that "settled" and "controlling" precedent holds that jurisdiction is proper in district courts over Novelty's APA and Fifth Amendment claims. *See* Novelty Reply in Support of Motion for Preliminary Injunction at 2. Novelty is wrong. In fact, the precedent on which Novelty relies in making this assertion is not good law in this circuit, let alone "settled" or "controlling" law. The first case on which Novelty relies is *Norman Bridge Drug Company v. Banner*, 529 F.2d 822, 823-24 (5th Cir. 1976), in which the Fifth Circuit

12

affirmed in part a district court's entry of a preliminary injunction in response to a DEA

suspension issued pursuant to § 824(d).  The second case on which Novelty relies is *Neil*

*Laboratories, Inc. v. Ashcroft*, 217 F. Supp. 2d 80 (D.D.C. 2002).  Citing *Norman Bridge*, the

*Neil Laboratories* court concluded that "a registrant subject to immediate suspension of

registration may seek judicial review by a district court before the suspension order becomes

final."  *Id.* at at 85 n.6.  Unfortunately for Novelty, neither *Norman Bridge* or *Neil Laboratories*

is good law in this circuit following *John Doe, Inc.*  In *John Doe, Inc.*, the D.C. Circuit expressly

rejected the various rationales district courts had offered for exercising jurisdiction to review

DEA determinations under the CSA.  *See id.* at 484 F.3d at 568-70.[8]  Accordingly, Novelty's

resort to *Norman Bridge* and *Neil Laboratories* is unavailing, and this Court therefore lacks

jurisdiction over Novelty's APA and Fifth Amendment claims.

### B.    Novelty Cannot Bring Its First Amendment Claim Outside Of The Review Process Congress Established

In its motion for partial summary judgment, Novelty advances two reasons why this

Court has jurisdiction over its First Amendment claim even if this Court lacks jurisdiction over

Novelty's APA and Fifth Amendment-based claims.  First, Novelty argues that jurisdiction is

proper because "[t]his Court has "original jurisdiction of all civil actions arising under the

Constitution, laws, or treaties of the United States."  Pl. Mem. in Support of Mot. for Summary

Judgment at 6 (citing 28 U.S.C. § 1331).  To begin with, the D.C. Circuit expressly rejected this

argument in *TRAC*.  *TRAC*, 750 F.2d at 77 n.30 (holding that "[p]ast suggestions that the District

---

[8]Given Novelty's failure to acknowledge — let alone distinguish — *John Doe, Inc.*, there is no small irony in the fact that Novelty accuses the Government of "consistently ignor[ing] the apposite precedent and misappl[ying] the law."  Pl. Mot. to Supplement the Record and Expedite Consideration of Plaintiff's Preliminary Injunction Motion at 5.

Court has general federal question jurisdiction under 28 U.S.C. § 1331 over some of these claims [governed by a direct review provision] were in error"). Moreover, this argument obviously proves too much. If Novelty were correct, and stating a federal cause of action were all that were required to get into *any* federal court, § 1331 would trump all other statutes in which Congress limited the subject matter jurisdiction of federal district courts, including those requiring administrative exhaustion as a prerequisite for federal subject matter jurisdiction as well as those providing for direct review of agency action in the courts of appeals. Because Congress is the sole arbiter of lower courts' jurisdiction, *see Bowles v. Russell*, 127 S.Ct. 2360, 2364 (2007), Congress' general grant of subject matter jurisdiction in § 1331 must be interpreted in tandem with other statutes limiting lower court jurisdiction, including the direct review provision in issue here. Thus, § 1331 provides no support for Novelty's assertion that this Court has jurisdiction over Novelty's First Amendment claim.

Novelty next argues that because it "does not seek administrative remedies or review of an action under the Administrative Procedure Act . . . , no exhaustion of administrative remedies is required." Pl. Mem. in Support of Mot. for Summary Judgment at 5-6.[9] Novelty's own actions, however, conclusively refute its contention that it is not seeking agency review of its First Amendment claim, since Novelty presented extensive evidence in support of this claim in administrative proceedings before the DEA. *Cf.* Pl. Mem. in Opp. to Def. Motion to Stay at 5

---

[9]In support of this proposition, the sole case Novelty cites is *Wilbur v. Harris*, 53 F.3d 542 (2d Cir. 1995). In *Wilbur*, the Second Circuit held that a plaintiff asserting a § 1983 claim was not required to exhaust state administrative remedies before pursuing her § 1983 claim. *Wilbur* has nothing to say about whether a plaintiff challenging federal agency action can split claims that arise from a common event (*i.e.*, the DEA administrative inspection and resulting suspension) from other causes of action arising out of the same event.

(asserting that the facts pertinent to Novelty's First Amendment claim "have been adduced in a full hearing at the DEA where cross-examination by the Government was fully afforded"). Indeed, the factual record on which Novelty seeks to rely in pursuing its First Amendment claim in this Court was developed entirely during agency proceedings. Given this, it is undeniable that Novelty's First Amendment claim may well go to the D.C. Circuit as part of any direct review appeal, and jurisdiction is therefore improper in this Court. *See TRAC*, 750 F.2d at 77 (noting that direct review provision operates to give courts of appeals exclusive jurisdiction over any claim that may "affect [the court of appeals'] future statutory review authority"); *see also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) ("In the absence of specific evidence of contrary congressional intent, however, we have held that review of orders resolving issues preliminary or ancillary to the core issue in a proceeding should be reviewed in the same forum as the final order resolving the core issue.").

Novelty's pursuit of its First Amendment claim before the agency underscores the obvious: All of Novelty's claims — including its First Amendment claim — arise out of the DEA's administrative inspection and the resulting suspension. Because Novelty's claims "all derive from a common nucleus of operative fact, the claims constitute a single case or controversy within the constitutional and statutory jurisdiction of the federal courts," this Court therefore must not countenance Novelty's impermissible attempt to end run the review process Congress established by splitting its cause of action. *Decatur Liquors, Inc. v. District of Columbia*, 478 F.3d 360, 362 (D.C. Cir. 2007). As discussed previously, permitting Novelty to pursue its First Amendment claim outside the direct review process Congress established would raise the undesirable prospect of duplicative and conflicting review. *TRAC*, 750 F.2d at 78

(stating that "exclusive jurisdiction eliminates duplicative and potentially conflicting review, and the delay and expense incidental thereto") (internal citations omitted).  Because Novelty is pursuing its First Amendment claim both in this Court and through the direct review process Congress established in § 877, it is entirely possible that the Court of Appeals would have to review the identical claim twice, on two different records, and under two different legal standards[10] were this Court to exercise jurisdiction.  There is no justification for such a bifurcated review process.

### C.     Because Novelty's First Amendment Claim Fails To Present A Substantial Question Of Federal Law, Federal Jurisdiction Is Lacking Over That Cause Of Action

Even in the absence of a direct review provision, jurisdiction would still not be proper in this Court with respect to Novelty's First Amendment claim.  Where, as here, "the federal claims are obviously frivolous or so attenuated and unsubstantial as to be absolutely devoid of merit, a federal court lacks subject-matter jurisdiction over those claims."  *Decatur Liquors*, 478 F.3d at 363 (quoting *Hagans v. Lavine*, 415 U.S. 528, 536-37 (1974) (internal quotations and citations omitted)).  Even the cases Novelty cites make this point clear.  *See Bell v. Hood*, 327 U.S. 678, 683 (1946) (stating that Court has no jurisdiction over federal claims that are "patently without merit").

---

[10]On a motion for summary judgment, Novelty would be entitled to relief on its First Amendment claim only if it could demonstrate that, even construing all disputed material facts in defendants' favor, Novelty was nonetheless entitled to judgment as a matter of law.  The D.C. Circuit would exercise plenary review of this purely legal determination.  On a review of final agency action in the D.C. Circuit, Novelty would only be able to prevail if it could show that DEA's findings of fact were not supported by substantial evidence or if its reasoning were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Penick Corp., Inc. v. Drug Enforcement Admin.*, 491 F.3d 483, 488 (D.C. Cir. 2007).

The gravamen of Novelty's First Amendment claim is that DEA violated Novelty's First Amendment rights by preventing Novelty employees from videotaping DEA agents' deliberations during the administrative inspection.  *See* Pl. Mem. in Support of Mot. for Partial Summary Judgment at 6.  It is undisputed that Novelty provided DEA agents a dedicated workspace during the inspection.  *See id.* at 3 ("To accommodate the inspection team, Novelty provided agents use of a 12 by 20 foot conference room as a workspace.").  It is similarly undisputed that "around noon on July 11, while agents vacated the conference room for lunch, Novelty executives installed a video-recorder on a tripod at the far end of the conference room." *Id.* at 4.  DEA agents, however, unplugged the camera upon returning from lunch and refused to allow Novelty to videotape its deliberations.  *Id.* at 5  ("At around 1:15 PM July 11, Novelty executives discovered that DEA agents had unplugged the video-recorder and removed it to the outside hallway where it was left inoperable.").  On two more occasions, Novelty attempted to record DEA deliberations in the conference room, both of which DEA thwarted.  *Id.*  DEA's refusal to allow Novelty to record its deliberations, Novelty alleges, constituted an unlawful restriction on Novelty's First Amendment rights.

Among other things, the First Amendment insulates from government restriction various types of speech and other expressive conduct.  *Virginia v. Black*, 538 U.S. 343, 358 (2003).  The First Amendment also gives persons the right to petition the government for a redress of grievances, *We the People Foundation, Inc. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007), as well as the right of access to most judicial proceedings.  *Washington Post v. Robinson*, 935 F.2d 282, 287 (D.C. Cir. 1991).  From these principles, Novelty extrapolates that it has a First Amendment right to videotape DEA's discussions during the administrative inspection.

This so-called First Amendment claim is beyond frivolous.  Novelty does not have a constitutional right to monitor or record internal DEA deliberations.  *See, e.g.*, *Portland Audubon Society v. Endangered Species Comm.*, 984 F.2d 1534, 1549 (9th Cir. 1993) (noting that "neither the internal deliberative process of the agency nor the mental processes of individual agency members" are proper components of the administrative record); *Norris & Hirshberg v. Securities and Exchange Commission*, 163 F.2d 689, 693 (D.C. Cir. 1947) (observing that "internal memoranda made during the decisional process are never included in a[n agency] record").  If the First Amendment granted such a right, it would seem to render unconstitutional portions of the APA.  *See* 5 U.S.C. § 552(b)(5) (exempting from public disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency").  The exclusion of deliberative materials from the public record "prevent[s] injury to the quality of agency decisions" by encouraging uninhibited and frank discussion of legal and policy matters.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151-52 (1975).

It is of no consequence that the DEA deliberations in issue took place on Novelty property.  By its own admission, Novelty permitted DEA to work onsite in a dedicated workspace.  *See* Pl. Mem. in Support of Mot. for Summary Judgment at 3 (acknowledging that Novelty provided DEA with conference room during pendency of DEA inspection).  In advancing its First Amendment claim during the administrative hearing, Novelty presented no authority to support the notion that by taking Novelty up on its offer to work in a dedicated onsite

18

workspace, DEA implicitly consented to Novelty videotaping its discussions.[11]  It goes without saying that if DEA believed that working on Novelty property would force it to choose between having its deliberations recorded or violating Novelty's constitutional rights, DEA would simply have taken the materials and records Novelty furnished back to DEA, where no one could argue plausibly that Novelty would have had a constitutional right to record DEA's deliberations. Because Novelty's First Amendment claim is wholly frivolous, this Court lacks subject matter jurisdiction under *Decatur Liquors* and *Bell*.

> **D.    Even If Novelty Has Articulated A Cognizable First Amendment Claim, It Cannot Show That It Suffered Any Injury That Would Be Redressed By A Favorable Decision**

Even if Novelty had a First Amendment right to eavesdrop on internal DEA deliberations, it would not have standing to bring such a claim in this case.  It is well settled that to have standing, a party must show, *inter alia*, that a favorable decision will redress the claimant's injury.  *Massachusetts v. E.P.A.*, 127 S.Ct. 1438, 1453 (2007).  Here, Novelty seeks a judicial reinstatement of its registration, relief that, even if granted, would do nothing to remedy Novelty's putative injury to its First Amendment rights.  Put another way, even had Novelty been

---

[11]In a prior filing, Novelty asserts that *Robinson v. Fetterman*, 378 F.Supp.2d 534 (E.D. Pa. 2005) compels the conclusion that Novelty has a First Amendment right to videotape DEA internal deliberations.  *See* Pl. Mem. in Support of Mot. for Partial Summary Judgment at 12-13. *Robinson* cannot bear the weight plaintiff places on it.  In *Robinson*, the court held that a citizen had a right to videotape police officers as they performed truck inspections on a public highway. *Id.* at 541.  Surely plaintiff can discern the enormous difference between videotaping officials performing vehicle inspections (which presumably involves little or no deliberation or consultation between officers) and videotaping police deliberations.  By Novelty's logic, there would be no constitutional difference between a citizen's right to record a President's speech to a trade association (which the First Amendment plainly would protect) and a citizen's right to record a President's deliberations with the Cabinet (which the First Amendment plainly would not protect).

allowed to videotape DEA deliberations, Novelty cannot show that this would have changed the outcome of DEA's investigation. Accordingly, Novelty lacks standing to assert its First Amendment claim.

## II.    NOVELTY'S FIRST AMENDMENT CLAIM FAILS TO STATE A CLAIM ON WHICH RELIEF CAN BE GRANTED

Even if this Court determines that it does have jurisdiction over Novelty's First Amendment claim, and that Novelty has standing to sue, Novelty has nonetheless failed to state a claim on which relief can be granted. For the reasons stated previously, Novelty has failed to plead a cognizable claim for relief under the First Amendment. *See Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1965, 1974 (2007) (holding that a plaintiff must plead "enough facts to state a claim of relief that is plausible on its face"). Accordingly, this Court should dismiss Novelty's First Amendment claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court dismiss plaintiff's complaint in its entirety.

Dated: June 5, 2008                              Respectfully Submitted,

                                                 JEFFREY A. TAYLOR
                                                 United States Attorney

                                                 ARTHUR R. GOLDBERG
                                                 Assistant Director
                                                 Federal Programs Branch

                                                 _____/s/_____
                                                 C. LEE REEVES
                                                 Department of Justice, Federal Programs Branch

20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: 202-514-4805
Fax: 202-616-8470
*Attorneys for Defendants*

DECLARATION OF LISA R. BARNHILL

I, Lisa R. Barnhill, hereby declare as follows:

1. I am a Diversion Investigator and Staff Coordinator assigned to the Dangerous Drugs and Chemicals Section of the Drug Enforcement Administration ("DEA").

2. As part of my duties for DEA, I coordinate investigations of alleged violations of the Controlled Substances Act.  With respect to the Plaintiff in this case, I investigated and oversaw other investigators engaged in the investigation of the dispensing practices of Novelty Distributors, Inc. ("Novelty").

3. I have reviewed DEA's investigative file on Novelty, and discussed the investigation with DEA personnel who conducted the investigation.  Every factual allegation contained in the Order to Show Cause and Immediate Suspension of Registration dated January 17, 2008, is supported by or based upon information compiled in the ordinary course of DEA's investigation of the subject entities and is duly documented in DEA's investigative file by those with knowledge of the facts set forth with information traceable to others.

4. I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.


_Lisa R. Barnhill_
LISA R. BARNHILL
DIVERSION INVESTIGATOR/STAFF
COORDINATOR


Executed this 6th day of May 2008 in Arlington, Virginia.

**DECLARATION OF LISA R. BARNHILL**
**STAFF COORDINATOR**
**DANGEROUS DRUGS AND CHEMICALS SECTION**

I, Lisa R. Barnhill, hereby declare as follows:

1. I am a Staff Coordinator assigned to the Dangerous Drugs and Chemicals Section of the Office of Enforcement Operations, Drug Enforcement Administration ("DEA"). I have served in my current capacity at DEA headquarters since July 2004, and have been a Diversion Investigator since July 1988.

2. With regard to my educational and training background, I graduated from George Mason University in Fairfax, Virginia in 1987, where I obtained a bachelors degree in law enforcement. Shortly thereafter, I was hired by DEA as a Diversion Investigator, and upon my hire, I attended a ten-week Basic School. In addition to the extensive training I received during Basic School, I also attended two sessions of the DEA (two-week) Advanced School for Diversion Investigators at the FBI Academy in Quantico, Virginia, as well as numerous training seminars and refresher courses between 1990 and 2003. Among the courses I have taken was one involving chemical hazards and familiarization. These courses familiarized me with matters involving chemical diversion to the illicit manufacture of methamphetamine, and the adverse environmental impact that results from this process.

1

3. As noted above, I have attended several training seminars, most notably the National Association of Drug Diversion Investigators which took place in Los Angeles in June 1991. Among the topics discussed at these seminars were national and regional chemical diversion and enforcement strategies.

4. Prior to my current position, I was a Diversion Investigator assigned to the Denver, Los Angeles and San Francisco Field Divisions. As part of my duties in the above field divisions, I conducted regulatory investigations involving manufacturers, distributors, pharmacies, practitioners, and other handlers of controlled substances. I was primarily responsible for preventing, detecting and investigating the diversion of controlled substances from legitimate channels to illicit traffic. I have conducted similar investigations related to manufacturers, distributors, importers and exporters of list I chemicals.

5. I have also provided investigative assistance in criminal and civil actions involving the diversion of imported list I chemicals, and the diversion of those imported materials into clandestine settings, mostly in the State of Colorado. The primary emphasis of most of these investigations has involved pseudoephedrine and ephedrine products. I have also worked cooperative chemical diversion investigations with state authorities, most notably the Denver Police Department ("DPD").

6. In my current position as a Staff Coordinator, I have also become familiar with the marketing of pseudoephedrine and ephedrine products in the United States, and their eventual use in the

illicit manufacture of methamphetamine and amphetamine.  I developed my knowledge in this

area through my review of investigative reports relating to chemicals, as well as cables that were

received from field offices around the country documenting clandestine laboratory seizures or

listed chemical products found in illicit settings.  These reports are sent into DEA headquarters

on a daily basis.  Illicit methamphetamine settings can range from dump sites to storage lockers.

I have also researched data from the National Association of Convenience Stores.


7.  As part of its enforcement posture, DEA has centralized authority to register chemical

applicants at its headquarters in Washington, D.C.  As Staff Coordinator, I am responsible for the

supervision of preregistration investigations of persons or entities seeking DEA registrations to

handle listed chemicals.  When applications for DEA registration are submitted, the agency's

field offices conduct investigations, and document their findings in investigative reports.  These

reports are then forwarded to DEA headquarters, and submitted to my attention for review.  I log

in each of the reports, attach a vetting sheet to them, and then review them to ensure that the

potential registrant has met the requirements of a DEA registration.  I also evaluate

recommendations on applications and make final determinations as to whether or not a DEA

application for registration as a chemical handler will be approved, returned to the originating

office for follow-up investigation, or recommended for order to show cause proceedings.


8.  My duties also include monitoring the activities of several DEA field division offices,

including those located in Denver, Colorado; Newark, New Jersey; New York, New York; St.

Louis, Missouri, as well as the Seattle Field Division.  I monitor these offices with respect to

3

their ongoing investigations of activities involving listed chemicals. My related duties in this

regard involve processing letters of non-objection ("LONOs") with respect to importers of list I

chemicals, and conducting investigations upon the receipt by DEA of Import/Export declaration

forms, also known as "DEA-486" forms. DEA-486 forms are to be submitted to DEA by an

importer or exporter of list I chemicals fifteen days prior to their import or export. Once the 486

forms are received by DEA, I then contact the importer to obtain information about their

customers. If there are several levels of distribution, I will typically contact the multiple

distributors to develop information about their customer base, with the goal of determining the

identity of the ultimate end user of the product.


9. My tenure in three DEA field divisions as well as my current tour of duty in DEA

headquarters has provided me with a unique vantage point with respect to DEA's monitoring of

the importation and subsequent distribution of list I chemical products. I have provided support

in criminal and civil investigations relating to regulatory matters of the registrant population.


10. I have also held numerous discussions with various representatives in the pharmaceutical and

chemical industry regarding their distribution of pseudoephedrine and ephedrine products. These

discussions normally relate to inquiries regarding DEA approval of pending chemical

applications, interpretation of DEA statutes and regulations, questions regarding LONOs and

DEA-486 forms.


11. With respect to regulated transactions of the list I chemicals ephedrine and pseudoephedrine,

4

and pseudoephedrine-based and ephedrine-based products, DEA distinguishes the distribution practices of what is referred to as the "traditional" market versus the "non-traditional" market. The "traditional" market is characterized by a very short chain of distribution, with over-the-counter products typically sold from the manufacturer through one layer of distribution directly to the retailer. Traditional outlets are typically large chain grocery stores such as Giant, Safeway and Food Lion, or nationally recognized pharmacy chains like Rite Aid, Kroger, Eckerds and CVS, just to name a few. These traditional products are also sold in larger convenience stores such as 7-11 and Dairy Mart, as well as large retail outlets such as Wal-Mart and K-Mart.

12. One example of a firm that follows the traditional distribution pattern is Warner-Lambert, now known as Pfizer; a DEA registered manufacturer and distributor of controlled substances and listed chemicals. I have held discussions with, and read affidavits from regulatory officials from Pfizer, and have obtained information that the company sells its 30 milligram pseudoephedrine products directly to supermarket and pharmacy chains, and nationally recognized wholesalers, such as Bergen Brunswig and Cardinal. More important, DEA is not aware of any accounts by Pfizer with firms considered part of the "non-traditional" market.

13. DEA has also developed information with respect to the so-called "non-traditional" market, as it relates to regulated transactions involving list I chemicals. The non-traditional market began to develop in the mid-1990s, as DEA imposed tighter restrictions on the sale of pseudoephedrine and ephedrine products, and imposed registration requirements on those selling these products. With respect to the "non-traditional" market, there is a markedly different chain of distribution.

5

Manufacturers and wholesalers who serve the non-traditional market will often have their

product pass through several layers of distribution before it reaches the retail level. In these

instances, the downstream non-traditional establishments are typically head shops, liquor stores,

small convenience stores and gas stations, video stores, and other retail establishments where

consumers would not normally purchase over-the-counter medications. Non-traditional stores

also tend to knowingly sell in large quantities to "smurfers"; these are groups of individuals

affiliated with methamphetamine traffickers who frequent these establishments at different times

or on different dates with the aim of buying out a store's supply of over-the-counter medications,

while avoiding detection and suspicion. Previously, non-traditional establishments sometimes

marketed pseudoephedrine and ephedrine products in higher strengths: for example,

pseudoephedrine products sold by these establishments were sometimes single entity, 60

milligram tablets and packaged in larger quantities of 36, 48, or 60-count bottle sizes. Non-

traditional establishments also sold 60 milligram pseudoephedrine tablets in 36 count blister plus

packs, as well as six and two-count packs.

14. By the late 1980s, traffickers and clandestine lab operators discovered the ease with which

ephedrine could be converted to methamphetamine. Bulk ephedrine powder eventually was

encountered with greater frequency in clandestine lab seizures. Both 1-ephedrine and d-

pseudoephedrine, which have very similar chemical structures, can be used to produce d-

methamphetamine.

15. In 1988, the Uniformed Controlled Substances Act (CSA) was amended to include the

Chemical Diversion and Trafficking Act (CDTA). The CDTA imposed reporting, record keeping and import/export notification requirements for regulated transactions in controlled chemicals. Under this law, bulk ephedrine became regulated; however, the law exempted over-the-counter ephedrine products such as tablets and capsules which are legally marketed or distributed under the Food, Drug and Cosmetic Act.

16. Within a month of the enactment of the CDTA and the controls it placed upon ephedrine powder, the first encounter with ephedrine tablets at a clandestine methamphetamine lab seizure occurred. Traffickers quickly realized that non-controlled ephedrine tablets could easily be purchased in large quantities for conversion to methamphetamine. It became evident that the ephedrine tablet exemption contained in the CDTA provided traffickers a loophole that would have to be closed.

17. Recognizing that additional authority under the law was required to deal with rogue chemical companies, in addition to closing the ephedrine loophole, Congress passed the Domestic Chemical Diversion Control Act of 1993 (DCDCA), which became effective April 16, 1994. The DCDCA removed the record keeping and reporting exemption for single entity ephedrine products and required registration for distributors of these products.

18. Illicit traffickers reacted quickly to the change in the laws regarding single-entity ephedrine products and began using over-the-counter combination products containing ephedrine as precursors to manufacturing methamphetamine. However, the most dramatic effect of the

7

passage of the DCDCA was the manner in which it led to the increased diversion of

pseudoephedrine tablets for the illicit production of methamphetamine. Because of their

chemical similarity, the illicit use of either ephedrine or pseudoephedrine yields the same

quantity of controlled substance. In response to the increased diversion of pseudoephedrine

tablets, Congress passed the Comprehensive Methemphetamine Control Act of 1996 (CMCA)

which expanded regulatory control of lawfully marketed drug products containing ephedrine,

pseudoephedrine, and phenylpropanolamine.

In response to DEA enforcement efforts, more and more "traditional" firms such as Pfizer and

the Perrigo Company (the nation's largest generic manufacturer of non-prescription

pharmaceutical and nutritional products) have discontinued their marketing of 60 milligram

pseudoephedrine and similar over-the-counter medications in bottle sizes with a single-active

ingredient. These traditional outlets also began packaging their over-the-counter products in

smaller quantities (i.e., blister packs), and maintained a 30 milligram strength for

pseudoephedrine products. However, even smaller blister packs are increasingly diverted to

illicit uses, in addition to over-the-counter products packaged in large blister packs and large

bottle sizes, with single active ingredients.

19. Despite the trend towards smaller packaging sizes and quantities in the traditional market,

non-traditional market operators began looking to manufacturers and distributors who sell these

over-the-counter products in large quantities. DEA has seen the apparent rise of a rogue market

in which manufacturers and wholesalers have sold listed chemicals to non-traditional outlets in

8

case quantities. In addition, these products are typically sold under brand names that are not nationally recognized.

20. I have reviewed data where the DEA Salt Lake City Resident Office conducted an analysis of traditional vs. non-traditional sales of pseudoephedrine. Their data for the year 1999 reveals that approximately one dozen non-traditional distributors sold three times as much pseudoephedrine as Pfizer and Perrigo combined. As noted above, I have also reviewed National Association of Convenience Stores annual data, which indicates that over-the-counter, non-prescription medication constitutes less that 2% of sales by convenience stores. Cough and cold products containing pseudoephedrine and ephedrine make up less than one half of one percent of convenience store sales.

21. I have also reviewed seizure data involving pseudoephedrine and ephedrine products found at clandestine settings. This data suggest that increased DEA enforcement efforts involving pseudoephedrine products may have redirected the attention of methamphetamine traffickers back to combination ephedrine products. Unfortunately, non-traditional outlets have been ready and willing to feed the demands of customers with ties to these illicit traffickers. I reviewed major market manufacturer's data regarding the combination ephedrine/guaifenesin products and learned that demand for the tableted version of the product was shrinking. The total year 2002 sales for these products at retail were equivalent to about one-tenth of the legitimate single entity pseudoephedrine market. I know that despite this small demand, many gray market distributors sell this product in amounts that would appear to make them competitors of the two major

9

manufacturers, yet their products do not display any attributes of national competition or distribution.

22. I have learned that the primary market shares for sales of combination ephedrine products belong to the manufacturers of Primatene and Bronkaid products and the national sales of these products in tablet forms have been on the decline for several years, since end-users prefer an inhalant version. DEA has developed information that the nationwide sales of combination ephedrine in the traditional market are much smaller than the market for other traditional cough and cold remedies, including products containing pseudoephedrine. DEA has also learned that some of these combination ephedrine products are marketed and sold through non-traditional outlets, not for their therapeutic uses as a broncho-dilator, but for use as a diet aid and stimulant, which are not uses approved by the Food and Drug Administration.

23. I have further reviewed the DEA investigative files with respect to the pending applications of most current applicants who have been referred for an Order to Show Cause. I have also reviewed investigative findings with respect to the types of listed chemical products that have been sold in the areas that these applicants wish to do business, the customers that have purchased these products, and the presence of large scale diversion of these products to the illicit manufacture of methamphetamine. I have also reviewed the ownership structure of these companies and the types of listed chemical products that they propose to sell should they become registered with DEA.

24. As noted in my declaration above, non-traditional establishments are typically liquor stores, small convenience stores, gas stations and other retail establishments where consumers would not normally purchase over-the-counter medications. The "non-traditional" market is comprised of establishments where over-the-counter medications are typically a minute percentage of the company's retail sales, or where listed chemical products would not be typically sold. Several recent marketing analyses by the Bethesda, Maryland firm Ricercar have concluded that almost all of these "gray market" sales are far in excess of what could be expected in the traditional market for stores of these kinds.

25. In addition to its numerous gas stations, mini-marts and convenience store accounts, the "non-traditional" entities of note to which sales of listed chemical products occur have also included meat markets, health food stores, beauty parlors, dress shops, fish tackle and bait shops, gift shops, and other atypical outlets for cough and cold remedies. Based upon my experience in matters pertaining to regulated transactions of listed chemicals, it is my assessment that many gray market participants indiscriminately distribute list I chemical products to entities that are directly involved with the illicit manufacture of methamphetamine.

26. I am aware that in such states as Tennessee, Missouri, Arkansas and Oklahoma, wholesalers distribute 25 milligram ephedrine products that are notoriously popular among methamphetamine traffickers, such as "MiniThin" and "Mini Twin", as well as ephedrine combination products by the brand names of "Max Brand," "Xtreme," and "Mini Two Way."

27. As noted above, these are brand names that are not nationally recognized, however, they have been identified as favorites of illicit methamphetamine lab operators, in part because the ephedrine and pseudoephedrine products are composed of a single (entity) active ingredient. As a result, these rogue product brands have been disproportionately represented in clandestine lab seizures around the United States involving listed chemical products, and account in part for the large number of clandestine seizures involving products distributed to the convenience store and gas station arena.

28. My experience in matters involving handlers of list I chemicals leads me to conclude that many new applicants are seeking entry into the non-traditional market to replace previous DEA chemical handler registrants who have been revoked, surrendered or left the market as a result of criminal actions. Most of these new applicants intend to engage predominantly in the business of supplying brands of listed chemicals products that are not nationally recognized, to "non-traditional" outlets, and in quantities that are obviously greater than expected sales to that market segment, i.e. convenience and related store markets. Many of the applicants plan to carry and supply only listed chemical products in strengths and sizes most desirable to methamphetamine lab operators.

29. In response to the growing number of methamphetamine lab incidents, several jurisdictions around the country, including Oklahoma and Tennessee have passed laws designed to curb the illicit conversion of listed chemicals to methamphetamine. These newly enacted laws typically restrict the sale of listed chemical products to pharmacies; require that these products be placed

behind a pharmacy counter when being sold; and further require customers who purchase these products to sign a log sheet. These new laws have apparently had the desired effect in reducing the number of methamphetamine lab seizures: For example, according DEA seizure data for May of 2005, the number of methamphetamine lab seizures across Tennessee decreased by 39 percent compared to May of 2004. The following month saw an even greater decrease of 59 percent compared to June of 2004. The State of Oklahoma has similarly experienced a dramatic decline in the number of methamphetamine lab seizures since the passage of its anti-methamphetamine law.

30. In light of the passage of anti-methamphetamine laws in various states around the country, DEA has monitored methamphetamine lab seizures, and the impact, if any, these initiatives have had. As with the preliminary data from Oklahoma and Tennessee, DEA has noted an apparent decrease in the number of illicit methamphetamine labs in other states where listed chemical products are no longer available to non-pharmacy business entities. It has become apparent that limiting the ability of distributors to sell listed chemical products to known sources of diversion (i.e., gas stations, convenience stores, etc.) has had a demonstrable impact in stemming the flow of these products towards the illicit manufacture of methamphetamine.

31.    DEA has further noted, however, that despite the restrictions that have been placed on the sale of pseudoephedrine and ephedrine tablets by the passage of various anti-methamphetamine initiatives around the country, individuals engaged in the illicit manufacture of

13

methamphetamine are again seeking creative alternatives to produce their illicit product. To that

end, DEA anticipates a market shift towards listed chemical products in gelatin cap form, which

despite their exempted status under various state anti-methamphetamine laws, can be converted

to methamphetamine. In 2005, DEA witnessed examples of this emerging market shift and noted

instances involving methamphetamine lab seizures in Oregon, Tennessee and Alabama where

exempted gelatin cap forms of listed chemical products have been found.


32. With respect to the Plaintiff in this case, I participated in the investigation of the distribution

practices of Novelty Distributors, Inc. ("Novelty"), d/b/a/ Greenfield Labs. Novelty's sole

registered location is 351 W. Muskegon Drive, Greenfield, Indiana 46140.


33. In order to verify that distributors of controlled substances are complying with the various

obligations imposed by statute and DEA regulations, DEA routinely conducts administrative

inspections of distributors' facilities and records. On July 9, 2007, DEA investigators went to

Novelty's registered location to execute an Administrative Inspection Warrant. However, DEA

investigators were initially denied access to Plaintiff's complete records of receipt and

distribution of List I chemicals. Despite repeated requests, Plaintiff's representative continued to

fail to provide investigators with all the requested records for the first three days of the

inspection.


34. One of the key areas that DEA investigators focused on was Plaintiff's use of storage

locations for List I chemicals. When investigators asked Plaintiff's representatives to provide the names of sales representatives and storage location addresses, Plaintiff's representatives initially refused to provide the information.

35. For three full days, DEA investigators continued to ask Plaintiff's representatives to provide distribution records. By the end of three days, Plaintiff's representative still had not fully complied. For instance, Plaintiff's representatives initially provided investigators with "coded" records which did not indicate, standing alone, which products were being distributed and where those products were being distributed. Plaintiff's representatives also failed to provide (1) the locations of approximately 150 unregistered storage lockers; (2) the names and addresses of warehouse employees who had access to the List I chemicals; (3) the names and addresses of the truck drivers who delivered the List I chemicals to the storage lockers; (4) the names and addresses of approximately 150 sales representatives who handle List I chemical products; (5) records showing returns of List I chemicals by Plaintiff's retail customer; (6) records regarding drug destruction; and (7) a list of Federal Express locations where Plaintiff sends its List I chemicals. DEA investigators informed Novelty representative Ryan Polk that the records Novelty provided were insufficient.

36. On the fourth day of the inspection, Plaintiff's representative, Ryan Polk,. stated that he would need more time to produce detailed records of actual sales which trace the distribution of List I chemical products to the individual retail customer. It was then agreed that Plaintiff would only have to produce the records for the period between January 1, 2007, and July 9, 2007

instead of the entire audit period of approximately two years. It was agreed that these records would be available to DEA by the afternoon of the inspection's fifth day, July 13, 2007.

37. On July 13, 2007, Plaintiff produced a volume of records. Upon receipt of these records, Mr. Polk was then asked if there were any other records of receipt or distribution that DEA had not requested which would be necessary to make the audit complete and accurate. Mr. Polk replied that DEA would be provided *all* the records necessary to conduct and complete the audit.

38. On July 17, 2007, because Plaintiff had not yet provided all the records necessary for the DEA audit, DEA Diversion Investigator (DI) Madeline Kuzma obtained an extension of the Administrative Inspection Warrant. The following day, on July 18, 2007, DI Kuzma went to Plaintiff's business and retrieved the remaining records.

39. On January 17, 2008, DEA issued an Order to Show Cause and Immediate Suspension of Registration ("the Order") against Plaintiff. Exhibit 1. As stated in the Order, the Deputy Administrator found that the "listed chemical products distributed by Novelty have been, and are likely to continue to be, diverted into the illicit manufacture of methamphetamine. Novelty has failed to maintain effective controls against such diversion as required by 21 U.S.C. § 823(h)(1). Novelty's failure to maintain effective controls against diversion, including its distribution of large amounts of scheduled listed chemical products, contribute to the illicit manufacture of methamphetamine. The illegal manufacture and abuse of methamphetamine pose a grave threat to public health and safety. The Deputy Administrator further concluded that "Novelty's

16

continued registration during the pendency of these proceedings would constitute an imminent danger to the public health and safety."

40. As stated in the Order, the Deputy Administrator's decision to suspend Plaintiff's registration was based on the following allegations, which are contained in the order:

A. "Novelty distributed, and continues to distribute, List I chemicals (specifically, scheduled listed chemical products) from over 100 unregistered locations in violation of 21 U.S.C. §§ 822(e) and 841(a)(1) and 21 C.F.R. §§ 1309.21 and 1309.23(a). Novelty stores scheduled list I chemical products at unregistered storage facilities and other locations throughout the United States. Novelty's employees or agents then distribute scheduled listed chemical products directly from these unregistered locations to regulated sellers. Violating Federal laws relating to the handling of List I chemicals is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(2) and 824(a)(4)." Ex. 1 at ¶ 2.

These allegations were based on interviews conducted by DEA investigators with Plaintiff Novelty employees. According to at least one employee, Novelty would ship List I chemical products to unregistered storage facilities. Instead of immediately being transferred over to a sales representative, the List I chemical products would remain in the facility, sometimes for several days, before being distributed from that unregistered location.

17

B. "Novelty has distributed, and continues to distribute, large quantities of scheduled listed chemical products to small retail outlets such as convenience stores. The quantity of scheduled listed chemical products that Novelty sells to some convenience stores far exceeds what those retail outlets could be expected to sell for legitimate, therapeutic purposes. Excessive sales of scheduled listed chemical products that are or may be diverted to the clandestine manufacture of methamphetamine is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(1), 823(h)(5) and 824(a)(4); *T. Young Associates, Inc.; Revocation of Registration*, 71 Fed. Reg. 60,567 (2006); *Holloway Distributing; Revocation of Registration*, 72 Fed. Reg. 42,118 (2007); *Planet Trading, Inc., d/b/a/ United Wholesale Distributors, Inc.; Denial of Application*, 72 Fed. Reg. 11,055 (2007)." Ex. 1 at ¶ 3.

The allegations above are based on DEA's analysis of the sales and distribution records which Plaintiff provided during the execution of the Administrative Inspection Warrant. The records were then reviewed by DEA's expert, who performed a market analysis to determine if the quantities of List I chemical products being distributed by Novelty were in accordance with the expected demand for those products when used for legitimate, therapeutic purposes.

DEA also determined that the scheduled listed chemical products distributed by Novelty in large quantities have been, and are likely to continue being, diverted to the clandestine manufacture of methamphetamine. This was based on an investigation which concluded that, in November 2002, 22 bottles of ephedrine products were found at an illicit methamphetamine laboratory in Connecticut. Those bottles were traced to Plaintiff's business. Ex. 1 at ¶ 3(a). Moreover, DEA learned that small retail outlets that receive large quantities of scheduled listed chemical products from Novelty sell such products to individuals in amounts that cannot be attributed to legitimate

18

individual needs.  For example, some of the retail outlets allow customers to make multiple

purchases of scheduled listed chemical products within a single week, and in some cases, within

a single day.  Some customers of these retail outlets purchased more than 9 grams of ephedrine or

pseudoephedrine base within 30 days in violation of 21 U.S.C. § 844(a).  Ex. 1 at ¶ 3(b).


C.  "In July 2007 DEA conducted an audit of Novelty's records and inventory for 20 scheduled

listed chemical products distributed by Novelty.  Novelty could not account for more than 60,000

dosage units of two ephedrine products.  The audit also revealed overages for 16 different

scheduled listed chemical products.  Novelty failed to maintain accurate records of its

distributions and receipts of scheduled listed chemical products in violation of 21 U.S.C. §

830(a) and 21 C.F.R. § 1310.04.  Failure to comply with the record keeping requirements of

Federal law is conduct that is inconsistent with the public interest.  *See* 21 U.S.C. §§ 823(h)(2)

and 824(a)(4)."  Ex. 1 at ¶ 4.

This allegation was based on an analysis of the sales and distribution records provided by

Plaintiff as a result of the Administrative Inspection Warrant.


D.  "From January 1, 2007, through July 9, 2007, Novelty distributed schedule listed chemical

products on at least 284 occasions to 35 retail outlets that were not self-certified under 21 U.S.C.

§ 830(e)(1)(A)(vii).  Regulated seller must be self-certified in order to sell any scheduled listed

chemical product at retail.  *See* 21 USC § 830(e)(1)(B)(i).  Distributing scheduled listed chemical

products to retail outlet that are not self-certified, and therefore cannot lawfully sell scheduled

listed chemical products, is conduct that is inconsistent with the public interest.  *See* 21 U.S.C.

19

§§ 823(h)(2), 823(h)(5) and 824(a)(4)." Ex. 1 at ¶ 5.

This allegation was based on a list of retail customers provided by Plaintiff as a result of the

Administrative Inspection Warrant. When DEA "spot checked" certain customers on the list, it

found that the addresses of the customers provided by Plaintiff did not match the addresses of

customers who filed self-certification forms with DEA. DEA also had no record of self

certification forms being filed by businesses whose addresses matched those of the 35 retail

customers Plaintiff provided.


E. "Novelty distributed 24-count bottles of scheduled listed chemical products on three

occasions to retail outlets after February 1, 2007. As of April 9, 2006, non-liquid schedule listed

chemicals could not be lawfully sold at retail except when packaged in blister packs containing

no more than two dosage units per blister. *See* 21 U.S.C. § 830(d)(2). Distributions of 24-count

bottles of scheduled listed chemical products to retail outlets that cannot lawfully sell bottles of

such products is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(h)(5)

and 824(a)(4)." Ex. 1 at ¶ 6.

This allegation was based on records provided by Plaintiff as a result of the Administrative

Inspection Warrant.


F. "Novelty distributed tablet form scheduled listed chemical products to retail outlets located in

two states, Kentucky and North Carolina that prohibit the sale of non-liquid ephedrine and

pseudoephedrine except in a gel-cap product. Distribution of scheduled listed chemical products

in violation of state law is conduct that is inconsistent with the public interest. *See* 21 U.S.C. §§

20

823(h)(2) and 824(a)(4)." Ex. 1 at ¶ 7.

This allegation was based on records provided by Plaintiff as a result of the Administrative Inspection Warrant.

I personally participated in the investigation which led to the Order to Show Cause and Immediate Suspension of Registration against Plaintiff, dated January 17, 2008. I have also reviewed DEA's investigative file on Novelty, and discussed the investigation with DEA personnel who assisted with the investigation. Every factual allegation contained in the Order to Show Cause and Immediate Suspension of Registration dated January 17, 2008, is supported by or based upon information compiled in the ordinary course of DEA's investigation of Plaintiff and is duly documented in DEA's investigative file by those with knowledge of the facts set forth with information traceable to others.

I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

_____Lisa R. Barnhill_____
Lisa R. Barnhill
Staff Coordinator
Drug Enforcement Administration

DIVERSION INVESTIGATOR

Executed this 6th day of May 2008 in Arlington, Virginia.

21

DECLARATION OF D. LINDEN BARBER

I, D. Linden Barber, hereby declare as follows:

1. I am the Associate Chief Counsel for the Diversion and Regulatory Litigation Section within the Office of Chief Counsel, Drug Enforcement Administration (DEA).

2. As part of my duties for DEA, I represent DEA in regulatory enforcement matters before DEA's Administrative Law Judges. I also supervise the other members of the Diversion and Regulatory Litigation Section.

3. In the case of *In the Matter of Novelty Distributors*, Docket No. 08-33, I served as Agency co-counsel and represented DEA during the hearing which commenced March 24, 2008. That hearing lasted approximately eight (8) days and concluded on April 2, 2008.

4. Consistent with the applicable statutes and DEA regulations, DEA issued an Order to Show Cause to Novelty accompanied by an Order immediately suspending Novelty's DEA registration as a distributor of list I chemicals. The Order to Show Cause set a hearing date for March 24, 2008. DEA regulations permit a party whose registration has been suspended to request an expedited hearing (that is, the party may request to begin the hearing on a date earlier than the hearing date established in the Order to Show Cause). *See* 21 C.F.R. § 1309.44(c).

5. On February 29, 2008, I participated in a pre-hearing telephone conference with the Administrative Law Judge and Novelty's counsel. Novelty raised the prospect of pursuing an expedited hearing in accordance with its prior written request for an expedited hearing (Attachment A). However, Novelty, through its counsel, informed the Administrative Law Judge that Novelty wished to proceed with the hearing on March 24, 2008, the date established in the Order to Show Cause.

6. The DEA has not yet issued a final order in the Novelty case. Based upon my experience and my knowledge of the agency's commitment to providing a prompt post-deprivation final order in cases involving Immediate Suspension Orders, I anticipate that DEA will issue a final order in the Novelty case on or before August 30, 2008.

7. I hereby declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. § 1746.

D. LINDEN BARBER
Associate Chief Counsel
Diversion and Regulatory Litigation Section
Drug Enforcement Administration

Executed this **7th** day of May 2008 at DEA Headquarters in Arlington, Virginia.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NOVELTY DISTRIBUTORS, INC.,<br>D/B/A GREENFIELD LABS,     ) | |
|       Plaintiff,     ) | |
|       v.     ) | No. CV 08-00635 (RMC) |
| MICHELE LEONHART,<br>In her official capacity as Acting Administrator<br>of the Drug Enforcement Administration, *et al.*,     ) | |
|       Defendants.     ) | |

## [Proposed] ORDER

Upon consideration of Defendants' Motion To Dismiss, it is hereby ORDERED that

Plaintiff's Complaint is DISMISSED.


Dated: _____.


_____
UNITED STATES DISTRICT JUDGE

Pursuant to D.C. Local Rule 7(k), below is a list of counsel to be notified:

<u>Counsel for Plaintiff</u>:

Jonathan W. Emord, Esq.
Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA 20124
Tel: (202) 466-6937

<u>Counsel for Defendants</u>:

C. Lee Reeves, Esq.
Department of Justice, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7109
Washington, D.C. 20530
Tel: (202) 514-4805