**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

        Plaintiff,

    v.

MICHELE LEONHART,
In her official capacity as Acting Administrator
of the Drug Enforcement Administration, *et al.*,

        Defendants.

No. CV-08-00635 (RMC)

---

## <u>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

Jonathan W. Emord (407414)
Andrea G. Ferrenz (460512)
Peter A. Arhangelsky
EMORD & ASSOCIATES, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Date Submitted:  June 16, 2008

## **TABLE OF CONTENTS**

Summary ................................................................................................................. 1

   I.  Opposition ......................................................................................................3

        A.  Standard for Review of Motion to Dismiss ...............................................3

        B.  Defendant's Motion Exceeds the Bounds of a Motion to Dismiss and
            Includes Improper Argument Based on Misleading, Incomplete Facts.......4

        C.  This Court Has Jurisdiction Over All of Novelty's Claims ........................9

            1.  Jurisdiction of Claims Under 21 U.S.C. § 824(d)........................9

            2.  Jurisdiction for Novelty's First Amendment Claims..................14

        D.  Novelty's First Amendment Claim is Supported by Facts and
            Apposite Precedent ...................................................................................17

        E.  Novelty's Claim Presents an Actual Controversy that is Reviewable
            Under the Declaratory Judgment Act .......................................................22

   II.  Conclusion ................................................................................................24

**Exhibits:**

Exhibit 1 -    Selected Transcript Pages from <u>In re Novelty Distributors</u>, DEA Docket
                08-33 (March 24-April 4, 2008)

## <u>TABLE OF AUTHORITIES</u>

**Cases**

A.E. Finley & Associates, Inc. v. U.S., 898 F.2d 1165 (6th Cir. 1990) ........................... 3

Alsager v. District Court of Polk County, Iowa, 518 F.2d 1160 (8th Cir. 1975) ............. 22

Capital Cities Media, Inc. v. Chester, 797 F.2d 1164 (3d Cir. 1986) .............................. 18

City of Ladue v. Gilleo, 512 U.S. 43 (1994)................................................................ 17, 20

District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428 (D.D.C. 1987).. 3

Easy Returns Worldwide, Inc. v. U.S., 266 F.Supp. 2d 1014 (E.D.Mo. 2003) ............... 12

Elrod v. Burns, 427 U.S. 347 (1976) .............................................................................. 23

Finnerty v. Cowen, 508 F.2d 979 (2d Cir. 1974).............................................................. 17

Government of Rwanda Working Group, 150 F.Supp. 2d 1 (D.D.C. 2001) ..................... 3

Herbert v. Lando, 441 U.S. 153 (1979) ........................................................................... 18

Hishon v. King & Spalding, 467 U.S. 69 (1984)................................................................ 4

John Doe, Inc. v. DEA, 484 F.3d 561 (D.C. Cir. 2007) ................................................... 13

Marbury v. Madison, 1 Cranch 137 (1803) ..................................................................... 17

Maruho Co., Ltd. v. Miles, Inc., 13 F.3d 6 (1st Cir. 1993).................................................. 2

Mills v. Alabama, 384 U.S. 214 (1966)............................................................................ 19

National Magazine v. U.S. Dept. of Defense, 762 F.Supp. 1558 (S.D.N.Y. 1991).......... 18

Neil Laboratories, 217 F.Supp. 2d 80 (D.D.C. 2002)...................................................... 11

Newson v. Norris, 888 F.2d 371 (6th Cir. 1989) ............................................................. 23

Penick Corp., Inc. v. DEA, 491 F.3d 483 (D.C. Cir. 2007).............................................. 16

Pitney Bowes v. United States Postal service, 27 F.Supp. 2d 15 (D.D.C. 1998) ............... 4

Presbyterian Church v. U.S., 870 F.2d 518 (9th Cir. 1989).............................................. 15

Public Service Commission of Utah v. Wycoff Co., Inc., 344 U.S. 237 (1952) .............. 22

Robinson v. Fetterman, 378 F.Supp. 2d 534 (E.D.Pa. 2005)................................ 18, 20, 22

Samuel Goldwyn, Inc. v. United Artists Corporation, 113 F.2d 703 (3d Cir. 1940)........ 23

San Juan Audobon Society v. Veneman, 153 F.Supp. 2d 1 (D.D.C. 2001) ...................... 3

Spiegel, Inc. v. FTC, 540 F.2d 287 (7th Cir. 1976) ......................................................... 16

Sterling Drug, Inc. v. FTC, 450 F.2d 698 (D.C. Cir. 1971)............................................. 15

United Trans. Union v. Gateway Western R.R. Co., 78 F.3d 1208 (7th Cir. 1996)....... 2, 3

Welsh v. Wisconsin, 466 U.S. 740 (1984)........................................................................ 20

Woodruff v. DiMario, 197 F.R.D. 191 (D.D.C. 2000) .................................................. 4, 5

## Statutes

21 U.S.C. § 824......................................................... 1, 4, 8, 9, 10, 11, 12, 13

21 U.S.C. § 877........................................................................... 10, 12, 13

28 U.S.C. § 1331........................................................................... 3, 14

28 U.S.C. § 2202........................................................................... 23

## Other Authorities

ALEXANDER MEIKLEJOHN, POLITICAL FREEDOM:  THE CONSTITUTIONAL POWERS OF THE
PEOPLE (Greenwood Press 1979)................................................................ 18

Vincent Blasi, The Checking Value in First Amendment Theory, 1977 Am. Bar Found.
Research J. 521 (1977)................................................................................ 18

William J. Brennan, Jr. The Supreme Court and the Meiklejohn Interpretation of the First
Amendment, 79 Harv. L. Rev. 1 (1965) ...................................................... 18

## Rules

Fed. R. Civ. Pro 12....................................................................... 1, 2, 3, 4, 8, 24

## SUMMARY

Plaintiff Novelty Distributors, Inc. d/b/a Greenfield Labs ("Novelty"), by counsel and pursuant to Local Civil Rule 7.1(b), hereby opposes Defendants' Motion to Dismiss. In their motion, the Defendants argue that this Court should dismiss Novelty's complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  See Federal Rule of Civil Procedure (Fed. R. Civ. Pro) 12(b)(1); 12(b)(6).  The Defendants' arguments fail to cite, let alone satisfy, the high burden of proof for dismissal under the rules.  Moreover, rather than accept well pled facts as true, as required under 12(b)(1) and 12(b)(6), Defendants argue the facts.  Defendants' motion invites treatment as a motion for summary judgment.  As explained herein, the motion should be denied.  This Court has subject matter jurisdiction to determine each of Novelty's claims, and each claim is actionable under this Court's apposite precedent.

Plaintiff's complaint presents claims against the Drug Enforcement Administration ("DEA") challenging the unlawful suspension of Novelty's DEA registration.  Novelty has presented facts to this Court that reveal DEA suspended Novelty's registration hastily without satisfying the statutory requirement by first adducing proof of an "imminent danger to the public health or safety."  21 U.S.C. § 824(d).  That improper DEA action deprived Novelty of its liberty and property interests without Due Process under the Fifth Amendment.   Novelty further presented facts demonstrating a First Amendment constitutional violation by DEA during its execution of an administrative warrant at Novelty headquarters.  While on Novelty's premises, DEA agents imposed a prior restraint, prohibiting Novelty from video and audio-recording adversarial interactions between Novelty executives and DEA agents.  DEA's

actions prevented Novelty from obtaining a contemporaneous record of the events unfolding during the execution of the search warrant. Novelty had a First Amendment right to make the record. By violating the statutory provision governing immediate suspensions and the Constitution, DEA also acted arbitrarily and capriciously in violation of the Administrative Procedure Act.

Novelty's complaint plainly established relevant facts supporting the elements to each of its three causes of action. It seeks a declaratory judgment on the DEA's law violations and injunctive relief to block further imposition of the suspension order that now threatens Novelty's financial viability and injunctive relief to cease and prevent recurrence of the law violations.

Instead of addressing Novelty's complaint, Defendants' motion to dismiss present substantive argument beyond the scope of a Motion to Dismiss, inviting summary judgment. See, e.g., Maruho Co., Ltd. v. Miles, Inc., 13 F.3d 6, 8 (1st Cir. 1993) (Motion to Dismiss sua sponte treated as motion for summary judgment).

The Defendants inappropriately seek to reargue their interpretation of the facts as opposed to consider them in a light most favorable to the Plaintiff's, thus violating the Fed. R. Civ. Pro 12(b)(6) standard. See United Trans. Union v. Gateway Western R.R. Co., 78 F.3d 1208, 1210 (7th Cir. 1996). The Defendants' attempt to argue the merits in their Rule 12(b)(1) and 12(b)(6) motion belies their argument that the complaint, on its face, is dismissable. For that reason and for Defendants' failure to accept as true the facts well plead, the motion may be summarily denied. Nevertheless, Novelty below addresses seriatim each of the substantive arguments advanced by Defendants, revealing each to fail.

I. **OPPOSITION**

A. **STANDARD FOR REVIEW OF MOTION TO DISMISS**

The Defendants present a motion more properly labeled a Cross Motion for Summary Judgment than a Motion to Dismiss. Without acknowledging its heavy burden, the Government reduces its Rule 12(b)(6) argument to a mere seven lines of text. See Govt's Motion to Dismiss at 20. Moreover, the Government predicates its Rule 12(b)(1) argument on an incomplete recitation of facts as opposed to a focus on the facts plead by Novelty.

Under Fed. R. Civ. Pro 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction over the claims asserted. San Juan Audobon Society v. Veneman, 153 F.Supp. 2d 1, 7 (D.D.C. 2001) (citing District of Columbia Retirement Bd. v. United States, 657 F. Supp. 428, 431 (D.D.C. 1987)). The level of proof required is only a preponderance of the evidence. Government of Rwanda Working Group, 150 F.Supp. 2d 1, 4 (D.D.C. 2001). If a motion challenges subject matter jurisdiction, this Court must accept the Complaint's well-pled factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor. Id. (citing United Trans. Union v. Gateway Western R.R. Co., 78 F.3d 1208, 1210 (7th Cir. 1996). A federal question confers subject matter jurisdiction on this court. See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of United States"); see also A.E. Finley & Associates, Inc. v. U.S., 898 F.2d 1165, 1167 (6th Cir. 1990) (Administrative Procedure Act waives sovereign immunity under § 1331). Each of Novelty's causes of action and requests for relief arise directly under federal law and are subjects fit for review by this

court.  Review of this DEA non-final agency action in district court is expressly provided

for in 21 U.S.C. § 824(d) and in apposite, controlling precedent.  Moreover, as explained

below, Novelty's claims are appropriate in this Court and not the Court of Appeals.

A court may dismiss a complaint for failure to state a claim only when no relief

could be granted under any set of facts consistent with the allegations.  See Woodruff v.

DiMario, 197 F.R.D. 191, 193 (D.D.C. 2000) (citing Hishon v. King & Spalding, 467

U.S. 69 (1984)).  This Court is bound to accept as true all well-pled allegations of fact,

excluding those that are overbroad and unsupported by specific factual averments.  Id.

(citing Pitney Bowes v. United States Postal service, 27 F.Supp. 2d 15, 19 (D.D.C.

1998)).  The Court should draw all reasonable inferences in the nonmovant's favor.

Woodruff, 197 F.R.D. at 193 (citing Judicial Watch v. Clinton, 880 F.Supp. 1, 7).  The

Rule 12(b)(6) motion tests whether the plaintiff has properly stated a claim, not whether

it will prevail on the merits.  Id.  Therefore, only a short statement of the claim and the

ground upon which it rests is required to survive a motion to dismiss under Rule 12(b)(6).

See Fed. R. Civ. Pro 8(a) (2) (a pleading that states a claim for relief must contain only a

"short and plain statement of the claim showing that the pleader is entitled to relief").

### B.  DEFENDANTS' MOTION EXCEEDS THE BOUNDS OF A MOTION TO DISMISS AND INCLUDES IMPROPER ARGUMENT BASED ON MISLEADING, INCOMPLETE FACTS

In its motion, the Defendants misstate the facts.  See Govt's Motion to Dismiss at

4-7.  In a section dedicated to its Rule 12(b)(1) argument on jurisdiction, the Defendants

rely on those misrepresented facts to suggest Novelty's motion fails to present a "a

substantial question of federal law."  Id. at 16.  That unseemly practice fails to satisfy the

standard of review.  By arguing its own interpretation of fact, the Defendants ask this

Court to draw reasonable factual inferences against Novelty, the nonmovant.  That is in direct contradiction to established precedent.  Woodruff, 197 F.R.D. at 193 (inferences in motion to dismiss must be drawn in favor of nonmovant).  Examination of the Defendants' attached affidavits in support of its statement of facts reveals the motion depends on argument over fact, more appropriately considered within the context of a motion for summary judgment.  The affidavits advance the Defendants' interpretation of facts which is a misinterpretation conflicting not only with the factual record, with DEA's own witnesses (including Barnhill) but also with the factual findings of the DEA Administrative Law Judge.  None of those documents were of course a part of Novelty's complaint or past pleadings.

Even were the Defendants' practice proper in a motion to dismiss, the Defendants' interpretation of the facts misleads.  In support of its assertions, the Government presents a declaration from DEA Diversion Investigator Lisa Barnhill.  DI Barnhill testified in the administrative hearing concerning her role in the audit at Novelty's headquarters.  See Transcript at 1163-1219 (Attached as Exhibit 1).  Thus, Barnhill had an earlier opportunity to explain the circumstances of the audit while subject to cross examination.  At hearing, Barnhill testified that Novelty did give DEA agents the documents they requested.  See T. at 1180-81 (Exhibit 1).  She now contradicts herself in the affidavit supplied by Defendants to the Court.  Now, for the first time in her affidavit, Barnhill alleges falsely that Novelty was uncooperative, a charge that is wholly unsupported by the ALJ's factual findings.  Compare ALJ Decision at 60-65 ("The Respondent had the data requested, but the time constraints for production were unrealistic. . . Ultimately, the Respondent provided the DEA with all of the information it

requested") <u>with</u> Barnhill Declaration at ¶ 33 ("Plaintiff's representatives continued to fail to provide investigators with all the requested records"), ¶ 35 ("Plaintiff's representatives also failed to provide. . .").

In fact, the record demonstrates that while Novelty executives did provide information from their files that contained codes, they repeatedly changed computer programming to supply DEA with precisely what it requested. <u>See</u> ALJ Decision at 61-62 and ¶235 (stating, "Ultimately, the Respondent provided the DEA with all of the information it requested" and "The Respondent had the data requested, but the time constraints for production were unrealistic, given the volume of the documents to be produced"). The Government's motion, however, misleads this Court into believing Novelty was uncooperative when, in fact, the record reveals that DEA did receive all of the documents requested, just not within the unreasonable deadlines originally set. <u>See</u> ALJ Decision at 63, ¶ 241.

Notably absent from the Government's motion and Barnhill's Declaration is any mention of the abusive, coercive behavior employed by Barnhill and her co-agents Meador and Kuzma against Novelty during the administrative search that created a hostile environment necessitating the video record. The ALJ found:

> On the third day of the inspection, Mr. Polk met with DI Kuzma, DI Barnhill, and DI Meador. DI Barnhill advised Mr. Polk that she believed the documents provided had been "scrubbed," and that such conduct constituted impeding a federal investigation, for which he could be arrested and charged. DI Barnhill showed Mr. Polk a provision of the Code of Federal Regulations at that time. . . Mr. Polk credibly testified that he did not believe that there was a basis to arrest him. . .
>
> DI Barnhill then requested 12,000 additional pages of documents, and she gave Mr. Polk three hours to produce them. Although physically impossible to accomplish, Mr. Polk believed that he would be arrested if he did not meet the DEA's deadline.

<u>See</u> ALJ Decision at 62-63, ¶¶ 237, 239.

It was in an environment of unlawful coercion and cajolery that Novelty determined a video record was necessary to memorialize the events that foreshadowed an arrest. <u>See</u> ALJ Decision at 63, ¶ 242 (Ryan Polk testified that "I wanted to have some proof or documentation that what was happening was exactly what was ultimately going to come out about what happened that day was truthful. (sic). I felt the best way to do that would be to document that through some form of media").

In its motion, the Government misconstrues Novelty's efforts to record their meetings with DEA as an attempt to record deliberations among the DEA agents. To the contrary, the record demonstrates that Novelty executives routinely held meetings with the agents in the conference room and sought to record those meetings. <u>See</u> ALJ Decision at 63 ¶ 243 ("The conference room was allocated as the working location for DEA personnel during the inspection, and it also served as the meeting room when the Respondent's personnel met with the DEA personnel"). Novelty executives would periodically meet and discuss document requests with DEA in the conference room. <u>See</u> Transcript at 2224-25 (Testimony of JR Merlau); <u>but see</u> ALJ Decision at 63-64, ¶¶ 245-49 (indicating that no meeting occurred between the time DEA refused Novelty the right to video tape and when Polk met with DEA later that day). Mr. Merlau testified that

> I mean, we were trying to be cooperative, which meant that sometimes Ryan would be meeting with the DEA employees to provide them other things that they've asked for. Other times, I was doing it, as we were trying to move through as fast as we could with this process. I mean, when the tape recording and the video taping was refused, we wound up, at least for some sort of protection, deciding that the both of us needed to go in together and talk to them together, I mean just because that was the only way that we could have any sort of documentation.

<u>See</u> Testimony of JR Merlau at 2224-25 (Attached as Exhibit 1).  After DEA refused

Novelty the right to video or audio record, Mr. Polk in fact met with DEA agents in the

conference room to discuss issues concerning the search warrant.  <u>See</u> ALJ Decision at

63, ¶ 240.  Mr. Polk testified that he wanted the protection of a record during that meeting

but was denied that right.  <u>See</u> Testimony of Ryan Polk at 2021-22 (Exhibit 1) (stating "I

wanted to have it on.  I wanted to have it on when I went into the room at 5:00 p.m. or

5:30 p.m for our next meeting").

Therefore, by suggesting Novelty had an interest in recording only DEA

deliberations, the Defendants mislead this Court and falsely represent the factual record.

Moreover, the recording equipment was overt, visible to all, inside the conference room.

The agents thus always possessed the simple expedient of walking outside the conference

room if, indeed, they wished to share confidences.  The argument that private

deliberations were invaded is a <u>post hoc</u> rationalization that rests on illogic and

supposition (the Defendants, in the first instance, offer no proof of that confidential

discussions were had and, in the second, no proof to establish that such discussions could

only take place in Novelty's conference room).

The Defendants' misinterpretation of fact provides nothing more than a dispute as

to the merits of the claim, not a basis for 12(b)(1) or (6) dismissal.  Therefore, the

Defendants' arguments belie their contention that Novelty failed to state an actionable

claim.  This Court should therefore deny the Defendants' Motion to Dismiss.

8

C. **THIS COURT HAS JURISDICTION OVER ALL OF NOVELTY'S CLAIMS**

1. **Jurisdiction of Claims Under 21 U.S.C. § 824(d)**

This Court has jurisdiction over Novelty's claims pursuant to 21 U.S.C. § 824(d) and this Court's apposite, controlling precedent. The Defendants' argument depends on ignorance of the statutory law and of this Court's controlling precedent. Defendants conclude erroneously that the controlling precedent of this Court is superseded (something not apparent from a Sheppardization of the cases and based on a misrepresentation of the only case cited by Defendants in support of that proposition). Against the controlling precedent, Defendants also conclude that Congress did not intend for an action in the district courts under 21 U.S.C. § 824(d). Both of those arguments lack a precedential foundation. Accordingly, this Court should find jurisdiction properly exists in the district courts under Novelty's narrow cause of action.

In 21 U.S.C. § 824(d), Congress confined DEA to a strict standard. Absent proof that continued registration presents an "imminent danger to the public health or safety," DEA is not authorized to suspend a DEA registrant's registration before a hearing. See 21 U.S.C. § 824(d). When DEA proceeds under Section 824(d), it suspends a registration without providing a hearing otherwise required by Due Process or an opportunity for the registrant to prove DEA's allegations lack merit. C.f. 21 U.S.C. § 824(c) (articulating ordinary process before revocation: "Before taking action pursuant to this section. . . the Attorney General shall serve upon the applicant or registrant an order to show cause why registration should not be denied, revoked, or suspended") (emphasis added). The pre-hearing deprivation puts a registrant out of business until a final order issues from the Administrator. That end of business continues oftentimes more than one calendar year

9

from the date an order to show cause issues until the Administrator issues a final

decision.  In Novelty's case, the period promises to be longer than nine months.  Not

many companies can survive a loss of one year's business and remain solvent.

Therefore, the grave constitutional implications inherent in an immediate

suspension compelled Congress to include a preliminary burden that DEA has to satisfy

before it suspends a registration.  See Norman Bridge Drug Company v. Banner, 529

F.2d 822, 828-29 (5th Cir. 1976).  The language, "or dissolved by a court of competent

jurisdiction," is Congress's command to the agency that Section 824(d) will not permit an

immediate suspension without the statutory proof required:  "imminent danger to the

public health or safety."

The Defendants are first mistaken that Congress intended for jurisdiction only in

the Court of Appeals.  See Govt's Motion to Dismiss at 8.  Section 877, miscited by

DEA, addresses only "final determinations, findings and conclusions of the Attorney

General."  21 U.S.C. § 877 (emphasis added).  An immediate suspension is an

interlocutory order issued long before a final determination on the merits of revocation

under 21. U.S.C. § 824(a).  Notice that Congress specifically named the U.S. Court of

Appeals in the statutory text of Section 877.  See 21 U.S.C. § 877 ("any person aggrieved

by a final decision of the Attorney General may obtain review of the decision in the

United States Court of Appeals for the District of Columbia or for the circuit in which his

principal place of business is located") (emphasis added).

The proper question, then, is why Congress did not also identify the Circuit

Courts as the proper forum in Section 824(d).  If the Defendants' argument is correct,

Congress would have written Section 824(d) to read:  "unless sooner withdrawn by the

Attorney General or dissolved by the U.S. Court of Appeals for the District of Columbia or by a circuit in which the registrant's principal place of business is located." C.f. 21 U.S.C. § 824(d). But Congress chose otherwise. Congress's choice of the actual language "by a court of competent jurisdiction" demonstrates its intent to permit review in the district courts and that, in fact, is what the precedent of this Court holds. See Norman Bridge, 529 F.2d at 823-24 ("the plain language of this section means that one faced with becoming the victim of the harsh expedient of suspension without prior notice may resort to the appropriate district court in search of appropriate relief") (emphasis added); see also Neil Laboratories, 217 F.Supp. 2d 80, 84 n.6 (D.D.C. 2002) (confirming that Norman Bridge is the law of this Court).

The Defendants next argue that "there is not even an allegation—let alone evidence—that the statutory procedures" for administrative review under Section 824 are inadequate. Govt's Motion to Dismiss at 10. The argument is incompetent because the direct statutory provision on point, 21 U.S.C. § 824(d), contemplates appeal to this court before administrative remedies are exhausted. See Norman Bridge, 529 F.2d at 828-29. Moreover, the Defendants ignore the breadth of evidence Novelty has submitted that demonstrates irreparable harm resulting from the immediate suspension. That extreme economic and reputational harm is the very reason Section 824(d)'s procedures would be inadequate without statutory provision for immediate appeal to the district court. In light of the immediate suspension, it would be grossly inequitable and unconstitutional to permit DEA to run an entity out of business while the company plodded through the cumbersome administrative process. That reasoning against delaying resort to the district court is memorialized in apposite precedent:

> The appellants fail to notice that what we have in this case is a statutory scheme specifically mandated by Congress.  Apparently in an effort to preserve the constitutional safeguards with reference to the seizure of property or the deprivation of professional status without notice, Congress was careful to prescribe two requirements for the suspension of registration and the seizure of property without notice, 21 U.S.C. § 824. Such a suspension, or such a seizure, may be invoked only to avoid imminent danger to the public health and safety.  In the absence of that factor there can be no suspension and no seizure without notice and an opportunity to be heard.  Moreover, when such action is taken, it survives only so long as it goes undissolved by a court of competent jurisdiction.

Norman Bridge, 529 F.2d at 828-29.

Second, the Defendants are incorrect in arguing that "there is no reason to believe . . . that the courts of appeals would be unable to grant Novelty the relief it seeks." Govt's Motion to Dismiss at 10.  The U.S. courts of appeal lack jurisdiction over Novelty's claims under Section 877 because Novelty does not challenge a final agency action.  The U.S. courts of appeal are  ill-equipped to handle the cause of action under Section 824(d) because they depend on the construction of  a factual record.  That factual record is necessary for a ruling on the preliminary injunction because litigants generally lack the benefit of the administration's reasoning before a suspension order issues.  See Easy Returns Worldwide,  Inc. v. U.S., 266 F.Supp. 2d 1014, 1016 n.1 (E.D.Mo. 2003) (Section 824(d) action where the district court based its decision in part on the testimony presented at hearing).  Without the ability to function as a trial court, the appellate court would be forced to examine only the agency's baseline accusations which, as demonstrated in the matter *sub judice*, reveal nothing of the untruth behind DEA's charges.  Therefore, even if the U.S. Courts of Appeal had jurisdiction over Novelty's claims (which they do not), they could not properly adjudicate the matter in the first instance.

Third, the Defendants are entirely incorrect in their argument that apposite, controlling precedent is somehow overruled by <u>John Doe, Inc. v. DEA</u>, 484 F.3d 561 (D.C. Cir. 2007). The Defendants argue, "the D.C. Circuit expressly rejected the various rationales district courts had offered for exercising jurisdiction to review DEA determinations under the CSA." Govt's Motion to Dismiss at 13. That argument is fiction. <u>John Doe</u> neither addresses actions under Section 824(d), nor overrules <u>Neil Laboratories</u>. <u>See</u> <u>John Doe, Inc.</u>, 484 F.3d at 568-70. Significantly, the <u>John Doe</u> court analyzed an attempt to draw a <u>final</u> agency action outside the purview of Section 877 into the district courts. <u>See</u> <u>Id.</u> at 568 (stating, "Having concluded the DEA's permit denial was sufficiently final to permit judicial review, we must still decide where jurisdiction properly lies. . ."). In fact, <u>Doe</u> involved a permit denial where the plaintiff waived his administrative remedies and thus challenged a final administrative order that fell squarely under Section 877, and had nothing to do with Section 824(d) here in issue. <u>Id.</u> at 564-65. Doe argued his claim should be considered in the district court because "there is a sphere of DEA activity that falls within APA's 'final agency action,' but outside § 877's 'final determinations, findings, and conclusions.'" <u>Id.</u> at 568. The Court there had little difficulty holding that final orders are reviewable by statutory fiat only in the U.S. courts of appeal. <u>Id.</u> at 569. Consequently, the Defendants predicate their entire flawed argument on one inapposite case.

Not only did <u>Doe</u> fail to renounce actions in the district court under Section 824(d), it never mentioned them. <u>Id.</u> at 568-70. Indeed, the holding in <u>Doe</u> has no bearing whatsoever on the rationale provided in <u>Norman Bridge</u> and <u>Neil Laboratories</u> that advocated district court review of an immediate suspension. <u>See</u> <u>Norman Bridge</u>,

13

529 F.2d at 828-29; <u>Neil Laboratories, Inc. v. Aschroft</u>, 217 F.Supp. 2d 80, 84-85

(D.D.C. 2002) (adopting <u>Norman Bridge</u> holding on jurisdiction). <u>Norman Bridge</u>, and

later <u>Neil Laboratories</u>, address the very specific, unique district court challenge under

the statutory language of 21 U.S.C. § 824(d). In <u>Neil Laboratories</u> this Court found

jurisdiction existed for Novelty's cause of action. See <u>Neil Laboratories</u>,217 F.supp. 2d

at 84. n.6. This Court unequivocally stated

> Generally, the disputed agency action must be "final agency action." 5
> U.S.C. § 704. This requirement however, may be avoided when "review
> is sought . . . pursuant to specific authorization in the substantive statute. .
> ." <u>Id</u>. **This court agrees with the Fifth Circuit's determination that**
> **the plain language of the CSA signifies that a registrant subject to**
> **immediate suspension of registration may seek judicial review by a**
> **district court before the suspension order becomes final.** 21 U.S.C. §
> 824 (d) (providing that a court of competent jurisdiction may dissolve a
> suspension order); <u>Norman Bridge Drug Co. v. Banner</u>, 529 F.2d 822,
> 823-24 (5th Cir. 1976). Thus, the court has authority to review the agency
> action although it is not final agency action.

<u>Neil Laboratories</u>, 217 F.Supp. 2d at 84 n.6 (internal citations included: emphasis

added).

## 2.  **Jurisdiction for Novelty's First Amendment Claims**

The Defendants argue that Novelty's First Amendment claims are improperly

before the Court under 28 U.S.C. § 1331. The Defendants believe Novelty's First

Amendment claims should be litigated first in the Administrative forum. See Govt's

Motion to Dismiss at 14-15. Ironically, DEA argued throughout the administrative

process that the administrative forum is not a proper venue for Novelty to present its

constitutional claims, but that, instead, the Courts were. See Transcript at 1130

(Argument from DEA Attorney Linden Barber) (Attached as Exhibit 1) (stating,

"[Novelty's] claims with regard to the First Amendment violations are matters that are

not properly before this Court and can be adjudicated and have their own remedy, and to

that extent those matters should be handled in other fora").  Thus, it is DEA's position

that Novelty's First Amendment claims should not be incorporated into the

Administrator's final order and, consequently, not considered by the Court of Appeals as

a part of the administrative decision and should not be reviewed directly in this Court.

By now suggesting Novelty's First Amendment claims are also inappropriate before this

Court, the Defendants are arguing that there is no forum for adjudication of Novelty's

First Amendment claim.

        Fortunately, Defendants are wrong.  It is well-settled that constitutional violations

by administrative agencies are immediately actionable in the federal courts without need

to exhaust administrative remedies.  See Sterling Drug, Inc. v. FTC, 450 F.2d 698, 710

(D.C. Cir. 1971) (exhaustion doctrine may be waived "where the agency has very clearly

violated an important constitutional or statutory right").

        The Defendants erroneously argue that the U.S. Court of Appeals could

eventually review Novelty's First Amendment theory under two separate standards.  See

Govt's Motion to Dismiss at 16 n.10 (stating "On a review of final agency action in the

D.C. Circuit, Novelty would only be able to prevail if it could show that DEA's findings

of fact were not supported by substantial evidence or if its reasoning were arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law").  The

Defendants simply apply the wrong standard.  This is a constitutional challenge

adjudicable under the First Amendment, not the APA.  See, e.g. Presbyterian Church v.

U.S., 870 F.2d 518, 523-25 (9th Cir. 1989) (allowing First Amendment claim to proceed

against various agencies in absence of final agency action).  Novelty claims DEA

violated its constitutional rights under the First Amendment to the United States Constitution.  If courts were handcuffed by the arbitrary and capricious APA standard on review of constitutional issues, the Bill of Rights would become a nullity.[1]  Courts are empowered under the Constitution to review constitutional issues wholesale.  Indeed, the DEA cannot escape constitutional scrutiny by hiding behind the APA's deferential standard of review.

The Government ultimately misses the crux of Novelty's First Amendment claim in the administrative forum.  Before the agency, Novelty argued the ALJ ought to exclude evidence as a result of First Amendment violations.  Now before this Court, Novelty seeks a declaratory judgment that the First Amendment was violated by the actions of the DEA agents.  Novelty's claim before this Court does not seek a ruling on the admissibility or weight of evidence but a substantive declaration of the violation of constitutional right by DEA.  At the administrative level, Novelty's First Amendment claim will not be factored when DEA determines whether Novelty's registration is in the public interest.  Absent review in this Court, there will be no lawful declaration of Novelty's constitutional right against imposition of a DEA prior restraint on speech.

There is no commensurate administrative remedy that can address the constitutional violations raised in Novelty's complaint.  Indeed, it is role of the federal judiciary, not the federal agencies, to interpret the Constitution.  See Spiegel, Inc. v. FTC, 540 F.2d 287, 294 (7th Cir. 1976) ("Generally, federal administrative agencies are

---

[1] In support of this standard, the Defendants cite Penick Corp., Inc. v. DEA, 491 F.3d 483, 488 (D.C. Cir. 2007).  While the Defendants cite this case in context of Novelty's First Amendment claim, Penick Corp. does not involve a constitutional challenge.  Id. at 488 (involving challenge under 21 U.S.C. § 823, and an improper burden-shifting claim arising out of an administrative adjudication).

without power or expertise to pass upon the constitutionality of administrative or legislative action"); <u>Finnerty v. Cowen</u>, 508 F.2d 979, 982 (2d Cir. 1974) ("Federal agencies. . . have neither the power nor the competence to pass on the constitutionality of administrative or legislative action"); <u>see</u> <u>generally</u>, <u>Marbury v. Madison</u>, 1 Cranch 137 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is"). The First Amendment violation at issue may have been temporally related to the events leading to the immediate suspension, but the issue of law is entirely independent of the issues of revocation now before the agency. Novelty asks this Court to determine the reach of the First Amendment in a pure analysis of constitutional law. That decision is far beyond the authority vested in the Drug Enforcement Administration.

### D. NOVELTY'S FIRST AMENDMENT CLAIM IS SUPPORTED BY FACTS AND APPOSITE PRECEDENT

Novelty has stated an actionable claim for relief on First Amendment grounds sufficient to withstand the Defendants' Motion to Dismiss. The Defendants argue that Novelty's First Amendment claim is "obviously frivolous" because Novelty is without the right to record "DEA deliberations." <u>See</u> Govt's Motion to Dismiss at 16-17. The notion that police actions on private property are "government deliberations" akin to those on government-owned public property is antithetical to the core values of the First Amendment and rejected by the federal courts. <u>See</u> <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 58 (1994) ("A special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to speak there"); <u>Stanley v. Georgia</u>, 394 U.S. 557, 564 (1969). The precedent plainly established the right of citizens to record actions of government agents on private property. <u>See</u> <u>Robinson v. Fetterman</u>, 378 F.Supp. 2d 534

17

(E.D.Pa. 2005) (First Amendment right to videotape police investigation from private land).

The Defendants completely ignore that Novelty intended to make a record of Novelty interactions with DEA agents. The Defendants incorrectly assume DEA agents possessed some heightened expectation of privacy within Novelty's office space. The Defendants argue, "[i]t is of no consequence that DEA deliberations in issue took place on Novelty property." Govt's Motion to Dismiss at 18. To the contrary, it is of great moment because the actions of law enforcement on private property are precisely those that implicate the First Amendment's checking value to the greatest extent. A central purpose of the First Amendment is to check government abuses by governmental men as well as governmental measures. See Vincent Blasi, The Checking Value in First Amendment Theory, 1977 Am. Bar Found. Research J. 521 (1977); ALEXANDER MEIKLEJOHN, POLITICAL FREEDOM: THE CONSTITUTIONAL POWERS OF THE PEOPLE (Greenwood Press 1979); William J. Brennan, Jr. The Supreme Court and the Meiklejohn Interpretation of the First Amendment, 79 Harv. L. Rev. 1 (1965); see also Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1184-86 (3d Cir. 1986) (discussing "checking value" of First Amendment); National Magazine v. U.S. Dept. of Defense, 762 F.Supp. 1558, 1572 (S.D.N.Y. 1991) (same); Herbert v. Lando, 441 U.S. 153, 185 n.4 (1979) (discussing application of "checking value"). That checking value rests at the core of the Amendment. See Blasi, supra. Unless we may record the actions of Government that directly affect our lives, we are denied information indispensable to protest ourselves from those actions, seek their reform, and expose abuses attendant to them. The power to check government abuse has long been recognized by our Supreme Court as vital to the

survival of a free state.  See Mills v. Alabama, 384 U.S. 214, 219 (1966) (stating "[T]he press serves and was designed to serve as a powerful antidote to any abuses of power by governmental officials . . . Suppression of the right of the press to praise or criticize governmental agents and to clamor and contend for or against change . . . muzzles one of the very agencies the Framers of our Constitution thoughtfully and deliberately selected to improve our society and keep it free").  The Defendants without aid of precedent attempt to trivialize this indispensable right.

DEA agents had no expectation of privacy on Novelty property.  If a Novelty employee overheard their "deliberations," nothing would prevent that employee from repeating the content of the conversations, and publishing them to the world, any more than if the receipt of such information occurred in a public street.  Similarly, there is no functional difference between repeating the statement and making a recording of the statement.

The Defendants err in their interpretation of the "dedicated onsite workspace."  Govt's Motion to Dismiss at 18-19.  This workspace was not promised to DEA for its exclusive use.  No such grant existed.  The record demonstrates that both DEA and Novelty employees frequented the room.  See ALJ Decision at 63, ¶ 243; Transcript at 2224-25.  In fact, the purpose of the conference room was for DEA to discuss with Novelty the type of records required and for DEA to review the records as Novelty employees brought them in.  The process was designed to be cooperative.  Accordingly, DEA cannot claim an entitlement to any degree of privacy within Novelty's headquarters.

In the presence of a warrant, Novelty executives were not at liberty to refuse the agents entry or access to documents.  The law consistently affords greater protection to

the activities of owners while on private property.  See, e.g., Welsh v. Wisconsin, 466

U.S. 740, 750 n.11 (1984) (Fourth Amendment affords greater protection to home in

context of warrantless searches).  "A special respect for individual liberty in the home has

long been part of our culture and our law; that principle has special resonance when the

government seeks to constrain a person's ability to speak there."  City of Ladue v. Gilleo,

512 U.S. 43, 58 (1994) (analyzing right to display political signs on private property)

(internal citations omitted).  "If the First Amendment means anything, it means that a

State has no business telling a man, sitting alone in his own house, what books he may

read or what films he may watch."  Stanley, 394 U.S. at 565 (discussing increased

protections of First Amendment in private space).  Although Novelty's business

headquarters is less private than one's home, it is more private than a public street corner

and yet the law has protected recording of government actions on public and private

properties.  See Robinson v. Fetterman, 378 F.Supp. 2d 524, 539 (E.D.Pa. 2005)

(videotape from private property); Smith v. City of Cumming, 212 F.3d at 1333 (public

property).   The public has an even greater need for transparency when agents encroach

on the boundaries of private property where their actions may occur without public

scrutiny.  Therefore, rights afforded citizens on a public highway must be no less than

equally applicable to Novelty executives on their own privately owned property when it

comes to the entry of government agents upon those private grounds to execute a warrant.

　　　　Apposite precedent demonstrates that Novelty has an actionable claim sufficient

to survive the Defendants' Motion to Dismiss.  See Robinson, 378 F.Supp. 2d 534.  As

Novelty fully stated in its earlier Motion for Summary Judgment on the First Amendment

issue, Robinson held that a citizen has an unequivocal right to videorecord government

activity under the First Amendment.  Id. at 538-39.  Although Robinson directly

addresses the very issue presented now before this Court, the Defendants relegate their

analysis of the case to a footnote.  See Govt's Motion to Dismiss at 19 n.11.  Without

providing any specific reason to doubt the applicability of Robinson, the Defendants

state, "Surely the Plaintiff can discern the enormous difference between videotaping

officials performing vehicle inspections (which presumably involves little or no

deliberation or consultation between officers) and videotaping police deliberations."  Id.

Surely Plaintiff cannot.  The need to check abuses, at the core of the First Amendment's

protections, exists in both contexts.  The police were not recorded in their squad cars, at

the police station, or in another location reserved by the state for inter-governmental

deliberations.  They were recorded during the execution of a law enforcement action

against a private citizen.  Likewise, here, the DEA agents were not to be recorded in their

vehicles, in their offices, or in any location reserved by the state for inter-governmental

deliberations.  They were to be recorded on private property during their execution of a

law enforcement action against Novelty.  Notably, the Defendants provide this Court with

no evidence that DEA agents actually shared any sensitive information while at Novelty,

or did anything beyond the routine act of issuing document requests and fishing for

evidence.  The agents did not discuss agency policy; they performed the routine tasks of

warrant execution.  The Defendants provide nothing to suggest DEA agents held

conversations that were any more sensitive than that of police officers consulting while

conducting routine examinations of cars.  See Robinson, 378 F.Supp. 2d at 539-41.  Both

scenarios involve normal functions of police agents in the field.  Most significantly,

however, the Defendants offer no argument suggesting DEA agents may prohibit video-

recording of public meetings held between Novelty executives and the agents.  Under no circumstances could these meetings be considered internal deliberations.

The <u>Robinson</u> court held that the plaintiff's motives for videotaping were irrelevant.  <u>Robinson</u>, 378 F.Supp. 2d at 541.  "<u>Although Robinson need not assert any particular reasons for videotaping the troopers</u>, he was doing so in order to make a visual record of what he believed was the unsafe manner in which they were performing their duties."  <u>Id.</u> (emphasis added).  In light of the court's decision in <u>Robinson</u>, it is absurd for the Defendants to advance an argument in a motion to dismiss that Novelty failed to state a First Amendment claim.  If anything, the Defendants' arguments attack the merits of Novelty's case and not the sufficiency of its complaint.

     E.   **NOVELTY'S CLAIM PRESENTS AN ACTUAL CONTROVERSY THAT IS REVIEWABLE UNDER THE DECLARATORY JUDGMENT ACT**

Novelty has an actionable claim under 28 U.S.C. § 2201 et seq.  Nevertheless, in its motion the Defendants argue that Novelty's injury cannot be redressed by its requested relief.  The Defendants' argument, which consumes all of eight lines of text, would gut the Declaratory Judgment Act.  28 U.S.C. § 2201 specifically permits jurisdiction where an "actual controversy" exists, "whether or not further relief is or could be sought."  In addition, "the mere fact that declaratory relief does not provide a coercive remedy is no reason to conclude that it will be ineffective."  <u>Alsager v. District Court of Polk County, Iowa</u>, 518 F.2d 1160, 1165 (8th Cir. 1975); <u>see</u> <u>also</u> <u>Public Service Commission of Utah v. Wycoff Co., Inc.</u>, 344 U.S. 237, 240 (1952) (the relief is available for a concrete case admitting of an immediate and definite determination of the legal rights of the parties).  Contrary to the Defendants' argument, declaratory relief may be

awarded even if there is no present right to consequential relief and no relief is sought

other than a declaration of the rights of the parties.  See Samuel Goldwyn, Inc. v. United

Artists Corporation, 113 F.2d 703, 707 (3d Cir. 1940) ("Where there is such a concrete

case admitting of immediate and definitive determination of the legal rights of the parties

in an adversary proceeding upon the facts alleged, the judicial function may be

appropriately exercised although the adjudication of the rights of the litigants may not

require the award of process or the payment of damages").

     Novelty alleges a concrete injury in the form of a constitutional deprivation of

First Amendment rights.  "The loss of First Amendment freedoms, for even minimal

periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S.

347, 373 (1976); see also Newson v. Norris, 888 F.2d 371, 378 (6th Cir. 1989) ("The

Supreme Court has unequivocally admonished that even minimal infringement upon First

Amendment values constitutes irreparable injury sufficient to justify [] relief").  Thus,

Novelty does not ask this Court to issue an opinion of an advisory nature.  Instead,

Novelty requests relief in the form of a declaration that resolves the legal rights of the

parties with respect to the First Amendment injury caused by DEA agents when they

imposed a prior restraint on Novelty's right to record their execution of a warrant on

Novelty's premises.  Moreover, the Declaratory Judgment Act provides for "[f]urther

necessary or proper relief based on a declaratory judgment or decree."  28 U.S.C. § 2202.

Therefore, Novelty's relief is not necessarily confined to the limits of the declaratory

judgment itself.  Novelty's requested relief resolves important legal rights applicable in a

situation likely to arise in the future as Novelty continues business in a regulated

industry.  Novelty presents before the Court an actual controversy capable of resolution through declaratory relief.  Accordingly, declaratory relief is proper.

## II.  CONCLUSION

For the foregoing reasons, the Defendants have failed to meet the high standard this Court imposes on movants under Fed. R. Civ. Pro 12(b)(1) and 12(b)(6).  The Defendants' motion is founded upon distortion and inapposite precedent.  Treating Novelty's well pled facts in its Complaint and filed pleadings as true, this Court has subject matter jurisdiction over Novelty's Complaint as it has stated actionable claims upon which relief can be granted.  Accordingly, Novelty respectfully requests that this Honorable Court deny Defendants' motion.

Respectfully submitted,

NOVELTY, INC.

By: _____/s/_____
        Jonathan W. Emord
        Andrea G. Ferrenz
        Peter A. Arhangelsky
        *Its Counsel*

Emord & Associates, P.C.
11808 Wolf Run Lane
Clifton, VA  20124
Ph:  (202) 466-6937
Fx:  (202) 466-6938
jemord@emord.com

Date submitted:  June 16, 2008

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NOVELTY DISTRIBUTORS, INC.,
D/B/A GREENFIELD LABS,

       Plaintiff,

  v.                                 No. CV-08-00635 (RMC)

MICHELE LEONHART,
In her official capacity as Acting Administrator
of the Drug Enforcement Administration, *et al.*,

       Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS**

**EXHIBIT 1:**

**Selected Transcript Pages from In re Novelty Distributors, DEA Docket No. 08-33**

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

```
þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ»
                    º
                    º
IN THE MATTER OF:   º
                    º   Docket No. 08-33
NOVELTY DISTRIBUTORS º
                    º
                    º
þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ¼
```

U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Thursday, March 27, 2008

     The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Page 940

TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

Vincent Tomei      943    957
Kimberly Rogers    972    981    988
Marie Gelin        991   1018   1032      1033
                                 1035
Voir Dire on page 1042

Madeline Kuzma    1049   1084   1110      1111
Lisa Barnhill     1120

EXHIBIT NO.           DESCRIPTION        MARK RECD
Government
4                                        1163 1166
27A   Hannaford Pharmacy Log Book            1044

20    Barnhill Declaration                   1123
30-33 Verification Documents             1192 1195
34    Report                             1167 1171
35    Sales Report                       1168 1170
36    Product List                       1171 1174
39-40                                         1220
47    Inventory Papers                   1177 1179

59    Log                                1054
60    Interview Questionaire                  1058
61    Interview Questionaire             1064 1075
69    Spreadsheet                        1188 1191
77    Log Books                          1048 1066

Administrative Law Judge

10    Respondent's Motion in Limine      1149
11    Government's Response to Motion    1149
      in Limine
12    Respondent's Motion to Suppress    1149
      Evidence During July 9, 2007
      Inspection

13    Respondent's Interlocutory         1150
      Appeal of the Order Denying
      the Motion to Exclude
      Government Counsel
14    Deputy Administrator's denial      1150
      of the interlocutory appeal

3b171aec-f2c4-456d-b92b-0e233a15f633

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 4 of 106

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER

Page 1125

1          A     It was issued, to the best of my

2     recollection, July 5th, and it was amended on

3     July 6th.

4          Q     All right, and now I want to show

5     you, first of all, Government Exhibit 4 on

6     pages 1 and 2.

7          A     Okay.

8                MR. EMORD:  Your Honor, we're just

9     going to enter our objection, and it may be

10     best to address the entire lot because

11     whatever Your Honor's ruling would be would

12     affect all of them.

13                JUDGE RANDALL:  All right.  Why

14     don't you identify for me what that lot

15     consists of --

16                MR. EMORD:  Thank you, Your Honor.

17                JUDGE RANDALL:  -- that is

18     encompassed in your objection?

19                MR. EMORD:  It's Government

20     Exhibit 4, Government Exhibit 30, Government

21     Exhibit 34, Government Exhibit 35, Government

22     Exhibit 36, Government Exhibit 37, Government

23     Exhibit 39, Government Exhibit 65, Government

24     Exhibit 66.

25                JUDGE RANDALL:  All right.  Just

3b171aec-f2c4-456d-b92b-0e233a15f633

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 5 of 106

Page 1126

1        one moment.

2                    (Pause in proceedings.)

3                    JUDGE RANDALL:  All right, Mr.

4        Emord.  You may be heard further.

5                    MR. EMORD:  Yes, Your Honor.

6        We've stated in our motion to suppress the

7        gist of the argument.  Let me just reiterate

8        in a succinct fashion.

9                    Under 5 USC Section 706.2(b), the

10       administrative agencies are prohibited from

11       taking actions which are contrary to

12       constitutional right.  Independent of 5 USC

13       Section 706, of course, is the person under

14       the Constitution which even were 5 USC Section

15       706  not directly applicable to the

16       administrative agencies, the Constitution

17       itself would be, and the First Amendment of

18       the Constitution, in particular.

19                    At the time of the administrative

20       warrant, as is stated in the motion to

21       suppress, there was an attempt to videotape

22       the progress of the execution of the warrant

23       and to do so at the Novelty plant in the

24       locations where the inspectors were.  In the

25       corner of the room was placed a tripod with a

3b171aec-f2c4-456d-b92b-0e233a15f633

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 6 of 106

Page 1127

1          video camera atop it.

2                    The inspectors, in particular,

3          Darrell Metter, removed the video camera from

4          the room, placed it outside the room, and

5          would not allow its use.  This occurred on two

6          occasions, and then on a third occasion an

7          audio cassette recorder was placed in the

8          room, and the audio cassette recorder was

9          dismantled with the cassette tape being

10         removed and the batteries of the cassette

11         recorder being removed by the DEA agents.

12                   It is an absolutely right under

13         the First Amendment to the Constitution that

14         one has the right to record the actions of

15         Government.  The checking value of the First

16         Amendment has historic roots, constitutional

17         roots.  The roots that here are in issue arise

18         from a prior restraint doctrine of the First

19         Amendment.  The Government may not deny you

20         the right to record its activities on your

21         premises, on your own property, restrain you

22         from allowing a record to be made, and that

23         constitutes a First Amendment violation.

24                   We've set forth the explanation of

25         that violation in the motion to suppress.  As

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 7 of 106

Page 1128

1          a consequence of the unconstitutional actions

2          associated with the inspection, the content

3          derived from the inspection, the

4          documentation, is tainted with this

5          unconstitutionality, and the use of it in this

6          proceedings should be -- it should be

7          suppressed because in response to the

8          constitutional violation that is entirely

9          appropriate, in light of the violation of the

10         Administrative Procedure Act and the First

11         Amendment, to deny the use of the ill-gotten

12         documentation in light of the constitutional

13         violation.

14                  It is particularly appropriate

15         here because in the course of executing the

16         warrant, we have identified certain specific

17         actions which we think are unreasonable and

18         exceed the statutory provision limitation on

19         reasonableness that allows the warrant to be

20         executed in the first place, both as to the

21         actual content of the warrant issued by the

22         court in Indiana and as to the statutory

23         provision which allows a warrant to be

24         executed.

25                  Both restrict an inspection to

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 8 of 106

Page 1129

```
 1          reasonable limitations on the use of the
 2          execution of the warrant.  We have identified
 3          a series of irregularities here, including a
 4          threat of arrest, including a demand of over
 5          12,000 pages of documents to be produced
 6          within a matter of hours, and the
 7          constitutional violation that we've just
 8          referred to.
 9                   In light of all of these factors,
10          which are laid out in the motion to suppress,
11          we move that the Court preclude the Government
12          from relying upon the fruit of that
13          inspection.
14                   JUDGE RANDALL:  Very well.  Mr.
15          Bayley, do you wish to be heard?
16                   MR. BARBER:  Your Honor, I will,
17          sine this is a motion to suppress, I know this
18          is Mr. Bayley's witness, but this is a matter
19          we briefed before, number one, and we do draw
20          Your Honor's attention to the brief that the
21          Government has filed in response to this.
22                   There are a number of things that
23          Your Honor should consider in your ruling.
24          Number one, the warrant was not facially
25          invalid and was issued by a federal magistrate
```

EXHIBIT 108 ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 9 of 106

Page 1130

1        judge, and with all due respect to the
2        authority of this Court over these
3        proceedings, it has no authority with regard
4        to the warrant issued by a federal magistrate
5        judge.
6                That said, certainly you can
7        determine what comes in or out of these
8        proceedings, and so we do acknowledge that.
9        However, Mr. Emord's claims with regard to
10       First Amendment violations are matters that
11       are not properly before this Court and can be
12       adjudicated and have their own remedy, and to
13       that extent those matters should be handled in
14       other fora.
15               With regard to the records that
16       Mr. Emord seeks to exclude, this is a matter
17       that is pending before this agency with regard
18       to the public interest with regard to
19       Novelty's registration, and in particular
20       matters that pertain to public health and
21       safety regarding the alleged diversion of
22       schedule listed chemical products.  In that
23       regard, Government Exhibit 4, which
24       Respondents seek to exclude is a record
25       required to be kept under the statute, and

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 10 of 106

Page 1131

1        thus even had DEA acted unreasonably, the
2        document would still be in the possession of
3        Novelty subject to inspection, copying by the
4        Enforcement Administration pursuant to the
5        warrant without regard to the manner in which
6        the warrant was executed.
7                    Number two, Government Exhibit 30,
8        also Government Exhibit 34 pertains to matters
9        that are covered within the face of the
10       warrant.  They are also records required to be
11       kept under the statute.  Even if DEA acted
12       unreasonably, these records would still have
13       to be maintained by Novelty and be free to be
14       discovered in the proper execution of the
15       warrant.
16                   Numbers 35 and 36 involve the
17       distribution of schedule listed chemicals,
18       records pertaining to schedule listed chemical
19       products, again, clearly within the face of
20       the warrant and records required to be kept by
21       this registrant under the statute which this
22       Agency enforces.
23                   The same is true with regard to
24       Item No. 37 and Government Exhibit 39,
25       Government Exhibit 65, shipping records to

3b171aec-f2c4-456d-b92b-0e233a15f633

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 11 of 106

Page 1132

1            North Carolina and Kentucky, and Novelty's

2            records showing distributions of ephedrine

3            allegedly not in blister packs.

4                     All of the records obtained are,

5            in fact, records that are either directly

6            required to be kept by statute and regulation

7            or they are records that bear upon an

8            investigation under the Controlled Substance

9            Act.  Therefore, the matters covered within

10           the face of the warrant which was properly

11           issued by a federal magistrate judge, these

12           matters should not be suppressed, and the

13           claim of First Amendment harm, as Mr. Emord

14           cited in his brief is properly taken in a

15           constitutional court, in the federal courts of

16           the United States, suppression of records

17           which are required to be kept or which

18           directly bear upon the investigation under the

19           Controlled Substances Act should not be

20           excluded from these proceedings, particularly

21           in light of the fact that these proceedings

22           are designed to determine whether the

23           continued registration of Novelty is

24           consistent with the public interest.

25                     MR. EMORD:  Can I be heard

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 12 of 106

Page 1133

1          further, Your Honor?

2                    JUDGE RANDALL:  Of course.  Just

3          one moment.

4                    Mr. Emord.

5                    MR. EMORD:  Yes, Your Honor.

6          First, a factual point of correction.

7          Government Exhibit No. 4 is not of Novelty's

8          creation.  It is the Government's own

9          creation.  The document bears the signature of

10         this witness, Lisa Barnhill and apparently of

11         Madeline Kuzma and is a Government generated

12         document, not a document generated by Novelty.

13                   Your Honor, in one of her earlier

14         orders in this case, passed upon the

15         demonstrative only precedent that we have,

16         Babcock and Wilcox Company v. OSHA, 610 F.2d

17         1128, 3rd Circuit, 1979, in which the Third

18         Circuit made clear that, to quote the Third

19         Circuit, "we think there are compelling

20         reasons for insisting that Fourth Amendment

21         claims for the suppression of evidence in OSHA

22         enforcement cases be tendered first to the

23         Commission rather than dealt in the first

24         instance by the court, allowing the agency to

25         correct the constitutional violation."

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 13 of 106

Page 1134

1              This agency, as all agencies of

2       the federal government, are bound, as is the

3       oath of the presiding officer, the oath of

4       each of the employees of the agency to adhere

5       to the restrictions of the Constitution of the

6       United States on the use of Government power

7       and the use of Government investigatory power,

8       and when those violations take place, it is

9       entirely appropriate for a forum before this

10      Agency that is being asked to receive the ill-

11      gotten gain of that investigation that did

12      result in this constitutional violation to

13      exclude it as an appropriate remedy for the

14      constitutional violation, and that power is

15      your power recognized in Babcock and Wilcox,

16      to the extent that the court there says that

17      constitutional violations are recognizable in

18      the forms inside the commissions.

19              And so it is that if this is

20      allowed and there is no sanction for the

21      misconduct, which is a constitutional

22      violation, it raises a question not only about

23      Wilcox, which in and of itself is the only

24      authority we have, and that from the Third

25      Circuit says the Constitution applies here as

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 14 of 106

Page 1135

1       one would expect and one would hope, and that

2       it is entirely your province to pass judgment

3       on the extent to which that constitutional

4       violation should result in the exclusion of

5       evidence, and in this case the suppression of

6       the evidence.

7                    As far as the legal requirement to

8       keep the documents, well, of course, there is

9       a legal requirement to keep the documents, but

10      that is not germane to the question of

11      admissibility in this case.  Yes, there is a

12      warrant that was executed.  The Government

13      contents it was lawfully executed.  If we give

14      them the benefit of the doubt and say that the

15      warrant was lawfully executed by the court, we

16      still have this problem.  There's a statutory

17      restriction on the use of a warrant to obtain

18      documents which says that it is limited to a

19      reasonable search.

20                   And the same is true.  The statute

21      requires that and the warrant itself requires

22      it, and the terms in issue, it's 21 USC 880,

23      directly applicable here, 880(b)(3)(B).  The

24      inspection is to be done within reasonable

25      limits and in a reasonable manner.

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 15 of 106

Page 1136

1              Well, reasonable limits must

2       necessarily include the constitutional limits

3       that are upon the officers of the Government.

4       Reasonable limits that they don't include the

5       constitutional limits upon the Government

6       would appear to be patentably unreasonable.

7              These officers are agents of the

8       Government who have sworn an oath to uphold

9       the constitution in what they do.  They must

10      be bound by that oath.  When they obtain

11      information during the course of investigation

12      which constitutional rights have been

13      violated, there must be some sanction for

14      that.

15             In this proceeding, the only

16      sanction available is the exclusion of the

17      evidence.  The exclusion of the evidence is

18      the most appropriate sanction because

19      otherwise we countenance the constitutional

20      violation.

21             Under the Fourth Amendment we also

22      have the requirement of a reasonable search

23      and seizure.  So the reasonable search and

24      seizure restriction, which comes from the

25      statute, from the Constitution, and is also

EXHIBIT 18-ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 16 of 106

Page 1137

```
 1        required to be adhered to by the

 2        Administrative Procedure Act section that we

 3        talked about which forbids the Agency to

 4        engage in action contrary to constitutional

 5        right provides us with the strongest possible

 6        basis to exclude this evidence, and it should

 7        be adhered to because the other argument to

 8        the contrary does not derive from the

 9        Constitution, is not predicated upon the

10        warrant as it has been argued, but rather is

11        an argument that goes not to the issue of the

12        execution of the warrant.  We're not before

13        the court in Indiana.  We're before Your

14        Honor.

15                   And Your Honor didn't issue the

16        warrant.  It's irrelevant.  What is relevant

17        is the admission of the evidence.

18                   Thank you, Your Honor.

19                   JUDGE RANDALL:  Thank you.

20                   Just one moment, please.

21                   (Pause in proceedings.)

22                   JUDGE RANDALL:  Mr. Barber, do you

23        wish to be heard further?

24                   MR. BARBER:  Yes, Your Honor.

25        Just briefly in light of Mr. Emord's raising
```

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER Page 17 of 106

Page 1138

```
 1        now the Fourth Amendment as well as the First
 2        Amendment issue.
 3                  First, we note there is no
 4        suppression remedy in this 880, the statute
 5        under which the warrant was issued.  We do not
 6        in any way deny this Court's authority to
 7        govern the proceeding and admission of
 8        evidence.  However, we note that there's no
 9        statutory authority for that.
10                  Secondly, we note the
11        Administrator's ruling on the interlocutory
12        appeal previously taken by Novelty, and
13        specifically with regard to Novelty's claim
14        that in that case Mr. Bayley, whom they sought
15        to exclude from these proceedings, counseled
16        a First Amendment violation.  The
17        Administrator specifically addressed the issue
18        and found that citing to a number of Agency
19        precedents, including the Harold Floyd Wright
20        matter, 50 Federal Register 24,329, and SJL
21        Drug Corp., 49 Federal Register 175; that the
22        exclusionary rule does not apply because the
23        proceedings are remedial in nature and exist
24        to protect the public interest.
25                  In those cases, although I have
```

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 18 of 106

Page 1139

1           not confirmed to a certainty, I believe in
2           those cases, Your Honor, the facts bear out
3           that the exclusionary rule that was sought was
4           sought under the Fourth Amendment for
5           violation of the Fourth Amendment.
6                   Notably, Mr. Emord decided no case
7           law that allows for the exclusion because of
8           a First Amendment violation.  He seeks to take
9           a Fourth Amendment exclusionary rule and apply
10          it to a First Amendment based on the assertion
11          that his client had a right to video-audiotape
12          agents in the execution of an administrative
13          agent's investigators in the execution of an
14          administrative inspection warrant.
15                  And whether or not that be true is
16          really not a matter for this Court whether
17          this client actually has that right, but in
18          order to exclude, you would first have to find
19          that his client had that right, once again,
20          well beyond the bounds of this body's
21          jurisdiction whose authority derives from the
22          Controlled Substances Act and the Code of
23          Federal Regulations delegated from the
24          Administrator, and so in order to exclude this
25          evidence, you would, indeed, have to find that

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 19 of 106

Page 1140

1          there was a First Amendment violation and that

2          exclusion was a proper remedy which would be

3          directly contrary to prior Agency rulings.

4                    We also note in this regard that

5          the case upon which the Respondent relies in

6          this matter, Babcock and Wilcox v. Marshall,

7          that it predates, indeed, is a Third Circuit

8          case from 1979, and predates rulings of the

9          Supreme Court of the United States,

10         specifically casting serious doubt on the

11         notion of whether the exclusionary rule

12         applies in administrative proceedings.

13                   And again, we direct Your Honor's

14         attention to the Administrator's denial of

15         Respondent's motion for interlocutory appeal

16         and citing to the case cited by the

17         Administration, Pennsylvania Board of

18         Probation and Parole v. Scott, which indeed

19         casts doubt on the exclusionary rule's use in

20         administrative proceedings.

21                   For all of these reasons, the

22         Government believes that the appropriate

23         sanction in this matter is not exclusion of

24         the evidence, and we ask Your Honor to deny

25         the motion to suppress.

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER    Page 20 of 106

Page 1141

 1                    MR. EMORD:  May I be heard one

 2      more time, Your Honor?

 3                    JUDGE RANDALL:  Yes, just one

 4      moment.

 5                    MR. EMORD:  Thank you.

 6                    (Pause in proceedings.)

 7                    JUDGE RANDALL:  Yes, Mr. Emord,

 8      you may be heard.

 9                    MR. EMORD:  A factual point of

10      correction is that the tripod for videotaping

11      was in place in the room before the agents

12      arrived, and that's just one point.

13                    The notion that administrative

14      agencies may apply the Constitution, in

15      particular, the First Amendment of the United

16      States is addressed in the Syracuse Peace

17      Council case before the Federal Communications

18      Commission in which the Federal Communications

19      Commission determined that because of the

20      First Amendment to the Constitution, it was

21      unable to enforce the fairness doctrine, which

22      was then an issue.  That is a case in the --

23      forgive me.  It was either in the '80s or

24      '90s.  We've got a citation for you for

25      Syracuse Peace Council.  It was affirmed by

EXHIBIT 08-ARGUMENT FROM ATTORNEYS EMFORD & BARBER  Page 21 of 106

Page 1142

 1          the United States Court of Appeals for the

 2          D.C. Circuit.

 3                    In particular, the Commission

 4          there held that they could not enforce to

 5          statutory provision under, well, the doctrine

 6          derived from the statutory provision in the

 7          Federal Communications Commission Act because

 8          of their oath of office.  They were sworn to

 9          uphold the Constitution of the United States.

10                    Independent of the exclusionary

11          rule, one has an obligation to adhere to the

12          Constitution by their oath of office.  Each of

13          the Commissioners there understood that their

14          oath of office was the predicate for acting to

15          prevent further enforcement under what was

16          then the fairness doctrine.

17                    Likewise, in this instance in the

18          presence of a constitutional violation, Your

19          Honor predicated on her oath of office can act

20          in like manner.  She need not rely upon the

21          exclusionary rule to suppress the evidence.

22                    Finally, Babcock and Wilcox is

23          applicable.  There is no case subsequent to

24          that case which calls into question the

25          precedent or otherwise modifies that precedent

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 22 of 106

Page 1143

1    with respect to the particular holding there

2    that the court there thought compelling

3    reasons for insisting that Fourth Amendment

4    claims for a suppression of evidence in OSHA

5    enforcement cases be tendered first to the

6    Commission.

7                Reference has been made to,

8    without specific identification of precedent,

9    to the Supreme Court disfavoring this

10   approach.  I'm unaware of any specific

11   precedent that would support the view that the

12   Supreme Court disfavored this approach, and I

13   should note that the appeal of the  Syracuse

14   Peace Council case affirmed by the D.C.

15   Circuit, we will check to see whether cert.

16   was denied in that case.

17                I've been informed that cert. was

18   denied in that case, although the denial of

19   cert. is not indicative of a holding.  Because

20   of the nature of the case, the importance of

21   it, and its significant extent, it is, I

22   think, indicative of the fact that a First

23   Amendment constitutional issue there, an issue

24   pertaining to the enforcement power of the

25   Federal Communications Commission was not

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 23 of 106

Page 1144

1       deemed worthy of review by the Supreme Court.

2                   The cite for the Syracuse Peace

3       Council case is 867 F.2nd 654.  It is a 1989

4       D.C. Circuit case on review of an order of the

5       Federal Communications Commission in which the

6       Federal Communications Commission determined

7       in no small measure based on the oaths of

8       office of the Commissioners that they lacked

9       the constitutional power to enforce an

10      unconstitutional doctrine or rule.

11                  That's all I have for the moment,

12      Your Honor.

13                  JUDGE RANDALL:  All right.  Just a

14      moment.

15                  (Pause in proceedings.)

16                  JUDGE RANDALL:  Mr. Barber,

17      anything further?

18                  MR. BARBER:  Very briefly, Your

19      Honor, we would simply note that as the case

20      cited by counsel recently is factually

21      distinguishable, there, if counsel's

22      representation is correct, it had to do with

23      Commissioners enforcing what was an

24      unconstitutional rule.

25                  Once again, in this case we're

EXHIBIT 18-ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 24 of 106

Page 1145

```
 1        dealing with allegations in this case of an
 2        alleged constitutional tort, not an
 3        unconstitutional rule, and the remedy sought
 4        here is exclusion when the appropriate remedy
 5        under the case law for First Amendment
 6        constitutional torts is action in the federal
 7        courts of the United States, and so we believe
 8        just based simply on counsel's representation
 9        that he made in his most recent presentation
10        about the facts of the Syracuse Peace Council
11        case, that it is inapplicable and should be no
12        basis for excluding the evidence.
13                  MR. EMORD:  One last time, Your
14        Honor?
15                  JUDGE RANDALL:  Yes, Mr. Emord.
16                  MR. EMORD:  Constitutional issues
17        have broad breadth as the precedent of the
18        Supreme Court well establishes.  The action or
19        inaction that results in constitutional
20        violations of such extreme import as our First
21        Amendment issues, even in the New York Times
22        v. Sullivan case, the courts undertook a very
23        rapid system of review in the context of a
24        prior restraint, this being a prior restraint,
25        to allow the case to reach the Supreme Court
```

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 25 of 106

Page 1146

1    on a very expedited basis in order for a
2    decision to be made.
3              Decisions that are made are
4    sweeping on First Amendment grounds, resulting
5    even in the invalidation of statutory
6    provisions, regulatory provisions, as was the
7    case in Syracuse Peace Council.  It was an
8    enforcement action by the agency holding a
9    party in violation of the fairness doctrine.
10   The Commission itself recognized that it had
11   a power to do that, but refused to exercise
12   the power on constitutional grounds.
13             There is no substantive matter
14   within which to distinguish an
15   unconstitutional action of government.  There
16   must be a consequence for the unconstitutional
17   actions of agents of the Government of the
18   United States.
19             In this case, the forum's only
20   recourse for the unconstitutional action lies
21   in the elimination of the opportunity to
22   present into evidence the documents obtained
23   during the unlawful execution of the warrant.
24   If the warrant had gone by without
25   constitutional violation, it would be another

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 26 of 106

Page 1147

1      thing.

2                This may be an issue of first

3      impression for this forum in that this forum

4      may not have previously been presented with a

5      constitutional violation during the execution

6      of the warrant.  If the Government chose to

7      present its case without reliance upon

8      documents obtained through the

9      unconstitutional warrant, from the

10     unconstitutional execution of the warrant, it

11     could do so, but it has chosen to rely upon

12     those very documents.  The response should be

13     appropriately to prevent the introduction of

14     that tainted evidence into the record.

15                Thank you, Your Honor.

16                JUDGE RANDALL:  Thank you.

17                MR. EMORD:  Oh, yes, Your Honor.

18     To cite the Syracuse Peace Council case before

19     the Commission, the Federal Communications

20     Commission, the cite is 52 Fed.Reg. 31768

21     (August 24th, 1987).

22                JUDGE RANDALL:  Very well.  I'm

23     going to take a short recess.  We are in

24     recess to be recalled I would expect in

25     approximately ten minutes.

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 27 of 106

Page 1148

1                        We're in recess.  Please carry on.

2                        (Whereupon, the foregoing matter

3                        went off the record at 2:51 p.m.

4                        and went back on the record at

5                        3:19 p.m.)

6                        JUDGE RANDALL:  We're on the

7        record.

8                        I have pending before me an

9        objection to the elicitation of the testimony

10       of the original Investigator Barnhill

11       concerning documents which have been marked as

12       Government's exhibits which the  Respondent

13       asserts have been procured in a process that

14       violated the Respondent's First Amendment

15       rights.

16                        First, I want to acknowledge that

17       I understand the Respondent's strong response

18       to the DEA actions as it perceives those

19       actions as they occurred in July of 2007.

20                        I also acknowledge that both

21       counsel put motions and briefs in in response

22       to this serious issue.

23                        In order to make a thorough record

24       so that should this issue become reviewed in

25       subsequently proceedings, I am going to mark

3b171aec-f2c4-456d-b92b-0e233a15f633

EXHIBIT 08 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 28 of 106

Page 1149

1          Respondent's Motion in Limine, filed on March
2          14th, 2008, as ALJ Exhibit 10.
3                              (Whereupon, the document
4                              referred to was marked
5                              as ALJ Exhibit No. 10
6                              for identification.)
7               JUDGE RANDALL:  The Government's
8          Response to the Motion in Limine, filed on
9          March 20th, 2008, as ALJ Exhibit 11.
10                             (Whereupon, the document
11                             referred to was marked
12                             as ALJ Exhibit No. 11
13                             for identification.)
14              JUDGE RANDALL:  Respondent's
15         Motion to Suppress Evidence During July 9,
16         2007 Inspection, filed on March 20th, 2008,
17         will be marked as ALJ Exhibit 12.
18                             (Whereupon, the document
19                             referred to was marked
20                             as ALJ Exhibit No. 12
21                             for identification.)
22              JUDGE RANDALL:  The Respondent's
23         Interlocutory Appeal of the Order Denying the
24         Motion to Exclude Government Counsel will be
25         marked as ALJ Exhibit 13.

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER   Page 29 of 106

Page 1150

```
 1                           (Whereupon, the document
 2                           referred to was marked
 3                           as ALJ Exhibit No. 13
 4                           for identification.)
 5                JUDGE RANDALL:  Which will give
 6        context to then the Deputy Administrator's
 7        denial of the interlocutory appeal, which will
 8        be marked as ALJ Exhibit 14.
 9                           (Whereupon, the document
10                           referred to was marked
11                           as ALJ Exhibit No. 14
12                           for identification.)
13                JUDGE RANDALL:  I find that
14        consistent with the Deputy Administrator's
15        denial of the interlocutory appeal and the
16        final order cited therein that the Drug
17        Enforcement Administration has previously held
18        that the exclusionary rule does not apply
19        because the proceedings, and I'm quoting, "are
20        remedial in nature and exist to protect the
21        public interest."
22                     In light of the fact that this
23        Agency's current position is that the
24        exclusionary rule does not apply, I therefore
25        am bound by these final orders and do not have
```

EXHIBIT 18 - ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 30 of 106

Page 1151

 1          the authority to grant the exclusion requested

 2          by the Respondent in this matter in their

 3          Motions to Suppress.

 4                    Next, the Respondent cites to a

 5          case they titled the Syracuse Peace Council

 6          and have given me the citation of 867 F.2d

 7          654, D.C. Circuit (1989).  In my reading of

 8          that case, I find that case is applicable to

 9          the proceeding before the FCC and in the

10          posture of that proceeding and the doctrines

11          binding that particular administrative agency.

12          I do not see, absent any further briefing, the

13          applicability of that case to the matters

14          pending before me.

15                    Therefore, I will not rely on my

16          duty as encompassed in my oath of office to

17          uphold the Constitution for I do not see that

18          this matter rises to that level in the current

19          posture that it is in before me based on the

20          record before me at this time.

21                    Therefore, I'm going to deny the

22          Respondent's motion, and I'm going to allow

23          the testimony to proceed.

24                    MR. EMORD:  Your Honor, we would

25          like to move for the opportunity to appeal

EXHIBIT 18 ARGUMENT FROM ATTORNEYS EMORD & BARBER  Page 31 of 106

Page 1152

```
 1          through the Agency's interlocutory appeal
 2          process under 21 CFR 1316.62, to have the
 3          Administrator address the question directly.
 4          As Your Honor noted in her decision, Your
 5          Honor felt bound by the order of the
 6          Administrator on the earlier motion to exclude
 7          counsel, and we think in light of the
 8          recognized gravity of the matter, as Your
 9          Honor also identified in her order, that we be
10          afforded the opportunity to present the
11          question directly to the Administrator before
12          further evidence is adduced from this witness.
13                    (Pause in proceedings.)
14                    JUDGE RANDALL:  Does the
15          Government wish to be heard concerning the
16          Respondent's request to take an interlocutory
17          appeal of this ruling and to stay this
18          proceeding pending the ruling on that
19          interlocutory appeal?
20                    MR. BARBER:  May I have a moment
21          to confer with co-counsel, Your Honor?
22                    JUDGE RANDALL:  Certainly.
23                    MR. BARBER:  And before we
24          respond, I would ask clarification.  Your
25          Honor posed the question to the Government in
```

Page 1163

```
 1                        (Whereupon, the

 2                        aforementioned document

 3                        was marked for

 4                        identification as

 5                        Government's Exhibit

 6                        Number 4.)

 7               BY MR. BAYLY:

 8        Q     First of all, tell us what the

 9    first two pages of this exhibit are.

10        A     The first two pages is a physical

11    inventory count of 20 products that we audited

12    during our inspection of Novelty Distributors.

13    This inventory contains an initial inventory,

14    which was obtained through Novelty records on

15    12-25-05, close of business, and then the

16    closing inventory, which was a physical count

17    taken by both DEA investigators and Novelty

18    employees.  That count was taken July 9th,

19    2007.  And we counted it as the close of

20    business.

21               During this time period, the

22    closing inventory actually took us a day and

23    a half to complete the count, but nothing was

24    shipped during the time we were counting the

25    inventory.  So that's why we stick with the
```

1        July 9th date.

2                    BY MR. BAYLY:

3        Q       COB?

4        A       Close of business, yes.

5        Q       Now, the government exhibit 4,

6    pages 1 and 2, is this inventory certified by

7    anybody?

8        A       Yes.  Myself and Madeline Kuzma,

9    investigators of the Drug Enforcement

10   Administration, signed it as well as a Novelty

11   representative, Ryan Polk, who is the Chief

12   Financial Officer of Novelty.  In fact, he was

13   one of the persons assisting in the physical

14   count.

15       Q       Did he certify both the initial

16   and closing inventory as it's depicted on

17   pages 1 and 2 of government exhibit 4?

18       A       Yes, he did.

19       Q       And did he enter these

20   certifications on both pages 1 and 2?

21       A       Yes, he did.

22       Q       And these substances that you

23   audited, generally what are they?

24       A       All 20 substances were List I

25   chemicals.

Page 1165

1      Q      And particularly generally which

2      ones, List I chemicals?

3      A      Primarily ephedrine products.

4      Q      Any pseudoephedrine?

5      A      Yes, there is some

6      pseudoephedrine.

7      Q      Now, page 3, can you tell us what

8      this document is?

9      A      Page 3 is what we call a

10     computation chart of all 20 products that were

11     audited.  And it depicts the inventories with

12     the receipts, sales, any returns that might

13     have occurred.  Basically it accounts for

14     anything coming into the company and going

15     out. And the final columns are a difference

16     and then the percentage of difference.

17     Q      Now, were pages 1 and 2 of

18     government exhibit 4 used in order to make the

19     computation chart for this audit?

20     A      Yes, they were.

21            MR. BAYLY:  Your Honor, I would

22     like to admit government exhibit 4.

23            MR. EMORD:  Is there a motion

24     pending for admission of evidence, Your Honor?

25            JUDGE RANDALL:  There is a motion

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1166

1          to admit government exhibit 4.

2                      MR. EMORD:  No objection.

3                      JUDGE RANDALL:  All right.  Just

4          one moment.

5                      (Pause.)

6                      JUDGE RANDALL:  I accept into

7          record government exhibit 4.

8                              (Whereupon, the

9                              aforementioned document,

10                             having previously been

11                             marked for

12                             identification as

13                             Government's Exhibit

14                             Number 4, was received

15                             in evidence.)

16                     MR. BAYLY:  All right.

17                     BY MR. BAYLY:

18         Q      Before I get into the explanation

19         or requesting you, Investigator Barnhill, to

20         explain this computation chart on page 3 of

21         government exhibit 4, I first want to have you

22         take a look at government exhibit 34.

23                             (Whereupon, the

24                             aforementioned document

25                             was marked for

Page 1167

1                        identification as

2                        Government's Exhibit

3                        Number 34.)

4               THE WITNESS:  Okay.

5               BY MR. BAYLY:

6          Q     And would you please tell us what

7     this document represents?

8          A     This document is a three-page

9     report printed by Novelty regarding the 20

10    items that were audited.  And it reflects who

11    they purchased these products from.  And these

12    sheets identify five different companies which

13    they purchase products -- from which they

14    purchase.  And it has -- it is delineated by

15    product code, the quantity received, the

16    transaction date, and from whom they purchased

17    the chemicals from.

18         Q     Now, are these required records?

19         A     This particular document is not.

20    It's a summary of what they purchased during

21    the audit period.

22         Q     But did you use that document for

23    your audit and your computation chart in

24    government exhibit 4, page 3?

25         A     Yes, we did.

Page 1168

1          Q      And then I would like to refer you

2      to government exhibit 35.

3                              (Whereupon, the

4                              aforementioned document

5                              was marked for

6                              identification as

7                              Government's Exhibit

8                              Number 35.)

9                  THE WITNESS:  Okay.

10                 BY MR. BAYLY:

11         Q      Would you please explain what that

12     document is?

13         A      It's a 157-page document that

14     Novelty printed for the government.  It

15     depicts the sales of the 20 items that were

16     audited for or during the inspection period.

17     And it identifies the item -- among other

18     things, the item number, the quantity shipped,

19     the date shipped, and shipped to who, which

20     was a three-digit code.

21                 MR. BAYLY:  All right.  I would

22     like to move into evidence government exhibit

23     35.

24                 MR. EMORD:  And, Your Honor, I

25     should just say an abbreviated objection, the

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1169

1       same foundation as was earlier the basis for

2       Your Honor's ruling.  We'll just reserve that

3       objection for all exhibits previously

4       identified to the Court as government exhibits

5       for which we had an objection.  I don't want

6       to be disruptive by continuously objecting.

7                   JUDGE RANDALL:  Thank you.

8                   So I understand that the

9       respondent is preserving their objection,

10      which has been raised in the motions to

11      suppress that are in this record as

12      administrative law judge exhibits pertaining

13      to the admissibility of government exhibits 4,

14      34, 35, and those that have been previously

15      identified.

16                  MR. EMORD:  Yes, Your Honor.

17                  JUDGE RANDALL:  Is that correct?

18                  MR. EMORD:  Yes.

19                  JUDGE RANDALL:  Thank you.  I

20      appreciate that, Mr. Emord. However, I will

21      continue to overrule the objection, and I will

22      admit into the record government exhibit 35.

23                               (Whereupon, the

24                               aforementioned document,

25                               having previously been

Page 1170

1                          marked for

2                          identification as

3                          Government's Exhibit

4                          Number 35, was received

5                          in evidence.)

6              MR. BAYLY:  And I would also move

7      to admit 34.

8              JUDGE RANDALL:  I have a question,

9      a voir dire question, about 34 that I need to

10     ask before I rule on the admissibility of 34.

11     I'm sorry.  Diversion Investigator Barnhill,

12     I didn't quite catch the source of the

13     information in government exhibit 34.

14             THE WITNESS:  We asked to see

15     receipts for the products audited for a time

16     period.  And we were, instead, given this

17     three-page summary.

18             JUDGE RANDALL:  So government

19     exhibit 34 was given to you by the respondent?

20             THE WITNESS:  Yes.

21             JUDGE RANDALL:  And it was given

22     during the course of the execution of the

23     administrative inspection warrant?

24             THE WITNESS:  Yes, it was.

25             JUDGE RANDALL:  Thank you.

Page 1171

1                    Are there any objections to the
2       admissibility of government exhibit 34 beyond
3       what's the ongoing objection?
4                    MR. EMORD:  No, Your Honor.
5                    JUDGE RANDALL:  Very well.  Then I
6       accept into the record government exhibit 34.
7                                (Whereupon, the
8                                aforementioned document,
9                                having previously been
10                               marked for
11                               identification as
12                               Government's Exhibit
13                               Number 34, was received
14                               in evidence.)
15                   BY MR. BAYLY:
16           Q      Now, Investigator Barnhill, were
17      government's exhibits 34 and 35 used to
18      conduct the audit and the results and the
19      computation chart on government exhibit 4,
20      page 3?
21           A      Yes, they were.
22           Q      All right.  The next document I
23      would like to refer you to is government 36.
24                               (Whereupon, the
25                               aforementioned document

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1172

```
 1                        was marked for
 2                        identification as
 3                        Government's Exhibit
 4                        Number 36.)
 5            THE WITNESS:  Okay.
 6            MR. BAYLY:  All right.
 7            BY MR. BAYLY:
 8       Q    Would you please explain what this
 9  document is?
10       A    This again is a printout from
11  Novelty representatives of all scheduled
12  listed chemical products from the time period
13  of January 1st, 2007 to July 9th, 2007.  And
14  this is activity of all products, not just the
15  20 which were audited.
16       A    All right.  When you say,
17  "activity," you're talking about purchase
18  receipts, sales records?
19       A    I'm sorry.  It's only sales, sales
20  of all their scheduled listed products.
21       Q    All right.  And was information
22  derived from government exhibit -- looking
23  over your shoulder, it's 36.  Was that used in
24  the audit?
25       A    No, it was not.
```

Page 1173

1          Q     Thirty-six, are those records

2     required to be kept?

3          A     Well, this is a summary printout

4     of what was sold.  So this document, in

5     particular, is not a record required to be

6     kept, but there is a record required to be

7     kept.  And this is just a summary. So this

8     document is not required.

9          Q     Was this document given to you by

10     Novelty representatives during the inspection?

11          A     Yes.

12          Q     All right.  And for what purpose

13     did they give you that document?

14          A     We wanted to see the movement of

15     their other products other than the ones that

16     we were auditing or sales of other chemical

17     products.

18          Q     Well, would it be fair to say that

19     this is a summary or their version of the

20     original records?

21          A     Yes.

22          Q     And this is what they gave you

23     when you requested the sales records?

24          A     That's correct.

25               MR. BAYLY:  Your Honor, I would

Page 1174

1     like to move into government 36 --
2                  JUDGE RANDALL:  Just one moment.
3                  (Pause.)
4                  JUDGE RANDALL:  Other than the
5     ongoing objection, are there any further
6     objections to the admissibility of government
7     exhibit 36?
8                  MR. EMORD:  Not to 36, Your Honor,
9     but I'm a little slow and missed some
10     confidential information in --
11                  JUDGE RANDALL:  All right.  Just a
12     moment.  Let me rule on one thing at a time.
13                  (Pause.)
14                  JUDGE RANDALL:  All right.  Very
15     well, then.  I will admit into the record
16     government exhibit 36.
17                         (Whereupon, the
18                         aforementioned document,
19                         having previously been
20                         marked for
21                         identification as
22                         Government's Exhibit
23                         Number 36, was received
24                         in evidence.)
25                  JUDGE RANDALL:  All right.  Now,

Page 1175

```
 1        Mr. Emord, confidential information?

 2                  MR. EMORD:  Yes, Your Honor.  In

 3        government exhibit number 4, there are total

 4        inventory figures that are supplied there that

 5        will be of utility to competitors.  So we

 6        would ask that it be, government exhibit

 7        number 4, marked confidential and protected

 8        subject to protective order in this case, Your

 9        Honor, and then --

10                  JUDGE RANDALL:  Just one moment.

11        Any objections to the government exhibit 4

12        being marked confidential and protected?

13                  MR. BAYLY:  I don't have an

14        objection.  I just hope Your Honor is keeping

15        track of all of these that need these

16        protective covers on them.

17                  JUDGE RANDALL:  Yes.  Thank you.

18        I'm trying to.  All right. Then I will agree

19        that government exhibit 4 will be marked

20        confidential and protected under the

21        protective order.

22                  MR. EMORD:  And likewise, Your

23        Honor.  I'm sorry.  Am I moving too quickly?

24                  JUDGE RANDALL:  No.  You're fine.

25        Go ahead.
```

Page 1176

1              MR. EMORD:  Okay.  Number 34,

2     government exhibit number 34 likewise has

3     proprietary information in it, including

4     inventory quantities.  And it also identifies

5     the vendors.  We would ask that it likewise be

6     marked confidential and protected and be

7     subject to the protective order.

8              JUDGE RANDALL:  Any objections to

9     so marking government exhibit 34?

10              MR. BAYLY:  No, Your Honor.

11              JUDGE RANDALL:  Very well.  It

12     will be marked confidential and protected.

13              Anything further, Mr. Emord?

14              MR. EMORD:  No, Your Honor.  Thank

15     you.

16              JUDGE RANDALL:  All right.  Very

17     well.  Mr. Bayly, you may continue.

18              MR. BAYLY:  Thank you, Judge

19     Randall.

20              BY MR. BAYLY:

21     Q    And next I would like to refer you

22     to government exhibit 47, Investigator

23     Barnhill.

24                    (Whereupon, the

25                    aforementioned document

Page 1177

1                         was marked for

2                         identification as

3                         Government's Exhibit

4                         Number 47.)

5              BY MR. BAYLY:

6         Q    Can you please identify that?

7         A    Okay.

8              JUDGE RANDALL:  If you would wait

9    just a second?  Let me get it. They're in

10   different binders.

11             MR. BAYLY:  All right.  That was

12   47.

13             JUDGE RANDALL:  Right.

14             MR. BAYLY:  Government exhibit.

15             (Pause.)

16             JUDGE RANDALL:  Thank you, Mr.

17   Bayly.  You may continue.

18             MR. BAYLY:  Thank you, Judge

19   Randall.

20             BY MR. BAYLY:

21        Q    Now, Investigator Barnhill, could

22   you please tell us what exhibit 47 is?

23        A    Exhibit 47 are basically work

24   papers used to take the closing inventory on

25   July 9th, 2007.  These papers were split up

Page 1178

1    among the investigators and Novelty employees

2    so we could go around and make a count of the

3    product on hand.  And this number was

4    transferred to, the first two pages of exhibit

5    4 to, document the closing inventory on July

6    9th, 2007.

7         Q    Okay.  So, then, obviously you

8    needed that for your audit, then?

9         A    Yes.

10              MR. BAYLY:  I would like to admit

11   47, Your Honor.

12              MR. EMORD:  We have no objection,

13   Your Honor, but for the request that it be

14   marked --

15              JUDGE RANDALL:  I'm sorry, Mr.

16   Emord.  If you are speaking to me, I can't

17   hear you.

18              MR. EMORD:  I'm sorry.  We have no

19   objection to the admission of the document

20   with the caveat that the confidential and

21   proprietary it be marked because it reveals

22   the movement of inventory, which would be of

23   use to competitors.  And we ask that it be

24   under the protection of the protective order

25   in the case.

Page 1179

```
 1                    JUDGE RANDALL:  Very well.  I

 2        accept into the record government exhibit 47,

 3        noting that it will be marked as confidential

 4        and protected.

 5                              (Whereupon, the

 6                              aforementioned document,

 7                              having previously been

 8                              marked for

 9                              identification as

10                              Government's Exhibit

11                              Number 47, was received

12                              in evidence.)

13                    JUDGE RANDALL:  You may continue,

14        Mr. Bayly.

15                    MR. BAYLY:  Thank you, Judge

16        Randall.

17                    BY MR. BAYLY:

18            Q     Now I want you to please,

19        Investigator Barnhill, refer back to exhibit

20        35.  Do you have that before you?

21            A     Yes, I do.

22            Q     All right.  Now, was there any

23        problem using government exhibit 35 in the

24        audit?

25            A     Well, yeah.  This is a 157-page
```

Page 1180

1      document showing sales of products to certain

2      locations.  And the big hindrance of actually

3      knowing what was sold, everything on here is

4      in code.

5               For example, we had no idea

6      looking on the face of this document what

7      product was sold and to whom because the ship

8      to column is a three-digit number.  So those

9      two things hindered the audit quite a bit.

10      Q     So in government 35, then, what

11      information are you really looking for that

12      was not supplied in that document?

13      A     Well, we need to know exactly the

14      product name, what active ingredient did it

15      contain, the strength.  We needed to know

16      where it went.

17      Q     And where it went in terms of

18      addresses you mean?

19      A     Correct, as well as the name of

20      the location.  We had no idea based on the

21      face of this document.

22      Q     All right.  Were you able to get

23      additional documents in order to get the

24      information you needed?

25      A     Eventually we were.  We had to ask

Page 1181

1        for it several times.  We did get another

2        document that did identify -- for example, the

3        first code on the first page is 17103, but

4        even the subsequent document didn't identify

5        the product as detailed as we needed.  So

6        eventually we got yet a third document to

7        fully identify that product.

8                    MR. BAYLY:  Right.  Well, Your

9        Honor, at this point I would want to request

10       that the witness be handed government exhibits

11       30 through 33 and 69.

12                    BY MR. BAYLY:

13           Q    And while those exhibits are being

14       obtained, Investigator Barnhill, I would like

15       you to turn now to government exhibit 4, page

16       3.

17           A    Okay.

18           Q    Would you reidentify that for us?

19           A    Government 4, page 3 is our

20       computation chart.

21           Q    All right.  And let's just go

22       through the columns so that the Court will

23       have an understanding of what you did.  The

24       first column is what?

25           A    It's the actual product name.

Page 1182

1          Q     And the second column is?

2          A     The product code.

3          Q     And the third column?

4          A     Beginning inventory.

5          Q     And then the column marked

6    "Receipts"?

7          A     Is next.

8          Q     Can you explain what the receipts

9    are?  What does that mean?

10         A     Receipts are the total used in the

11   audit.  It came from exhibit 34.  And it's not

12   only receipts of what they purchased from

13   their suppliers, but it's also anything else

14   coming into the company, such as returns.

15         Q     All right.

16         A     It just shows movement into the

17   company.

18         Q     Credits, if you will?

19         A     Credits.

20         Q     The next column, it says, "Total."

21   Can you explain what that is?

22         A     The total is when you add up the

23   beginning inventory and the receipts so

24   everything on hand and -- let's see.  Our

25   beginning inventory date was December 25th,

Page 1183

1        '05.  So the existing inventory back in 2005

2        plus anything that came into the company

3        during our audit period.  Those two figures

4        were summed together for the total column.

5              Q     All right.  And then the next

6        column is closing inventory?

7              A     Correct.  That is the physical

8        inventory on hand as of July 9th, '07.

9              Q     Okay.  And that's the first two

10       pages of government exhibit 4?

11             A     Yes, it is.

12             Q     And the sales?

13             A     That figure came from exhibit 35.

14       And it reflects the movement of scheduled

15       listed chemical products going out of the

16       country -- out of the company.  So it could be

17       sales.  It could be returns back to their

18       suppliers but anything leaving.

19             Q     Okay.  Then the next column is

20       difference?

21             A     No.  The next --

22             Q     I'm sorry.  Total.  I jumped

23       ahead.

24             A     Total.  And that's where you sum

25       the figures of the closing inventory plus the

Page 1184

1    sales column.

2          Q      Now we're at the difference

3    column?

4          A      Yes.

5          Q      And can you explain that one?

6          A      It's the difference between the

7    total on the left side of the computation

8    chart versus the difference between the total

9    on the right side of the computation chart.

10         Q      Okay.  Then you have percent

11   difference.  Can you explain that?

12         A      We just -- it's a mathematical

13   equal where you find the percentage difference

14   between the two columns titled "Total."  And

15   the difference column and percentage

16   difference column gives you an idea if there's

17   an overage or shortage and by what percentage.

18         Q      Okay.  Now, you've used the terms

19   "overage" and "shortage."  So let's look back

20   at the difference column and also the percent

21   difference column.  And tell us which numbers

22   are overages and which are shortages.

23         A      Out of the 20 products audited,

24   only 3 balanced completely.  But it should be

25   noted that two out of those three had

Page 1185

1        absolutely no movement within the company

2        whatsoever.  The --

3            Q     Let me just take -- it would

4        probably be easier to do it by an example.

5        You have the second product there audited is

6        a double-action 12 of blister packet 25 mg,

7        product code 17103.  Do you see that?

8            A     Yes, I do.

9            Q     Okay.  Now, if you go over to the

10       difference and the percent difference, it's

11       18,384 difference with a percent difference of

12       3.5 percent.  Now, what do the difference and

13       the percent difference represent as to this

14       product?

15           A     Well, it means that Novelty claims

16       to have sold more than what they had on hand.

17       So typically an overage is indicative of poor

18       recordkeeping.  And 18,384 saleable units is

19       how we identified these, or 3 and a half

20       percent.  And that's during this time period,

21       the audit time period.

22           Q     All right.  Well, let's drop down

23       to almost the bottom of this first set of

24       audited products.  And it looks like it's the

25       third one from the bottom.  It's mini 2-way 25

3b171aec-f2c4-456d-b92b-0e233a15f633

1        mg gelcap 24-count bottle, product code 17902.

2        Do you see that column?

3            A      Yes, I do.

4            Q      And if you follow along to the

5        right on that same column, you will see

6        -27,924, and then you'll see a -96.03 percent.

7        What do those negative numbers represent?

8            A      Those negative numbers are -- tell

9        investigators that there is a shortage, that

10       they were -- they bought more than what they

11       sold or they bought and had on hand more than

12       what they sold.  In fact, they didn't balance

13       at all.  So there was as shortage of over

14       27,000, close to 28,000 units, which

15       represented a shortage of 96 percent.

16           Q      All right.  Now I want to shift

17       your attention to the bottom four entries on

18       this computation chart.

19           A      Okay.

20           Q      And what do those bottom four

21       entries represent?

22           A      We re-audited four products

23       because we got different numbers when

24       comparing Novelty's receipts versus their

25       warehouse documentation.  And throughout the

EXHIBIT 08 BARNHILL TESTIMONY        Page 56 of 106

1          process of the audit period, one of the things

2          that we do is conduct verifications.

3                    And in this case, we contacted

4          Novelty's five suppliers and asked them for

5          "During the time period, what did you sell to

6          Novelty?" And it was a way to verify Novelty's

7          receipts.

8                    And in these four cases, the

9          numbers differed significantly enough to make

10          the difference and percentage difference

11          columns drastically different.

12          Q     These four products you say

13          differed.  Differed from what?

14          A     Differed from the first audit.

15          For example, the very first of the four

16          products, double action 6-count ephedrine,

17          25-milligram tablet, it's product code 17121.

18          Q     Right.

19          A     Above in the chart, Novelty says

20          that they received 656,688 units.

21          Q     Now let me interrupt you here so

22          we're clear on the record, Investigator

23          Barnhill.  Are you looking at the first

24          original audit products?  Are you down at the

25          bottom of the page, where you re-audited the

```
 1       four?
 2            A    I am talking about the upper
 3       portion of the audit paper, product code
 4       17121.  So it's --
 5            Q    Okay.  So that's the first audit?
 6            A    It's the first audit.
 7            Q    Right.  All right.  Continue,
 8       please.
 9            A    So Novelty claims that they
10       received 656,688 units into their company
11       during the audit period.  Yet, the supplier
12       claims that they only sold Novelty 429,024
13       units.  So just the changing of that one
14       column in the computation chart changes the
15       difference -- and, again, I'm back at the top
16       -- from 48,000 units difference to 275,664
17       units difference.  So it jumps from originally
18       7.3 percent overage to 64.25 percent overage.
19            Q    Okay.  And let me then ask you to
20       take a look at government exhibit 69.
21                           (Whereupon, the
22                           aforementioned document
23                           was marked for
24                           identification as
25                           Government's Exhibit
```

Page 1189

1                        **Number 69.)**

2                    BY MR. BAYLY:

3          **Q      And if you would identify that for**

4    **us?**

5          **A      Okay.  Is 69 a two-page document?**

6                    MR. BAYLY:  Your Honor, may I have

7    a moment, please?

8                    JUDGE RANDALL:  Yes.

9                    MR. BAYLY:  It looks like we've

10   got a double marking.

11                   (Pause.)

12                   MR. BAYLY:  All right.

13                   JUDGE RANDALL:  You may continue.

14                   MR. BAYLY:  Thank you.

15                   BY MR. BAYLY:

16         **Q      Well, yes.  Why don't you identify**

17   **both pages of government exhibit 69?**

18         **A      Okay.  The first page of**

19   **government exhibit 69 is a repeat of page 3,**

20   **government 4, government exhibit 4.**

21         **Q      So it's just a duplicate, then?**

22         **A      Yes.**

23         **Q      All right.  And the second page?**

24         **A      The second page is a spreadsheet,**

25   **if you will, of the difference between Novelty**

Page 1190

1    printouts, Novelty hard copy invoices of

2    receipts, and then what the manufacturer says

3    that they sold to Novelty.  And that's where

4    we came into having different numbers on the

5    left side of the computation chart, on the

6    receipt side of the computation chart.

7        Q    So, then, this second page of

8    government exhibit 69 was used in the

9    secondary audit of the four products at the

10   bottom on page 3 of government exhibit 4?

11       A    Some of these numbers were, not

12   all of them.  This chart was primarily made to

13   show the depiction of how Novelty's records

14   sometimes even disagreed with themselves.

15             MR. BAYLY:  All right.  Your

16   Honor, I would like to move in government's

17   69.

18             MR. EMORD:  One moment, please,

19   Your Honor.

20             JUDGE RANDALL:  Certainly.

21             (Pause.)

22             MR. EMORD:  We would not object,

23   subject to Your Honor's earlier order.  We

24   would like to have it marked confidential and

25   proprietary in light of that it contains

Page 1191

1      inventory movement information and that it be

2      subject to the protective order in this case.

3                    JUDGE RANDALL:  Any objections to

4      that caveat, Mr. Bayly?

5                    MR. BAYLY:  No.  And we would also

6      like to remove the first page. We have it

7      looks like a duplicate on the first page of

8      69.  So we just need the second page in.

9                    JUDGE RANDALL:  So you want to

10     alter the exhibit and have only the page that

11     begins with "A third comparison was made"?

12                   MR. BAYLY:  Yes.

13                   JUDGE RANDALL:  All right.  Any

14     objections to removing the first document?

15                   MR. EMORD:  No, Your Honor.

16                   JUDGE RANDALL:  All right.  Very

17     well.  I accept into the record government

18     exhibit 69 as reconfigured as a one-page

19     document and note that it should be marked as

20     confidential and protected.

21                              (Whereupon, the

22                              aforementioned document,

23                              having previously been

24                              marked for

25                              identification as

Page 1192

1                          Government's Exhibit

2                          Number 69, was received

3                          in evidence.)

4              MR. BAYLY:  Thank you, Judge

5      Randall.

6              JUDGE RANDALL:  Thank you.  You

7      may continue.

8              MR. BAYLY:  All right.

9              BY MR. BAYLY:

10         Q     And now I would like to turn your

11     attention to government exhibits 30 through

12     33, Investigator Barnhill.

13                          (Whereupon, the

14                          aforementioned documents

15                          were marked for

16                          identification as

17                          Government's Exhibits

18                          Number 30 through 33,

19                          respectively.)

20              THE WITNESS:  Okay.

21              BY MR. BAYLY:

22         Q     First of all, identify for us

23     government exhibit 30.

24         A     In conducting verification of

25     receipts, I contacted Novelty's five

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1193

1          suppliers.  This first exhibit, government
2          exhibit 30, is a printout from an e-mail that
3          I received from DMD, a supplier of Novelty.
4          And they say this is what they shipped to
5          Novelty during our audit period.
6               Q    All right.  And government 31?
7               A    This is the same type of document.
8          It was used for verification purposes.  This
9          one is government exhibit 31.  Kirk
10         Pharmaceuticals says this is what they shipped
11         to Novelty during our audit period. So this
12         shipping document should be reflected as
13         Novelty's receipts.
14              Q    And government exhibit 32?
15              A    Again this document was obtained
16         for verification purposes of the audit.  It's
17         a 12-page document where AAA says these are
18         the products sold during the audit period to
19         Novelty, which, again, are Novelty's receipts.
20              Q    All right.  And, finally,
21         government exhibit 33?
22              A    This was obtained for verification
23         purposes in our audit for the period of
24         December to -- December 2005 to July '07.
25         These are the sales by Lehigh Valley

Page 1194

1      Technologies to Novelty.  And, again, it's

2      their sales.  So it should be reflected as

3      Novelty receipts.

4          Q    Now, government's 30 through 33,

5      were these documents that you used to conduct

6      the second audit, which is depicted on the

7      bottom four lines of government exhibit 4,

8      page 3?

9          A    Yes, it is.

10             MR. BAYLY:  All right.  Your

11     Honor, I would like to admit government's

12     exhibits 30 through 33.

13             MR. EMORD:  Your Honor, we note

14     that those exhibits are already marked

15     confidential and protected.  Oh, sorry.

16     Apparently we marked that, Your Honor.  Pardon

17     me.  We would ask that those exhibits be

18     marked confidential and protected for the same

19     reasons previously stated and be subject to

20     the protective order.

21             JUDGE RANDALL:  Very well.  Any

22     objections to the marking as confidential and

23     protected, Mr. Bayly?

24             MR. BAYLY:  No, Judge Randall.

25             JUDGE RANDALL:  Very well.  Then I

EXHIBIT 08 BARNHILL TESTIMONY

Page 1195

1    accept into the record government exhibits 30,

2    31, 32, and 33.

3                        (Whereupon, the

4                        aforementioned

5                        documents, having

6                        previously been marked

7                        for identification as

8                        Government's Exhibits

9                        Number 30 through 33,

10                       respectively, were

11                       received in evidence.)

12            BY MR. BAYLY:

13        Q    Now, Investigator Barnhill, I want

14   you to turn back to government exhibit 35.  Is

15   that still up there?

16        A    Yes.

17        Q    And this document has already been

18   admitted, but I want to ask you if this

19   document has any significant notations

20   regarding shipments to drop-off or off-site

21   storage locations.

22        A    Yes.  When we received this

23   document under the ship to column, there's a

24   three-digit number and nothing more.  So we

25   had to ask Novelty employees what these

Page 1196

1           three-digit codes meant.  And we were told by

2           Ryan Polk that these three-digit numbers

3           identified off-site storage locations

4           throughout the country.

5                Q     So that the three-digit numbers

6           are a code?

7                A     Yes, they are.

8                Q     Were they a code for addresses?

9                A     Yes.  We had to get another

10          document to identify the location of these

11          places because, again, it's only a three-digit

12          number in the column.

13                    MR. BAYLY:  Your Honor, I'd like

14          the witness to be handed government exhibit

15          67.

16                              (Whereupon, the

17                              aforementioned document

18                              was marked for

19                              identification as

20                              Government's Exhibit

21                              Number 67.)

22                    BY MR. BAYLY:

23                Q     Now, was government 35, then,

24          obtained during your administrative inspection

25          warrant execution of Novelty starting July

1          9th?

2                A     Yes, it was.

3                Q     Okay.  And if I could please ask

4      you to identify -- well, before I ask you to

5      identify that, were you able to obtain

6      eventually addresses for government exhibit 35

7      so you could obtain addresses to match the

8      codes?

9                A     Yes.  In fact, it took several

10     days to get that printout because throughout

11     the course of the inspection, Novelty

12     employees told us that they thought that

13     information was not within the scope of the

14     warrant.  So they refused to give it to us for

15     the first several days.

16                But eventually we did get it.  And

17     when I compared exhibit 35 with the printout

18     that they gave me, I found that there were 34

19     sales route numbers that were not identified

20     in the follow-up printout.

21               Q     Were you ever able to get

22     documentation to identify these 34 sites?

23               A     No, we never did get the

24     documentation.

25               Q     Can you tell us what exhibit 67

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1198

1    is?

2         A     Sixty-seven is a brief summary of

3    the 34 sales route numbers that we never got

4    identifying information, such as name and

5    address.

6         Q     And did you obtain this

7    documentation from Novelty during the

8    execution of the admin. inspection warrant on

9    July 9th, 2007?

10        A     The information came from Novelty,

11   but I created this printout of the 34 route

12   numbers that did not exist.

13        Q     Okay.  That document, though, was

14   derived from what exhibit?

15        A     It was derived, in part, from

16   exhibit 35.

17             MR. BAYLY:  Okay.  Your Honor, I

18   would like to move government exhibit 67 into

19   evidence.

20             MR. EMORD:  No objection, Your

21   Honor.

22             JUDGE RANDALL:  Very well.  I

23   accept into the record government exhibit 67.

24                      (Whereupon, the

25                       aforementioned document,

Page 1199

```
 1                         having previously been
 2                         marked for
 3                         identification as
 4                         Government's Exhibit
 5                         Number 67, was received
 6                         in evidence.)
 7              MR. BAYLY:  All right.
 8              BY MR. BAYLY:
 9         Q    Investigator Barnhill, I now want
10     to refer you back to government exhibit 35, on
11     page 29.
12         A    Okay.
13         Q    And --
14              JUDGE RANDALL:  Excuse me.  I'm
15     sorry, Mr. Bayly.  We're in government exhibit
16     35 now, at page 29?  Is that correct?
17              MR. BAYLY:  That is correct.
18              JUDGE RANDALL:  All right.  Just
19     one moment, please.  Just a moment.
20              BY MR. BAYLY:
21         Q    And I want to draw your attention
22     to a ship date of 7-16-07.  Do you see that?
23         A    Yes, I do.
24         Q    And how many ship dates do you see
25     with that date?
```

Page 1200

1          A      On this one page, I see three.

2          Q      Is there any significance to the

3     ship dates noting July 16th, 2007?

4          A      Yes.  This is significant because

5     this is Novelty's record.  All of exhibit 35

6     is Novelty's record of what was sold during

7     our audit period.  And 7-16-2007, or July

8     16th, 2007, had not yet occurred.

9               So we asked Mr. Polk if we should

10    subtract out these figures.

11         Q      And his response was?

12         A      Was no, we should not.  We should

13    count them as being product sold.

14         Q      Did you ask or obtain information

15    from Mr. Polk -- that's Ryan Polk, for the

16    record, is it not?

17         A      Yes, it is.

18         Q      -- how Novelty determines its

19    orders to its convenience store customers?

20         A      I was told by Mr. Polk and I think

21    one or two other Novelty employees that these

22    products are not pre-sold, but they send

23    shipments out to their -- these outlying

24    storage locations.

25               And from there, the sales reps

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1201

1    make weekly or sometimes biweekly visits to

2    the customers.  And they stock the shelves as

3    necessary.

4         Q    And the storage locations that

5    he's referring you to, are those the ones that

6    are documented in government's exhibits 35 and

7    67?

8         A    Correct.

9              MR. BAYLY:  I'm sorry there are so

10   many documents, but I think at this time I

11   would request the witness to be given

12   government exhibit 68.

13                      (Whereupon, the

14                      aforementioned document

15                      was marked for

16                      identification as

17                      Government's Exhibit

18                      Number 68.)

19              JUDGE RANDALL:  All right.  Mr.

20   Bayly, if you would wait until I tell you that

21   I am ready and have the exhibit in front of

22   me, I would appreciate it.

23              MR. BAYLY:  Certainly.  And 39 and

24   40 and 58.  All right. Thirty-nine, 40, 58.

25                      (Whereupon, the

Page 1202

1                              aforementioned documents

2                              were marked for

3                              identification as

4                              Government's Exhibits

5                              Number 39, 40, and 58,

6                              respectively.)

7                 MR. BAYLY:  I'm sorry I'm jumping

8        around so much.

9                 JUDGE RANDALL:  You're starting

10       with 68, though, for the witness?

11                MR. BAYLY:  Yes.

12                JUDGE RANDALL:  Okay.  You may

13       continue.

14                MR. BAYLY:  Thank you, Judge

15       Randall.

16                BY MR. BAYLY:

17           Q    Investigator Barnhill, do you have

18       government exhibit 68 before you?

19           A    Yes, I do.

20           Q    Can you tell us what this document

21       represents?

22           A    This information was derived from

23       some information we received in the course of

24       our administrative inspection warrant.  And

25       this information came to us on a CD.  And the

Page 1203

1          information was broken down three different

2          ways.  It was sorted by either product code,

3          by chronological order, or by customer.

4                    So in searching that data or just

5          looking at that data -- and I have to say that

6          this was not data throughout the entire audit

7          period, but it was only a six-month snapshot

8          of what was sold in that time period of

9          January '07 to July '07.

10         Q    Okay.  So these are sales records,

11         then?

12         A    Yes, they are sales.  We pulled

13         out some figures that were interesting to us

14         because the quantities were so large.  And I

15         put those quantities in this spreadsheet which

16         is depicted in government exhibit 68.

17         Q    Now, is this a document that you

18         acquired during the execution of the

19         administrative inspection warrant?

20         A    No, it is not.

21         Q    Is this a document you made up

22         yourself?

23         A    Yes, it is.

24         Q    And where do you derive the

25         information for government 68?

Page 1204

```
 1              A     It came from Novelty, but it was
 2       regarding sales of scheduled listed products
 3       during our time -- our audit period.  But,
 4       again, this is just a snapshot of six months.
 5                     MR. BAYLY:  Your Honor, I would
 6       like to admit government exhibit 68.
 7                     MR. EMORD:  No objection, Your
 8       Honor.
 9                     JUDGE RANDALL:  Very well.  I
10       accept into the record government exhibit 68.
11                           (Whereupon, the
12                           aforementioned document,
13                           having previously been
14                           marked for
15                           identification as
16                           Government's Exhibit
17                           Number 68, was received
18                           in evidence.)
19                     MR. BAYLY:  All right.
20                     BY MR. BAYLY:
21              Q     And, Investigator Barnhill, I
22       would like you to look at government exhibit
23       58.  Can you identify that?  Is that up there?
24              A     Probably.
25              Q     I'm sorry.  There's quite a bit of
```

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1205

1        paper up there now.  Did I ask for 58?

2            A      Yeah.  It's here.  Okay.

3            Q      In terms for reference, first of

4        all, would you please identify this document?

5            A      Government exhibit 58 is an

6        affidavit of Mark Bleodsoe of Novelty's

7        opposition of defendant's motion and Novelty's

8        cross-motion.  Is that what you --

9            Q      Is that an affidavit filed in

10       another court?

11           A      Yes, it is.

12           Q      Are you familiar with this

13       affidavit?

14           A      No, not thoroughly.

15               MR. BAYLY:  Your Honor, I would

16       like to admit government exhibit 58.

17               MR. EMORD:  I object, Your Honor,

18       because the exhibit is incomplete.  As noted

19       on the front page of the exhibit, there are

20       some 36 pages, exactly 36 pages to the

21       exhibit.

22               The attachments have not been

23       included with this exhibit, which are

24       indispensable for comprehending the affidavit

25       that is being supplied.  So it would mislead.

Page 1206

1                    And, therefore, because only 15 of

2        the 36 pages are a part of this exhibit, we

3        object to its admission into evidence.

4                    JUDGE RANDALL:  Mr. Bayly, do you

5        wish to be heard?

6                    MR. BAYLY:  Yes.  This is the

7        affidavit of Mark Bleodsoe which we gave to

8        the respondent's counsel very early on.  So

9        it's a pleading that is in the United States

10       District Court.  So any amendments or

11       additions to this certainly are available to

12       respondent.

13                   If they feel like they need to

14       expand or add to this document, we certainly

15       won't object.  But as the document stands, it

16       speaks for itself.

17                   MR. EMORD:  Your Honor, we object.

18                   JUDGE RANDALL:  Just a moment.

19                   (Pause.)

20                   JUDGE RANDALL:  Yes, Mr. Emord?

21                   MR. EMORD:  There will come a time

22       when Your Honor will be reviewing this

23       material for determination in the case.  And

24       denying the -- if you look at the affidavit

25       itself, it makes reference to specific

Page 1207

1    attachments.

2                    And I don't understand why counsel

3    just can't supply the Court with a complete

4    copy with the attachments, rather than not

5    have the complete copy at this time.

6                    And the affidavit is incomplete

7    without it because the affidavit specifically

8    inside the sworn affidavit here, it makes

9    reference to the attachments.

10                   JUDGE RANDALL:  Mr. Bayly, do you

11   wish to be heard further?

12                   MR. BAYLY:  No.  We'll withdraw

13   it.

14                   JUDGE RANDALL:  You'll withdraw

15   the document?

16                   MR. BAYLY:  Yes.

17                   JUDGE RANDALL:  All right.  Very

18   well.  Then I show that government exhibit 58

19   has been withdrawn.

20                   BY MR. BAYLY:

21        Q        Investigator Barnhill, in the

22   course of your investigation of Novelty, did

23   you become aware that Novelty had its own

24   limitation of sales policy to convenience

25   stores for their List I products?

1        A     Yes.  During our on-site portion

2    of our inspection, we were told that Novelty

3    had a self-imposed restriction of one case of

4    scheduled listed products to convenience store

5    per visit.

6        Q     All right.  And were you aware of

7    -- when you say, "per visit," are you aware of

8    the time period that the visit entailed?  In

9    other words, was it a month, twice a month,

10   every other month?

11       A     We were led to believe that most

12   sales people make a call once every two weeks.

13       Q     All right.  Now, I want to refer

14   you back to government exhibit 68.

15       A     Okay.

16       Q     And would you just go through the

17   columns on government exhibit 68 so that we

18   can all understand better what this exhibit

19   depicts?

20       A     Okay.  The first column is store.

21   And this is the actual customer.  It's not the

22   three-digit storage locker location but its

23   actual location of the recipient.  And

24   typically they're gas stations.  So this is a

25   code for the gas station itself, the city and

Page 1209

```
1        state in which that gas station is located.
2                 Then because some of these
3        transactions had so many pills for kicks and
4        grins, I went onto Google and searched
5        population of these particular cities.  The
6        next --
7            Q    Okay.  So based on that, what do
8        those numbers represent under the population
9        column?
10           A    It's what's represented in county
11       records or other census-type documents, what
12       these particular cities claim as their
13       population.
14           Q    Okay.  And then the next column?
15           A    The next column is total number of
16       tablets sold.  So depending on if the gas
17       station received a 6-count pack or a 24-count
18       pack, we broke it down into number of tablets
19       sold in the 6-month time period.
20           Q    Now, these tablets, could they be
21       what strengths of ephedrine?
22           A    Of ephedrine, it's either 12 and a
23       half or 25-milligram.  It could be either.
24           Q    Okay.  And what time period do
25       these sales records represent in government
```

Page 1210

1      exhibit 68?

2           A    It represents the six-month time

3      or snapshot of January '07 to July '07.

4           Q    And what does the last column

5      represent?

6           A    The last column says, "Number of

7      transactions over the case limit."  Some of

8      those lines are blank because allegedly they

9      didn't violate their own policy.  But the

10     number in this column represents the number of

11     times the sales reps violated their own

12     Novelty policy of selling over one case per

13     visit or per transaction.

14          Q    Okay.  Again, you have indicated

15     the policy was in what period of time?

16          A    This chart represents from January

17     '07 to July '07.

18          Q    Okay.  I'm sorry.  I didn't make

19     myself clear.  You say the policy of one case

20     per transaction?

21          A    Right.  They used "one case per

22     transaction" and "one case per visit"

23     simultaneously.

24          Q    All right.  And that term meant

25     twice a month roughly?

Page 1211

1        A    Yes.

2        Q    And so that column represents

3   what, then, in relation to the policy of one

4   case two times a month?

5        A    No.  According to their policy, it

6   would have been one case per visit.  So if a

7   sales rep visited a store twice a month, they

8   could have sold two cases a month.

9        Q    I see.  So that's what that last

10   column represents?

11        A    Yes.  No, no.  This last column is

12   the number of times.  So let's say for the

13   first time, Emlenton, Pennsylvania, we say

14   that there were two transactions over the case

15   limit.  So two times during that six-month

16   time period the sales representative sold over

17   the case limit to that particular gas station.

18        Q    All right.  But when you say that,

19   is it maybe one case over the limit, two

20   cases, or can you determine from that

21   document?

22        A    From that -- from this document,

23   you can't determine that.

24        Q    Okay.  So all you can determine is

25   that at certain times they were over the one

Page 1212

1       case per transaction policy?

2              A       Correct.  Correct.

3                      MR. BAYLY:  All right.  I would

4       like to admit 68 or has that been admitted?

5                      MR. EMORD:  It's already --

6                      JUDGE RANDALL:  It's been

7       admitted.

8                      MR. BAYLY:  Okay.  Thank you.

9       Sorry.

10                     BY MR. BAYLY:

11             Q       And now let's move to government

12      exhibit 40.

13             A       Is that this one?  Okay.

14             Q       All right.  You've got government

15      exhibit 40 there, Investigator Barnhill?

16             A       Yes, I do.  Okay.

17             Q       Now, I see you were gathering the

18      entire exhibit of 40?

19             A       Yes.

20             Q       All right.  Please look at that

21      document.  Look it over and tell us what this

22      document is.

23             A       Okay.  This document comes from

24      Novelty records.  Again, it came from the CDs

25      provided from Novelty.  And, again, it's the

Page 1213

1    data that only encompasses a six-month time

2    period.

3         Q    Is that the six-month audit

4    period?

5         A    No.  This is strictly January '07

6    to July '07.  The audit period was from

7    December '05 to July '07.

8         Q    Okay.

9         A    But this is a snapshot of activity

10   that happened during those first six months of

11   2007.  And this government exhibit 40, which

12   is 13 pages, identifies locations where

13   Novelty sold chemical products to gas stations

14   that were not self-certified.

15        Q    Okay.  Explain for the record what

16   self-certification means.

17        A    Self-certification.  Well, go back

18   a little bit.  The Combat Methamphetamine

19   Epidemic Act of 2005 was signed and was

20   enacted in 2006.  And part of that act

21   required retailers of certain -- retailers not

22   of certain but retailers of scheduled products

23   have to adhere to certain regulations.

24              Among them would be that the

25   products have to be kept behind the counter.

Page 1214

 1          They have to maintain logbooks.  They have to

 2          be self-certified, which means they go onto

 3          the DEA Web site, follow a mini training

 4          course, and agree to abide by the regulations

 5          as set forth.

 6                   And then once the manager or

 7          responsible party for the gas station agrees

 8          to those conditions, they print out a

 9          self-certification certificate.  And that

10          certificate is to be maintained in the store.

11              Q    Now, is that a requirement for any

12          store that will sell scheduled listed products

13          --

14              A    Yes, it is.

15              Q    -- scheduled listed chemicals?

16              A    Yes, it is.

17              Q    All right.  And I would like you

18          to look at government exhibit 39 now.  Is that

19          up there?

20              A    Yes, it is.

21              Q    All right.  What is government

22          exhibit 39?

23              A    Government exhibit 39 is a

24          103-page document.  It's on, I would guess, 8

25          and a half by 11 sheets of paper because

Page 1215

1     they're folded and put in the record.  But
2     each page has approximately 25-30 gas station
3     names.
4               The first column is a store
5     identifier number, then the store name, the
6     chain it's associated with, the address, city,
7     state, zip code, and a phone number.
8          Q    Now, are these records that you
9     obtained from Novelty?
10         A    Yes, they are.
11         Q    Okay.  And these are records that
12    are required to be kept?
13         A    Yes, they are.
14         Q    And are these records, then --
15    well, let me back up here.  These are records
16    that Novelty supplied to you during the
17    administrative inspection warrant execution?
18         A    Yes, they are.
19         Q    And what did you use the records
20    for, and what are the reasons that you used
21    and referred to these records in government
22    exhibit 39?
23         A    Well, we wanted to see who their
24    actual customers were because the sales to the
25    three-digit storage lockers really weren't the

Page 1216

```
 1        final sale.  The final sale is to these gas
 2        stations.  So we asked to see who their final
 3        customers were.  And we were given this
 4        103-page document.
 5            Q     Now, were any of those records
 6        from the 103-page document of Novelty records
 7        used to verify self-certifications?
 8            A     Yes, they were.
 9            Q     All right.  And explain for us
10        based on government exhibits 39 and 40 how you
11        conducted the verifications of the
12        self-certifications for the convenience store
13        customers of Novelty.
14            A     Well, we did not check every
15        single store.  I can't remember how many
16        stores are on these 103 pages.  It's quite a
17        few, especially since there's 25-30 stores per
18        page.
19                  So we spot-checked to see if these
20        stores were self-certified. And if we found
21        that one was not, then that's when we went to
22        the CDs and printed off the information to
23        create exhibit 40.
24                  But how we determined whether a
25        store was self-certified or not, we used
```

1    exhibit 39.  And early on in the

2    self-certification process, we saw that not

3    all stores called themselves Acorn Market

4    number 39, for example.  There's Acorn Market

5    is the parent company.  So if we typed into

6    the computer Acorn Market 39, we might get a

7    hit.  We might not because down at the local

8    level, Acorn Market 39 might be called Joe's

9    Stop and Go or Sally's Quick Stop.  It could

10   be several different names.  So we could not

11   search on name alone.

12        Q    So did you use the addresses in

13   government exhibit 39, then, that were

14   provided to you by Novelty?

15        A    Yes.  And the way we tried to

16   narrow down as best as possible whether these

17   locations were self-certified or not, we

18   started with the zip code and worked

19   backwards.  So a lot of times there's a couple

20   of different city names within a zip code.

21            So we started with zip code, made

22   sure we had the right city name.  And then we

23   wanted to see if we had the right address.

24   And if we did not see an address in that

25   database that matched the Novelty printout,

Page 1218

1          then we concluded that that particular store

2          was not self-certified.

3               Q    Okay.  When you say, "database,"

4          can you just explain that a little more,

5          Investigator Barnhill?

6               A    This internal database was created

7          when the CMEA went into effect because it was

8          required that gasoline stations or any entity

9          that was going to sell these scheduled listed

10         products be self-certified.

11                   So DEA set up in conjunction with

12         the online training the database to maintain

13         all of these self-certifications.  So it's an

14         in-house database that contains that

15         information.

16              Q    So when you checked based on the

17         information provided by Novelty in government

18         exhibit 39, what was the result as depicted in

19         government 40?

20              A    That there were several locations.

21         I don't recall the number exactly, but there

22         were several locations that we found -- and,

23         again, this was just a spot-check -- that were

24         not self-certified.

25                   And based on these 13 pages in

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1219

1      exhibit 40, we came to determine that over 1.1

2      million tablets were sold to these stores in

3      a 6-month time period.

4            Q     Roughly how many stores are noted

5      in government exhibit 40?

6            A     I would believe it's around 33 to

7      35.  It's somewhere in there.

8                  MR. BAYLY:  Your Honor, I would

9      like to move into admission government

10     exhibits 39 and 40.

11                 MR. EMORD:  We have no objection

12     to -- first I'll take 39.  But we do have the

13     caveat that it be marked confidential and

14     protected because it contains the list of

15     customer names, all of the customer names, and

16     that it be subject to the protective order.

17                 JUDGE RANDALL:  Very well.  Any

18     objections to that caveat, Mr. Bayly?

19                 MR. BAYLY:  No.  For protective

20     orders, we're not going to object.

21                 JUDGE RANDALL:  All right.  Very

22     well.  I will accept into the record

23     government exhibit 39, noting that it should

24     be marked confidential and protected; and

25     government exhibit 40.

3b171aec-f2c4-456d-b92b-0e233a15f633

Page 1996

UNITED STATES DEPARTMENT OF JUSTICE

* * * * * *

DRUG ENFORCEMENT ADMINISTRATION

* * * * * *

HEARING

* * * * * *

þíííííííííííííííííííí»
                    º
                    º
IN THE MATTER OF:   º
                    º   Docket No. 08-33
NOVELTY DISTRIBUTORS º
                    º
                    º
þíííííííííííííííííííííí¼


U.S. Department of Justice
Drug Enforcement Administration
Courtroom E-2123
600 Army Navy Drive

Arlington, VA 22202

Tuesday, April 1, 2008

     The above entitled matter came on for

hearing, pursuant to notice at 9:00 a.m.

BEFORE:  GAIL A. RANDALL
         Administrative Law Judge

Page 1998

TABLE OF CONTENTS

WITNESS          DIRECT CROSS REDIRECT RECROSS

Ryan Polk       2003   2076   2111     2118
  Voir Dire on page 2042
Chris Collins    2170   2209
  Voir Dire on page 2182


J.R. Merlau      2215
  Voir Dire on page 2287

Exhibit No.  Document                  Mark Recd

ALJ

14    Formerly Novelty Exhibit 27
Respondent
9     Iventory                  2265 2268
11    Schematic                 2269 2273

13    SLC Cage Procedures       2275 2280
28    Company Handbook          2281 2284
36    Polk Document             2042 2045
40    Show Cause                2285 2291
46    email                     2292 2294

Government

1     DEA Registration          2125 2125
8-17  EPIC Charts               2126 2130
19    Snyder Declaration        2130 2136
22    FDA Proposed Rule         2137 2137
51-55 Witness Testimoy          2138
51                                   2143

52                                   2151
54                              2148 2151
63    PDR Excerpt               2152 2152
64    NDH Excerpt               2153 2155
90    JAMA Sloan Survey         2156 2157
91    CHCPA Document            2157 2158
92    NIH Common Cold FAQs      2158 2159

93    NHLBI Document            2159 2165

1          BY MR. EMORD:

2          Q     Did there come a time that you --

3     Well, did you ever receive information as to

4     whether Novelty, meaning an executive for

5     Novelty, communicated to DEA dissatisfaction

6     with DEA's removal of the video equipment from

7     the room the second attempt videotaping was

8     made?

9          A     No, I did not personally as an

10    executive of the company tell them I was

11    displeased with their removal of the video

12    equipment.

13         Q     But did you come to understand

14    from anyone else at Novelty?

15         A     Yes.

16         Q     And what were you informed?

17               MR. BARBER:  Objection, Your

18    Honor.  There is still no foundation as to the

19    source of his information and when the

20    information was received by this witness.

21               JUDGE RANDALL:  Overruled.  The

22    foundation is adequate.  You may ask those

23    questions on cross, Mr. Barber.

24               THE WITNESS:  Yes.  Yes, it came

25    to my attention that J.R. had told them that

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2020

1      we wanted to that equipment present.

2               BY MR. EMORD:

3          Q     Now was there a third attempt --

4      Well, excuse me.  Did there come a time when

5      a Novelty executive attempted to audio record

6      the investigation?

7          A     Yes.

8          Q     And what day was that attempt

9      made?

10         A     Wednesday the 9th or Wednesday the

11     11th.

12         Q     And did that occur after the

13     second attempt to video record the

14     investigation?

15         A     Yes.

16         Q     And what happened with the audio

17     recorder?

18         A     The audio recorder was placed at

19     the end of the table, the end of the

20     conference room table.

21         Q     In the same room?

22         A     The same room.  It was placed on

23     the table with the record button depressed or

24     record was activated.  There was a quick

25     disabling or deactivation of the recording.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2021

1          Q     By whom?

2          A     I do not know who disabled the

3    recorder.  But you can tell on the recording

4    it cuts off and then goes on to the previous

5    recording.  When I came into the room around

6    5:00 p.m. or 5:30 p.m. that evening the

7    recorder was laying on the table, batteries

8    removed, tape removed, cover for the batteries

9    apart and laying on the table.

10         Q     And did you have any conversation

11   with another Novelty executive concerning the

12   audio taping attempt?

13         A     Yes.

14         Q     And who was that person?

15         A     J.R. Merlau.

16         Q     And what were you told?

17         A     I was told that he placed it on

18   the end of the table with --

19         Q     Who was he?

20         A     J.R. Merlau told me that he placed

21   the tape recorder on the end of the table with

22   the record function active.

23         Q     And then what happened according

24   to J.R.?  Did he tell you anything else?

25         A     Yes.  He said they verbally

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

EXHIBIT 18 - POLK TESTIMONY    Document 36-2    Filed 06/16/2008    Page 94 of 106

Page 2022

1      objected to it being there and turned it off.

2           Q    And did J.R. tell you whether that

3      was against his wishes?

4           A    Yes.

5           Q    And what did he tell you?

6           A    It was against -- He wanted to

7      keep it on.  I wanted to have it on.  I wanted

8      to have it on when I went into the room at

9      5:00 p.m. or 5:30 p.m. for our next meeting.

10               MR. EMORD:  If the Court Clerk

11     will place before the witness what has been

12     identified ALJ Exhibit 1 as well to save time

13     Novelty Exhibit 36 as well.  I'm sorry I'm

14     having you do that all at once.

15               (Off the record discussion.)

16               BY MR. EMORD:

17          Q    Do you have both documents, Mr.

18     Polk?

19          A    Yes, sir.

20          Q    All right.  In a moment, I'm going

21     to ask you questions about them.  Now I

22     believe you previously testified that during

23     the course of the investigation the DEA

24     investigators asked you to produce various

25     documents.

Page 2215

```
1        Honor.
2                  JUDGE RANDALL:  Mr. Emord, you may
3        call your next witness.
4                  MR. EMORD:  Yes, Your Honor.  We
5        next call J.R. Merlau.
6                  JUDGE RANDALL:  Mr. Merlau, you
7        remember being sworn in?
8                  THE WITNESS:  Yes, ma'am.
9                  JUDGE RANDALL:  All right.  You
10       are still under oath.  You may have a seat.
11                    DIRECT EXAMINATION
12                 BY MR. EMORD:
13        Q     Mr. Merlau, were you -- I'm sorry.
14       Were you present on July 9th, 2007 when DEA
15       investigators arrived at Novelty?
16        A     I was, not when they actually
17       arrived, but I was called in.
18        Q     And when you were called down,
19       shortly thereafter, who did you see from the
20       Drug Enforcement Administration present at
21       Novelty?
22        A     It was Ms. Barnhill, Ms. Kuzman,
23       Agent Harris, Mr. Meador, and Mr. Bayly.
24                 JUDGE RANDALL:  I'm sorry.  I
25       didn't hear the last name.
```

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2216

```
 1                 THE WITNESS:  Mr. Bayly.

 2                 BY MR. EMORD:

 3          Q     Now, did you, at any point in time

 4     after first seeing the agents present from

 5     DEA, object to the presence of any of those

 6     agents?

 7          A     Yes.

 8          Q     And who did you object to?

 9          A     I was in the room with Ryan.  Both

10     of  us had expressed our objections at the

11     very beginning.  It was that Monday morning.

12     Then talking both with yourself, as our

13     counsel, and our local counsel, Mr. Bickham,

14     we expressed the same thing through them, as

15     well.

16          Q     And to whom, among the government

17     agents, did you object to particular ones

18     being present?

19          A     I mean, the ones that I thought

20     were the most inappropriate was, first of all,

21     Mr. Meador because of existing litigation,

22     surrounds his deposition.  And then also Mr.

23     Bayly, which in hindsight, if I had known that

24     he was the government's lead or co-counsel,

25     whatever you want to call it, I think it was
```

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

EXHIBIT 08-MERLAU-TESTIMONY      ument 36-2      Filed 06/16/2008      Page 97 of 106

Page 2217

1          probably even more inappropriate, but he

2          didn't strike me as the worst one.  Mr. Meador

3          was.

4               Q    Now, during the course of the

5          investigation, did there come a time when you

6          caused a video recorder to be installed in the

7          room?

8               A    I did.  I mean --

9               Q    Well, when during the course of

10         the investigation did you cause a video

11         recorder to be placed, what date?

12              A    It was Wednesday.  It was when the

13         DEA employees were at lunch, was the first

14         time I placed that in a back room right

15         towards the corner.  It was on the tripod.  I

16         placed it in the room, plugged it in, and then

17         left.

18              Q    And a video recorder placed in the

19         room at that time, was it placed there during

20         a time when government agents were present?

21              A    No one was present at that time.

22         They were at lunch.

23              Q    All right.  And it was placed in

24         the back of the room, you said?

25              A    Yes.  It was kind of a rectangular

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

1    room, so if you figure the door was on the

2    bottom right, right at that white piece of

3    paper, the camera was in kind of the up left.

4         Q    All right.  And did it block

5    ingress or egress from the room?

6         A    No.

7         Q    Did it block access to documents?

8         A    No.

9         Q    Now, subsequent to your placing

10    the video recorder in the room for the first

11    time - let me try to get a temporal frame of

12    reference.  You say lunch time.  Roughly what

13    time did you place the video recorder in

14    there?

15         A    12:30, 1:00, right in that range.

16         Q    And did there come a time when the

17    DEA investigators returned?

18         A    It was slightly after I put it in

19    the room, maybe 15, 20 minutes after, and I

20    didn't note the time, but if I was to guess,

21    it would be maybe 1:15.

22         Q    When they returned to the room,

23    were you present in the room?

24         A    I was not.  I had gone back

25    upstairs and was working on some other things.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2219

1          Q      Did you return to the room that
2     same day?
3          A      Yes.
4          Q      Upon your return to the room, did
5     you notice the video recorder had been moved?
6          A      Yes.  When I went down to the
7     room, and I think Ryan might have told me that
8     it had already been taken out, but when I went
9     down I saw that it was still in the hallway.
10    Picked it up at that time, brought it back
11    into the room, was carrying it into the room,
12    plugging it back into the wall to set it up
13    again when Mr. Meador came over to grab it out
14    of my hands, and jerked the plug out of the
15    wall.
16         Q      And then what happened?
17         A      He took it back out of the room.
18    I protested.  He set it in the hallway, and
19    said that they would not allow them to be
20    taped.
21         Q      You say you protested.  In what
22    manner did you protest?
23         A      I told them that our counsel
24    advised that we did have the right to record
25    their actions, and that that was out intent to

Page 2220

1        do so.

2                Q      And did he respond to that

3        statement?

4                A      He just said they're not going to

5        allow it.

6                Q      And did there come a time

7        thereafter, that same day, in which you placed

8        a audio recorder in the room?

9                A      Yes.  It was later that day,

10       probably near the close of business.  I'm not

11       sure of the exact time, again, but later

12       afternoon.  I took a dictation tape recorder

13       that I have, and took it  into the room,

14       placed it on the end of the table, hit record.

15       Told them I need to do this.  I have the

16       ability, or the right to do this.  I apologize

17       because I know that they were upset, set it on

18       the table, and I walked out.  Ryan told me

19       that when he went in to meet with them later,

20       that the tape had been dismantled.

21               Q      Did anyone from Novelty, to your

22       knowledge, protest that action of the -- or

23       protest the action to the Government of

24       dismantling the recorder?

25               A      Nobody from Novelty was in the

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2221

1          room when they took it apart, no.

2              Q    Subsequently, did you mention

3          anything about the recorder to the government

4          agents?

5              A    Honestly, I don't remember.

6              Q    All right.  Now, why did Novelty

7          wish to video record or audio tape the

8          investigators?

9              A    There was a lot of things about

10         the whole, an administrative inspection that

11         we were concerned about.  They didn't seem, as

12         Ryan talked about, there was concerns.  And

13         what we wanted to do is to, kind of a lot of

14         different things.  One, to document the

15         interaction that was happening, that we wanted

16         to be able to show that to our counsel, and

17         then we wanted to have it as a public record,

18         if necessary, as well.

19             Q    Now, you say you had some

20         concerns.  Specifically, what events caused

21         you to have concern?

22             A    I mean, as Ryan had testified, I

23         mean, when the DEA agents, or DEA employees,

24         I'm sorry, first walked into our building and

25         said, start qualifying who's there and why.

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2222

1        I mean that right there in itself was -- the

2        bells start going off.  Why is there an

3        attorney?  Why are there two people from

4        Washington Headquarters?  Why is one of those

5        people specifically involved in the allegation

6        of making a false statement that we've

7        contest.  I mean, all those things were very -

8        - I'm just a Novelty guy.  I mean, I'm

9        thinking this is -- this smells bad.

10             Q    Now, are you aware of any threat

11        of arrest having been made by any of the DEA

12        investigators?

13             A    I was not in the room when that

14        happened.  Immediately after it --

15                  MR. BARBER:  Objection, Your

16        Honor.  The witness is beginning to narrate a

17        question that was a yes or no, was he aware of

18        any threat of arrest.  And unless a question

19        is posed that allows the Government an

20        opportunity to object, we are again

21        disadvantaged, and I ask that the witness not

22        narrate in a non-responsive manner.

23                  Number two, the witness is also

24        incompetent to testify as to this, as he just

25        said he wasn't in the room when whatever it is

ff1c698c-fcb5-4028-8dbd-8fb330fc0e13

Page 2223

1    happened.

2                    JUDGE RANDALL:  Mr. Emord, do you

3    wish to be heard?

4                    MR. EMORD:  Oh, yes.  I'm asking

5    for his understanding, Your Honor.  And he has

6    an understanding, and hearsay is liberally

7    permitted in these proceedings.  It doesn't

8    matter whether he was in the room or not, he

9    heard about it.

10                    JUDGE RANDALL:  Very well.  I will

11    sustain the objections to the extent that it's

12    asking for a narrative, and he's answered the

13    question pending, and ask that you move on

14    with your next question.

15                    MR. EMORD:  Very well, Your Honor.

16                    BY MR. EMORD:

17        Q    Did there come a time when someone

18    from Novelty informed you of a threat of

19    arrest from DEA agents?

20        A    Yes.

21        Q    Who informed you?

22        A    Ryan Polk.

23        Q    And what did he say?

24        A    Immediately after it happened, he

25    came up to my office and explained to me that

Page 2224

1      he'd just been threatened with arrest.  He was

2      very upset.

3              Q     Now, that occurred on what day?

4              A     That was on Wednesday.

5              Q     And did that precede the time in

6      which the video camera was installed?

7              A     Yes.

8              Q     By how many hours?

9              A     Maybe two and a half, right in

10     that range.

11             Q     Did it have an affect upon your

12     interest in relying upon a video camera?

13             A     Absolutely.

14             Q     In what way?

15             A     I mean, it was continued

16     inconsistencies and concerns that were being

17     raised with us.  I mean, that was a great

18     example of something that we felt wasn't

19     right, and that we wanted to have documented

20     actions like that, so that we could actually

21     present them later.  I mean, here not long

22     after this - I mean, we were trying to be

23     cooperative, which meant that sometimes Ryan

24     would be meeting with the DEA employees to

25     provide them other things that they've asked

Page 2225

1    for.  Other times, I was doing it, as we were

2    trying to move through as fast as we could

3    with this process.  I mean, when the tape

4    recording and the video taping was refused, we

5    wound up, at least for some sort of

6    protection, deciding that the both of us

7    needed to go in together and talk to them

8    together, I mean just because that was the

9    only way that we could have any sort of

10    documentation.

11         Q    Now, are you aware of any

12    allegation having been made concerning -- by

13    the government agents concerning scrubbing, or

14    sanitizing the documents?

15         A    Yes.

16         Q    And what is your understanding of

17    the allegation?

18         A    That Ryan was told that the

19    information that he provided was too accurate;

20    so, therefore, it must be scrubbed and

21    cleansed.  I mean, they were accusing him of

22    falsifying records, with no foundation.

23         Q    And when did that occur?

24         A    I believe that was Tuesday, but I

25    have to check.  I don't know for certain if it

Page 2226

1     was Tuesday or late Monday.  I think it was

2     Tuesday.

3          Q     Was that prior to the video

4     taping?

5          A     Yes.

6          Q     Was it your intent through video

7     taping to obtain direct evidence of abuses

8     present?

9          A     Yes.  I mean, that was -- it was

10    to document the events that happened. It was

11    to document our concerns of professional, and

12    possible ethical issues, and to have a

13    recorded record of that.

14              MR. EMORD:  Now, if the Court

15    Clerk will please supply the witness with what

16    has been marked for identification as Novelty

17    Exhibit 5.

18              BY MR. EMORD:

19         Q     Do you have Novelty Exhibit 5

20    before you, sir?

21         A     I do.

22         Q     Do you know who caused to have

23    this document prepared?

24         A     Ryan Polk.

25              JUDGE RANDALL:  Just one second,